# 24-960-cr

_____
_____

United States Court of Appeals

For the Second Circuit

_____

Docket No. 24-960-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

CHINWENDU ALISIGWE, a/k/a SEALED DEFENDANT 1,

Defendant-Appellant.

_____

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**APPENDIX FOR DEFENDANT-APPELLANT CHINWENDU ALISIGWE
VOLUME I OF II**

_____

Federal Defenders of New York, Inc.

 Appeals Bureau

52 Duane Street, 10th Floor

New York, New York 10007

Tel. No.: (212) 417-8742

*Attorney for Defendant-Appellant*
**CHINWENDU ALISIGWE**

**COLLEEN P. CASSIDY**,

 *Of Counsel*

_____
_____

**A000001**

## TABLE OF CONTENTS TO THE APPENDIX

### VOLUME I

District Court Docket Sheet,
S.D.N.Y. 22 Cr. 425 (VEC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 004

Superseding Indictment,
filed August 17, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 027

Motion to Suppress Statements and Evidence,
filed January 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 032

Declaration in Support of Motion to Suppress,
filed January 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 033

Defendant's Memorandum of Law in Support of Motion to Suppress,
filed January 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 037

Plea Hearing Transcript,
dated February 24, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 052

Status Conference Transcript,
dated March 2, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 082

Duress Hearing Transcript,
dated May 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 093

Opinion and Order, Precluding Duress Defense,
filed June 23, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 177

Government's Memorandum of Law in Opposition of Motion to Suppress,
filed August 4, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 186

Status Conference Transcript,
dated August 25, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 192

Defendant's Reply Memorandum of Law,
filed October 13, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 197

Suppression Hearing Transcript,
    dated November 17, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 203

Defendant's Post-Hearing Letter Brief in Support of Motion to Suppress,
    filed November 22, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 212

Government's Post-Hearing Letter Brief in Opposition of Motion to
Suppress,
    filed November 29, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 219

Government Letter regarding Dates of International Mail Seizures,
    filed November 29, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 226

Opinion and Order, Denying Motion to Suppress,
    filed November 30, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 228

## VOLUME II

Trial Transcript,
    dated December 13, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 247

Trial Transcript,
    dated December 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 354

Defense Sentencing Memorandum,
    filed March 25, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 399

Sentencing Transcript,
    dated April 8, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 418

Government Exhibits 301-309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 457

Judgment in a Criminal Case,
    filed April 9, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 466

Notice of Appeal,
    filed April 11, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 473

**Query    Reports     Utilities     Help    Log Out**

CLOSED,APPEAL,ECF,PRIOR

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:22-cr-00425-VEC-1

Case title: USA v. Alisigwe                           Date Filed: 08/04/2022

Magistrate judge case number: 1:22-mj-06067-UA        Date Terminated: 04/09/2024

Assigned to: Judge Valerie E. Caproni

### Defendant (1)

**Chinwendu Alisigwe**                    represented by   **Andrew Brian Stoll**
*TERMINATED: 04/09/2024*                                  Stoll, Glickman & Bellina, LLP
*also known as*                                           300 Cadman Plaza West, 12th Floor
Sealed Defendant 1                                        Brooklyn, NY 11201
*TERMINATED: 04/09/2024*                                  718-852-3710
                                                          Fax: 718-852-3586
                                                          Email: astoll@stollglickman.com
                                                          *TERMINATED: 08/22/2023*
                                                          *LEAD ATTORNEY*
                                                          *Designation: Retained*

                                                          **Ariel Charlotte Werner**
                                                          Federal Defenders of New York Inc. (NYC)
                                                          52 Duane Street
                                                          10th Floor
                                                          New York, NY 10007
                                                          (212) 417-8700
                                                          Email: ariel_werner@fd.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Public Defender or*
                                                          *Community Defender Appointment*

                                                          **Sylvie Jill Levine**
                                                          Federal Defenders of New York
                                                          52 Duane Street, 10th Floor
                                                          New York, NY 10007
                                                          212-417-8700
                                                          Fax: 212-571-0392
                                                          Email: sylvie_levine@fd.org
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Public Defender or*
                                                          *Community Defender Appointment*

**Pending Counts**                                        **Disposition**

**A000004**

| | |
|---|---|
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT BANK FRAUD (1s) | IMPRISONMENT: Five (5) years on Counts 1, 2, and 4 to be served concurrently. SUPERVISED RELEASE: Five (5) years on Counts 1 and 2, Three(3) years on Count 4 to be served concurrently. RESTITUTION: $499,949.88 |
| 18:1344A.F BANK FRAUD (2s) | IMPRISONMENT: Five (5) years on Counts 1, 2, and 4 to be served concurrently. SUPERVISED RELEASE: Five (5) years on Counts 1 and 2, Three(3) years on Count 4 to be served concurrently. RESTITUTION: $499,949.88 |
| 18:1028A.F FRAUD WITH IDENTIFICATION DOCUMENTS (AGGRAVATED IDENTITY THEFT) (3s) | |
| 18:1956-4999.F MONEY LAUNDERING - FRAUD, OTHER (CONSPIRACY) (4s) | IMPRISONMENT: Five (5) years on Counts 1, 2, and 4 to be served concurrently. SUPERVISED RELEASE: Five (5) years on Counts 1 and 2, Three(3) years on Count 4 to be served concurrently. RESTITUTION: $499,949.88 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT BANK FRAUD (1) | Dismissed |
| 18:1344A.F BANK FRAUD (2) | Dismissed |
| 18:1028A.F FRAUD WITH IDENTIFICATION DOCUMENTS (AGGRAVATED IDENTITY THEFT) (3) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:1028A.F AGGRAVATED IDENTITY THEFT, 18:1349.F CONSPIRACY TO COMMIT BANK FRAUD, 18:1344A.F BANK FRAUD | |

**Plaintiff**

USA                   represented by   **Jonathan Leavitt Bodansky**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
646-957-1800
Email: jonathan.bodansky@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Adam Sloan Hobson**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
212-637-2484
Fax: 212-637-2527
Email: Adam.Hobson@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Elizabeth Anne Espinosa**
DOJ-USAO
1 St. Andrew's Plaza
New York, NY 10007
212-637-2216
Email: elizabeth.espinosa@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Meredith Foster**
DOJ-USAO
Southern District of New York
One Saint Andrews Plaza
New York
New York, NY 10007
212-637-2310
Email: meredith.foster@usdoj.gov
*ATTORNEY TO BE NOTICED*

**William C. Kinder**
DOJ-USAO
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
212-637-2394
Email: william.kinder@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/25/2022 | | SEALED ORAL ORDER as to Sealed Defendant 1. (Signed by Magistrate Judge Sarah Netburn on 7/25/2022)(dif) [1:22-mj-06067-UA] (Entered: 07/27/2022) |
| 07/25/2022 | 1 | COMPLAINT as to Chinwendu Alisigwe (1). In Violation of 18 U.S.C. 1028A, 1349 and 2; 1344 (Signed by Magistrate Judge Sarah Netburn) (dif) [1:22-mj-06067-UA] (Entered: 07/27/2022) |

| 07/26/2022 | | Arrest of Chinwendu Alisigwe. (dif) [1:22-mj-06067-UA] (Entered: 07/27/2022) |
|---|---|---|
| 07/26/2022 | 3 | CJA 23 Financial Affidavit by Chinwendu Alisigwe. (Signed by Magistrate Judge Sarah Netburn) (Federal Defender Ariel Werner Appointed) (dif) [1:22-mj-06067-UA] (Entered: 07/27/2022) |
| 07/26/2022 | | Attorney update in case as to Chinwendu Alisigwe. Attorney Ariel Charlotte Werner for Chinwendu Alisigwe added.. (dif) [1:22-mj-06067-UA] (Entered: 07/27/2022) |
| 07/26/2022 | 4 | Minute Entry for proceedings held before Magistrate Judge Sarah Netburn: Initial Appearance as to Chinwendu Alisigwe held on 7/26/2022., Detention Hearing as to Chinwendu Alisigwe held on 7/26/2022, Deft Appears with Federal Defender Ariel Werner and AUSA Elizabeth Espinosa for the government. Detention; See Transcript; ( Preliminary Hearing 8/9/2022 (dif) [1:22-mj-06067-UA] (Entered: 07/27/2022) |
| 08/04/2022 | 5 | INDICTMENT FILED as to Chinwendu Alisigwe (1) count(s) 1, 2, 3. (jm) (Entered: 08/05/2022) |
| 08/04/2022 | | Case Designated ECF as to Chinwendu Alisigwe. (jm) (Entered: 08/05/2022) |
| 08/05/2022 | 6 | ORDER as to Chinwendu Alisigwe. WHEREAS on August 4, 2022, an Indictment was filed against Defendant Chinwendu Alisigwe, see Dkt. 5; WHEREAS Mr. Alisigwe has already been presented before a Magistrate Judge, see Dkt. 4; and WHEREAS this case has been assigned to the Undersigned; IT IS HEREBY ORDERED that an arraignment in this matter is scheduled for Tuesday, August 9, 2022, at 10:30 a.m. The arraignment will be held in Courtroom 443 of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007. SO ORDERED. ( Arraignment set for 8/9/2022 at 10:30 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni. )(Signed by Judge Valerie E. Caproni on 8/5/2022)(bw) (Entered: 08/05/2022) |
| 08/09/2022 | 7 | RULE 5(F) ORDER as to Chinwendu Alisigwe. (Signed by Judge Valerie E. Caproni on 8/9/2022) (ap) (Entered: 08/09/2022) |
| 08/09/2022 | 8 | ORDER: as to Chinwendu Alisigwe. IT IS HEREBY ORDERED that the parties must appear for a status conference on October 14, 2022 at 2:30 p.m. in Courtroom 443, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007. IT IS FURTHER ORDERED that time is excluded for the period between August 9, 2022, and October 14, 2022 under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7) (A), as the ends of justice served by taking such action outweigh the best interest of the public and the Defendant in a speedy trial given the complexity of the case, the volume of discovery, and the logistical difficulties that continue to be caused by COVID-19. Time excluded from 8/9/2022 until 10/14/2022. (Status Conference set for 10/14/2022 at 02:30 PM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni) (Signed by Judge Valerie E. Caproni on 8/9/2022) (ap) (Entered: 08/09/2022) |
| 08/09/2022 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Arraignment as to Chinwendu Alisigwe (1) Count 1,2,3 held on 8/9/2022. Plea entered by Chinwendu Alisigwe Not Guilty. Defendant Chinwendu Alisigwe present with attorney Jonathan Marvinny. AUSA Jonathan Bodansky present. Court Reporter Sara Beiter present. Consistent with the requirements of Fed. R. Crim. P 5(f), in the presence of Chinwendu Alisigwe, the AUSA was orally reminded of his obligations under the Constitution to disclose exculpatory evidence to the defense. Defendant arraigned on the Indictment and entered a plea of NOT GUILTY. Defendant remand continued. (jbo) (Entered: 08/09/2022) |
| 08/18/2022 | 9 | NOTICE OF ATTORNEY APPEARANCE: Andrew Brian Stoll appearing for |

| | | |
|---|---|---|
| | | Chinwendu Alisigwe. Appearance Type: Retained. (Stoll, Andrew) (Entered: 08/18/2022) |
| 09/02/2022 | 10 | NOTICE OF ATTORNEY APPEARANCE Elizabeth Anne Espinosa appearing for USA. (Espinosa, Elizabeth) (Entered: 09/02/2022) |
| 09/19/2022 | 11 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Arraignment held on 8/9/2022 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Sara Beiter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/11/2022. Redacted Transcript Deadline set for 10/20/2022. Release of Transcript Restriction set for 12/19/2022. (McGuirk, Kelly) (Entered: 09/19/2022) |
| 09/19/2022 | 12 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Arraignment proceeding held on 8/9/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/19/2022) |
| 10/14/2022 | 13 | LETTER MOTION addressed to Judge Valerie E. Caproni from USA dated October 14, 2022 re: Proposed Protective Order . Document filed by USA as to Chinwendu Alisigwe. (Attachments: # 1 Text of Proposed Order Proposed Protective Order)(Espinosa, Elizabeth) (Entered: 10/14/2022) |
| 10/14/2022 | 14 | PROTECTIVE ORDER as to Chinwendu Alisigwe...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Valerie E. Caproni on 10/14/2022) (ap) (Entered: 10/14/2022) |
| 10/14/2022 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Status Conference as to Chinwendu Alisigwe held on 10/14/2022. Defendant Chinwendu Alisigwe present with attorney Andrew Stoll. AUSA's Elizabeth Espinosa and Jonathan Bodansky present. Court Reporter Andrew Walker present. Trial motion's schedule set. Jury Trial March 13, 2023. Remand continued. (jbo) (Entered: 10/20/2022) |
| 10/17/2022 | 15 | ORDER as to Chinwendu Alisigwe. IT IS HEREBY ORDERED that any pretrial motions are due not later than December 9, 2022, any responses are due not later than January 6, 2023, and any replies are due not later than January 13, 2023. Any motions in limine are due not later than January 27, 2023, and any responses are due not later than February 10, 2023. The parties' proposed voir dire questions and requests to charge are due not later than February 24, 2023. IT IS FURTHER ORDERED that a Final Pretrial Conference is scheduled for March 8, 2023 at 2:30 p.m. in Courtroom 443, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY. Jury selection and the trial will commence on March 13, 2023. IT IS FURTHER ORDERED that time is excluded for the period between October 14, 2022, and March 8, 2023, under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7) (A), as the ends of justice served by taking such action outweigh the best interest of the public and the Defendant ina speedy trial given the complexity of the case, the volume of discovery, and the logistical difficulties that continue to be caused by COVID-19 (Motions due by 12/9/2022., Replies due by 1/13/2023., Responses due by 1/6/2023, Pretrial Conference set for 3/8/2023 at 02:30 PM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) Time excluded from 10/14/22 until 3/8/23. (Signed by Judge Valerie E. Caproni on 10/17/22)(jw) (Entered: 10/17/2022) |
| 10/21/2022 | 16 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Hearing held on 7/26/2022 before Magistrate Judge Sarah Netburn. Court Reporter/Transcriber: Carole Ludwig, |

| | | |
|---|---|---|
| | | (212) 420-0771, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/14/2022. Redacted Transcript Deadline set for 11/21/2022. Release of Transcript Restriction set for 1/19/2023. (js) (Entered: 10/21/2022) |
| 10/21/2022 | 17 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Hearing proceeding held on 7/26/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (js) (Entered: 10/21/2022) |
| 11/02/2022 | 18 | FIRST MOTION for Bond ., FIRST MOTION for Release from Custody . Document filed by Chinwendu Alisigwe. (Attachments: # 1 Exhibit A- Arraignment Transcript, # 2 Exhibit B- Customs Interview, # 3 Exhibit C- Green Card, # 4 Exhibit D- Irving Gluck Letter, # 5 Exhibit E- Don Kaplan and Renee Edison-Kaplan Letter, # 6 Exhibit F- Letter of Lucy Smith)(Stoll, Andrew) (Entered: 11/02/2022) |
| 11/03/2022 | 19 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that the Government must file any response to the motion not later than Monday, November 7, 2022. IT IS FURTHER ORDERED that a bail hearing is scheduled for Wednesday, November 9, 2022 at 2:30 P.M. in Courtroom 443 of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007. SO ORDERED. (Responses due by 11/7/2022 Bail Hearing set for 11/9/2022 at 02:30 PM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) (Signed by Judge Valerie E. Caproni on 11/3/2022) (lnl) (Entered: 11/03/2022) |
| 11/07/2022 | 20 | RESPONSE in Opposition by USA as to Chinwendu Alisigwe re: 18 FIRST MOTION for Bond .FIRST MOTION for Release from Custody .. (Bodansky, Jonathan) (Entered: 11/07/2022) |
| 11/09/2022 | 21 | ORDER 18 Motion for Bond. as to Chinwendu Alisigwe (1); denying 18 Motion for Release from Custody. IT IS HEREBY ORDERED that the motion is DENIED for the reasons stated at the hearing. The Clerk of Court is respectfully directed to terminate the pending motion at Dkt. 18 (Signed by Judge Valerie E. Caproni on 11/9/22) (jw) (Entered: 11/09/2022) |
| 11/09/2022 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Bond Hearing as to Chinwendu Alisigwe held on 11/9/2022. Defendant Chinwendu Alisigwe present with attorney Andrew Stoll. AUSA Jonathan Bodansky present. Pretrial Officer Stephen Boose present. Defendant'smotion for bail is denied. Defendant remand continued. (Court Reporter Sharonda Jones) (ap) (Entered: 11/14/2022) |
| 12/01/2022 | 22 | SEALED DOCUMENT placed in vault. (jus) (Entered: 12/01/2022) |
| 12/07/2022 | 23 | FIRST MOTION for Extension of Time *to file pretrial motions*., MOTION for Extension of Time to File . Document filed by Chinwendu Alisigwe. (Stoll, Andrew) (Entered: 12/07/2022) |
| 12/08/2022 | 24 | MEMO ENDORSEMENT as to Chinwendu Alisigwe granting 23 FIRST MOTION for Extension of Time to file pretrial motion. ENDORSEMENT: Application GRANTED. The deadline for pretrial motions is hereby extended from Friday, December 9, 2022 until Friday, December 23, 2022, the deadline for any responses is extended from Friday, January 6, 2023 until Friday, January 20, 2023, and the deadline for any replies is extended from Friday, January 13, 2023 until Friday, January 27, 2023. SO ORDERED. |

| | | |
|---|---|---|
| | | (Motions due by 12/23/2022R. Responses due by 1/20/2023. Replies due by 1/27/2023.) (Signed by Judge Valerie E. Caproni on 12/8/2022) (lnl) (Entered: 12/08/2022) |
| 12/19/2022 | 25 | SECOND MOTION for Extension of Time *to file motions and corresponding deadlines*. Document filed by Chinwendu Alisigwe. (Stoll, Andrew) (Entered: 12/19/2022) |
| 12/20/2022 | 26 | MEMO ENDORSEMENT as to Chinwendu Alisigwe (1) granting 25 SECOND MOTION for Extension of Time to file motions and corresponding deadlines. ENDORSEMENT: Application GRANTED. The deadline for pretrial motions is hereby extended from Friday, December 23, 2022 until Friday, January 6, 2023, the deadline for any responses is extended from Friday, January 20, 2023 until Friday, February 3, 2023, and the deadline for any replies is extended from Friday, January 27, 2023 until Friday, February 10, 2023. (Signed by Judge Valerie E. Caproni on 12/20/2022) (ap) (Entered: 12/20/2022) |
| 12/20/2022 | | Set/Reset Deadlines as to Chinwendu Alisigwe: Motions due by 1/6/2023. Responses due by 2/3/2023. Replies due by 2/10/2023. (ap) (Entered: 12/20/2022) |
| 01/06/2023 | 27 | FIRST MOTION to Suppress *Statements and Evidence*. Document filed by Chinwendu Alisigwe. (Stoll, Andrew) (Entered: 01/06/2023) |
| 01/06/2023 | 28 | MEMORANDUM in Support by Chinwendu Alisigwe re 27 FIRST MOTION to Suppress *Statements and Evidence*.. (Attachments: # 1 Exhibit ROI, # 2 Exhibit FBI Document, # 3 Exhibit Transcript)(Stoll, Andrew) (Entered: 01/06/2023) |
| 01/06/2023 | 29 | DECLARATION of Chinwendu Alisigwe in Support as to Chinwendu Alisigwe re: 27 FIRST MOTION to Suppress *Statements and Evidence*.. (Stoll, Andrew) (Entered: 01/06/2023) |
| 02/01/2023 | 30 | LETTER MOTION addressed to Judge Valerie E. Caproni dated February 1, 2023 re: Adjournment of Deadline . Document filed by USA as to Chinwendu Alisigwe. (Bodansky, Jonathan) (Entered: 02/01/2023) |
| 02/02/2023 | 31 | MEMO ENDORSEMENT 30 LETTER MOTION addressed to Judge Valerie E. Caproni dated February 1, 2023 re: Adjournment of Deadline as to Chinwendu Alisigwe....ENDORSEMENT...Application GRANTED. The Government's deadline to respond is hereby extended from Friday, February 3, 2023 until Friday, February 17, 2023. Defendant's deadline to reply is extended from Friday, February 10, 2023 until Friday, February 24, 2023. (Signed by Judge Valerie E. Caproni on 2/2/2023) (jw) (Entered: 02/02/2023) |
| 02/02/2023 | | Set/Reset Deadlines/Hearings as to Chinwendu Alisigwe:Defendamt Replies due by 2/24/2023. Government Responses due by 2/17/2023. (jw) (Entered: 02/02/2023) |
| 02/17/2023 | 32 | LETTER MOTION addressed to Judge Valerie E. Caproni dated February 17, 2023 re: Change of Plea Hearing and Pretrial Deadlines . Document filed by USA as to Chinwendu Alisigwe. (Bodansky, Jonathan) (Entered: 02/17/2023) |
| 02/17/2023 | 33 | MEMO ENDORSEMENT as to Chinwendu Alisigwe granting 32 LETTER MOTION addressed to Judge Valerie E. Caproni dated February 17, 2023 re: Change of Plea Hearing and Pretrial Deadlines. ENDORSEMENT: Application GRANTED. The parties must appear for a change-of-plea hearing on Friday, February 24, 2023 at 10:30 A.M. The Government must email the plea agreement to Chambers at least 48 hours prior to the hearing. SO ORDERED. (Change of Plea Hearing set for 2/24/2023 at 10:30 AM before Judge Valerie E. Caproni) (Signed by Judge Valerie E. Caproni on 2/17/2023) (lnl) (Entered: 02/17/2023) |
| 02/24/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Status Conference as to Chinwendu Alisigwe held on 2/24/2023. Defendant Chinwendu Alisigwe present with |

A000010

| | | |
|---|---|---|
| | | Attorney Andrew Stoll. AUSA Jonathan Bodansky present. Court Reporter George Malinowski present. Defendant's change of plea adjourned until March 2, 2023. Time excluded. Remand continued. (bw) (Entered: 02/24/2023) |
| 02/24/2023 | | ORAL ORDER as to Chinwendu Alisigwe Time excluded from 2/24/2023 until 3/2/2023. (bw) (Entered: 02/24/2023) |
| 02/24/2023 | | Terminate Deadlines and Hearings as to Chinwendu Alisigwe: Terminated Change of Plea Hearing set for 2/24/2023 at 10:30 AM before Judge Valerie E. Caproni. (bw) (Entered: 02/24/2023) |
| 02/24/2023 | 34 | ORDER as to Chinwendu Alisigwe... IT IS HEREBY ORDERED that for the reasons stated at the hearing, the parties must appear for a status conference on Thursday, March 2, 2023 at 10:30 A.M. in Courtroom 443, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007. IT IS FURTHER ORDERED that time remains excluded until March 8, 2023 under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7) (A). See Order, Dkt. 15. SO ORDERED. (Signed by Judge Valerie E. Caproni on 2/24/23)(jbo) (Entered: 02/24/2023) |
| 03/02/2023 | 35 | LETTER MOTION addressed to Judge Valerie E. Caproni from USA dated March 2, 2023 re: Request for Evidentiary Hearing On Duress Defense . Document filed by USA as to Chinwendu Alisigwe. (Espinosa, Elizabeth) (Entered: 03/02/2023) |
| 03/02/2023 | 36 | ORDER as to Chinwendu Alisigwe. WHEREAS on March 2, 2023, the parties appeared before the Court for a status conference; WHEREAS the parties are currently scheduled to begin trial on March 27, 2023; and WHEREAS Defendant indicated at the hearing that he is contemplating presenting an affirmative defense of duress at trial; IT IS HEREBY ORDERED that the parties must appear for a further status conference on Tuesday, April 4, 2023 at 10:30 A.M. in Courtroom 443, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007. At the conference, Defendant must be prepared to indicate whether he is pursuing a duress defense, any witnesses he intends to call in support of that defense, when he is available for an evidentiary hearing regarding that defense, and when he is available for trial. IT IS FURTHER ORDERED that Defendant's trial date is adjourned sine die pending Defendant's decision regarding whether to assert duress. IT IS FURTHER ORDERED that time is excluded for the period between March 8, 2023 and April 4, 2023 under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A), as the ends of justice served by taking such action outweigh the best interest of the public and the Defendant in a speedy trial given Defendant's need to determine whether he seeks to pursue duress as an affirmative defense. SO ORDERED. ( Status Conference set for 4/4/2023 at 10:30 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni. )(Signed by Judge Valerie E. Caproni on 3/2/2023)(bw) (Entered: 03/02/2023) |
| 03/02/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Status Conference as to Chinwendu Alisigwe held on 3/2/2023. Defendant Chinwendu Alisigwe present with attorney Andrew Stoll. AUSA's Elizabeth Espinosa and Jonathan Bodansky present. Court Reporter Steven Greenblum present. Status conference set for April 4, 2023 at 10:30 a.m. Time excluded until April 4, 2023. Defendant remand continued. (jbo) (Entered: 03/02/2023) |
| 03/02/2023 | | Set/Reset Hearings as to Chinwendu Alisigwe: Status Conference set for 4/4/2023 at 10:30 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni. (anc) (Entered: 03/28/2023) |
| 03/16/2023 | 37 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Conference held on 3/2/23 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the |

A000011

| | | |
|---|---|---|
| | | Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/6/2023. Redacted Transcript Deadline set for 4/17/2023. Release of Transcript Restriction set for 6/14/2023. (Moya, Goretti) (Entered: 03/16/2023) |
| 03/16/2023 | 38 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Conference proceeding held on 3/2/23 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 03/16/2023) |
| 03/21/2023 | 39 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Plea held on 2/24/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: George Malinowski, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/20/2023. (McGuirk, Kelly) (Entered: 03/21/2023) |
| 03/21/2023 | 40 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Plea proceeding held on 2/24/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 03/21/2023) |
| 04/04/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni:Status Conference as to Chinwendu Alisigwe held on 4/4/2023. Defendant Chinwendu Alisigwe present with attorney Andrew Stoll. AUSA Jonathan Bodansky present. Court Reporter Sadie Herbert present. Status conference held to discuss scheduling a hearing with regards to defendant's duress defense. Defendant remand continued. Time excluded until May 31, 2023 (jw) (Entered: 04/04/2023) |
| 04/05/2023 | 41 | JOINT LETTER MOTION addressed to Judge Valerie E. Caproni dated April 5, 2023 re: Scheduling Evidentiary Hearing . Document filed by USA as to Chinwendu Alisigwe. (Bodansky, Jonathan) (Entered: 04/05/2023) |
| 04/05/2023 | 42 | ORDER as to Chinwendu Alisigwe. IT IS HEREBY ORDERED that the parties must appear for a pretrial evidentiary hearing regarding Defendant's duress defense on Thursday, May 25, 2023 at 11:00 A.M. in Courtroom 443, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007. IT IS FURTHER ORDERED that not later than Friday, April 21, 2023, Defendant must respond to the Governments letter regarding his threshold burden to present the defense. The Government must reply not later than Friday, May 5, 2023. IT IS FURTHER ORDERED that time is excluded under the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(D) for the period between April 4, 2023 and a prompt disposition on the Governments motion. (Government Replies due by 5/5/2023., Defendant Responses due by 4/21/2023, Pretrial Evidentiary Hearing set for 5/25/2023 at 11:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) Time excluded from 4/4/23 until 5/5/23. (Signed by Judge Valerie E. Caproni on 4/5/2023)(jw) (Entered: 04/06/2023) |
| 04/18/2023 | 43 | FIRST LETTER MOTION addressed to Judge Valerie E. Caproni from Andrew Stoll dated 4/18/23 re: reschedule hearing . Document filed by Chinwendu Alisigwe. (Stoll, |

| | | Andrew) (Entered: 04/18/2023) |
|---|---|---|
| 04/19/2023 | 44 | MEMO ENDORSEMENT as to Chinwendu Alisigwe on re: 43 FIRST LETTER MOTION filed by Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from Attorney Andrew Stoll dated 4/18/23 re: reschedule hearing. ENDORSEMENT: Application GRANTED. The hearing scheduled for Thursday, May 25, 2023 at 11:00 A.M. is hereby adjourned until Friday, June 2, 2023 at 10:00 A.M. SO ORDERED. ( Evidentiary Hearing set for 6/2/2023 at 10:00 AM before Judge Valerie E. Caproni. ) (Signed by Judge Valerie E. Caproni on 4/19/2023)(bw) (Entered: 04/20/2023) |
| 04/20/2023 | 45 | LETTER RESPONSE to Motion by Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from Andrew Stoll dated 4/20/23 re: 35 LETTER MOTION addressed to Judge Valerie E. Caproni from USA dated March 2, 2023 re: Request for Evidentiary Hearing On Duress Defense .. (Stoll, Andrew) (Entered: 04/20/2023) |
| 05/10/2023 | 46 | LETTER MOTION addressed to Judge Valerie E. Caproni from USA dated May 10, 2023 re: Request to Reschedule June 2 Hearing . Document filed by USA as to Chinwendu Alisigwe. (Espinosa, Elizabeth) (Entered: 05/10/2023) |
| 05/11/2023 | 47 | MEMO ENDORSEMENT 46 LETTER MOTION addressed to Judge Valerie E. Caproni from USA dated May 10, 2023 re: Request to Reschedule June 2 Hearing as to Chinwendu Alisigwe...ENDORSEMENT...Application GRANTED. The hearing scheduled for Friday, June 2,2023 at 10:00 A.M. is hereby rescheduled to Tuesday, May 30, 2023 at 11:00 A.M. (Signed by Judge Valerie E. Caproni on 5/11/2023) (jw) (Entered: 05/11/2023) |
| 05/11/2023 | | Set/Reset Deadlines/Hearings as to Chinwendu Alisigwe: Evidentiary Hearing set for 5/30/2023 at 11:00 AM before Judge Valerie E. Caproni (jw) (Entered: 05/11/2023) |
| 05/26/2023 | 48 | LETTER MOTION addressed to Judge Valerie E. Caproni from Andrew B. Stoll dated May 26, 2023 re: Permission to Bring Laptop and Hard Drive into Courthouse . Document filed by Chinwendu Alisigwe. (Stoll, Andrew) (Entered: 05/26/2023) |
| 05/26/2023 | 49 | MEMO ENDORSEMENT 48 LETTER MOTION addressed to Judge Valerie E. Caproni from Andrew B. Stoll dated May 26, 2023 re: Permission to Bring Laptop and Hard Drive into Courthouse as to Chinwendu Alisigwe...ENDORSEMENT... Application DENIED without prejudice. Counsel must comply with the Undersigned's criminal rules of practice, which require counsel to email a proposed order to Chambers. The form order is available here: https://www.nysd.uscourts.gov/sites/default/files/2020-06/Electronic%20Dev.pdf (Signed by Judge Valerie E. Caproni on 5/26/2023)(jw) (Entered: 05/26/2023) |
| 05/30/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Evidentiary Hearing as to Chinwendu Alisigwe held on 5/30/2023. Defendant Chinwedu Alisigwe present with attorney Andrew Stoll. AUSA's Elizabeth Espinosa and Jonathan Bodansky present. Paralegal Arjun Ahuja present. Court Reporter Rebecca Forman present. Defendant testified regarding duress defense. Briefing schedule set. Remand continued. (lnl) (Entered: 06/01/2023) |
| 05/31/2023 | 50 | LETTER MOTION addressed to Judge Valerie E. Caproni from USA dated May 31, 2023 re: Request to Exclude Time . Document filed by USA as to Chinwendu Alisigwe. (Espinosa, Elizabeth) (Entered: 05/31/2023) |
| 05/31/2023 | 51 | MEMO ENDORSED denying 50 LETTER MOTION re: Request to Exclude Time as to Chinwendu Alisigwe (1)... ENDORSEMENT: Application DENIED as moot. Time in this case has been excluded under the Speedy Trial Act until "a prompt disposition on the Government's motion" to preclude Mr. Alisigwe from presenting a duress defense at trial. See Order, Dkt. 42. The Court will schedule a status conference when resolving the |

| | | |
|---|---|---|
| | | motion. SO ORDERED. (Signed by Judge Valerie E. Caproni on 5/31/23) (jbo) (Entered: 06/01/2023) |
| 06/23/2023 | 52 | OPINION AND ORDER as to Chinwendu Alisigwe. The parties must appear for a status conference on Monday, July 10, 2023 at 10 A.M. in Courtroom 443 of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007. The parties must be prepared to discuss a trial schedule at the conference. The Clerk of Court is respectfully directed to close the open motion at Dkt. 35. (Status Conference set for 7/10/2023 at 10:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni) (Signed by Judge Valerie E. Caproni on 6/23/2023) (See ORDER set forth) (ap) Modified on 6/23/2023 (ap). (Entered: 06/23/2023) |
| 06/29/2023 | 53 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Hearing held on 5/30/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/20/2023. Redacted Transcript Deadline set for 7/31/2023. Release of Transcript Restriction set for 9/27/2023. (McGuirk, Kelly) (Entered: 06/29/2023) |
| 06/29/2023 | 54 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Hearing proceeding held on 5/30/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/29/2023) |
| 07/10/2023 | 55 | ORDER as to Chinwendu Alisigwe. IT IS HEREBY ORDERED that for the reasons stated at the July 10, 2023 conference, the trial in this case is scheduled for Monday, November 6, 2023 in Courtroom 443 of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007. The Final Pretrial Conference is scheduled for Thursday, November 2, 2023 at 2:30 P.M. IT IS FURTHER ORDERED that the Government's response to Defendant's pretrial motion is due not later than Friday, August 4, 2023. Defendant's reply is due not later than Friday, August 18, 2023. Any hearing required to resolve the motion will be held on Thursday, October 19, 2023 at 10:00 A.M. IT IS FURTHER ORDERED that any motions in limine are due not later than Friday, August 25, 2023, with responses due not later than Friday, September 8, 2023. The parties proposed voir dire questions and requests to charge are due not later than Friday, September 22, 2023. (Defendant Replies due by 8/18/2023., Responses due by 8/4/2023, Motion Hearing set for 10/19/2023 at 10:00 AM before Judge Valerie E. Caproni., Final Pretrial Conference set for 11/2/2023 at 02:30 PM before Judge Valerie E. Caproni.) (Signed by Judge Valerie E. Caproni on 7/10/2023)(jw) (Entered: 07/10/2023) |
| 07/10/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Status Conference as to Chinwendu Alisigwe held on 7/10/2023. Defendant Chinwendu Alisigwe present with attorney Andrew Stoll. AUSA Elizabeth Espoinosa present. Trial motions' schedule set. Jury Trial to begin November 6, 2023 at 10:00 a.m. Time excluded until November 6, 2023. Defendant remand continued. (Jury Trial set for 11/6/2023 at 10:00 AM before Judge Valerie E. Caproni) (Court Reporter Dana Holland) (ap) (Entered: 07/11/2023) |
| 08/02/2023 | 56 | NOTICE OF ATTORNEY APPEARANCE William C. Kinder appearing for USA. (Kinder, William) (Entered: 08/02/2023) |
| 08/04/2023 | 57 | MEMORANDUM in Opposition by USA as to Chinwendu Alisigwe re 27 FIRST MOTION to Suppress *Statements and Evidence*.. (Attachments: # 1 Exhibit Declaration |

**A000014**

| | | |
|---|---|---|
| | | of Special Agent William McKeen)(Bodansky, Jonathan) (Entered: 08/04/2023) |
| 08/07/2023 | 58 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that, because Mr. Alisigwe's moving papers are sufficiently detailed to establish contested issues of fact regarding the Seizure's lawfulness, the parties must appear for a suppression hearing regarding the Seizure. The hearing is rescheduled from Thursday, October 19, 2023, at 10:00 A.M. to Wednesday, September 13, 2023, at 10:00 A.M. SO ORDERED. (Suppression Hearing set for 9/13/2023 at 10:00 AM before Judge Valerie E. Caproni) (Signed by Judge Valerie E. Caproni on 8/7/2023) (lnl) (Entered: 08/07/2023) |
| 08/09/2023 | 59 | DECLARATION of Chinwendu Alisigwe in Support as to Chinwendu Alisigwe re: 27 FIRST MOTION to Suppress *Statements and Evidence*.. (Stoll, Andrew) (Entered: 08/09/2023) |
| 08/16/2023 | 60 | LETTER MOTION addressed to Judge Valerie E. Caproni from AUSA William Kinder dated August 16, 2023 re: Suppression Hearing Schedule . Document filed by USA as to Chinwendu Alisigwe. (Kinder, William) (Entered: 08/16/2023) |
| 08/16/2023 | 61 | MEMO ENDORSEMENT as to Chinwendu Alisigwe (1) granting 60 LETTER MOTION addressed to Judge Valerie E. Caproni from AUSA William Kinder dated August 16, 2023 re: Suppression Hearing Schedule. ENDORSEMENT: Application GRANTED. The suppression hearing scheduled for Wednesday, September 13, 2023 at 10:00 A.M. is hereby adjourned until Thursday, September 21, 2023 at 2:30 P.M. (Signed by Judge Valerie E. Caproni on 8/16/2023) (ap) (Entered: 08/16/2023) |
| 08/16/2023 | | Set/Reset Hearings as to Chinwendu Alisigwe: Suppression Hearing set for 9/21/2023 at 02:30 PM before Judge Valerie E. Caproni. (ap) (Entered: 08/16/2023) |
| 08/17/2023 | 62 | (S1) SUPERSEDING INDICTMENT FILED as to Chinwendu Alisigwe (1) count(s) 1s, 2s, 3s, 4s. (jm) (Entered: 08/17/2023) |
| 08/17/2023 | 63 | ORDER as to Chinwendu Alisigwe. IT IS HEREBY ORDERED that an arraignment in this matter is scheduled for Tuesday, August 22, 2023, at 10:00 a.m. The arraignment will be held in Courtroom 443 of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007 (Arraignment set for 8/22/2023 at 10:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) (Signed by Judge Valerie E. Caproni on 8/17/2023)(jw) (Entered: 08/18/2023) |
| 08/21/2023 | 64 | MOTION for Andrew B. Stoll to Withdraw as Attorney . Document filed by Chinwendu Alisigwe. (Stoll, Andrew) (Entered: 08/21/2023) |
| 08/21/2023 | 65 | DECLARATION of Andrew B. Stoll in Support as to Chinwendu Alisigwe re: 64 MOTION for Andrew B. Stoll to Withdraw as Attorney .. (Stoll, Andrew) (Entered: 08/21/2023) |
| 08/22/2023 | 66 | ORDER as to Chinwendu Alisigwe. WHEREAS on August 17, 2023, a Superseding Indictment was filed against Defendant Chiwendu Alisigwe, see Dkt. 62; WHEREAS on August 21, 2023, Defendant's counsel Andrew Stoll moved to withdraw from this matter, see Not. of Mot., Dkt. 64; WHEREAS on August 22, 2023, the parties appeared for a conference (the "Conference"); and WHEREAS at the Conference, Defendant was arraigned and the Court entered a plea of not guilty on his behalf; IT IS HEREBY ORDERED that for the reasons stated at the Conference, Mr. Stoll is relieved as Defendant's counsel and the Federal Defenders of New York are reappointed as Defendant's counsel. The Clerk of Court is respectfully directed to close the open motion at Docket Entry 64. IT IS FURTHER ORDERED that the parties must appear for a status conference on Friday, August 25, 2023, at 10:30 a.m. in Courtroom 443 of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007. SO ORDERED. ( Status Conference set for 8/25/2023 at 10:30 AM in Courtroom |

A000015

| | | |
|---|---|---|
| | | 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni. ) (Signed by Judge Valerie E. Caproni on 8/22/2023)(bw) (Entered: 08/22/2023) |
| 08/22/2023 | | Attorney update in case as to Chinwendu Alisigwe. Attorney Andrew Brian Stoll terminated. (bw) (Entered: 08/22/2023) |
| 08/22/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Arraignment as to Chinwendu Alisigwe (1) Count 1s,2s,3s,4s held on 8/22/2023. Defendant Chinwendu Alisigwe present with attorney Andrew Stoll. AUSA's Elizabeth Espinosa and William Kinder present. Defendant arraigned on S1 Superseding Indictment and entered a plea of NOT GUILTY. Andrew Stoll relieved as counsel for the defendant and Federal Defenders are appointed. Status conference scheduled for August 25, 2023 at 10:30 a.m. Defendant remand continued. (Status Conference set for 8/25/2023 at 10:30 AM before Judge Valerie E. Caproni) (Court Reporter Raquel Robles) (ap) (Entered: 08/22/2023) |
| 08/25/2023 | 67 | ORDER as to Chinwendu Alisigwe. WHEREAS on July 10, 2023, the Court set a trial date for Monday, November 6, 2023, see Order, Dkt. 55; WHEREAS on August 4, 2023, the Government responded to Defendant's motion to suppress, see Gov't Mem., Dkt. 57; WHEREAS on August 16, 2023, the Court scheduled a suppression hearing for Thursday, September 21, 2023, at 2:30 P.M., see Order, Dkt. 61; WHEREAS on August 22, 2023, the Court relieved Defendant's previous counsel and reappointed the Federal Defenders of New York to represent him; see Order, Dkt. 66; and WHEREAS on August 25, 2023, the parties appeared for a status conference (the "Conference"); IT IS HEREBY ORDERED that for the reasons stated at the Conference, any reply in support of Defendant's motion to suppress is due not later than Friday, September 29, 2023. The suppression hearing is adjourned from Thursday, September 21, 2023, at 2:30 P.M. to Thursday, October 19, 2023, at 10:00 A.M. IT IS FURTHER ORDERED that for the reasons stated at the Conference, the trial date is adjourned from Monday, November 6, 2023, to Monday, December 11, 2023. The deadline for motions in limine is extended from Friday, August 25, 2023, to Friday, October 6, 2023, with responses due not later than Friday, October 20, 2023. The deadline for proposed voir dire questions and requests to charge is extended from Friday, September 22, 2023, to Friday, October 27, 2023. The Final Pre-Trial Conference is adjourned from Thursday, November 2, 2023, at 2:30 P.M. to Thursday, December 7, 2023, at 2:30 P.M. SO ORDERED. ( Replies due by 9/29/2023. Suppression Hearing set for 10/19/2023 at 10:00 AM before Judge Valerie E. Caproni. Brief due by 8/6/2023; Responses to Brief due by 10/20/2023; Ready for Trial by 12/11/2023. Final Pretrial Conference set for 12/7/2023 at 02:30 PM before Judge Valerie E. Caproni. ) (Signed by Judge Valerie E. Caproni on 8/25/2023)(bw) (Entered: 08/25/2023) |
| 08/25/2023 | | Terminate Deadlines and Hearings as to Chinwendu Alisigwe: Terminated Jury Trial set for 11/6/2023 at 10:00 AM before Judge Valerie E. Caproni. (bw) (Entered: 08/25/2023) |
| 08/25/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Status Conference as to Chinwendu Alisigwe held on 8/25/2023. Defendant Chinwendu Alisigwe present with attorney Ariel Werner. AUSA's Elizabeth Espinosa, Jonathan Bodansky and William Kinder present. Court Reporter Kristen Carannante present. Suppression Hearing scheduled for October 19, 2023. Motion's schedule set. Jury Trial to begin December 11, 2023. Defendant remand continued. (jbo) (Entered: 08/25/2023) |
| 08/25/2023 | | Set/Reset Hearings as to Chinwendu Alisigwe: Jury Trial set for 12/11/2023 at 10:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni. (anc) (Entered: 09/20/2023) |
| 08/29/2023 | 68 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Conference held on 7/10/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Dana Holland, (212) 805-0320, Transcript may be viewed at the court public terminal or purchased |

| | | |
|---|---|---|
| | | through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/19/2023. Redacted Transcript Deadline set for 9/29/2023. Release of Transcript Restriction set for 11/27/2023. (McGuirk, Kelly) (Entered: 08/29/2023) |
| 08/29/2023 | 69 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Conference proceeding held on 7/10/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 08/29/2023) |
| 09/15/2023 | 70 | ORDER as to Chinwendu Alisigwe: WHEREAS a suppression hearing is currently scheduled for Thursday, October 19, 2023, at 10:00 A.M.; and WHEREAS that time is no longer convenient for the Court; IT IS HEREBY ORDERED that the suppression hearing is adjourned until Friday, October 20, 2023, at 2:30 P.M. (Suppression Hearing set for 10/20/2023 at 02:30 PM before Judge Valerie E. Caproni on 9/15/2023) (Signed by Judge Valerie E. Caproni on 9/15/2023) (ap) (Entered: 09/15/2023) |
| 09/21/2023 | 71 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Conference held on 8/25/23 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/12/2023. Redacted Transcript Deadline set for 10/23/2023. Release of Transcript Restriction set for 12/20/2023. (Moya, Goretti) (Entered: 09/21/2023) |
| 09/21/2023 | 72 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Conference proceeding held on 8/25/23 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/21/2023) |
| 09/26/2023 | 73 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Hearing held on 5/30/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/17/2023. Redacted Transcript Deadline set for 10/27/2023. Release of Transcript Restriction set for 12/26/2023. (McGuirk, Kelly) (Entered: 09/26/2023) |
| 09/26/2023 | 74 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Hearing proceeding held on 5/30/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 09/26/2023) |
| 09/27/2023 | 75 | LETTER MOTION addressed to Judge Valerie E. Caproni from Ariel Werner dated September 27, 2023 re: Request to adjourn pretrial deadlines . Document filed by Chinwendu Alisigwe. (Werner, Ariel) (Entered: 09/27/2023) |

| 09/28/2023 | 76 | MEMO ENDORSEMENT as to Chinwendu Alisigwe on re: 75 LETTER MOTION filed by Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from Attorney Ariel Werner dated September 27, 2023 re: Request to adjourn pretrial deadlines. ENDORSEMENT: Application GRANTED. The new pretrial schedule is as follows: - Defendant's deadline to file his reply in support of his motion to suppress is extended from September 29, 2023, to October 13, 2023; - The suppression hearing is adjourned from October 20, 2023, at 2:30 P.M. to November 17, 2023, at 2:30 P.M.; - The deadline to submit motions in limine is extended from October 6, 2023, to October 20, 2023; - The deadline to submit responses to motions in limine is extended from October 20, 2023, to November 3, 2023; - The deadline to submit voir dire questions and requests to charge is extended from October 27, 2023, to November 15, 2023. SO ORDERED. ( Replies due by 10/13/2023. Brief (Motions in limine) due by 10/20/2023; Responses to Brief due by 11/3/2023. Suppression Hearing set for 11/17/2023 at 02:30 PM before Judge Valerie E. Caproni. ) (Signed by Judge Valerie E. Caproni on 9/28/2023)(bw) (Entered: 09/28/2023) |
| --- | --- | --- |
| 10/10/2023 | 77 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Arraignment held on 8/22/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Raquel Robles, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/31/2023. Redacted Transcript Deadline set for 11/13/2023. Release of Transcript Restriction set for 1/8/2024. (McGuirk, Kelly) (Entered: 10/10/2023) |
| 10/10/2023 | 78 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Arraignment proceeding held on 8/22/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/10/2023) |
| 10/13/2023 | 79 | REPLY MEMORANDUM OF LAW in Support as to Chinwendu Alisigwe re: 27 FIRST MOTION to Suppress *Statements and Evidence*. . (Werner, Ariel) (Entered: 10/13/2023) |
| 10/16/2023 | 80 | NOTICE OF ATTORNEY APPEARANCE Meredith Foster appearing for USA. (Foster, Meredith) (Entered: 10/16/2023) |
| 10/20/2023 | 81 | MOTION for Discovery *Reciprocal discovery of defense trial exhibits*. Document filed by USA as to Chinwendu Alisigwe. (Kinder, William) (Entered: 10/20/2023) |
| 10/20/2023 | 82 | MOTION in Limine *Government's Motions in Limine*. Document filed by USA as to Chinwendu Alisigwe. (Kinder, William) (Entered: 10/20/2023) |
| 10/20/2023 | 83 | MOTION in Limine . Document filed by Chinwendu Alisigwe. (Werner, Ariel) (Entered: 10/20/2023) |
| 11/03/2023 | 84 | MEMORANDUM in Opposition by Chinwendu Alisigwe re 81 MOTION for Discovery *Reciprocal discovery of defense trial exhibits*., 82 MOTION in Limine *Government's Motions in Limine*.. (Werner, Ariel) (Entered: 11/03/2023) |
| 11/03/2023 | 85 | RESPONSE to Motion by USA as to Chinwendu Alisigwe re: 83 MOTION in Limine .. (Foster, Meredith) (Entered: 11/03/2023) |
| 11/05/2023 | 86 | NOTICE OF ATTORNEY APPEARANCE: Sylvie Jill Levine appearing for Chinwendu Alisigwe. Appearance Type: Public Defender or Community Defender Appointment. (Levine, Sylvie) (Entered: 11/05/2023) |

| 11/10/2023 | 87 | LETTER MOTION addressed to Judge Valerie E. Caproni from Ariel Werner and Sylvie Levine dated November 10, 2023 re: Request for argument time on November 17, 2023 re: motion for reconsideration . Document filed by Chinwendu Alisigwe. (Werner, Ariel) (Entered: 11/10/2023) |
|---|---|---|
| 11/13/2023 | 88 | ORDER as to Chinwendu Alisigwe. WHEREAS a suppression hearing is currently scheduled for Friday, November 17, 2023, at 2:30 P.M.; WHEREAS the parties filed motions in limine on October 20, 2023, Dkts. 81-83; and WHEREAS the parties filed responses in opposition to the motions in limine on November 3, 2023, Dkts. 84-85. IT IS HEREBY ORDERED that the parties be prepared to discuss the motions in limine and the defense's pending motion for reconsideration of the Court's order precluding a duress defense at the suppression hearing on November 17, 2023. IT IS FURTHER ORDERED that the Clerk of Court is respectfully directed to terminate the open motion at Dkt. 87. SO ORDERED. ( Suppression Hearing set for 11/17/2023 at 02:30 PM before Judge Valerie E. Caproni. ) (Signed by Judge Valerie E. Caproni on 11/13/2023)(bw) (Entered: 11/13/2023) |
| 11/13/2023 | 89 | LETTER by USA as to Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from AUSA William Kinder dated November 13, 2023 re: Suppression Hearing Document filed by USA. (Kinder, William) (Entered: 11/13/2023) |
| 11/14/2023 | 90 | NOTICE OF ATTORNEY APPEARANCE Adam Sloan Hobson appearing for USA. (Hobson, Adam) (Entered: 11/14/2023) |
| 11/14/2023 | 91 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that the hearing is rescheduled for Friday, November 17, 2023, at 2:00 P.M. SO ORDERED. (Suppression Hearing set for 11/17/2023 at 02:00 PM before Judge Valerie E. Caproni) (Signed by Judge Valerie E. Caproni on 11/14/2023) (lnl) (Entered: 11/14/2023) |
| 11/15/2023 | 92 | Proposed Voir Dire Questions by USA as to Chinwendu Alisigwe. (Foster, Meredith) (Entered: 11/15/2023) |
| 11/15/2023 | 93 | Proposed Jury Instructions by USA as to Chinwendu Alisigwe. (Attachments: # 1 Exhibit Jury Instructions in U.S. v. Garcia, # 2 Exhibit Jury Instructions in U.S. v. Kone, # 3 Exhibit Jury Instructions in U.S. v. Conde, # 4 Exhibit Jury Instructions in U.S. v. Insaidoo)(Foster, Meredith) (Entered: 11/15/2023) |
| 11/15/2023 | 94 | Proposed Voir Dire Questions by Chinwendu Alisigwe. (Werner, Ariel) (Entered: 11/15/2023) |
| 11/15/2023 | 95 | Proposed Jury Instructions by Chinwendu Alisigwe. (Werner, Ariel) (Entered: 11/15/2023) |
| 11/17/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Suppression Hearing as to Chinwendu Alisigwe held on 11/17/2023. Defendant Chinwendu Alisigwe present with attorneys Ariel Werner and Sylvie Levine. AUSA's William Kinder, Meredith Foster and Adam Hobson present. Court Reporter Rebecca Forman present. Witness testimony heard. Motion briefing schedule set. Defendant remand continued. (bw) (Entered: 12/01/2023) |
| 11/20/2023 | 96 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that for the reasons stated at the Conference, no later than Wednesday, November 22, 2023, Alisigwe may file a brief, not to exceed seven pages, on whether the plain view exception applies to the seizure of passports in his bedroom. The Government's response brief, also not to exceed seven pages, is due no later than Wednesday, November 29, 2023. IT IS FURTHER ORDERED that not later than Wednesday, November 29, 2023, the Government must submit a letter via ECF providing the Court the dates on which Alisigwe's international mail was intercepted. IT IS FURTHER ORDERED that for the reasons stated at the |

Conference, Alisigwe's motion for reconsideration of the duress defense is taken under advisement. IT IS FURTHER ORDERED that for the reasons stated at the Conference, if the Court denies Alisigwe's motion for reconsideration, then the Government's motion to preclude evidence of a backdoor duress defense is GRANTED. IT IS FURTHER ORDERED that for the reasons stated at the Conference, Alisigwe's motion to preclude cumulative, irrelevant, and prejudicial evidence of the underlying fraud is DENIED without prejudice. Alisigwe may reraise the objection if and when the Government attempts to offer cumulative, irrelevant, or prejudicial evidence. IT IS FURTHER ORDERED that for the reasons stated at the Conference, Alisigwe's motion for early disclosure of § 3500 materials and an exhibit list is DENIED. That said, the Government is encouraged to provide Alisigwe with the § 3500 material and an exhibit list as early as possible. IT IS FURTHER ORDERED that for the reasons stated at the Conference, the Government's motion to limit the cross-examination of Special Agent McKeen to the scope of the direct and matters concerning his credibility is GRANTED. IT IS FURTHER ORDERED that for the reasons stated at the Conference, the Government's motion for discovery is DENIED. That said, Alisigwe is encouraged to provide the Government and the Court with an exhibit list of routine exhibits that do not reveal confidential trial strategy in advance of trial. (Motions due by 11/22/2023. Responses due by 11/29/2023) (Signed by Judge Valerie E. Caproni on 11/20/2023) (See ORDER set forth) (ap) (Entered: 11/20/2023)

| | | |
|---|---|---|
| 11/22/2023 | 97 | MEMORANDUM in Support by Chinwendu Alisigwe re 27 FIRST MOTION to Suppress *Statements and Evidence.. Post-hearing brief in support of motion to suppress* (Werner, Ariel) (Entered: 11/22/2023) |
| 11/28/2023 | 98 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Hearing held on 11/17/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/19/2023. Redacted Transcript Deadline set for 12/29/2023. Release of Transcript Restriction set for 2/26/2024. (McGuirk, Kelly) (Entered: 11/28/2023) |
| 11/28/2023 | 99 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Hearing proceeding held on 11/17/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/28/2023) |
| 11/29/2023 | 100 | MEMORANDUM in Opposition by USA as to Chinwendu Alisigwe re 27 FIRST MOTION to Suppress *Statements and Evidence.. Post-Hearing Letter Brief Regarding Passports and Licenses Seized at Arrest* (Kinder, William) (Entered: 11/29/2023) |
| 11/29/2023 | 101 | LETTER by USA as to Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from AUSA William Kinder dated November 29, 2023 re: Dates of International Mail Seizures Document filed by USA. (Kinder, William) (Entered: 11/29/2023) |
| 11/30/2023 | 102 | OPINION AND ORDER as to Chinwendu Alisigwe. For the foregoing reasons, Alisigwe's motion to suppress is DENIED. His motion for reconsideration of the Duress Opinion is also DENIED. The Clerk of Court is respectfully directed to close the open motions at Docket Entry 27 and 83. (Signed by Judge Valerie E. Caproni on 11/30/2023) (jw) (Entered: 11/30/2023) |
| 11/30/2023 | 103 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 11/30/2023) |

A000020

| 12/04/2023 | 104 | LETTER by USA as to Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from Adam S. Hobson dated December 4, 2023 re: Final Pretrial Conference Schedule Document filed by USA. (Hobson, Adam) (Entered: 12/04/2023) |
|---|---|---|
| 12/04/2023 | 105 | MEMO ENDORSEMENT as to Chinwendu Alisigwe on re: 104 LETTER by USA as to Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from AUSA Adam S. Hobson dated December 4, 2023 re: Final Pretrial Conference Schedule. ENDORSEMENT: Application GRANTED. The final pretrial conference scheduled for Thursday, December 7, 2023, at 2:30 P.M. is rescheduled for Thursday, December 7, 2023 at 10:30 A.M. SO ORDERED. ( Pretrial Conference set for 12/7/2023 at 10:30 AM before Judge Valerie E. Caproni. ) (Signed by Judge Valerie E. Caproni on 12/4/2023)(bw) (Entered: 12/04/2023) |
| 12/05/2023 | 106 | LETTER MOTION addressed to Judge Valerie E. Caproni from Ariel Werner dated December 5, 2023 re: Request for order permitting use of electronic devices . Document filed by Chinwendu Alisigwe. (Attachments: # 1 Proposed Order Proposed Order) (Werner, Ariel) (Entered: 12/05/2023) |
| 12/05/2023 | 107 | LETTER by USA as to Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from USA dated 12/5/2023 re: Voir Dire Questions Document filed by USA. (Attachments: # 1 Exhibit List of Names, Entities, Places)(Foster, Meredith) (Entered: 12/05/2023) |
| 12/06/2023 | 108 | SUPPLEMENTAL MOTION in Limine . Document filed by USA as to Chinwendu Alisigwe. (Foster, Meredith) (Entered: 12/06/2023) |
| 12/06/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Pretrial Conference as to Chinwendu Alisigwe held on 12/6/2023. Defendant Chinwendu Alisigwe present with attorneys Ariel Werner and Sylvie Levine. AUSA's William Kinder, Meredith Foster and Adam Hobson present. Court Reporter Pamela Utter present. Jury selection and Jury Trial to begin December 11, 2023. Defendant remand continued. (bw) (Entered: 12/11/2023) |
| 12/07/2023 | 109 | ORDER as to Chinwendu Alisigwe. WHEREAS on December 6, 2023, the Government filed a motion in limine requesting the Court to rule that Mr. Alisigwe's tax returns for the years 2017 to 2021 and his application for naturalization are admissible, see Dkt. 108; and WHEREAS on December 7, 2023, the parties appeared for a Final Pre-Trial Conference; IT IS HEREBY ORDERED that the Government's supplemental motion in limine is GRANTED IN PART. That Mr. Alisigwe (a) listed certain names on his naturalization application form and (b) failed to report certain income in his tax returns are relevant facts, and the parties have indicated that they believe they can reach an appropriate stipulation as to those facts. The Government should not mention either fact during its opening and must provide the Court with notice before mentioning either of those facts in front of the jury; when the Government wishes to introduce the stipulation, the Court will rule on the Defendant's Rule 403 objection. If the parties fail to agree on the language of either stipulation, the Government must notify the Court immediately so that it can rule on the admissibility of either document itself. IT IS FURTHER ORDERED that the Clerk of Court is respectfully directed to terminate the open motion at Dkt. 108. SO ORDERED. (Signed by Judge Valerie E. Caproni on 12/7/2023)(bw) (Entered: 12/07/2023) |
| 12/11/2023 | 110 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that the parties be prepared to address at the final charge conference the issues raised in this Order. SO ORDERED. (Signed by Judge Valerie E. Caproni on 12/8/2023) (lnl) (Entered: 12/11/2023) |
| 12/11/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Voir Dire held on 12/11/2023 as to Chinwendu Alisigwe. Defendant Chinwendu Alisigwe present with attorneys Ariel Werner and Sylvie Levine present. AUSA's William Kinder, Meredith |

| | | |
|---|---|---|
| | | Foster and Adam Hobson present. Jury selection completed. Opening statements heard. Witness testimony heard. Jury Trial to continue tomorrow, December 12, 2023. Defendant remand continued. (Court Reporter Pamela Utter and Tracy Groth) (ap) (Entered: 12/12/2023) |
| 12/12/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Jury Trial as to Chinwendu Alisigwe held on 12/12/2023. Defendant Chinwendu Alisigwe present with attorneys Ariel Werner and Sylvie Levine present. AUSA's William Kinder, Meredith Foster and Adam Hobson present. Court Reporters Pamela Utter and Tracy Groth present. Witness testimony heard. Jury Trial to continue tomorrow, December 13, 2023. Defendant remand continued. (lnl) (Entered: 12/13/2023) |
| 12/13/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Jury Trial as to Chinwendu Alisigwe held on 12/13/2023. Defendant Chinwendu Alisigwe present with attorneys Ariel Werner and Sylvie Levine present. AUSA's William Kinder, Meredith Foster and Adam Hobson present. Court Reporters Pamela Utter and Tracy Groth present. Witness testimony heard. Closing summations completed. Jury Trial to continue tomorrow, December 14 2023. Defendant remand continued. (lnl) (Entered: 12/14/2023) |
| 12/14/2023 | 111 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that Mr. Alisigwe will be sentenced on Monday, April 8, 2024, at 11:00 A.M. in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007. Sentencing submissions are due on Monday, March 25, 2024. IT IS FURTHER ORDERED that any post-trial motions are due by no later than Friday, January 19, 2024. The Government's response to any post-trial motions is due by no later than Friday, February 9, 2024, and the Defendant's reply is due by no later than Friday, February 16, 2024. SO ORDERED. (Motions due by 1/19/2024. Responses due by 2/9/2024. Replies due by 2/16/2024. Sentencing set for 4/8/2024 at 11:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) (Signed by Judge Valerie E. Caproni on 12/14/2023) (lnl) (Entered: 12/14/2023) |
| 12/14/2023 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Jury Trial as to Chinwendu Alisigwe held on 12/14/2023. Defendant Chinwendu Alisigwe present with attorneys Ariel Werner and Sylvie Levine present. AUSA's William Kinder, Meredith Foster and Adam Hobson present. Court Reporters Pamela Utter and Tracy Groth present. Jury charge completed. Verdict returned. Defendant remand continued. (lnl) (Entered: 12/15/2023) |
| 12/15/2023 | 112 | JURY VERDICT as to Chinwendu Alisigwe (1) Guilty on Count 1s,2s,3s,4s. (ap) (Entered: 12/18/2023) |
| 12/15/2023 | 113 | EXHIBIT 1-NOTE FROM JURY as to Chinwendu Alisigwe. (ap) Modified on 12/18/2023 (ap). (Entered: 12/18/2023) |
| 12/15/2023 | 114 | EXHIBIT 2-NOTE FROM JURY as to Chinwendu Alisigwe. (ap) (Entered: 12/18/2023) |
| 12/15/2023 | 115 | EXHIBIT 3-NOTE FROM JURY as to Chinwendu Alisigwe. (ap) (Entered: 12/18/2023) |
| 12/15/2023 | 116 | EXHIBIT 4-NOTE FROM JURY. as to Chinwendu Alisigwe. (ap) (Entered: 12/18/2023) |
| 12/22/2023 | 117 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Conference held on 12/7/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2024. Redacted Transcript Deadline set for 1/22/2024. Release of Transcript Restriction set for 3/21/2024. (McGuirk, Kelly) (Entered: 12/22/2023) |

| 12/22/2023 | 118 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Conference proceeding held on 12/7/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/22/2023) |
|---|---|---|
| 12/26/2023 | 119 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Trial held on 12/11/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Tracy Groth, (212) 805-0320, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/16/2024. Redacted Transcript Deadline set for 1/26/2024. Release of Transcript Restriction set for 3/25/2024. (McGuirk, Kelly) (Entered: 12/26/2023) |
| 12/26/2023 | 120 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Trial proceeding held on 12/11/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/26/2023) |
| 12/26/2023 | 121 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Trial held on 12/12/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/16/2024. Redacted Transcript Deadline set for 1/26/2024. Release of Transcript Restriction set for 3/25/2024. (McGuirk, Kelly) (Entered: 12/26/2023) |
| 12/26/2023 | 122 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Trial proceeding held on 12/12/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/26/2023) |
| 12/26/2023 | 123 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Trial held on 12/13/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Tracy Groth, (212) 805-0320, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/16/2024. Redacted Transcript Deadline set for 1/26/2024. Release of Transcript Restriction set for 3/25/2024. (McGuirk, Kelly) (Entered: 12/26/2023) |
| 12/26/2023 | 124 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Trial proceeding held on 12/13/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/26/2023) |

A000023

| | | |
|---|---|---|
| 12/26/2023 | 125 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Trial held on 12/14/2023 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/16/2024. Redacted Transcript Deadline set for 1/26/2024. Release of Transcript Restriction set for 3/25/2024. (McGuirk, Kelly) (Entered: 12/26/2023) |
| 12/26/2023 | 126 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Trial proceeding held on 12/14/2023 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/26/2023) |
| 03/25/2024 | 129 | SENTENCING SUBMISSION by Chinwendu Alisigwe. (Werner, Ariel) (Entered: 03/25/2024) |
| 03/25/2024 | 130 | SENTENCING SUBMISSION by USA as to Chinwendu Alisigwe. (Attachments: # 1 Exhibit Victim Impact Statement)(Foster, Meredith) (Entered: 03/25/2024) |
| 04/01/2024 | 131 | LETTER by USA as to Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from AUSAs Meredith Foster & William Kinder dated April 1, 2024 re: Loss calculation Document filed by USA. (Kinder, William) (Entered: 04/01/2024) |
| 04/05/2024 | 132 | SENTENCING SUBMISSION by Chinwendu Alisigwe. (Werner, Ariel) (Entered: 04/05/2024) |
| 04/05/2024 | 133 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that, by no later than 6:00 P.M. on Sunday, April 7, 2024, the Government must file a letter stating whether Wheelchairs 4 Kids and Prince George's County experienced actual loss from the scheme. If they did, the letter must provide the evidence at trial establishing the actual loss amount. IT IS FURTHER ORDERED that in the same letter the Government must inform the Court which victims (and at what amount each) comprise the $499,949.88 in requested restitution. (Signed by Judge Valerie E. Caproni on 4/5/2024) (ap) (Entered: 04/05/2024) |
| 04/07/2024 | 134 | Sentencing Letter by USA as to Chinwendu Alisigwe re: April 5, 2024 Order. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Foster, Meredith) (Entered: 04/07/2024) |
| 04/08/2024 | 135 | Sentencing Letter by USA as to Chinwendu Alisigwe re: Proposed Restitution Order. (Attachments: # 1 Proposed Order Proposed Restitution Order)(Foster, Meredith) (Entered: 04/08/2024) |
| 04/08/2024 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Sentencing held on 4/8/2024 for Chinwendu Alisigwe (1) Count 1s,2s,3s,4s. Defendant Chinwendu Alisigwe present with attorneys Ariel Werner and Sylvie Levine. AUSA's Meredith Foster and Adam Hobson present. Defendant sentenced. Remand continued. (see Judgment) (Court Reporter Lisa Franko) (ap) (Entered: 04/09/2024) |
| 04/09/2024 | 136 | PRELIMINARY ORDER OF FORFEITURE/MONEY JUDGMENT as to (S1 22-Cr-425) Chinwendu Alisigwe. SO ORDERED: (Signed by Judge Valerie E. Caproni on 4/8/2024) [*** NOTE: See this Order as set forth. ***] (bw) (Entered: 04/09/2024) |
| 04/09/2024 | 137 | ORDER OF RESTITUTION as to (S1 22-Cr-425) Chinwendu Alisigwe. SO ORDERED: (Signed by Judge Valerie E. Caproni on 4/9/2024) [*** NOTE: See this Order as set |

A000024

| | | |
|---|---|---|
| | | forth. ***]. (bw) (Entered: 04/09/2024) |
| 04/09/2024 | | DISMISSAL OF COUNTS on Government Motion as to Chinwendu Alisigwe (1) Count 1,2,3. (bw) (Entered: 04/09/2024) |
| 04/09/2024 | 138 | JUDGMENT In A Criminal Case (S1 22-Cr-425-01). Date of Imposition of Judgment: 4/8/2024. Defendant Chinwendu Alisigwe (1) was found guilty on Count(s) 1s, 2s, 4s, after a plea of not guilty. Count(s) open and underlying are dismissed on the motion of the United States. IMPRISONMENT: Five (5) years on Counts 1, 2, and 4 to be served concurrently. - The court makes the following recommendations to the Bureau of Prisons: The Court recommends the defendant be designated in a facility close to New York City Metropolitan Area to facilitate visits. SUPERVISED RELEASE: Five(5) years on Counts 1 and 2, Three(3) years on Count 4 to be served concurrently. Standard Conditions of Supervision (See page 4 of Judgment). Special Conditions of Supervision (See page 5 of Judgment). ASSESSMENT: $300.00, due immediately. RESTITUTION: $499,949.88. - Special instructions regarding the payment of criminal monetary penalties: Defendant must pay at least 10% of his monthly gross income towards his financial obligations after release. While in custody he must make payments in accordance with BOP's Inmate Financial Responsibility Program. - The defendant shall forfeit the defendant's interest in the following property to the United States: $4,463,475.80. (Signed by Judge Valerie E. Caproni on 4/9/2024) (bw) (Entered: 04/09/2024) |
| 04/11/2024 | 139 | NOTICE OF APPEAL by Chinwendu Alisigwe from 138 Judgment. (nd) (Entered: 04/11/2024) |
| 04/11/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Chinwendu Alisigwe to US Court of Appeals re: 139 Notice of Appeal.(nd) (Entered: 04/11/2024) |
| 04/11/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Chinwendu Alisigwe re: 139 Notice of Appeal were transmitted to the U.S. Court of Appeals. (nd) (Entered: 04/11/2024) |
| 04/15/2024 | 140 | SEALED DOCUMENT placed in vault. (jus) (Entered: 04/15/2024) |
| 05/20/2024 | 141 | TRANSCRIPT of Proceedings as to Chinwendu Alisigwe re: Sentence held on 4/8/2024 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Lisa Picciano Franko, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/10/2024. Redacted Transcript Deadline set for 6/20/2024. Release of Transcript Restriction set for 8/19/2024. (McGuirk, Kelly) (Entered: 05/20/2024) |
| 05/20/2024 | 142 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Chinwendu Alisigwe. Notice is hereby given that an official transcript of a Sentence proceeding held on 4/8/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/20/2024) |
| 06/12/2024 | 143 | LETTER by Chinwendu Alisigwe addressed to Judge Valerie E. Caproni, from Chidimma Alisigwe dated 5/28/2024 re: Defendant's wife writes regarding appeal. (ap) (Entered: 06/13/2024) |
| 06/12/2024 | 144 | LETTER by Chinwendu Alisigwe addressed to Judge Valerie E. Caproni, from Chinwend Alisigwe dated 5/28/2024 re: Defendant writes regarding appeal. (ap) (Entered: 06/13/2024) |

| 06/13/2024 | 145 | ORDER as to Chinwendu Alisigwe: IT IS HEREBY ORDERED that, by not later than Friday, June 21, 2024, Defendant's counsel must submit a letter to the Court confirming that they have taken steps to resolve this issue with their client and indicating whether they need Court assistance in resolving this issue. (Signed by Judge Valerie E. Caproni on 6/13/2024) (ap) (Entered: 06/13/2024) |
| 06/20/2024 | 146 | LETTER by Chinwendu Alisigwe addressed to Judge Valerie E. Caproni from Ariel Werner, Sylvie Levine, and Colleen Cassidy dated June 20, 2024 re: Appeal Withdrawal (Werner, Ariel) (Entered: 06/20/2024) |

### PACER Service Center

| | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/02/2024 15:12:26 | | | |
| **PACER Login:** | FDle0026 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cr-00425-VEC |
| **Billable Pages:** | 22 | **Cost:** | 2.20 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CHINWENDU ALISIGWE,

Defendant.

**SUPERSEDING INDICTMENT**

S1 22 Cr. 425 (VEC)

## COUNT ONE
### (Conspiracy to Commit Bank Fraud)

The Grand Jury charges:

1.     From at least in or about November 2016 through at least in or about January 2023, in the Southern District of New York and elsewhere, CHINWENDU ALISIGWE, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

2.     It was a part and an object of the conspiracy that CHINWENDU ALISIGWE, the defendant, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, ALISIGWE agreed to make and caused to be made false statements to multiple financial institutions in order to obtain funds to which he was not entitled, including by fraudulently opening bank accounts using the identities of other persons.

(Title 18, United States Code, Section 1349.)

**A000027**

## COUNT TWO
### (Bank Fraud)

The Grand Jury further charges:

3.     From at least in or about November 2016 through at least in or about January 2023, in the Southern District of New York and elsewhere, CHINWENDU ALISIGWE, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, ALISIGWE engaged in a scheme to make false statements to financial institutions in order to obtain funds to which he was not entitled, including by fraudulently opening bank accounts using the identities of other persons.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT THREE
### (Aggravated Identity Theft)

The Grand Jury further charges:

4.     From at least in or about November 2016 through at least in or about January 2023, in the Southern District of New York and elsewhere, CHINWENDU ALISIGWE, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, ALISIGWE possessed and used false identification documents bearing the names and other means of identification of other persons during and in relation to the conspiracy to commit bank fraud and bank fraud violations charged in Counts One and Two of

A000028

this Superseding Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

### COUNT FOUR
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

5.     From at least in or about November 2016 through at least in or about January 2023, in the Southern District of New York and elsewhere, CHINWENDU ALISIGWE, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

6.     It was a part and an object of the conspiracy that CHINWENDU ALISIGWE, the defendant, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

### FORFEITURE ALLEGATIONS

7.     As a result of committing the offenses alleged in Counts One and Two of this Superseding Indictment, CHINWENDU ALISIGWE, the defendant, shall forfeit to the United

3

States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

8.      As a result of committing the offense alleged in Count Four of this Superseding Indictment, CHINWENDU ALISIGWE, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

### Substitute Assets Provision

9.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third person;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be subdivided without difficulty;

A000030

Case: 24-960, 08/14/2024, DktEntry: 17.1, Page 31 of 247

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

5

**A000031**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA

                                                    NOTICE OF MOTION

      -against-

                                                    22-CRIM-425 (VEC)

CHINWENDU ALISIGWE

                            Defendant
-------------------------------------------------------------X

      Upon the declaration of Chinwendu Alisigwe, and the Memorandum of Law in Support of the Motion to Suppress and its attached exhibits, Defendant Chinwendu Alisigwe will move this Court, before the Honorable Valerie E. Caproni, United States District Judge for the Southern District of New York, at the United States Courthouse located at 40 Foley Square, New York, New York, for an order, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, suppressing physical evidence and statements obtained in violation of the Fourth and Fifth Amendments to the United States Constitution, and granting such other relief as the Court may deem just and proper.

January 6, 2023
Brooklyn, New York

                                    Respectfully Submitted,

                                    Stoll, Glickman & Bellina, LLP
                                    *Attorneys for Chinwendu Alisigwe*

                                    _____
                                    by Andrew B. Stoll
                                    300 Cadman Plaza West, 12th Floor
                                    Brooklyn, NY 11201

**A000032**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA

                                                    DECLARATION

            -against-

                                                    22-CRIM-425 (VEC)

CHINWENDU ALISIGWE

                        Defendant
---------------------------------------------------------------X

     CHINWENDU ALISIGWE declares, pursuant to 28 U.S.C. §1746, that the following is true and correct:

     1.     I am the defendant in the above captioned matter and am represented by Andrew B. Stoll.

     2.     I am not a lawyer, and I rely on Mr. Stoll for legal counsel; he drafted this document based on information I provided him

     3.     Prior to February 7, 2019 I had traveled internationally frequently.

     4.     On February 7, 2019 as I came through customs at JFK Airport while returning from overseas, the customs officer asked me what I considered to be standard questions upon returning to the United States, such as where I was coming from and what the purpose of my travel was.

5.     After I answered what I considered standard questions, the customs officer asked me to come with him to another area and escorted me to a waiting area with multiple rooms off the main waiting area.

6.     As the customs officer escorted me there, he turned to two gentlemen in the vicinity ("the agents") and said something to the effect of "are you guys ready for him?"

7.     The agents wore civilian clothes and escorted me to one of the rooms.

8.     The room they took me to was small; they had me sit down.

9.     One of the agents sat down with me; the other agent stood by the door, which they had closed.

10.     I asked the agents if they were customs officers and one said "no, we're agents." I asked, "agents of what" and one said "we are officers." I said "I explained myself to the other officers" and one agent said "we are from a different department."

11.     This experience was far from standard or what I knew as routine questioning upon returning to the United States.

12.     One officer took out a picture that looked like me, though it was not very clear and asked "who's this?" I asked, "[w]hat does this picture have to do with me coming back? Am I in any trouble?" The agent said "not yet" as I continued asking why he was showing me the picture.

**A000034**

13.   About that time, the agent took out what appeared to be an audio recording device; he said something to the effect of, "I am going to start over," and appeared to start the device recording.

14.   The agent then started asking me questions again about the picture, and about my contacts to Nigeria and associates and family in the United States. He asked me about multiple passports from multiple countries.  He asked me where the picture he was showing me was taken.  He asked where my bag was. The other agent said "we know what you do."

15.   The agents had taken my phone, and directed me to unlock it, and they took it to another room.

16.   At no point did anyone at JFK Airport advise me that I had a right to an attorney, or that I had the right to remain silent.

17.   On March 1, 2021 I was at Kennedy Airport and I was again detained; this time a customs agent took my phones, told me to unlock them, and brought them to another room without my consent.

18.   On the morning of July 26, 2022, I was arrested inside my home.

19.   That morning, agents entered my home forcefully by breaking in the front door.  I was tying my sweatpants near the front door when they broke in, and agents immediately grabbed me, handcuffed me, and asked if I was alone, to which I truthfully replied "yes".

20.   After that, while I was still handcuffed, an agent was going from room to room in my apartment, busting open all the doors.  A female agent told them to stop busting the doors.  One agent went back and forth between my bedroom and their car about five times, and at some point I asked "[w]hy are you searching my house?  Do you have a search warrant?"  The male agent who had been going back and forth replied "I'm not searching, I'm just taking a look."

21.   Nevertheless, on the third or fourth trip to my bedroom, while I was handcuffed right by the front door to the apartment, the male agent went under my bed and retrieved a brown envelope containing documents, which I saw him remove from my home.  The envelope was closed at the time the agents entered my home; its contents were not apparent without opening the envelope and examining its contents.  One could not have reached the envelope without slightly lifting the bed and reaching about as far as the arm could extend.


_____
Chinwendu Alisigwe

Date: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA


        -against-                         22-CRIM-425 (VEC)


CHINWENDU ALISIGWE


                 Defendant
-------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CHINWENDU ALISIGWE'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS


Andrew B. Stoll
Stoll, Glickman & Bellina, LLP
*Attorneys for Chinwendu Alisigwe*
300 Cadman Plaza West, 12th Floor
Brooklyn, NY  11201


**A000037**

## **PRELIMINARY STATEMENT**

Defendant Chinwendu Alisigwe respectfully submits this Memorandum of Law in support of his pre-trial motion, pursuant to Rule 12 of the Federal Rules of Criminal Procedure, for an order suppressing statements and physical evidence unlawfully obtained from him at JFK Airport as he was returning from trips abroad, evidence unlawfully obtained in a search of his home at the time he was arrested, and evidence obtained from interception of mail addressed to him, as well as any evidence derived from those illegal interrogations, searches and seizures.

Alternative to suppression, Defendant moves this Court for a hearing to resolve any disputed factual issues relevant to this motion.

I.  MR. ALISIGWE'S SEIZURES AND INTERROGATIONS AT JFK INTERNATIONAL AIRPORT

On February 7, 2019 Mr. Alisigwe was returning to the United States from abroad through JFK International Airport ("JFK"). *Exhibit 1, Department of Homeland Security Report of Investigation* ("ROI"); *Declaration of Chinwendu Alisigwe* ("*Alisigwe Declaration*").[1] According to Mr. Alisigwe, he was brought by the customs officer to two agents; as he was brought to them, the initial officer asked the agents "are you guys ready for him"; the agents questioned him in a small room with the door closed with one agent standing by the door; the agents told Mr.

---

[1] The government has consented to this unsigned declaration so long as I have it signed by Mr. Alisigwe next time I meet him in person; I have reviewed every line of it with him for accuracy.

Alisigwe they were not customs officers but "agents" "from a different department"; the agents confronted Mr. Alisigwe with a photo that resembled him and asked him questions about it; when Mr. Alisigwe asked if he was in trouble the agent answered "not yet"; the agents then started recording the interrogation while they asked him about multiple passports from multiple countries; the agents told Mr. Alisigwe "we know what you do," directed Mr. Alisigwe to unlock his phone, and proceeded to search his phone and bags; the agents never gave Mr. Alisigwe *Miranda* warnings. *Alisigwe Declaration*.

On March 1, 2021, Mr. Alisigwe was again returning home from abroad through JFK; his phone was again seized and searched by FBI agents, without consent. *Exhibit 2*, *FBI Record*; *Alisigwe Declaration*.

## A. THE STATEMENTS AT JFK

The Second Circuit has been clear that the dictates of *Miranda* and progeny apply at international entry points. *United States v. Lnu*, 653 F.3d 144 (2d Cir. 2011). While "a reasonable traveler will expect some constraints as well as questions and follow up," at an entry point, the Court nevertheless emphasized that whether a traveler is in "custody" for *Miranda* purposes remains a "holistic" inquiry "in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant" and that a "reasonable

person's expectations about how the questioning is likely to unfold are also relevant." *United States v. Lnu*, 653 F.3d 144, 153-154 (2d Cir. 2011).

Mr. Alisigwe was quickly turned over to two agents waiting just for him, who identified themselves vaguely as being from a different agency than the customs officer, confronted him with an apparent photo of himself, told him "we know what you do," and ominously warned Mr. Alisigwe when he asked that he was "not yet" in trouble. In a small room with a closed door, any reasonable traveler under the circumstances would have believed himself "subjected to restraints comparable to those associated with a formal arrest," rendering Mr. Alisigwe's detention "custodial" for *Miranda* purposes. *United States v. Lnu*, 653 F.3d 144, 153 (2d Cir. 2011) (*cleaned up*). In the absence of *Miranda* warnings, the pointed questioning constituted custodial interrogation, and the responses and derivative evidence should, respectfully, be suppressed.

## B. THE SEARCHES OF MR. ALISIGWE'S PHONES AT JFK

Mr. Alisigwe moves to suppress the results of the search of his phone at JFK. "Although routine border searches of a person's belongings are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches, require reasonable suspicion." *U.S. v. Irving*, 432 F.3d 401, 414 (2d Cir. 2005). The Supreme Court of course has recognized the uniquely personal nature of the contents of a cell phone, which contains "vast quantities of personal

information literally in the hands of individuals... implicating privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Riley v. California*, 573 U.S. 373, 386-393 (2014). As with searches of an arrestee, international travelers have "reduced privacy interests" and expectations; yet, in *Riley*, the Supreme Court made clear that a search of an arrestee's phone requires a warrant notwithstanding the diminished privacy expectations.

Though the Second Circuit and US Supreme Court have yet explicitly extended *Riley* to border searches, several other circuits and district courts have addressed the question, with varying results and distinctions. First, there is largely consensus that in light of *Riley*, forensic border searches of cell phones are "nonroutine, permissible only on a showing of individualized suspicion" *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018); *see also United States v. Cano*, 934 F.3d 1002, 1007 (9th Cir. 2019).

Two issues arise from *Kolsuz* and *Cano*; one is whether the distinction between a manual search and a forensic search of a phone is reasonable. The Supreme Court in *Riley* itself drew no such distinction, and the distinction is simply not tenable. Our phones contain the most intimate information and detail without resort to a forensic exam.

The second issue is what "individualized suspicion" or even "reasonable suspicion" means in this context. In Cano, the Court limited the scope to preclude

4

A000041

"the power to search for *evidence* of contraband that is *not* present at the border… put differently, can border agents conduct a warrantless search for evidence of past or future border-related crimes? We think that the answer must be 'no.' The detection of contraband is the strongest historic rationale for the border-search exception." *United States v. Cano*, 934 F.3d 1002, 1018 (9th Cir. 2019) (*italics in original, cleaned up*). The Fourth Circuit appears to agree, writing "to conduct such an intrusive and nonroutine search under the border search exception (that is, without a warrant), the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband... the Government may not invoke the border exception on behalf of its generalized interest in law enforcement and combatting crime." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (*cleaned up*). *See Also United States v. Kamaldoss*, 19-CR-543 (ARR), at *24-25 (E.D.N.Y. Apr. 22, 2022) ("forensically searching a cell phone may lead to the discovery of physical contraband.... this general law enforcement justification is quite far removed from the purpose originally underlying the border search exception… but the time for such a decision is not now. In the face of conflicting circuit precedent and the absence of any guidance from the Second Circuit on searches of digital devices at the border, I leave this matter for a later date and a higher court" (*cleaned up*).

5

In *United States v. Bongiovanni*, 19-CR-227 (JLS) (MJR), at *3-4 (W.D.N.Y. Nov. 22, 2022), the Court considered a non-forensic, manual search of phone; the Court found that the search did require a warrant, noting the "gravitational pull" of the Supreme Court's decision in *Riley*, but applied the good-faith exception and did not suppress the search results.[2] But in applying the "current state of the case-law", to apply the good faith exception, the Court did not cite any Second Circuit or Supreme Court cases addressing phone searches at the border.

We believe the application of Supreme Court and Second Circuit precedent clearly precludes a warrantless manual search of a phone at the border for the general purpose of finding evidence of criminal activity, as opposed to a search for contraband. The "gravitational pull" referenced in Bongiovanni is not escapable. The government had no warrant to search Mr. Alisigwe's phone at JFK, no reason to specifically expect they would find contraband on his phone, and the fruits of the February 7, 2019 and March 1, 2021 searches, as well as any derivative evidence should, respectfully, be suppressed.

## II.     THE SEARCH OF MR. ALISIGWE'S HOME AND SEIZURE OF HIS DOCUMENTS

Mr. Alisigwe was arrested at his home pursuant to an arrest warrant on July 26, 2022. While Mr. Alisigwe remained handcuffed and guarded by an agent well

---

[2]        The magistrate's recommendation, in docket entry 292, made clear the search was not a forensic one.

6

**A000043**

outside of his bedroom, another agent repeatedly entered his bedroom, retrieving a brown envelope from under his bed on about his third trip. *Alisigwe Declaration*. Inside the envelope were documents that Mr. Alisigwe seeks to suppress. Although the agents had no search warrant, they retrieved and opened the envelope, examined its contents, and then seized it and its contents.

The envelope and its contents were the product of an unreasonable search and seizure, and should, respectfully, be suppressed. The search was not permissible as a search incident to arrest, as it took place after Mr. Alisigwe had been arrested and handcuffed and the location of the envelope was well beyond his control. A search incident to arrest may only include "the space within an arrestee's immediate control, meaning the area from within which he might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, 556 U.S. 332, 335 (2009) (*cleaned up*). "In determining whether or not an area is within the arrestee's 'immediate control,' we consider not only the arrestee's location, but also the nature of any restraints that have been imposed upon the person." *United States v. Blue*, 78 F.3d 56, 60 (2d Cir. 1996) (*cleaned up*).

It is clear that the envelope and its contents do not meet the search incident to an arrest exception to the warrant requirement and the envelope and its contents and any derivative evidence should, respectfully, be suppressed.

III.     ANY EVIDENCE RECOVERED AS A RESULT OF INTERCEPTIONS
         OF MAIL BEING SHIPPED TO MR. ALISIGWE WAS RECOVERED
         WITHOUT A WARRANT, AND MUST BE SUPPRESSED

The prosecution asserted at Mr. Alisigwe's arraignment that "HSI has intercepted at least five additional passports being shipped through the mail to the defendant". *Exhibit 3, Arraignment Transcript* p. 8.  There was no search warrant for the mail.

The Fourth Amendment protects a person's mail from governmental search or seizure without a warrant.  *United States v. Van Leeuwen*, 397 U.S. 249 (1970). Any mail to Mr. Alisigwe intercepted by the government  should, respectfully, be suppressed.

IV.     MOTION FOR A HEARING

In the event there are factual disputes precluding ready resolution of Mr. Alisigwe's motions, we respectfully request a hearing to determine the facts.

V.     MOTION FOR LEAVE TO SUPPLEMENT

Mr. Alisigwe has made the best arguments he can based on the information he has.  We are continuing to gather discovery materials and attempting to resolve any disputes without the need for Court intervention; in the event further information is revealed that we believe is helpful to our motions, I respectfully request leave to supplement this memorandum.

8

**A000045**

January 5, 2023
Brooklyn, New York

Respectfully Submitted,

Stoll, Glickman & Bellina, LLP
*Attorneys for Chinwendu Alisigwe*

_____
by Andrew B. Stoll
300 Cadman Plaza West, 12th Floor
Brooklyn, NY  11201

9

**A000046**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

05/19/2020 16:47 EDT
Page 1 of 5

**CASE NUMBER**
NY18DK18NY0004

**CASE OPENED**
9/7/2018

**CURRENT CASE TITLE**
Chinwendu Celestine ALISIGWE

**REPORT TITLE**
Interview/Border Search ALISIGWE

**SYNOPSIS**

SAC NY DBFTF received information from HSI Attaché London that subject Chinwendu Celestine ALISIGWE an LPR is using multiple identities. The United Kingdom (UK) Border Force seized a fraudulent Republic of South Africa (RSA) passport with a U.S. nonimmigrant visa (NIV) in the name of Wilhelm HEINTZ. CBP facial recognition determined a positive match to subject ALISIGWE. Subject ALISIGWE is a native and citizen of Nigeria. Subject filed a N-400 Application to Naturalize with USCIS. SAC NY DBFTF will investigate and pursue criminal or administrative charges if applicable. This case will be worked in cooperation with HSI Attaché London, USCIS and the US Attorney's office EDNY.

This report of investigation serves to document an interview and border search of ALISIGWE.

**REPORTED BY**
Kyle Tallio
NO TITLE FOUND

**APPROVED BY**
Gino LaRusso
SPECIAL AGENT

**DATE APPROVED**
2/22/2019

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Chinwendu Celestine ALISIGWE | NY18DK18NY0004-003 | 2/22/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

05/19/2020 16:47 EDT                                                                              Page 2 of 5

## DETAILS OF INVESTIGATION

A photo of Chinwendu Celestine ALISIGWE (DOB: ███████, COC: Nigeria, LPR ██████ was previously identified as appearing on a fraudulent South African passport be███ ████entity Wilhelm HEINZ (DOB: ████████, COC: South Africa).

On February 7, 2019, ALISIGWE arrived on JFK International Airport on Virgin Airlines flight 25 after traveling from Lagos, Nigeria, with transit through London, United Kingdom. ALISIGWE was encountered by HSI NY DBFTF Special Agents Kyle Tallio and Joseph Guardino after his arrival in CBP Secondary. ALISIGWE agreed to a voluntary interview with SAs Tallio and Guardino. Beginning at 0006 hours on February 8, 2019, ALISIGWE provided the following statement:

ALISIGWE indicated he returned to the United States after six weeks in Nigeria. ALISIGWE indicated he has three children (7 years old, 4 years old, 3 years old, and 3 months old) and a wife in Nigeria, and an ex-girlfriend and child in Boston. ALISIGWE travels to Nigeria every year. ALISIGWE works Cele Primary Care Provider Incorporated, a home health care agency which was incorporated five years ago. ALISIGWE is primarily the only employee of Cele Primary Care Provider, but occasionally hires one other person. ALISIGWE worked at Partners in Care prior to starting his own company. ALISIGWE also has a business buying damaged vehicles at auction and shipping them to Nigeria for sale. ALISIGWE frequently buys cars from the Port Authority. ALISIGWE bought a house in 2018 located at ██████████████████████, NY. ALISIGWE lives on the first floor of this house. ALISIGWE's home has a tenant on the second floor who pays $1900 per month. ALISIGWE's phone number is ████████████ ALISIGWE's email address is ████████. com, which he uses for personal matters and business. ALISIGWE has never used any names other than his middle name "Celestine". ALISIGWE was presented with a photo from the HEINZ passport. ALISIGWE stated "That looks like me." ALISIGWE repeatedly denied knowing when or where the photo was taken. ALISIGWE denied having citizenship in any other countries. ALISIGWE denied having passports in any additional countries. ALISIGWE denied using any passport aside from his Nigerian passport. ALISIGWE's father died in 2015. ALISIGWE's uncles tried to take property that belonged to his father after his father's death, but this was settled after ALISIGWE's travel to Nigeria.

The interview concluded at 0059 hours. ALISIGWE's baggage was collected and an inbound border search of ALISIGWE's belongings were conducted. The following items were noted in ALISIGWE's baggage:

1. Mortgage Statement for ALISIGWE relating to address ██████████████████ 1434.
2. New York Vehicle Title for 2014 Mercedez-Benz GL4 VIN#4██████████████.
3. Receipt for payment of New York traffic violations reference number 2017180010-106

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Chinwendu Celestine ALISIGWE | NY18DK18NY0004-003 | 2/22/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

The baggage exam concluded at approximately 0150 hours and ALISIGWE departed the CBP inspection area.

The investigation continues.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Chinwendu Celestine ALISIGWE | NY18DK18NY0004-003 | 2/22/2019 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

**UNCLASSIFIED//FOUO**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/25/2021

Document Title:

(U) To document CBP JFK interview with ALISIGWE

Methods:

In Person Interview

Activity Date:

03/01/2021

At:

JFK Airport, Queens, New York, United States

Details :(U)

On March 1, 2021, Task Force Officer Detective JUSTINE KILLION (KILLION) and HSI Special Agent Kyle Tallio (TALLIO) met with CBP officers at JFK International Airport, Delta Terminal 4, Queens, New York..

ALISIGWE was returning on Delta flight and met at his departing gate. ALISIGWE was met by CBP officers who escorted him to an interview room for a

**UNCLASSIFIED//FOUO**

Investigation on   03/01/2021   at   Queens, New York, United States (In Person)

File #   288A-NY-3064637      Date drafted   03/01/2021

by   JUSTINE KILLION

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

288A-NY-3064637

(U) TO Document CBP interview with

Continuation of FD-302 of ALISIGWE                                                    , On  03/01/2021  , Page   2 of 2

secondary interview. ALISIGWE had a carryon bag and two luggage suitcases in his possession when he de-boarded the plane.

The search of ALISIGWEs personal affects did not yield any nefarious items. ALISIGWE had two cell phones on her person. The first cell phone is a Galaxy S20 Ultra5G with associated phone number 347-430-0927. The second cell phone is a Galaxy A71 5G, unknown number, IMEI ending in xx4915.

Data, text messages and information contained in both ALISIGWE's cell phones indicate a data backup was initiated to restore older information seen during the 2019 interview. Additional names, bank accounts and alias used to open the bank accounts associated in this investigation was also discovered.

ALISIGWE had identification on his possession that was consistent to the identification used in 2019 when he was interviewed by CBP, consisting of: Passport # A50451209, and Alien Resident Card containing his photo. ALISIGWE mentioned to CBP officers he was visiting family and is returning home to his residence.

Photos of the 2019 and 2021 interview are uploaded as a 1A for comparison.

A000051

N2OCalsP

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           22 Cr. 425 (VEC)

5    CHINWENDU ALISIGWE,

6                  Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           February 24, 2023
9                                          10:30 a.m.

10

     Before:
11
                         HON. VALERIE E. CAPRONI,
12
                                               District Judge
13
                               APPEARANCES
14
     DAMIAN WILLIAMS,
15        United States Attorney for the
          Southern District of New York
16   BY:  JONATHAN BODANSKY
          Assistant United States Attorney
17
     ANDREW STOLL
18        Attorney for Defendant

19

20

21

22

23

24

25

N2OCalsP

```
 1              (Case called)
 2              MR. BODANSKY:  Good morning, your Honor.  Jonathan
 3   Bodansky for the government.
 4              THE COURT:  Good morning, Mr. Bodansky.
 5              MR. STOLL:  Good morning.  It's Andrew Stoll,
 6   S-t-o-l-l, for Mr. Alisigwe.
 7              THE COURT:  Good morning, Mr. Stoll.  Good morning,
 8   Mr. Alisigwe.
 9              THE DEFENDANT:  Good morning.  Thank you, your Honor.
10              THE COURT:  Please be seated.
11              Mr. Stoll, I understand that your client wishes to
12   plead guilty; is that correct?
13              MR. STOLL:  That's correct, your Honor.
14              THE COURT:  Mr. Alisigwe, your attorney has told me
15   that you wish to plead guilty.  Before that can happen, I need
16   to ask you some questions so I can be sure that you're pleading
17   guilty because you are guilty and not for any other reason, and
18   that you fully understand the rights that you will be giving up
19   and the consequences of your plea.
20              Ms. Caliendo, can you please swear in the defendant.
21              (Defendant sworn)
22              THE DEPUTY CLERK:  State your full name for the record
23   and spell your last name.
24              THE DEFENDANT:  Chinwendu Alisigwe, A-l-i-s-i-g-w-e.
25              THE COURT:  Mr. Alisigwe, you're now under oath.  What
```

A000053

N2OCalsP

1    that means is that if you answer any of my questions falsely,

2    the government can use your answer against you in a prosecution

3    for perjury or for making a false statement.

4            Do you understand that?

5            THE DEFENDANT:  Yes, your Honor.

6            THE COURT:  How old are you?

7            THE DEFENDANT:  I'm 37.

8            THE COURT:  Where were you born?

9            THE DEFENDANT:  Nigeria.

10           THE COURT:  How far did you go in school?

11           THE DEFENDANT:  High school diploma.

12           THE COURT:  Are you able to read and understand

13   English?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Are you now or have you recently been

16   under the care of a doctor or a psychiatrist?

17           THE DEFENDANT:  No.

18           THE COURT:  Have you ever been treated or hospitalized

19   for any mental illness or any type of addiction, including drug

20   or alcohol addiction?

21           THE DEFENDANT:  No.

22           THE COURT:  In the past 24 hours, have you taken any

23   drugs, medicines, or pills, or have you consumed any alcohol?

24           THE DEFENDANT:  No.

25           THE COURT:  Is your mind clear today?

A000054

N2OCalsP

| | |
|---|---|
| 1 | THE DEFENDANT: Yes. |
| 2 | THE COURT: Your attorney has told me that you wish to |
| 3 | plead guilty; is that correct? |
| 4 | THE DEFENDANT: That's correct. |
| 5 | THE COURT: Have you had an opportunity to discuss |
| 6 | this case with your attorney, including the consequences of |
| 7 | pleading guilty? |
| 8 | THE DEFENDANT: Yes. |
| 9 | THE COURT: Are you satisfied with Mr. Stoll and his |
| 10 | representation of you? |
| 11 | THE DEFENDANT: Yes. |
| 12 | THE COURT: Does either attorney have any doubt about |
| 13 | the defendant's competence to enter a guilty plea at this time? |
| 14 | MR. BODANSKY: No, your Honor. |
| 15 | MR. STOLL: No, your Honor. |
| 16 | THE COURT: On the basis of the defendant's responses |
| 17 | to my questions and my observations of his demeanor, I find |
| 18 | that he is fully competent to enter an informed guilty plea at |
| 19 | this time. |
| 20 | Mr. Alisigwe, before I accept your guilty plea, I'm |
| 21 | going to describe to you the rights that you have that you will |
| 22 | be giving up if you plead guilty. Please listen carefully. If |
| 23 | you don't understand any of my questions or if you just need an |
| 24 | opportunity to talk to your attorney, tell me that and I'll |
| 25 | stop and give you an opportunity to talk to Mr. Stoll. Okay? |

**A000055**

N2OCalsP

 1          THE DEFENDANT:  Okay.

 2          THE COURT:  Your attorney has said that you wish to

 3  plead guilty.  You have the right to plead not guilty and to

 4  persist in that plea.

 5          Do you understand that?

 6          THE DEFENDANT:  Yes.

 7          THE COURT:  You have the right to be represented by an

 8  attorney at trial and at every other stage of the proceedings.

 9  If you cannot afford an attorney, an attorney will be appointed

10  to represent you without cost to you.

11          Do you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  You have the right to a speedy and public

14  trial by a jury on the charges against you which are contained

15  in the indictment.

16          Do you understand that?

17          THE DEFENDANT:  Yes.

18          THE COURT:  If you went to trial, you would be

19  presumed innocent.  The government would have to prove, beyond

20  a reasonable doubt, that you are guilty.  You would not have to

21  prove that you are innocent at trial.

22          Do you understand that?

23          THE DEFENDANT:  Yes.

24          THE COURT:  If you went to trial, you would have the

25  right to see and hear all of the witnesses, and your attorney

1    could cross examine the witnesses that the government calls.

2            Do you understand that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  If you went to trial, your attorney could

5    object to the government's evidence.  You would also have the

6    right to present evidence and the right to compel witnesses to

7    come to court to testify on your behalf.

8            Do you understand that?

9            THE DEFENDANT:  Yes.

10            THE COURT:  If you went to trial, you would have the

11    right to testify if you wanted to, but you could not be forced

12    to testify if you did not want to.  If you chose not to

13    testify, I would tell the jury they could not hold that against

14    you.

15            Do you understand that?

16            THE DEFENDANT:  Yes.

17            THE COURT:  If there were a trial, the jury would be

18    composed of 12 people, and all 12 would have to agree that the

19    government has proven you guilty beyond a reasonable doubt

20    before they could find you guilty.

21            Do you understand that?

22            THE DEFENDANT:  Yes, your Honor.

23            THE COURT:  If you were convicted at trial, you would

24    have the right to appeal the verdict.

25            Do you understand that?

N2OCalsP

 1          THE DEFENDANT:  Yes.

 2          THE COURT:  If you plead guilty and I accept your

 3   plea, you'll be giving up all of the rights that I just

 4   described, except your right to an attorney, and you'll be

 5   found guilty just based on your plea of guilty.

 6          Do you understand that?

 7          THE DEFENDANT:  Yes.

 8          THE COURT:  We have to go through a number of other

 9   things this morning before I actually ask you how you plead.

10   Up until the point that I ask you how you plead and you tell me

11   guilty and I accept your plea, you can change your mind.  After

12   I accept your plea, that's it, it is final.

13          Do you understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Mr. Alisigwe, have you received a copy of

16   the indictment in this case?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Did you read the indictment?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Did you discuss it with your attorney?

21          THE DEFENDANT:  Yes.

22          THE COURT:  You're offering to plead guilty to Count

23   Three, which charges you with aggravated identity theft.

24          Do you understand that?

25          THE DEFENDANT:  Yes.

A000058

N2OCalsP

 1      THE COURT:  Mr. Bodansky, what are the elements of an

 2  aggravated identity theft charge?

 3      MR. BODANSKY:  Your Honor, the elements of Count Three

 4  are that the defendant knowingly transferred, possessed, or

 5  used, without lawful authority, a means of identification of

 6  another person during and in relation to a felony, enumerated

 7  in 18 U.S.C. Section 1028A(c), which includes bank fraud and

 8  bank fraud conspiracy, as charged in Counts Two and One of the

 9  indictment respectively.

10      With respect to the elements of those underlying

11  offenses of bank fraud, the bank fraud conspiracy, the elements

12  of bank fraud charged in Count Two are that there was a scheme

13  to defraud a financial institution, the defendant executed or

14  attempted to execute the scheme with the intent to defraud the

15  financial institution, and at the time of the execution of the

16  scheme, the financial institution was insured by the FDIC.

17      With respect to Count One, the elements are that the

18  conspiracy existed, that is an agreement existed between two or

19  more people to commit bank fraud and that the defendant

20  knowingly and willfully became a member of that conspiracy.

21      THE COURT:  I didn't hear this when you went through

22  it, and I could be wrong, does this have to be an actual

23  person's identity?

24      MR. BODANSKY:  I believe it does, your Honor.

25      THE COURT:  Thank you.

**A000059**

N2OCalsP

1          Mr. Alisigwe, if you don't plead guilty, the

2     government would have to prove all of the elements that

3     Mr. Bodansky just laid out beyond a reasonable doubt at trial.

4          Do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  This is a case where there's not a maximum

7     and a minimum, there's just a single penalty.  This crime

8     carries a mandatory two-year term of imprisonment, which must

9     be consecutive to any other term of imprisonment if you're

10    serving another term.

11         You're not currently in jail for anything else;

12    correct?

13         THE DEFENDANT:  No.

14         THE COURT:  So this is a two-year term of

15    imprisonment.

16         Do you understand that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  A term of supervised release of one year;

19    a fine of up to $250,000 or two times the pecuniary gain from

20    the crime or two times the pecuniary loss from the crime,

21    whichever one of those three numbers is the largest; and a

22    mandatory $100 special assessment.

23         Do you understand that?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  Supervised release means that you'll be

**A000060**

N2OCalsP

1  subject to monitoring and supervision after your release from

2  prison.

3  　　　　Do you understand that?

4  　　　　THE DEFENDANT:  Yes, your Honor.

5  　　　　THE COURT:  There are terms and conditions of

6  supervised release that you have to comply with.  If you don't

7  comply with those terms and conditions, you could be returned

8  to prison without a jury trial.

9  　　　　Do you understand that?

10  　　　　THE DEFENDANT:  Yes.

11  　　　　THE COURT:  If you violate the terms and conditions of

12  supervised release and you're sent back to prison, that new

13  prison term could be for all or part of the term of supervised

14  release and you will not necessarily get credit for time that

15  you already served on supervised release.

16  　　　　Do you understand that?

17  　　　　THE DEFENDANT:  Yes.

18  　　　　THE COURT:  As part of your sentence, I can order you

19  to pay restitution to any person or entity that was injured as

20  a result of your criminal conduct.

21  　　　　Do you understand that?

22  　　　　THE DEFENDANT:  Yes, your Honor.

23  　　　　THE COURT:  If I accept your guilty plea and I adjudge

24  you guilty, that adjudication may deprive you of valuable civil

25  rights, such as the right to vote, the right to hold public

N2OCalsP

office, the right to serve on a jury, the right to possess any

type of a firearm, and the right to hold certain professional

licenses.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Are you a U.S. citizen?

THE DEFENDANT:  No.

THE COURT:  So this is less relevant if you're not a

U.S. citizen.

Are you a resident of the United States?

THE DEFENDANT:  Yes.

THE COURT:  You have a green card?

THE DEFENDANT:  Yes.

THE COURT:  Some of these things, as a green card

holder, you would normally be allowed to do.  Certainly, green

card holders can hold certain professional licenses.  Because

you will now be a felon, that may not be available to you

anymore.

Do you understand that?

THE DEFENDANT:  Right.

THE COURT:  So you just told me that you're a green

card holder; correct?

THE DEFENDANT:  Yes.

THE COURT:  Have you discussed the possible

immigration consequences of this conviction with your attorney?

A000062

N2OCalsP

```
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  What do you understand the possible
 3   immigration consequences to be?
 4              THE DEFENDANT:  He told me that I may be likely to be
 5   deported.
 6              THE COURT:  That you're likely to be deported?
 7              THE DEFENDANT:  Yes.
 8              THE COURT:  Is that also your understanding,
 9   Mr. Bodansky?
10              MR. BODANSKY:  Yes, your Honor.
11              THE COURT:  So in all likelihood, you're going to be
12   deported from the United States after you serve your sentence.
13              Do you understand that?
14              THE DEFENDANT:  Yes.
15              THE COURT:  If, for whatever reason, you are not
16   deported after serving your sentence or if you're held in the
17   United States pending deportation, you'll be subject to
18   supervised release.
19              Do you understand that?
20              THE DEFENDANT:  Yes, your Honor.
21              THE COURT:  If you're deported from the United States
22   and you return to the United States without the permission of
23   the Attorney General during the period of supervised release,
24   that's a crime.
25              Do you understand that?
```

N2OCalsP

```
 1                THE DEFENDANT:  Yes.
 2                THE COURT:  It would also violate the terms of
 3     supervised release.
 4                Do you understand that?
 5                THE DEFENDANT:  Yes.
 6                THE COURT:  If you're held in the United States
 7     pending deportation and you commit a crime, that may also
 8     violate the terms of your supervised release.
 9                Do you understand that?
10                THE DEFENDANT:  Yes.
11                THE COURT:  If, for whatever reason, the immigration
12     consequences are different from what your attorney has told you
13     they're likely, that is for whatever reason you're not deported
14     or you're deported faster than you think you're supposed to be
15     deported, none of that is a reason for you to withdraw your
16     guilty plea.
17                Do you understand that?
18                THE DEFENDANT:  Yes.
19                THE COURT:  Mr. Alisigwe, there are sentencing
20     guidelines that I have to consider in determining the
21     appropriate sentence in your case.
22                Do you understand that?
23                THE DEFENDANT:  Yes.
24                THE COURT:  In your case, the sentencing guidelines is
25     two years, which is the sentence for this case.
```

N2OCalsP

1      Do you understand that?

2           THE DEFENDANT:  Yes.

3           THE COURT:  If you're sentenced to prison, there is no

4    parole, and therefore you cannot be released early on parole.

5           Do you understand that?

6           THE DEFENDANT:  Yes.

7           THE COURT:  So there used to be parole in the United

8    States, and in some states, there still is parole, which allows

9    you to be released from prison early.  That doesn't exist in

10   the federal system.

11          Do you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  So your sentence will be your sentence

14   minus whatever good time you get.

15          Do you understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And good time is about 15 percent if you

18   behave in jail.

19          Do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  I've been given a copy of the plea

22   agreement, which we'll mark as Court Exhibit 1.

23          Did you sign the plea agreement?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Did you read the agreement before you

N2OCalsP

1    signed it?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Did you discuss it with your attorney

4    before you signed it?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Are there any agreements, promises, or

7    understandings with the government that are not contained in

8    the plea agreement?

9          THE DEFENDANT:  No.

10         THE COURT:  Has anyone threatened you or forced you to

11   plead guilty?

12         THE DEFENDANT:  No.

13         THE COURT:  Other than what's in the plea agreement,

14   has anyone promised you anything or offered you any inducement

15   to plead guilty?

16         THE DEFENDANT:  No.

17         THE COURT:  Has anyone made a promise to you of what

18   your sentence will be?

19         THE DEFENDANT:  No.

20         THE COURT:  Actually, they all have.  They told you

21   your sentence is going to be two years; right?

22         THE DEFENDANT:  Yes.

23         THE COURT:  You understand that?

24         THE DEFENDANT:  Yes.

25         THE COURT:  So one of the provisions that's in your

A000066

N2OCalsP

1  plea agreement is what's called the waiver of the statute of

2  limitations.  What that waiver means is that if, for some

3  reason, at some point down the road your plea is withdrawn or

4  your conviction is vacated, the government would be allowed to

5  charge you at that time in the future with any crime they could

6  charge you with today, notwithstanding the passage of time.

7          Do you understand that?

8          THE DEFENDANT:  Could you repeat that again, please.

9          THE COURT:  Sure.  So every once in a while something

10  will happen after a person pleads guilty, like maybe the court

11  finds the statute is unconstitutional or something happens so

12  that the conviction on the basis of your guilty plea gets

13  vacated.  What the waiver of the statute of limitations says is

14  the government essentially gets to come back to today and say,

15  well, we could have charged him today with certain crimes, we

16  didn't because he pled guilty to Count Three, but Count Three

17  has now been vacated.  So at that point in time in the future,

18  they could charge you with any crime they could charge you with

19  today.

20          This is highly unlikely to become an issue for you,

21  but do you understand what you're agreeing to?

22          THE DEFENDANT:  Excuse me.

23          THE COURT:  Sure.

24          (Defendant and counsel conferred)

25          MR. STOLL:  Thank you, your Honor.

N2OCalsP

1           THE COURT:  Do you understand now?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Your plea agreement also contains an

4    agreement regarding the guidelines calculation that applies in

5    your case.  Again, in this case, there's one sentence that's

6    available for this crime and that's two years.  If I sentence

7    you to more than two years, you can appeal that.  If I sentence

8    you to less than two years, the government can appeal that.

9    But no one's going to appeal because your sentence is going to

10   be two years.

11          Do you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Mr. Alisigwe, in order for me to accept

14   your guilty plea, I have to be convinced that you actually

15   committed this crime.  So can you tell me what you did that

16   makes you guilty.

17          THE DEFENDANT:  I used a fake IDs, fake

18   identifications to open up accounts to commit fraud.

19          THE COURT:  When you say "to commit fraud," what did

20   you do to commit fraud?

21          THE DEFENDANT:  To receive money in the account.

22          THE COURT:  How did you receive money in the account?

23          THE DEFENDANT:  Through wire.

24          THE COURT:  And why was somebody wiring you money to

25   that account?  Had you told them something that wasn't true?

A000068

N2OCalsP

1          MR. STOLL:  Your Honor, if I may, it's a conspiracy

2     case.  I think he can say that he knew that the funds he was

3     taking were the proceeds of fraud, but he didn't necessarily

4     play a part in what initiated those transactions.

5          THE COURT:  Did other people that you were working

6     with do things and say things that were untrue in order to get

7     money moved into those bank accounts?

8          THE DEFENDANT:  I have no idea.

9          THE COURT:  Tell me what you did.

10          THE DEFENDANT:  What I did is I opened -- I used a

11     fake identifications to open accounts.

12          THE COURT:  Who gave you the fake identifications?

13          MR. STOLL:  Your Honor, he received them.  I don't

14     know that he --

15          THE COURT:  I'm not looking for a name.  Someone gave

16     him fake identification.

17          THE DEFENDANT:  Yes.

18          THE COURT:  Of real people?

19          THE DEFENDANT:  Some are not real people.

20          THE COURT:  I'm sorry?

21          MR. STOLL:  Why don't we have a minute, your Honor.

22          THE COURT:  Go ahead.

23          (Defendant and counsel conferred)

24          THE COURT:  Okay.

25          THE DEFENDANT:  Some of them -- some of them are real

N2OCalsP

1    names, some are not.

2        THE COURT:  Some are real people, some are not?

3        THE DEFENDANT:  Yeah.

4        THE COURT:  So you had these false identifications.

5    Of the people that you had identification for that was a real

6    person, did you have that person's permission to use their

7    identity to open a bank account?

8        THE DEFENDANT:  No.  The account that I --

9        THE COURT:  So you did not have the persons', whose

10    identity you used, permission to open a bank account with it;

11    correct?

12        THE DEFENDANT:  Correct.

13        THE COURT:  Were you the one who was actually opening

14    the bank accounts?

15        THE DEFENDANT:  Yes.

16        THE COURT:  So you used someone else's identity to

17    open a bank account; correct?

18        THE DEFENDANT:  Yes.

19        THE COURT:  And why were you opening these bank

20    accounts in other people's names?

21        THE DEFENDANT:  Because I was asked to, I was asked to

22    do it, to open the accounts, that if I open it, they will put

23    money in the account.

24        THE COURT:  So they will put money in the account.

25        And what was your understanding of where this money

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000070**

N2OCalsP

1 was coming from?

2 THE DEFENDANT: To be honest, your Honor, I don't

3 know.

4 THE COURT: So all you know is that you opened bank

5 accounts using false names and that somehow or another, money

6 flowed into that account?

7 THE DEFENDANT: Yeah.

8 THE COURT: And what did you get out of this?

9 THE DEFENDANT: They give me a little percent of it.

10 THE COURT: They gave you a little bit of the money?

11 THE DEFENDANT: Yeah.

12 THE COURT: So did you understand that this money was

13 coming from some sort of criminal conduct?

14 THE DEFENDANT: Yes, to be honest.

15 THE COURT: You knew it was coming from some sort of

16 criminal conduct?

17 THE DEFENDANT: Yes.

18 THE COURT: And where were you opening accounts?

19 THE DEFENDANT: In the bank.

20 THE COURT: Banks where?

21 THE DEFENDANT: New York.

22 THE COURT: In New York City?

23 THE DEFENDANT: Yes.

24 THE COURT: In Manhattan or the Bronx?

25 THE DEFENDANT: In Queens. In Queens.

A000071

N2OCalsP

| | |
|---|---|
| 1 | THE COURT:  In Queens? |
| 2 | THE DEFENDANT:  Yes.  There's one in Manhattan. |
| 3 | THE COURT:  Also in Manhattan? |
| 4 | THE DEFENDANT:  Yes. |
| 5 | THE COURT:  In what banks?  Do you remember the name |

of the banks?

THE DEFENDANT:  Chase Bank.

THE COURT:  Mr. Bodansky, is this adequate that this
was in furtherance of during in and relation to a bank fraud?

MR. BODANSKY:  Yes, your Honor, I believe it is.

THE COURT:  Does the government have evidence that the
money that was flowing into these accounts were proceeds of
fraud?

MR. BODANSKY:  Yes, your Honor.

THE COURT:  Would you please proffer to me what that
evidence is.

MR. BODANSKY:  The evidence that the money flowing
into these accounts were the proceeds of fraud is largely based
on witness testimony from the various victims of those
fraudulent schemes.

THE COURT:  And what were the frauds, were these loans
that were taken out in fake names and the like?

MR. BODANSKY:  There are various schemes.  There are
three schemes alleged in the complaint, three business email
compromise schemes.

22

N2OCalsP

```
 1            THE COURT:  Is the government's theory that the
 2   defendant, his allocution is one of essentially conscious
 3   avoidance, he knew it was some kind of crime, he apparently did
 4   not inquire as to what was actually behind the money flowing
 5   into the account or do you actually have evidence that he had
 6   some more involvement than that?
 7            MR. BODANSKY:  We don't necessarily have firm evidence
 8   of more involvement than that.  His role appeared to be to open
 9   the bank accounts into which these funds were flowing into and
10   out of.
11            THE COURT:  Did you ever ask the people you were
12   working with how was the money being generated?
13            THE DEFENDANT:  Yes, sometimes I asked, but they tell
14   me don't -- they say don't worry about that.
15            THE COURT:  Don't worry about that?
16            THE DEFENDANT:  Yeah.
17            THE COURT:  And did they explain to you why they
18   needed you to open bank accounts?
19            THE DEFENDANT:  The only thing they told me, if I open
20   the account, they going to put money in the account and then I
21   withdraw the money, then take my percentage.
22            THE COURT:  And you understood there was something
23   illegal going on with all of this?
24            THE DEFENDANT:  Yeah, at the time I understood that
25   something not good going on with it.
```

**A000073**

N2OCalsP

1    THE COURT:  At the time you were doing all this, you

2  knew that?

3    THE DEFENDANT:  At the beginning I didn't, but later I

4  figure out that the money wasn't good.

5    THE COURT:  When did you figure that out relative to

6  when you got arrested?

7    THE DEFENDANT:  Actually before I was arrested.

8    THE COURT:  And while the scheme was still going on?

9    THE DEFENDANT:  Yeah, when it was going on.

10    THE COURT:  And you nevertheless continued to open

11  bank accounts for these people?

12    THE DEFENDANT:  No, I later stopped.

13    THE COURT:  As soon as you learned that it was wrong,

14  you stopped?

15    THE DEFENDANT:  Yeah, I stopped opening accounts for

16  them.

17    MR. STOLL:  Could I have a moment, your Honor.

18    THE COURT:  Let me try one more.

19    Before you stopped, you knew you were opening bank

20  accounts in names that were not your own; correct?

21    THE DEFENDANT:  Yes.

22    THE COURT:  And you knew that money was coming into

23  these accounts from some sort of criminal conduct; correct?

24    THE DEFENDANT:  Yes.

25    THE COURT:  And that was true when you were still

1    opening the accounts; correct?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Mr. Bodansky, are you still satisfied that

4    that's adequate?

5              MR. BODANSKY:  I believe so, your Honor.  I should

6    also just add with respect to the elements, I did forget to

7    mention the government would also be required to prove by a

8    preponderance of the evidence that venue is appropriate in the

9    Southern District of New York.

10             THE COURT:  He said one of the banks is in Manhattan.

11             MR. BODANSKY:  Yes.

12             THE COURT:  Okay.  Mr. Alisigwe, when you were doing

13   this, did you know that what you were doing was wrong and

14   against the law?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Did anyone threaten or coerce or force you

17   to participate in this scheme?

18             THE DEFENDANT:  No.

19             THE COURT:  You sure?

20             THE DEFENDANT:  Yes.

21             THE COURT:  You understand that needing money is not

22   the same as being forced to engage in criminal conduct?

23             Do you understand that?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Did any of your coconspirators threaten

A000075

25

N2OCalsP

1    you in any way to make you participate in this?

2              THE DEFENDANT:  Yes.

3              THE COURT:  They did threaten you?

4              THE DEFENDANT:  Yeah.

5              THE COURT:  What did they threaten you with?

6              THE DEFENDANT:  My mother's life.

7              THE COURT:  Your mother's life?  To get you to

8    participate in the scheme?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Okay.  Have you discussed this as a

11   potential defense with Mr. Stoll?

12             THE DEFENDANT:  No.

13             THE COURT:  I'm going to adjourn this.  You're going

14   to have to discuss with him whether that is a viable defense or

15   not.  What we're going to do is we're going to adjourn --

16             Do you have time to talk to him today?

17             MR. STOLL:  I do.

18             THE COURT:  What we're going to do is adjourn until

19   this afternoon.

20             What's your schedule like, Mr. Bodansky?

21             MR. BODANSKY:  The government can be available any

22   time, your Honor.

23             THE COURT:  Let's kick it over to the marshals.  He's

24   got lunch downstairs, I presume, or across the street?

25             THE MARSHAL:  Yes, ma'am.

**A000076**

N2OCalsP

1        THE COURT:  You're going to have to go over to 500 to

2  talk to him.

3        Why don't we schedule this, it's 11:00 now, let's come

4  back at 2:30.

5        Mr. Alisigwe, what I want you to do is talk to

6  Mr. Stoll.  What you just articulated might be a defense.  That

7  doesn't mean you can't plead guilty, but it means you're going

8  to need to tell me that you understand that there's a potential

9  defense there, but I want you to talk to your attorney about

10  it.  That's his job, is for you to tell him what really

11  happened here so he can figure out how to advise you on the

12  best way forward.  Okay?

13        THE DEFENDANT:  Okay.

14        THE COURT:  So we're going to come back at 2:30.  See

15  you all at 2:30.

16        (Recess)

17        (Continued on next page)

18

19

20

21

22

23

24

25

A000077

N2OCalsP

AFTERNOON SESSION

2:30 p.m.

THE COURT:  Please be seated.

Mr. Stoll, have you had an opportunity to consult with your client?

MR. STOLL:  I have, your Honor.  What I would suggest at this point, we spoke for a good while about this, and what I would suggest is we adjourn this either with or without a date, whenever you want to do it, and let my client and I discuss this a little further.  I appreciate what you had elicited during the allocution, and it's something for us to seriously consider some more.  We can either write to the Court and ask to reschedule a plea date or write to the Court and say it doesn't seem like it's going that way at this point.  It's still an open question for us.

THE COURT:  I believe I've got this case scheduled for trial when?

THE DEPUTY CLERK:  March 13th.

THE COURT:  So the government is going to either need to be prepping for trial or not.

MR. STOLL:  I understand that.  Mr. Bodansky and I discussed that a little over the phone.  I know the pretrial submissions were adjourned without a future date.

I would hope, given the way this arose here, that we would be able to arrange a later trial date.  If not and my

A000078

N2OCalsP

|    |    |
|----|----|
| 1  | client decides to go forward, I'll do what I have to do, |
| 2  | although there might be some pieces that really would require |
| 3  | more time for me.  So, I would hope you would be open to that |
| 4  | and flexible on that. |
| 5  | THE COURT:  Mr. Bodansky. |
| 6  | MR. BODANSKY:  The government certainly has no |
| 7  | objection to adjourning in the near term for the plea and does |
| 8  | think it does make sense to adjourn for a later trial date |
| 9  | given the way things have unfolded. |
| 10 | THE COURT:  In other words, the government has not |
| 11 | gotten ready for trial. |
| 12 | MR. BODANSKY:  It would be helpful to have a bit more |
| 13 | time given way this has unfolded, yes, your Honor. |
| 14 | THE COURT:  Here's my view, the defendant is in |
| 15 | custody, I would like to take advantage of gaps on my calendar |
| 16 | to get him tried.  I could adjourn the trial from March 13th, |
| 17 | to push it a little bit further back to the end of the month. |
| 18 | THE DEPUTY CLERK:  The 27th. |
| 19 | THE COURT:  So let's tentatively think about that. |
| 20 | Here's what I'm going to do, I'm going to adjourn |
| 21 | this, the plea, and turn it over into a status conference on, |
| 22 | let's say Wednesday, because I know that my deputy really wants |
| 23 | to work on Wednesday, unless do it on Tuesday. |
| 24 | THE DEPUTY CLERK:  This Tuesday, Judge, the 28th? |
| 25 | THE COURT:  The 28th, right. |

N2OCalsP

1          THE DEPUTY CLERK:  In the morning?

2          THE COURT:  Why don't we do it in the morning.  Are

3     you available Tuesday morning?

4          MR. STOLL:  I am.

5          THE COURT:  Let's do it Tuesday morning at 10 o'clock.

6          What I'm going to need at that point, Mr. Stoll, is

7     we're going to complete the plea or you're going to tell me

8     that you're withdrawing.  We're going to either finish the plea

9     allocution or you're going to tell me he's withdrawing this

10    plea and doesn't want to proceed with the plea, in which case

11    I'll set a schedule.  Think about, for your head purposes,

12    assume I'm going to set you down for the end of March so that

13    we can get the case tried.

14         Anything further from the government?

15         MR. BODANSKY:  I would ask to exclude time between now

16    and the next status conference on the 28th in the interests of

17    justice.

18         THE COURT:  In the interests of justice, I'm excluding

19    time to give Mr. Stoll and his client time to further consider

20    whether he wants to proceed with the plea or with trial.  The

21    interest in doing that outweighs the defendant's and the

22    public's interest in a speedy trial.

23         Mr. Stoll, anything further from you?

24         MR. STOLL:  Judge, I think that just maybe if instead

25    of Tuesday we could -- I'm sorry I didn't mention this before.

N2OCalsP

1 Maybe if we put it on for Thursday, March 2nd, it's going to

2 make it easier for me to get time to really consult with my

3 client some more.

4     THE COURT: That's fine. So 10:30 on Thursday.

5     MR. STOLL: Thank you.

6     THE COURT: And I'm excluding time until March the 2nd

7 for the same reasons.

8     Anything else, Mr. Stoll?

9     MR. STOLL: Nothing.

10     THE COURT: Thanks, everybody.

11           * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         22 CR 425 (VEC)

5   CHINWENDU ALISIGWE,

6              Defendant.                 Conference
    ------------------------------x

7                                         New York, N.Y.
8                                         March 2, 2023
                                          10:30 a.m.
9

10  Before:

11
                    HON. VALERIE E. CAPRONI,
12
                                          District Judge
13
                           APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  ELIZABETH ESPINOSA
         JONATHAN BODANSKY
17       Assistant United States Attorneys

18  STOLL GLICKMAN & BELLINA, LLP
         Attorneys for Defendant
19  BY:  ANDREW STOLL

20

21

22

23

24

25

A000082

1              (Case called)

2              MS. ESPINOSA:  Good morning, your Honor, Elizabeth

3   Espinosa and Jonathan Bodansky for the government.

4              THE COURT:  Good morning, Ms. Espinosa and

5   Mr. Bodansky.

6              MR. STOLL:  Good morning, your Honor, Andrew Stoll for

7   Mr. Alisigwe.

8              THE COURT:  Good morning, Mr. Stoll.

9              Good morning, Mr. Alisigwe.

10             THE DEFENDANT:  Good morning, your Honor.

11             THE COURT:  Please be seated, everyone.

12             We were last together when Mr. Alisigwe was pleading

13  guilty, and he told me that there had been threats, and

14  Mr. Stoll was going to consult with his client.

15             I have also since then received a letter, dated March

16  the 2nd, from the government laying out all of what their

17  position is of what makes out a duress defense.

18             Mr. Stoll, what do you think?

19             MR. STOLL:  Your Honor, I'll get to the punchline

20  first, and then if you will allow me to backtrack, I appreciate

21  it.

22             First of all, I am going to be asking for an

23  adjournment of the trial, ideally to May 10 for us, because

24  this duress defense has arisen at such a late moment.

25             Let me explain what I have done since last week.  You

1   know this arose, I myself was surprised by it, this past

2   Friday.  I certainly want to provide effective assistance of

3   counsel to my client and be able to pursue any valid defense he

4   has.

5        Obviously, I spoke with him for a while before we

6   re-reconvened on Friday.  Over the weekend -- I have never

7   asserted a duress defense -- I did all the research I needed to

8   do.

9        What I realized over the weekend is that, to me, one

10   of the elements of the defense, and that is the lack of a

11   reasonable opportunity to escape the harm -- I spoke with my

12   client.  I knew the facts just before meeting with him on

13   Friday.

14        And I immediately started reaching out to experts in

15   Nigerian policing and civil rights and human rights.  By

16   Sunday, I had already reached out to multiple potential experts

17   that I might want to talk to and engage because the case law,

18   which -- the case law dismays me, but it is what it is in the

19   Second Circuit, and it seems to say that a defendant's

20   subjective belief that turning to the authorities would not

21   have been productive is not enough to carry the defendant's

22   burden.

23        So that's why I was consulting with experts in

24   Nigerian policing, so that I can demonstrate, more as a matter

25   of law, or at least to get us over the threshold of getting it

1    charged to a jury, that the general perception of what the

2    police can do in Nigeria and the danger of turning to the

3    police in Nigeria is qualitatively different than what one

4    would just simply assume it would be in the United States, and

5    to give the Court and the jury far more than just my client's

6    objective, vague belief that it would be no help to turn to the

7    police to save his mother's life or to get out from under this

8    situation.

9         I started talking to experts.  I continued.  I had

10   conversations with experts throughout this week, meetings by

11   Zoom.

12        Meanwhile, I've been in communication with the

13   prosecution about the defense.  They have, obviously, had some

14   concerns and asked for an offer of proof, suggested they would

15   want a pretrial hearing.  We might very well join in their

16   application for a pretrial hearing determining whether we can

17   assert the affirmative defense.  I don't think, as a matter of

18   law, we should be forced to testify and give a preview of our

19   defense.

20        On the other hand, the worst-case scenario possible

21   for me is that my client take the stand, testify consistently

22   with what he said at his allocution, and then not be given the

23   opportunity to assert -- to charge the jury on the affirmative

24   defense of duress.

25             I need to provide expert disclosures to the

A000085

Case: 24-960, 08/14/2024, DktEntry: 17.1, Page 86 of 247

1   prosecution.  Obviously, before I provide those disclosures, I

2   will need an expert and need to retain an expert.

3           If we are going to assert this defense, we are going

4   to need to arrange for witnesses to travel from Nigeria, very

5   possibly my client's mother, although we might ask for

6   permission to do that by video, very possibly an expert.  And

7   depending on who the expert is, we might or might not need help

8   with a visa, or we might be requesting a video appearance that

9   way as well.

10          We are working hard to meet the Court's concern about

11  a prompt trial here.  We are concerned about a prompt trial

12  because, as you pointed out on Friday, and as my client well

13  knows, he's in custody.  He wants to have his trial.  But

14  obviously if we are going to have this trial, and we are going

15  to assert an affirmative defense, we have to be prepared to

16  effectively mount it.

17          That's where I'm at.  I saw you shaking your head a

18  little about the dates I requested.  I have a few other

19  proposed dates, if the Court is inclined to grant our request

20  for an adjournment.

21          THE COURT:  I think I essentially adjourned it

22  already, so the March 13 date, which is what you were scheduled

23  for, is off.  I had mentioned in passing adjourning it to March

24  27.  With all due respect to everybody's ability, I don't

25  think, given everything you just said, March 27 is not going to

A000086

```
1    work as a date for this trial.

2                MR. STOLL:  I think that's right.

3                THE COURT:  Here is what I think we should do.  You

4    asked for May 10.  May 10 does not work for me.  And likely

5    it's going to kick over into -- June is most likely -- June we

6    have got two trials.

7                I don't have in my head right now a date to slot this

8    trial in, but what I do have, based on everything you have just

9    told me, is the belief that I want briefing on the issue of

10   whether the government is entitled to a pretrial hearing on the

11   defense.  I have read your letter, but I haven't read the cases

12   behind it, and you need to continue your work, Mr. Stoll on

13   finding out whether you really think you've got a defense that

14   you can support.

15               So what I propose is, I give you a month to kind of

16   get your ducks in a row to figure out whether you have really

17   got a defense, and that would also then allow you to find out

18   when -- if you've got experts who are coming or people who are

19   coming from Nigeria, to do the work necessary to find out when

20   they are available.

21               The likelihood of me allowing these witnesses to

22   testify via video is low.  I would want to hear from the

23   parties, and I would want to understand what the difficulties

24   are.

25               But, as I'm confident you know, duress is an odd --
```

1    it's a rarely raised defense because it's obviously a very

2    difficult defense to make out.  That's also going to rest very

3    heavily on credibility.  I don't like to put jurors in the

4    position of having to evaluate credibility based on a video

5    testimony of a witness who is multiple time zones away.

6    Something always goes wrong with video communications.

7            So all of that is to say, what I want is for you to

8    have your ducks in a row so you know when your witnesses are

9    available, whether you really are going to advance this

10   defense, and at that point I'll set a briefing schedule for

11   whether the government is entitled to a pretrial hearing on the

12   defense.  Then we will set things from there.

13           Let me give me a month to get your ducks in a row.

14   Today is March the 2nd.  Let's do this on April 4.  That's

15   before Passover.

16           What time?

17           THE DEPUTY CLERK:  In the morning.

18           THE COURT:  Let's say 10:30.

19           Just to make it clear, Mr. Stoll, you need to know at

20   that point whether you are in fact going to pursue this

21   defense, who your witnesses are, and when they are available

22   for both an evidentiary hearing and a trial.  Those will

23   probably go together because -- they will definitely go

24   together if you are going to call experts because there is no

25   reason to schlep people from Nigeria to here twice.  They are

1    likely to go together.

2          The downside of that, obviously, is, you are not going

3    to know until the eve of trial whether your defense is going to

4    be permitted.  But the alternative is to have a delay and have

5    your witnesses going back and forth.  It strikes me that they

6    should go together if you are going to call the expert as a

7    witness at the evidentiary hearing, if there is an evidentiary

8    hearing.

9          MR. STOLL:  Your Honor, I've still been working this

10   through for myself.  Like I said, I might very well consent to

11   the prosecution's request for a hearing.  The hearing doesn't

12   strike me as something that would rest on credibility so much

13   as whether we were able to make out a *prima facie* case.

14         The lay of the land on that for me is already somewhat

15   clear as to what it will look like.  Once I have an expert and

16   an expert report, it will be much clearer.  I would personally

17   probably be able to just make a proffer as to what my client's

18   testimony was likely to look like.

19         What I'm suggesting is, as a matter of convenience to

20   the Court and the prosecution and the defense, it would likely

21   be very helpful if the Court were able to rule without a

22   hearing but on the papers as a *prima facie* matter.  So I'm

23   putting that out as a possibility because maybe that would --

24   if the Court were willing to engage in that sort -- in that

25   sort of pretrial ruling, it might very well be very helpful.

A000089

1          THE COURT:  That's a possibility.  Let's discuss that

2     when you have more facts at your disposal on April the 4th.

3          MR. STOLL:  Thank you.

4          THE COURT:  Anything further from the defendant?

5          MS. ESPINOSA:  Your Honor, I want to put a couple of

6     things on the record to make sure we are all on the same page.

7          On the topic of the duress defense, we have invited

8     the defense to also proffer to us, either from the defendant

9     directly on the form of a mitigation submission, the basis for

10    this defense.  If this defendant does have a valid defense,

11    that's something we would take very seriously, and we would

12    consider how to proceed.

13         We just want to make abundantly clear that we are

14    ready to listen if he wishes to bring that evidence to our

15    attention.  To date, he hasn't accepted that invitation.  But I

16    also understand that he's in fairly early stages in figuring

17    this out.  I just wanted to make that very clear.

18         We have had discussions with Mr. Stoll on the issue of

19    expert notice.  There is a chance here that the government

20    would make a *Daubert* challenge as to any experts.  We would

21    need ample time to do that as well, so we will keep an eye out

22    for that.

23         I also wanted to flag, we flagged for Mr. Stoll, and

24    we want to flag for your Honor as well, recently, as you may

25    have noticed in a footnote in our letter, it was recently

A000090

1    brought to our attention that another U.S. Attorney's Office

2    has evidence of ongoing fraud conduct by this defendant beyond

3    the time period charged in our indictment.

4             THE COURT:  Not ongoing since he has been in jail.

5             MS. ESPINOSA:  No, not since he has been in jail.

6    After the time period in our indictment, the conduct continued

7    as to a victim in another jurisdiction, but the conduct was

8    carried out by the defendant from New York.

9             Because we were in a plea-negotiation posture, we are

10   not at that time actively pursuing obtaining that additional

11   evidence and contemplating additional charges.  But now that we

12   are in a different posture, we are working with that U.S.

13   Attorney's Office to get that file.

14            We may well either supersede with an additional time

15   period for our charges, or potentially additional counts,

16   depending on exactly what we see there, or, alternatively, we

17   may seek to introduce that as 404(b).  We just wanted to flag

18   that for your Honor that that is there.  And in light of the

19   changed circumstances, we are pursuing that as expeditiously as

20   we can because we obviously don't want any delay to result from

21   that either.

22            THE COURT:  I appreciate that.

23            When is time excluded through at this point?

24            MS. ESPINOSA:  Your Honor, I believe it's March 27.

25            THE COURT:  I am going to exclude it until April 4, in

1   light of the defense need to get their ducks in a row on a

2   potential duress defense, and find that the defendant's need

3   for more time outweighs the public and the defendant's interest

4   in a speedy trial.

5           Anything further from you, Mr. Stoll?

6           MR. STOLL:  No, your Honor.  Thank you.

7           THE COURT:  I will see you all on April 4.  Thank you.

8           (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000092

N5U3ALIH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                22 Cr. 425 (VEC)

5  CHINWENDU ALISIGWE,

6          Defendant.

7  ------------------------------x   Hearing

8                           New York, N.Y.
                           May 31, 2023
9                           11:00 a.m.

10

11  Before:

12                HON. VALERIE E. CAPRONI,

13                           District Judge

14                   APPEARANCES

15  DAMIAN WILLIAMS
      United States Attorney for the
16      Southern District of New York
  ELIZABETH ESPINOSA
17  JONATHAN BODANSKY
      Assistant United States Attorneys
18

  STOLL, GLICKMAN & BELLINA, LLP
19      Attorneys for Defendant
  ANDREW STOLL
20

21

22

23

24

25

A000093

N5U3ALIH

1         (Case called)

2         MS. ESPINOSA:  Good morning, your Honor.  Elizabeth

3 Espinosa and Jonathan Bodansky for the government.

4         THE COURT:  Good morning, Ms. Espinosa, Mr. Bodansky.

5         MR. STOLL:  Good morning, your Honor.  For

6 Mr. Alisigwe, it's Andrew Stoll.

7         THE COURT:  Good morning, Mr. Stoll.  Good morning,

8 Mr. Alisigwe.

9         THE DEFENDANT:  Good morning, your Honor.

10         THE COURT:  Please be seated.

11         Mr. Stoll, this is your hearing, so call your first

12 witness.

13         MR. STOLL:  Thank you, your Honor.  I want to put one

14 thing on the record.  I had a communication with the government

15 just about the admissibility of any statements that are made at

16 this hearing and their admissibility at trial.

17         My understanding is the government agrees with our

18 position that any statements that Mr. Alisigwe makes on the

19 stand here in support of attempting to be allowed to argue a

20 duress defense are not be admissible on the People's case as

21 evidence in chief on the prosecution's direct case.

22         THE COURT:  Ms. Espinosa?

23         MS. ESPINOSA:  Your Honor, that's generally our

24 understanding as well, is that typically the rule at a pretrial

25 hearing is any statements made by a defendant are admissible as

A000094

N5U3ALIH                    Alisigwe - Direct

1   impeachment evidence, but not as direct evidence in the

2   government's case in chief.  So I have no disagreement.

3              THE COURT:  That's my understanding as well.

4              Mr. Stoll.

5              MR. STOLL:  We are calling Mr. Chinwendu Alisigwe.

6              THE COURT:  Come on up, Mr. Alisigwe.

7              MR. STOLL:  Judge, can we take his leg irons off?

8              THE COURT:  He'll be okay once he gets up here.

9              Go ahead, Mr. Stoll.

10             MR. STOLL:  Thank you.

11             THE COURT:  You might do better, so the microphone is

12   closer to your mouth, if you are at the podium.  Unless you

13   just set up here there.

14             MR. STOLL:  No, it's fine.

15    CHINWENDU ALISIGWE,

16        called as a witness by the Defendant,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. STOLL:

20   Q.  Where were you born, Mr. Alisigwe?

21   A.  Nigeria.

22   Q.  How long did you live in Nigeria after you were born?

23   A.  About 22 years.

24             THE COURT:  Hang on.  You don't need to lean forward

25   to the microphone.  As long as the microphone is in front of

A000095

N5U3ALIH                    Alisigwe - Direct

1   you.

2           So you lived in Nigeria for about 23 years?

3           THE COURT:  About 23 years, yeah.

4   Q.  Where in Nigeria were you raised?

5   A.  I was raised in a local village called Amike.

6           THE COURT:  How do you spell that?

7           THE WITNESS:  A-M-I-K-E.

8   Q.  Did you say that was in Orlu, O-R-L-U?

9   A.  Yeah.

10  Q.  In what province or larger geographic region was that?

11  A.  It is a small, small village.

12  Q.  What's the larger area?

13  A.  The larger area you could say is Imo State.

14          THE COURT:  Imo State?

15          THE WITNESS:  I-M-O space State.

16  Q.  Where sort of physically in Nigeria is that?  The north,

17  east, south, west?

18  A.  Southeast.

19          THE COURT:  Is that close to Lagos?

20          THE WITNESS:  No.

21  Q.  Growing up, did you have any siblings?

22  A.  Yes.

23  Q.  How many?

24  A.  I have five siblings, but the two are dead.

25  Q.  Okay.  And which of your siblings died?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000096

N5U3ALIH                    Alisigwe - Direct

1   A.  The first son.  His name is Uche.

2              THE COURT:  Richard?

3              THE WITNESS:  Uche.

4              THE COURT:  How do you spell that?

5              THE WITNESS:  U-C-H-E.

6   Q.  How old were you when Uche died?

7   A.  I can't remember.  He died 1990 -- I think 1999.

8   Q.  What did he die from?

9   A.  He was poisoned.

10  Q.  And your other sibling that passed away, who was that?

11  A.  My sister, my second eldest sister.

12  Q.  What did she die from?

13  A.  The same.  Poison also.

14  Q.  I'm sorry.  When did your sister pass away?

15  A.  My sister passed away --

16  Q.  Approximately.

17  A.  I think 2018.  No.  2012.  Somewhere around 2013.  Yeah,

18  2012.

19  Q.  Are your parents alive?

20  A.  She passed away 2014.  It was 2014 she passed away.

21  Q.  Are your parents alive?

22  A.  My mother is alive, but my father passed away.

23  Q.  What did your father pass away from?

24  A.  He was poisoned in a meeting.  He went for a meeting, so he

25  was poisoned in a meeting.  Like a village meeting.

N5U3ALIH                    Alisigwe - Direct

1    Q.   Okay.  And how is your mother's health?

2    A.   Her health is not good.  She have hypertension, high blood

3    pressure, and also low blood pressure.  She have a stomach

4    ulcer.  She has both knees arthritis.  That's what they call

5    it.  Arthritis.  Both knees, she can't stand straight.  When

6    she stand, she have to bend and hold the hands on the desk or

7    something.

8    Q.   How old is she?

9    A.   Approximately -- she be -- she be about 70, 70 something.

10   Q.   Okay.  Is there, in Orlu where you grew up, is there a 911

11   system similar to what we have here in the United States?

12   A.   No, no, no, no.  No, we don't have that.

13   Q.   In your experience, in your observations, are the police in

14   Orlu equipped similarly to how the police are equipped in New

15   York City?

16   A.   No, no, no, no.

17   Q.   And can you describe your understanding of the general view

18   and attitude and sort of more specifically the trust of the

19   police in Orlu?

20   A.   I would say zero.  You can't really trust police, yeah.

21   Q.   And why is that, from your experience or your

22   understanding?

23   A.   The only people that can say they can call police and

24   police will attend to them are the people, like, in politics.

25   Like leader, governor, local government.  People that's related

N5U3ALIH                    Alisigwe - Direct

1    to those leaders.  Like, you are well known to the city.  Then

2    when you call police, they will respect you, they will come,

3    yeah.

4    Q.  Other than the sense that the police might not be

5    responsive to you, are you aware of any other concerns or

6    concerns that you personally had, say, in the last 10 years

7    about the police and in your hometown?

8    A.  Sometime, sometime you see a lot of people, like, back

9    home, they will tell you don't come home now.  Everywhere is

10   hot.  Don't come home.  We don't know who is police and who are

11   criminals.  So that's different organizations, some of them

12   they call them IPOB.  Some of them are Biafra.

13            THE COURT:  Some of them are what?

14            THE WITNESS:  IPOB.

15            THE COURT:  IPOB?

16            THE WITNESS:  Yeah.  Some of them are Biafra.

17   Q.  B-I-A-F-R-A?

18   A.  Some of them are called Asari-Dokubo.  Yeah.

19   Q.  Now I just want to dial back to something you said a moment

20   ago.  When you said you might get calls from friends, people

21   you know in Nigeria saying don't come home right now, it's hot.

22   Are you referring to people who you associated with on criminal

23   activities or other people?

24   A.  No, other people.  Other people.  Like the people from the

25   village or people that I went to school with.  They will tell

A000099

N5U3ALIH                    Alisigwe - Direct

1    you don't come home.  The area is not safe.  The village is not

2    safe.  The town is not safe.  They are killing people on the

3    streets almost every day.

4              THE COURT:  Who is killing people on the streets

5    almost every day?

6              THE WITNESS:  All these groups.

7              THE COURT:  The militia groups?

8              THE WITNESS:  Yeah.  They have, they form different

9    groups.  And you don't know who is who.  Sometimes they come

10   out with the military uniforms, sometimes they come out with

11   the police uniforms.  So the police that will come, most of

12   them they come up with their uniforms also.  Yeah.

13   Q.  You are aware of sort of controversy in New York City or

14   New York State about police activities and police brutality,

15   things like that, right?

16   A.  Hmm-hmm.

17   Q.  When you talk about the sense of police in Nigeria, are you

18   talking about something similar to how the police -- you

19   understand the police to behave in New York, or is it something

20   different?

21   A.  Totally different.

22   Q.  How is it different?

23   A.  Like, in New York, when a police pull you over, they first

24   of all approach you, greet you, talk to you, tell you why they

25   pulled you over, ask you for your driver's license.  All that.

N5U3ALIH                    Alisigwe - Direct

1   Over there, it's not like that.  Yeah, it's not like that.

2   Q.  What's it like over there?

3   A.  It's like, this is the words they use.  They pull you over

4   and say park your car, get out from the car, hands up, kneel

5   down, lie down, don't move.  Then most of these things you have

6   to do it.  If you don't do it, the next thing you hear the gun

7   pointed at you.

8        So if you are in a car with your children or your

9   wife, you will be likely safe.  They will not harm you or do

10  anything crazy, because your wife will start screaming.  Don't

11  kill my husband or don't kill my brother or don't kill my son.

12  When they start screaming like that, they ask you where are you

13  from.  You tell them.

14       The problem is you don't know who is police.  You

15  don't who is not police.  So some of these people, they come

16  most of the time pretend to be police.  They actually ask for

17  driver's license and ask you for your particulars.  Particulars

18  means like in America they ask you for your license and your

19  registration.  They ask you, they take you to the car.

20  Everything is registered.  But when they come back, they say

21  you don't have this, you don't have.  You park your car, get

22  down from the car.  Then you have to do what they call

23  settlement.

24  Q.  What is that?

25  A.  You have to pay.

N5U3ALIH                    Alisigwe - Direct

1    Q.  Okay.

2    A.  Yeah, they will collect the money from you and ask you to

3    wait.  Then go inside their pickup, like a pickup car where

4    their leader is, maybe their senior officer, and discuss with

5    the person.  Then come back and say the money you bring is

6    small.  You add more.  They go back.  So when they come back

7    with your particulars, which is your registration and your

8    license, then you know you are safe to go.  Then they give it

9    to you and you go.

10   Q.  Are you aware of whether it's safe to be in public with a

11   laptop in your hometown?

12   A.  A laptop?

13   Q.  A laptop.  A computer.  To be in public with a computer?

14   A.  No.  You're not safe with that.

15   Q.  Why is that?  Can you explain that?

16   A.  If they see you with a laptop, the police going to arrest

17   you right away.  That's, that's the first thing.  Or they see

18   you with an iPhone.  They will take the iPhone from you.  There

19   was a time they were checking everybody that have an iPhone.

20   They would check your iPhone.  They will take you inside the

21   car, then you would transfer money into the account they would

22   give you that will let you go.  If you don't do it, they will

23   arrest you.  If your phone is locked, they'll unlock it.  If

24   you unlock it, they say go into your bank account, show me your

25   bank account.  Log in, we need to see your account, before they

N5U3ALIH                    Alisigwe - Direct

1    let you go.

2    Q.  Are you aware of any arrests and disappearances of people

3    with laptops?

4    A.  Oh, yeah, a lot.  It's a lot of people.

5    Q.  How are you aware of that?

6    A.  Because people back home, they will call you and tell you,

7    when you coming back, how you have to move, what you should do,

8    what you shouldn't do.  They tell you the time you have to be

9    outside, and the time you have to go home.  They will tell you

10   all that.  Yeah.

11   Q.  Is your mother still in Orlu?

12   A.  Yes.

13   Q.  Did there come a time that you moved to the United States?

14   A.  Huh?

15   Q.  Let back up a little bit.  I'm sorry.

16        Did you graduate from high school in Nigeria?

17   A.  Yes.

18   Q.  Did you go to college or the equivalent in Nigeria?

19   A.  No.

20   Q.  Did you work in Nigeria?

21   A.  I did construction work.

22   Q.  What kind of construction work?

23   A.  Like a building construction.  Like I worked as a

24   bricklayer.

25   Q.  What did your father do for a living?

A000103

N5U3ALIH                          Alisigwe - Direct

1   A.  My father was in the Army before he retired.  He started a

2   business he was doing, and he was robbed.  They robbed him

3   almost four times.  So that's why I couldn't go to college.

4   Q.  What kind of business was he in?

5   A.  Huh?

6   Q.  What kind of business was your father in?

7   A.  He was selling foodstuffs.

8           THE COURT:  What?

9           THE WITNESS:  Foodstuff.  They would travel to

10  different city and buy the foodstuff.  Beans, rice, and bring

11  them back to the east and sell there.

12  Q.  How did it come about that you moved to the United States?

13  A.  That's when I won an American visa lottery.

14  Q.  The visa lottery.  And when did you put your name in for

15  the visa lottery?

16  A.  That was 2000 -- I think 2007.  I think 2007.

17          THE COURT:  I'm sorry.  Is that when you came to the

18  U.S?

19          THE WITNESS:  No, when I put the name on the visa

20  lottery at the office.

21          THE COURT:  When did you move to the U.S.?

22          THE WITNESS:  2008.

23  Q.  Where did you move to?

24  A.  I first went to California.

25  Q.  Where did you stay in California?

A000104

N5U3ALIH                    Alisigwe - Direct

1   A.  There if you traveling, you have to look in the village,

2   the family that have someone that live in America or the

3   country you going so you can stay with the family.

4   Q.  Who did you stay with?

5   A.  Helen.

6   Q.  Where was she?

7   A.  She's in California.

8   Q.  Where?

9   A.  L.A.

10  Q.  How long did you stay with Helen?

11  A.  I stay -- I stayed with Helen for, like, I think two months

12  and two weeks.  Then I moved in with her cousin George in the

13  same California there.  I moved in with him.  So, I was with

14  him for a while before I moved to New York.

15  Q.  When you were in L.A., did you apply for work?

16  A.  Yes, I applied for work, but you need to have a -- you need

17  to have a car.  When they ask you a question and ask if you

18  have a car and you say no, they will get right back to you and

19  say sorry.  The only job I was doing, I was helping out George

20  in the church.  The church name is called In His Presence.  So

21  I used to do, because I spoke with -- George helped me to speak

22  with the pastor in the church, so I was doing cleaning.  I

23  would go on Thursdays and Saturdays to do cleaning in the

24  church.  And I cut hair at home with George clipper, his

25  friends, I cut his friends' hair.  George give me money to buy

A000105

N5U3ALIH                    Alisigwe - Direct

1   a calling card to call my family.

2   Q.  Did you join the military or look into joining the

3   military?

4   A.  Yeah, I applied to join the Navy.

5   Q.  So what happened with that?

6   A.  So I didn't pass the first one, so I applied take the exam

7   again.  Before my mom, she started -- my dad told her about it.

8   And she said no, no, no.  You are not going.  America will ship

9   me to Africa and they will kill me there.  If I sign in and go,

10  she threatened me like she would die.  She would die if I do

11  it, she would die.  But I really wanted to do it then because

12  my father said yes, yes, because he was in military.  He wanted

13  me to join, and I really wanted to join.  But my mom's cry

14  discouraged me, so I didn't continue with it.

15  Q.  How long were you in California before you moved?

16  A.  I was in California I think to 2009.

17  Q.  All right.

18  A.  I think 2009.  No.  2008, December.  2008 December is when

19  I came to New York.  It was snow.  Snow that day.  That was my

20  first time seeing snow.

21  Q.  Okay.  And what did you do when you got to New York?

22  A.  The guy that I went to his house, so, may he rest in peace.

23  So he helped me give me a place, he said he would take me to a

24  restaurant where I would start working.  So I went there.  This

25  African restaurant.  She said she hired two people already.

A000106

N5U3ALIH                        Alisigwe – Direct

| 1 | She referred me to another person that have a Subway, like a |
| 2 | Subway fast food.  Yeah, so, the person hired me.  I started |
| 3 | working there at the Subway store. |
| 4 | Q.  Did you get any other work? |
| 5 | A.  Yes. |
| 6 | Q.  What other work? |
| 7 | A.  After that, I applied to work at a Walmart.  Walmart store. |
| 8 | Yeah.  I worked there before I go to -- I went to do a program |
| 9 | at Partners in Care. |
| 10 | Q.  What is that? |
| 11 | A.  Partners in Care is a healthcare company. |
| 12 | Q.  What kind of healthcare? |
| 13 | A.  Home health aides.  When they train you, they hire you. |
| 14 | You start working for them. |
| 15 | Q.  Did there come a time when you started working as a home |
| 16 | health aide? |
| 17 | A.  Yes. |
| 18 | Q.  For Partners in Care? |
| 19 | A.  Yeah, for Partners in Care. |
| 20 | Q.  How long did you work for them for? |
| 21 | A.  I worked for them for like almost two years. |
| 22 | Q.  Doing what sort of things? |
| 23 | A.  Like, I take care of old people, sick people, all that. |
| 24 | Q.  In their homes? |
| 25 | A.  Yeah, in their homes.  I take care of them. |

N5U3ALIH                    Alisigwe - Direct

1          THE COURT:  Mr. Stoll, can we sort of get --

2          MR. STOLL:  Sure, Judge.

3   Q.  While you were working as a home health aide, did there

4   come a time you started getting into any activities that you

5   thought were perhaps illegal?

6   A.  No.

7   Q.  Did there ever come a time you got involved in activities

8   that you believed were illegal?

9   A.  No.  Yeah.  The time that was when -- actually that's when

10  I started receiving call.

11          THE COURT:  That's when you did what?

12          THE WITNESS:  When I received the first call.  Like

13  from back home.  Yeah.

14  Q.  We're talking about essentially the activities that are the

15  subject of the indictment that bring you here today.

16  A.  Oh, okay.  That's when I received calls from back home.

17  Q.  So when did you first become involved, let's just call it

18  the identity --

19  A.  2016.

20  Q.  Hold on one minute.

21  A.  Okay.

22          THE COURT:  Hang on a second, both of you.  You have a

23  tendency to jump on his answers.  Let him finish before you put

24  your next question.  And you do the same thing.  Let him finish

25  his question before you start to answer.

N5U3ALIH                    Alisigwe - Direct

1      THE WITNESS:  Okay.

2   Q.  I am just going to call it the identity theft as the

3   general overall label for the activities we are talking about

4   here today.

5      Okay.  When did you first become involved in the

6   identity theft activities?

7   A.  2016.

8   Q.  How did you first become involved in that?

9   A.  That was 2015 that I received a call.  The person called me

10  and said I have business that I am going to do.  I want you to

11  do business with me.  Help me, you help me, I will help you.  I

12  said what kind of business?  So, he said -- I'm sorry.  I asked

13  him is it a car business?  Usually we go to auction to buy cars

14  and ship back home, they fix it and sell it.  Sometimes I fix

15  it here and sell.  So I asked him if it is a car business.  He

16  said no, it is a different business.  But I shouldn't worry,

17  that he will call me back again.  I said okay.  So --

18  Q.  Let me just stop you for a minute there, okay.

19      Who was that person who called you?

20  A.  I don't know.

21      THE COURT:  So a total stranger calls you?

22      THE WITNESS:  Yeah, hmm-hmm.

23      THE COURT:  You don't know who the person is?

24      THE WITNESS:  I asked him who are you.  He called my

25  name.  He said hey, hey, Chinwendu, like, that's how we talk

N5U3ALIH                    Alisigwe - Direct

back home.  He will ask you, hey, Chinwendu.  I said fine.  I

said who are you.  But in the broken language, the way we talk.

I said who are you.  He said, ah, you don't remember me.  I say

no, I don't remember you.  He said I have business.  Because

then people used to call us from back home, I need a car, I

need Honda Accord.  Can you help me buy it.  You bought a car

from Mr. this, I like his Honda.  Can you help me buy the same

Honda Accord?  You know, stuff like that.  So that's why I

asked him who are you.  He said I know you, but I want us to do

business.  My mind, I thought he was the car business.  But he

said he is going to call me back.  He didn't call me back.

          Then I think about a week later he called me back

again.  I said I was waiting for your call.  He said yeah, I

was putting things together.  I said okay.  He said the

business I want us to do.  Don't be scared, it's not a bad

business, nothing is going to happen to you.  I said what is

it?  I said is it a car?  He said no.  He said I want you to

give me an account so I will send money into the account.  I

said what do you mean give you an account, you will send money

to the account?  You want me to buy a car for you?  He said no.

I said if it's not for a car, I am not sending you an account.

He said don't worry, I will discuss with you, the way you will

understand what I am saying.  I said okay.  So he didn't call

me again.

          But after like six months, I was getting ready to

A000110

N5U3ALIH                    Alisigwe - Direct

1   travel to Nigeria.  He called me.  He said, hey, the business I

2   told you about, and when the call comes in it will come in as

3   call-1.  I wouldn't know who is calling.  Because sometimes

4   international calls come like that.  So when I pick it up, he

5   will start talking.  When I hear his voice, I will know it was

6   him.

7          I said what do you really want?  He said I want you to

8   open accounts.  I said I won't do that.  I won't open an

9   account for you.  So he said if I can do it, then he will help

10  me out.  I said help me out on what?  He said don't worry.

11  When you come back, I will come see you.  I said come see me

12  where?  I asked him what is your name, where are you from?  He

13  said I'm from the same place where you are from.

14         I called my wife.  I said --

15  Q.  I'm sorry.  Where was your wife?  When did you get married?

16  A.  I got married 2018 December.

17  Q.  Okay.  Where did you get married?

18  A.  Nigeria.

19  Q.  And where was your wife when you first started getting

20  these calls from this person?

21  A.  Nigeria.

22         So I called my wife and told my wife.  My wife says I

23  should be careful.  I said sometimes even when you call me you

24  come up call-1 or my mom or my brother, so I don't know.  She

25  said don't pick it up.  I said okay.  He didn't call me.  So

N5U3ALIH                    Alisigwe - Direct

1   when I went back home, I was waiting for the person to come to

2   our house.

3   Q.  When was this, when you went back home?

4   A.  2015 December, yeah.  So I went back home.  He didn't show

5   up.  He didn't come.  So I was waiting for the person to come.

6   He didn't come.

7          So after Christmas, by January my father, you know,

8   started getting sick.  We took him to the hospital.  In process

9   of trying to save my father's life, he passed away.  Before he

10  passed away, I came back to United States.  I came back like

11  this week.  The following week, my father passed away.  So this

12  guy did not come and meet me at that point.  So when I came

13  back, he send me a picture.  Send me a picture of my mom.

14  Q.  Who sent you a picture of your mom?

15  A.  The same person who had been calling.

16  Q.  He sent you a picture how?

17  A.  Like, you know how you text someone a picture, like if I

18  had my phone right now, I take a picture.  He sent me a picture

19  of my mom.  So, I said how did you get this picture?  That's

20  when I started getting inquisitive.  So, we now start talking.

21  He said, listen, I know your mom.  I know your father.  Your

22  father just died, so we know you, and we want you to work with

23  us.  I said hold on.  Don't do anything to my mom.  He said I

24  am not going to do anything to your mom, but you have to listen

25  to me first.

N5U3ALIH                    Alisigwe - Direct

1          So he start telling me how I will open the account.  I

2     said I can't go and open an account at all.  So he said don't

3     worry, I will send you what you use to open the accounts.  I

4     said okay, but let me call you back.  Give me a number I can

5     call you back.  He said no, that he will call me.  I said okay.

6          I called my wife.  I couldn't tell my wife that one.

7     I said that number called me again.  She said what did they

8     say?  I said don't worry, babe, don't worry.  I'll talk to you

9     later.  She said okay.

10          Then after a week, he send me a text.  Said here,

11     listen, I will call you.  When I call you, pick up.  I said

12     okay.  Before he called me again, he sent me a picture of my

13     mom again.

14          THE COURT:  Another picture of your mother?

15          THE WITNESS:  Another picture of my mom that day.

16     A.  So when I saw that picture, in a few minutes and he called

17     me, I picked up the phone.  I said how are you getting my

18     mother's picture?  How are you getting this?

19          He said listen, we know everything about you and your

20     family.  So just listen to me, and do as I say, and nobody will

21     get hurt.  Nothing will happen to you to your mom.  We know

22     your father is dead.  If your mom die, I don't think you will

23     be able to come back home.  And after your mom, we will come

24     after your family.  We know everybody in your family.

25          I said what do you want from me?  He said just open

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000113**

N5U3ALIH                    Alisigwe - Direct

1    the account, then I will tell what you to do.  I said okay.

2    Then after a month, he send me -- how do I say that in English.

3    A tracking number.  I should put it to the post office that I

4    will receive something.  When I receive that, I will receive

5    something inside this, then I will follow the instruction.  So

6    I receive that.  It was there was a phone inside it.

7               THE COURT:  There was a what inside it?

8               THE WITNESS:  A phone.

9               THE COURT:  So he sent you a phone from Nigeria?

10              THE WITNESS:  Yup.

11   A.  So he said I should go and buy a SIM card and put it inside

12   the phone.  When I buy a SIM card and put it inside the phone

13   that I should call him.  I said how am I going to call you?  He

14   said look inside the paper, you will see a number there.  Call

15   that number, I will pick up.

16              Before I made that call, I called my wife.  I said

17   this guy is still calling me.  She said what did he really

18   want?  He want me to do something for him.  But I couldn't tell

19   my wife because I know she's always scared.

20              So, I bought that SIM card, put it inside the phone,

21   called that number.  He pick -- somebody picked up, but it

22   wasn't the same voice.  I said I want to speak with the person

23   that send me this phone he said I should buy.  He said don't

24   worry, he can hear you.  So I bought the SIM card and I've

25   called you.  What do you want me do?  He said okay, now open

**A000114**

N5U3ALIH                    Alisigwe - Direct

1    the envelope.  Inside that envelope that I will see some

2    instruction there.  I said yeah, I have opened it.  He said

3    okay, that I should keep that.  That I should study it and

4    memorize the name.  The names there.  Like, he will send me

5    another stuff.  That when he send that, he will call me on this

6    number.  That I shouldn't give anybody this number.

7              THE COURT:  I'm lost.  What was in the package?  There

8    was a telephone with --

9              THE WITNESS:  A telephone and directions and names.

10             THE COURT:  Lots of names?

11             THE WITNESS:  No, like about three names.

12             THE COURT:  Three names that you were supposed to

13   memorize?

14             THE WITNESS:  He said memorize these names.  I am

15   going to send you other stuff.

16             THE COURT:  What were you supposed to do with the

17   piece of paper?

18             THE WITNESS:  He wrote it on a piece of paper.

19             THE COURT:  Why did you have to memorize?  You had the

20   piece of paper.

21             THE WITNESS:  No, he said I should memorize it.  I

22   said okay.  The reason why he asked me to memorize it is when

23   he called me again, he now ask me to take a passport picture.

24             THE COURT:  Of yourself?

25             THE WITNESS:  Yeah, and send to him.  So when I sent

**A000115**

N5U3ALIH                        Alisigwe – Direct

|  |  |
|---|---|
| 1 | it, that's when they did a passport, and send the passport |
| 2 | over.  And those passport have the name.  So when I receive it, |
| 3 | he said I should go right away, I shouldn't wait more than two |
| 4 | days to open the account under -- |
| 5 | THE COURT:  Two days from when? |
| 6 | THE WITNESS:  From the day that I receive the |
| 7 | passport. |
| 8 | THE COURT:  Ah. |
| 9 | THE WITNESS:  I should open the account within two |
| 10 | days. |
| 11 | Q.  So you got a passport in the mail with somebody else's name |
| 12 | and pedigree information with your photo on it? |
| 13 | A.  Yeah.  I don't know if it's a person's name or not. |
| 14 | Q.  At that point, did you contact the police in Nigeria? |
| 15 | A.  No, no. |
| 16 | Q.  Why not? |
| 17 | A.  What would they do? |
| 18 | Q.  I'm asking you. |
| 19 | A.  They wouldn't do anything.  They wouldn't do anything. |
| 20 | Q.  Did you have any concerns, other than the fact that it just |
| 21 | wouldn't be productive? |
| 22 | A.  When I wanted to contact them is when I went home.  After a |
| 23 | year I went home.  So they came to the restaurant where we were |
| 24 | eating. |
| 25 | Q.  Who came? |

A000116

N5U3ALIH                    Alisigwe - Direct

A.  These guys, they came with the two trucks.  Like one is,

one is a Lexus, the other one is a Cherokee Jeep.  So they pull

up, send somebody to come and -- this restaurant, it's not like

American restaurant.  We call it buka, where we go eat like

native foods.  Yeah.  So, I didn't know how they tracked me

there.  He tells me there, oh, you were coming home, you didn't

tell me you was coming home.  I have stuff you should be doing.

I said I have my life to live.  I don't want to do it again.

He said if you don't do it, you will see what I will do.  When

you go back, if I call and you don't pick up, then you will see

what I will do.

Q.  Okay.  So why didn't you go to the police then?

A.  I didn't go to the police because the people that I saw

inside that car, the smoke was coming out of that car.  They

will kill right away.  If I call police and tell police about

it, number one, the police will not do anything.  The police

will ask me who are they.  Where are they from.  How can they

look at that.  And even if I told them that, okay, this is the

person, if I know the person, this is the person, this is where

they live, they will not still do anything.

        So once you told them they have guns, that they can

kill, they threaten to kill, the police will not even go.  They

will tell you sit there.  Write your statement.  When you're

finished, you bring it here.  Then you go.  Write your phone

number, we'll call you.

A000117

N5U3ALIH                     Alisigwe – Direct

1  Q.  Did you have any other concerns, other than the fact they

2  wouldn't do anything?  Did you have any other concerns about

3  giving the police information in Nigeria?

4  A.  Other concerns?  Like, I don't really understand.

5  Q.  Any concerns about your safety or the safety of the people

6  around you?

7  A.  Yes, of course.

8  Q.  Why?

9  A.  If they find out, okay, let's say I made up my mind not to

10  pick up the call.  The thing they did, they went straight to my

11  mom.  My mom have a scooter, like a little machine she drives.

12  She drives it, it helps her to go out to the market, buy stuff

13  and come back.  They send me pictures of my mom with them.

14  Then when I call my mom and ask my mom, did you see anybody?

15  She says yes, I saw your friends.  I saw your friend.  They

16  said they were your friends.  They came back from America.

17  They said they were coming to the house, they said she should

18  greet me.  They said they were your friends.  You see that.

19  So, at that point, that's when they took my mom's pictures

20  again and send to me.

21  Q.  Did you ever go to the authorities in the United States to

22  report these threats?

23  A.  I was scared.  No.

24  Q.  Why not?

25  A.  I was scared.  I was scared about my mom's life.

N5U3ALIH                    Alisigwe - Direct

1   Q.  Okay.

2   A.  Yeah.

3   Q.  And what was your fear?

4   A.  My fear --

5   Q.  Let me just rephrase that, I'm sorry.

6   A.  Okay.

7   Q.  Why were you afraid that going to the authorities in the

8   United States could threaten your mother's life somehow?

9   A.  If I go to the authorities here in the United States, that

10  means I am not going to be able to do what they asking me to

11  do.  That would eventually, they will kill my mom.  If they try

12  to reach me and they couldn't reach me, they would kill my mom,

13  yeah.

14  Q.  And did you continue to engage in identity theft activities

15  for these people?

16  A.  Yes, of course, when they call me, I would do it.  But

17  sometime I said I'm not going to do it again.  But each time I

18  said I wouldn't do it for a certain period of time, like couple

19  of months, they would start threatening me with my mom.  And

20  the last threats they threaten me was to locate where my wife

21  and my kids live.  That's when I start doing it again with

22  them.  When they call me again, I will pick up.

23  Q.  All right.  Did you ever learn the names or the identity of

24  the people who are threatening you and sending you IDs in the

25  mail?

```
N5U3ALIH                    Alisigwe - Direct
```

1  A.  Their names?

2  Q.  Yes, of the people who were forcing you to do these

3  activities?

4  A.  I don't know their names.

5  Q.  Okay.  So it is fair to say you continued to do these

6  identity theft activities for a couple of years at least,

7  right?

8  A.  Yes.

9  Q.  I want to move you forward to about February 7, 2019.  Were

10  you coming back into the country from Nigeria that time?

11  A.  Hmm-hmm.

12  Q.  Yes?

13  A.  Yes, I was coming back.

14  Q.  Where were you flying in through, what airport?

15  A.  J.F.K.

16  Q.  And did something unusual happen at J.F.K. that day?

17  A.  Yes.

18  Q.  Tell me what happened?

19  A.  When I got to the airport, so, when I went to the counter

20  to the officer to check me in, so, when I finished, he said

21  follow me.  So I followed him inside the office.  He said sit

22  down here.  I sat down.  So he pulled my file on the basket,

23  there is a basket right there, he put it in.  So after like an

24  hour or 45 minutes, they call my name.  So I went to the

25  counter.  They checked.  They said are you Mr. Alisigwe?  I

N5U3ALIH                    Alisigwe - Direct

1    said yes.  Where are you coming from?  I told the officer.  So

2    he said okay.  What are you coming back with?  I said with my

3    clothes, my shoes, I have some foodstuffs.  He said okay.  He

4    said wait.  I'm coming.  He went down.  Went into the office.

5    When he went into the office, came out, another two men came

6    out with him.  But not with the same uniform the officers there

7    was wearing.  So they came and called me.  He said come with

8    us.  I said okay.  I went, they took me inside another office.

9    Q.  Let me stop you there for one moment.

10            MR. STOLL:  Your Honor, I am going to introduce I

11   believe with the government's consent Exhibit Defense Exhibit

12   A, and it looks like you have it in front of you, and that's

13   the ROI for the incident we're discussing here.

14            THE COURT:  Okay.

15   Q.  Continue.

16   A.  So, they took me inside the office.  So he said you know

17   why we are -- I said, no, I don't know.  He said okay.  Sit

18   down, sit down.  So when I sat down, the other officer said

19   what's your name.  I told him my name.  He said where are you

20   from?  I said I'm from Nigeria.  He said originally?  I told

21   him.  He said you married or single?  I said I'm married.  So,

22   he said, you know, you know that we know what you do.  I said

23   what do I do.  What do you mean.  He said, yeah, of course we

24   know what you do. He said hold on.  The other officer now told

25   him hold on.  So both of them start having conversations.  So

A000121

N5U3ALIH                     Alisigwe - Direct

1    after that, he brought out a small, like a recording device.

2    So he put it on the table.  Press it.  He said I'm so-and-so

3    person, I'm from the FBI.  They don't want to mention his name.

4    We are going to record this conversation here.  All we need you

5    to do is tell the truth.  I said what is going on?

6    Q.  Let me stop you for a minute.  I know you were saying to

7    them what is going on and things like that.  But in your mind,

8    did you have a sense of what they were questioning you about

9    and what they were interested in?

10   A.  No.

11   Q.  You had no idea what they were questioning you about?

12   A.  No, at that point I didn't know.  So I was thinking maybe

13   it's because of my citizenship that I applied.

14   Q.  Then what happened?

15   A.  Because when they asked me about my kids, their names,

16   this, this, that.  So he started the questions over again and

17   asked me about my wife, my wife's name, my kids' names, my

18   father's name, my mother's name.  So I answer.  That's when I

19   start having the idea what's going on.

20   Q.  What was that idea?

21   A.  The idea is when he brought a picture, like in a black and

22   white, presented it to me.

23   Q.  What was that a picture of?

24   A.  A picture of me.

25   Q.  Okay.  Where was that picture taken, as far as you can

N5U3ALIH                    Alisigwe - Direct

1    tell?

2    A.  I can't really remember.

3    Q.  Okay.  And what did you believe at that point, what were

4    you starting to believe that they were questioning you about?

5    A.  At that point I started thinking that this is not, because

6    I look at the picture, it's not a passport picture that I used

7    on my citizenship.  When you filling out the form, you bring

8    your passport picture, so it's different from that.  They said

9    you know this person?  I said why are you asking me that?  So I

10   said this is not a picture, this is not a picture that I used

11   when I filled my citizenship.  They were asking me so many

12   questions about my citizenship.  When did I submit it?  Have I

13   went for fingerprint?  Have I went for this?  So all my mind

14   was about the citizenship application.  So, the other officer,

15   the tall guy, said you know who's that on that picture?  So I

16   looked at him, I said I'm under arrest?  He said no.

17   Q.  What did you think you might be under arrest for?

18   A.  Under arrest.

19   Q.  Why did you think you might be under arrest?

20   A.  That was the question that came out from my mind.  I said

21   am I under arrest?  Because the other one have a handcuff.

22   Brought out the handcuff, the ones that they could put on you,

23   like single one, put it on the table.  He said this is you.

24   And he asked me do you have a passport of another country with

25   you?  I said no.  So he look at the other officer.  I think we

N5U3ALIH                     Alisigwe - Direct

1    will need to check his bags.  So that's when I said do I need a

2    lawyer for this?  He said no, you don't need a lawyer at all

3    for this.  You don't need a lawyer.  Everything is fine.

4            Then they took me out, called the other officer to

5    bring my bags.  So we went down to the section, they checked my

6    bags.  First of all, they took my phone for like hours, they

7    brought my phone.  The other officer start checking my phone,

8    going through the pictures on my phone.  What are you looking

9    for?  He said when I find what I am looking for, he said, I

10   will tell you.  Who is this?  That's my brother.  Who is this?

11   My cousin.  Who is this?  My mother.  Who is this?  I keep

12   answering that.

13           So at a point I said this is too much.  You are not

14   telling me what I really did, so I think I need to call a

15   lawyer.  He said you don't need to call a lawyer here at all.

16   So, he said okay.  We are done.

17           THE COURT:  Let me interrupt for a second.

18           Where are we going with this, Mr. Stoll?

19           MR. STOLL:  I'm almost done with this portion.

20           THE COURT:  We don't need the chapter and verse what

21   happened in that interview unless something happened.

22           MR. STOLL:  I'll move it forward.  I'll demonstrate

23   why it's probative, your Honor.

24   Q.  Did there come a time that you left the airport that day

25   not under arrest?

N5U3ALIH                    Alisigwe - Direct

1    A.  Yes.

2    Q.  By the time you left that airport, did you think that you

3    were a suspect in identity theft?

4    A.  Yes.

5    Q.  Notwithstanding the fact that you thought you were a

6    suspect in identity theft, after you left the airport that day,

7    did you continue to conduct activities in furtherance of

8    identity theft?

9    A.  I did when they called me after, after three weeks to a

10   month, they called me.  So we are talking on the phone.  I said

11   I was stopped, and I am not going to do it again.  They stopped

12   me at the airport, they showed me I think one of that picture I

13   sent to you guys to do those passports or something, so I'm

14   scare.  I'm not doing this again.  So we yell on the phone.  I

15   hang up the phone.  So they said make sure you pay the phone

16   bill on that phone.  If we call you and don't get you on the

17   phone, maybe you block us, your mother is dead.

18           So, I didn't pick the phone three weeks, about two

19   months I didn't pick up.  That's when they went to my house.

20   They went to my house, they saw my mom.

21   Q.  How did you learn that?

22   A.  They send me the picture.

23   Q.  Okay.

24   A.  Yeah.

25   Q.  After you got that picture, did you commence opening bank

```
N5U3ALIH                    Alisigwe - Direct
```

1  accounts and moving money through those bank accounts under

2  false names at that point?

3  A.  Yes.

4  Q.  Okay.  Why, if you were a suspect, if you knew you were a

5  suspect at that point, did you continue engaging in those

6  identity theft activities?

7  A.  To be honest with you, it was because of my mom.

8  Q.  Okay.  Just I want to move you way forward now.

9          Let me just have one moment, your Honor.

10          I'm going to move you way forward to when you were in

11  this courtroom a couple of appearances ago and you entered a

12  guilty plea.  Do you remember that?

13  A.  Yes.

14  Q.  Did there come a time during that when you were in the

15  middle of that plea allocution, did there come a time that you

16  began to cry?

17  A.  Yeah.

18  Q.  Why?

19  A.  It's when the judge asked me the reason why.

20  Q.  The reason why what?

21  A.  The reason why I'm -- did anybody force me to sign this.

22  Am I okay with this and all that.  So that's when I remembered

23  about everything that happened.  Like, if they didn't, if I

24  didn't do what I did with them, I would not be in court.  I

25  would not be arrested.  I would not be suffering now.  So, I

N5U3ALIH                    Alisigwe – Direct

1   remembered about all that and my mom.  So, I said I have to, I

2   have to open up and say the truth.

3   Q.  What specific question did the judge ask you that caused

4   you to begin to cry, if you remember?

5   A.  When she told me that she read everything on the plea.  So

6   she said do you understand everything I said?  I said yes.  So

7   she asked me if I'm signing this, is anybody forcing me to do

8   this, did I decide to sign, do I accept this plea.  So I said

9   yeah.  So she now told me about that I would not be able to

10  have some license in America to practice and all that.  I said

11  I understand.  But, at that point, I talked to myself, it's

12  better for me to say the truth.

13  Q.  Did there come a point where the judge asked you if anybody

14  forced you to commit these crimes?

15  A.  Yes.

16  Q.  What happened when she asked you that?

17  A.  I told her yes.

18  Q.  Okay.

19          MR. STOLL:  I have no further questions.  Thank you.

20          THE COURT:  Thank you.

21          MS. ESPINOSA:  Your Honor, may we have one moment to

22  make sure the laptop is connected?

23          THE COURT:  Sure.

24          MS. ESPINOSA:  Thank you.

25  CROSS-EXAMINATION

N5U3ALIH                    Alisigwe - Cross

1    BY MS. ESPINOSA:

2    Q.  Good morning, Mr. Alisigwe.

3    A.  Good morning.

4    Q.  Now, you testified on your direct examination that some

5    unknown people made threats about your mother; is that right?

6    You remember that?

7    A.  Yes, yes.

8    Q.  Now, how many times did these unknown people call you?

9    A.  I can't remember how many times.

10   Q.  How often did they call you?

11   A.  Sometime they call me -- sometime they call me twice a

12   week.  Sometime they call me three times a week.  Sometime they

13   don't call me.  Maybe next month they will call.

14   Q.  So you said they started calling you in late 2015; is that

15   right?

16   A.  Yes.

17   Q.  And they kept calling you up until the time you were

18   arrested; is that right?

19   A.  Yes.

20   Q.  And they kept sending you passports and other people's

21   identities to open bank accounts during that time, right?

22   A.  Yeah, they were sending me passport.

23   Q.  How many passports did they send you?

24   A.  I don't know how many passports.

25   Q.  More than 10?

N5U3ALIH                    Alisigwe - Cross

1   A.  Maybe.

2   Q.  More than 20?

3   A.  I don't know.

4   Q.  Did you open a bank account using each one of those fake

5   passports?

6   A.  There were some they send, they would say, okay, we don't

7   need that anymore, don't open an account with that.

8   Q.  You said that these people communicated with you over the

9   telephone; is that right?

10  A.  Yes.

11  Q.  Did they call you using a normal telephone or did they call

12  you through WhatsApp?

13  A.  They call me using a normal, the call always come call-1.

14  Q.  Always came as call-1?

15  A.  Yeah, call-1.

16  Q.  Did you communicate with these people on WhatsApp as well?

17  A.  On WhatsApp?  Maybe a few times, yeah.

18  Q.  What name came up for WhatsApp?  Did it also say call-1?

19  A.  Nah.

20  Q.  What did it say?

21  A.  That is not even a human being's name.

22  Q.  But what was the human being's name?

23  A.  That was a nickname.

24  Q.  What nickname?

25  A.  Called Odomkpa.

N5U3ALIH                    Alisigwe - Cross

1   Q.  Can you spell that?

2   A.  Odomkpa.

3           THE COURT:  Spell it.

4           THE WITNESS:  I am going to try.  O-B-O-D-O-M-K-P-O.

5   no.  A.  M-K -- M-K-P-A.  Something like that, yeah.

6   Q.  Now these people, they sent you pictures of your mom on

7   WhatsApp or did they send you pictures some other way?

8   A.  No, on a text, like when you get a text message.

9   Q.  Just a normal text message, not through an app?

10  A.  Yeah.

11  Q.  How many pictures of your mom did they send?

12  A.  I can't remember how many of them they send.

13  Q.  Now, what was the telephone number of the phone that they

14  sent you from Nigeria?

15  A.  I can't remember the number.  Because you keep changing the

16  phone.

17  Q.  They'd keep sending you new phones?

18  A.  They would start telling me to go buy a new phone.

19  Q.  And to go buy a new SIM card?

20  A.  Yeah.

21  Q.  How often would they tell you?

22  A.  A lot.

23  Q.  Once a week?  Once a month?

24  A.  I can't remember in that particular, but it's a lot.  A lot

25  of SIM card.  They asked me to buy.  Most of the time they

N5U3ALIH                    Alisigwe - Cross

1    asked me you buy a SIM card, buy a phone.  Throw that one away.

2    Don't use that one away.

3    Q.  Did they send you money to buy these phones?

4    A.  They send me money to buy the phone?

5    Q.  They told you to buy new phones.  Did they send you money?

6    A.  No, no.

7    Q.  Now, you said that they threatened your mother, right?

8    A.  Hmm-hmm.

9    Q.  What specifically did they say they would do to your

10   mother?

11   A.  They said they would kill my mother.

12   Q.  How many times did they tell you that?

13   A.  Many times.

14   Q.  Every time they called?

15   A.  Not every time they called.  Like whenever I start saying I

16   am not doing this again, I am not going to do this again.

17   Q.  And did you ever talk to your mother about these threats?

18   A.  I wouldn't tell my mother that.

19   Q.  Did you ever tell her that the people were threatening her?

20   A.  No, I can't do that.

21   Q.  Why not?

22   A.  Do you know where I'm from?  Where I'm from, my mother hear

23   that someone is threatening to kill her, with what is going on

24   from where I'm from, she will have heart attack.

25   Q.  So you didn't --

```
      N5U3ALIH                 Alisigwe - Cross
```

1   A.  People die every day.  Like, they kidnap people almost

2   every day.

3   Q.  How do you know that?

4   A.  I'm from there.

5   Q.  But how do you know that?  Do you hear it on the news?

6   A.  It is on the news.  You can even check it out on your

7   YouTube.  You can see a lot of them.

8   Q.  You didn't tell your mother maybe she needed to be extra

9   careful?

10  A.  I can't even -- if you call my mom and tell my mom that

11  someone was trying to kill her, that she should do this, she

12  should do that, I wouldn't do it.

13  Q.  So your mother never knew she was in danger?

14  A.  No.

15  Q.  Did you ever tell your wife?

16  A.  Yes.

17  Q.  When did you tell your wife?

18  A.  I told my wife that was -- I think after, I think about

19  almost two years ago that I told my wife.

20  Q.  And why didn't you try to move your mom to another

21  location?

22  A.  I tried.

23  Q.  What did you do to try?

24  A.  I told her, I told my mom I want her to go and stay with my

25  wife.  She declined.  She said I can go visit my children and

**A000132**

N5U3ALIH                         Alisigwe - Cross

1   come back.  Like, this is her husband's house.  She will not

2   leave her husband's grave.  It is a tradition where I'm from.

3   It's very hard to tell a woman, an old woman that her husband

4   is dead to leave that place, because almost every other day she

5   goes to the burial spot where the husband is buried, sweep that

6   place, remove some weeds growing around there.

7   Q.  But if you told your mother she was in danger, surely she

8   would have wanted to move?

9   A.  My mother have hypertension.  Do you know what that means?

10  High blood pressure.  If I tell my mom that, the story about

11  what is going on, that would kill her.

12  Q.  You were traveling to Nigeria regularly through the whole

13  time that you were committing this crime, right?

14  A.  Yes, I was traveling to Nigeria to see my wife and my kids

15  and my mom also.

16  Q.  So you went about once a year; is that right?

17  A.  Yeah.

18  Q.  And you usually stayed for a couple of months at a time,

19  right?

20  A.  Yes.

21  Q.  And during that time, you saw your mom?

22  A.  Yes, I saw my mom.  I went to the village and saw my mom.

23  Q.  And you said that on one occasion, you were eating at a

24  restaurant and some people in vehicles came and saw you at the

25  restaurant; is that right?

N5U3ALIH                    Alisigwe - Cross

1  A.  Yes.

2  Q.  How many people were in those vehicles?

3  A.  Maybe like about six.

4  Q.  Was your mom there too?

5  A.  No, my mom wasn't in the vehicle.

6  Q.  Was she in the restaurant with you?

7  A.  Who I was with in the restaurant?

8  Q.  Who were you with in the restaurant?

9  A.  Oh, my cousin, yeah.

10 Q.  Did you regularly meet with the people who were threatening

11 your mom while you were in Nigeria?

12 A.  No.

13 Q.  That was the only time you met with them?

14 A.  Yeah, that was the only time I met them.

15 Q.  You never knew their names?

16 A.  No.

17 Q.  You never knew any nicknames for them?

18 A.  No.  Okay.  There was a time I asked them, I said, okay,

19 what is your name?  He said, no, you could call me anything you

20 want.

21 Q.  Did you have a particular name for them?

22 A.  No.

23 Q.  Did you save their number in your phone?

24 A.  What number am I going to save?

25 Q.  They gave you a number to call when they sent you the

A000134

N5U3ALIH                          Alisigwe - Cross

1   package with the phone.

2   A.  What name would I save it with?  I did not save it.

3   Q.  Why didn't you save it?

4   A.  What name would I save it with?  I don't have a name.  So

5   if I knew their name, I would save it.

6           THE COURT:  Couldn't you save it as caller-1?

7           THE WITNESS:  Nah.

8           THE COURT:  Bad guys?  Mean guys who are threatening

9   my mom?

10          THE WITNESS:  No, no, no.

11          THE COURT:  Why not?

12          THE WITNESS:  No, I didn't save it.  Whenever they

13  would call.  Okay, look at this, they could call me today with

14  their number.  Then tomorrow, they will call me with caller-1.

15  They keep calling me, you see international call.  It appears

16  call-1.  So they send me stuff on WhatsApp.  If I tried to call

17  them on that, it won't go through.  It will not be after a few

18  days, they say don't use that, buy a new phone, then you call

19  us.

20  Q.  How did you give them the number to your phone?  How would

21  you tell them what your new phone number was?

22  A.  The new phone number.

23  Q.  You didn't have a number for them, but they kept telling

24  you to change your phone, to change your number.  How would you

25  get back in touch with them with your new number?

N5U3ALIH                    Alisigwe - Cross

1    A.   Okay.  They would tell me now go buy a phone.  Then I will

2    buy it, buy a SIM card.  Activate it, yes, it's activated, send

3    me the number.  I would send them the number.

4              THE COURT:  So you had a number to send it?

5              THE WITNESS:  On WhatsApp.

6              THE COURT:  You had a number.

7              THE WITNESS:  That particular one, at that point, then

8    I would send it to them.  But the other ones that asked me to

9    buy new phones, when I buy new phones, the person that will

10   come collect money from me will now collect the number from me,

11   or the person may even give me a new phone that I would use.

12             THE COURT:  This is a whole new thing.  You were

13   meeting with people in the U.S. who were giving you phones?

14             THE WITNESS:  There was a guy that came most of the

15   time to collect money from me.

16   Q.   Who came to collect money from you?

17   A.   I don't know the guy.

18   Q.   What did he look like?  Was he tall, short?

19   A.   No, about average in height.

20   Q.   Was he American, Nigeria?

21   A.   I believe he's African, but I can't really say, because he

22   speaks more fluent English than I do.  Yeah.

23   Q.   What did you call that man?

24   A.   What I call him?

25   Q.   Yeah.  What names did you call him?

```
      N5U3ALIH                    Alisigwe - Cross
```

 1   A.  I didn't call him any name.  He would call me on the phone

 2   and say hey, I'm coming.

 3   Q.  Was it always the same guy?

 4   A.  No.

 5   Q.  How many different people might come to collect money?

 6   A.  Just only that guy.

 7   Q.  So one person met you over the course of four, five years?

 8   A.  First of all, they would call me from Nigeria and tell me

 9   that someone will come to collect money from me.  Then that is

10   the guy that will come.

11   Q.  Where did they have you meet the guy?

12   A.  Sometime, most of the time at the park.

13   Q.  What park?

14   A.  Baisley Park.

15          THE COURT:  How do you spell that?

16          THE WITNESS:  Baisley Park in Queens.

17          THE COURT:  B-A-S-L-E-Y?

18          THE WITNESS:  Something like that.  Baisley.

19   Q.  How did you know what person you were supposed to give the

20   money to?

21   A.  They will call me.

22   Q.  How did you know when you got to the park that you were

23   giving the money to the right guy?

24   A.  It was the same person.  I told you, same person that comes

25   to collect the money.

A000137

N5U3ALIH                    Alisigwe - Cross

1   Q.  And what --

2              THE COURT:  Wait a minute.  So the very first time you

3   gave this person money.

4              THE WITNESS:  Right.

5              THE COURT:  Tell me what he said to you and what you

6   said to him.

7              THE WITNESS:  He said I'm from your friends.  That's

8   the word he used.

9              THE COURT:  And you figured that must be the guy.

10             THE WITNESS:  They told me the guy will come and the

11  guy will call me.

12             THE COURT:  How much money did you give him?

13             THE WITNESS:  At that first time I gave him I think

14  17,000.

15             THE COURT:  17,000?

16             THE WITNESS:  Yes.

17  Q.  In cash?

18  A.  Yes.

19  Q.  And did you withdraw the cash from the bank accounts you

20  opened using fake IDs?

21  A.  Yes.

22  Q.  Did you get to keep a percentage for yourself?

23  A.  At the beginning I wasn't keeping, but by the time they

24  said, okay, I can check this, sometimes they would tell me to

25  take 2,000, sometimes they tell me to take 5,000.  Sometimes

**A000138**

N5U3ALIH                    Alisigwe - Cross

1  they tell me just it is different figures they tell me to take.

2  Q.  Was the amount you get to keep related to how much was in

3  the bank accounts?  Was it a set percentage of what was in the

4  bank accounts?

5  A.  They would just tell me keep this, use this to buy phone,

6  use it to buy anything that we need you to buy, just keep that.

7  That's the word they would use.

8  Q.  How often did they tell you to keep some money?

9  A.  Not really a lot of often.

10 Q.  So during this time, when you were opening bank accounts

11 with fake IDs, how were you supporting yourself?

12 A.  Huh?

13 Q.  How were you making money to live during this time?

14 A.  I do car business.  I buy cars from the auctions or from

15 people that sell cars on the street.  So I buy and fix it,

16 sometimes I ship it to Nigeria.  Fix it over there and sell it.

17 Q.  So going back to the guy that you gave money to.  How did

18 you get in touch with that guy?

19 A.  How did I get in touch with him?

20 Q.  How did you set up the time to meet him in the park?

21 A.  The people from Nigeria, they will call me and tell me.

22 They will call me and tell me go to the park so-and-so time.

23 So-and-so person will be there.  And the person will call you.

24 Q.  What number did the person call you from?

25 A.  He call me with different numbers.

A000139

N5U3ALIH                    Alisigwe - Cross

1    Q.  U.S. numbers or Nigeria numbers?

2    A.  U.S. number.

3    Q.  Did you save those numbers in your phone?

4    A.  Nah.

5    Q.  What would that person say when you gave him money?

6    A.  He would tell me I am from your friends, they asked me to

7    collect money from.  Once I give him the money, he walks off,

8    then I will walk to my car and drive off.

9    Q.  Did the people tell you how much money you were supposed to

10   give this guy?

11   A.  Yes.

12   Q.  Did the guy count the money to make sure you had given it

13   to him?

14   A.  No.  He would just collect the money and walk.

15   Q.  How did you get give it to him, in an envelope or a bag?

16   A.  Sometime in an envelope.

17   Q.  How much money was it typically?

18   A.  How much?  Like, I don't understand.

19   Q.  Was it usually about $17,000, was it more, was it less?

20   A.  Sometime it's less.  Yeah.

21        THE COURT:  How would you get the money out of the

22   account?

23        THE WITNESS:  They would tell me when to go to the

24   bank and say the money is there, that I should check it.  I

25   have to go to the ATM and check.  That if the money is there, I

A000140

N5U3ALIH                    Alisigwe - Cross

1    will tell them, they will call me later in the day and say you

2    see the money?  Yes.  They say leave the money there.  They

3    would tell me when to go.

4              THE COURT:  How would you get the money out of the

5    bank?

6              THE WITNESS:  Sometime I use my ATM, sometime I go

7    into the bank with that passport they give me.

8              THE COURT:  With the false passport.  You would write

9    a check?

10             THE WITNESS:  Sometime they tell me to write a check.

11             THE COURT:  Okay.

12   Q.  When you withdrew it from an ATM, how much money could you

13   withdraw at a time?

14   A.  It depends how much the ATM is paying.

15   Q.  So would you have to go back to the bank multiple times to

16   get all the money out?

17   A.  They would tell me when to go to the bank.  They always

18   give me instructions.

19   Q.  They would tell you every single time you went to the bank,

20   you would get instructions from someone?

21   A.  Basically, when they put money in the account, they would

22   tell me, that's when they call me and say, hey, so-and-so date,

23   go to the bank, withdraw money, withdraw such-and-such amount.

24   Q.  Let's say, for example, there was $17,000 in the account

25   that you needed it get out.  You couldn't get all of that out

N5U3ALIH                    Alisigwe - Cross

1   of an ATM at one time, could you?

2   A.  No.

3   Q.  So you would have to go back to the ATM multiple times to

4   get the money out?

5   A.  Yeah.  Sometimes I would go to the ATM multiple times.

6   Q.  Now, you said that there were various periods of time when

7   you would stop opening the account, right?

8   A.  Hmm-hmm.

9   Q.  You would stop for a couple of months at a time?

10  A.  Yes.

11  Q.  And you were ignoring their calls during this time?

12  A.  Yes.

13  Q.  Weren't you worried about what would happen to your mom

14  while you were ignoring these calls?

15  A.  I told them I'm not going to do it again.

16  Q.  You felt you could tell them you were not going to do it

17  again?

18  A.  Okay.  I felt like, you know, what I go through each time,

19  they tell me what to do, how to go to the bank.

20  Q.  Mr. Alisigwe, I am talking about the times when you felt

21  comfortable to tell them you were going to stop and you stopped

22  for a couple of months at time.  Isn't that what you just said?

23  A.  I said I stopped for a couple months.  It's not I feel

24  comfortable.

25  Q.  But you did it anyway?

N5U3ALIH                    Alisigwe - Cross

1   A.  Yeah.  But I told them.  But at the same time, they keep

2   calling me, sending me that picture, everything would turn

3   around for me.

4   Q.  When you stopped for too long, they would send you another

5   picture; is that what you are saying?

6   A.  Yes.

7   Q.  Mr. Alisigwe, what's your mother's name?

8   A.  My mother's name is Ijeoma.

9          THE COURT:  Spell that.

10  A.  I-J-E-M-A.

11  Q.  Sorry.  Keep going.

12  A.  I-J-E-O-M-A.

13  Q.  I-J-E-O-M-A; is that right?

14  A.  Yes.

15  Q.  What's her last name?

16  A.  The same last name with me.  Alisigwe.

17  Q.  How did you communicate with your mother normally?

18  A.  I call her on the phone.

19  Q.  Did you ever talk to her on WhatsApp?

20  A.  No, my mother doesn't have WhatsApp.  My mother is too old

21  for WhatsApp.

22  Q.  Did your mother have a smart phone?

23  A.  No.  She have a small phone she use that she have a little

24  girl that helps her most of the time.

25  Q.  I want to talk a little bit more about the accounts you

N5U3ALIH                    Alisigwe - Cross

1   were opening.  So you were opening these accounts using these

2   fake passports that the people send you, right?

3   A.  Yes.

4   Q.  And these passports had your photo on them?

5   A.  Yes.

6   Q.  But they had other people's names on them, right?

7   A.  They have different names.

8   Q.  And sometimes they also gave you fake driver's licenses,

9   right?

10  A.  You mean with the passport?

11  Q.  Yeah.  To go with the passport.

12  A.  Yes.

13  Q.  All of those were in other people's names, right?

14  A.  All in different names.

15  Q.  They all had your photo on them?

16  A.  Yes.

17  Q.  And some of these IDs were in real people's identities,

18  right?

19  A.  I don't know.

20  Q.  You don't know?

21  A.  No.

22  Q.  But you never had permission to use these people's

23  identity, right?

24  A.  I don't know if it is people's identity, because most of

25  the names, I don't know if the names, I don't know.

N5U3ALIH                    Alisigwe - Cross

1    Q.  You would go to the bank, you would go into the bank and

2    open an account so you would claim to be that person, right?

3    You would tell the bank "this is my name."

4    A.  When you go to the bank to open an account, you give them

5    the -- I give them the passport.

6    Q.  So you were lying to the bank about your identity, right?

7    A.  Yes.

8    Q.  And then after the account was opened, money would be

9    deposited, right?

10   A.  After some time, they would call me and say money is in the

11   account.

12   Q.  Did you ever help deposit the money?

13   A.  No, I don't know how they put the money in the account.

14          THE COURT:  So you opened the account with no money?

15   You had to make an initial deposit.

16          THE WITNESS:  Some banks you don't put any money.

17          THE COURT:  You can open an account with no money?

18          THE WITNESS:  They will tell you how much time you

19   have to put money in the account.

20   Q.  Did you ever --

21   A.  But some of them I used money to open it too.

22          THE COURT:  Sometimes you --

23          THE WITNESS:  Yeah, I used, like sometimes $50,

24   sometimes $100.

25   Q.  Where did you get that money?

**A000145**

N5U3ALIH                    Alisigwe - Cross

1   A.  That's from the money they gave me.

2   Q.  So that would be some of the money they told you you could

3   keep.  You would use it to open new accounts?

4   A.  Yes.

5   Q.  Did you ever deposit other money into those accounts?

6   A.  Which other money?

7   Q.  Did you ever deposit money orders?

8   A.  Money orders.  No.

9   Q.  Did you ever deposit checks in those bank accounts?

10  A.  Some of them.  Some of them they would tell me to deposit a

11  check.  I would write a check and deposit it.

12  Q.  You would deposit a check that is in the name of the person

13  on the account?

14  A.  Yeah, they would tell me to write a check, like if you --

15  if I have, like, how do I explain it.  Like two accounts.

16  That's money on this one.  Okay, the money on this one, I

17  cannot withdraw the money all at one time.  They said I should

18  write a check on this one and deposit it on this one.

19  Q.  How many --

20  A.  So I can withdraw the money fast, and give it to them.

21  Q.  And when you did that, did they send you the checks?  How

22  did you get the checks?

23  A.  How do I get the checks?

24  Q.  Where did you get a check for the first account so you

25  could deposit it in the second account?

N5U3ALIH                    Alisigwe – Cross

1   A.  When you open an account, they give you checks.

2   Q.  They give you checks?

3   A.  Yeah.

4   Q.  Now, you said that sometimes you withdrew the money in

5   cash, right?

6   A.  Yes.

7   Q.  Did you ever send the money out by wire transfer?

8   A.  Yes.

9   Q.  How would you get the wire instructions?  How would you get

10  the receiving account?

11  A.  They would send me a message.

12  Q.  By WhatsApp or text message?

13  A.  That's when they would send me a message on WhatsApp.

14          MS. ESPINOSA:  All right.  Mr. Ahuja, can you please

15  pull up what is marked for identification as Government Exhibit

16  3.  Can you zoom in on the passport portion.

17  Q.  Mr. Alisigwe, that's a picture of you, right?

18  A.  Yes.

19  Q.  Now, is this one of the passports you used to open a bank

20  account?

21          MR. STOLL:  Can we just identify what Bates stamp this

22  is.

23          MS. ESPINOSA:  On Government Exhibit 3, we gave you an

24  index.  I have a copy.

25          THE COURT:  Bates number 4024.

N5U3ALIH                    Alisigwe – Cross

1        MR. STOLL:  Thank you.  I don't have the index.

2        MS. ESPINOSA:  Okay.

3        The government moves to admit Government Exhibit 3.

4        THE COURT:  Any objection?

5        MR. STOLL:  No.

6        THE COURT:  3 is received.

7        (Government's Exhibit 3 received in evidence)

8   Q.  Mr. Alisigwe, what's the name on this passport?

9   A.  Wilhelm Heinz.

10       MS. ESPINOSA:  Mr. Ahuja, can you please pull up

11  what's marked for identification as Government Exhibit 12.  Can

12  you go to the next page.  And can you zoom in on the top half

13  of the page.

14  Q.  Mr. Alisigwe, you opened a bank account in the name Wilhelm

15  Heinz, didn't you?

16  A.  Yes.

17  Q.  Using this passport?

18  A.  Yes.

19       MS. ESPINOSA:  And do we have the Bates number on

20  that.  Mr. Ahuja, if you can zoom out.  And the Bates number is

21  at the bottom there.

22       MR. STOLL:  Thank you.

23       MS. ESPINOSA:  The government moves to admit

24  Government Exhibit 12.

25       MR. STOLL:  No objection.

N5U3ALIH                    Alisigwe – Cross

1          THE COURT:  12 is received.

2          (Government's Exhibit 12 received in evidence)

3          MS. ESPINOSA:  Can you zoom back in on the top half of

4     the page, please, or call out the top half of the page.

5     Q.  Mr. Alisigwe, you see in the top-right corner where it says

6     date opened, you see the date there?

7     A.  Yes.

8     Q.  What's the date that this account was opened?

9     A.  It says here 8/11/2018.

10    Q.  That's August 11, 2018; is that right?

11    A.  Yes.

12    Q.  And looking at the branch information just below that, it

13    says this account was opened at Lefferts Boulevard 103rd

14    Street; is that right?

15    A.  Yes.

16    Q.  And then if you look down, you see the account number

17    there.  Can you see that?

18    A.  Yes.

19    Q.  And you opened both a checking account and a savings

20    account with this ID, right?

21    A.  Yes.

22    Q.  Can you read the account number there for the checking

23    account?

24    A.  312725572.

25          MS. ESPINOSA:  Mr. Ahuja, you can take this down.  Can

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

**A000149**

N5U3ALIH                    Alisigwe - Cross

1   you please pull up what's marked for identification as

2   Government Exhibit 1.

3   Q.  Mr. Alisigwe, that's you, right?

4   A.  Yes.

5   Q.  And that's you doing a transaction at a bank, right?

6           MR. STOLL:  If I can just stop for a moment just to

7   identify the Bates stamp on this again.

8           MS. ESPINOSA:  Give me one second, your Honor.  We had

9   provided an index to defense counsel, but it appears I forgot

10  to the print it out.  This is a still from USAO Bates number

11  ending in 4029.

12          MR. STOLL:  Thank you.

13          THE COURT:  If you want to e-mail it to us to speed

14  things along, you we can get it printed out.

15          MS. ESPINOSA:  We'll do that now.

16          THE COURT:  If you e-mail it to chambers or to

17  Ms. Caliendo directly.

18          MS. ESPINOSA:  I'll ask if one of my colleagues would

19  do that.

20          MR. STOLL:  If you would cc me on that.

21          MS. ESPINOSA:  You received it on Friday.

22          MR. STOLL:  I don't doubt it, but if you would kindly

23  send it to me, that would be great.

24          THE COURT:  Go ahead.

25          MS. ESPINOSA:  Government moves to admit Government

**A000150**

N5U3ALIH                    Alisigwe - Cross

1   Exhibit 1.

2               THE COURT:  Any objection?

3               MR. STOLL:  No.

4               THE COURT:  1 is received.

5               (Government's Exhibit 1 received in evidence)

6               MS. ESPINOSA:  Mr. Ahuja, if you can just call out the

7   date and time at the top of the page here.

8   Q.  Mr. Alisigwe, do you see at the bottom of that section a

9   date and time?

10  A.  Yes.

11  Q.  Can you please read that date and time.

12  A.  8/11/2018.

13  Q.  And approximately what time was this?  What time does say

14  there?

15  A.  12:56.

16  Q.  Now, looking at the top line, where is the location of this

17  transaction?  You see it where it says site?

18              This is at a JPMorgan Chase, right?

19              MR. STOLL:  Your Honor, I'm just going to object to

20  the extent that the government's questioning is not really

21  intended to go to the duress or coercion defense.  It is really

22  establishing the elements of the crime, which are not an issue

23  here.

24              THE COURT:  I'm waiting for how you are going to tie

25  this all together, Ms. Espinosa.

N5U3ALIH                    Alisigwe - Cross

1          MS. ESPINOSA:  Yes, your Honor.

2          THE COURT:  Ties into duress.

3          MS. ESPINOSA:  Your Honor, it also goes to the

4    defendant's credibility.

5          THE COURT:  Okay.

6          MS. ESPINOSA:  But I will keep it short.

7          THE COURT:  Thank you.

8    Q.  And this took place at Lefferts Boulevard, right?

9    A.  Yes.

10         MS. ESPINOSA:  Now, Mr. Ahuja, can you please go back

11   to Government Exhibit 12.  Could you please go to the next

12   page.  Is there another page?  Yes.  Could you please call out

13   the electronic signature at the top.

14   Q.  Mr. Alisigwe, does it say that it was signed at 12:39 p.m.

15   on August 11, 2018?

16   A.  Yes.

17   Q.  That's just about 15, 20 minutes before that surveillance

18   still, is that right, from 12:57?

19         MS. ESPINOSA:  You can take that down, Mr. Ahuja.  All

20   right.  Can you please pull up Government Exhibit 7.  What's

21   marked for identification as Government Exhibit 7, and I don't

22   know if it's possible -- I don't think we can rotate it.  Can

23   you please zoom in on the passport.

24   Q.  Is this another one of the passports that the people sent

25   you?

**A000152**

```
        N5U3ALIH                  Alisigwe - Cross
```

1    A.  Yes.

2    Q.  And that's you in that picture, right?

3    A.  Yes.

4    Q.  And the name is Gwen Maro Kibbe; is that right?

5    A.  Yes.

6    Q.  You opened bank accounts using this ID?  Do you recall if

7    you opened bank accounts using this ID?

8    A.  I'm trying to think.  I can't remember.

9              MS. ESPINOSA:  Can you, Mr. Ahuja, can you please pull

10   up what's marked for identification as Government Exhibit 6.

11             I apologize.  Before that, I move to admit Government

12   Exhibit 7.

13             THE COURT:  7 is received.

14             (Government's Exhibit 7 received in evidence)

15   Q.  Please pull up Government Exhibit 6.

16             Mr. Alisigwe, is that a photo of you?

17   A.  Yes.

18   Q.  And that's another ATM transaction, right?

19             THE COURT:  Is that you at an ATM machine?

20             THE WITNESS:  That's my picture.  I don't know where

21   is that.

22             MS. ESPINOSA:  Government moves to admit Government

23   Exhibit 6.

24             THE COURT:  Any objection?

25             MR. STOLL:  No.

**A000153**

N5U3ALIH                    Alisigwe – Cross

1      THE COURT:  6 is received.

2          (Government's Exhibit 6 received in evidence)

3      MS. ESPINOSA:  Now, Mr. Ahuja, can you please pull up

4   what's marked for identification as Government Exhibit 14.

5   Could you zoom in on the name at the top of the account.

6   Q.  Mr. Alisigwe, this is account in the name of Gwen Maro

7   Kibbe, right?

8   A.  Yes.

9   Q.  Does that remind you that you opened an account in this

10  name?

11  A.  Yes.

12         MS. ESPINOSA:  You can take that down now.  I

13  apologize.  Could you please pull that back up.  Government

14  Exhibit 14.

15         Government moves to admit Government Exhibit 14.

16         THE COURT:  Any objection?

17         MR. STOLL:  No.

18         THE COURT:  14 is received.

19         (Government's Exhibit 14 received in evidence)

20  Q.  Could you please go to page 66 of that document.  Can you

21  please call out the top transaction.

22         Mr. Alisigwe, you see the top entry there?

23  A.  Yes.

24  Q.  It shows a check deposit into the bank account for Gwen

25  Maro Kibbe; is that right?

N5U3ALIH                    Alisigwe - Cross

1   A.  Yes.

2   Q.  A check in the amount of $35,200?

3   A.  Yes.

4   Q.  Is that one of the checks the people told you you needed to

5   deposit?

6   A.  Yes.

7           MS. ESPINOSA:  You can take that down.  Mr. Ahuja, can

8   you please pull up Government Exhibit 8.  Marked for

9   identification as Government Exhibit 8.  Can you please zoom in

10  on the passport portion.

11  Q.  Mr. Alisigwe, this is another passport with your photo on

12  it, right?

13  A.  Yes.

14  Q.  This one is in name Sadia Mughal.  Do you see that?

15  A.  Yes.

16  Q.  Did you open bank accounts in that name?

17  A.  Yes.

18  Q.  You owned multiple bank accounts in this name, right?

19  A.  Yeah, I think so.

20          MS. ESPINOSA:  The government moves to admit

21  Government Exhibit 8.

22          THE COURT:  Any objection?

23          MR. STOLL:  No.

24          THE COURT:  8 is received.

25          (Government's Exhibit 8 received in evidence)

**A000155**

N5U3ALIH                    Alisigwe – Cross

1              MS. ESPINOSA:  Your Honor, may I have one moment?

2              THE COURT:  Sure.

3              MS. ESPINOSA:  I think we can move on.  Your Honor, I

4     apologize.

5     Q.  Mr. Alisigwe, your attorney asked you some questions about

6     an interview you had at the airport.  Do you remember that?

7     A.  Yes.

8     Q.  During that interview, some officers were asking questions;

9     is that right?

10    A.  Yes.

11    Q.  During that interview, at that point in time you had been

12    opening accounts using fake IDs for about three years; is that

13    right?

14    A.  Yes.

15    Q.  And you said that when you first were interviewed or at the

16    beginning of that interview, you didn't know why they were

17    interviewing you?

18    A.  Uh-uh.

19    Q.  It didn't occur to you it was because you had been opening

20    accounts using fake IDs?

21    A.  Uh-uh.

22              THE COURT:  You have to say yes or no.

23    A.  No.

24    Q.  It did not occur to you?

25    A.  Until they show me the picture of me, that's when I

N5U3ALIH                    Alisigwe - Cross

1   started.

2   Q.  During this interview, did you ever say to the officers

3   that people were threatening you and forcing you to open

4   accounts using fake IDs?

5   A.  No, I did not.

6   Q.  Why not?

7   A.  Because I was scared.

8   Q.  You were scared of the officers?

9   A.  I was scared of what going to result back home.

10  Q.  But you didn't think to ask these officers for help?

11  A.  No, I didn't.  I didn't ask them.

12  Q.  You were also interviewed by CBP officers on another

13  occasion, right, a couple year later?

14  A.  Yeah, it wasn't about -- they didn't show me any picture.

15  It was just where I'm coming from, my children.  They asked me

16  what I'm coming back with.  I told them the stuff I have in my

17  bag.  They checked my bags, they let me go.

18  Q.  And you never told them that you were being threatened by

19  people to commit crimes, right?

20  A.  No.  The officers that were there checking people, when

21  they call your name, you come up, they asked you a few

22  questions, you say, yeah, how long were you over there, you

23  tell them.  When they finish, they give you back your stuff,

24  then some people they bring their bag, check their bags.

25  Q.  During that --

A. Welcome back.
Q. During that interaction, you never told them you were being threatened by people did you?
A. No.
Q. You traveled to Nigeria multiple times after these threats started, right?
A. Yes.
Q. And each time you returned to the U.S. through some airport, right?
A. What?
Q. You came back in into the U.S. after each of these trips through an airport, right?
A. Yes.
Q. Every time someone checked your passport?
A. They checked my passport.
Q. And you never told anybody you were being threatened?
A. No.
Q. You never went to the police in New York and told them you were being threatened?
A. No, I never did.
Q. During any of your trips, you never went to the police in Nigeria and told them you were being threatened right?
A. No, I did not.
Q. Now, and you never told anyone about these threats at all until you mentioned it in court when you were trying to plead

N5U3ALIH                          Alisigwe – Cross

1   guilty; is that right?

2   A.  I mentioned it to my wife.

3   Q.  But other than your wife, you didn't tell anybody else?

4   A.  Nobody else.

5   Q.  Not even your lawyer?

6           MR. STOLL:  Objection, your Honor.

7           THE COURT:  Sustained.

8   Q.  So, I'll wrap up shortly, but you opened these accounts for

9   five years, right?

10  A.  Yes.

11  Q.  And throughout this time, you never knew who was

12  threatening you?

13  A.  No.

14  Q.  You never had a phone number saved for them in your phone?

15  A.  No.

16  Q.  You never knew their names?

17  A.  No.

18  Q.  Never told your mom about the threats?

19  A.  No, I never told my mom.

20  Q.  And during that time, you opened multiple bank accounts

21  using fake IDs, right?

22  A.  Yes.

23  Q.  You deposited money into those accounts?

24  A.  I didn't deposit money into the account.  The money would

25  come into the account.  They would call me and tell me to

N5U3ALIH                        Alisigwe - Cross

1   withdraw the money.

2   Q.  But you sometimes deposited checks into the accounts?

3   A.  That is the money that was paid into the accounts.  I

4   explained to you before.  The money will be paid into like this

5   account.  They will ask me to write a check from this account

6   to the other account.

7   Q.  Right.  So sometimes you wrote a check from one account to

8   another account?

9   A.  Yes.

10  Q.  And after you wrote the check, you deposited the check in

11  the other account, right?

12  A.  Yes.

13  Q.  And sometimes you sent wires out of the accounts?

14  A.  Yes.

15  Q.  And you withdrew money and gave it to somebody in a park?

16  A.  Yes.

17  Q.  Sometimes you got to keep a portion of the money, right?

18  A.  Sometimes they asked me to keep some money, yeah.

19          THE COURT:  They asked you to keep the money?

20          THE WITNESS:  They asked me to keep, to take -- if the

21  money is like 20,000, they say, okay, take 3,000.  Keep the

22  money.  We'll tell you what to do with it.  Most of the time

23  the only thing they would tell me do with it is buy phones.

24          THE COURT:  You are telling me you never benefited

25  from this crime at all.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000160**

N5U3ALIH                    Alisigwe - Cross

1          THE WITNESS:  Those are the money that I do benefit

2     from.

3          THE COURT:  You were buying a phone from them.

4          THE WITNESS:  No, I can't buy one phone for 3 or

5     4,000.

6          THE COURT:  I'm sorry.  You just said that you were

7     allowed to keep $3,000, and they would tell you what to do with

8     it.

9          THE WITNESS:  They would tell me what to do with it.

10    But just to buy one phone for $100 or $70, yeah.

11         THE COURT:  So the rest of it was yours.

12         THE WITNESS:  Yes.  The rest of it would become mine.

13    Q.  You got to spend the rest of it on whatever you wanted?

14    A.  Yes.

15         MS. ESPINOSA:  One moment, your Honor.

16         THE COURT:  Sure.

17    Q.  Mr. Alisigwe, you said at one point that you tried to

18    convince your mother to move to your wife's house, right?

19    A.  Yes.

20    Q.  Where does your wife live?

21    A.  My wife live in Owere.

22    Q.  Was it close to where your mother lived?

23    A.  No.

24    Q.  You sent money back to Nigeria to your family, right?

25    A.  Yes.

N5U3ALIH                          Alisigwe - Cross

1    Q.  Send money to your mom?

2    A.  I send money to my mom.

3    Q.  And you built your mom a new house in Nigeria, right?

4    A.  I built my mom a new house?

5    Q.  Did you provide your mom a new house in Nigeria?

6    A.  I renovated my father's house.

7    Q.  You rebuilt your father's house?

8    A.  Yeah.  My father built a house there already.  So I

9    completed the house.

10   Q.  I see.  And you didn't, with that money, didn't try to move

11   your mom to another house?

12   A.  To another house like?

13   Q.  You didn't try to get her to move to another house.  You

14   were sending her money.

15   A.  How am I going to move her to another house.  I tried to

16   move her to away.  She refused to go.  She refused to move.

17   She refused to leave the house.

18            MS. ESPINOSA:  No further questions, your Honor.

19            THE COURT:  Mr. Stoll, anything further?

20            MR. STOLL:  Nothing further, your Honor.

21            THE COURT:  I just want to verify a couple of things.

22            You don't know who these people were?

23            THE WITNESS:  No.

24            THE COURT:  You don't know how they got your telephone

25   number?

A000162

N5U3ALIH                        Alisigwe - Cross

1          THE WITNESS:  Nope.

2          THE COURT:  You never had a number where they could be

3    reached?

4          THE WITNESS:  The number?

5          THE COURT:  Other than the response they would text

6    you, you would text back.  The next time it could be a

7    different number.

8          THE WITNESS:  Yes.

9          THE COURT:  When you were arrested in this case, were

10   you read your Miranda rights?  Did the agents tell you what

11   your rights were, that you had the right to remain silent when

12   you were arrested?

13         THE WITNESS:  When I was arrested?

14         THE COURT:  Yeah.

15         THE WITNESS:  You mean when they arrested me in my

16   house?

17         THE COURT:  Yes.

18         THE WITNESS:  I can't remember them telling me that

19   because they bust in my door.  They knocked on the door.  So I

20   came, I was -- I picked up my sweatpants, put it on.  I was

21   holding them almost to my waist when I walked to the door.

22   They bust the door open.

23         THE COURT:  They came in.

24         THE WITNESS:  They came in.

25         THE COURT:  They said you are under arrest.

**A000163**

N5U3ALIH                    Alisigwe - Cross

1          THE WITNESS:  They said you are under arrest.

2          THE COURT:  They took you to their office.

3          THE WITNESS:  Yeah.

4          THE COURT:  Did you make a statement after they

5     arrested you?

6          THE WITNESS:  They asking me questions, and they told

7     me I have a right for a lawyer.  I can speak to my lawyer or I

8     could talk to them.

9          THE COURT:  Did you talk to them?

10          THE WITNESS:  No.

11          THE COURT:  You did not.

12          THE WITNESS:  Yes.

13          THE COURT:  Were you worried, in light of the fact

14     that the guys in Nigeria had told you that if you quit

15     responding to them, they were going to harm your mother?

16          THE WITNESS:  Yes, I was worried at that point.

17          THE COURT:  But you didn't tell anybody?

18          THE WITNESS:  I was going to talk about it, but I was

19     scared.

20          THE COURT:  You didn't tell, just to confirm --

21          THE WITNESS:  I did not tell them.

22          THE COURT:  You were concerned that you were now in

23     custody, they took your telephone away from you, so you

24     couldn't respond?

25          THE WITNESS:  Yes.

A000164

73

N5U3ALIH                    Alisigwe - Cross

1           THE COURT:  And yet you told no one.

2           THE WITNESS:  Right.

3           THE COURT:  That your mother was at risk.

4           THE WITNESS:  Yes.  I told no one.

5           THE COURT:  But you were concerned.

6           THE WITNESS:  Yes, I was concerned.  I was seriously

7    concerned.

8           THE COURT:  The whole reason you participated in this

9    crime was that you were so worried about your mother.

10          THE WITNESS:  Yes.

11          THE COURT:  And yet once you were arrested, so you

12   could no longer participate in the crime.

13          THE WITNESS:  Yes.

14          THE COURT:  You told no one that your mother was at

15   risk.

16          THE WITNESS:  Yes, but they knew.  They knew that I

17   was arrested.

18          THE COURT:  Who knew?  How?  How could the bad guys

19   know you were arrested?

20          THE WITNESS:  Your Honor, where I'm from is different

21   from here.

22          THE COURT:  Tell me how the day you were arrested, the

23   people in Nigeria could know that you were under arrest.

24          THE WITNESS:  That's what they call -- I know the

25   Court don't believe in it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000165**

1          THE COURT:  I want you to explain to me how.

2          THE WITNESS:  That's what they call voodoo.

3          THE COURT:  Voodoo.

4          THE WITNESS:  Yes.  So they know -- they could find

5   out anything.  My cousin that live here in America, when I got

6   arrested, after a week, I called him on the phone.  He told me

7   that people from Nigeria has been calling him and asking him

8   about the case.

9          THE COURT:  Hmm-hmm.  Okay.

10          Anything further from the government?

11          MS. ESPINOSA:  No, your Honor.

12          THE COURT:  Anything further from you, Mr. Stoll?

13          MR. STOLL:  No, your Honor.

14          THE COURT:  Thank you.  You can return to your seat.

15          (Witness excused)

16          THE COURT:  Do the parties want oral argument on this?

17   Mr. Stoll?

18          MR. STOLL:  Your Honor --

19          THE COURT:  I would give you time to get your thoughts

20   together.

21          MR. STOLL:  Time in terms of weeks or times in terms

22   of now?

23          THE COURT:  Times in terms of today.

24          MR. STOLL:  I'm happy to make my arguments now, your

25   Honor.  I don't need any more time.

N5U3ALIH

| | |
|---|---|
| 1 | THE COURT:  We can't do it right now.  I've got things |
| 2 | I have to do.  So the question is do you want to make argument |
| 3 | or not?  Because if you do, I am going to ask you to come back |
| 4 | at 2:30. |
| 5 | MR. STOLL:  I'm happy to. |
| 6 | MS. ESPINOSA:  Government would like that as well, |
| 7 | your Honor. |
| 8 | THE COURT:  2:30.  See you all at 2:30. |
| 9 | (Recess) |
| 10 | THE COURT:  Please be seated. |
| 11 | Mr. Stoll, this is your motion. |
| 12 | MR. STOLL:  Thank you, your Honor.  Judge, I'll be |
| 13 | brief.  And I know you have the prosecution's memo to the Court |
| 14 | in advance of this hearing as well as mine. |
| 15 | But I just want to reemphasize the really minimal |
| 16 | burden we have to have the jury charged on a defense or an |
| 17 | affirmative defense.  It is any foundation in the evidence, no |
| 18 | matter how weak or incredible the evidence or how tenuous the |
| 19 | defense would be, would entitle us to a charge on the duress |
| 20 | defense.  Any foundation in the evidence.  So it is just a |
| 21 | prima facie showing. |
| 22 | And I don't think, I don't imagine there is any |
| 23 | dispute that we've met our burden at least as to the first two |
| 24 | elements of the duress defense.  That is that, if believed, |
| 25 | that a jury could reasonably conclude that Mr. Alisigwe was |

1    posed with a threat of force directed at the time of his

2    conduct, and a threat sufficient to induce a well-founded fear

3    of impending death or serious bodily injury.  And as I'm sure

4    you know, and I've pointed out in my papers, that applies to

5    other family members as well as just defendant himself.

6           And again, I don't imagine there is a dispute as to

7    whether we've made out a prima facie case there.  But in case

8    there is a dispute, at least as to credibility, there is a

9    reason I brought out what happened at the plea allocution.  And

10   you were here and you saw it in real time, and you saw when

11   Mr. Alisigwe was moved to tears and what a surprise it appeared

12   to be to everybody in the room that in fact his -- that the

13   people who were compelling him to do these crimes compelled

14   him, threatened his mother's life.

15          So I think what this hearing is really going to turn

16   on is the third element of the duress defense, and that is that

17   he has to show that plausibly a jury could conclude that he had

18   a lack of a reasonable opportunity to escape the harm, other

19   than by engaging in the illegal activity.

20          Those are the elements.  Those are the three elements.

21   And I know there's bad case law for the defense and there is

22   bad case law from the Second Circuit, and I'm well aware of it.

23   But none of that case law establishes any additional elements

24   that we have to meet.

25          So, I know there is language in some of the cases

A000168

N5U3ALIH

1    about, you know, the defendant didn't satisfy a requirement

2    that they show they couldn't have gone to the U.S. authorities

3    in a particular case.  But, I mean, that is really dicta in

4    light of the consistency with which the Second Circuit has laid

5    out these three elements, and only these three elements, to

6    make out a duress defense.  So I think any one of these cases

7    has to be looked at, of course, in light of their specific

8    facts and circumstances.

9            And here, you've heard from Mr. Alisigwe, he's told

10   you what it's like in Nigeria.  Not in the U.S., not something

11   that any of us in this room, other than he, I believe, have any

12   firsthand experience or deep knowledge about.  But he has told

13   you about what he knows about the policing in Nigeria, the

14   likelihood that they would be any help, and even the fact that

15   there is a large crossover between the authorities and

16   civilians, and it is hard to tell who is the police and who is

17   not in Nigeria.  And that a reasonable inference could be that

18   anything that went to the police, if you weren't a person of

19   powerful means, would go straight to the very people who were

20   threatening his mother's life.

21           There was effective cross-examination here, yeah, but

22   that goes to credibility, and any issues of credibility I think

23   have to be resolved in Mr. Alisigwe's favor.

24           Your final effective cross-examination here really, I

25   think if one credits that the organization that's committing

A000169

N5U3ALIH

1  these crimes is a sophisticated organization, which they must

2  surely be to be able to create the identifications they are

3  creating and pull off the schemes they are pulling off, they're

4  certainly sophisticated enough to be able to look up on PACER

5  and know when somebody's been arrested, when somebody goes off

6  the radar, know they've gone off the radar because they're

7  running from the authorities or they're off the radar because

8  they are arrested, because they are in custody.

9         It may go to my client's credibility somewhat, but

10  those issues of credibility have to be resolved in his favor.

11         So, in sum, I think he's made out the elements, and

12  the one question I have is what harm would there be.  What harm

13  would there be in -- because these elements have words like

14  "reasonable" within them.  So, reasonable, I mean all our law

15  boils down to fuzzy words like "reasonable."  But, if

16  reasonableness and reasonable inferences are a question here,

17  then who better to make those conclusions as to what is a

18  reasonably founded fear and what's not, than a jury, rather

19  than anybody here foreclosing it as a matter of law.

20         So for all those reasons, your Honor, I think it would

21  be appropriate and right to grant us the ability to mount this

22  defense that you saw occur here in the court in real time, give

23  it to a jury, let them decide, and Mr. Alisigwe will rise or

24  fall depending on what the jury concludes.

25         I appreciate it.

N5U3ALIH

| | |
|---|---|
| 1 | THE COURT:  Thank you.  Ms. Espinosa. |
| 2 | MS. ESPINOSA:  Thank you, your Honor. |
| 3 | Now, as a threshold matter, I'll say the government |
| 4 | does dispute that the defendant has met each of the three |
| 5 | elements here, and we would not characterize the burden that |
| 6 | the defendant has to meet as very low.  In fact, in precluding |
| 7 | a duress defense, Judge Rakoff described the elements that the |
| 8 | defendant had to meet as rigorous in *U.S. v. Pestana*, 865 |
| 9 | F.Supp. 2d 357. |
| 10 | Here, your Honor, I think the defendant's testimony |
| 11 | has made clear that he can't meet any of the requirements |
| 12 | necessary to, as a matter of law, lay out a duress defense. |
| 13 | For the first two elements, he must show that the risk of death |
| 14 | or serious bodily harm to him or to his mother was so specific |
| 15 | and immediate that he had no other alternatives, and I don't |
| 16 | think that any of the defendant's testimony here gave rise to a |
| 17 | specific or immediate threat of serious bodily harm such that |
| 18 | he did not have an opportunity to escape or help his mother to |
| 19 | escape. |
| 20 | Here, the defendant testified about unknown people who |
| 21 | started calling him.  He never knew who they were.  He never |
| 22 | knew who they worked with, he never knew their names, he never |
| 23 | had a phone number to save.  He only met them in person once, |
| 24 | and he didn't testify about any efforts that he made to find |
| 25 | out who these people were or to find out who they were working |

**A000171**

1    for or to find out the true scope of their reach or ability to

2    carry out any of the threats he just detailed here today.

3           But I do agree with the defendant that really where it

4    all is going to come to a head is the inescapability

5    requirement.  And I think the defendant's testimony here today

6    made clear he cannot meet that requirement.  The defendant

7    testified that for months at a time he stopped answering the

8    calls of the people who were threatening him, that he didn't

9    respond to them for prolonged periods.  And during that time,

10   those people didn't carry out their threat against his mother.

11          The Second Circuit has found that incredibly short

12   windows of opportunity to escape are sufficient to doom a

13   duress defense as a matter of law.  In *U.S. v. Alicea*, the

14   court found that a 20-minute opportunity to go to the

15   authorities at an airport was sufficient, and because the

16   defendants did not take that 20-minute window of opportunity to

17   escape, they could not present -- their duress defense was

18   insufficient.

19          Here the defendant had repeated opportunities.  He had

20   the months where he stopped answering phone calls.  He had all

21   of his encounters with U.S. authorities at the airport.  He had

22   the interviews with CBP or with agents at the airport.  As your

23   Honor pointed out, he had his post-arrest opportunity to also

24   bring concerns to the attention of law enforcement, and he did

25   not take any of those opportunities.

A000172

N5U3ALIH

1    Now, without commenting on the validity or the
2    genuineness of his beliefs that he could not go to the
3    authorities in Nigeria, the case law also makes clear that a
4    defendant's subjective belief that going to law enforcement
5    would be futile is not in and of itself sufficient to say that
6    was not an opportunity to escape.

7    Here the defendant also had the opportunity to move
8    his mother to another location.  He had the opportunity to move
9    her to his wife's house.  He said that he was concerned that
10   the risk to her health of even telling her about these threats
11   would be too great.  But, your Honor, the case law is not that
12   the opportunity to escape be straightforward or easy or
13   obvious.  It is that it is available to him, it is reasonably
14   possible, and the fact it is difficult is not in and of itself
15   sufficient here to show he could not escape at any point during
16   the many years when he was engaged in this conduct.

17   Now, for all those reasons, your Honor, the defendant
18   fails to meet his burden to put on a duress defense.

19   Defense counsel asked what harm would this to be let
20   this go to the jury.  I think there is significant harm to let
21   the evidence of a legally insufficient affirmative defense go
22   to a jury.  it could lead to confusion, it wastes their time,
23   because a jury shouldn't have to sit through testimony if the
24   testimony itself is as a matter of law insufficient to spell
25   out the defense.

N5U3ALIH

1      So the government thinks the defendant should be

2  precluded from making a duress defense.

3      THE COURT:  Thank you.

4      Mr. Stoll, do you want the last word?

5      MR. STOLL:  No.

6      THE COURT:  I am going to take it under advisement.

7  You'll hear from me in due course.

8      Anything further from the government?

9      MS. ESPINOSA:  No, thank you, your Honor.

10      THE COURT:  Anything further from the defense?

11      MR. STOLL:  No.  Thank you for having us here.

12      MS. ESPINOSA:  Your Honor, I don't believe we have a

13  next date in this case.

14      THE COURT:  We don't.

15      MS. ESPINOSA:  Could we set either a conference date

16  or a control date?

17      THE COURT:  I will set it when I issue the opinion.

18      MS. ESPINOSA:  Okay.

19      THE COURT:  Let's assume that I deny the duress

20  defense.  Is the government going to remake your plea offer?

21      MS. ESPINOSA:  Your Honor, at this point I don't think

22  that the same plea offer would be available.  Though if

23  Mr. Alisigwe and his counsel want to talk to us about that, we

24  can have conversations with our supervisors.  But we will

25  certainly be in a position to make a plea offer.

**A000174**

N5U3ALIH

1          THE COURT:  Everything had been done, right?  There
2    were no motions in limine in this case, there was no motions to
3    suppress.
4          MS. ESPINOSA:  There was a motion to suppress, and
5    because the plea was scheduled, we had adjourned our date to
6    respond.
7          THE COURT:  It didn't get fully briefed.
8          MS. ESPINOSA:  It did not get fully briefed.
9          THE COURT:  Once when the decision comes out, we'll
10   set a status conference and schedule out the rest of the stuff.
11         MS. ESPINOSA:  Thank you, your Honor.
12         THE COURT:  Mr. Stoll?
13         MR. STOLL:  Thank you.
14         THE COURT:  Thanks, everybody.
15         (Adjourned)
16
17
18
19
20
21
22
23
24
25

```
1                    INDEX OF EXAMINATION

2    Examination of:                      Page

3     CHINWENDU ALISIGWE

4    Direct By Mr. Stoll  . . . . . . . . . . . . .3

5    Cross By Ms. Espinosa  . . . . . . . . . . . .36

6                    GOVERNMENT EXHIBITS

7    Exhibit No.                          Received

8     3   . . . . . . . . . . . . . . . . . . . .56

9     12  . . . . . . . . . . . . . . . . . . . .57

10    1   . . . . . . . . . . . . . . . . . . . .59

11    7   . . . . . . . . . . . . . . . . . . . .61

12    6   . . . . . . . . . . . . . . . . . . . .62

13    14  . . . . . . . . . . . . . . . . . . . .62

14    8   . . . . . . . . . . . . . . . . . . . .63

15

16

17

18

19

20

21

22

23

24

25
```

A000176

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/23/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                       :

UNITED STATES OF AMERICA,           :

                                        :

               -against-                      :               22-CR-425 (VEC)

                                          :

                                          :            OPINION AND ORDER

CHINWENDU ALISIGWE,             :

                               Defendant.            :

                                          :
------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Chinwendu Alisigwe ("Mr. Alisigwe") is charged with conspiracy to commit bank fraud, bank fraud, and aggravated identity theft. The Government alleges that he opened bank accounts using fake forms of identification and withdrew funds that were the proceeds of fraud from those accounts. *See* Compl., Dkt. 1; Indictment, Dkt. 5. After Mr. Alisigwe indicated during a status conference that he wishes to present an affirmative defense of duress at trial, the Government moved for a pretrial evidentiary hearing regarding the anticipated defense and a pretrial ruling regarding whether Mr. Alisigwe has made a sufficient threshold showing that he is entitled to present the defense at trial. *See* Gov't Mot., Dkt. 35. The Court held an evidentiary hearing on May 30, 2023.[1] For the following reasons, Mr. Alisigwe is precluded from presenting a duress defense at trial.

---

[1]      Mr. Alisigwe joined the Government's request for an evidentiary hearing. *See* Def. Response, Dkt. 45. The Court therefore granted the request without deciding whether the Government would have been entitled to an evidentiary hearing had Mr. Alisigwe opposed the request. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (noting that it is "appropriate for a court to hold a pretrial evidentiary hearing to determine whether a defense fails as a matter of law"). Only Mr. Alisigwe testified at the evidentiary hearing.

A000177

## BACKGROUND[2]

Mr. Alisigwe was born and raised in Orlu, Nigeria.  May 30, 2023 Transcript ("Tr.") at

3:20–4:9.  His mother, who is around 70 years old, still lives in Orlu and suffers from

hypertension.  *Id.* at 6:1-9, 11:11-12.

In 2008, after winning the visa lottery, Mr. Alisigwe moved to the United States.  *Id.* at

12:12-24.  About seven or eight years later, Mr. Alisigwe first became involved in the activities

that are the subject of the Indictment in this case.  *Id.* at 16:7–17:9.  At some point in 2015, Mr.

Alisigwe received a phone call from a stranger seeking to do business with him.  *Id.* at 17:8–

18:11.[3]  Mr. Alisigwe thought that the stranger was perhaps seeking help to purchase a car in the

United States, which was a common request from people in Nigeria.  *Id.* at 18:4-10.  Mr.

Alisigwe testified that he never knew how the stranger obtained his number.  *Id.* at 70:21–71:1.

About a week later, the stranger called back and said that he wanted Mr. Alisigwe to

provide bank account information so the stranger could wire money to the account.  *Id.* at 18:12-

18.  Mr. Alisigwe refused his request.  *Id.* at 18:20-21.

About six months later, the stranger called again and said that Mr. Alisigwe would soon

be receiving a call from a number identified as "call-1."  *Id.* at 18:25–19:6.  The stranger told Mr.

Alisigwe that he wanted Mr. Alisigwe to open bank accounts for him.  *Id.* at 19:7-12.  Mr.

Alisigwe refused and asked the stranger to identify himself.  *Id.*  The stranger declined to do so

and told Mr. Alisigwe that he was from the same place as Mr. Alisigwe.  *Id.* at 19:10-13.

---

[2]     The Court construes the evidence presented at the evidentiary hearing in the light most favorable to Mr. Alisigwe for the purposes of this decision.  *See United States v. Villegas*, 899 F.2d 1324, 1345 (2d Cir. 1990).

   The parties agreed that Mr. Alisigwe's statements during the hearing will be admissible as impeachment evidence but not as direct evidence in the Government's case in chief.  *See* May 30, 2023 Transcript ("Tr.") at 2:13–3:3; *cf. Simmons v. United States*, 390 U.S. 377, 393–94 (1968) (holding that the Government may not establish a defendant's guilt at trial by using testimony the defendant gave at a pretrial suppression hearing).

[3]     The stranger allegedly knew Mr. Alisigwe's name but did not disclose his own name.  Tr. at 17:21–18:4.

2

A000178

In early 2016, after a trip to Nigeria during which he did not meet the stranger who had been calling, *id.* at 20:3-6, Mr. Alisigwe's father died; he received a photograph of his mother via text message from the stranger, *id.* at 20:7-19. The stranger told Mr. Alisigwe said that he knew his mother and that his father had recently died. *Id.* at 20:19-23. The stranger said he would not "do anything" to his mother so long as Mr. Alisigwe opened a bank account, with further instructions to follow. *Id.* at 20:23–21:5.

A week later, the stranger texted Mr. Alisigwe another photograph of his mother. *Id.* at 21:12-15. In a subsequent call when Mr. Alisigwe pressed for an explanation for how the stranger had images of Mr. Alisigwe's mother, *id.* at 21:16–18, the stranger responded:

> [W]e know everything about you and your family. So just listen to me, and do as I say, and nobody will get hurt. Nothing will happen to you to your mom. We know your father is dead. If your mom die[s], I don't think you will be able to come back home. And after your mom, we will come after your family. We know everybody in your family.

*Id.* at 21:19-24. Mr. Alisigwe then agreed to open a bank account. *Id.* at 21:25–22:1.

One month later, Mr. Alisigwe received by mail a package containing a cellphone, directions (including a telephone number at which the stranger could be reached), and a list of approximately three names. *Id.* at 22:2-15, 23:7-11. The stranger told Mr. Alisigwe to buy a SIM card and to call him at the number provided in the package. *Id.* at 22:11-15. When Mr. Alisigwe called the phone number, the stranger answered and instructed Mr. Alisigwe to review the instructions provided in the package, memorize the list of names he had provided, and not to give the stranger's telephone number to anyone. *Id.* at 22:20–23:4.

The next time the stranger called, he asked Mr. Alisigwe for a photograph of himself; shortly thereafter, Mr. Alisigwe received passports in the mail featuring his photograph but the names of other people. *Id.* at 23:21–24:13. Mr. Alisigwe was instructed to open accounts using

3

the passports within two days of receipt so that the stranger could wire money into the accounts. *Id.* at 23:21–24:13, 44:12–49:11. Mr. Alisigwe misrepresented his identity to withdraw funds from these accounts. *Id.* at 51:25–53:7.

A different stranger would routinely meet Mr. Alisigwe in a park in New York to give him new phones and to collect the cash Mr. Alisigwe had withdrawn from the accounts. *Id.* at 44:12–45:25, 48:15–49:11. Mr. Alisigwe was allowed to keep some of the cash to buy new phones or to purchase whatever he wanted. *Id.* at 46:22–47:7; 69:6-14.

At one point, when Mr. Alisigwe was having lunch at a restaurant in Nigeria, the men with whom he had been dealing appeared in two vehicles and ordered Mr. Alisigwe to continue following their instructions and to always answer the phone when they called. *Id.* at 24:22–25:11. According to Mr. Alisigwe, this was the only time he met the men who had threatened to harm his family if he did not work with them. *Id.* at 41:23–42:14.

Mr. Alisigwe did not contact the Nigerian police because he believed they would not do anything to help him, especially if they became aware that the people threatening him were armed and dangerous. *Id.* at 24:14–25:25, 66:21-23.[4] Mr. Alisigwe was also concerned that if the people who were threatening him found out that he had reported them to the police, they would harm his mother. *Id.* at 26:1-20. Mr. Alisigwe was particularly concerned when he learned that his mother had met the people who were threatening him and that she thought they were his friends from the United States. *Id.*

---

[4]     According to Mr. Alisigwe, the police in Orlu are not reliable because they only attend to politicians and because members of violent militia groups sometimes pose as police officers. *Id.* at 6:13–8:12, 9:14-23. Ostensible police officers may, for example, stop a motorist and threaten the driver at gunpoint until they are paid a bribe. *Id.* at 9:2–10:9. Police officers in Orlu also purportedly arrest anyone with a laptop or an iPhone and hold them until a bribe is paid. *Id.* at 10:10–11:1.

**A000180**

Mr. Alisigwe did not contact law enforcement in the United States because he was afraid that doing so would prevent him from complying with the stranger's orders; if he no longer complied, his mother would be killed. *Id.* at 26:21–27:13, 66:16-20.

Whenever Mr. Alisigwe told the stranger that he no longer wanted to participate in illegal activity, he would receive threats to his mother's life, and eventually threats to the lives of his wife and children. *Id.* at 27:14-22. Mr. Alisigwe never told his mother about these threats because he was concerned that doing so would scare her badly, possible leading to a heart attack or other adverse health consequences. *Id.* at 39:19–40:14. Although Mr. Alisigwe tried to move his mother to another location to protect her, she refused to move. *Id.* at 40:20–41:11.

Mr. Alisigwe therefore continued to engage in illegal activity for several years. *Id.* at 28:5-8. He never learned the names of the individuals who were threatening him, but consistently received phone calls from them, sometimes as frequently as three times a week. *Id.* at 27:23–28:4; 36:4-13.

On February 7, 2019, Mr. Alisigwe flew into JFK Airport from Nigeria. *Id.* at 28:9-15. At the airport, Mr. Alisigwe was stopped and interviewed by FBI agents. *Id.* at 28:19–32:16. Over the course of the interview, Mr. Alisigwe realized that the FBI suspected him of engaging in identity theft. *Id.* at 33:2-4; 64:19–65:1. He did not tell the FBI agents that he was being threatened because he was afraid of what would happen in Nigeria. *Id.* at 65:2-9. Shortly thereafter, Mr. Alisigwe told the men who were threatening him that he no longer wished to cooperate because he was afraid of being apprehended, and stopped answering their phone calls for about two months. *Id.* at 33:5-19. He then received another photograph of his mother, which prompted him again to cooperate with the strangers. *Id.* at 33:19–34:7.[5]

---

[5] Mr. Alisigwe was interviewed by U.S. Customs and Border Protection officers a few years later; he again did not report that he was being threatened by people in Nigeria. *Id.* at 65:12–66:4.

5

**A000181**

Mr. Alisigwe engaged in the illegal activity at issue for approximately five years. *Id.* at 67:8-10. He did not report the threats against him to law enforcement when he was arrested in this case. *Id.* at 71:9–72:21. Although Mr. Alisigwe was concerned that his mother would be at risk because he could no longer respond to calls from the stranger after he was arrested, he believed that the men who were threatening him were aware of his arrest through voodoo. *Id.* at 72:13–74:8.

Mr. Alisigwe first informed the Court of the threats on February 24, 2023, when, during a guilty plea proceeding, the Undersigned asked him whether he had been forced to commit any of the crimes to which he was pleading guilty. *Id.* at 34:10–35:17; *see also* Order, Dkt. 34. Before that point, Mr. Alisigwe had not reported the threats to anyone other than his wife. Tr. at 40:15-19, 66:24–67:4.

## DISCUSSION

### I.     Legal Standard

"Duress is a legal excuse for criminal conduct if, at the time the conduct occurred, the defendant was subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there was no reasonable opportunity to escape other than by engaging in the unlawful activity." *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (internal quotation marks and citations omitted).

To be entitled to present a duress defense charge at trial, a defendant must "raise a factual issue regarding each element of the defense." *Id.* (citation omitted); *see also United States v. Villegas*, 899 F.2d 1324, 1343 (2d Cir. 1990) (explaining that a defendant is entitled to a duress defense at trial if he "can make a prima facie showing as to each of the elements" of the defense).

If the defendant's evidence, "even if believed, fails to establish all of the elements of a duress defense," the Court may rule upon the defense as a matter of law and need not submit it to a jury. *United States v. Bifield*, 702 F.2d 342, 346 (2d Cir. 1983). If, however, the defense has "any foundation in the evidence," no matter how "weak or incredible," the defense must be charged to a jury. *United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992).

The elements of a duress defense are: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury;[6] and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity." *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005).

## II. Mr. Alisigwe Has Failed to Make a Prima Facie Showing of Duress

Because Mr. Alisigwe has not proffered adequate evidence that he lacked a reasonable opportunity to escape harm to his family other than by engaging in illegal activity, he has failed to make a prima facie showing of duress. Accordingly, he is not entitled to raise the defense at trial.[7]

Mr. Alisigwe engaged in the illegal conduct that gave rise to the Indictment for approximately five years. *See* Tr. at 67:8-10. He was approached by U.S. law enforcement in connection with this illegal conduct at least twice. *Id.* at 28:16–33:4, 64:19–65:9, 71:9–72:21. At no point during this extended period of illegal conduct, however, did Mr. Alisigwe report the threats against his family to any law enforcement officers, whether in Nigeria or in the United States. *Id.* at 65:2-9–66:4; 71:9–72:21. That alone is fatal to his duress defense. *See United*

---

[6] Evidence that a defendant's family has been threatened may be sufficient to establish the defense. *See United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990) (citing *United States v. Contento–Pachon*, 723 F.2d 691, 694 (9th Cir. 1984)).

[7] Because Mr. Alisigwe has failed to make a prima facie showing with respect to the third element of duress, the Court does not decide whether he has made adequate showings with respect to the first two elements.

**A000183**

*States v. Bakhtiari*, 913 F.2d 1053, 1057–58 (2d Cir. 1990) (concluding that a defendant whose Iranian family was purportedly at risk of danger at the hands of "unidentified Iranians" if the defendant refused to commit certain criminal acts was not entitled to raise a duress defense at trial because the defendant "never communicated the alleged threats to any federal, state or local law enforcement authority"); *United States v. Alicea*, 837 F.2d 103, 105–07 (2d Cir. 1988) (concluding that even though "threats were made" against defendants' families in New Jersey, they were not entitled to present duress defenses at trial because there was "no evidence" that defendants "made any attempt either to seek protection from the authorities for their families or to telephone a warning directly to their relatives when they had an opportunity to do so").

Mr. Alisigwe emphasized during the evidentiary hearing that he did not report the threats against his family to Nigerian law enforcement because Nigerian police officers cannot be trusted. *See* Tr. at 24:14–25:25; 66:21-23. That does not rescue a duress defense. Any issues with Nigerian police did not prevent Mr. Alisigwe from reporting the threats against his family to law enforcement in the United States. *See Bakhtiari*, 913 F.2d at 1058 (dismissing the defendant's argument that he did not have a reasonable opportunity to escape threats to his family in Iran because approaching U.S. law enforcement "would have served no purpose"; the defendant, unlike his family, was based in the United States, and therefore could have sought help from U.S. authorities); *United States v. Subhan*, No. 99-CR-1149 (HB), 2000 WL 1738665, at *1–3 (S.D.N.Y. Nov. 22, 2000) (concluding that the defendant, who asserted that his son had been kidnapped by "unknown individuals" in Pakistan who required the defendant to cooperate with them, was not entitled to present a duress defense at trial because, even assuming that "the Pakistani police were corrupt," the defendant's "failure to report his plight to the U.S. authorities preclude[d]" a duress defense).

8

**A000184**

Mr. Alisigwe insisted that contacting U.S. authorities was also out of the question because doing so would have prevented him from cooperating with the men who were threatening him, which could have led to his mother's death. *See* Tr. at 26:21–27:13. That argument fails because Mr. Alisigwe's subjective fears about the consequences of contacting U.S. law enforcement are insufficient to excuse compliance with this element of a duress defense. *See Alicea*, 837 F.2d at 105–07 (concluding that defendants were not entitled to present a duress defense because they failed to seek help from law enforcement despite their "constant terror" of being apprehended by their abductors if they tried to seek help); *cf. United States v. Nwoye*, 663 F.3d 460, 464 (D.C. Cir. 2011) (concluding that a defendant was not entitled to present a duress defense because she failed to seek help from law enforcement even though she "was especially vulnerable as a recent immigrant who believed her fate was in the control of a corrupt law enforcement agent" and therefore hesitated to seek help).

For all of those reasons, the Court concludes that Mr. Alisigwe has failed to make a prima facie showing of duress. He is therefore precluded from raising a duress defense at trial.

## CONCLUSION

The parties must appear for a status conference on **Monday, July 10, 2023 at 10 A.M.** in Courtroom **443** of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007. The parties must be prepared to discuss a trial schedule at the conference. The Clerk of Court is respectfully directed to close the open motion at Dkt. 35.

**SO ORDERED.**

Date: June 23, 2023
New York, NY

    **VALERIE CAPRONI**
    **United States District Judge**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
UNITED STATES OF AMERICA                      :
                                              :
        - v -                                 :          22 Cr. 425 (VEC)
                                              :
CHINWENDU ALISIGWE,                           :
                                              :
                 Defendant.                   :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT CHINWENDU ALISIGWE'S PRE-TRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Elizabeth A. Espinosa
Jonathan L. Bodansky
William Kinder
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

**BACKGROUND**........................................................................................................ **2**

    A. The February 7, 2019 Border Search .............................................2

    B. The July 26, 2022 Arrest.................................................................3

    C. The Passports Intercepted from the Mail ......................................4

**ARGUMENT**............................................................................................................ **4**

**I.**   **The Defendant's Motion to Suppress Statements Should be Denied** ................................ **4**

**II.**  **The Defendant's Motion to Suppress Evidence Seized During the Border Searches at JFK Should Be Denied**.............................................................. **4**

    A. Applicable Law ..............................................................................4

    B. Discussion ....................................................................................10

**III.** **The Defendant's Motion to Suppress Evidence Seized from His Residence Should Be Denied After a Hearing**.......................................... **16**

    A. Applicable Law ............................................................................16

    B. Discussion ....................................................................................17

**IV.** **The Defendant's Motion to Suppress Evidence Intercepted from International Mail Should be Denied** ........................................................ **18**

**CONCLUSION** ...................................................................................................... **19**

i

The Government respectfully submits this memorandum of law in opposition to motions by defendant Chinwendu Alisigwe (the "defendant" or "Alisigwe") to suppress: (1) any statements made by Alisigwe during interviews with federal law enforcement agents at JFK International Airport ("JFK") on February 7, 2019, and March 1, 2021, after Alisigwe returned from international travel (the "Challenged Statements"); (2) the results of two manual reviews of Alisigwe's phone conducted by agents at JFK on the same days (the "Border Searches"); (3) certain fraudulent passports seized in plain view at the time of Alisigwe's arrest; and (4) certain fraudulent passports seized by Customs and Border Protection ("CBP") from international mail intercepted at the United States' border.   (*See* Dkt. No. 28 ("Def. Mem.").)

The Court should deny the defendant's motions in their entirety.

*First*, the defendant was not in custody when he made the Challenged Statements, and therefore agents were not required to give *Miranda* warnings.   Regardless, the Court need not address this issue at this time, as the Government presently has no intention to offer the Challenged Statements at trial.   This motion is therefore moot.

*Second*, the Border Searches comported with the Fourth Amendment because they were routine searches—which do not require either reasonable suspicion or a warrant—but were nevertheless also supported by reasonable suspicion.   Moreover, even if the Court were to decide that the Border Searches were not justified by the border search exception, the extreme remedy of suppression would not be appropriate because law enforcement agents acted on the basis of good faith, given the extensive case law permitting warrantless searches of cellphones at the border. This motion should therefore be denied without a hearing.

*Third*, because the defendant's declaration has put material facts in dispute with respect to the seizure of four passports from his home, the Government concedes that a hearing is needed on

1

A000188

this point.   The Government submits that at such a hearing, the evidence will show that the passports were observed by law enforcement officers in plain sight while the officers effectuated Alisigwe's arrest and prepared him for transportation to court.   Thus, the warrantless seizure of that evidence was entirely appropriate and permissible under the plain view exception.

*Last*, the fraudulent passports seized by CBP from international mail intercepted at the border were lawfully taken under CBP's warrantless border search authority.   Thus, the warrantless seizure of that evidence was entirely permissible, and this motion should be denied without a hearing.

## BACKGROUND

### A.      The February 7, 2019 Border Search

In late 2018, Homeland Security Investigations ("HSI") received information from the HSI Attaché in London, United Kingdom, indicating that Alisigwe was using multiple identities, including a fraudulent passport from the Republic of South Africa in the name Wilhelm Heinz (the "Heinz Passport").   (Dkt. No. 28-1 at 11.)   Using facial recognition software, CBP matched the photograph on the fraudulent Heinz Passport to Alisigwe.

On February 7, 2019, Alisigwe landed at JFK after traveling from Lagos, Nigeria through London.   CBP agents directed Alisigwe to a secondary inspection area, where he was met by two HSI agents.   Alisigwe agreed to speak with the agents, who did not give him *Miranda* warnings. The agents asked Alisigwe about his travel to Nigeria, his family, his employment in the United States, and the property he owned in the United States.   (Dkt. No. 28-1 at 12.)   The agents also asked Alisigwe if he ever used passports from other countries or other names and showed him a photograph of himself taken from the Heinz Passport.   During the encounter, the HSI agents asked Alisigwe to unlock his cellphone, which Alisigwe did.   The agents then conducted a

2

A000189

manual search of Alisigwe's cellphone.   They did not forensically extract the cellphone; rather, an agent manually went through the cellphone and took photographs of relevant material using his own cellphone.   After the agents conducted the review, they returned the cellphone to Alisigwe.

Similarly, on March 1, 2021, Alisigwe again flew into JFK and was met by CBP officers, who escorted him to an interview room.   The CBP officers interviewed Alisigwe about the purpose of his travel and again asked him to unlock his cellphone.   (*Id.* at 15.)   The CBP officers provided the unlocked cellphone to HSI agents, who again conducted a manual review but did not forensically extract the cellphone.

### B.   The July 26, 2022 Arrest

On the morning of July 26, 2022, in connection with this case, law enforcement agents arrested Alisigwe at his residence pursuant to an arrest warrant.   (Ex. A, Decl. of Special Agent William McKeen ¶ 2.)   The agents first knocked on the door of the residence and announced their presence.   (*Id.* ¶ 3.)   After receiving no answer, they breached the door, entered the residence, and encountered Alisigwe as he was exiting his bedroom.   (*Id.* ¶¶ 3-4.)   The agents placed Alisigwe under arrest, then accompanied him into his bedroom so that he could find appropriate clothing for his transportation to court.   (*Id.* ¶ 5.)   It was at that time, while conducting a protective sweep of the room prior to the defendant's reentry into that area, that the agents observed on the floor of the bedroom, in plain view to the side of the bed, a stack of four passports, including a Kenyan passport.   (*Id.* ¶ 6.)   Special Agent McKeen, who first observed the passports, immediately recognized the items as possible contraband—based on his knowledge that Alisigwe is not a Kenyan citizen, and his knowledge of Alisigwe's extensive use of fraudulent identification documents, including passports, in connection with the criminal conspiracy that is the subject of this case—and seized them as such.   (*Id.* ¶¶ 7-8.)

3

C.      **The Passports Intercepted from the Mail**

Both prior to and subsequent to Alisigwe's arrest, law enforcement intercepted and seized

additional fraudulent passports within international mail addressed to Alisigwe.   Those passports

were mailed from overseas and intercepted by CBP at the border, pursuant to CBP's warrantless

border search authority.

## ARGUMENT

I.      **The Defendant's Motion to Suppress Statements Should be Denied**

Questioning someone entering the United States at the border, in most circumstances, does

not amount to a "custodial interrogation" that requires the provision of *Miranda* warnings, even if

the questioning occurs in a setting in which the subject is not freely permitted to leave.   *United*

*States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).   Nevertheless, the Court need not address

this issue at this time, as the Government presently has no intention to offer at trial any statements

made by the defendant during his February 7, 2019, and March 1, 2021 interviews at JFK.   This

motion is therefore moot.

II.     **The Defendant's Motion to Suppress Evidence Seized During the Border Searches at JFK Should Be Denied**

A.      **Applicable Law**

1.      **The Border Search Authority to Search Electronic Devices Without a Warrant**

The "border search" exception is a "longstanding, historically recognized exception to the

Fourth Amendment's general principle that a warrant be obtained" for a search.   *United States v.*

*Ramsey*, 431 U.S. 606, 621 (1977).   That longstanding principle reflects that "[t]he Government's

interest in preventing the entry of unwanted persons and effects is at its zenith at the international

border."   *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).   In addition, "[t]he

4

**A000191**

1

N8p2AliC kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          22 Cr. 425 (VEC)

5   CHINWENDU ALISIGWE,

6              Defendant.

7   ------------------------------x        Conference

8                                          August 25, 2023
                                           10:35 a.m.
9

10  Before:

11              HON. VALERIE E. CAPRONI,

12                                         District Judge

13

14                    APPEARANCES

15
    DAMIAN WILLIAMS
16       United States Attorney for the
         Southern District of New York
17  BY:  ELIZABETH A. ESPINOSA
         JONATHAN L. BODANSKY
18       WILLIAM C. KINDER
         Assistant United States Attorneys
19

20  FEDERAL DEFENDERS OF NEW YORK
         Attorneys for Defendant
21  BY:  ARIEL C. WERNER

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A000192

N8p2AliC kjc

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Counsel, please state your
 3      appearance for the record.
 4              MS. ESPINOSA:  Good morning, your Honor.  Elizabeth
 5      Espinosa, William Kinder, and Jonathan Bodansky for the
 6      government.
 7              THE COURT:  Good morning.
 8              MS. WERNER:  Good morning, your Honor.  Federal
 9      Defenders, by Ariel Werner, for Mr. Alisigwe.
10              THE COURT:  Good morning, Ms. Werner.  Good morning,
11      Mr. Alisigwe.
12              THE DEFENDANT:  Good morning, your Honor.
13              THE COURT:  Okay, Ms. Werner.  Thank you for the
14      Federal Defenders stepping in on this.  As you may know, we
15      have got a partially briefed motion for a motion to suppress
16      and we have a trial date scheduled for November 6.
17              Would you like to be heard on those two issues?
18              MS. WERNER:  Yes, your Honor.
19              I have looked at the docket, I have pulled the papers.
20      I haven't had a chance to read everything in the last few days.
21      I'm very glad to represent Mr. Alisigwe again.  Unfortunately,
22      I cannot do so on that timeline.  I have spoken to him about
23      that.  I have also spoken to the government about that.  So my
24      request would be for an adjournment of both of those upcoming
25      proceedings—the hearing and the trial.
```

N8p2AliC kjc

1          I would respectfully request a trial date after

2    December 11.  I know that sounds like a somewhat artificial

3    date.  It's because I have a series of submissions, and I also,

4    at the risk of oversharing, have a partner who is also a lawyer

5    and will be traveling for a trial out of state which puts me in

6    a bind in terms of childcare.

7          THE COURT:  But any time after December 11 works?

8          MS. WERNER:  For trial, yes.

9          THE COURT:  For trial.

10         (Court and clerk confer).

11         THE COURT:  Does December 11 work for the government?

12         MS. ESPINOSA:  Your Honor, some combination of the

13   AUSAs will be available on December 11.

14         THE COURT:  I don't want to suggest that you are all

15   fungible, but you know.

16         MS. ESPINOSA:  Exactly, your Honor.

17         THE COURT:  So trial will be December 11.

18         Do you want to file a reply on the suppression motion,

19   Ms. Werner?

20         MS. WERNER:  I think it would make sense for the Court

21   to set a date for a reply so that I can review the papers and

22   have that opportunity if I wish to do so.

23         THE COURT:  Okay.  So any reply will be due on

24   September 8.  Does that give you adequate time?

25         MS. WERNER:  Your Honor, it does not, simply because I

N8p2AliC kjc

1  have so many submissions that are due in the next few weeks.

2  If the Court would indulge me and set a date at the end of

3  September or early October, I would appreciate that.

4       THE COURT:  Let's say September 29.

5       I will set the rest of these dates, sort of interim

6  dates, when I have a calendar in front of me that will lay out

7  the schedule.

8       We are going to need a suppression hearing in this, as

9  I recall.  There is kind of a clear question of fact that's

10 going to need to be resolved.  So give me a date in October.

11      (Court and clerk confer)

12      THE COURT:  October 19 at 10:00 for the suppression

13 hearing, and you will get the balance of the dates for things

14 like motions *in limine* and the requests to charge, etc.

15      How long does the government think this trial is going

16 to take?

17      MS. ESPINOSA:  Your Honor, I don't think it will be a

18 particularly long trial.  I think that it will be less than a

19 week for our case in chief.  It may well be in the order of

20 three days, but we are still determining the exact number of

21 witnesses at this point.

22      THE COURT:  That was kind of what I was thinking.

23      Okay?  Anything further from the government.

24      MS. ESPINOSA:  No, your Honor.

25      THE COURT:  Anything further from the defense,

N8p2AliC kjc

1   Ms. Werner?

2              MS. WERNER:  No.  Thank you, your Honor.

3              THE COURT:  Thank you, all.

4                           oOo

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CHINWENDU ALISIGWE,
              Defendant.

No. 22 Cr. 425 (VEC)

# REPLY TO THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

David E. Patton, Esq.
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

*Counsel for Chinwendu Alisigwe*

Ariel Werner
*Of counsel*

To:  Damian Williams, Esq.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007

      Attn:  Elizabeth Espinosa, Esq.
            William Kinder, Esq.
            Assistant United States Attorneys
            Southern District of New York

The Court should grant Mr. Alisigwe's motion to suppress (1) unlawfully obtained statements; (2) evidence seized during illegal, warrantless searches of Mr. Alisigwe's cell phone; (3) evidence seized during an unlawful, warrantless search of Mr. Alisigwe's home; and (4) evidence unlawfully intercepted from international mail addressed to Mr. Alisigwe. *See* Dkt. 28 ("Motion"). The Government has represented that it does not intend to offer the challenged statements at trial and concedes that a hearing is required to address Mr. Alisigwe's motion to suppress evidence illegally obtained from his home. *See* Gov't Opp'n, Dkt. 57, at 1-2. Accordingly, this reply focuses on Mr. Alisigwe's motion to suppress evidence obtained through unlawful cellphone searches and mail interceptions. Evidence of both should be suppressed.

## I. The Court Should Suppress Evidence Obtained Through Illegal, Warrantless Searches of Mr. Alisigwe's Cell phone.

On two occasions, federal agents looking for evidence of a crime that had nothing to do with border security illegally searched Mr. Alisigwe's cell phone without a warrant. The Government's effort to portray these unlawful searches as routine searches subject to the "border search exception" is unavailing. The searches violated Mr. Alisigwe's rights under the Fourth Amendment and their fruits should be suppressed.

"Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Riley v. California*, 573 U.S. 373, 393 (2014). Most are "minicomputers that also happen to have the capacity to be used as a telephone" but "could just as easily be called

1

cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Id.* In recognition of the tremendous privacy right at stake in a modern cell phone, the Supreme Court held nearly a decade ago that the search of a cell phone requires a warrant, even when that requirement may inconvenience law enforcement's ability to combat crime. *Id.* at 401, 403.

The border-search exception, contrary to the Government's arguments, does not excuse the two illegal searches of Mr. Alisigwe's device. That exception is not unlimited. *United States v. Smith*, No. 22 Cr. 352 (JSR), 2023 WL 3358357, at *5 (S.D.N.Y. May 11, 2023). Even a border search must be reasonable, balancing the search's "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985)).

This balancing test—weighing an individual's significant privacy interest in the contents of their cell phone against the government's interest in searching that phone without a warrant—yields the result that, even at the border, warrantless phone searches violate the Fourth Amendment. Indeed, "[n]one of the rationales supporting the border search exception justifies applying it to searches of digital information contained on a traveler's cell phone, and the magnitude of the privacy invasion caused by such searches dwarfs that historically posed by border searches and would allow the Government to extend its border search authority well beyond the border itself." *Id.* at *7. Accordingly, *Riley*'s prohibition against warrantless

2

cell phone searches extends to such searches conducted at the border. *Id.* at *9; *see also United States v. Booth*, 583 F.Supp.3d 545, 554 (S.D.N.Y. Feb. 1, 2022) (applying *Riley*'s warrant requirement to searches of cell phones seized at the border); *United States v. Bongiovanni*, 19 Cr. 227 (JLS) (MJR), at *3-4 (W.D.N.Y. Nov. 22, 2022) (finding that a warrantless, manual cell phone search violated the Fourth Amendment); *United States v. Djibo*, 151 F. Supp. 3d 297, 309-10 (E.D.N.Y. 2015) (suppressing evidence obtained from a warrantless cell phone search at the border).

The Second Circuit cases relied on by the Government are inapposite. Three of them—*United States v. Dattmore*, No. 12 Cr. 166A, 2013 WL 4718614 (W.D.N.Y. Sept. 3, 2013); *United States v. Young*, 12 Cr. 210 (RJA) (JJM), 2013 WL 885288 (W.D.N.Y. Jan. 16, 2013); and *United States v. Singh*, No. 12 Cr. 121 (DLI), 2012 WL 2501032 (E.D.N.Y. June 27, 2012)—predate *Riley*. The fourth, an Eastern District case, concerned a defendant who had "handed his phone to the officer or agents and … gave the agents express consent to search his phone." *United States v. Oladokun*, No. 15 Cr. 559 (BMC), 2016 WL 4033166, at *7, *19 (E.D.N.Y. July 27, 2016). Mr. Alisigwe gave no such consent.

Nor does the good faith exception excuse this violation of Mr. Alisigwe's Fourth Amendment rights. It is the government's burden to demonstrate the objective reasonableness of officers' purported "good faith." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011). They cannot meet that burden.

3

**A000200**

The searches at issue happened more than five years after the Supreme Court, in *Riley*, emphasized the intrusiveness of cell phone searches and held that the Fourth Amendment prohibits the warrantless execution of such invasive examinations by law enforcement. Well-trained officers handling countless cases involving cell phone evidence should be expected to learn and follow the law that governs such devices. They should have known that such devices cannot be searched without a warrant.

The facts of the two searches of Mr. Alisigwe's phones cut against application of the good faith exception. Both searches occurred in the context of planned interceptions of Mr. Alisigwe at the border. Agents learned his flight schedule, met him at the airport, detained him, and demanded his phone. The Government claims that agents had reason to suspect that Mr. Alisigwe was engaged in criminal activity and that his device would contain relevant evidence of his crimes. Dkt. 57 at 11. Had they applied for a warrant, they likely would have received one. There is no good reason why they did not try.

In accordance with *Riley*, the Court should suppress evidence gathered during these two warrantless searches of Mr. Alisigwe's cell phone.

## II. The Court Should Suppress Evidence Illegally Intercepted From Mail Addressed to Mr. Alisigwe.

The Court should also suppress evidence gathered from law enforcement's warrantless seizure and search of his personal mail. The law requires at least some cause for intercepting and seizing inbound mail. Although the interception of incoming international mail may be treated as an "extended" border search, such

4

**A000201**

searches must be supported by, at least, reasonable suspicion. *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986). The Government has offered no justification for the search of Mr. Alisigwe's mail, and evidence obtained through that search should be suppressed.

## CONCLUSION

For the foregoing reasons and in conjunction with Mr. Alisigwe's Original Motion, Mr. Alisigwe respectfully submits that his motion to suppress should be granted.

Dated:      New York, New York
             October 13, 2023

Respectfully Submitted,

Ariel Werner
Assistant Federal Defender
212-417-8770
Ariel_werner@fd.org

5

**A000202**

NBH3ALIH                    Killion - Cross

1    understand that.  But that's what the point of that motion is.

2              THE COURT:  Okay.  Ms. Werner?

3              MS. WERNER:  Ms. Levine will handle this one, your

4    Honor.

5              MS. LEVINE:  I guess as we wrote in the motion

6    response, I think the government is conflating our Rule 16

7    obligations and this idea of giving them a list of everything

8    we want to reference during our cross-examination.

9              THE COURT:  They are not asking for that.  They are

10   not asking for everything you want to reference.  If they are,

11   that's denied.

12             MS. LEVINE:  Thank you.  Frankly, I wasn't sure

13   reading their motion.

14             We will of course comply with Rule 16.  We've already

15   complied with the expert disclosure requirement of Rule 16.  We

16   did so last week, ahead of any statutory schedule.  The

17   question of Rule 16(a)(1), that rule says that we will do it as

18   soon as practicable.  And the Court has said a lot today about

19   following the rules as written, that's really all we are asking

20   to do.  The government kind of read in this reciprocal, because

21   we use the word reciprocal obligation.  It means that there is

22   an express obligation on the defense to have an exhibit list

23   prepared and distributed, and we don't think that is correct.

24   But of course we will comply with our Rule 16(a)(1) obligation.

25             THE COURT:  From my perspective, if you can create an

**A000203**

NBH3ALIH                    Killion - Cross

1   exhibit list, even if it is wildly over-inclusive, it is

2   helpful to me because then I know you've got them marked, and I

3   can keep track of what defense exhibits are being introduced.

4   To the extent there are exhibits that it makes sense to tell

5   the government about, that it's not disclosing your secret

6   defense strategy and the smoking gun that's going to decimate

7   some government witness on cross-examination, no one expects

8   you to turn that over.  But, routine stuff that doesn't do

9   that, I would urge you to turn it over, just to make the trial

10  go smoother.

11            MS. LEVINE:  Understood.

12            THE COURT:  So there are not unnecessary objections.

13            I think that that's everything.  Is there anything

14  else pending?

15            MS. WERNER:  There are other aspects of the

16  suppression motion, I don't know, I'm not sure if your Honor is

17  prepared to rule on those today.  We will be briefing the issue

18  that's the subject of today's hearing, but there is the

19  question of the phone searches at the border.

20            THE COURT:  Right.  That you are not asking for more

21  briefing on that.

22            MS. WERNER:  We are not.

23            THE COURT:  That will be in the opinion.  Do you want

24  to argue that?  Do you want to be heard on that?

25            MS. WERNER:  If the Court would like to hear from us.

NBH3ALIH                      Killion - Cross

1           THE COURT:  Oh, there is nothing I would like better.

2           MS. WERNER:  We've really laid it out in our papers,

3    your Honor.  But the fundamental argument on the border search

4    question is this.  *Riley* comes out years before this search.

5    This is not a prototypical border search where CBP agents or

6    TSA agents are stopping a person and searching them for

7    something that has to do with their travel.  This is a case

8    where agents went to the airport after reviewing Mr. Alisigwe's

9    flight plans and intended to stop him.  They had every

10   opportunity to seek a search warrant.  And years after *Riley*,

11   they should have known that that was the right course.

12          THE COURT:  What's the best case you've got that

13   they're required at the border to get a search warrant?

14          MS. WERNER:  The best case is not a Second Circuit

15   case, but I would say it is the *Smith* case, where Judge Rakoff

16   explained why a cell phone search at the border differs

17   significantly from a typical border search of somebody's

18   luggage or their pockets.

19          THE COURT:  I think everybody agrees it differs.  The

20   question is whether it differs enough that it triggers the

21   warrant requirement, and whether there is any indication that

22   the lengthy precedent that says searches at the border are

23   different has been trumped by *Riley*.

24          MS. WERNER:  I think there is good reason to think

25   that it has been trumped, your Honor.  *Riley* is very clear

A000205

NBH3ALIH                    Killion - Cross

1    about the night and day difference between searching a person's

2    pockets and searching a person's phone.  Extending that to the

3    border context, it is even more pronounced, because at the

4    border, the government is looking for evidence that somebody

5    might be bringing in with them to the country.  That's the

6    usual context of a border search.

7              THE COURT:  Or taking out.

8              MS. WERNER:  Or taking out.  Right.

9              One of the points that Judge Rakoff makes in the *Smith*

10   decision is that when you are talking about a phone, you are

11   talking about evidence that exists, usually, in the cloud, it's

12   not tangible evidence in the same way.  And it's evidence that

13   has nothing to do with a person smuggling contraband in,

14   smuggling contraband out.  It is really a search for intimate

15   details of a person's life, their communications, the photos

16   they've taken, the messages they've exchanged.

17             THE COURT:  It could have to do with whether or not

18   they're excludable from the United States.  That is, are they a

19   terrorist.

20             MS. WERNER:  That could be.  But, under that logic, I

21   guess the government could stop and search every person's phone

22   to find out if they are a terrorist in an intrusive search.

23             THE COURT:  The question is whether that triggers --

24   I'm not suggesting that they should search everybody.  But the

25   question is whether, again, the question is whether the warrant

A000206

NBH3ALIH                    Killion - Cross

 1    requirement has now dropped on to every digital search that's

 2    conducted at the border.  And I don't think that's the law.

 3         MS. WERNER:  It may not be every, your Honor.  I could

 4    imagine a case where law enforcement finds someone at the

 5    border, they did not anticipate locating them leaving the

 6    country or entering the country on that day, and they have

 7    specific reason to believe that there is evidence of a crime on

 8    this person's phone.

 9         THE COURT:  So reasonable suspicion would be adequate?

10         MS. WERNER:  I don't know if reasonable suspicion

11    would be adequate in that situation, your Honor, but that's not

12    the circumstance here.  The circumstance here is that the

13    government likely could have even showed probable cause to get

14    a warrant based on the fact they had been investigating

15    Mr. Alisigwe for several years prior even to the first search.

16    And the first search occurs five years after the *Riley* opinion.

17    And so the government had every opportunity to get a warrant

18    and was on notice that the new standard as of five years prior

19    was that a warrant is required for phone searches.

20         THE COURT:  *Riley* doesn't say a warrant is required

21    for phone searches at the border.

22         MS. WERNER:  It does not.  However, the officers in

23    this case are not TSA agents who --

24         THE COURT:  Border searches are not limited to TSA

25    agents.

A000207

NBH3ALIH                    Killion - Cross

1      MS. WERNER:  They're not.  The reason I bring it up,

2  your Honor, is because the good faith exception, which is part

3  of the government's argument here, we don't think should excuse

4  this search.  These are officers who are investigating a crime.

5      THE COURT:  You argue that, but the problem is that

6  the good faith exception requires it to be clear, and you've

7  got a problem that it's not clear.  That is, *Riley* holds what

8  it holds, but *Riley* in the Supreme Court decision did not drop

9  that down or say in any way that it changes what is

10  decades-long precedent regarding the very low expectation of

11  privacy that people have when they cross the border.

12      MS. WERNER:  That may be, your Honor.

13      THE COURT:  I hear your argument.  I understand your

14  argument.

15      MS. WERNER:  Okay.  The next issue, your Honor, is the

16  statements.  The government has said that they do not plan to

17  introduce those statements.

18      THE COURT:  That's moot.

19      MS. WERNER:  We rest on our argument.

20      And the final matter is the passports that were

21  intercepted in the international mail.  We simply think the

22  government has not put on any evidence, they haven't put forth

23  any facts to establish a reason that this mail was being

24  searched.  It's not the case that --

25      THE COURT:  It is a border search.  Aren't they

A000208

NBH3ALIH                    Killion - Cross

1   relying on the border search rationale?

2          MS. WERNER:  They are, but the law does not say at the

3   border you can open any mail without any reason to suspect

4   contraband.

5          THE COURT:  Okay.

6          MS. WERNER:  One moment, your Honor.

7          THE COURT:  I think there are cases that say any

8   international mail can be opened.  But I could be wrong about

9   that.

10         MS. WERNER:  Something more is required, but that is

11  our position.

12         THE COURT:  Even if it is reasonable suspicion?  They

13  had reasonable suspicion, didn't they?

14         MS. WERNER:  They haven't put that forward.  They have

15  not established what the suspicion was for this particular

16  mail.  *U.S. v. Gaviria*, 805 F.2d 1108 (2d Cir. 1986).  It is

17  cited in our papers.  Although the interception of incoming

18  international mail may be treated as an extended border search,

19  such searches should be supported by some suspicion.  The

20  government has not put forth what the suspicion was that led

21  officers to open Mr. Alisigwe's international mail.

22         THE COURT:  Okay.  Who is arguing this?

23         MR. KINDER:  That's me, your Honor.  Just very

24  briefly, your Honor, with respect to the border search, both on

25  the phone and the mail, there was reasonable suspicion.  Unless

A000209

NBH3ALIH                    Killion - Cross

the Court has specific questions, I think we can rest on our

papers.

THE COURT:  Refresh my recollection on what, at the

time his mail was opened, you had information from the attache

in London that he was using a fake passport?

MR. KINDER:  Yes.  This investigation started when the

U.K. border force alerted U.S. law enforcement, CBP and HSI,

that there was a passport in the name of a German individual

bearing the face of the defendant.  That's what kicked this all

off.

THE COURT:  So that's the basis then for searching his

international mail?

MR. KINDER:  That's correct.  And then of course

additional evidence is obtained through the course of the

investigation.

THE COURT:  When was the mail intercepted?

MR. KINDER:  I don't have that.  I'm sorry, your

Honor.  I do not have that date in front of me.

THE COURT:  Okay.  If you could provide that in a

letter to the Court.

MR. KINDER:  Of course.

THE COURT:  Anything further?

MR. KINDER:  No, your Honor.  Not from the government.

MS. WERNER:  Nor from the defense.

THE COURT:  All right.  Thank you all.

**A000210**

NBH3ALIH                    Killion - Cross

1          Is this the trial team on both sides?

2          MS. WERNER:  Yes.

3          THE COURT:  I've got another hearing that's now 20

4    minutes late, so if y'all would clear out quickly, I would

5    appreciate it.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Barry D. Leiwant
*Interim Executive Director
and Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

November 22, 2023

**By ECF and Email**

Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

### Re: *United States v. Chinwendu Alisigwe*, 22 Cr. 425 (VEC)

Dear Judge Caproni:

On July 26, 2022, while executing an arrest warrant for Chinwendu Alisigwe, Federal Bureau of Investigations ("FBI") Special Agent ("SA") William McKeen searched Mr. Alisigwe's bedroom without a warrant and seized four passports. In so doing, he violated Mr. Alisigwe's rights under the Fourth Amendment.

Contrary to the government's claim that the passports were found during a valid protective sweep (Gov't Opp'n, ECF No. 57 at 3), Friday's hearing established that SA McKeen saw them during an unlawful secondary search after completing the sweep of Mr. Alisigwe's room. And though SA McKeen testified that the passports were lying in plain view on the bedroom floor, the facts are more consistent with Mr. Alisigwe's explanation in his declaration that the passports were stored in a closed brown envelope under the bed. *See* Alisigwe Decl., ECF No. 29 at ¶ 21. Finally, whether the passports were under the bed or in the middle of the floor, they were not immediately recognizable as contraband and therefore were not subject to seizure under the "plain view" doctrine. They must be suppressed.

## I. Hearing testimony

The government called two witnesses at Friday's hearing: SA McKeen and NYPD/FBI Task Force Officer ("TFO") Justine Killion—together, the lead agents in charge of investigating Mr. Alisigwe. Tr. 21, 48, 55. By the time of Mr. Alisigwe's arrest, they had been investigating him for years. *Id.* 21-23.

SA McKeen and TFO Killion obtained an arrest warrant from a judge in the Southern District of New York and planned to execute it on July 26, 2022. *Id.* 56. They

also asked the U.S. Attorney's Office to apply for a search warrant allowing them to search Mr. Alisigwe's home at the time of his arrest, but the U.S. Attorney's Office refused. *Id.* 25-26. As a result, on July 26, 2022, agents found themselves "entering the home of a long-time suspect without a warrant to search the premises," unlike the many arrests they had previously conducted along with search warrants. *Id.* 26-27, 45-46, 57.

Mr. Alisigwe knew that law enforcement officers were storming his house. They pulled up in front with four or five cars carrying approximately 14 agents and officers. *Id.* 8, 27, 57. Five or six officers approached the front door, knocked, and announced their presence. *Id.* 8, 27, 49. They waited about a minute for Mr. Alisigwe to come to the door. *Id.* 29. When he did not come, they broke down his door with a battering ram. *Id.* 9, 58.[1] They entered and called out that they were FBI. *Id.* 10-11. They found Mr. Alisigwe awake, coming out of his bedroom, phone in hand. *Id.* 30, 49. "[H]e was already aware of [law enforcement's] presence." *Id.* 30. And he would have known the likely reason for their visit, having been stopped not once but twice at JFK and asked about his use of fraudulent identities. *Id.* 30-31; Alisigwe Decl. at 1-2.

Mr. Alisigwe was handcuffed without incident. *Id.* 58. He stayed in the main room of his home with TFO Killion while other officers conducted a protective sweep of his bedroom. *Id.* 12-14, 19-20, 35-36, 59. SA McKeen described a protective sweep as a "methodical" search for people and weapons. *Id.* 6-7. He explained that during a sweep, officers can seize anything they identify as contraband or evidence of a crime. *Id.* 7.

SA McKeen testified that he and another agent—he could not recall which— conducted the sweep of Mr. Alisigwe's bedroom. *Id.* 12. He entered the room and walked around the bed to the other side so that he could see every part of the room and make sure there were no more people inside. *Id.* 14, 36. It took one to three minutes to conduct the sweep. *Id.* 44. He testified that the sweep was completed before Mr. Alisigwe was brought into the room, in keeping with best practices for officer safety. *Id.* 35, 37. TFO Killion agreed that the bedroom had been cleared before she and another agent, Melvin Geeverghese, entered with Mr. Alisigwe. *Id.* 62.[2] SA McKeen did not recall Mr. Alisigwe yelling or becoming upset when two officers entered his room without him to conduct the protective sweep. *Id.* 38.

---

[1] SA McKeen conceded that he and the arrest team departed from their own operations plan by breaking down the door without taking additional steps to make contact with Mr. Alisigwe before doing so. They did not follow all the steps in their operations brief—knock, wait a reasonable amount of time, call the subject on the telephone, and then call out using a PA— before breaking down his door with a battering ram. Tr. 29.

[2] The Government did not offer testimony from Agent Geeverghese or any other agent who participated in the sweep and could have corroborated SA McKeen's account.

A000213

SA McKeen was not aware of any photographs taken inside Mr. Alisigwe's home during the sweep and arrest, or photographs of the passports in the spot where they were found, despite the presence of 12 to 14 cell phone cameras. *Id.* 31-32. He did not take photos himself. *Id.* 33. During the hearing, however, SA McKeen drew a diagram to show the path he followed during the protective sweep and the place where he ostensibly found the passports. According to his diagram, pictured at right, the protective sweep brought him (represented by a triangle on the left side of the bed) to the



almost-exact location of the passports on the floor (marked by an "X"). *Id.* 36. Somehow, although it was a narrow space, and he was only one or two feet from the passports, he did not notice them during the protective sweep. *Id.* 18-22, 36-37. Seeing no people, no weapons, and no evidence of crime, SA McKeen had completed his initial protective sweep. *Id.* 37. He "felt very confident there were no more people in that room." *Id.* He informed his colleagues that the room was safe.

With the room cleared, TFO Killion brought Mr. Alisigwe in to get dressed for court. *Id.* 15, 37, 60. She had him sit on the bed. *Id.* 62.[3] While Mr. Alisigwe dressed, SA McKeen continued looking around the room, "sweeping and scanning" for weapons despite having completed his protective sweep for people. *Id.* 16, 37. According to SA McKeen, it was during this never-ending weapons "sweep," after the completion of the protective sweep, that he located and seized the four passports. *Id.* 17-18. He claimed that nothing obstructed his view of them and that they were not in any envelope or bag. *Id.* 18-22. SA McKeen said nothing about the passports when he found them. *Id.* 53-54, 67. He never remarked on the fact that evidence of a crime was lying on the floor in plain view. He never held up the passports and said, "[L]ook what I found." *Id.* 67. TFO Killion did not hear or learn about them until she was back at the office. *Id.* 54.

---

[3] The testimony of TFO Killion and SA McKeen differed as to where Mr. Alisigwe was asked to sit down. SA McKeen marked his diagram with an "x" to show that Mr. Alisigwe sat down at the foot of the bed. *Id.* 15. TFO Killion marked the top righthand side of the bed, next to door, with an "A" to indicate the place where she had Mr. Alisigwe sit. *Id.* 63.

3

Mr. Alisigwe saw that SA McKeen was searching his room. Both SA McKeen and TFO Killion testified that Mr. Alisigwe yelled, demanded a search warrant, and protested the illegal search of his home. *Id.* 39, 52, 65. TFO Killion recalled Mr. Alisigwe asking, "[I]f this is not a search warrant, why is someone going through my stuff[?]" *Id.* 52, 66. And while TFO Killion testified that she could not see what SA McKeen was doing when Mr. Alisigwe complained about agents going through his belongings with no warrant, SA McKeen testified that Mr. Alisigwe became upset around the time that McKeen retrieved the passports. *Id.* 39, 52, 66.

SA McKeen's testimony at the hearing that he observed the passports after the completion of the initial protective sweep, while Mr. Alisigwe was in the room getting dressed, *id.* 40, contradicted at least two prior accounts he had given. In a declaration signed on August 4, 2023, SA McKeen affirmed that he and another agent had accompanied Mr. Alisigwe into his bedroom to get dressed for court, and that he had conducted a protective sweep of the bedroom at that time, during which he observed a stack of passports on the floor of the bedroom to the side of the bed. ECF 57-1 at 2-3; Tr. 40-42. SA McKeen made the same claim in an evidence collection log—that the passports were observed "during" a protective sweep. *Id.* 44. At the hearing, SA McKeen claimed that he had located the passports after the sweep was completed, when he was scanning the room for weapons as Mr. Alisigwe dressed for court. *Id.* 16, 37.

## II.   The Court should not credit Special Agent McKeen's testimony about the way he found and seized the passports.

SA McKeen's testimony that the passports were found in the middle of the bedroom floor is not credible. Mr. Alisigwe's assertion in his declaration that the passports were kept in an envelope under his bed is significantly more plausible, for several reasons:

(1)    SA McKeen's diagram and testimony make the claim that his protective sweep brought him almost exactly to the place where he says the passports lay on the floor. His assertion that he did not notice them during his initial search of such a small place is unconvincing. It is more likely that the passports were not in plain view during the protective sweep.

(2)    Mr. Alisigwe's recollection that the passports were in an envelope under the bed, ECF No. 29 at 4, is consistent with the testimony of both SA McKeen and TFO Killion that Mr. Alisigwe became upset around the time that McKeen seized the passports, and that he challenged their authority to search his room without a warrant. If SA McKeen merely picked up the passports from the floor, it would not make sense for Mr. Alisigwe to question why McKeen was rifling through his stuff. His protestations are more consistent with SA McKeen digging around the room to see what he could find.

(3)    Mr. Alisigwe had time to react after realizing that law enforcement officers were coming into his home. They knocked on his door repeatedly and called out that they were from the FBI before breaking down his door. It would have been reasonable

for him to stash any contraband before greeting them, rather than leaving it in plain view in the middle of the floor.

(4)     It is implausible that SA McKeen would find a stack of four fraudulent passports lying plainly on Mr. Alisigwe's floor and yet say nothing to his colleagues, including his co-lead agent, given the centrality of fraudulent passports to their investigation.  It is far more likely that he would stay quiet about his seizure of the passports, rather than informing his colleagues, if he had retrieved them after unlawfully searching under Mr. Alisigwe's bed.

(5)     SA McKeen appears to have misunderstood the permissible bounds of a protective sweep.  He defined such sweeps as giving him the authority to search for people and then to continue searching, without limit, for dangerous weapons.  Tr. 37.  That understanding of a protective sweep is incompatible with the law, as discussed below, which allows time-limited protective sweeps for third parties that might endanger officers and for weapons within an arrestee's area of immediate control.  SA McKeen may have erroneously believed that he had the right to search under the bed as part of a protective sweep.

## III.   SA McKeen was conducting an illegal search when he found the passports, and it was unlawful for him to seize them as evidence.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  *Maryland v. Buie*, 494 U.S. 325, 327 (1990); *see also United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (goal of protective sweep is to stop "a potential ambush by unforeseen third parties").  Moreover, "[t]he justification for a protective sweep is ephemeral:  it may last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  *United States v. Moran Vargas*, 376 F.3d 112, 115 (2d Cir. 2004).  These limits apply with equal force in circumstances like Mr. Alisigwe's, where officers enter a home or room to obtain clothing for an arrestee.  "Arresting officers are not granted any more leeway to invade the privacy unnecessarily of an insufficiently dressed arrestee than they have with the fully dressed."  *United States v. Rudaj*, 390 F. Supp. 2d 395, 405 (S.D.N.Y. 2005), *aff'd sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009).  "To paraphrase Judge Learned Hand, it would be 'small consolation to know that one's papers are safe only so long as one is [fully dressed] at home.'" *Id.* (quoting *United States v. Kirschenblatt*, 16 F.2d 202, 2023 (2d Cir. 1926)).

The "plain-view" doctrine allows law enforcement to seize "what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be."  *Washington v. Chrisman*, 455 U.S. 1, 5-6 (1982).  The doctrine "is subject to three express requirements: (1) the agents must be lawfully on the premises; (2) the discovery must be inadvertent, and (3) its incriminating nature must be immediately apparent."  *United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977)

(citing *Coolidge v. New Hampshire*, 403 U.S. 443, 464-69 (1971)). The plain-view doctrine does not excuse the seizure of evidence not immediately recognized as incriminating "without conducting some further search of the object." *Minnesota v. Dickerson*, 508 U.S. 366, 275 (1993). For the seizure to fall under the plain-view exception, the evidence must be "[p]atently incriminating." *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999).

SA McKeen's seizure of the four passports cannot be justified under the claim that the passports were lying in plain view during a protective sweep. This is undoubtedly true if the Court agrees that the passports were stored under Mr. Alisigwe's bed, and/or in an envelope. But it is still true if the Court credits SA McKeen's testimony about when and where he located the passports. The Court does not need to discredit SA McKeen's testimony to find that Mr. Alisigwe's rights were violated.

The protective sweep had ended by the time SA McKeen found the passports. He searched the open space in Mr. Alisigwe's room—the area around the bed—and concluded that no one lay in wait. He informed TFO Killion that it was safe to bring Mr. Alisigwe into the room to dress. The sweep was done, and he should not have continued looking around the room. Counter to SA McKeen's belief that a protective sweep may include "sweeping and scanning for weapons [that] never stops," Tr. 37, officers cannot conduct limitless weapons searches under the guise of protective sweeps. Protective sweeps are "ephemeral" and serve the goal of locating third parties that might be lying in ambush. To the extent that officers may search for weapons during a protective sweep, that search is limited to an arrestee's "grab area," or the area within the arrestee's immediate control. *United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir. 1991). In considering whether an area is within an arrestee's "immediate control," courts consider the arrestee's location as well as any restraints that have been imposed, such as handcuffs. *United States v. Blue*, 78 F.3d 56, 60 (2d Cir. 1996). Here, the left side of the bed and the area underneath the bed were both outside of Mr. Alisigwe's grab area while he was handcuffed and on the right side of the bed.[4] *Id.* (area between mattress and box spring was not within the immediate control of an arrestee lying on the floor handcuffed, two feet from the bed and guarded by officers). In addition, the area on the left side of the bed, which SA McKeen had already swept, could not have harbored a theretofore undiscovered dangerous third party. *Id.* at 60-61.

Moreover, the "incriminating nature" of the passports could not have been immediately apparent to SA McKeen without a further search—opening and inspecting the inside of the passports—even if they were lying on the floor instead of in an envelope or bag under the bed. *See United States v. Paulino*, 850 F.2d 93, 98 (2d Cir. 1988), *cert.*

---

[4] As noted above, *see supra* note 3, SA McKeen tried to place Mr. Alisigwe closer to where SA McKeen claimed to have found the passports, while TFO Killion testified that Mr. Alisigwe was sitting directly inside the door on the right side of the bed. Either way, Mr. Alisigwe's area of immediate of control would not have included the place where SA McKeen claimed to have seen the passports and certainly would not have included the area under the bed.

*denied*, 490 U.S. 1052 (1967) (picking up and examining bills—later determined to be counterfeit—found in plain view was an additional search); *United States v. Silva*, 714 F. Supp. 693 (S.D.N.Y. 1989) ("Any act on the part of an agent beyond merely viewing what is already exposed," including opening a notebook found in plain view, "would clearly constitute a search.") (citations omitted); *see also United States v. Dichiarinte*, 445 F.2d 126, 131 (7th Cir. 1971) (items that cannot be identified as criminal until they are "opened and read" are not in plain view because "their criminal character [is] not apparent on a mere surface inspection"). The passports might have been real rather than fraudulent, belonging to friends or associates who had left them in Mr. Alisigwe's possession or home. Only by conducting a further search—opening the passports to see the name and photograph inside—could SA McKeen determine that they were "[p]atently incriminating." *Kiyuyung*, 171 F.3d at 83. Even if he suspected that the passports contained valuable evidence, he could not open and inspect them without a warrant. *See United States v. Ross*, 456 U.S. 798, 822-23 (1982) ("[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view."); *United States v. Rudaj*, 390 F. Supp. 2d 395, 405 (S.D.N.Y. 2005), *aff'd sub nom. United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009) (dismissing prosecution's argument that the Fourth Amendment allows the warrantless search of containers believed to contain incriminating evidence). If SA McKeen suspected, but could not be sure, that the passports were contraband, the proper protocol would have been for officers to seal the premises and seek a warrant to locate, seize, and search inside any passports they found.

## IV.   Conclusion

SA McKeen's warrantless search of Mr. Alisigwe's room and seizure of four passports was unlawful. The passports were not found in a protective sweep; the sweep had been completed. The passports were not in plain view; they were in an envelope under the bed. And even if the Court credits SA McKeen's testimony that they were lying on the floor, in plain view, the passports were not immediately recognizable as contraband without a further warrantless search—the opening of the passports.

For the foregoing reasons, and those stated at Friday's suppression hearing and in Mr. Alisigwe's motion papers, the passports should be suppressed.

Respectfully submitted,

/s/_____
Ariel Werner
Sylvie J. Levine
Assistant Federal Defender
917-751-2050

cc:   counsel of record

7

A000218



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 29, 2023

**BY ECF**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

>  Re:    *United States v. Chinwendu Alisigwe*, S1 22 Cr. 425 (VEC)

Dear Judge Caproni:

The Government respectfully submits this post-hearing letter in further support of its opposition to defendant Chinwendu Alisigwe's motion to suppress the passports and licenses seized at his arrest. The Court should deny Alisigwe's motion.

## I.       Hearing Evidence

At the hearing on November 17, 2023, Special Agent William McKeen of the Federal Bureau of Investigation ("FBI") testified for the Government. He began working for the FBI as a staff operations specialist over thirteen years ago, and he became a Special Agent in 2016. (Tr. 3). Until his promotion to Supervisory Special Agent with the FBI's national cyber division (which became effective the day after the hearing), he was assigned to CY-6, the Financial Cyber Crimes Task Force. *Id*. In his capacity as a Special Agent with CY-6, Special Agent McKeen investigated financially motivated crimes involving the use of high technology or cyber-enabled techniques. *Id*. at 4. He has executed approximately 50 arrest warrants, the significant majority of which have taken place inside residences. *Id*. at 4-5. He has executed a similar number of premises search warrants. *Id*. at 5. He has been trained on and is familiar with the FBI's protocols for the execution of arrest and premises search warrants. *Id*.

Special Agent McKeen described the FBI's arrest of Alisigwe, which took place at Alisigwe's residence in Queens, New York, just after 6 a.m. on July 26, 2022. *Id*. at 7-8. A team of approximately a dozen agents were present. *Id*. at 8. Special Agent McKeen entered the residence with the arrest team. *Id*. at 10. Alisigwe came out of a bedroom located down a small hallway. *Id*. at 10-11. Detective Justine Killion of the New York City Police Department ("NYPD"), who is also a Task Force Officer for CY-6, then placed Alisigwe in handcuffs. *Id*. at 11.

Once Alisigwe had been handcuffed, Special Agent McKeen and another agent went to the bedroom to conduct a protective sweep of the room. *Id*. at 12. The bedroom was adjacent to the

hallway where Alisigwe was handcuffed. *Id.* at 10-11. Special Agent McKeen proceeded directly to the bedroom because he has been trained that an open door inside a residence can be a source of danger. *Id.* Immediately to the right of the door to the bedroom was a bed. *Id.* Special Agent McKeen went around the foot of the bed to the other side of the room, to see if anyone else was present. *Id.* at 13-14. The second agent remained on the side of the room closest to the door. *Id.* at 14. Once Special Agent McKeen and the second agent determined that no other persons were in the bedroom, they instructed Detective Killion to bring Alisigwe in so that he could get dressed and be out of the way of the other agents in the residence. *Id.* at 15. Detective Killion brought Alisigwe into the bedroom and sat him down on the bed. *Id.*

After Alisigwe entered, Special Agent McKeen continued to look around the room to ensure the agents' safety. *Id.* at 16, 37. That is when Special Agent McKeen noticed a stack of passports about one to two feet away. *Id.* at 16, 20. It was resting on the floor to the left of a nightstand, which was to the left of the bed. *Id.* at 16. Nothing obstructed Special Agent McKeen's view of the passports. *Id.* They were neither under the bed nor inside an envelope. *Id.* at 18.

Special Agent McKeen immediately noticed that the top passport was a Republic of Kenya passport. *Id.* at 17. This was notable to Special Agent McKeen because he knew that Alisigwe was a Nigerian (not Kenyan) citizen, and also that Alisigwe had been charged with fraudulently opening bank accounts using false identity documents, including passports from various African countries. *Id.* He thus recognized that the stack of passports sitting on the floor was evidence of a crime. *Id.* Special Agent McKeen then picked up the passports and looked through them. *Id.* The stack included four different passports, each with Alisigwe's photograph and the name of another person. *Id.* at 17-18. Inside each passport was a corresponding driver's license, also with Alisigwe's photograph and the name of another person. *Id.* Special Agent McKeen seized the passports only about one minute after Alisigwe had been placed in handcuffs. *Id.* at 19. The time was 6:04 a.m., less than five minutes after the agents had entered Alisigwe's residence. *Id.* at 20.

Detective Killion also testified, corroborating Special Agent McKeen's account of the arrest. She entered Alisigwe's residence with other agents, saw Alisigwe come out of his bedroom, and commanded him to move towards her with his hands behind his back. *Id.* at 49. Detective Killion placed Alisigwe in handcuffs and brought Alisigwe to his bedroom to get a change of clothes, where she sat him down on the bed. *Id.* at 50. Detective Killion recalled that Special Agent McKeen and Special Agent Melvin Geeverghese were also present in the bedroom. *Id.* Special Agent McKeen was on the far side of the bed from the door. *Id.* at 51. From where Detective Killion was standing, she could not see the floor on the far side of the bed. *Id.* at 52. Detective Killion was not looking at Special Agent McKeen because she was focused on getting Alisigwe dressed. *Id.* She did not see other agents look under Alisigwe's bed or otherwise search for evidence. *Id.* at 53. She did not learn about the seizure of the passports and licenses until she was back at the office after Alisigwe's arrest. *Id.*

## II.    Legal Standard

"An arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). Thus, law enforcement officers "[g]enerally do

not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect." *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995). Once inside a suspect's home, officers may then perform a "protective sweep" to protect themselves or others. *Id*. at 216.

Under the "plain view" doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). That is because, "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Id*. (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)). Thus, "when law enforcement officers have lawfully entered premises in connection with an arrest, and in the course of making a permissible quick and limited protective sweep of the premises they see an object whose incriminating character is immediately apparent, 'and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *Id*. (quoting *Dickerson*, 508 U.S. at 375); *see also United States v. Kirk Tang Yuk*, 885 F.3d 57, 79 (2d Cir. 2018) ("During a protective sweep, officers are entitled to seize items that are in plain view if they have 'probable cause to suspect that the item is connected with criminal activity.'"); *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) ("Patently incriminating evidence that is in plain view during a proper security check may be seized without a warrant.").

### III.    Special Agent McKeen Lawfully Seized the Passports and Licenses

Special Agent McKeen's plain-view seizure of the passports and licenses on the floor of Alisigwe's bedroom was lawful. The Court should credit Special Agent McKeen's in-court testimony over Alisigwe's untested written declaration and deny Alisigwe's motion to suppress the evidence seized at his arrest.

*First*, the unrebutted hearing evidence establishes that the passports and licenses were in plain view in Alisigwe's bedroom, which Special Agent McKeen had lawfully entered for a protective sweep. Special Agent McKeen went into Alisigwe's bedroom to conduct a protective sweep for persons and weapons, remained in the bedroom once the defendant was brought in to get his clothes, and then saw, just one to two feet away, a stack of passports sitting on the floor. (Tr. 11-16, 38). The stack of passports was to the left of the nightstand, which was to the left of the bed. *Id.* at 16. The passports were not under the bed, and there was nothing obstructing Special Agent McKeen's view of them. *Id.* at 20. The fact that a single person had multiple passports, in a stack, was itself suspicious and suggested that these were not Alisigwe's legitimate passports. Special Agent McKeen also saw that the top passport was from Kenya. *Id.* at 16-17. He understood right away that it was contraband, because he knew that Alisigwe was not Kenyan, and that the charges against Alisigwe involved his opening bank accounts using false identity documents. *Id.* Because Special Agent McKeen was "lawfully in a position" from which he viewed the stack of passports, and the "incriminating character" of the stack of passports was "immediately apparent," he was entitled to seize them without a warrant. *Delva*, 858 F.3d at 149.

*Second*, Special Agent McKeen's testimony is credible. He is an experienced and well-trained professional who has executed many dozens of arrest and search warrants. (Tr. at 4-5). He was just promoted to be a Supervisory Special Agent in the FBI's national cyber division. *Id.* at

3-4. Unlike Alisigwe, he has no personal interest in the outcome of this case, no motive to lie, and his testimony was subject to cross-examination. Special Agent McKeen's testimony was also corroborated by Detective Killion. Although she did not see the passports herself, her description of the arrest was consistent with Special Agent McKeen's account: the agents entered the residence; Alisigwe emerged from his bedroom; Detective Killion handcuffed him and took him into the bedroom for a change of clothes; Special Agent McKeen and another agent were in the room; and Special Agent McKeen was on the far side of the bed from the door. *Id.* at 49-52. Detective Killion did not see any agents look under the bed or conduct a search for evidence. *Id.* at 53.

*Third*, Alisigwe's declaration is not credible. Alisigwe asserts that he was handcuffed by the front door to the apartment while a male agent walked to and from the bedroom to a car outside five times, and on the third or fourth trip, that agent took a closed envelope containing the passports from under the bed. (Dkt. 59 ¶¶ 20, 21). According to Alisigwe, he was not in the bedroom when Special Agent McKeen saw the stack of passports. Instead, he was handcuffed outside of the bedroom, about 35-40 feet away. (Dkt. 59 ¶ 21; Tr. 15). By his own admission, then, Alisigwe did not see the stack of passports at the time Special Agent McKeen seized them. There is thus no evidence in the record—*none*—rebutting the Government's evidence that the passports and licenses were on the floor to the left of the bed when Special Agent McKeen saw them.[1]

Moreover, Alisigwe's assertion that the male agent seized the envelope on his third or fourth trip between the bedroom and a car outside is not believable given the evidence presented at the hearing. Special Agent McKeen testified that he remained in the bedroom after entering it for the protective sweep, and that he seized the passports and licenses only one minute after Alisigwe had been placed in handcuffs. *Id.* at 38, 44. Special Agent McKeen's account is consistent with his contemporaneous note in the collected items log, which indicated that the seizure took place at 6:04 am—just four minutes after the agents knocked and announced their presence at Alisigwe's door. *Id.* at 20. It is also consistent with Detective Killion's testimony that Special Agent McKeen was present when she brought Alisigwe into the bedroom, which happened moments after she handcuffed him. *Id.* at 50-51. To believe Alisigwe's declaration, the Court would have to conclude that there was an orchestrated conspiracy among Special Agent McKeen, Detective Killion, and other agents to cover up an illegal search in sworn testimony and contemporaneous reports of the arrest, at perilous risk to their careers. Alisigwe offered no evidence at the hearing supporting his declaration. The Court should disregard it.

*Fourth*, Alisigwe's remaining arguments are meritless. He asserts that the seizure was unlawful because Special Agent McKeen's protective sweep for persons had ended by the time he saw the passports. (Dkt. 97 at 6). According to Alisigwe, once the room had been cleared for persons, Special Agent McKeen was only permitted to inspect areas from which Alisigwe could

---

[1] It is possible that Alisigwe misremembers what he did with this particular set of fraudulent passports. During the duress hearing, Alisigwe acknowledged that he possessed and used multiple passports with his photo and other names to open multiple bank accounts. (Dkt. 53 at 36-37, 51-52, 56-63). Given the volume of false identity documents used by Alisigwe, it is possible that Alisigwe did actually have other passports in an envelope under his bed, but that Special Agent McKeen never found them because he only seized what he saw in plain view on the floor.

reach a weapon. *Id.* Alisigwe is wrong on both the facts and the law. As Special Agent McKeen testified, his security check remained ongoing at the time he saw the stack of passports, as he was scanning the room to ensure the safety of the agents who were in close proximity to Alisigwe inside a small bedroom. (Tr. 16, 37). The protective sweep was not, as the defense suggests, "limitless." (Dkt. 97 at 6). Special Agent McKeen spotted the passports only one minute after Alisigwe had been handcuffed, and less than five minutes after entry into the residence. (Tr. 19-20, 29). The seizure was thus lawful because it occurred during a protective sweep. *Kirk Tang Yuk*, 885 F.3d at 79.

But even if Special Agent McKeen's protective sweep had been completed, the seizure would still have been lawful. The plain-view doctrine permits agents to seize contraband if they are "lawfully in a position" from which they can view it. *See Delva*, 858 F.3d at 149. The key inquiry is thus whether Special Agent McKeen was lawfully in the bedroom when he saw the stack of passports. There is no reasonable dispute on this point. He lawfully entered Alisigwe's bedroom to conduct a protective sweep, and lawfully remained in the room as Alisigwe was brought in for a change of clothes.

Alisigwe argues that once Special Agent McKeen determined that no other persons were in the room, he "should not have continued looking around the room" except for in areas within Alisigwe's "grab area." (Dkt. 97 at 6). But this argument misunderstands the plain view doctrine. To be sure, during a protective sweep, law enforcement agents are permitted to conduct "quick and limited" searches of a premises for people and weapons within an arrestee's grab area. *See United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir. 1991). But Special Agent McKeen did not search for the passports; he saw them in plain view on the floor. Nothing about the protective sweep doctrine limits an agent's ability to look around a room and seize evidence in plain view, so long as the agent is lawfully present in that location. In *United States v. Hernandez*, No. 92 Cr. 323 (LJF), 1992 WL 251463, at *1 (S.D.N.Y. Sept. 21, 1992), for example, the Court upheld a plain-view seizure even though the officer's protective sweep had concluded. There, an officer executing an arrest warrant entered the defendant's residence for a protective sweep to determine if other persons were present. *Id.* at *1. After the protective sweep was "finished," the officer was "walking back to the living room" when he "glanced into the bathroom and saw the gun" that the defendant sought to suppress. *Id.* at *3. The Court observed that it was "reasonable for [the officer] to have looked into the bathroom as he walked by," and upheld the plain-view seizure because "[t]he officers were lawfully on the premises when the weapon was seized in plain view." *Id.* at 3-4. *See also United States v. Parrilla*, No. 13 Cr. 360 (AJN), 2014 WL 1621487, at *4 (S.D.N.Y. Apr. 22, 2014) (plain view seizure of cellphones during a narcotics arrest was proper where "the agents were lawfully present in the bedroom to conduct a protective sweep"). So too here. Special Agent McKeen was lawfully present in the bedroom when Alisigwe was brought into the room. His spotting of contraband on the floor by his feet was not an impermissible search; it was entirely reasonable and appropriate. The seizure of the passports and licenses was thus permitted under the plain-view doctrine.

Indeed, the Second Circuit has repeatedly endorsed the seizure of plain-view evidence where it was not related to a protective sweep, but merely in connection with an officer's duty to clothe arrestees when taking them into custody. *See United States v. Ivezaj*, 568 F.3d 88, 98 (2d Cir. 2009) ("We agree that the agents were permitted to enter [the defendant's] bedroom to find

clothing for him and seize any incriminating evidence that was in plain view."); *United States v. Viserto*, 391 F. App'x 932, 935 (2d Cir. 2010) ("[W]e have held that the seizure of contraband discovered in executing [the duty to clothe an arrestee] does not violate the Fourth Amendment." (collecting cases)). Alisigwe's assertion that Special Agent McKeen should have shielded his eyes from the stack of passports after Alisigwe entered is without basis in the law and should be rejected.

Alisigwe also argues that the incriminating nature of the stack of passports was not evident without Special Agent McKeen's "further search" of "opening and inspecting the inside of the passports." (Dkt. 97 at 6-7). Alisigwe is wrong. That the stack of passports was contraband was plain on its face. In evaluating the incriminating nature of an object seized in plain view, the "evidentiary significance of an item" must be viewed "from the perspective of a law enforcement officer." *United States v. Kidd*, No. 22-287, 2023 WL 7290904, at *2 (2d Cir. Nov. 6, 2023) (quoting *United States v. Barrios-Moriera*, 872 F.2d 12, 17 (2d Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990)). "Near certainty of the article's criminal character is not necessary. The matrix of facts and circumstances, including the experience and judgment of the police officer, must be weighed in determining whether the item is contraband." *Id.* Special Agent McKeen knew that the charges against Alisigwe, a Nigerian citizen, involved his opening bank accounts using false identity documents, including passports from various African countries. (Tr. 17-18). So when Special Agent McKeen saw a stack of passports next to Alisigwe's bed, and the top passport was from Kenya, he reasonably and correctly concluded that the passports were contraband. This conclusion was confirmed when he picked up the passports and found that they had Alisigwe's photograph but the names of other persons. *Id.*

The Second Circuit and other courts have repeatedly upheld the plain view seizure of passports under similar circumstances. *See United States v. Rollins*, 522 F.2d 160, 166 (2d Cir. 1975) (passports were facially incriminating as "evincing an intention to depart the jurisdiction in haste"); *United States v. Dunloy*, 584 F.2d 6, 11 (2d Cir. 1978) (plain-view seizure of currency, coins, and passport was permissible); *see also United States v. Fawole*, 785 F.2d 1141, 1145 (4th Cir. 1986) (incriminating nature of passports was "immediately apparent" to officer because "the same photograph accompanied two different names"); *cf. United States v. Kusek*, 647 F. Supp. 1150, 1151 (S.D.N.Y. 1986) (airline boarding pass seized in plain view was admissible in case involving international drug dealing). This Court should too.

### IV.    Conclusion

The Court heard unrebutted testimony that Special Agent McKeen was lawfully in Alisigwe's bedroom when he saw obvious contraband in plain view.  The Court should deny Alisigwe's motion to suppress the passports and licenses seized at his arrest.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


By: /s/ _____
     William C. Kinder
     Meredith Foster
     Adam Hobson
     Assistant United States Attorneys
     (212) 637-2394

Cc:    Ariel Werner, Esq. (by ECF)
         Sylvie Levine, Esq. (by ECF)

06.20.2018
**A000225**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 29, 2023

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     *United States v. Chinwendu Alisigwe*, S1 22 Cr. 425 (VEC)

Dear Judge Caproni:

Pursuant to the Court's request at the November 17, 2023 suppression hearing in the above-captioned matter, the Government is providing the dates for the international mail seizures challenged in defendant Chinwendu Alisigwe's motion to suppress. (Dkt. 28.) The international mail seizures resulted from routine searches by Customs and Border Patrol ("CBP") agents of packages shipped into the United States from abroad—primarily from Lagos, Nigeria. Each of the packages contained passports and driver licenses bearing Alisigwe's photograph and the names of other persons.

The dates, contents, and ports of entry for each seizure are provided below:

| Seizure Date | Contents | Port of Entry |
|---|---|---|
| July 30, 2020 | 1 Kenya passport;<br>1 Kenya driver license;<br>1 Angola passport;<br>1 Angola driver license | Cincinnati, Ohio (DHL Hub) |
| March 19, 2022 | 2 Kenya passports;<br>2 Kenya driver licenses | Cincinnati, Ohio (DHL Hub) |
| June 24, 2022 | 1 Uganda passport;<br>1 Uganda driver license | Cincinnati, Ohio (DHL Hub) |
| January 19, 2023 | 1 Uganda passport;<br>1 Uganda driver license | JFK International Airport |
| January 25, 2023 | 4 Uganda passports;<br>3 Uganda driver licenses;<br>2 Angola passports;<br>2 Angola driver licenses;<br>1 Togo passport;<br>1 Togo driver license | JFK International Airport |

Alisigwe argues that reasonable suspicion is required to search international mail. (Dkt. 79 at 5). He is incorrect. Reasonable suspicion is not required for the routine inspection of international shipments at the border, such as those at issue here. *See United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986) (customs officials in New York were "not required to establish reasonable suspicion" to inspect package sent from Colombia, because inspection occurred prior to the package's entry into the United States). The authority to conduct a border search of international mail is "based upon the inherent 'right of the sovereign to protect itself by stopping and examining persons and property crossing into this country.'" *Id.* at 1111 (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)). CBP was not required to have reasonable suspicion to search the international mail containing the passports and licenses bearing Alisigwe's photograph. The Court should deny Alisigwe's motion to suppress the international mail seizures.[1]

Further, as set forth in the Government's opposition, reasonable suspicion is also not required to justify the February 7, 2019 and March 1, 2021 manual reviews of Alisigwe's phone at the border. (Dkt. 57 at 4-13). But even if it is, U.S. law enforcement had developed reasonable suspicion to support the February 7, 2019 and March 1, 2021 border searches. Prior to the February 7, 2019 border search, U.S. law enforcement had learned from the U.K. Border Force that Alisigwe was using a fraudulent South African passport in the name of Wilhelm Heinz. *Id.* at 11-12.

Even if the Court were to conclude that law enforcement's border searches of Alisigwe's phone and mail required some showing of cause, it should still deny Alisigwe's motion under the good faith exception to the exclusionary rule. *See United States v. Smith*, No. 22 Cr. 352 (JSR), 2023 WL 3358357, at *13-14 (S.D.N.Y. May 11, 2023) (declining to suppress border search of phone under good-cause exception).
.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/_____
William C. Kinder
Meredith Foster
Adam Hobson
Assistant United States Attorneys
(212) 637-2394

Cc:    Ariel Werner, Esq. (by ECF)
       Sylvie Levine, Esq. (by ECF)

---

[1] The Government does not contend that CBP targeted these specific packages because of a suspected connection to Alisigwe, as the packages were addressed to recipients not facially related to him. Rather, CBP opened these packages pursuant to routine inspection practices. It is permitted to conduct such routine inspections of international mail pursuant to the border search authority. *See Gaviria*, 805 F.2d at 1112.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___11/30/2023_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                     :

UNITED STATES OF AMERICA,         :

                     :

         -against-           :        22-CR-425 (VEC)

                     :

                     :       OPINION AND ORDER

CHINWENDU ALISIGWE,        :

                 Defendant.   :

                     :

------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Chinwendu Alisigwe ("Alisigwe") is charged with conspiracy to commit bank fraud,

bank fraud, aggravated identity theft, and conspiracy to commit money laundering in violation of

18 U.S.C. §§ 1344, 1028A, and 1956(a)(1)(B)(i). *See* Superseding Indictment, Dkt. 62. The

Government alleges that he opened bank accounts using fake forms of identification and

withdrew funds that he knew were the proceeds of unlawful activity from those accounts. *See*

Compl., Dkt. 1; Superseding Indictment, Dkt. 62. On January 6, 2023, Alisigwe moved to

suppress (1) evidence obtained from searches of his cellphones conducted at the border upon his

return to the United States; (2) evidence seized from Alisigwe's home at the time of his arrest;

and (3) evidence intercepted from Alisigwe's mail. *See* Def. Not. of Mot., Dkt. 27; Def. Mem.,

Dkt. 28.[1] The Court held an evidentiary hearing on November 17, 2023 (the "Suppression

Hearing").[2] For the following reasons, Alisigwe's motion to suppress is DENIED.

---

[1]     Alisigwe also moved to suppress statements made to law enforcement at the border. *See* Def. Mem., Dkt. 28, at 2. Because the Government does not intend to offer those statements at trial, *see* Gov't Mem., Dkt. 57 at 4, the Court denies Alisigwe's motion as moot.

[2]     The evidentiary hearing pertained solely to the lawfulness of a seizure of evidence from Alisigwe's home at the time of his arrest. *See* Order, Dkt. 58.

On October 20, 2023, Alisigwe filed a motion to reconsider the Court's June 23, 2023, Opinion and Order precluding him from presenting a duress defense at trial ("Duress Opinion"). *See* Motion, Dkt. 83. The Court held oral argument on the motion for reconsideration at the Suppression Hearing. *See* Order, Dkt. 88. For the reasons discussed below, Alisigwe's motion to reconsider the Duress Opinion is DENIED.

## BACKGROUND

Motion to Suppress

In 2018, Homeland Security Investigations ("HSI") received information from a London-based HSI attaché that Alisigwe was using multiple identities and had possessed a fraudulent South African passport bearing his photograph and another person's name. *See* Report of Investigation ("ROI"), Dkt. 28-1 at 1–2. Based on that information, the U.S. Department of Homeland Security ("DHS") opened an investigation into Alisigwe. *See id.* at 1.

On February 7, 2019, Alisigwe was stopped by U.S. Customs and Border Protection ("CBP") agents at John F. Kennedy International Airport ("JFK Airport") upon his return to the United States from Nigeria. *See* Alisigwe Decl., Dkt. 59 ¶ 4–5; ROI at 2; Gov't Mem., Dkt. 57 at 2. Alisigwe agreed to speak to HSI agents. *See* Alisigwe Decl. ¶¶ 10–16; Gov't Mem. at 2. The HSI agents took Alisigwe's cellphone, directed him to unlock it, and took the phone to another room. *See* Alisigwe Decl. ¶ 15. The parties do not dispute that law enforcement searched Alisigwe's cellphone manually (without deploying forensic tools) and then returned the phone to Alisigwe. *See* Gov't Mem. at 2–3.[3]

On March 1, 2021, Alisigwe was again stopped by CBP agents at JFK Airport upon his return to the United States. *See* Alisigwe Decl. ¶ 17. The CBP agents took two cellphones from

---

[3]      Alisigwe did not reply to the Government's response asserting that the search was a manual search.

**A000229**

Alisigwe, directed him to unlock the phones, and took the phones to another room. *See* Alisigwe

Decl. ¶ 17; FBI Report, Dkt. 28-2. The parties do not dispute that HSI agents again searched

Alisigwe's cellphones manually. *See* Gov't Mem. at 3.[4] The cellphones were presumably

returned to Alisigwe.

On July 26, 2022, around 6:00 A.M, Alisigwe was arrested inside his home in Queens

pursuant to an arrest warrant. *See* Suppression Hearing Tr. at 7–8; Alisigwe Decl. ¶ 18. The

parties dispute what happened next. According to Alisigwe, law enforcement forced open all of

his doors and seized an opaque envelope that was hidden under his bed while Alisigwe waited

handcuffed by the front door of the apartment. *See* Alisigwe Decl. ¶¶ 19–21. According to the

Government, FBI Special Agent William McKeen ("Agent McKeen") and another agent

conducted a "protective sweep" of Alisgwe's bedroom after he was arrested in the living room.

*See* Suppression Hearing Tr. at 12. After finishing the protective sweep and determining the

bedroom was clear of persons, Detective Justine Killion of the NYPD/FBI Cyber Crime Task

Force ("Detective Killion") brought Alisigwe into the bedroom so that he could change into

clothing appropriate for his initial appearance in court later that day. *Id.* at 14–15, 50. While

Agent McKeen was standing in the bedroom following his protective sweep and only about 30 to

40 seconds after Alisigwe entered the room, Agent McKeen saw a stack of passports on the floor

beside the bed across the room from the doorway into the bedroom. *Id.* at 16, 19. The top

passport in the stack was a Republic of Kenya passport. *Id.* at 16–17. Based on his knowledge

that Alisigwe had allegedly used fraudulent passports in connection with a criminal scheme and

that he is a citizen of Nigeria, not Kenya, Agent McKeen recognized the passports as contraband

and seized them. *Id.* at 17. Agent McKeen testified that he did not look under the bed and did

---

[4]      Alisigwe did not reply to the Government's response asserting that the searches were manual searches.

not know whether there was an envelope underneath the bed. *Id.* at 18. While Alisigwe, Agent McKeen, Detective Killion, and a third law enforcement officer were in the bedroom, Detective Killion heard Alisigwe say, "[I]f this is not a search warrant, why is someone going through my stuff[?]" *Id.* at 52.

During the course of this investigation, CBP intercepted Alisigwe's international mail at the U.S. border and uncovered multiple false passports bearing Alisigwe's photograph and other persons' names being sent to him. *See* McKeen Decl., Dkt. 57-1 ¶ 10. The dates of the international mail seizures span from July 30, 2020, more than a year after Alisigwe was first stopped at JFK airport, to January 25, 2023, six months after he was arrested. *See* Letter, Dkt. 101.

<u>Motion for Reconsideration</u>

On February 24, 2023, the Court held a change-of-plea hearing, at which Alisigwe was expected to enter a guilty plea. *See* Order, Dkt. 33. His guilty plea was not accepted because during his allocution he said that he had been coerced or forced to commit the crime because of threats to his mother's life. Plea Hearing Tr., Dkt. 39 at 24–25. The Court adjourned the hearing to give defense counsel an opportunity to consult with Alisigwe to determine whether he still wished to plead guilty or wished to persist in his not guilty plea and attempt to mount a duress defense. *Id.* at 25–29. Alisigwe subsequently notified the Court that he had chosen the latter. Letters, Dkts. 41, 45.

With Alisigwe's consent, pursuant to *United States v. Bifield*, 702 F.2d 342, 346–47 (2d Cir. 1983), the Court held a pretrial evidentiary hearing on May 30, 2023, to consider whether Alisigwe could present a prima facie case of a duress defense. *See* Order, Dkt. 47. Only Alisigwe testified at the hearing. *See* Evidentiary Hearing Tr., Dkt. 53. He testified that he

A000231

opened the fraudulent bank accounts because a stranger called him and threatened his mother's life if he did not do so.  *Id.* at 16–20.  He did not contact the Nigerian police because he believed they would do nothing to assist him and because he was worried that the people threatening him would harm him or his mother if they found out he had contacted the police.  *Id.* at 24–26.  He did not contact law enforcement in the United States because, he testified, he was afraid that doing so would prevent him from complying with the stranger's orders, and if he no longer complied, his mother would be killed.  *Id.* at 26–27.

On June 23, 2023, the Court held that Alisgwe had not presented a prima facie duress defense because Alisigwe unquestionably had reasonable opportunities to escape harm other than by engaging in the illegal activity by contacting law enforcement in the United States.  *See* Duress Opinion, Dkt. 52 at 7–9.

## DISCUSSION

### I.      Legal Standard for the Motion to Suppress

"The Fourth Amendment to the Constitution provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting U.S. Const. amend. IV).

The "ultimate touchstone" of the Fourth Amendment is "reasonableness."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  To determine whether a search is reasonable, courts "examine the totality of the circumstances" and "balance, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests."  *In re Terrorist Bombings*, 552 F.3d 157, 172 (2d Cir. 2008) (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)).  A

A000232

search for evidence of criminal wrongdoing generally requires law enforcement to obtain a search warrant. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).

There are, of course, several well-established exceptions to the warrant requirement. *See Katz v. United States*, 389 U.S. 347, 357 (1967). Routine border searches, including searches of outer clothing and luggage, are reasonable without probable cause or a warrant in light of the Government's right to "control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977); *see also United States v. Flores-Montano*, 541 U.S. 149, 153 (2004).[5] The same exception applies to searches of international mail. *See Ramsey*, 431 U.S. at 619–22. Nonroutine, "more invasive" border searches, such as strip, body cavity, or involuntary x-ray searches, do not require a warrant but do require "reasonable suspicion." *Tabbaa v. Chertoff*, 509 F.3d 89, 98 (2d Cir. 2007) (internal citation omitted). To determine whether a nonroutine search was reasonable, courts weigh "the offensiveness of the intrusion" against "the level of warranted suspicion." *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006). Relevant factors include "unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." *Id.* at 124.

Under the "plain view" exception to the warrant requirement, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object,[6] they may seize it without a

---

[5] An international airport "is considered the functional equivalent of a border" for Fourth Amendment purposes. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (citing *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986)).

[6] Once an arrest warrant has been obtained for a particular person, without a separate search warrant, law enforcement may enter what they reasonably believe to be the person's residence when they reasonably believe that the person is present to effectuate the arrest. *See Payton v. New York*, 445 U.S. 573, 603 (1980); *United States v.*

warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). If an article is in plain view, "neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133 (1990).

At a suppression hearing, the Government bears the burden of justifying an exception to the warrant requirement by a preponderance of the evidence. *See United States v. Sosunov*, No. 17-CR-0350 (KBF), 2018 WL 2095176, at *6 (S.D.N.Y. May 7, 2018) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)).

## II.     Alisigwe's Motion to Suppress Evidence Found on His Cellphones Is Denied

Alisigwe argues that evidence obtained from his cellphones should be suppressed because, although routine border searches are permissible without a warrant, border searches of cellphones are not; the unprecedented privacy interests at stake, according to Defendant, require that such searches be conducted only on the basis of a search warrant supported by probable cause. *See* Def. Mem. at 3–6 (citing *Riley v. California*, 573 U.S. 373 (2014)). The Government asserts that the "manual" review of a cellphone is a routine search, that law enforcement had reasonable suspicion justifying even a nonroutine search, and that, in all events, the good faith exception would preclude suppression of the evidence seized in this case. *See* Gov't Mem. at 10–16. The Court concludes that the border searches, although nonroutine, were justified by reasonable suspicion, and that, in any event, the good faith exception applies.

### A.  Evidence from Alisigwe's Cellphones Was Lawfully Obtained

Neither the Supreme Court nor the Second Circuit has had occasion to decide whether cellphone searches at the border are routine, nonroutine, or *sui generis* such that a search based

---

*Lauter*, 57 F.3d 212, 214 (2d Cir. 1995). Law enforcement may also conduct a "protective sweep" of the premises incident to an arrest to protect themselves and others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

on anything short of a search warrant or probable cause is unlawful.  In *Riley*, the Supreme Court held that officers must generally secure a warrant before searching an arrestee's cellphone because the Government interests at stake — harm to officers and destruction of evidence — are not significantly implicated when officers are reviewing digital data and because modern cellphones raise heightened privacy interests.  573 U.S. at 386–98.

Although *Riley* enshrines the commonsense principle that searching an arrestee's digital data is significantly more intrusive than searching his physical belongings, it did not upend long-settled precedent governing border searches.  As a general matter, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior" and is "struck much more favorably to the Government."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538–40 (1985) (noting that the expectation of privacy is "less at the border than in the interior").

The Government interests at stake also differ.  At the border, CBP's primary focus is on intercepting "contraband, dutiable merchandise, immigration fraud, and terrorism," but it also has authority to engage in nonroutine searches when its agents "reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties."  *United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015) (affirming the legality of a nonroutine border search because CBP officers had reasonable suspicion that the defendant "was engaged in a financial crime"); *see also* U.S. Customs & Border Prot., *Summary of Laws Enforced by CBP*, https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code (last modified Oct. 13, 2016) [hereinafter *Summary of Laws Enforced by CBP*] (listing Title 18 of the U.S. Code among the laws that CBP enforces).[7]

---

[7]     Alisigwe asserts that, to the contrary, the Government's interest at the border is "limited" to the detection of contraband, "protecting national security," or "blocking the entry of unwanted persons"; according to Alisigwe, the

8

By contrast, when making an arrest, law enforcement is concerned with seizing weapons and preventing the destruction of evidence, goals that have little or no relation to digital data, which "cannot itself be used as a weapon" and which can be preserved through less invasive means. *Riley*, 573 U.S. at 387–91. *Riley* did not, however, impose a categorical warrant requirement on all cellphone searches, including those conducted at the border. *Cf. Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2021) ("Every circuit that has faced this question has agreed that *Riley* does not mandate a warrant requirement for border searches of electronic devices, whether basic or advanced."); *United States v. Wanjiku*, 919 F.3d 472, 485 (7th Cir. 2019) ("[N]o circuit court, before or after *Riley*, has required more than reasonable suspicion for a border search of cell phones or electronically-stored data.").

In this Court's view, cellphone searches cannot be conducted without reasonable suspicion of criminal activity because they are not routine border searches. The Court recognizes that there is no "precise line" between routine and nonroutine searches, *Tabbaa*, 509 F.3d at 98, and that caselaw is mixed on whether a border search of a cellphone is routine. This Court is of the view that even a manual review of the contents of a person's cellphone is on the "more invasive" end of the search spectrum. *Id.* at 98. As the Supreme Court noted in *Riley*, modern cellphones implicate privacy concerns "far beyond" those involved in routine searches of a suspect's "wallet" or "purse." 573 U.S. at 393; *see also United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) (concluding that forensic examination of a cellphone at the border requires a showing of reasonable suspicion); *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018)

---

Government's interest does not include a "generalized interest in law enforcement and combatting crime." Def. Mem. at 4–5 (citing *United States v. Cano*, 934 F.3d 1002, 1018 (9th Cir. 2019); *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019)). That is not the law in this Circuit. *See United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015) ("CBP officers . . . have the authority to search and review a traveler's documents and other items at the border when they reasonably believe that a traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties.").

(same); *United States v. Bongiovanni*, No. 19-CR-227 (JLS) (MJR), 2022 WL 17481884, at *11–12 (W.D.N.Y. Aug. 5, 2022) (same with respect to manual and forensic examination), *report & recommendation adopted*, 2022 WL 17139489 (W.D.N.Y. Nov. 22, 2022). Accordingly, the search of a person's cellphone at the border requires reasonable suspicion of criminal activity.[8]

On both occasions that law enforcement agents searched a cellphone belonging to Alisigwe, they had reasonable suspicion to do so. At the time of the February 7, 2019, search, DHS had launched an investigation regarding Alisigwe's use of "multiple identities." ROI at 1. The United Kingdom's border force had seized a fraudulent South African passport bearing Alisigwe's photograph, and DHS's Document and Benefit Fraud Task Force was planning to pursue criminal or administrative charges against Alisigwe. *Id.* at 1–2; *see also* Gov't Mem. at 11. Contributing to the reasonable suspicion, during the February 7, 2019, border stop, Alisigwe indicated that the photograph used in the fraudulent South African passport "look[ed] like [him]" but "repeatedly denied knowing when or where the photo was taken." ROI at 2; Alisigwe Decl. ¶ 12. Two years later when Alisigwe was stopped on March 1, 2021, law enforcement's investigation was ongoing, and the suspicion that existed in 2019 had not abated. *See generally* FBI Report, Dkt. 28-2.[9]

---

[8]     The Government urges the Court to hold that a "manual," as opposed to a "forensic," cellphone search is routine because it is relatively less invasive. *See* Gov't Mem. at 10. While the Court agrees that a manual search of a cellphone is less invasive than a forensic search, it nonetheless concludes that even a manual cellphone search is nonroutine for the reasons discussed *infra*; it need not decide whether a forensic cellphone search, which the parties agree did not take place in this case, is so invasive that even reasonable suspicion is insufficient to render the search reasonable.

[9]     The Government asserts in its briefing that, between the two border searches, substantial additional investigation was conducted, including issuing subpoenas for bank records, identifying additional fraudulent identification documents used by Alisigwe, interviewing victims of fraud whose money had been deposited into accounts Alisigwe opened using false identification documents, and seizing additional fraudulent passports at the border bearing Alisigwe's photograph and the names of other individuals. Gov't Mem. at 11–12. Because the Government did not submit any evidence to support these assertions, the Court did not consider them in its analysis. *See Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in legal memoranda or oral argument are not evidence[.]" (quotation omitted)). The Court did, however, consider the Government's representation that its investigation was continuing at the time of the March 1, 2021, stop.

A000237

In short, the Government has satisfied its relatively modest burden to show reasonable suspicion; the cellphone searches were, therefore, lawful. *See Levy*, 803 F.3d at 123–24 (concluding that CBP officers had reasonable suspicion to conduct a nonroutine border search given the Government's "criminal investigation" of the defendant's financial crime before he was stopped); *United States v. Kamaldoss*, No. 19-CR-543 (ARR), 2022 WL 1200776, at *11 (E.D.N.Y. Apr. 22, 2022) (concluding that the Government's ongoing investigation of the defendant and seizure of contraband in packages addressed to the defendant justified a nonroutine search of the defendant's cellphone at the border).

### B. Evidence from Alisigwe's Cellphones Was Seized in Good Faith

Even if those district courts that have held that a warrant is required to search a suspect's cellphone at the border are correct, *see United States v. Smith*, No. 22-CR-352 (JSR), 2023 WL 3358357, at *7 (S.D.N.Y. May 11, 2023); *United States v. Djibo*, 151 F. Supp. 3d 297, 309–10 (E.D.N.Y. 2015), Alisigwe's motion to suppress would, nevertheless, fail under the good faith exception.

### 1. Legal Standard

"As both the Supreme Court and Second Circuit have held, a violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Kim*, No. 16-CR-191, 2017 WL 5256753, at *3 (E.D.N.Y. Nov. 10, 2017) (citing *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010); *Herring v. United States*, 555 U.S. 135, 138 (2009)); *see also United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." (internal citation omitted)).

Because the exclusionary rule exacts a heavy toll on society, it generally does not apply when suppression would provide only marginal deterrence to misconduct by law enforcement. *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (quoting *Herring*, 555 U.S. at 141). "The rule's corrective value justifies its cost when the police 'exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" *Id.* at 117–18 (quoting *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)). With those remedial purposes in mind, the good-faith exception asks "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Herring*, 555 U.S. at 145 (cleaned up).

## 2. Application

As noted above, to date, neither the Supreme Court nor the Second Circuit has addressed the lawfulness of warrantless searches of cellphones at the border. At the time law enforcement searched Alisigwe's cellphones in February 2019 and in March 2021, those federal circuit courts that had considered the issue had concluded either that border searches of cellphones are routine and do not require even reasonable suspicion or that forensic (but not manual) border searches of cellphones require reasonable suspicion. *See Alasaad*, 988 F.3d at 17–18 (summarizing the state of the law in February 2021 and concluding that "neither a warrant nor probable cause is required for a border search of electronic devices" and that manual device searches can be conducted without reasonable suspicion).

CBP reasonably interpreted existing law in its 2018 directive, which instructs officers that "basic" searches of a traveler's electronic devices may be conducted "with or without suspicion," whereas "advanced" searches of a traveler's electronic devices require "reasonable suspicion of activity in violation of the laws enforced or administered by CBP." U.S. Customs & Border Prot., *CBP Directive Regarding Border Searches of Electronic Devices* (Jan. 4, 2018),

12

A000239

https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Search-of-Electronic-Media.pdf, §§ 5.1.3–5.1.4.  The criminal laws at issue in this case are among the laws enforced by CBP.  *See Summary of Laws Enforced by CBP*, *supra* p. 8 (listing Title 18 of the U.S. Code among the laws that CBP enforces).

Given the state of the law in 2019 and 2021, the good faith exception would apply to the border searches in this case if warrants were required.  *See Smith*, 2023 WL 3358357, at *7, 13 (denying suppression of evidence obtained from a border search of the defendant's cellphone because "the breadth of the 'border search exception' was still largely in place" in March 2021); *Bongiovanni*, 2022 WL 17481884, at *13–14 (same with respect to a search conducted in April 2019).

### III.  Alisigwe's Motion to Suppress Evidence Seized from His Apartment Is Denied

Alisigwe argues that law enforcement's seizure of passports from his apartment was unlawful.  In a declaration, he asserted that the agent found the passports in an opaque envelope under his bed after Alisigwe had been handcuffed and was being held in another room.  *See* Def. Mem. at 6–7; Alisigwe Decl. ¶¶ 20–21.  According to the Government, Agent McKeen seized the passports, which were in plain view on the floor, while conducting a safety sweep of Alisigwe's apartment.  *See* Gov't Mem. at 16–18.

Agent McKeen testified that he entered Alisigwe's bedroom to conduct a protective sweep.  Suppression Hearing Tr. at 12.  After completing the sweep and concluding the room was clear of other persons, he remained in Alisigwe's bedroom while Detective Killion brought Alisigwe into the room to change his clothes.  *Id.* at 14–15.  Only 30 to 40 seconds after Alisgwe entered his bedroom to change clothes, Agent McKeen saw, in plain view, a stack of passports on the floor in the corner of Alisigwe's room.  *Id.* at 16, 19.  He saw that the top passport was

13

from Kenya, even though he knew Alisigwe was Nigerian. *Id.* at 16–17. Agent McKeen further testified that he never looked under the bed and had no knowledge of whether there was an envelope located there. *Id.* at 18. Detective Killion, who accompanied Alisigwe into the bedroom, was focused on getting him dressed and did not notice what Agent McKeen was doing. *Id.* at 52. Still, she corroborated the location within the room at which Agent McKeen was standing — on the opposite side of the bed from the door. *Id.* And she confirmed that she never saw any agent look under the bed or actively search for evidence during the arrest. *Id.* at 53.

The Court acknowledges Mr. Alisigwe's contradictory declaration, in which he states that a "male agent went under [his] bed and retrieved a brown envelope containing documents" and that "[o]ne could not have reached the envelope without slightly lifting the bed and reaching about as far as the arm could extend." Alisigwe Decl. ¶ 21. The Court also acknowledges and credits Detective Killion's testimony that Alisigwe raised concerns that agents were "going through [his] stuff" without a search warrant.[10] Suppression Hearing Tr. at 52. Considering that declaration and the evidence adduced at the Suppression Hearing,[11] the Court finds that Agent McKeen's version of events, which was partially corroborated by Detective Killion, is credible.

Agent McKeen's credible testimony shows that the plain view exception to the warrant requirement applies to the seizure of the passports. Agent McKeen was lawfully in Alisigwe's bedroom when he saw the stack of passports. Even though the initial protective sweep had ended, Agent McKeen was still lawfully in the bedroom and did not need to close his eyes as

---

[10]     As indicated in note 11, *infra*, Alisigwe did not testify at the suppression hearing. That was, of course, his right, but it left his contemporaneous objection unexplained. The statement itself is ambiguous. It is not clear at all that Alisigwe was referring to Agent McKeen's discovery of the passports or whether he was objecting to what some other agent was doing. Even if it was a reference to Agent McKeen, it is not clear whether to Alisigwe picking up passports that are in plain sight constitutes "going through [his] stuff."

[11]     Alisigwe chose to rest on his declaration and not to testify at the Suppression Hearing. Suppression Hearing Tr. at 68– 69.

14

soon as he confirmed that the room was clear of other people. *See United States v. Hernandez*, No. 92-CR-323 (LJF), 1992 WL 251463, at *3 (S.D.N.Y. Sept. 21, 1992) (denying a motion to suppress a gun that an officer saw when, "after having finished the protective sweep, he glanced into the bathroom and saw the gun as he was walking back to the living room"). The passports were in plain view because they were stacked on the floor in the corner of the bedroom, not under the bed or in an envelope. Notwithstanding Defendant's assertion to the contrary, *see* Def. Supp. Mem., Dkt. 97 at 6, it was apparent that the passports were likely contraband because the top passport was from Kenya, even though Alisigwe is Nigerian. Together, these facts show that (1) Agent McKeen was "lawfully in a position from which [he could] view [the] object[s]," (2) the objects' "incriminating character [was] immediately apparent," and (3) he had "a lawful right of access to the object." *Dickerson*, 508 U.S. at 375. Agent McKeen, therefore, could seize the passports without a warrant pursuant to the plain view exception.

For all of these reasons, Alisigwe's motion to suppress evidence seized from his residence is denied.

### IV. Alisigwe's Motion to Suppress Evidence Intercepted from International Mail Is Denied

Alisigwe asserts that the passports that law enforcement seized from international mail addressed to him should be suppressed because they were obtained without a search warrant. *See* Def. Mem. at 8 (citing *United States v. Van Leeuwen*, 397 U.S. 249 (1970)). That argument fails because the border search exception has equal application to international mail. *See Ramsey*, 431 U.S. at 619–22.

Alisigwe's motion to suppress evidence seized from his international mail is, therefore, denied.

### V. Alisigwe's Motion to Reconsider this Court's Ruling Precluding His Duress Defense Is Denied

Local Criminal Rule 49.1(d) allows parties to move for reconsideration of adverse decisions.[12] Courts may grant a motion for reconsideration upon a showing of "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error or prevent manifest injustice." *United States v. Goldberg*, No. 12-CR-864 (LAP), 2021 WL 2444548, at *1 (S.D.N.Y. June 15, 2021) (citation omitted). The standard for reconsideration "is not met by rearguing points the Court has already considered and rejected, nor by raising new arguments not previously presented." *United States v. Del Villar*, 20-CR-295 (VEC), 2021 WL 5180048, at *1 (S.D.N.Y. Nov. 7, 2021).

It is well established that the elements of a duress defense are: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity." *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005). As to the third element, "where there is a reasonable opportunity to escape the threatened harm, the defendant must take reasonable steps to avail himself of that opportunity, whether by flight or by seeking the intervention of the appropriate authorities." *United States v. Alicea*, 837 F.2d 103, 106 (2d Cir. 1988). The Court held in its Duress Opinion that Alisgwe did not make any factual showing as to the third element because he wholly failed to contact U.S. law enforcement. *See* Dkt. 52, at 7–9. Alisigwe's arguments in his motion for

---

[12] The rule provides that any such motion for reconsideration must be filed within 14 days of the Court's determination of the original motion. In this case, the motion for reconsideration was filed approximately four months after the Court decided the motion; it was, therefore, untimely. The Court, however, has exercised its discretion in this case to excuse the untimeliness and will consider the merits of the motion. The Defendant asserts that the availability of a duress defense is crucial to his case, and, during the intervening four months, Defendant changed counsel.

16

reconsideration repeat the same arguments already rejected in that Opinion. The Court already considered and rejected his argument that he did not have a reasonable opportunity to escape harm because he reasonably believed Nigerian law enforcement would not help and was scared of the consequences of seeking the intervention of United States law enforcement. *See id.* at 8–9. Alisigwe does not point to controlling decisions that the Court overlooked in rejecting those arguments.

Upon Alisigwe's request at the Suppression Hearing, the Court has re-reviewed Second Circuit precedent in this area and adheres to its prior decision that, because he did not notify law enforcement in the United States about the threats to his mother despite opportunities to do so, he did not make any showing in support of the third element — that he lacked a reasonable opportunity to escape harm other than by engaging in illegal activity. There is no question that Alisigwe had multiple opportunities and many months in which he could have notified law enforcement in the United States of the threats rather than engaging in criminal conduct. At a bare minimum, Alisigwe was stopped twice on his re-entry to the United States by CBP. He easily could have explained the situation he purportedly was in during those encounters.

The Second Circuit's decision in *United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990), is squarely on point. Bakhtiari claimed that unidentified Iranians threatened him and his family in Iran unless he assisted them in obtaining certain chemicals, silencers for machine funds, and hand grenades. *Id.* at 1058. He also claimed that he met with an individual at the Iranian Mission to the United Nations who showed him pictures of his father being tortured in Iran a few years earlier; that experience indicated to the defendant that the threats were not merely hypothetical. *Id.* at 1056. Similar to Alisigwe's testimony in this case, the defendant also

testified that he was told that the Iranian government would know if he went to United States law enforcement. *Id.*

The District Court assumed that Bakhtiari had "a good faith basis for believing that members of his family were threatened by persons acting for the present government of Iran." *Id.* at 1058. But he "never communicated the alleged threats to any federal, state or local law enforcement authority." *Id.* That alone made his evidence "fall[] far short of the necessary threshold showing . . . that would require a district court to permit the defense to go to a jury." *Id.*[13] The Court "decline[d] to adopt the conclusion [the defendant] implicitly urge[d] — that contacting law enforcement officials is tantamount to abandoning any hope of securing the safe return of a threatened family member. *Id.*; *see also United States v. Alicea*, 837 F.2d 103, 107 (2d Cir. 1988) (affirming preclusion of duress defense where there was "no evidence that [the defendants] made any attempt . . . to seek protection from the authorities for their families").

As recently as last week, the Second Circuit reaffirmed the *Alicea* holding that a defendant's failure to report threats to U.S. law enforcement when there is an opportunity to do so is fatal to the duress defense. In *United States v. Williams-Dorsey*, No. 22-1360-CR, 2023 WL 8015469, at *4–5 (2d Cir. Nov. 20, 2023), the defendant asserted that he traveled from Mexico to Syracuse, New York to sell drugs to protect a hostage in Mexico, who would have been killed if the defendant did not follow through with the drug transaction. *Id.* at *5. The District Court precluded the defendant from presenting the duress defense to the jury because, despite flying through multiple U.S. airports to get to Syracuse, he did not notify any U.S.

---

[13]     Later in the opinion, the Second Circuit stated that "not only did Bakhtiari completely fail to take adequate, reasonable steps to notify law enforcement officials of the alleged threats against him and his family, but he also took affirmative steps to commit additional crimes never even contemplated by the unidentified Iranians." *Bakhtiari*, 913 F.2d at 1058. The fact that Bakhtiari committed additional crimes was not a necessary fact underlying the Second Circuit's decision; instead, it appeared to be icing on the cake for why the district court correctly precluded a duress defense.

official that, unless he engaged in the drug transaction, the hostage would be killed. *Id.* The Second Circuit affirmed because the defendant "could not demonstrate that he lacked reasonable opportunity to escape the threatened harm by alerting law enforcement authorities in the United States prior to the drug transaction in Syracuse." *Id.*

The Second Circuit has consistently held over the last three and a half decades that a defendant is not entitled to present a duress defense to a jury if he did not report threats against him, his family, or others to U.S. law enforcement when there was an opportunity to do so prior to engaging in criminal conduct. *See Williams-Dorsey*, 2023 WL 8015469, at *4–6 (precluding duress defense due to defendant's failure to go to U.S. authorities); *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) (same); *Bakhtiari*, 913 F.2d at 1058 (same); *Alicea*, 837 F.2d at 107 (same).

Because this Court is bound by clear, on-point Second Circuit precedent, Alisigwe's motion for reconsideration is DENIED.

## CONCLUSION

For the foregoing reasons, Alisigwe's motion to suppress is DENIED. His motion for reconsideration of the Duress Opinion is also DENIED. The Clerk of Court is respectfully directed to close the open motions at Docket Entry 27 and 83.

**SO ORDERED.**

Date: **November 30, 2023**
New York, NY

**VALERIE CAPRONI**
**United States District Judge**

19

A000246

## CERTIFICATE OF SERVICE

I certify that a copy of this Appendix has been served by ACMS on the United States Attorney/S.D.N.Y.; Attention: **MEREDITH C. FOSTER, ESQ.,** Assistant United States Attorney, 26 Federal Plaza, New York, NY 10278.

Dated:     New York, New York
               August 14, 2024

_Colleen P. Cassidy_

**COLLEEN P. CASSIDY**
Assistant Federal Defender