# 24-960-cr

United States Court of Appeals

For the Second Circuit

_____

Docket No. 24-960-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

CHINWENDU ALISIGWE, a/k/a SEALED DEFENDANT 1,

Defendant-Appellant.

_____

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPENDIX FOR DEFENDANT-APPELLANT CHINWENDU ALISIGWE
VOLUME II OF II**

Federal Defenders of New York, Inc.

Appeals Bureau

52 Duane Street, 10th Floor

New York, New York 10007

Tel. No.: (212) 417-8742

*Attorney for Defendant-Appellant*

**CHINWENDU ALISIGWE**

**COLLEEN P. CASSIDY**,

*Of Counsel*

# TABLE OF CONTENTS TO THE APPENDIX

## VOLUME I

District Court Docket Sheet,
    S.D.N.Y. 22 Cr. 425 (VEC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 004

Superseding Indictment,
    filed August 17, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 027

Motion to Suppress Statements and Evidence,
    filed January 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 032

Declaration in Support of Motion to Suppress,
    filed January 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 033

Defendant's Memorandum of Law in Support of Motion to Suppress,
    filed January 6, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 037

Plea Hearing Transcript,
    dated February 24, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 052

Status Conference Transcript,
    dated March 2, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 082

Duress Hearing Transcript,
    dated May 31, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 093

Opinion and Order, Precluding Duress Defense,
    filed June 23, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 177

Government's Memorandum of Law in Opposition of Motion to Suppress,
    filed August 4, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 186

Status Conference Transcript,
    dated August 25, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 192

Defendant's Reply Memorandum of Law,
    filed October 13, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 197

Suppression Hearing Transcript,
    dated November 17, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 203

Defendant's Post-Hearing Letter Brief in Support of Motion to Suppress,
    filed November 22, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 212

Government's Post-Hearing Letter Brief in Opposition of Motion to
Suppress,
    filed November 29, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 219

Government Letter regarding Dates of International Mail Seizures,
    filed November 29, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 226

Opinion and Order, Denying Motion to Suppress,
    filed November 30, 2023. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 228

## VOLUME II

Trial Transcript,
    dated December 13, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 247

Trial Transcript,
    dated December 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 354

Defense Sentencing Memorandum,
    filed March 25, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 399

Sentencing Transcript,
    dated April 8, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 418

Government Exhibits 301-309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 457

Judgment in a Criminal Case,
    filed April 9, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 466

Notice of Appeal,
    filed April 11, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A 473

NCD5ali1                    Mughal - Cross

1        Government's Exhibits 305 through 308 are authentic

2    copies of photographs taken by CBP agents of Alisigwe's

3    personal effects following Alisigwe's February 7, 2019 arrival

4    at JFK International Airport.

5        On March 1, 2021, defendant Chinwendu Alisigwe arrived

6    at JFK International Airport after traveling internationally.

7    Upon Alisigwe's arrival, CBP agents conducted an interview of

8    Alisigwe and mainly reviewed his cell phone.

9        Government Exhibit 301 is an authentic copy of a

10   photograph taken by CBP agents of Alisigwe's cell phone

11   following Alisigwe's March 1, 2021 arrival at JFK International

12   Airport.  It is further agreed that this stipulation, which is

13   marked as Government Exhibit 804, may be received in evidence

14   as a government exhibit at trial.

15       The government offers Government's Exhibits 301

16   through 309.

17            THE COURT:  As well as 804?

18            MR. KINDER:  As well as 804.

19            THE COURT:  Any objection?

20            MS. LEVINE:  No.

21            THE COURT:  804 and 301 through 309 are received.

22            (Government's Exhibits 804 and 301 through 309

23   received in evidence)

24            MR. KINDER:  The government calls Kyle Tallio.

25   KYLE TALLIO,

A000247

NCD5ali1                    Tallio – Direct

1           called as a witness by the Government,

2           having been duly sworn, testified as follows:

3                THE DEPUTY CLERK:  State your full name for the record

4    and spell your last name.

5                THE WITNESS:  Kyle Tallio.  T-A-L-L-I-O.

6    DIRECT EXAMINATION

7    BY MR. KINDER:

8    Q.  Good morning, Special Agent Tallio.

9    A.  Good morning.

10   Q.  Where do you work?

11   A.  Homeland Security Investigations.

12   Q.  What's your title?

13   A.  I'm a special agent.

14   Q.  Is Homeland Security Investigations also commonly referred

15   to as HSI?

16   A.  Correct.

17   Q.  And that is part of the Department of Homeland Security?

18   A.  Correct.

19   Q.  How long have you worked for HSI?

20   A.  Just under six years.

21   Q.  Are you assigned to a particular unit?

22   A.  I am.  I'm currently assigned to the violent gang task

23   force.

24   Q.  How long have you been with the violent gang task force?

25   A.  Since 2021.

NCD5ali1                    Tallio - Direct

Q.  Prior to working with the violent gang task force, were you
in a different unit at HSI?

A.  I was.

Q.  What unit?

A.  The document and benefit fraud task force.

Q.  And approximately what dates were you with the document and
benefit fraud task force?

A.  From August 2018 through early 2021.

Q.  And prior to working at HSI, did you work in law
enforcement?

A.  I did.

Q.  What did you do?

A.  I was an officer in a couple other roles with Customs and
Border Protection.

Q.  What are your responsibilities as a special agent with HSI?

A.  Primarily I investigate violations of federal law.

Q.  Specifically, when you were working with the document and
benefits fraud task force, what types of cases did you work on?

A.  I worked on cases involving document fraud, immigration
fraud, and public benefits fraud.

Q.  I want to direct your attention to February 7/February 8,
2019.  In the course of your work, did you conduct an interview
of an individual then?

A.  I did.

Q.  What date was that interview?

NCD5ali1                    Tallio - Direct

1   A.   It was February 8th.  So it was a couple minutes after

2   midnight on February 8th.

3   Q.   Who did you interview?

4   A.   Chinwendu Celestine Alisigwe.

5   Q.   Do you see that individual in the courtroom today?

6   A.   I do.

7   Q.   Can you identify him by an article of clothing he is

8   wearing?

9   A.   The tan shirt.

10              THE COURT:  Indicating the defendant, Mr. Alisigwe.

11  Q.   Special Agent Tallio, where did the interview take place?

12  A.   JFK International Airport.

13  Q.   And was the defendant returning from an international trip?

14  A.   He was.

15  Q.   When did he arrive?

16  A.   I believe it was just before midnight on February 7th.

17  Q.   So he arrived on February 7th and then the interview

18  happened in the very early morning minutes of February 8th?

19  A.   Correct.

20  Q.   During the interview, did you review the defendant's

21  personal effects?

22  A.   I did.

23  Q.   And did you review the defendant's phone?

24  A.   I did.

25  Q.   Did you take photographs of the defendant's personal

NCD5ali1                    Tallio - Direct

1  effects and phone?

2  A.  Some of them, yes.

3  Q.  Let's talk about the phone.  Did you take pictures of the

4  phone?

5  A.  Yes, I did.

6  Q.  Can we please publish what is in evidence as Government

7  Exhibit 302?

8          Special Agent Tallio, can you describe what the jury

9  sees --

10         THE JURY:  We don't have it.

11         THE COURT:  Very good.

12         MR. KINDER:  It is still not on here.

13         THE JURY:  There we go.

14         MR. KINDER:  Mr. Santello, I think we can take off the

15  zoom.

16  Q.  Special Agent Tallio, can you describe for the jury what

17  they see in Government Exhibit 302?

18  A.  It is a photo I took of Mr. Alisigwe's phone.

19  Q.  Is that your hand in the back of the phone?

20  A.  It is.

21  Q.  What do we see on the screen of the phone?

22  A.  It was a photo on Mr. Alisigwe's phone of what appeared to

23  be some messages.

24  Q.  So it was a photograph saved on the phone?

25  A.  Correct.

NCD5ali1                        Tallio – Direct

1   Q.   Where was it saved on the phone?

2   A.   I believe in the gallery or some app to that effect.

3   Q.   Can you describe, generally, the information that is shown

4   on the screen of the defendant's phone?

5            MS. LEVINE:  Objection.

6            THE COURT:  Overruled.

7   A.   Some messages, four messages with the name, a string of

8   numbers, followed by DOB and a date, and then there is what

9   appears to be replies.

10  Q.   OK.  The string of numbers that you referred to, do you

11  have an understanding of what those string of numbers are?

12           MS. LEVINE:  Objection.

13           THE COURT:  Maybe y'all should come up.

14           (Continued next page)

15

16

17

18

19

20

21

22

23

24

25

NCD5ali1                        Tallio - Direct

1           (At side bar)

2           THE COURT:  OK.  So one of my concerns is that what

3   has been blacked out prevents the jury from seeing that it is a

4   Social Security number.  Or it appears to be a Social Security

5   number.

6           MS. LEVINE:  Right.  I'm not trying to subvert the

7   redactions.  If he wants to say it was nine digits and if it

8   had hyphens -- I don't know if it did or not -- he can say

9   that, but his opinion that it is a Social Security number is

10  not admissible.

11          THE COURT:  Rephrase the question.

12          MR. KINDER:  Yes.

13          THE COURT:  And you know what, because of the

14  redactions, just lead him through it.  OK?

15          MR. KINDER:  Yes.

16          MS. LEVINE:  Yes.

17

18

19

20

21

22

23

24

25

A000253

NCD5ali1                        Tallio - Direct

1            (In open court)

2     BY MR. KINDER:

3     Q.  Special Agent Tallio, do you see the redactions on the

4     screen of the phone?

5     A.  Yes.

6     Q.  And after that there is a string of four numbers?

7     A.  Correct.

8     Q.  Do the redactions cover up what is a nine digit string of

9     numbers?

10    A.  Yes.

11    Q.  Let's go ahead and have you read the first four messages,

12    from top to bottom, under the heading "Old Items."?

13            MS. LEVINE:  Objection.

14            THE COURT:  Overruled.

15    A.  Daniel Johnson, 0028, DOB April 17, 1982.

16            The next one is Dennis Clark, 2994, DOB January 5,

17    1980.

18            Next one is Joseph Haley, 5693, DOB June 7, 1982.

19            The last one is Sadia Mughal, 1658, DOB January 7,

20    1975.

21    Q.  And those messages all appear to be sent on February 7?

22    A.  That's correct.

23    Q.  Between about 4:18 p.m. and 4:30 p.m.?

24    A.  That's correct.

25    Q.  Can you read the response in yellow directly below that?

NCD5ali1                    Tallio - Direct

1    A.   OK.   A big thanks.

2    Q.   And what time is that sent?

3    A.   4:33 p.m. on February 7.

4         MR. KINDER:   Let's take that down and publish

5    Government Exhibit 303.

6    Q.   Special Agent Tallio, what does the jury see on the screen

7    of the defendant's phone here?

8    A.   Similar to the last photo, it is a photo I took of

9    Mr. Alisigwe's phone.

10   Q.   And could you please read the text in the five lines

11   beneath the heading business name?

12   A.   LI Industrial Company Limited.  Business address 995 East

13   78th Street, Brooklyn, New York, 11236.

14   Q.   And read the next three blocks of text?

15   A.   Account number.  There is a redaction with 4201.  Routing

16   no. 021000089.  Swift Code CITI US 33.

17   Q.   And the last block of text?

18   A.   Citibank N.A., 185 Madison Avenue, New York, New York,

19   10016.

20   Q.   And let's publish 304.  What does the jury see on the

21   screen of the defendant's phone here?

22   A.   Similarly, it is a photo that was in his -- in

23   Mr. Alisigwe's phone.

24   Q.   And you see there is a date in the middle of the screen,

25   August 7, 2018?

NCD5ali1                    Tallio - Direct

1    A.  Correct.

2    Q.  Can you please read the two messages below that?

3    A.  Keith C. Devan, SSN -- there is a redaction -- and 4779.  D

4    August 23rd, 1976.

5           The next one is Harlan Gray, SSN -- a redaction --

6    5260.  D January 20th, 1980.

7    Q.  And what is the response in green?

8    A.  Thank you very much.

9           MR. KINDER:  Let's publish 309.

10   Q.  Special Agent Tallio, what is this exhibit?

11   A.  This is another photo that I took from Mr. Alisigwe's

12   phone.

13   Q.  So this is a photo that you took of the phone?

14   A.  Correct.

15   Q.  And it is close up enough so that all that is seen is just

16   the screen of the phone?

17   A.  Correct.

18   Q.  And what does this appear to show?

19   A.  There was a picture on Mr. Alisigwe's phone of a letter

20   from Citibank fraud prevention.

21   Q.  Can you read the return address on this letter?

22   A.  I can.  Citibank N.A. Fraud Prevention, P.O. box -- I can't

23   make out the whole number, I believe it is 760027-9027, San

24   Antonio, Texas -- I believe it is 79245-996.

25   Q.  And who is the letter addressed to?

A000256

NCD5ali1                    Tallio - Direct

1    A.  David Hudgins.

2    Q.  How do you spell that last name?

3    A.  H-U-D-G-I-N-S.

4    Q.  And what is the address?

5    A.  995 East 78th Street, Brooklyn, New York, 11236-3827.

6            MR. KINDER:  One moment, your Honor?

7            THE COURT:  Yes.

8            (Counsel conferring)

9            MR. KINDER:  Can we please publish 305?

10   BY MR. KINDER:

11   Q.  Special Agent Tallio, what is this a photograph of?

12   A.  It's a photo I took of an ID card that was in

13   Mr. Alisigwe's personal effects.

14   Q.  And what is the name listed?

15   A.  C. Alisigwe.

16           MR. KINDER:  And let's publish 306.

17   Q.  What do you see here?

18   A.  It is a photo I took of Mr. Alisigwe's lawful permanent

19   resident card and New York State driver's license.

20   Q.  On the Green Card can you read the name and date of birth?

21   A.  The surname is Alisigwe, the given name is Chinwendu C.,

22   the date of birth is November 21, 1985.

23   Q.  Can you read the name and date of birth on the driver's

24   license?

25   A.  The last name is Alisigwe also, the name is Chinwendu,

A000257

NCD5ali1                      Tallio - Direct

1    there is middle initial C, and the date of birth is November

2    21, 1985.

3           MR. KINDER:  308?

4    Q.  What is this, Special Agent?

5    A.  It is a photo I took of Mr. Alisigwe's passport.

6    Q.  Can you read the name?

7    A.  Last name is Alisigwe, the first name is Celestine

8    Chinwendu.

9           MR. KINDER:  You can take that down.

10   Q.  Special Agent Tallio, did you ever see the defendant's

11   phone again?

12   A.  Yes.

13   Q.  When and where?

14   A.  On March 1, 2021, at JFK Airport.

15   Q.  And the defendant had also returned from an international

16   flight then?

17   A.  Correct.

18          MR. KINDER:  Can we publish 301?

19   Q.  Special Agent Tallio, what does this photograph show?

20   A.  It's a photo I took of Mr. Alisigwe's phone on that second

21   encounter.

22   Q.  And what is on the screen of the phone?

23   A.  It's a WhatsApp conversation that was in his phone.

24   Q.  It is a WhatsApp conversation with a WhatsApp user by the

25   account name of Agbogidi?

A000258

NCD5ali1                      Tallio - Cross

1   A.  Yes.

2   Q.  And the sent messages from the defendant's phone are shown

3   in green?

4   A.  Correct.

5   Q.  And you see there is a blue box at the top that lists the

6   date May 11, 2018?

7   A.  Correct.

8   Q.  Can you please read the message sent by the defendant's

9   phone below that date?

10  A.  "Anything for Sadia Mughal" with two question marks.

11  Q.  And what time was that sent?

12  A.  2:52 p.m.

13          MR. KINDER:  Nothing further.

14          THE COURT:  Cross, Ms. Levine.

15  CROSS-EXAMINATION

16  BY MS. LEVINE:

17  Q.  Good morning.

18  A.  Good morning.

19  Q.  Special Agent Tallio, you testified that you met Chinwendu

20  Alisigwe in February of 2019; is that right?

21  A.  Correct.

22  Q.  At JFK Airport?

23  A.  Correct.

24  Q.  And the reason -- well, when I say you met him let's talk

25  about where that happened.  Mr. Alisigwe was flying into JFK;

NCD5ali1                    Tallio - Cross

1   is that right?

2   A.  Correct.

3   Q.  And he went through the regular customs inspection; right?

4   A.  Correct.

5   Q.  And then you and your fellow officers instructed CBP to put

6   him in secondary inspection; right?

7   A.  Correct.

8   Q.  Which means he was taken out of line and brought to the

9   secondary inspection area; right?

10  A.  Correct.

11  Q.  And then you and your colleagues met him in a private room

12  off of that area; right?

13  A.  Yeah.  It was the secondary area so it is a room with

14  officers and --

15  Q.  A room in the secondary area.

16  A.  Yes.

17  Q.  And you didn't tell Mr. Alisigwe beforehand that that was

18  going to happen, right?

19  A.  Correct.

20  Q.  It was a surprise inspection; right?

21          MR. KINDER:  Objection.

22          THE COURT:  Sustained.

23  Q.  You pulled Mr. Alisigwe into that room because you were

24  looking for evidence of fraudulent financial transactions --

25          MR. KINDER:  Objection.

NCD5ali1                          Tallio - Cross

1           THE COURT:  Overruled.

2    Q.   -- and stolen identification information; right?

3    A.   Or documents, yes.

4    Q.   That's what you were looking for that day?

5    A.   Yes.

6    Q.   And you searched Mr. Alisigwe; right?

7           MR. KINDER:  Objection.

8           THE COURT:  Overruled.

9    A.   I searched his belongings.

10   Q.   You searched his belongings?

11   A.   Correct.

12   Q.   And looking for those things you just mentioned; right?

13   A.   Correct.

14   Q.   And you did not find any fraudulent identification on

15   Mr. Alisigwe that day?

16   A.   Correct.

17   Q.   Instead, you found --

18          MS. LEVINE:  Can I see GX- 308?

19   Q.   -- you found what is depicted?

20          THE COURT:  Is it on your screen?

21          THE JURY:  No -- OK.

22          THE COURT:  OK.

23   Q.   You saw what was in Government Exhibit 308, a Republic of

24   Nigeria passport; right?

25   A.   Correct.  That was given by Mr. Alisigwe.

**A000261**

NCD5ali1                         Tallio - Cross

1  Q.  Mr. Alisigwe had this passport, Government 308 with him;

2  right?

3  A.  Correct.

4  Q.  Had the name Celestine Chinwendu Alisigwe on it?

5  A.  Correct.

6  Q.  From Nigeria?

7  A.  Correct.

8  Q.  And you also seized some credit or debit cards that had his

9  name on them; right?

10  A.  I didn't seize them.  I looked --

11  Q.  Sorry.  You looked at them and photographed them; right?

12  A.  Yes.

13  Q.  And they had the name Chinwendu Alisigwe?

14  A.  Correct.

15  Q.  And he had a Green Card with him; right?

16  A.  Correct.

17         MS. LEVINE:  Can you put up Government Exhibit 306?

18  Q.  This was the Green Card he had with him; right?

19  A.  Correct.

20  Q.  A permanent resident card in the name of Chinwendu C.

21  Alisigwe?

22  A.  Correct.

23  Q.  From Nigeria?

24  A.  Yes, ma'am.

25  Q.  Date of birth 11/21/85; right?

A000262

394

NCD5ali1                    Tallio - Cross

1   A.  Correct.

2   Q.  The same as the passport?

3   A.  I believe the first and middle name are flipped.

4   Q.  Sorry.  The date of birth was the same as the passport?

5   A.  Yes.  Correct.

6   Q.  And the last name is the same as the passport?

7   A.  Yes.

8   Q.  But the first and middle named are swapped?

9   A.  Correct.

10  Q.  And you saw, that day, a New York State driver's license?

11  A.  Yes.

12  Q.  That's also depicted in Government Exhibit 306?

13  A.  Correct.

14  Q.  It also is in the name of Chinwendu Alisigwe?

15  A.  Yes.

16  Q.  It also has the date of birth 11/21/85?

17  A.  Correct.

18  Q.  And those were the identification documents he had on him

19  when you stopped him in February of 2019?

20  A.  Yes.

21       MS. LEVINE:  OK.  You can take that down.

22  Q.  Mr. Alisigwe had a phone with him that day when you

23  intercepted him at the airport; right?

24  A.  Correct.

25  Q.  And you wanted to look inside the phone; right?

A000263

NCD5ali1                    Tallio - Cross

1   A.  Correct.

2            MR. KINDER:  Objection.

3            THE COURT:  Overruled.

4   Q.  Are you familiar with what a cell phone extraction is?

5   A.  Yes.

6   Q.  Tell the jury what a cell phone extraction is.

7   A.  It's a forensic copy of a device.

8   Q.  And by forensic copy of the device, what you mean is you

9   take somebody's cell phone, you connect it to a computer, and

10  you are able to download all the information that is contained

11  in it, right?

12  A.  Correct.

13  Q.  You didn't get a full extraction of Mr. Alisigwe's cell

14  phone that day; right?

15  A.  Correct.

16  Q.  Instead you scrolled through it; right?

17  A.  Yes.

18  Q.  And you literally held your cell phone above his cell phone

19  and took pictures of the screens you wanted to memorialize;

20  right?

21  A.  Correct.

22  Q.  And obviously that method you didn't capture everything

23  that was on Mr. Alisigwe's phone?

24  A.  Correct.

25  Q.  OK.  And I want to talk about --

A000264

NCD5ali1                    Tallio - Cross

1          MS. LEVINE:  If you could put up 301, please?

2     Q.  You testified that Government Exhibit 301 was in the chat

3     portion of Mr. Alisigwe's phone; right?

4     A.  Yes, it was in the WhatsApp application.

5     Q.  And in the WhatsApp app, the user of the app, their

6     messages appear in green on the right-hand side; right?

7     A.  Correct.

8          MS. LEVINE:  Now can you put up Government Exhibit

9     302?

10    Q.  Now, what's pictured in Government Exhibit 302 also appears

11    to be a text conversation of some kind; right?

12    A.  Yes, but it's a picture, it's not the text conversation.

13    Q.  Precisely.  This wasn't taken out of a texting app; right?

14    A.  Correct.

15    Q.  If it was in the texting app you could conclude that the

16    user was the person typing the response bubbles; right?

17    A.  Correct.

18    Q.  Instead, this is a picture of a conversation; right?

19    A.  Correct.

20    Q.  And you have no idea if it was between the user of

21    Mr. Alisigwe's phone or a different user?

22    A.  Correct.

23    Q.  And the same is true on 303 --

24         MS. LEVINE:  If you could pull up 303?

25    Q.  -- that's not a conversation at all, actually, right, 303?

A000265

NCD5ali1                         Tallio – Cross

1   A.   I believe it is part of a WhatsApp conversation.

2   Q.   Ah.  But, again, this is a photograph of a text?

3   A.   Correct.

4             MS. LEVINE:  You can take that down.

5   Q.   When you intercepted Mr. Alisigwe at JFK in 2019, you also

6   asked him questions; right?

7             MR. KINDER:  Objection.

8             THE COURT:  Let me see you at side bar.

9             (Continued next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000266

NCD5ali1                         Tallio - Cross

1              (At side bar)

2              THE COURT:  OK.  What's the objection.

3              MR. KINDER:  Two concerns.  One, it is outside the

4    scope of direct.

5              THE COURT:  That's what I thought it was going to be.

6              MR. KINDER:  Two, I don't know where this is going but

7    it appears to offer hearsay statements by the defendant.

8              THE COURT:  Hang on a second.  The pending question

9    is:  You asked him questions.  The answer to that would be yes

10   or no, assuming it is within the scope, but why is it within

11   the scope?

12             MS. LEVINE:  So, first it is in the scope because they

13   laid the foundation that he's an investigator, his credentials

14   as an investigator -- you are giving me a look already.

15             THE COURT:  I'm sorry.  I'm just choking at the

16   incredibly broad sense of scope.

17             MS. LEVINE:  Well, look.  I think we -- the next --

18             THE COURT:  Look.  The pending question is irrelevant.

19   What is your next question?

20             MS. LEVINE:  So I do want to -- this is what happened

21   at the border.  Officer Tallio goes there, thinking that he is

22   going to get big information about Mr. Alisigwe being involved

23   in an identification scam.  They look for identifications, they

24   don't get any.  We just did that.  They ask him questions about

25   suspicious traveling.  The answers to those questions are not

A000267

NCD5ali1                    Tallio - Cross

1  suspicious, they are not about fraudulent documents.  He says I

2  was visiting my family in Nigeria.  He says that he is a home

3  health aide.  They are responsive to his suspicions they're

4  responsive to the government's overall suspicions about him in

5  this case, so we do think that they are relevant and we think

6  that they're --

7        THE COURT:  But he could have been lying.  You want

8  them in for the truth.

9        MS. LEVINE:  At this -- no, I don't think I can get

10 them in for the truth through this agent.

11       THE COURT:  Then why is it relevant?

12       MS. LEVINE:  Because they stop him because they think

13 he is engaged in wrongdoing and they find absolutely no

14 evidence of that wrongdoing and they let him go.

15       THE COURT:  Right.  OK.  So what?  I disagree that

16 they found no evidence of wrongdoing given what is on his phone

17 but put that to one side.

18       MS. LEVINE:  Yes.

19       THE COURT:  Do you object to her bringing that out?

20       MR. KINDER:  Yes, I do.  I think this is outside the

21 scope, he hasn't testified about the communications.

22       One of the other issues here is in the motion to

23 suppress there was a motion to suppress statement by

24 Mr. Alisigwe, we said we weren't going to bring those out so we

25 stayed away from those deliberately.  We have narrowly stuck to

A000268

NCD5ali1                      Tallio - Cross

1    the phone and the personal effects.  That is the scope.

2              THE COURT:  Sustained.

3              MS. LEVINE:  As long as we are up here?

4              THE COURT:  Yes, as long as we are up here.

5              MS. LEVINE:  My next set of questions are about other

6    things Officer Tallio did in this investigation that the

7    government did not explicitly ask about on direct -- hang on --

8    one, they're absolutely relevant.  Specifically --

9              THE COURT:  Yes, but are they within the scope?

10             MS. LEVINE:  Well, I'm going to get to that in one

11   second.

12             First, they're relevant because the government has

13   made much of the 995 East 78th Street address at this trial.

14   Officer Tallio, as part of this investigation, did a controlled

15   delivery to 995 East 78th Street.  At 995 East 78th Street, he

16   saw someone else receive the package of faux passports, they

17   surveilled that person, they identify that person, that person

18   was not Mr. Alisigwe, and that person was suspected of fraud.

19   That is relevant to respond to the government's allegations

20   that -- they're saying that every document that went to 9 --

21   that Mr. Alisigwe --

22             THE COURT:  Look.  Well, Mr. Kinder?

23             MR. KINDER:  This is exactly why we filed the MIL on

24   the case agent issue which was decided in our favor.  This is

25   outside the scope of the direct.

A000269

NCD5ali1                    Tallio - Cross

1          THE COURT:  It is outside the scope.

2          MS. LEVINE:  OK, but by that logic I'll call the

3     special agent in my case-in-chief.

4          THE COURT:  That's right.  That's absolutely right.

5     And then you are subject to the cross-examination that that was

6     a conspirator.

7          MS. LEVINE:  Sure.

8          THE COURT:  That doesn't really help you that much but

9     it is beyond the scope.  So, let's let you make your own

10    strategic decision whether you want to call an agent and

11    whether you have dealt with the Touhy issues associated with

12    that.  But, it is beyond the scope.  I mean, that was in fact

13    litigated pretrial.

14         MS. LEVINE:  Yes and no.

15         They ask about one action the agent took in 2019.

16    They ask about a subsequent action he took in 2021.  In between

17    he took a third action that is not inculpatory with regard to

18    Mr. Alisigwe and they say, oh, we stepped over that so

19    carefully as for that not to be relevant?  Or is that to be

20    outside the scope?

21         THE COURT:  It is scope.

22         MS. LEVINE:  I don't think -- Rule 611 has a

23    permissive standard.

24         THE COURT:  It does.

25         MS. LEVINE:  It has permissive standard for exactly

NCD5ali1                    Tallio - Cross

1   this reason, that it doesn't let the government mislead the

2   jury.

3            THE COURT:  The jury is not being misled.  He has put

4   on solely the contents of the man's phone.

5            MS. LEVINE:  He didn't just put on the contents of the

6   phone, he took pictures of the phone looking for evidence of

7   identity theft because he was investigating identity theft

8   vis-à-vis Chinwendu Alisigwe.

9            THE COURT:  Right.

10           MS. LEVINE:  This is another step in the investigation

11  and it is one that didn't -- it wasn't inculpatory and I think

12  we have an absolute -- it is fair response, it is fair -- it is

13  a fair response and I think it actually is within the scope

14  but, even if it wasn't under the most technical reading, I

15  think under 611 it is proper, it is relevant, and I shouldn't

16  have to recall him to talk about just another step in his

17  investigation.

18           MR. KINDER:  Special Agent Tallio did not testify

19  about the purpose of the investigation or his involvement in it

20  on direct.  He testified solely to the 2019 and 2021 border

21  encounters in which he took photos of the phone and some

22  personal effects.  That is the scope.

23           MS. LEVINE:  Even if that's right, this same agent, as

24  part of the same investigation, based on information he got

25  during the 2019 phone search -- it is the address in the 2019

A000271

NCD5ali1                    Tallio - Cross

1   phone search that he just testified to that Mr. Kinder had him

2   read into the record, the 995 East 78th Street address -- he

3   then took subsequent steps and investigated that.  To follow up

4   on what Mr. Kinder just elicited, to see if it led to

5   Mr. Alisigwe.  And it didn't.

6          It is within the scope, it is responsive, it should be

7   permitted.

8          THE COURT:  I disagree it is within the scope so I'm

9   going to sustain the objection.

10          MR. KINDER:  Let me just note while we are here, we

11   will have similar objections to Special Agent McKeen's

12   cross-examination if similar types of questions are asked about

13   Special Agent McKeen.

14          MR. KINDER:  Correct.

15          THE COURT:  The FBI agent?

16          MR. KINDER:  Yes.

17          THE COURT:  Fine.

18          (Continued on next page)

19

20

21

22

23

24

25

A000272

NCDJALI2                    Tallio - Cross

1              (In open court; jurors present)

2    BY MS. LEVINE:

3    Q   After you took those photographs of Mr. Alisigwe's phone at

4    the airport in February of 2019, you let Mr. Alisigwe go,

5    right?

6    A   Correct.

7    Q   Into the United States?

8    A   Correct.

9    Q   He was free to live his life?

10   A   Correct.

11   Q   Free to travel?

12   A   Correct.

13   Q   Wasn't facing any criminal charges at that point?

14   A   Correct.

15   Q   On March 1 of 2021, you again stopped Mr. Alisigwe entering

16   the country at JFK, right?

17   A   He was stopped by CBP officers.

18   Q   He was stopped by CBP officers, but you were there, right?

19   A   Correct.

20   Q   You were in a different room because you didn't want him to

21   see you?

22   A   Correct.

23   Q   Because you were the guy that stopped him last time?

24   A   Correct.

25   Q   But at your directions CBP officers stopped him?

NCDJALI2                      Tallio - Cross

1    A    Yes.

2    Q    And you again wanted to look in his phone?

3    A    Correct.

4    Q    And his belongings, right?

5    A    I believe the CBP officers looked at his belongings.

6    Q    At your directions?

7    A    Yes.

8    Q    And the CBP officers brought you his phone in another room,

9    right?

10   A    Correct.

11   Q    And again, you did not take an extraction of Mr. Alisigwe's

12   cell phone at that point?

13   A    Correct.

14   Q    You again scrolled through it, right?

15   A    It was a combination of scrolling and searching, yes.

16   Q    You went through the phone looking for things, right?

17   A    Correct.

18   Q    You were investigating Mr. Alisigwe?

19   A    Correct.

20   Q    And again, the way you captured things in his phone was by

21   holding your phone over his phone and taking pictures of it,

22   right?

23   A    Correct.

24   Q    And again, after you did that, you let Mr. Alisigwe go?

25   A    Correct.

NCDJALI2                    Tallio - Cross

1  Q   Into the United States?

2  A   Yes.

3  Q   Free to live his life?

4  A   Correct.

5  Q   Free to travel?

6  A   Correct.

7  Q   Not facing any criminal charges?

8           MR. KINDER:  Objection.

9           THE COURT:  Overruled.

10 A   Correct.

11          MS. LEVINE:  Can I have a minute, your Honor.

12          THE COURT:  Sure.

13          MS. LEVINE:  Nothing further, your Honor.

14          If I could have a minute with the government.

15          THE COURT:  Sure.  Anything further, Mr. Kinder?

16          MR. KINDER:  No further questions.

17          THE COURT:  All right.  Thank you.  You can step down.

18          (Witness excused)

19          THE COURT:  Call your next witness.

20          MR. KINDER:  The government would like to read another

21 stipulation.

22          THE COURT:  Okay.

23          MR. KINDER:  Can we publish 806?

24          THE COURT:  Is it up?  Good.  Okay.  Go ahead.

25          This is 806?

A000275

NCDJALI2

1      MR. KINDER:  This is 806.

2          The parties agree that if Officer Maria Morelli of

3  United States Customs and Border Protection had been called to

4  testify during the above-referenced trial, she would have

5  testified to the following:

6          Number one, Government Exhibit 601 is a counterfeit

7  Uganda passport in the name of "Jose Kuri Salua Harfush" that

8  was seized on January 25, 2023 by CBP from international mail

9  bound for Jamaica, New York.

10         Two, Government Exhibit 602 is a counterfeit Uganda

11  driver's license in the name of "Jose Kuri Salua Harfush" that

12  was seized on January 5, 2023 by CBP from international mail

13  bound for Jamaica, New York.

14         Government Exhibit 603 is a counterfeit Uganda

15  passport in the name of "Luis Bringas Alvarez" that was seized

16  on January 5, 2023 by CBP from international mail bound for

17  Jamaica, New York.

18         Government Exhibit 604 is a counterfeit Uganda

19  driver's license in the name of "Luis Bringas Alvarez" that was

20  seized on January 25, 2023.

21         THE COURT:  Hang on a second.  Can you blow up maybe

22  four paragraphs at a time so it's legible for people that are

23  looking at distance at a screen.  Great.

24         MR. KINDER:  Government Exhibit 604 is the counterfeit

25  Uganda driver's license in the name of "Luis Bringas Alvarez"

A000276

NCDJALI2

1  that was seized on January 25, 2023 by CBP by international

2  mail bound for Jamaica, New York.

3      Government Exhibit 605 is a counterfeit Uganda

4  passport in the name of "Jack Clifton Dailey" that was seized

5  on January 25, 2023 by CBP from international mail bound for

6  Jamaica, New York.

7      Government Exhibit 606 is a counterfeit Angola

8  passport in the name of "Luis Bringas Alvarez" that was seized

9  on January 25, 2023 by CBP from international bail bound for

10  Jamaica, New York.

11      Government Exhibit 607 is a counterfeit Angola

12  driver's license in the name of "Luis Bringas Alvarez" that was

13  seized on January 25, 2023 by CBP from international mail bound

14  for Jamaica, New York.

15      Government Exhibit 608 is a counterfeit Angola

16  passport in the name of "Daniel Andres Durand Luna" that was

17  seized on January 25, 2023 by CBP from international mail bound

18  for Jamaica, New York.

19      Government Exhibit 609 is a counterfeit Angola

20  driver's license in the name of "Daniel Andres Durand Luna"

21  that was seized on January 25, 2023 by CBP from international

22  mail bound for Jamaica, New York.

23      Government Exhibit 610 is a counterfeit Togo passport

24  in the name of "Jeffrey Lawson" seized on January 25, 2023 from

25  international mail bound for Jamaica, New York.

A000277

NCDJALI2

1           Government Exhibit 611 is a counterfeit Togo driver's

2    license in the name of "Jeffrey Lawson" that was seized on

3    January 25, 2023 by CBP from international mail bound for

4    Jamaica, New York.

5           Government Exhibit 612 is a counterfeit Uganda

6    passport in the name of "Robert Krueger" that was seized on

7    January 19, 2023 by CBP from international mail bound for

8    Jamaica, New York.

9           Government Exhibit 613 is a counterfeit Uganda

10   driver's license in the name of "Robert Krueger" that was

11   seized on January 19, 2023 by CBP from international mail bound

12   for Jamaica, New York.

13          It is further agreed that if Officer Alex Phillips of

14   CBP had been called to testify during the above-referenced

15   trial, he would've testified to the following:

16          Government Exhibit 614 is a counterfeit Kenya passport

17   in the name of "Stephen Thomas Culshaw" that was seized on

18   March 19, 2023 by CBP from international mail bound for

19   Rosedale, New York.

20          Government Exhibit 615 is a counterfeit Kenya driver's

21   license in the name of "Stephen Thomas Culshaw" that was seized

22   on March 19, 2023 by CBP from international bail bound for

23   Rosedale, New York.

24          THE COURT:  Hang on a second.  You've gotten ahead of

25   us.  Back up.

A000278

NCDJALI2

1    MR. KINDER:  Government Exhibit 616 is a counterfeit

2  Kenya passport in the name of "Christopher Earl Combest" that

3  was seized on March 19, 2023 by CBP from international mail

4  bound for Rosedale, New York.

5    Government Exhibit 617 is a counterfeit Kenya driver's

6  license in the name of "Christopher Earl Combest" that was

7  seized on March 19, 2023 from international mail bound for

8  Rosedale, New York.

9    It is further agreed that if Officer Steven Stuart of

10  CBP had been called to testify during the above-referenced

11  trial, he would've testified to the following:

12    Government Exhibit 618 is a counterfeit Kenya passport

13  in the name of "Peter Okon Ekan" that was seized on July 30,

14  2020 by CBP from international mail.  Government Exhibit 618

15  was sent in a package from Lagos, Nigeria addressed to "Warren

16  Roberts" of 995 East 78 Street, Brooklyn, NY 11236.

17    Government Exhibit 619 is a counterfeit Kenya driver's

18  license in the name of "Peter Okon Ekan" that was seized on

19  July 30, 2020 by CBP from international mail.  Government

20  Exhibit 619 was sent in a package from Lagos, Nigeria addressed

21  to "Warren Roberts" of 995 East 78 Street, Brooklyn, New York,

22  11236.

23    Government Exhibit 620 is a counterfeit Angola

24  passport in the name of "Andrew Anne Prudhoe" that was seized

25  on July 30, 2020 by CBP from international mail.  Government

NCDJALI2

Exhibit 620 was sent in a package from Lagos, Nigeria addressed
to "Warren Roberts" of 995 East 78 Street, Brooklyn, New York,
11236.

Government Exhibit 621 is a counterfeit Angola
driver's license in the name of Andrew Anne Prudhoe that was
seized on July 30, 2020 by CBP from international mail.
Government Exhibit 621 was sent in a package from Lagos,
Nigeria addressed to Warren Roberts of 995 East 78 Street,
Brooklyn, New York, 11236.

Government Exhibit 622 is a counterfeit South Africa
passport in the name of "Wilhelm Heinz" that was seized on
July 27, 2018 by the United Kingdom Border Force from
international mail bound for Little Neck, New York.  After
seizing Government Exhibit 622, the United Kingdom Border Force
provided it to CBP.

It is further agreed that Government Exhibits 601
through 622 were retained by law enforcement and were never
delivered to the addresses listed on the packages.

It is further agreed that this stipulation, which is
marked as Government Exhibit 806, and Government Exhibits 601
through 622 may be received into evidence as Government
Exhibits at trial, and the government offers 806 as well as 601
through 622.

THE COURT:  All right.  806 and 601 through 622 are
received.

A000280

NCDJALI2

1          (Government's Exhibit 806 and 601-622 received in

2     evidence)

3          MR. KINDER:  And your Honor, can we take a couple of

4     minutes to display these exhibits on the ELMO.

5          THE COURT:  Sure.  You'll have these back in the jury

6     room with you.

7          MR. KINDER:  This is 601.

8          THE COURT:  Are they on your screen?

9          JUROR:  Yes.

10          MR. KINDER:  I'll just display each one briefly.

11          THE COURT:  Why don't you display about every few.

12          MR. KINDER:  Okay.  Can I zoom out?

13          THE COURT:  No, just move it.  You don't have to zoom

14     out.

15          MR. KINDER:  I was wondering if I could do multiple at

16     a time.  I'll just display a few.

17          THE COURT:  Okay, thank you.

18          Again, you'll have them all in the jury room.

19          MR. KINDER:  Okay.

20          THE COURT:  Call your next witness.

21          MR. KINDER:  The government calls William McKeen.

22     WILLIAM MCKEEN,

23          called as a witness by the Government,

24          having been duly sworn, testified as follows:

25     DIRECT EXAMINATION

NCDJALI4

1    breather.  Mr. Alisigwe, in addition to this being a trial
2    that's very important to him, is having a bunch of personal
3    concerns.  He can't locate his mom right now and that is
4    obviously really stressful.  He tried to call last night in MDC
5    and was unsuccessful.  It's a lot.  We're just going to ask for
6    two minutes while we set up.
7              (Pause)
8              THE COURT:  Ms. Levine, is your client ready to
9    proceed?
10             MS. LEVINE:  Yes.
11             THE COURT:  Let's go.
12             (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

NCDJALI4                        Summation - Ms. Foster

1              (In open court; jurors present)

2              THE COURT:  All right.  Ms. Levine, Ms. Werner, do you

3    have any evidence?

4              MS. LEVINE:  Your Honor, at this time the defense

5    rests.

6              THE COURT:  Both sides have now rested.  That means

7    that you've now heard all of the evidence that you are going to

8    hear.

9              The next step in the case is summations.  The

10   government goes first and last because the government has the

11   burden of proof.  I'll then charge you on the law and you'll

12   begin to deliberate.  I think based on the estimates of time

13   that they have given me, that they're probably going to sum up

14   today, you'll go home and come in tomorrow.  I'll charge you on

15   the law tomorrow and you'll begin deliberations tomorrow.  But

16   maybe they'll be faster than I anticipate, but I don't think

17   so.  We'll also take a break between the summations.

18             MS. LEVINE:  The defense renews our motion from before

19   lunch.

20             THE COURT:  Deemed renewed, deemed ruled on.  Okay.

21             Ms. Foster?

22             MS. FOSTER:  Sadia Mughal, Ronald Henry Nellen, Ramon

23   Garcia Pastor, Bruce Powers, John Louis Foulk, Wilhelm Heinz,

24   Gwen Maro Kibbe, Daniel Johnson, Dennis Clark, and Warren

25   Roberts.  You have seen dozens of IDs in this case from

NCDJALI4                     Summation - Ms. Foster

1   Namibian passports to Pennsylvania driver's licenses, and on
2   each of those IDs there is one face, the face of the defendant.

3          The defendant's face is on each of these IDs because
4   he used each and every one of them.  He used real people's
5   names and Social Security numbers to open fake bank accounts
6   and to launder more than a million dollars in stolen money,
7   money that the defendant's co-conspirators had stolen from
8   nonprofits like Wheelchairs 4 Kids and individuals like Suzanna
9   Lee, money that needed to be moved before anyone could figure
10  out what happened to it and where it had gone.

11         The scheme was simple.  The defendant's
12  co-conspirators would trick people into sending large sums of
13  money using email and phone call scams.  Money was then
14  deposited into the fake bank accounts the defendant had opened.
15  And after the money was deposited, the defendant would move the
16  money and move it around in complicated ways to make it hard to
17  track before spending it.

18         Because the scheme was all about deception, the
19  defendant could not use his own name to open the accounts.  He
20  would get caught.  So instead, he used other people's
21  identities, people like Sadia Mughal and Warren Roberts.  As my
22  colleague told you on Monday, this case is about lies and
23  money, lies told to steal money from innocent victims, lies
24  told to banks where that money was sent, lies told to hide that
25  stolen money.

NCDJALI4                    Summation - Ms. Foster

1          But despite all these lies, the defendant is here

2     today because he cannot lie his way out of this evidence.  It

3     is clear, it is consistent, and it is not complicated.  The

4     overwhelming evidence in this case points to one thing, the

5     defendant is guilty of all of the crimes charged in the

6     indictment.

7          This is the government's summation.  It is our

8     opportunity, now that all of the evidence is in, to put it all

9     together for you and explain why the evidence proves beyond a

10    reasonable doubt that the defendant committed the crimes

11    charged.  Over the past few days, you have seen and heard a lot

12    of evidence.  You've seen bank records and surveillance

13    footage, you've seen photos on the defendant's phone and read

14    the defendants text messages.  You've seen fake IDs that were

15    recovered next to the defendant's bed.  You've heard from

16    victims whose money was stolen through email and phone scams.

17    You've also heard from victims whose identities the defendant

18    used to lie to banks and open bank accounts.

19         I'll go through that evidence that came in over the

20    course of the trial and show how it all fits together, to

21    explain how it shows that the defendant committed the crimes

22    with which he is charged.  Now, though, before we talk about

23    the evidence, let's take a moment and talk about the crimes the

24    defendant committed.

25         At the end of the summations in this case, Judge

A000285

NCDJALI4                    Summation - Ms. Foster

1    Caproni will instruct you on the law, and it is those

2    instructions you must follow and that control.  I'll also talk

3    about the law with you in a little more detail after I talk

4    about the evidence, but I want to briefly outline the charges

5    for you before jumping into the evidence.

6            The defendant is charged with four counts in this

7    indictment.  The first count is bank fraud conspiracy.  A

8    conspiracy is just an agreement.  It's an understanding between

9    people to commit a crime, and here that crime is bank fraud.

10   The second count is bank fraud.  At a high level, bank fraud

11   just means that the defendant participated in a scheme to lie

12   to get money that was at a bank.

13           MS. LEVINE:  Objection.

14           THE COURT:  Overruled.

15           MR. KINDER:  The third count against the defendant is

16   aggravated identity theft.  Aggravated identity theft means

17   that when the defendant committed bank fraud, when he lied to

18   the banks to get money, he used someone else's identity without

19   permission.

20           MS. WERNER:  Objection.

21           THE COURT:  I'll charge you on the law.  So my charge,

22   if there's any difference, listen to my charge on the law and

23   not the prosecutor's.

24           MS. FOSTER:  And finally, the defendant is charged

25   with another conspiracy, a conspiracy to commit money

A000286

NCDJALI4                    Summation - Ms. Foster

laundering.  And money laundering is, at a high level, when

someone moves stolen money in a way that's designed to conceal

or hide it.

MS. WERNER:  Objection.

THE COURT:  Overruled.

MS. FOSTER:  Now let's turn to the evidence.  The

evidence you've seen proves beyond a reasonable doubt five key

facts, five key facts that lead to the conclusion that the

defendant is guilty of each of the crimes that I just outlined

for you.

One, the defendant lied to banks by opening and

controlling bank accounts using other people's names and

identities; two, the identities used to open those accounts

were stolen from real people and the defendant knew it; three,

the defendant's accounts received money from fraud schemes;

four, the defendant knew the money was dirty and moved it

around to hide where it came from; and, fifth, the defendant

did these things with other people.

Let's start with the first fact.  The defendant lied

to banks by opening bank accounts using other people's

identities.  What does the evidence show?  Well, it shows that

the defendant opened dozens of bank accounts using other

people's names and Social Security numbers.  To start, what are

those bank accounts?  You heard the testimony of FBI forensic

accountant Jillian Bronson who walked through these bank

A000287

NCDJALI4                    Summation - Ms. Foster

1   accounts.  You heard from Ms. Bronson the 36 bank accounts were
2   opened across a number of banks, banks like Bank of America,
3   Citibank, JPMorgan Chase, HSBC.  You also heard and saw records
4   showing that these accounts were opened in a variety of
5   different names and Social Security numbers.  Some of those
6   names appeared on multiple accounts.  Look right here, Sadia
7   Mughal's name is on seven different accounts.  You heard from
8   Sadia Mughal.  She told you she didn't open any of those
9   accounts.
10          Dennis Clark's name is on four accounts.  Daniel
11  Johnson's is also on four accounts, Joseph Haley on four.  The
12  defendant used some of the same stolen identities over and over
13  again.  You also heard from Ms. Bronson that these accounts
14  were connected in various ways.  They were opened using the
15  same email addresses, same phone numbers, the same addresses.
16  Money was also transferred back and forth between those
17  accounts.  These accounts are listed on these two slides from
18  Ms. Bronson's presentation.  That full presentation is in
19  evidence as Exhibit 501, and you should look at it when you
20  deliberate if you thought it was helpful.  The bank records
21  themselves are also in the record, and you can look at them,
22  too, but this presentation is a helpful summary of those
23  records.
24          The one name that isn't on any these accounts is the
25  defendant's name, but you saw mountains of evidence showing

A000288

NCDJALI4                    Summation - Ms. Foster

1    that, while the defendant's name wasn't on these fake accounts,

2    he was the person who actually opened and controlled each of

3    them.  When the defendant opened these accounts, he lied to the

4    banks.  Instead of providing his own name, Chinwendu Alisigwe,

5    he provided the names of other people, people like Sadia

6    Mughal, Warren Roberts, Wilhelm Heinz, and Ronald Henry Nellen.

7            As I said, there's truly a mountain of evidence

8    proving that the defendant was the one who opened the fake

9    accounts, but I want to focus on four key pieces of evidence

10   that show you it was him.  You saw the IDs that were used to

11   open the accounts, all with his picture on them.  You saw

12   surveillance footage of the defendant at bank windows and ATMs

13   making transactions on those accounts.  You saw photos and text

14   messages from the defendant's own cell phone talking about

15   these accounts, and you saw purchases on these fake accounts

16   from the exact same places where the defendant made purchases

17   on his personal bank account.

18           Let's start with one of the obvious reasons you know

19   the defendant was the person who opened these fake accounts,

20   the photo IDs.  Stepping back, you heard from both the FBI

21   forensic accountant and JPMorgan Chase investigator Robert

22   Novakowski that when an account is opened, banks keep records

23   relating to that opening.  And one of those opening records is

24   a record of any photo identification that the accountholder

25   presented at that opening.

A000289

NCDJALI4                    Summation - Ms. Foster

1          You then saw the photo IDs that were on file for
2     approximately 25 of the 36 accounts, and you saw that despite
3     all these names, dates of birth, states, and countries that
4     appear on these documents, one person's face appears on all of
5     them, the defendant.  There is no doubt that it's the defendant
6     who is on all of these IDs.  Look at him.  The same person
7     who's on those photos clearly appears in front of you today.

8          Also, look at the photos of the defendant on his cell
9     phone.  If you look at photos of the defendant on that phone
10    and compare those photos to the photos on the ID, it is the
11    same person, same exact beard, same hair style, same cheeks,
12    same nose, same mouth.

13         You also know it's the defendant in those IDs because
14    you heard from FBI Agent William McKeen that a whole stack of
15    passports and driver's licenses all in different names were
16    recovered at the time of the defendant's arrest in the
17    defendant's apartment next to his bed.  And you can look at
18    those passports and driver's licenses that are in evidence.
19    The picture on all those IDs that were found next to the
20    defendant's bed are the same person on all of those account
21    opening documents, and that person is the defendant.

22         These passports and driver's licenses that were
23    recovered next to the defendant's bed are also important
24    because they show the defendant had access to IDs featuring his
25    face and stolen identities.  Not only could he obtain these

A000290

NCDJALI4                    Summation - Ms. Foster

1    fake IDs if he needed to, but he did obtain them.  IDs with the

2    defendant's face and other people's names were such a normal

3    part of this defendant's life that the defendant literally

4    slept next to a stack of them.

5            And why does his face appear on all these IDs?

6    Because he was the one who opened all of these accounts.  But

7    that's not all.  You didn't just see that the defendant's face

8    was on all of the IDs that opened the accounts.  You also saw

9    him on the bank surveillance footage.  That's another reason

10   you know that the defendant was the person who opened and

11   controlled these 36 fake accounts.

12           As you saw, the evidence at this trial includes

13   hundreds of images of surveillance footage.  18 of the fake

14   accounts had surveillance footage that showed who was using

15   those accounts.  And if you look at the surveillance footage

16   for each of those 18 accounts, one person and one person only

17   is shown accessing the accounts over and over again, and it's

18   the defendant.

19           Here, you see the defendant opening fake accounts.

20   Here is the defendant depositing checks into the fake accounts.

21   Here, you see him wiring money from one fake account to another

22   fake account.  You also see him wiring money from fake accounts

23   to China.  Surveillance footage after surveillance footage also

24   shows the defendant withdrawing money from these accounts,

25   withdrawing money at tellers, withdrawing money at ATMs.  In

A000291

NCDJALI4                    Summation - Ms. Foster

1    one of the surveillance images of the defendant withdrawing

2    money from a fake account, he is carrying an envelope with the

3    name "W Roberts" on it, warren Roberts.  That is the same name

4    on the account from which this withdrawal is made.  And why is

5    the defendant and no one else on all of this surveillance

6    footage for these accounts?  You know why.  Because the

7    defendant was the person who opened these accounts, controlled

8    these accounts, moved money through the accounts, and took

9    money out of the accounts.

10        Now, again, you need only look at the defendant here

11   in the court today to tell that he is the same person on all of

12   the surveillance, but that's not the only way you can tell.  As

13   I previously mentioned, you have seen the photos of the

14   defendant on his phone.  And if you look at photos from the

15   defendant's phone dated from around the same time as specific

16   surveillance stills, it is undeniably the same person.  He has

17   the same hair style, the same build.

18        Take, for example, 2018.  Around that time, the person

19   on the surveillance footage for the fake account has short

20   hair.  So does the defendant.  Fast forward to 2019.  You can

21   see that the person who controlled the fake accounts has grown

22   his hair out a little more.  Now, again, look at the photos of

23   the defendant on his phone from the same time period.  The

24   defendant has also grown his hair out.  These are clearly not

25   coincidences.  The defendant and the man who's using the fake

A000292

NCDJALI4                    Summation - Ms. Foster

1    accounts don't just happen to look alike and have the same

2    haircuts.  It's obviously him.

3           This brings us to the third reason you know the

4    defendant controlled these accounts.  He received and sent

5    messages about them.  Earlier this morning, you saw text

6    messages and photos from the defendant's cell phones and on

7    those phones were numerous images and text messages about the

8    fake accounts and the names and Social Security numbers that

9    were used to open them, identities like Sadia Mughal and bank

10   account information for fake accounts.

11          Now, ask yourselves why would the defendant's phone

12   include this information, bank account information and

13   identifying information for specific people, people who the

14   defendant has no connections with, people whose names were also

15   used to open fake accounts?  You know why.  There's only one

16   reason that is consistent with all of the other evidence that

17   you have seen.  The defendant sent and received the personal

18   identifying information because he used it to open and control

19   these fake accounts.

20          Now, let's turn to the fourth reason you know the

21   defendant controlled these accounts, the purchases on them.

22   You heard from the FBI forensic accountant and saw records that

23   the fake accounts were used to make about $100,000 of purchases

24   over a three-year period, purchases of things like shopping,

25   food, gas, utilities.  You also saw that chart prepared by the

A000293

NCDJALI4                    Summation - Ms. Foster

1    forensic accountant from his analysis of the bank records.  It

2    shows that the person who controlled the fake accounts made

3    purchases at specific stores repeatedly, places like the

4    Dunkin' Donuts in Elmont, New York, places that he likes to go

5    to over and over again.  And what do you see on the defendant's

6    own personal bank account?  Purchases at these exact same

7    stores.

8            Why did the defendant shop at the same spots as the

9    person who operated the fake accounts?  Again, you know why.

10   The person who operated the fake accounts shopped at the same

11   stores as the defendant because he was the defendant.  This

12   evidence proves beyond a reasonable doubt that the defendant

13   opened and controlled fake accounts opened in other people's

14   names.  And what is that evidence?  The IDs, surveillance

15   footage, the defendant's cell phone photos and text messages,

16   and the purchases on the accounts.

17           Before moving on to point two, let me make what is

18   probably an obvious point by now.  When the defendant was

19   opening accounts in other people's names and using them to

20   transfer money or take money out, those were lies.  He was

21   lying to banks.  When he was going to banks and opening

22   accounts using these names, he was lying.  When he was

23   depositing checks written out to these individuals, he was

24   lying.  When he wrote checks to these accounts and signed his

25   name as Sadia Mughal or Warren Roberts, he was lying.  When he

A000294

NCDJALI4                    Summation - Ms. Foster

1    initiated wire transfers in those accounts, he was lying.

2              Now, let's turn to the second fact.  The identities

3    that the defendant used to open those account were stolen from

4    real people, and the defendant knew that.  The defendant did

5    not just lie to banks by providing fake names.  Instead, he

6    lied to banks by providing names and identities stolen from

7    real people.  I'll break this down.

8              First, why do you know the defendant opened the

9    accounts using the names of real people?  Simple.  You heard

10   from and saw three of these people whose names and identities

11   were used to open these accounts:  Sadia Mughal, Warren

12   Roberts, Ronald Henry Nellen.

13             These names appear on 10 of the 36 accounts that were

14   opened by the defendant.  You heard from each of them that

15   their real names are the names that appear on these accounts.

16   You also heard from Ms. Mughal that her real Social Security

17   number ends in 1658, the same Social Security number that the

18   defendant used to open several accounts in her name.

19             You also know that none of those individuals opened

20   the fake accounts in their name or authorized anyone else to do

21   this, including the defendant.  They all stated that they have

22   never had bank accounts at the banks where the fake accounts in

23   their names were opened.  And you know that the IDs presented

24   to the banks to open those accounts were not their real IDs.

25   You saw them and you saw that they are not the individual who

A000295

NCDJALI4                    Summation - Ms. Foster

1   appears on the IDs used to open those accounts, and the
2   defendant knew this.
3           Look at the defendant's phone.  That's why the
4   defendant's phone had so many text messages carefully
5   confirming the specifics of the stolen identities.  These text
6   messages show that these were not names and Social Security
7   numbers that the defendant made up on the spot when opening the
8   bank accounts.  They were not names in his head.  Instead, he
9   needed to get these names and Social Security numbers from
10  someone else, and he needed to get them exactly right.  And why
11  did he need to get them from someone else?  Well, because they
12  were real names and Social Security numbers, real names and
13  Social Security numbers, just like Ms. Mughal's.
14          You also know that the defendant knew that when he was
15  using these stolen identities, he was doing something wrong.
16  You know it because of what he said to immigration authorities
17  when they asked if he had ever used any other names or aliases.
18  As you heard, the parties stipulated that in October 2017, the
19  defendant told immigration authorities that he'd only ever used
20  two names and aliases since birth, Chinwendu Celestine Alisigwe
21  and Celestine Chinwendu Alisigwe.  But you know that only a few
22  weeks before submitting this application, the defendant opened
23  multiple bank accounts using other people's names, including
24  two accounts in the name of Gwen Maro Kibbe and one account in
25  the name of Ronald Henry Nellen.

A000296

NCDJALI4                    Summation - Ms. Foster

1      So he had used other aliases.  Why didn't he tell

2  immigration authorities about these other aliases, names he

3  used only a few weeks prior to open bank accounts?  You know

4  why.  Because he should not have been using these names.

5  Because he knew they were the names and identities of real

6  people who hadn't given him permission.

7      Now, let's turn to the third fact.  The accounts

8  controlled by the defendant received money from fraud schemes.

9  Before we talk about how you trace the money, let's talk about

10  the fraud schemes for a moment.  Over the course of this trial,

11  you heard and saw evidence from multiple victims of fraud

12  schemes, schemes designed to trick people into sending money to

13  bank accounts controlled by the defendant.  Some of these fraud

14  schemes involved fraudsters impersonating victims in email and

15  others involved fraudsters impersonating victims via phone

16  calls.  The purpose was all the same, dupe people into sending

17  money.

18      There is no real dispute that real people, companies,

19  and nonprofits were tricked into sending money, so I'll only

20  very briefly describe what you heard about them.  First, you

21  heard from Madeline Robinson at Wheelchairs 4 Kids.  You heard

22  that someone impersonated her without her knowledge by email

23  and got her banker to send a $48,000 check to Ronald Henry

24  Nellen.  Here is that email.

25      You heard about similar email scams involving Suzanna

NCDJALI4                    Summation - Ms. Foster

1   S. Lee in Prince George's County.  Ms. Lee told you that

2   someone impersonated her over email and got her personal banker

3   to send a wire in the amount of approximately $680,000.  And

4   you learned from Mr. Bell, who processes wires for Prince

5   George's County, that he was tricked into sending approximately

6   $1 million on behalf of Prince George's County, tricked by

7   someone who impersonated one of his colleagues by email.

8          You also heard about the fraud against Warren Roberts

9   from Janeen Kastner at RPM International and Warren Roberts

10  himself.  You learned that Mr. Roberts's common stock account,

11  valued at approximately half a million dollars, was cashed out

12  by someone who impersonated him.  And finally, you heard about

13  the fraud again Heinz Wilhelm, a fraud that resulted in the

14  full value of Mr. Wilhelm's retirement account at Prudential

15  being withdrawn to a bank account at JPMorgan Chase, a

16  retirement account valued at approximately $111,000.  This

17  testimony was clear.  Real people were defrauded into sending

18  hundreds of thousands of dollars through various impersonation

19  schemes.

20         I want to be very clear about why the government put

21  on these witnesses and proved to you what happened in these

22  schemes.  The purpose of that evidence was only to prove to you

23  that the money that was sent from those scams was dirty money.

24  It was the proceeds of a crime, the crime of tricking people

25  through a targeted and fraudulent email or phone call into

NCDJALI4                    Summation - Ms. Foster

1   sending a check or a wire to the bank accounts opened and

2   controlled by the defendant.

3          You don't have to find that the defendant was a

4   computer genius or the person hacking anyone's email accounts,

5   sending the fake emails, or making the fake phone calls.  You

6   also don't have to find that the defendant ever interacted with

7   any of these victims.  That's because his role was to help

8   launder the money that came out of those scams.  He was the

9   person who had helped conceal the stolen funds by moving it in

10  complicated ways and then withdrawing it to cash or wiring it

11  abroad.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

A000299

NCD5ali5                    Summation - Ms. Foster

1    MS. FOSTER:  (Continuing)  The defendant played a

2    limited but vital role in a much bigger scheme.

3        So how do you know that the money that the defendant

4    was moving around the fake bank accounts was the money that

5    came from these scams?  It is straightforward.  Just look at

6    the bank records.  You see that each of the checks and wires

7    that were sent as a result of these scams were deposited into

8    the fake accounts under the control of the defendant.

9        Again, let's start with Wheelchairs 4 Kids.  Look at

10   the bank records for the bank account in the name of Ronald

11   Henry Nellen.  Days after the fraud, the exact check from

12   Wheelchairs 4 Kids that was sent out because of the fraud, was

13   deposited into the Nellen account.

14       A similar thing happens with the money from the

15   Suzanna S. Lee fraud.  On the same day this money is stolen, a

16   wire transfer from Ms. Lee in the exact amount of the stolen

17   funds is deposited into one of the fake accounts.

18       You see the same thing happen with Prince George's

19   County.  Within days of the money being stollen, a wire from

20   Prince George's County, in the exact amount of the stolen

21   funds, gets deposited into one of the fake accounts.

22       You see the same thing happen with a requirement

23   contract for Wilhelm Heinz at Prudential.

24       The only money that does not follow the same

25   straightforward pattern is the money stolen from Warren

NCD5ali5                    Summation - Ms. Foster

1    Roberts.  You heard from both Mr. Roberts and Ms. Kastner, who

2    works on employee compensation for RPM, that approximately

3    $500,000 of common stock was withdrawn from Mr. Roberts'

4    account over several months, yet you only see deposits of about

5    $335,000 from RPM get deposited into the fake accounts open in

6    the name of Warren Roberts during this time frame.  What

7    explains the difference between these two figures?  You heard

8    from Ms. Kastner it is taxes.  You heard from Ms. Kastner that

9    when an employee's common stock is withdrawn, taxes are

10   withheld.  So an employee who has common stock work $500,000

11   will not get that amount if he or she tries to withdraw it.

12           Now, to be clear, how do you know the defendant

13   controlled all of the accounts that these stolen funds went

14   into?  Well, again, because they are five of the 36 fake

15   accounts that I already walked through with you in detail.  You

16   also see the defendant on surveillance footage opening and

17   conducting transactions on these accounts, and the defendant's

18   face appears on IDs used to open those accounts.

19           So, to recap, what does this all show?  Companies,

20   non-profits, and individuals, were defrauded out of hundreds of

21   thousands of dollars -- non-profits like Wheelchairs 4 Kids,

22   individuals like Warren Roberts and Suzanna Lee -- and the

23   money from those accounts was deposited into accounts

24   controlled by the defendant.

25           Now, you also know that when the stolen money hits the

**A000301**

NCD5ali5                    Summation - Ms. Foster

1    defendant's accounts it did not stay there.  He did his part to

2    launder the money, to move it around to conceal, and that

3    brings us to the next fact.

4         The fourth key fact you know is that when the

5    defendant got his piece of the stolen money, he knew it was

6    dirty and he tried to conceal it.  How do you know that?  I

7    want you to focus on five specific reasons:

8         He moved the money in ways designed to hide it.  He

9    did not disclose the money on his tax returns because he knew

10   it was dirty.  He used fake IDs to open the accounts into which

11   the money moved, he used dozens of fake accounts to hide the

12   money by transferring money between them.  And, checks and

13   wires deposited into those fake accounts were continually being

14   returned to the sender.

15        Let's start with the first reason.  Look at what the

16   defendant did once the stolen money was deposited into his

17   accounts.  Almost as soon as the stolen money got deposited

18   into these bank accounts, the defendant took steps to hide it

19   and conceal it, and one of those steps that you saw was that

20   the defendant tried to move the stolen money out of the

21   accounts as quickly as possible.  There are numerous examples

22   of this, I will focus on two.

23        First, look at the transfer from Prudential, in the

24   amount of about $111,000, into the Wilhelm Heinz bank account.

25   You see from the bank records that within days of the stolen

NCD5ali5                    Summation - Ms. Foster

1    money being deposited into this account, the defendant tried to

2    withdraw it, fast.  Over an approximately four-day period, the

3    defendant withdrew large sums of it to cash and transferred

4    approximately two thirds of the stolen funds to another one of

5    the accounts he opened and controlled.

6          You also see the same pattern with the money stolen

7    from Suzanna S. Lee.  Within days of the stolen money being

8    deposited into the account, the defendant withdrew large sums

9    of the money.  One day after the wire went in, the defendant

10   made several cash withdrawals and wrote a check for about

11   $280,000 to a business account he opened and controlled, a

12   business account under Wilhelm Heinz' name.

13         And then, a few days after that, he withdrew more of

14   the stolen funds to cash and wrote neck check to the same

15   business account.  Why did he have to withdraw the money so

16   quickly?  Because he knew the money was stolen so he needed to

17   move the money out quickly before the banks would catch on and

18   close or freeze the account.

19         Here is an alert you see on the Nellen account after

20   the money that was stolen from Wheelchairs 4 Kids was deposited

21   into that account.

22         The defendant also needed to move the stolen funds

23   before the victims and their banks caught on, before they could

24   trace the money to these accounts and try to get it back.  And

25   you know this was not just an imaginary concern.  If you look

A000303

NCD5ali5                    Summation - Ms. Foster

1    at the bank records for the fake accounts opened by the

2    defendant you see check after check, and wire after wire,

3    deposited into those accounts get returned.  You see it with

4    the Suzanna S. Lee wire.  Only a few days after the money was

5    wired into the account, the wire was returned to the sender.

6    And why were the checks and wires constantly being returned?

7    Well, because the victims and the banks caught on and tried to

8    get their money back.  It is not complicated.

9           Another step the defendant took to try to hide and

10   conceal the stolen money was to move it in ways that made it

11   hard to track.  And what were those ways?  One, the FBI

12   forensic accountant told you that large sums of the deposits

13   that went into the fake accounts controlled by the defendant

14   were withdrawn by cash.  Untraceable cash, approximately

15   $650,000 in cash withdrawals, were made from those fake

16   accounts over an approximately three-year period.  And you know

17   from your own common sense that once you take cash out of an

18   ATM, it is almost impossible to know where that money goes.

19   You also see this in the two examples we have just walked

20   through.  Almost as soon as the stolen money was deposited into

21   those accounts, the defendant made ATM withdrawal after ATM

22   withdrawal after ATM withdrawal.

23          The defendant also wired large sums of that stolen

24   money to foreign countries, to places like China and the United

25   Kingdom, places where it would be hard for the victims to

A000304

NCD5ali5                    Summation - Ms. Foster

1   recover that stolen money.  Approximately 17 percent of the

2   total deposits into all of the fraud accounts was withdrawn by

3   international wire transfer or about $1 million.

4           You also saw this happen with the Warren Roberts

5   stolen funds.  Shortly after those funds were deposited into

6   the defendant's account, he wired large sums of the stolen

7   funds to bank accounts in China and the United Kingdom.

8           Another way he tried to hide the funds was to move the

9   stolen funds through fake accounts he had opened.  He tried to

10  play a shell game moving the stolen money from one account to

11  the other.

12          During the defense's cross-examination of Ms. Bronson,

13  the FBI forensic accountant, they asked Ms. Bronson about all

14  these inter-account transfers.  Ms. Bronson told you about how

15  much money would move from one bank account to another.  This

16  is because moving money from one account to another was a key

17  piece of the defendant's money laundering.  The thought process

18  was blatant.  The more he moved the stolen funds between the

19  accounts, the harder it would be to trace.

20          You see this with the Prudential deposit the one that

21  went into the Heinz account controlled by the defendant.

22  Shortly after it was deposited into the account, he sent

23  $75,000 of the stolen funds to another account he controlled,

24  an account in the name of Horay Textile Limited.  And from

25  there, a few days later, $65,000 of those funds moved to

NCD5ali5                    Summation - Ms. Foster

1  another account he controlled, an account in the name of Sadia

2  Mughal.  And then, a few weeks later he sent almost all of

3  those funds to another account, again in the name of Sadia

4  Mughal.  And finally, he wired $48,000 of this money to an

5  account in China.

6       It is clear that the defendant was the one who

7  conducted all these transactions, all of this moving of stolen

8  funds from one account to another.  He is on surveillance

9  footage at the start of these transactions and he is also on

10  surveillance at the end of them.

11       Now, I want you to ask yourselves, if these

12  transactions weren't dirty and if the defendant did not know

13  that they were dirty, why did he move the money through

14  accounts all owned and controlled by him?  Account, after

15  account, after account.  What legitimate purpose is there for

16  moving funds from one account you control to another?  There is

17  none -- unless you know the money is dirty and you need to hide

18  it to make it hard to track, to keep the banks and the victims

19  from getting back those stolen funds.

20       What was the defendant's state of mind when he did all

21  of this?  His actions make it incredibly clear -- to conceal,

22  to disguise, to hide the money.  And why did he need to hide

23  the money and to conceal it?  Because he knew it was dirty.  It

24  was that simple.

25       Second, you know the defendant knew the money was

**A000306**

NCD5ali5                    Summation - Ms. Foster

1    dirty from his tax returns.  You may remember the stipulation

2    that was read into evidence in this case.  You can see on the

3    stipulation that during the years when the defendant was

4    receiving the stolen money, around 2017 to 2020, he never

5    reported any income from it.  He reported income from real

6    estate rentals, he reported income from a home health aide

7    business, but he never reported any of the income he received

8    into these bank accounts, money that you heard had no

9    connection whatsoever to a real estate rental or a home health

10   aide business.

11        You also know that the defendant got income from the

12   stolen money, you see it in the Prudential deposit we just

13   walked through.  Each time the money was moved from one account

14   to the other, the defendant kept a portion for himself.  It was

15   his cut for being the person who helped to disguise the funds.

16   You also know this from the $100,000 you heard the defendant

17   spend on personal items using the money in the fake accounts.

18   You saw he spent thousands of dollars at Speedway, Zara, and

19   Nordstrom.  This is income, it is the defendant's slice of the

20   pie, it is income he received from laundering the stolen money.

21        And why did he not report this income?  Well, your

22   common sense tells you that most people probably do not file

23   taxes for money that is being stolen because it could lead to

24   getting caught.

25        A third reason you know that the defendant knew the

**A000307**

NCD5ali5                    Summation - Ms. Foster

1    money was dirty and he tried to hide it is that he opened these

2    accounts with fake identities.  We have already talked about

3    these fake identities at length so I will not go over them

4    again.  I just want you to think about the purpose.  Why did

5    the defendant need to disguise his real identity when he opened

6    the accounts?  Because he knew the accounts were being used to

7    launder stolen money, money that was dirty, and he didn't want

8    to get caught with those stolen identities, dozens and dozens

9    of stolen identities.

10         Fourth, you know that the defendant knew the money was

11   dirty and he needed to conceal it from the pure number of

12   accounts that he opened to launder this money.  36 fake

13   accounts.

14         Ms. Bronson, the forensic accountant, also showed you

15   that many of these 36 bank accounts were open during the same

16   time period.  Ask yourself:  Why would someone need to open 36

17   accounts over the course of three years, and why would someone

18   need multiple accounts opened at one time?  All because someone

19   needs to hide money, hide money from transferring to one

20   account from another by playing a shell game.  And, as you can

21   see from this chart, when one account was shut down, the

22   defendant would often just open another one so he could

23   continue to play the shell game.

24         This brings me to the final reason you know that the

25   defendant knew the money was dirty.  As I have already

A000308

NCD5ali5                     Summation - Ms. Foster

1    mentioned, the wires and checks that were deposited into the

2    defendant's accounts were constantly being returned.  You can

3    see this with the money that was stolen from Prince George's

4    County that was deposited into the defendant's Dennis Clark

5    account.  Only a day or two after the money was wired into the

6    account it was returned.  You also saw this with the Suzanna S.

7    Lee wire transfer.

8         Now, think about it.  Legitimate money doesn't just

9    get returned to a sender, it is a sign something is wrong with

10   the money.  And the defendant saw this sign over and over

11   again.  Certain of the bank records even explicitly told the

12   account owner -- the defendant -- the reason the wires or the

13   money was being returned.

14        Look at the bank records for the account that received

15   the Suzanna S. Lee wire transfer.  As I just mentioned, that

16   wire was returned, and under the description of why it was

17   returned the bank noted:  For reason:  Fraud.

18        If the defendant did not know that the funds deposited

19   in his bank accounts were stolen before, he certainly knew it

20   by this point.  The bank told him.  But did he stop?  No.  He

21   kept opening accounts into which stolen funds were deposited.

22        So, how do you know that when the defendant got his

23   piece of the stolen money, he knew it was dirty, and tried to

24   conceal it?  Well, the five reasons we just went over.  And

25   what does this all show?  That the defendant knew, beyond a

A000309

NCD5ali5                    Summation - Ms. Foster

1   reasonable doubt, that the money was dirty and that he tried to

2   hide it.

3          Now let's get to the fifth and final fact that we have

4   proven to you, which is that when the defendant lied to banks,

5   and when the defendant laundered dirty money, he didn't do it

6   alone, he agreed with others to do it.  I don't think I need to

7   spend much time on this given all the evidence that we have

8   gone through so I will be brief and just focus on the key

9   pieces of evidence from which you know the defendant agreed

10  with others to do all of this.

11         First, you saw the text messages and photos on the

12  defendant's phone just this morning.  You saw from those

13  messages and photos that the defendant communicated with others

14  about names and personal identifying information that were used

15  to open the fake accounts.

16         You see him ask people whether there is anything for

17  Sadia Mughal, one of the names used to open multiple of the

18  fake accounts.

19         And here is another text message in which the

20  defendant writes to someone named Agbogidi.  Ramon Pastor

21  should be in the mail box by now.  Please help me check.

22  Again, Ramon Pastor is a name used to open multiple fake

23  accounts.

24         You also saw images that you heard the defendant send

25  via WhatsApp, images that reference bank accounts opened using

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000310**

NCD5ali5                    Summation - Ms. Foster

1    stolen identities including stolen identities like Ronald Henry

2    Nellen.

3         So, what conclusion should you draw from all of these

4    texts and photos?  Well, that the defendant and others were

5    working together, working jointly to use other people's

6    identity to hide stolen money.

7         You also know the defendant was not working alone

8    based on the bank records and just the broader context of this

9    fraud.  The defendant was not the scammer, he was the money

10   launderer -- the person responsible for concealing funds stolen

11   by other people.  Other people who made sure that the stolen

12   funds were sent to the defendant so the defendant could launder

13   the stolen funds for them and take his cut.

14        The defendant was also not the last stop for these

15   stolen funds.  That was other people, people in China and the

16   United Kingdom, other co-conspirators.

17        This broader context shows you that the defendant did

18   not act alone.  He was in agreement with others, an agreement

19   not only to conceal and disguise the money, but also to lie to

20   banks, all as part of an effort to hide the dirty fraud

21   proceeds.  They agreed, they conspired, they were in it

22   together.

23        Members of the jury, over the course of this trial we

24   have proven to you five central facts and it is these five

25   facts that you should remember when you deliberate and decide

A000311

NCD5ali5                    Summation - Ms. Foster

1    whether the defendant has committed the crimes with which he is

2    charged.  These facts check virtually every one of the legal

3    boxes I am about to tell you about.

4         Now I want to return to the law and walk through how

5    all of this evidence leads to the conclusion the defendant is

6    guilty of each of the offenses with which he is charged.

7    Again, those charges are bank fraud conspiracy, bank fraud,

8    aggravated identity theft, and money laundering conspiracy.

9    First, I will start with Count Two, which is bank fraud.

10        For the bank fraud count, you need to find three

11   things:  First, you need to find that there was a scheme to

12   obtain money or property under the custody or control of a bank

13   by means of materially false or fraudulent pretenses,

14   representations, or promises.  Judge Caproni will tell you what

15   that means, but it boils down to lies told banks to get money.

16   There is no shortage of lies to banks to get money here.  Every

17   time the defendant went to a bank teller and requested a

18   withdrawal from a fake account using a name other than his own,

19   the defendant was lying to the bank.  Same with when he wrote a

20   check using one of those fake accounts.  Or when he wired money

21   from those accounts.

22        We have shown you lots of examples that the defendant

23   told to banks to get money under their control.  But you only

24   need to find one lie for bank fraud.  Just one.  So if you find

25   the defendant lied one time to a bank to obtain money under its

A000312

NCD5ali5                    Summation - Ms. Foster

1    custody or control, then you should fine this element met.

2              Second, you have to find that the defendant acted

3    knowingly, willfully, and with specific intent to obtain money

4    under the custody or control of a bank.  You know the defendant

5    knew what he was doing and knew that what he was doing was

6    wrong.  The defendant knew that his name wasn't Sadia Mughal or

7    Warren Roberts, or Ronald Henry Nellen, or any of the other

8    identities he used to open and operate bank accounts.  So he

9    knew that when he went to a bank account and pretended to be

10   one of these people to withdraw or transfer funds, he was lying

11   to that bank and he did it over and over again for years.

12             And why did he have to lie?  Because he needed to

13   obtain the funds in that bank account.  He knew the bank

14   wouldn't just hand over the money to someone whose name wasn't

15   on the account.  He had to pretend to be someone else so he

16   could get the money.  And you know he was in on the scheme

17   because you saw how he took money out for himself, his cut of

18   the pie.

19             And then, third, you have to find the fraud was

20   committed on a financial institution insured by the Federal

21   Deposit Insurance Corporation -- or the FDIC.  You have this

22   here.  The parties have stipulated that all of the banks, where

23   the fake accounts were opened, were insured by the FDIC.  So,

24   this element is met.

25             Let's now discuss Count One, bank fraud conspiracy.

NCD5ali5                    Summation - Ms. Foster

1  This count requires the government to prove that the defendant

2  agreed with others to commit bank fraud and that he did so

3  knowingly -- and that he knowingly and willfully joined that

4  conspiracy.

5      We have already discussed the mountains of evidence

6  that the defendant committed bank fraud and that he did so

7  knowing what he did was wrong.  And you know from the

8  defendant's text and the broader context of this fraud that the

9  defendant did not work alone in defrauding banks, he worked

10  with other people.

11      Next, Count Three, aggravated identity theft.  Count

12  Three has three elements.  The first of these is that the

13  defendant knowingly transferred, possessed, or used what is

14  called a means of identification.  This can be any number of

15  identification.  I expect that Judge Caproni will tell you that

16  it includes someone's own name or Social Security number.

17      The second element is that those means of

18  identifications were transferred, possessed or used during and

19  in relation to the bank fraud.  You know these two elements are

20  met.  While you only need to find that the defendant used a

21  stolen means of identification one time for these counts to be

22  satisfied, the evidence showed that the defendant used dozens

23  of names and Social Security numbers to open up the accounts,

24  the same accounts that he is on surveillance footage conducting

25  transactions on.

A000314

NCD5ali5                    Summation - Ms. Foster

1      These identities were also used by the defendant in

2  relation to the bank fraud he committed.  To find this element

3  met, the identities that were used must have been at the heart

4  of the bank fraud conduct.  And they were.  The defendant used

5  these stolen identities to lie to banks so he could withdraw

6  money.  The bank fraud would not have worked without them.

7      The third element is that the use of the name or bank

8  account number or other means of identification was without

9  lawful authority.  For the defendant to be guilty of this count

10  the government also has to show that it wasn't just a fake name

11  that the defendant was using but the name or Social Security

12  number of a real person and that the defendant knew they were a

13  real person.

14      Now, again, you know these people exist.  Several of

15  them walked into this courtroom, they took the witness stand,

16  and they told you that they did not open these bank accounts in

17  their name.  They had not given the defendant or anybody else

18  permission to use their names so you know it was clearly

19  without lawful authority.  And you know the defendant knew they

20  were real people.  These were not names that he made up on the

21  spot but real names and identifying information he needed to

22  receive from other people.  You have seen some of those text

23  messages.  And what happened to that money once it got into the

24  accounts?

25      This brings us to the final count, Count Four,

**A000315**

NCD5ali5                    Summation - Ms. Foster

1   conspiracy to commit money laundering.  When Judge Caproni

2   instructs you on the law for this count, I expect she will tell

3   you that the elements of the count are the same as Count One,

4   except the object of this conspiracy is money laundering, not

5   bank fraud.

6           Now, what is money laundering?  A financial

7   transaction designed to conceal or disguise the nature, source,

8   ownership, or control of fraud, and here the fraud that is

9   charged in the indictment is specifically wire fraud.  Wire

10  fraud is just fraud that uses or causes the use of interstate

11  wires which are telephone calls, e-mails, or bank transfers of

12  money.  Think of all the e-mails, phone calls, and bank

13  transfers that were part of the fraud schemes in this case.

14  Bank transfers, you could see on the bank records, crossed

15  state lines.  And you know from the defendant's bank records

16  that the defendant agreed with others to launder the money that

17  came from this wire fraud.  Bank records show the defendant

18  receiving the stolen money, moving it around in complicated

19  ways, and then wiring it to other people in China.

20          Members of the jury, you have listened closely to all

21  of the evidence over the last few days.  As you have heard, the

22  defendant laundered large sums of dirty money stolen from

23  victims through bank accounts.  He did it for a profit.  He

24  knew what he was doing and he thought he would never get

25  caught.  He thought he would never get caught, in part, because

A000316

NCD5ali5

1    he used dozens of stolen identities, identities he stole from

2    other people.  But he was wrong and that's why we are here

3    today.  It is finally time for you, the jury, to hold the

4    defendant accountable for these crimes.  This is not a close

5    case.  Take a step back, look at all of these facts together,

6    think about the testimony you have heard, look at the evidence,

7    and use your common sense.  Use it when you consider the bank

8    records, the surveillance footage, the text messages, and the

9    photos on the defendant's phone, as well as all the testimony

10   you have heard.  And after considering that evidence, I ask

11   that you return the only verdict consistent with the evidence

12   and the law:  The defendant, Chinwendu Alisigwe, is guilty.

13             THE COURT:  Thank you, Ms. Foster.

14             Let's take a quick break.  We are not going to take a

15   long break.  You should go to the facilities quickly and be

16   ready to come back out and we will hear from the defense.

17             Don't discuss the case yet, leave your books on your

18   chair, take about a seven-minute break.

19             (Continued on next page)

20

21

22

23

24

25

NCD5ali5

```
 1              (Jury not present)

 2              THE COURT:  Seven minutes.

 3              (Recess)

 4              THE COURT:  Are you ready?  Who is summing up for the

 5   defense?

 6              MS. WERNER:  That's me, your Honor.

 7              THE COURT:  OK.  Let's go.

 8              Do we have half the Federal Defenders in to watch?

 9   No, just a smidgen.

10              MS. WERNER:  We have a solid handful.

11              MS. LEVINE:  We are rolling deep.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NCD5ali5                    Summation - Ms. Werner

1          (Jury present)

2          THE COURT:  Please, be seated.

3          Ms. Werner?

4          MS. WERNER:  Chinwendu Alisigwe never intended to

5    commit fraud.  He never intended to steal an actual person's

6    identity.  He never intended to launder money.  He is not

7    guilty.

8          Mr. Alisigwe was a small pawn on someone else's

9    chessboard, and a pawn, of course, does not choose where it

10   goes.  Someone else moves it, one square at a time.  Yes,

11   Mr. Alisigwe was on the board.  Yes, he moved across the

12   squares.  But only when someone else told him to and only where

13   someone else told him to.  He was not the king, he was not the

14   strategist, he didn't even know the strategy.  He was a pawn.

15         You have learned over the last few days about a

16   sprawling, sophisticated criminal operation involving overseas

17   fraudsters, e-mail hackers, document forgers.  It has tentacles

18   as far away as China and Thailand.  It involves hacking into

19   people's e-mail accounts and pretending to be them and

20   convincing major financial institutions to wire out hundreds of

21   thousands of dollars at a time.

22         The government has done a fine job of proving that a

23   sprawling, sophisticated operation existed and that it managed

24   to target real people and entities.  But, the government has

25   not proven that Mr. Alisigwe knew anything about that

A000319

NCD5ali5                    Summation - Ms. Werner

1   sprawling, sophisticated operation, or that he intentionally

2   played a part in it.  Let's talk about it, this vast operation

3   that they have been telling you about over the last three days.

4           The government said it was simple.  It is not simple.

5   But it does happen almost the same way every time.  Somewhere

6   in the world there are fraudsters with the tools and skills to

7   track down people, companies, and organizations with assets

8   that could be stolen.  These fraudsters find a mark, a target.

9   They find the money, find where it is stored, which bank, which

10  fund.  They figure out the exact right person to contact to

11  request the money.  Meanwhile, somewhere out there, there are

12  also hackers, e-mail hackers who hijack an e-mail account

13  belonging to the target person or organization.  They take over

14  that e-mail account so that they can pretend to be the true

15  user of that e-mail address.  Then, the fraudsters and the

16  hackers, they write e-mails.  They're designed to seem

17  authentic, to come off as if they've been sent by the true user

18  of that e-mail address.  They contact the bank or the company

19  and they direct the transfer of their mark's assets into a

20  different bank account, a new bank account.  They learn and

21  follow the transfer rules and withdrawal protocols of the

22  financial institutions and the people that they are trying to

23  trick.  They make follow-up phone calls to verify the transfer

24  requests.  They fill out authentic request forms and send

25  e-mails that seem real.  They know how to make it look like a

NCD5ali5                    Summation - Ms. Werner

1    legitimate request for funds.  And, when asked for

2    verification, those fraudsters, those hackers, can provide real

3    information, real dates of birth, addresses, phone numbers, and

4    they sometimes convince folks on the other end that their

5    requests are legitimate and that the money should be sent.

6          Then, in addition to the fraudsters and the hackers,

7    we have the ID forgers.  Somewhere in the world false

8    identifications are being made.  They're good fakes.  They're

9    convincing.  They have real people's names on them.  But the

10   birthdates are fake, the nationalities are fake, and the

11   photographs are of someone else.  They're mailed to the United

12   States to a number of different addresses and they're used to

13   open bank accounts.

14         And then, finally, if they pull off the steal, the

15   fraudsters deposit their winnings into these newly opened

16   U.S. Bank accounts.  The money does not say there long.  In

17   many cases, people in banks quickly realize their mistake, they

18   report the loss, and often it is not too late for accounts to

19   be frozen and money to be clawed back.  In other cases, the

20   money gets wired overseas to companies in China or Thailand or

21   the UK.  Maybe that's the end of the story and someone there

22   gets the money.  Maybe not.  That's as far as we know.  The

23   point is, there is a lot going on here.

24         This scheme involves lots of people in different

25   places with skills and tools and know-how that they are using

A000321

NCD5ali5                    Summation - Ms. Werner

1    to carry out a complex scheme.  And while the government has

2    sketched out what that scheme looks like, they have not proved

3    beyond a reasonable doubt that Mr. Alisigwe knew about any of

4    that beyond the most basic fact that he was supposed to use

5    fake IDs to open bank accounts that someone else put money in.

6         So let's talk about the evidence they offered at

7    trial.  To start, ask yourself:  Which of the government's

8    witnesses give you clarity as to what Mr. Alisigwe knew about

9    this sprawling scheme?  Most of them could not say anything

10   about him at all.  Eight witnesses sat here -- eight -- and

11   told you the same thing:  They did not know Mr. Alisigwe, they

12   had never heard of him, they had never spoken with him, they

13   could not make any connection between their own experience --

14   between their own experience -- and him.  It was not until the

15   second day of trial -- I wrote it down on my notepad -- it was

16   noon on the second day the first time a witness was able to

17   make any connection to Mr. Alisigwe, the first time he entered

18   this story.

19        We started by hearing from Ronald Nellen, the retired

20   surgeon who flew here from Wisconsin.  That man knew nothing

21   about Mr. Alisigwe.  Someone chose Mr. Nellen's name, someone

22   made an ID with that name.  Mr. Nellen had no idea who did it

23   or why.

24        We heard from Madeline Robinson, the non-profit

25   director from Florida.  Someone found her organization, which

A000322

NCD5ali5                    Summation - Ms. Werner

1    sounds like it did very good work, someone targeted it, hacked

2    her e-mail, sent messages to her banker, requested checks.

3    None of that was done by Mr. Alisigwe.

4           The government has agreed from the beginning from

5    their opening statement that he was not the e-mail guy.  He

6    knew nothing about Ms. Robinson, and Ms. Robinson knew just as

7    little about Mr. Alisigwe as he knew about her:  Nothing.

8           Warren Roberts.  Mr. Roberts also knew nothing about

9    Mr. Alisigwe.  Someone else identified him as a target, they

10   figured out that he was an employee and shareholder at RPM

11   International.  They figured out that Mr. Roberts had an asset

12   that they could steal, his stock shares.  They made a plan to

13   steal that asset.  They got RPM and Equiniti to sell the stock

14   shares and got those shares into an account in the U.S., and

15   none of that was done by Mr. Alisigwe.

16          Mr. Roberts didn't know who targeted him, he didn't

17   know who called RPM pretending to be him, and we know from the

18   government Mr. Alisigwe was not the phone call guy.

19   Mr. Roberts knew only that his money was taken and then he got

20   it back.  He knew nothing about Mr. Alisigwe.

21          Janeen, also from RPM, the executive from Ohio, she

22   knew nothing about Mr. Alisigwe.  She heard a voicemail where

23   someone else called RPM pretending to be Mr. Roberts seeking

24   transfer of his stock shares.  It was not Mr. Alisigwe who made

25   that call.

A000323

NCD5ali5                    Summation - Ms. Werner

1          We heard from Suzanna Soh Lee.  Someone hacked her

2     e-mail.  Someone convinced her bank to wire out $685,000 from

3     her personal private banking account.  Someone, a woman, called

4     the bank to verify that request and that was not Mr. Alisigwe.

5     He didn't do any of that.  And Ms. Lee knew nothing about

6     Mr. Alisigwe.  She doesn't know who emailed her bank to request

7     that transfer, she doesn't know who called.  She said nothing

8     to implicate Mr. Alisigwe whatsoever.

9          We heard from Luther Bell, representative from Prince

10    George's County, Maryland.  Someone hacked his e-mail.  Someone

11    persuaded him -- sorry.  Someone hacked his colleague's e-mail.

12    Someone persuaded him to authorize a $1 million wire.  That was

13    not Mr. Alisigwe.  Mr. Bell knew nothing about Mr. Alisigwe.

14         We heard from Sadia Mughal.  Someone made

15    identifications with her name on them.  That was not

16    Mr. Alisigwe who made those identifications, the

17    identifications came in the mail.  And what is important is

18    that Ms. Mughal knew nothing about Mr. Alisigwe.

19         Mr. Dolcimascolo, he knew nothing about Mr. Alisigwe.

20    That's eight witnesses, eight out of the twelve that the

21    government called, who did not say a single thing about

22    Mr. Alisigwe.  And the government has not proved that

23    Mr. Alisigwe knew anything about them either.  As they admit,

24    he was not the e-mail guy, he wasn't the phone call guy.  He

25    didn't locate these people, he didn't decide to steal their

A000324

NCD5ali5                    Summation - Ms. Werner

1  money, he didn't hack their e-mails.  The government has not

2  offered any solid proof that he knew they existed.  No proof

3  that he knew their e-mails were hacked.  No proof that he knew

4  their money was stolen.

5       So what has the government proved?  What have they

6  proved about Chinwendu Alisigwe?  They have proved that he used

7  fake identifications to open bank accounts.  They have proved

8  that he did transactions in those accounts, that he moved

9  money, withdrew money, and deposited money within the banks and

10 at ATMs.  That's it.

11      The government tries to gloss over the fact that it

12 has not connected Mr. Alisigwe's banking activity to this

13 broader conspiracy by calling him the money guy.  But he wasn't

14 the money guy.  That's too broad.  He was the money

15 at-the-counter guy.  He was the ATM guy.  He was the pawn they

16 send in to the heavily-surveilled bank lobby who has no

17 knowledge of the big picture operation.  And that's what we

18 learned from the government's remaining witnesses.

19      The government will tell you that even if Mr. Alisigwe

20 played a small role in the conspiracy he is guilty but that's

21 not all.  He is not guilty unless they prove that he played a

22 role, knowingly and intentionally, and that is something that

23 they cannot prove.

24      Because the government cannot prove that, because they

25 cannot prove that Mr. Alisigwe knowingly and intentionally

A000325

NCD5ali5                    Summation - Ms. Werner

1    participated in this conspiracy, because they have no evidence

2    of his state of mind, they try to focus your attention

3    elsewhere.  They showed you picture, after picture, after

4    picture, all showing the same thing:  Mr. Alisigwe at the ATM.

5    Mr. Alisigwe in the bank lobby.  They had two witnesses on the

6    stand for hours connecting ATM withdrawals to bank statements.

7    And why pile on picture after picture, including pictures where

8    the person at the ATM is wearing a surgical mask and you can't

9    even say that that's Mr. Alisigwe?  They pile all of that on

10   because they're trying to make you look over here because they

11   can't prove an essential element of this case.

12            Showing you more and more evidence of the exact same

13   thing, that Mr. Alisigwe was involved in opening and using bank

14   accounts, does not let them off the hook for showing you

15   evidence of the other things they would have to prove for you

16   to find Mr. Alisigwe guilty.

17            Here is another example of the government trying to

18   pile on, trying to overstate its case, to compensate for the

19   fact that they have no evidence of Mr. Alisigwe's state of

20   mind.  This claim that nearly $6 million of victim money flowed

21   into the accounts.  You heard it, it was early on in the

22   government's opening statement, their first opportunity to tell

23   you about the evidence you would hear in this case.  I quote:

24   Nearly $6 million of victim money flowed into the accounts

25   opened by the defendant.  Well, we know that is not true.

A000326

NCD5ali5                    Summation - Ms. Werner

1    You remember what Jillian Bronson, the FBI CPA, the

2    accountant with the 100-slide PowerPoint said when I pressed

3    her:  That $6 million figure includes deposits that went into

4    the accounts from the other subject accounts.  That $6 million

5    figure was calculated by doubling and tripling, by

6    quadruple-counting money.  She counted money the first time it

7    came into an account and then she recounted it every time it

8    moved.

9    I asked her:  You agree that your nearly $6 million

10   figure here does not mean nearly $6 million of money taken from

11   victims and then placed in the subject accounts?

12   No, it doesn't mean that.

13   She had to agree.

14   Now, on redirect, after opening on this $6 million

15   loss, the government got up and said oh, we never meant to make

16   that claim, did we.  We never meant to suggest that that pie

17   chart represented $6 million of lost victim money.  But they

18   opened on it, that was one of the first claims out of their

19   mouths.  Notice that today in closing the government got up and

20   said more than a million dollars.  A five million dollar change

21   to their opening statement to their closing statement.

22   They're going to tell you that's not a big deal, the

23   fact that they told you that this was a case about $6 million

24   of victim losses.  And you have to ask yourself this, this is

25   why it is a big deal.  Can you trust the claims the government

A000327

NCD5ali5                    Summation - Ms. Werner

1    is making when such a big one turned out to be false?  When

2    they are that cavalier to the tune of $5 million?  They are

3    hoping that if we all look over here, $6 million, maybe we

4    won't have to talk about the fact that Mr. Alisigwe did not

5    have the state of mind to commit the crimes he is charged with.

6          They also keep talking about loss despite the fact

7    that every single victim who came into this room, every single

8    person who had their account or their e-mail hacked, got their

9    money back.  And I suggest to you that this emphasis on loss is

10   nothing but fear mongering because they cannot prove the

11   essential elements of the crimes they have charged him with.

12         The government has said that Mr. Alisigwe is guilty of

13   four separate crimes because of his opening and his use of bank

14   accounts:  Bank fraud, bank fraud conspiracy, aggravated

15   identity theft, and money laundering conspiracy.  For all of

16   them the government must prove that he actually intended to

17   commit the crime.

18         Starting with bank fraud and bank fraud conspiracy,

19   the Court will instruct you on the elements of those charges

20   and she will instruct you -- the Judge will instruct you that

21   you cannot find Mr. Alisigwe guilty of these charges unless he

22   knowingly and intentionally defrauded the bank, unless he

23   knowingly intentionally and willfully joined this conspiracy.

24   You should hold the government to their burden on these counts.

25   Absolutely.  That's a burden they have not met.  But here is

NCD5ali5          Summation - Ms. Werner

1   where we need to focus our efforts, our thinking.  On Count

2   Three, aggravated identity theft, we have to talk about this.

3          It is not enough that there is a real Sadia Mughal.

4   It is not enough that there is a real Warren Roberts or a real

5   Ronald Nellen.  It is not enough that the fake IDs Mr. Alisigwe

6   was mailed and used, happened to be in the names of real people

7   that the government tracked down.  And if Mr. Alisigwe did not

8   know that these were real people, he is not guilty of Count

9   Three.  If the government has not proved beyond a reasonable

10  doubt that he knew these were real people, he is not guilty of

11  Count Three and they absolutely have not met their burden on

12  that key element.

13         First, remember that Mr. Alisigwe had absolutely no

14  role in the frauds and scams at the core of this case.  They

15  agree he is not the phone call guy.  They agree he is not the

16  e-mail guy.  He is not the person who tracked down Warren

17  Roberts, stole his RPM shares.  He was not the person who

18  located Suzanna Lee and her bank account.  He was not the

19  person who found Madeline Robinson and the account of her

20  organization.  He did not impersonate any of them in any e-mail

21  or phone call.

22         So, what about the people whose names were in the

23  passports and the driver's license?  Mr. Alisigwe was shipped

24  many fake passports, many fake driver's licenses.  But he did

25  not make those IDs.  He did not choose the names that went

NCD5ali5                    Summation - Ms. Werner

1  inside them.  He did not choose the birthdate, the addresses.

2  He didn't choose the country that those documents were from;

3  the states the driver's licenses were from.  We see, in

4  Government Exhibit 806, a stipulation, that these passports

5  were being shipped from abroad -- from Lagos, 5,000 miles

6  away -- and you now know that these IDs had names that

7  corresponded with real people.  But Mr. Alisigwe was not the

8  person who tracked down these real people and chose to make

9  identifications in their names.

10          There has been absolutely no proof of the fact that

11  you would need a Social Security number -- a real Social

12  Security number -- to open a bank account.  Mr. Alisigwe

13  received these documents with birthdates, with addresses, and

14  he opened bank accounts using that information.  It is logical

15  to assume that he believed that information was false and he

16  opened these bank accounts with that state of mind.

17          There is not a shred of evidence that he knew the

18  names or identities were real.

19          What is more, there are many reasons why it would have

20  been most logical for Mr. Alisigwe to assume that these were

21  not real people, that they did not exist, for him to assume

22  that it did not matter if they were real or fake.  Let's look

23  at an example.

24          Wilhelm Heinz.  The identification in the name of

25  Wilhelm Heinz says Wilhelm Heinz and that's the name

A000330

NCD5ali5                    Summation - Ms. Werner

1    Mr. Alisigwe used opening a bank account.  But that was not the

2    real name of the person that the government believes he stole

3    the identity of.  The real name of that person, the person

4    whose Prudential account was targeted by fraudsters, was Heinz

5    Wilhelm.  And when this document came with the name Wilhelm

6    Heinz, Mr. Alisigwe just opened the account in that name

7    because, to him, the name didn't matter, what matters is what

8    is in this identification.  It is not a real person, it is just

9    a piece of ID that is being used to open a bank account.

10          Let's take Sadia Mughal.  Sadia Mughal's

11    identifications, her bank accounts, had two different

12    birthdates.  The account was opened using whichever birth date

13    was on the passport, January 7th or January 23rd.  But a person

14    cannot have two birthdays so receiving documents that had two

15    different birthdate on them, why would Mr. Alisigwe assume that

16    one of those is correct?  Why would he assume that there is a

17    real Sadia Mughal?  The logical assumption for him to make is

18    that there is no real Sadia Mughal and that the information

19    that he is receiving does not have to be correct, that it is

20    not correct, that the information on the passports and the

21    driver's licenses does not matter.  If it mattered, if it had

22    to be correct, then how could it be OK for Sadia Mughal to have

23    two different birthdays?

24          Similarly, Luis Bringas Alvarez, that we see in

25    Government Exhibit 606 and 603, we see two different passports

**A000331**

NCD5ali5                    Summation - Ms. Werner

1    with different countries of citizenship for this name, Luis

2    Bringas Alvah.  We see that there are, again, two different

3    birthdays, one saying May 5, 1980; another saying May 5, 1982.

4         For Mr. Alisigwe seeing these documents, the logical

5    assumption would be that there is no such person as Luis

6    Bringas Alvah, this is a fake name.  This is a fake name, these

7    are fake birthdays, these are fake countries -- or real

8    countries with fake citizenships.  These documents are being

9    sent to him, he opens accounts, but none of this proves that he

10   knew a real person, if one exists, named Luis Bringas Alvah.

11        Many of these passports have birthdates that call out

12   the documents as being from fake people.  These would signify

13   to Mr. Alisigwe that there were no real people and that's why

14   it is logical for him to have believed that these were not real

15   people.

16        Agent William McKeen found four passports in

17   Mr. Alisigwe's home, two of them have the same birthday.  Two

18   of them -- not on this slide -- but two of them said September

19   9, that was for Siemers Birgit and Oscar Medalla.

20        We see the same thing with other identities.  We see

21   here January 1st birthdate for Wilhelm Heinz; the same for

22   Ramon Pastor; the same for Daniel Luna; the same for Warren

23   Roberts.  Elsewhere, you will find that there was a January 1st

24   birthday for the name Dennis Eckstein; for Daniel Luna.  All of

25   these people with January 1, New Year's Day birthdays.  The

A000332

NCD5ali5                    Summation - Ms. Werner

1    logical assumption is that these people are fake.  These are

2    identities that are manufactured, whole cloth, by the

3    fraudsters overseas who are mailing these documents.

4            The IDs, the passports, the driver's licenses were

5    mailed to Mr. Alisigwe.  Yes.  He used them, yes.  But that is

6    the end of the evidence about his identity theft that the

7    government is trying to make you believe he committed.  Based

8    on what we know about the information contained on those IDs,

9    Mr. Alisigwe had every reason to believe that they were fake.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A000333

NCDJALI6                    Summation - Ms. Werner

1              MS. WERNER:  They have not proved beyond a reasonable

2     doubt that he knew a single one of these people existed in the

3     real world.

4              Mr. Alisigwe is also not guilty of conspiring to

5     commit money laundering.  The government has not met its burden

6     of proving that he knew the money in the accounts came from any

7     crime.  It is not enough that he wired money or that he

8     withdrew money.  It's not enough that he opened the accounts,

9     it's not enough that the money in the accounts came from some

10    faraway fraud, because he did not know any of that.  He did not

11    conspire or agree to launder money if he did not intend to

12    launder money.

13             If he did not know that the money in the accounts was

14    criminally derived, he is not guilty, and there has been no

15    evidence of his intent or knowledge with regard to where the

16    money in those accounts came from.  Remember, he had no role

17    whatsoever in the business email compromise scams that you

18    heard about.  He did not pick the people, he did not pick the

19    companies.  He did not write the emails.  He didn't make the

20    phone calls.  He did not request the wires, he didn't make the

21    phone calls trying to push those wires through.  There is no

22    proof he knew any of that was happening.

23             You're sitting here today with information about this

24    scheme.  And you have to remember that the information you have

25    today from the government's PowerPoint, from their fancy

A000334

NCDJALI6                    Summation - Ms. Werner

1    charts, from all of the information they have shared with you

2    about this sprawling scheme, that's not the information that

3    Chinwendu Alisigwe had.  You now have seen the real people.

4    You have now learned about the actual schemes to target these

5    people.  He had none of that information at his disposal.

6           Just because you now know and believe a fact in this

7    case, does not mean Mr. Alisigwe knew about it, and he did not

8    know where the money in those accounts was coming from.  The

9    government has done nothing to prove that he did know.

10          A few days ago, my colleague, Ms. Levine, explained

11   that a trial is like a puzzle.  In some cases as the government

12   case unfolds, a picture emerges that clearly shows how the

13   defendant is guilty of the charged crimes.  In any trial, the

14   government has the burden of giving you enough pieces to see

15   clearly that a defendant is guilty of the charges.  She told

16   you that it would be impossible that there would be missing

17   pieces in this case, and you know by now that she was right.

18          The missing pieces are not insignificant.  They are

19   elements of the crimes he is charged with.  The government left

20   a missing piece instead of proving beyond a reasonable doubt

21   that Mr. Alisigwe knew the identification documents he was

22   mailed corresponded to real people.  They left a missing piece,

23   instead of proving beyond a reasonable doubt that Mr. Alisigwe

24   knew where the money in the accounts was coming from.  Without

25   these pieces, the puzzle is incomplete and Mr. Alisigwe is not

A000335

NCDJALI6                    Summation - Ms. Werner

1    guilty.

2            The government talked a lot about timeline here.  We

3    saw Jillian Bronson's complicated charts showing when accounts

4    were opened, when they were closed.  And here's a timeline fact

5    that I find very interesting.  You heard evidence during this

6    trial about accounts being used through 2020, and you heard

7    evidence that Mr. Alisigwe was arrested on July 26 of 2022.

8    And then, we heard a stipulation about passports, many

9    passports seized by customs and border patrol that were coming

10   into this country in January of 2023, six months after

11   Mr. Alisigwe was arrested.

12           These passports are still coming in from overseas.

13   What does that tell you?  Not that he was still opening bank

14   accounts.  He wasn't.  It tells you that before he was

15   arrested, when he received those IDs with his face and with the

16   names of others, when he opened those accounts, he was doing

17   the bidding of others.  It tells you that the people pulling

18   the strings, the people running the chess board were so far

19   away, so many levels above Mr. Alisigwe, that they did not even

20   know he had been arrested and that they could no longer nudge

21   him across the chessboard to serve their ends.  It tells you

22   that he was not in communication with them.  He was not in

23   agreement with them, he was not in a conspiracy with them.  He

24   was just the ATM guy.

25           Let me make one thing abundantly clear.  We've talked

**A000336**

NCDJALI6                    Summation - Ms. Werner

1    about puzzles to help you understand missing pieces from the

2    government's case.  We've talked about chess and chess pieces

3    to help you understand that Mr. Alisigwe was a pawn in someone

4    else's strategy.  But this is not a game.  This is

5    Mr. Alisigwe's real life.

6             And whenever the government wants to change a person's

7    life forever by convicting them of a crime or crimes, they have

8    a very high burden.  You heard about it at the beginning of

9    this trial and you will hear about it again when Judge Caproni

10   instructs you on the law that will be your north star, the star

11   you must follow during your deliberations.  You heard about it

12   repeatedly because it is that important.  It is the bedrock of

13   our American system of justice, the burden of proof beyond a

14   reasonable doubt.  The government has not met that burden.

15            In a moment, one of the prosecutors will stand up and

16   they will have an opportunity to respond to everything I have

17   said and to try to convince you that they have filled in these

18   pieces that are missing from their case.  I won't have another

19   opportunity to speak with you, nor will Ms. Levine.  And so

20   when you hear from the government, remember, remember that the

21   government has not proved that Mr. Alisigwe intended to commit

22   fraud.  Remember they have not proved that he intended to

23   launder money, they have not proved at all that he intended to

24   steal a real person's identity, that he knew any of those

25   documents corresponded with the names of real people somewhere

NCDJALI6                    Summation - Ms. Werner

1    in the world.

2            There was somewhere out there a sprawling conspiracy

3    to commit email scams, to steal people's money, to impersonate

4    real people, but Chinwendu Alisigwe, he was not involved in

5    that strategy.  He was not the email guy, he was not the phone

6    call guy.  He was not the fraud guy.  He was the ATM guy.  That

7    is all the government has proved in this case.  He was not the

8    chess master.  He was just a pawn.

9            THE COURT:  Thank you, Ms. Werner.

10           Okay.  We're going to take another short break.

11   Again, a seven-minute break.  Go to the facility first.  Be

12   ready to go when we're ready.  Leave your books on your chair.

13   Don't talk about the case yet.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

A000338

NCDJALI6

1          (In open court; jurors not present)

2          THE COURT:  Okay.  Seven minutes.

3          (Recess)

4          THE COURT:  Ready?  About how long is it going to be?

5          MR. KINDER:  Hard to say.  10, 15.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A000339**

NCDJALI6                        Rebuttal - Mr. Kinder

1              (In open court; jurors present)

2              THE COURT:  Mr. Kinder.

3              Your screens are up.  It's blue?

4              MR. KINDER:  When I get there, we'll make sure.

5              THE COURT:  Go ahead, Mr. Kinder.

6              MR. KINDER:  We're almost done.  This is the

7    government's last chance to respond to what you've heard from

8    the defense.  And what you heard is this:  Distraction after

9    distraction after distraction.  Ms. Werner's presentation was

10   designed to do one thing, distract you from the overwhelming

11   evidence that you've heard these past three days.  Ms. Werner's

12   a great advocate, but she cannot make the evidence disappear.

13   The actual evidences, dozens of fake passports and fake IDs

14   with the defendant's photograph, the bank surveillance images,

15   the texts and photos on the defendant's phone, and the bank

16   records are just devastating to the defendant.  And that

17   evidence clearly shows beyond a reasonable doubt that the

18   defendant is guilty.

19             Now, before I begin, I want to remind you that the

20   defendant has absolutely no burden whatsoever at this trial.

21   The burden of proof is always with the government.  The

22   defendant can simply sit there throughout the trial.  He

23   doesn't have to call any witnesses.  He doesn't have to

24   cross-examine any witnesses.  He didn't have to make any

25   arguments to you.  The government always has the burden and we

A000340

NCDJALI6                    Rebuttal - Mr. Kinder

1    embrace that burden, and in this case we carry it

2    overwhelmingly.  But if the defendant does make arguments to

3    you through his counsel, as you just saw, you can and should

4    scrutinize those arguments.

5         I'm going to spend some time now speaking with you

6    about how you should scrutinize the arguments you just heard.

7    I'm not going to address every point that defense counsel made,

8    but I want you to ask yourself this for each of the defendant's

9    arguments:  Does that really explain all of the evidence you

10   saw?  Is it really a reasonable understanding of what you saw

11   at this trial with your own eyes, what you heard with your own

12   ears?  Or is it a distraction?

13        One of the things you heard a lot about just now was

14   all of the things that the defendant didn't do.  He didn't send

15   the fake emails.  He didn't make the phone calls.  He didn't

16   make the fake passports.  And Ms. Werner focused on the fact

17   that the defendant wasn't known to the witnesses.  There were

18   lots of slides about that.  They ended every cross-examination

19   of every witness by asking, "Do you know Mr. Alisigwe?"  They

20   all said no, of course.  The defense wants you to think that

21   the defendant can't be guilty because he had no contact with

22   the victims.  That's wrong.  They are focused on the things he

23   didn't do to distract you from what he did do.

24        Let's be clear about one thing.  The government is not

25   arguing that the defendant sent the emails or made the phone

NCDJALI6                    Rebuttal - Mr. Kinder

1   calls or made the fake passports.  That wasn't the defendant's

2   job.  The defendant was not the email guy, he was not the phone

3   call guy.  The defense just used that phrase as if it is a

4   point for them.  It's not.  It's an admission.  He was the ATM

5   guy, but he wasn't just the ATM guy.  He was the guy who lied

6   to the banks to open the accounts.  He was the guy who moved

7   the money through the accounts.  He was the money launderer.

8   That was his role.  He laundered money by opening bank accounts

9   using stolen identities, accounts he opened by lying to the

10  banks, received the stolen money into those accounts, and then

11  moved the money out of the accounts.  That role was absolutely

12  critical to the functioning of this scheme.

13          He was part of a conspiracy.  The charges in this case

14  involve conspiracy, multiple people working together in

15  different roles, different parts to play.  That is the whole

16  point of a conspiracy.  Some guys send fake emails and some

17  guys lie to the banks and launder the money.  I expect Judge

18  Caproni will instruct you that the manner or extent of the

19  defendant's participation in the conspiracy doesn't matter.

20  What matters is that he deliberately joined the criminal

21  conspiracy.  And on that point, the evidence is absolutely

22  clear he did.

23          Another thing Ms. Werner spent some time on was trying

24  to minimize the defendant's role in the fraud scheme.  The

25  fraud was bigger than him.  The fraud continued even after he

A000342

NCDJALI6                    Rebuttal - Mr. Kinder

1   was arrested.  The defendant was just a pawn on the chessboard.

2   But even a pawn is part of the team, and the defendant was no

3   small pawn.  He played a major role in this fraud scheme.  He

4   was the money guy.  He was the fraudster who owned the

5   accounts.  That was the bank fraud.  He was the fraudster who

6   moved the money.  That was the money laundering.  He did those

7   things over and over again.  The scheme doesn't work without

8   someone performing that job.

9        And even if there are other fraudsters who hacked into

10  the emails and who impersonated victims on the phone, other

11  fraudsters who were ringleaders, other fraudsters who had

12  different or bigger roles, other fraudsters who found the

13  identity theft victims, that's all irrelevant to the

14  defendant's guilt.  He didn't have to play any of those other

15  roles to be part of the conspiracy.  All he had to do was agree

16  that he would do his part to make the scheme a success.

17       Again, listen to Judge Caproni's instructions when it

18  comes to the conspiracy charges.  I expect she'll instruct you

19  that the duration and extent of the defendant's participation

20  in the conspiracy doesn't matter.  The defendant does not need

21  to know all of the details of the conspiracy or know all of its

22  participants.  That's now how crime works, and that's not what

23  the law requires.

24       There is so much evidence of a conspiracy here.  The

25  dozens of passports with the defendant's face sent to the

A000343

NCDJALI6                    Rebuttal - Mr. Kinder

1    United States in the mail, passports that were obviously

2    intended for him.  The photos of messages on the defendant's

3    phone with account information, dates of birth, and Social

4    Security numbers.  The WhatsApp text chain with Agbogidi, read

5    through that chat when you're deliberating, government

6    Exhibit 401.  Those are two co-conspirators talking about the

7    accounts in their fraud schemes.

8            Sadia Mughal, Ramon G. Pastor, Agbogidi invites the

9    defendant to a party at the 995 East 78th Street address.  The

10   defendant was a part of a conspiracy with Agbogidi who lives

11   there.  The defendant tells Agbogidi to check the mail for

12   something from Citi.  That's the defendant talking about his

13   dirty accounts with a co-conspirator.

14           So what is the defense left with?  They can do nothing

15   but try to minimize his role in the conspiracy, but they cannot

16   eliminate it.  At the beginning of the presentation, Ms. Werner

17   said that what her client did was open the accounts with fake

18   IDs that others filled with money, but that is still bank

19   fraud.  Ms. Werner also spent some time talking about how the

20   defendant didn't know that the money coming from the accounts

21   was from fraud.  They're saying look, the defendant wasn't the

22   guy who convinced people to send victim money to the account,

23   so how could he have known that the money coming in was stolen?

24   But you know he knew the money was dirty.  Ms. Foster walked

25   you through the reasons why.

NCDJALI6                    Rebuttal - Mr. Kinder

1          Let me highlight a couple.  First and foremost, the

2     fake accounts which he opened in other people's names using

3     fake passports.  What possible legitimate purpose could there

4     be for opening an account in someone else's name using a fake

5     identity document?  There is none.  And the defendant didn't

6     just open one account.  He opened dozens of accounts in other

7     people's names using dozens of fake passports and fake IDs, all

8     with his photograph but other people's names, names that he

9     knew were not his.

10          And then he watched as deposit after deposit after

11    deposit poured into those accounts.  And he moved that money

12    around.  He took some for himself, and he wired some overseas.

13    You don't do that without knowing it's wrong.

14          Second, the tax returns.  You know the defendant knew

15    the money was dirty from his tax returns.  From 2017 to 2020,

16    he never reported any of the income that he received into these

17    bank accounts.  And you know he got income from these bank

18    accounts because you saw how he spent it.  He used about

19    $100,000 of it on personal items, Best Buy, Zara, Nordstrom,

20    Macy's, Rockaway Liquor.  And that doesn't include all of the

21    cash, the cash he withdrew at the ATMs over and over again.

22    That was income and he did not report it.  Why?  Because people

23    don't file taxes for the money they earn through fraud because

24    it's likely they'll get caught.

25          Here's another one that Ms. Foster didn't focus as

NCDJALI6                    Rebuttal - Mr. Kinder

1   much on, the photos on his phone.  Remember Government

2   Exhibit 309?  That's the photo of an envelope from Citibank's

3   fraud prevention department addressed to David Hudgins.  You

4   saw that this morning.  That name, David Hudgins, is one of the

5   names the defendant used to open an account.  The defendant had

6   a picture of that piece of mail saved on his phone, a letter

7   from Citibank's fraud department addressed to David Hudgins.

8          Or what about Government Exhibit 407, another picture

9   of a bank fraud alert on the defendant's phone?  That fraud

10  alert was addressed to Ronald Henry Nellen, one of the real

11  people you heard from whose identity was stolen.  That photo

12  was in the defendant's WhatsApp sent messages.  That means he

13  sent it.  The banks sent those alerts when they found

14  suspicious transaction activity in the accounts opened by the

15  defendant.  The defendant saw them.  He had pictures of those

16  fraud alerts.  That proves he knew that the accounts were used

17  for fraud.

18         And on top of that, he knew that all these accounts

19  that he kept opening kept getting closed.  You saw how quickly

20  he had to move the money to other accounts or else the banks

21  would catch it and reverse the transfer.  The defendant knew

22  the accounts were dirty accounts because he watched as they

23  kept getting closed for fraud, and he just kept opening new

24  ones.

25         I urge you to take a look at slide 16 of Government

A000346

NCDJALI6                     Rebuttal - Mr. Kinder

1    Exhibit 501, Ms. Bronson's presentation.  That's the slide with

2    all of the account opening timelines.  You'll see that the

3    accounts early on in the fraud scheme get closed, and then he

4    opens more and he opens more and he opens more and they get

5    closed.

6         Now, let's talk about the defense argument that the

7    defendant didn't know that the identities he used to open bank

8    accounts belonged to real people.  It's another distraction.

9    It's ridiculous.  You heard from three of the people whose

10   identities the defendant stole, real people sitting right

11   there.  You saw them, Sadia Mughal, Ronald Henry Nellen, Warren

12   Roberts.  You saw the photos on the defendant's phone with

13   names, dates of birth, and Social Security numbers including

14   Sadia Mughal's name and Social Security number.  Government

15   Exhibits 302 and 304.

16        You saw that the defendant used Social Security

17   numbers to open at least 15 of the fake accounts.  If someone

18   said to you, "Hey, can you open up some bank accounts for me,

19   but before you do that, here, have some of these names and

20   dates of birth and Social Security numbers.  Do it with these,"

21   common sense would tell you that those are the identities of

22   real people.  The scheme had to be believable, otherwise it

23   wouldn't work.  That's why he had to use specific names and

24   Social Security numbers that were given to him by the

25   fraudsters he was working with.

A000347

NCDJALI6                    Rebuttal - Mr. Kinder

1    And then you have his statements to the immigration
2    authorities:  Just weeks after the defendant opened multiple
3    fake accounts using other people's names, including Ronald
4    Henry Nellen, he certified to the immigration authorities that
5    he had never used any aliases.  You know that wasn't true.  In
6    fact, he had just used Nellen's name a few weeks earlier.  Why
7    did he do that?  Because he knew he was using the names of real
8    people and it was wrong.

9    The defense made a show of the fact that the account
10   that the defendant opened in the name of Wilhelm Heinz was not
11   a real person because the actual person was Heinz Wilhelm.
12   Another distraction.  You saw real people get up here and say
13   they never authorized the defendant to open accounts in their
14   name.  They want you to believe that just because some of the
15   information on the stolen identities was wrong like the order
16   of Heinz Wilhelm's name or the dates of birth, that shows you
17   the defendant must not have known he was using real identities.

18   They want you to believe that he opened account after
19   account after account using the names and dates and dates of
20   birth and Social Security numbers that were provided to him by
21   his co-conspirators, the sophisticated co-conspirators, as the
22   defense characterizes them.  And they want you to believe he
23   didn't know there were real people behind those identities.
24   You know that's crazy.  He was integral to the scheme.  He's
25   not opening that many accounts, making that many withdrawals,

A000348

NCDJALI6                    Rebuttal - Mr. Kinder

1   moving that much money around without knowing how the scheme

2   works.

3          They talked about how some of the identity information

4   that was provided to the defendant was not accurate, wrong

5   names wrong dates of birth.  That is not relevant to the

6   aggravated identity theft charge.  You don't have to steal

7   someone's entire identity to be guilty of aggravated identity

8   theft.  I expect that Judge Caproni will instruct you that you

9   only need to knowingly use a means of identification of another

10  person, which can be a name, signature, Social Security number,

11  date of birth, driver's license number, state identification

12  number, passport number, or address.  You only need to use one

13  name to be guilty of aggravated identity theft.  Ronald Henry

14  Nellen, Sadia Mughal, Warren Roberts.

15         And here's another reason that the government has

16  proved that the defendant knew the money was dirty and that the

17  identities he used were real people.  I expect that Judge

18  Caproni is going to instruct you that the knowledge requirement

19  can be satisfied if the defendant deliberately avoided learning

20  the truth about the source of the money and stolen identities.

21  The law calls this conscious disregard.

22         The law does not allow people — not just the

23  defendant, but anyone — to bury their head in the sand and

24  deliberately avoid learning the truth when the truth is trying

25  to get their attention.  You are entitled to find the defendant

A000349

NCDJALI6                     Rebuttal - Mr. Kinder

1    guilty if you look at the evidence and conclude that he put his

2    head in the sand, that he deliberately ignored all warning

3    signs and kept on committing the crime.

4           If you know there's a high probability that those

5    names are from real people and you deliberately disregard it,

6    that's the same as knowing it, and that's why the evidence of

7    the defendant's actions and words are such powerful evidence of

8    his knowledge.  Dozens of fakes passports with other people's

9    identities, the 36 accounts he opened with those fake passports

10   in other people's names, the money he moved through multiple

11   accounts he controlled while he was pretending to be those

12   other people, the messages on his phone with account

13   information, victim names, Social Security numbers, dates of

14   birth, the failure to report the fraud proceeds on his taxes,

15   his statement to immigration that he hadn't used other names,

16   this evidence can only mean one thing.  The defendant knew the

17   money was dirty and he was using the identities of real people.

18   He had to have known.  And if the defendant didn't know that

19   what he was doing was illegal, then it was only because he

20   deliberately avoided confirming the truth, and that makes him

21   guilty.

22          Ms. Werner spent some time in her closing talking

23   about the $6 million of deposits and withdrawals into the

24   accounts.  Let me be clear.  That is a distraction, and you

25   should not take the bait.  You do not need to decide how much

**A000350**

NCDJALI6                    Rebuttal - Mr. Kinder

1    money the victims lost.  That's not an element of any of the

2    charged crimes.  I expect that Judge Caproni will instruct you

3    that for bank fraud it is not relevant whether the victims

4    actually suffered any monetary loss.  Even if no victim lost a

5    single cent because the banks caught the fraudulent transfers

6    in time, it can still be bank fraud.  And even if there's only

7    a single dollar of victim loss, it can still be bank fraud.

8         The government needs to prove the existence of the

9    scheme to defraud the banks, not the amount of loss.  You know

10   that a scheme exists here.  And as Ms. Bronson explained to you

11   directly, the $6 million is not total victim losses.  That

12   calculation was never meant to identify total victim losses.

13   The $6 million is the total amount of deposits and withdrawals

14   in the fake accounts.  Transfers into and out of the fake

15   accounts, yes, that includes transactions where the defendant

16   moved stolen victim money from fake account to fake account to

17   fake account.

18        The defendant wants you to conclude that this means

19   the fraud isn't all that big, because the victims didn't lose

20   $6 million, that the government overpromised as to how bad this

21   all was.  That is the wrong takeaway.  Ms. Werner is missing

22   one of the central points of this trial.  This is a money

23   laundering case.  The $6 million is the amount of money that

24   moved into and out of the fake accounts opened by the

25   defendant.  Each of those inner account transfers of the same

A000351

NCDJALI6                    Rebuttal - Mr. Kinder

1    victim money that Ms. Werner talked about, they are not victim

2    losses.  They are transactions meant to conceal the proceeds of

3    fraud.  That is the money laundering.  It is the defendant

4    hiding the stolen victim money, deliberately making it hard to

5    count by moving it through the accounts he controlled in

6    different identities over and over again.

7              Can we bring up slide 71 of Ms. Foster's presentation.

8              We want you to study this slide when you deliberate.

9    This is the roadmap of the defendant's money laundering

10   activity.  It starts which a fraudulent transfer of $111,000

11   taken from Heinz Wilhelm's life insurance policy at Prudential.

12   Three days later, the defendant transfers $75,000 to the

13   Santander account that he opened in the name of Horay Textile.

14   He's on video making that transfer.  Mr. Novakowski showed that

15   to you.

16             Four days later, he writes a check for $65,000 to the

17   Sterling National Bank account he opened in the name of Sadia

18   Mughal.  A few weeks after that, he deposits a check from Sadia

19   Mughal for $64,136.26 into the JPMorgan Chase account he opened

20   in the name of Sadia Mughal.  He's on video making that

21   deposit.  Mr. Novakowski showed it to you.  And then, just over

22   a week later, the defendant wires $48,100 to a bank in Hong

23   Kong.  He's on video making that wire transfer.  Mr. Novakowski

24   showed it to you.

25             You should add up all these transactions.  It's not

**A000352**

NCDJALI6                    Rebuttal - Mr. Kinder

1    double counting victim losses.  It's counting the defendant's

2    money laundering transactions.  Those transactions prove that

3    the defendant is a money launderer.

4          We can take that down.

5          Defense talked to you about the burden of proof and

6    how high it is.  The government has to prove the charges beyond

7    a reasonable doubt.  That is our burden and we embrace it.  But

8    there is nothing mystical about the term "reasonable doubt."

9    The standard is not insurmountable.  It's a standard guided by

10   common sense.  It's the standard that has been used in every

11   criminal case in the history of this country.  Every day juries

12   reach verdicts in criminal cases.  The standard has been met

13   before and we have met it here.

14          MS. WERNER:  Objection.

15          THE COURT:  Overruled.

16          MR. KINDER:  When we started this trial, I asked you

17   to do three things:  First, pay close attention to the

18   evidence.  You've done that, and we thank you for it.  Second,

19   follow Judge Caproni's instructions on the law.  She's going to

20   give those instructions to you.  Third, use your common sense,

21   the common sense you use every day.  Don't let defense counsel

22   distract you.  Look at the evidence and the law and use your

23   common sense.  If you do those three things, you will see that

24   the evidence is overwhelming.  The defendant is guilty.

25          THE COURT:  Thank you, Mr. Kinder.

**A000353**

NCE5ali1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

                    v.                       22 Cr. 425 (VEC)

CHINWENDU ALISIGWE,

                    Defendant.

------------------------------x

                                             December 14, 2023
                                             9:20 a.m.

Before:

                    HON. VALERIE E. CAPRONI,

                                        U.S. District Judge


                         APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:   WILLIAM KINDER
        MEREDITH FOSTER
        ADAM HOBSON
        Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant Alisigwe
BY:   ARIEL C. WERNER
        SYLVIE J. LEVINE

NCE5ali1

1            (Trial resumed; jury not present)

2            THE DEPUTY CLERK:  Counsel, please state your

3 appearance for the record.

4            MR. KINDER:  Good morning, your Honor.  William

5 Kinder, Adam Hobson, and Meredith Foster for the government.

6            THE COURT:  Good morning.

7            MS. WERNER:  Good morning, your Honor.  Federal

8 Defenders by Ariel Werner and Sylvie Levine, here with

9 Mr. Alisigwe.

10            THE COURT:  Good morning.

11            Good morning, everybody.  Please, be seated.

12            My deputy got a call at 2 till 9 from juror no. 3

13 saying he anticipated being late again today, he wasn't sure

14 when he would be here, maybe by 9:45, but he wasn't yet on a

15 train.  He is staying with his brother in Queens, he lives in

16 Hunters Point, he is going to be late.

17            Does anybody want to be heard on whether he should be

18 excused and we should seat alternate no. 1 so we can go ahead

19 and start?  The rest of the jury is here.

20            (Counsel conferring)

21            THE COURT:  Does the defendant want to be heard?

22            MS. WERNER:  Your Honor, we would object to excusing

23 him at this point.  While we agree that it is certainly rude to

24 show up even 15 minutes late when the Court has instructed him

25 to be here at a certain time, we don't agree that it would be

**A000355**

NCE5ali1

1    grounds to excuse him at this point and would prefer to give

2    him a little bit more of a grace period.

3          THE COURT:  How much of a grace period do you want to

4    give him?  I remember that I specifically told them all last

5    night if they were getting here late, they need to get on an

6    earlier train.

7          MS. WERNER:  I think 15 minutes would be appropriate.

8          THE COURT:  15 minutes?  We don't even give a full

9    professor 15 minutes anymore.

10          Look.  Let me explain my thought on this.  I would

11    like to get a verdict today; I think it is in everyone's

12    interest, including your client's.  That means the earlier they

13    start deliberating, the earlier we get a verdict and it is less

14    likely to go over.  I am prepared to give him, because he is

15    not late yet, what we have got is his phone call giving me

16    every reason to believe he is going to be late.

17          MS. WERNER:  We think the jury is likely to finish its

18    deliberations today.  This was not a complex case, it was less

19    than three days of testimony and I think that that 15 minutes

20    is unlikely to make a difference and prevent them from

21    achieving the end of their deliberations today.

22          THE COURT:  Mr. Kinder?

23          MR. KINDER:  The government doesn't take a position.

24          THE COURT:  All right.  Let me just say, I'm going to

25    grant the request to give him 15 minutes but what the defense

A000356

NCE5ali1

```
1   is doing is imposing on 11 people, 12 people, 13 people --
2   whatever it is -- an incredible inconvenience.  They're sitting
3   back here, they got here on time, and one knucklehead who
4   refuses to get on the train on time is holding everything up.
5   So, again, I'm going to grant it, but recognize that you are
6   imposing on a lot of solid citizens wasted time.
7            (Recess)
8            THE COURT:  Please be seated.  It is now 9:45 and he
9   has not arrived.  The defense doesn't object to him being
10  excused at this point, correct?
11           MS. WERNER:  Correct.
12           THE COURT:  Let's seat alternate no. 1 as juror no. 3.
13  Everybody else stays in the same seat.
14           THE DEPUTY CLERK:  Do you want the alternate juror to
15  bring his stuff out, the last one?
16           THE COURT:  Yes.
17           Do you have the exhibits ready to go?
18           MR. KINDER:  Yes.  They've been provided to
19  Ms. Caliendo.
20           THE COURT:  And you have signed off on the drive?
21           MS. WERNER:  We have.
22           (Continued on next page)
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000357**

NCE5ali1                    Charge

1             (Jury present)

2             THE COURT:  Please be seated, everyone.

3             Good morning, everybody.

4             THE JURY:  Good morning.

5             THE COURT:  Thank you for your patience.  As you see,

6    we have now seated alternate no. 1 as juror no. 3.  Juror no. 3

7    will be excused.  I have a binder on your chair.  You can turn,

8    if you like, to page no. 3 of the binder.

9             Members of the jury, you have now heard all of the

10   evidence.  I am now going to instruct you on the law that

11   governs the case.  There are three parts to these instructions.

12            First, I will provide you with some general

13   instructions about your role and about how you are to decide

14   the facts of the case.  These instructions would apply to just

15   about any trial.

16            Second, I will give you specific instructions about

17   the legal rules applicable to this particular case.

18            Third, I will give you instructions on the general

19   rules governing your deliberations.

20            I will read most of this.  It is not my favorite way

21   to communicate with a jury, but because there is a need for

22   precision, it is important that I get the words just right so

23   that's why I will be reading.

24            I have provided each of you with a copy of the charge.

25   If you find it easier to listen and understand while you are

A000358

NCE5ali1                    Charge

1    reading along, please do so.  If you would prefer, you can just

2    listen.  Either way, you will have a copy of the charge with

3    you in the jury room so you can consult it if you want to

4    reread any portion to facilitate your deliberations.  You will

5    also have in the jury room a verdict form on which to record

6    your verdict, that should be in the pocket of your binder.

7              It is my duty to instruct you on the law just as it

8    has been my duty to preside over the trial and decide what

9    testimony and evidence is relevant for your consideration.  It

10   is your duty to accept my instructions on the law and to apply

11   them to the facts as you have determined them.

12             On legal matters, you must take the law as I give it

13   to you.  You may not substitute your own notions or opinions of

14   what the law is or ought to be.  You should not be concerned

15   about the wisdom of any rule that I state.  Regardless of any

16   opinion that you may have as to what the law is or should be,

17   it would violate your sworn duty to base a verdict upon any

18   view of the law other than that which I give you.

19             If any attorney has stated a legal principle different

20   from what I tell you, you must follow my instructions.  You

21   should not single out any particular instruction as alone

22   stating the law.  You should consider my instructions as a

23   whole as you deliberate.

24             You should not infer from anything I have said or done

25   during this trial that I have any view on the credibility of

A000359

NCE5ali1                    Charge

1    the witnesses, or any view about how you should decide the

2    case.  I have no opinion as to the facts or the verdict that

3    you render in this case.

4           You are the sole and exclusive judges of the facts.

5    You determine the credibility of the witnesses.  You resolve

6    any conflicts that may exist in the evidence.  You draw

7    whatever reasonable inferences you decide to draw from the

8    facts as you have determined them, and you determine the weight

9    to give the various pieces of evidence.

10          You must base your discussions and decisions solely on

11   the evidence presented to you during the trial and that

12   evidence alone.  You may not consider or speculate on matters

13   not in evidence, or matters outside the case.

14          As I told you at the outset of the case, it is the

15   duty of the attorneys to object when the other side offers

16   testimony or evidence that the attorney believes is not

17   properly admissible.  Therefore, you should draw no inference

18   if an attorney objected to evidence.  Nor should you draw any

19   inference from the fact that I may have sustained or overruled

20   an objection.

21          You are required to evaluate the evidence calmly and

22   objectively, and you must be completely fair and impartial.

23   Your verdict must be based solely on the evidence introduced at

24   this trial or the lack of evidence.  The parties in this case

25   are entitled to a trial free from prejudice or bias for or

NCE5ali1                    Charge

1    against either side.  Our judicial system works only if you

2    reach your verdict through a completely fair and impartial

3    consideration of the evidence.

4           In deciding the facts of the case, it would be

5    improper for you to consider any personal feelings you may have

6    about any party or any witness, any punishment that might be

7    imposed, or any other such irrelevant factor.  This case must

8    be decided by you as an action between parties of equal

9    standing in the community and of equal worth.  All parties are

10   entitled to the same fair trial.  The government and the

11   defendant stand as equals before the law and are to be dealt

12   with as equals in this court.

13          The defendant, Chinwendu Alisigwe, is charged with

14   several crimes.  Please bear in mind that a charge is not

15   evidence of anything and that Mr. Alisigwe is presumed

16   innocent.

17          The government has the burden of proving every element

18   of each charge beyond a reasonable doubt.  If the government

19   succeeds in meeting its burden on a particular charge, your

20   verdict must be guilty on that charge.  If it fails, your

21   verdict must mean not guilty as to that charge.  The burden of

22   proof never shifts to the defendant.  The law presumes every

23   defendant to be innocent and therefore never imposes upon a

24   defendant in a criminal trial the burden or duty of calling any

25   witnesses or producing any evidence.

A000361

NCE5ali1                        Charge

1      In other words, as to each charge, the defendant

2  starts with a clean slate and is presumed innocent until such

3  time, if ever, that you as a jury are satisfied that the

4  government has proved beyond a reasonable doubt that he is

5  guilty of that crime.

6      The question then becomes what is reasonable doubt.

7      The words almost define themselves.  It is a doubt

8  based on reason and common sense.  It is a doubt that a

9  reasonable person has after carefully weighing all of the

10  evidence.  It is a doubt that would cause a reasonable person

11  to hesitate to act in a matter of importance in his or her

12  personal life.

13      Proof beyond a reasonable doubt must, therefore, be

14  proof that is so convincing that a reasonable person would not

15  hesitate to rely upon in making an important decision if his or

16  her own life.

17      Proof beyond a reasonable doubt is not, however, proof

18  beyond all possible doubt.  A reasonable doubt is not a doubt

19  based on Caprice or whim.  Nor is it a doubt based on

20  speculation or suspicion.  Reasonable doubt is also not an

21  excuse to avoid the performance of an unpleasant duty.

22      If, after fair and impartial consideration of the

23  evidence, you have a reasonable doubt as to the defendant's

24  guilt as to a particular charge, then you must find him not

25  guilty on that charge.  On the other hand, if after fair and

**A000362**

NCE5ali1                    Charge

1    impartial consideration of all of the evidence you are

2    satisfied beyond a reasonable doubt of the defendant's guilt on

3    that charge, then you must find him guilty of that charge.

4              I am going to take a moment to describe to you what is

5    and is not evidence in this case.

6              As I have said, you must rely only on evidence in your

7    deliberations.  The evidence in this case is the sworn

8    testimony of the witnesses, the exhibits, and the stipulations

9    that were received in evidence.  Other things are not evidence.

10             A question by a lawyer is not evidence.  The

11   witnesses' answers are evidence, not the question.  Similarly,

12   documents that lawyers provided to witnesses to refresh their

13   recollection are not evidence.  Only the witnesses' answers are

14   evidence.

15             Arguments by lawyers are not evidence.  What the

16   attorneys said in their opening statements and in their

17   summations was intended to help you understand the evidence and

18   to reach a verdict.  If your recollection of the facts differs

19   from the attorneys' statements, it is your recollection that

20   controls.

21             Statements that I may have made concerning the

22   evidence are not evidence.

23             Testimony that has been stricken or excluded is not

24   evidence and it may not be considered by you in rendering your

25   verdict.

A000363

570

NCE5ali1                    Charge

1      Anything you may have seen or heard outside the

2    courtroom is not evidence.

3      Now I will discuss what is evidence.  Evidence may

4    come in several forms:

5      The sworn testimony of witnesses, regardless of who

6    called the witness, is evidence.  This is true of the

7    witnesses' answers on both direct and cross-examination.

8      The exhibits that were admitted during the trial are

9    evidence.

10      The stipulations that both parties agreed to and read

11   during the trial are evidence.  You must accept as true the

12   facts to which the parties stipulate.  Some of the stipulations

13   were about what witnesses would have said if he or she had been

14   called to testify.  You must accept as true the fact that the

15   witness would have given that testimony but it is up to you to

16   determine the weight or importance of that testimony.

17      Generally, there are two types of evidence that you

18   may consider in reaching your verdict, direct and

19   circumstantial.

20      Direct evidence is testimony by a witness about

21   something he or she knows by virtue of his or her own senses;

22   something that he or she has done, seen, felt, touched, or

23   heard.  For example, if a witness testified that on the day in

24   question she was in her office and she could see that it was

25   raining all day, that would be direct evidence about the

A000364

NCE5ali1                   Charge

1    weather that day.

2              Circumstantial evidence is evidence of one fact from

3    which you may infer the existence of other facts.  For example,

4    assume that a witness testified that his office does not have a

5    window.  On the day in question, however, he saw numerous

6    people coming into the office with wet raincoats and carrying

7    dripping umbrellas.  That testimony about wet raincoats and

8    dripping umbrellas is circumstantial evidence that it was

9    raining that day.  So, even though you have no direct evidence

10   regarding the weather, you have circumstantial evidence that it

11   was raining.

12             With circumstantial evidence you must be careful to

13   draw reasonable inferences that reflect all of the evidence.

14   For example, if you live in the city and you wake up in the

15   morning and you see that the sidewalk is wet but the street is

16   dry, it is not reasonable to infer that it rained last night.

17   Instead, a more reasonable inference is that the building staff

18   has hosed down the sidewalk.

19             That is all there is to circumstantial evidence.  You

20   infer on the basis of reason and common sense from one fact --

21   in my first example dripping raincoats and umbrellas -- the

22   existence or non-existence of some other fact, in that case

23   rainy weather.  When circumstantial evidence is presented it is

24   of no less weight than direct evidence.

25             You have had the opportunity to observe the witnesses.

A000365

NCE5ali1                    Charge

1    You are the sole judges of the credibility of each witness and

2    the importance of his or her testimony.  Decide what testimony

3    to believe and what not to believe.  Consider each witnesses'

4    demeanor and manner of testifying, the witness' opportunity to

5    see, hear, and know about the events described, the witness'

6    ability to recall and describe those things, the reasonableness

7    of the testimony in light of all the other evidence in the

8    case.  Consider whether part of a witness' testimony was

9    contradicted or supported by other testimony, by what the

10   witness said or did on a particular occasion, or by the

11   testimony of other witnesses or by other evidence.

12        You should consider whether the witness had an

13   opportunity to observe the facts he or she testified about.

14   You should also consider whether the witness' recollection of

15   the facts stands up in light of all the other evidence in the

16   case.

17        If you find that a witness has willfully testified

18   falsely as to an important matter, you may disregard the

19   witness' entire testimony, or you may accept as much of the

20   testimony as you find to be true and disregard what you find to

21   be false.  A witness may have been mistaken or may have lied in

22   part of his or her testimony while being accurate and truthful

23   in other parts.

24        In deciding whether to believe a witness, you should

25   specifically note any evidence of hostility or affection that

A000366

NCE5ali1                    Charge

1    the witness may have had for or against the defendant.

2    Likewise, you should consider evidence of any other interest or

3    motive that the witness may have in cooperating with or helping

4    either party.

5         It is your duty to consider whether the witness has

6    permitted any such bias or interest to color his or her

7    testimony.  If you find that a witness is biased, you should

8    view his or her testimony with caution, weigh it with care, and

9    subject it to close and searching scrutiny.

10        Of course, the mere fact that a witness is interested

11   in the outcome of the case does not mean the witness has not

12   told the truth.  It is for you to decide from your observations

13   and applying your common sense and experience, and all the

14   other considerations mentioned, whether the possible interest

15   of a witness in the outcome of the case has intentionally or

16   otherwise colored or distorted his or her testimony.  You are

17   not required to believe or disbelieve an interested witness.

18   You may accept as much of the testimony as you deem reliable

19   and reject as much as you deem unworthy of belief.

20        You have heard testimony from law enforcement

21   officials.  The fact that a witness may be employed as a law

22   enforcement official or government employee does not mean that

23   his or her testimony is necessarily deserving of more or less

24   consideration, or greater or lesser weight than that of an

25   ordinary witness.

NCE5ali1                    Charge

1        You have heard evidence during the trial that certain

2   witnesses met with the attorneys before the witness appeared in

3   court.  There is nothing either unusual or improper about a

4   witness meeting a lawyer before testifying.  Such a meeting

5   allows the witness to know the subjects that he or she will be

6   questioned about, focus on those subjects, and have the

7   opportunity to review relevant exhibits before being questioned

8   about them.  Such consultation makes the trial process more

9   efficient.  In fact, it would be unusual for a lawyer to call a

10  witness without such consultation.

11       What weight, if any, you give to the fact or nature of

12  the witness' preparation for his or her testimony and what

13  inferences you draw from such preparation are matters

14  completely within your discretion.

15       In short, what you must try to do in deciding

16  credibility is to size up a person just as you would in any

17  important matter in your own life where you are trying to

18  decide if a person is truthful, straightforward, and accurate

19  in his or her recollection.

20       The government has presented exhibits in the form of

21  charts and summaries.  These exhibits purport to summarize the

22  underlying evidence that was used to prepare them.  The summary

23  charts are no better evidence than the testimony or documents

24  upon which they are based.  I decided to admit these charts and

25  summaries in order to save time.  You should consider these

A000368

NCE5ali1                    Charge

1   charts and summaries as you would any other evidence.

2         There are several persons whose names you have heard

3   during the course of the trial who did not testify.  I instruct

4   you that each party had an equal opportunity or lack of

5   opportunity to call those witnesses.  Therefore, you should not

6   draw any inferences or reach any conclusions as to what such

7   witnesses would have said had they been called.  Their absence

8   should not affect your judgment in any way.

9         You should, however, remember that the law does not

10  impose on a defendant in a criminal case the burden or duty of

11  calling any witnesses or producing any evidence.

12        Some of the people who may have been involved in the

13  events at issue in this trial are not on trial.  You may not

14  draw any inference from the fact that persons other than the

15  defendant were not named as defendants in the indictment, nor

16  may you speculate as to the reasons why other persons are not

17  on trial.  Those matters are wholly outside your concern and

18  have no bearing on your function as jurors.

19        Mr. Alisigwe did not testify in this case.  Under our

20  Constitution, a defendant has no obligation to testify or to

21  present any evidence.  You may not attach any significance to

22  the fact that the defendant did not testify.  You may not draw

23  any adverse inference against the defendant because he did not

24  testify.  No defendant is ever required to prove that he is

25  innocent.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A000369**

NCE5ali1                    Charge

1          Among the exhibits admitted into evidence were

2     documents that were redacted.  Redacted means that part of the

3     document was removed or blacked out.  You are to concern

4     yourself only with the part of the item that has been admitted

5     into evidence.  You should not consider any possible reason why

6     the remainder has been redacted or speculate as to what may

7     have been redacted that was not introduced into evidence.

8          All of the evidence that was admitted at trial,

9     including evidence seized during the searches you heard about,

10    was lawfully collected and may be considered by you.  The

11    government's investigation, what it did, and what it did not

12    do, is not an issue.  The issue for you to decide is whether

13    the evidence presented to you is sufficient to prove the crimes

14    charged beyond a reasonable doubt.

15         Now let's turn to the specific charges against

16    Mr. Alisigwe.

17         Mr. Alisigwe is charged with bank fraud, conspiracy to

18    commit bank fraud, aggravated identity theft, and conspiracy to

19    commit money laundering.

20         You must consider and return a verdict as to each

21    count.  There is no significance to the order of the counts or

22    to the specific number of counts charged.  To that end, my

23    charge will not track the order of the charges as they appear

24    in the indictment, although the verdict sheet will.  So, the

25    verdict sheet is in a different order than this charge.  I'm

A000370

NCE5ali1                    Charge

1   going to start with Count Two.

2           So, Count Two charges Mr. Alisigwe with bank fraud.

3   Bank fraud has three elements:

4           First, a scheme to obtain money or property that was

5   under the custody or control of a bank by means of materially

6   false or fraudulent pretenses, representations, or promises;

7           Second, the defendant acted knowingly, willfully, and

8   with a specific intent to obtain money or property that was

9   under the control of a bank; and

10          Third, at the time of the scheme the bank that was the

11  target of the scheme was insured by the Federal Deposit

12  Insurance Corporation.

13          The defendant must prove each element beyond a

14  reasonable doubt.

15          MS. WERNER:  Your Honor?  I'm sorry.  The government.

16          THE COURT:  What did I say?

17          MS. WERNER:  Defendant.

18          THE COURT:  Oh.  I'm terribly sorry.

19          The government must prove each element beyond a

20  reasonable doubt.

21          The first element is that there was a scheme to obtain

22  money or property that was under the custody or control of a

23  bank by means of materially false or fraudulent

24  representations.

25          A scheme is simply a plan, device, or course of

A000371

NCE5ali1                    Charge

1    conduct to accomplish an objective.

2            A representation is false if it was untrue when it was

3    made.  Deceitful statements of half-truths or the concealment

4    of material facts also constitute false representations.  A

5    fact is material if it is a fact that a reasonably prudent

6    person would consider important -- would consider to be

7    important or would rely upon in making a decision.

8            The government does not have to prove that the bank

9    actually relied on the false or fraudulent representation.  It

10   is sufficient for the government to prove that the

11   misrepresentation was one that is capable of influencing a

12   decision-maker's decision.

13           Similarly, it does not matter whether that the bank

14   might have discovered the fraud if it had probed further.  If

15   you find a scheme had existed, it is irrelevant whether the

16   victim of the fraud was careless or negligent, or whether the

17   victim actually suffered any monetary loss.

18           The second element is that the defendant participated

19   in the scheme knowingly, willfully, and with a specific intent

20   to obtain money or property that was under the control of a

21   bank.

22           To act knowingly means to act voluntarily and

23   deliberately, rather than mistakenly or inadvertently.  To act

24   willfully means to act voluntarily and with a wrongful purpose.

25   A person acts intentionally if he acts deliberately and

**A000372**

NCE5ali1                    Charge

1  purposefully.  That is, the defendant's actions must have been

2  his conscious objective rather than the product of mistake,

3  accident, negligence, or some other innocent reason.

4       That said, good faith is a complete defense to a

5  charge of bank fraud.  The defendant acted in good faith if he

6  honestly believed that all material facts were disclosed, or

7  honestly believed that his acts were lawful, even if that

8  belief turned out to be incorrect.  The defendant has no burden

9  to establish good faith.  The burden is on the government to

10 prove intent and the consequent lack of good faith beyond a

11 reasonable doubt.

12      The third element is that at the time of the scheme

13 the bank that was the target of the scheme was federally

14 insured.  I instruct you as a matter of law that banks insured

15 by the Federal Deposit Insurance Corporation, or "FDIC", are

16 federally insured.

17      It is not necessary for the government to prove that

18 the defendant knew that the financial institution was federally

19 insured.

20      Mr. Alisigwe is charged both with committing bank

21 fraud and with aiding and abetting the commission of bank

22 fraud.  You should consider whether the government has proved

23 Mr. Alisigwe is guilty on an aiding and abetting theory only if

24 you have first determined that the government has not proved

25 that he, himself, committed bank fraud.

A000373

580

NCE5ali1                    Charge

1      The aiding and abetting statute provides, in relevant

2  part, that whoever commits an offense or aids, abets, counsels,

3  commands, induces, or procures its commission, is punishable as

4  a principal.  What that means is that even if a particular

5  defendant did not himself commit the crime with which he is

6  charged, the government may meet its burden of proof by proving

7  that (i) another person actually committed the offense with

8  which the defendant is charged; and (ii) the defendant aided or

9  abetted that person in the commission of the offense.

10     In order to prove the defendant guilty as an aider or

11  abettor the government must prove the following elements beyond

12  a reasonable doubt:

13     First, that another person committed bank fraud as I

14  have explained it to you;

15     Second, that the defendant, knowing that the crime was

16  being committed, intentionally associated himself with the

17  crime; and

18     Third, that the defendant intentionally took some

19  action to make the crime succeed.

20     I previously charged you on what it means to act

21  knowingly and intentionally.  Please note, however, that the

22  law does not permit guilt by association.  A defendant is only

23  guilty of aiding and abetting a crime if, in addition to

24  knowing of the criminal activity, he actually took actions

25  intended to make the crime succeed.

**A000374**

NCE5ali1          Charge

1        If you find that the government has proved beyond a

2   reasonable doubt that Mr. Alisigwe committed bank fraud, or if

3   you find that the government proved beyond a reasonable doubt

4   that the defendant aided and abetted the commission of bank

5   fraud, then you must find Mr. Alisigwe guilty of bank fraud.

6   On the other hand, if you find that the government failed to

7   prove one or more elements of bank fraud and has failed to

8   prove that Mr. Alisigwe aided and abetted the commission of

9   bank fraud, then you must find Mr. Alisigwe not guilty of bank

10  fraud.  Either way, you must record your verdict in response to

11  Question 2 on the question sheet.

12       Count One charges Mr. Alisigwe with conspiracy to

13  commit bank fraud.

14       Conspiracy to commit bank fraud has two elements:

15          First, a conspiracy to commit bank fraud existed; and

16          Second, the defendant knowingly and intentionally

17  joined the agreement with the intent to accomplish the unlawful

18  purpose.

19       The government must prove both elements beyond a

20  reasonable doubt.

21       The first element is the existence of a conspiracy,

22  the goal of which was to commit bank fraud.  There are two

23  parts to the first element:  An agreement and an illegal goal.

24       Starting with the first part of the first element, a

25  conspiracy is just an agreement between two or more people.  To

A000375

NCE5ali1                    Charge

1   establish the existence of a conspiracy, the government is not

2   required to prove that two or more people sat around a table

3   and entered into a formal agreement.  It is sufficient for the

4   government to prove that two or more people, in some way or

5   manner, reached a common understanding.

6        The second part of the first element is an illegal

7   goal.  The indictment alleges that the goal of the conspiracy

8   was bank fraud.  In deciding whether the goal of the conspiracy

9   was to commit bank fraud, you should consider my previous

10  instructions on what constitutes bank fraud.

11       The second element is that the defendant knowingly and

12  intentionally joined the conspiracy with the intent to

13  accomplish the unlawful objective.

14       I have previously instructed you on what it means to

15  act knowingly and intentionally, and you should apply those

16  definitions here.

17       It is not necessary for the government to prove that

18  the defendant was fully informed of all of the details of the

19  conspiracy, or that he knew all of the participants.  He need

20  only know one other member of the conspiracy and need only know

21  one of its unlawful goals.

22       The duration and extent of the defendant's

23  participation in the conspiracy has no bearing on the

24  defendant's guilt.  He can join the conspiracy at any point and

25  need not have received any benefit in return.  Once formed, the

A000376

NCE5ali1                    Charge

1    conspiracy is presumed to continue until either its objective

2    is accomplished or there is some affirmative proof that the

3    defendant withdrew and disassociated himself from it.

4              On the other hand, merely being associated or friendly

5    with a conspirator does not make the defendant a member of the

6    conspiracy, even if he knows that the conspiracy exists.  Mere

7    presence at the scene of a crime, even coupled with knowledge

8    that a crime is taking place, is not sufficient to support a

9    conviction.  Put differently, knowledge and association are not

10   enough.  The defendant must have intentionally participated in

11   the conspiracy with knowledge of its unlawful purpose and with

12   the intent to aid in the accomplishment of its unlawful goal.

13             Please bear in mind that conspiracy to commit bank

14   fraud is an entirely distinct and separate offense from bank

15   fraud itself.  The actual commission of bank fraud is not an

16   element of the crime of conspiracy to commit bank fraud.

17             If you find that the government has proved beyond a

18   reasonable doubt that Mr. Alisigwe conspired to commit bank

19   fraud, then you must find Mr. Alisigwe guilty of Count One.  On

20   the other hand, if you find that either element has not been

21   proved beyond a reasonable doubt, then you must find

22   Mr. Alisigwe not guilty of Count One.  Either way, you must

23   record your verdict in response to Question 1 on the verdict

24   sheet.

25             Count Three charges Mr. Alisigwe with aggravated

A000377

NCE5ali1                    Charge

1    identity theft.  You should consider Count Three if, but only

2    if, you have found Mr. Alisigwe guilty of either Count One or

3    Count Two, or both.  Aggravated identity theft has three

4    elements:

5            First, the defendant knowingly used, transferred, or

6    possessed a means of identification of another person;

7            Second, the defendant used, transferred, or possessed

8    a means of identification of another person during and in

9    relation to the crimes charged in Count One or Count Two; and

10            Third, the defendant acted without lawful authority.

11            The government must prove each element beyond a

12   reasonable doubt.  The first element is the defendant knowingly

13   used, transferred, or possessed a means of identification of

14   another person.

15            The terms "transfer," "possess," and "use" have their

16   common meanings.  The government need only prove one of these,

17   but the government must be unanimous as to which act you find

18   has been proven.

19            The term "means of identification" means any name or

20   number that may be used, alone or in conjunction with other

21   information, to identify a specific individual.  Means of

22   identification includes but is not limited to a name,

23   signature, Social Security number, date of birth, driver's

24   license number, state identification number, passport number,

25   or address.  The means of identification must be that of an

A000378

NCE5ali1                    Charge

1    actual person living or dead.

2           The government must prove that at the time the means

3    of identification was used, transferred, or possessed, the

4    defendant knew it was the means of identification of an actual

5    person.  I have previously charged you on what it means to act

6    knowingly and that definition applies here as well.

7           The second element is that the use, transfer, or

8    possession of the means of identification was during and in

9    relation to either of the crimes charged in Counts One or Count

10   Two.

11          "During and in relation to" another offense means that

12   the means of identification was at the crux of that crime, here

13   bank fraud or conspiracy to commit bank fraud.  Put

14   differently, the means of identification must have been a key

15   mover in the crime in which it was used.

16          The third element is that the defendant acted without

17   lawful authority when he used, transferred, or possessed the

18   means of identification of another person.  A person acts

19   without lawful authority when he acts without the consent or

20   knowledge of the person whose means of identification he is

21   using.  A person also acts without lawful authority when he

22   uses a means of identification of another person in furtherance

23   of a crime, even if he does so with the person's consent.

24          If you find that the government has proved beyond a

25   reasonable doubt that the defendant committed aggravated

A000379

NCE5ali1                    Charge

1    identity theft, then you should not consider whether he is

2    guilty as an aider and abettor.

3              If you find the government has not proved that the

4    defendant himself committed aggravated identity theft, then you

5    must consider whether he is guilty as an aider and abettor.

6              I have previously charged you on what it means to aid

7    and abet the commission of a crime and you should apply that

8    charge here.

9              If you find that the government has proved beyond a

10   reasonable doubt that Mr. Alisigwe committed aggravated

11   identity theft, or if you find that the government has proved

12   beyond a reasonable doubt that the defendant aided and abetted

13   the commission of aggravated identity theft, then you must find

14   Mr. Alisigwe guilty of Count Three.  On the other hand, if you

15   find that the government failed to prove one or more elements

16   of aggravated identity theft and failed to prove that

17   Mr. Alisigwe aided and abetted the commission of aggravated

18   identity theft, then you must find Mr. Alisigwe not guilty of

19   Count Three.  Either way, you must record your verdict in

20   response to question 3 on the verdict sheet.

21             Finally, Mr. Alisigwe is charged with conspiracy to

22   commit money laundering.

23             Conspiracy to commit money laundering has two

24   elements:

25             First, a conspiracy to commit money laundering

A000380

NCE5ali1                    Charge

1    existed; and

2              Second, the defendant knowingly and intentionally

3    joined the agreement with the intent to accomplish the unlawful

4    purpose.

5              The government must prove both elements beyond a

6    reasonable doubt.

7              As I previously charged you, a conspiracy requires an

8    agreement and an illegal goal.

9              I have previously charged you on what the government

10   has to prove to satisfy its burden of proof on there being an

11   agreement and you should apply that instruction here.

12             The indictment charges that the goal of this

13   conspiracy was money laundering.  Money laundering has four

14   elements:

15             First, the defendant conducted or attempted to conduct

16   a financial transaction;

17             Second, the financial transaction involved the

18   proceeds of specified unlawful activity which here is alleged

19   to be wire fraud;

20             Third, the defendant knew that the financial

21   transaction would involve the proceeds of some form of illegal

22   activity -- of unlawful activity; and

23             Fourth, that the defendant knew that the transaction

24   was designed, in whole or in part, to conceal or disguise the

25   nature, location, source, ownership, or control of the proceeds

A000381

NCE5ali1                    Charge

1    of the unlawful activity.

2            The first element of money laundering is that the

3    defendant conducted or attempted to conduct a financial

4    transaction.

5            A "financial transaction" is (1) a transaction that

6    affects interstate or foreign commerce by moving funds by wire

7    or other means or by use of one or more monetary instruments;

8    or (2) a transaction that uses a financial institution that is

9    engaged in or the activities of which affect interstate or

10   foreign commerce.  A "monetary instrument" is anything that

11   represents money such as coins or currency, personal checks,

12   cashier's checks, bank checks, or money orders.  A "financial

13   institution" includes a bank that is insured by the FDIC, a

14   commercial bank, a foreign bank, or an issuer, redeemer, or

15   cashier of checks or money orders.

16           The term "interstate or foreign commerce" means

17   commerce between states, territories, or possessions of the

18   United States, or between the United States and a foreign

19   country.  "Commerce" includes acts and transactions that cross

20   state or national lines or which affect the flow of money.  A

21   minimal effect is sufficient and the government is not required

22   to prove that the defendant knew the transaction would affect

23   interstate or foreign commerce.

24           The second element of money laundering is that the

25   funds involved in the financial transactions were the proceeds

A000382

NCE5ali1                    Charge

1    of some form of a specified unlawful activity that is a felony.

2              In this case the government charges that the funds at

3    issue were the proceeds of wire fraud.  I charge you that as a

4    matter of, law wire fraud is a specified unlawful activity and

5    it is a felony.  The government does not have to prove that the

6    defendant himself committed wire fraud.  It need only prove

7    that the financial transaction that was part of the conspiracy

8    involved funds that were the proceeds of wire fraud committed

9    by someone.

10             There are three elements of wire fraud:

11             First, a scheme to defraud.  I have already instructed

12   you on what a scheme is and that definition applies here.

13   Fraud is a general term that includes all possible means by

14   which a person seeks to gain an unfair advantage over another

15   by making false representations, false suggestions, false

16   pretenses, or by concealing material facts.  Thus, a scheme to

17   defraud is a plan or course of action to deprive another of

18   money or property by making false representations regarding

19   material facts.  As I instructed you earlier, a fact is

20   material if it is a fact that a reasonably prudent person would

21   consider to be important or would rely upon in making a

22   decision.  The government need not prove that anyone

23   experienced a financial loss from the scheme.

24             Second, that the perpetrator knowingly and willfully

25   participated in the scheme with the specific intent to defraud.

A000383

NCE5ali1                    Charge

1    I have already defined what it means to act knowingly,

2    willfully, and with intent to defraud in my earlier

3    instructions apply here as well.

4          Third, that the perpetrator used or caused the use of

5    interstate wire communications in furtherance of that scheme to

6    defraud.  Telephone calls, faxes, e-mails, or bank transfers of

7    money that pass between two or more states or between the

8    United States and a foreign country are all examples of

9    interstate wire communications.  The wire communication itself

10   need not be fraudulent but the wire communication must have in

11   some way furthered or advanced the scheme to defraud.  It is

12   not necessary that any of the participants in the wire fraud

13   scheme were directly or personally involved in any wire

14   communication, as long as it was reasonably foreseeable that a

15   wire communication would occur in the execution of the scheme

16   to defraud.

17         The third element of money laundering is that the

18   defendant knew the funds involved in the financial transaction

19   were the proceeds of some sort of unlawful activity.  The

20   government does not have to prove that the defendant knew the

21   funds were proceeds of any particular offense.  It need only

22   prove that the defendant knew that the funds involved were the

23   proceeds of some sort of illegal activity.

24         The fourth element of money laundering is that the

25   defendant knew that the financial transaction was designed, in

A000384

NCE5ali1          Charge

1  whole or in part, to conceal or disguise the nature, location,

2  source, ownership, or control of the proceeds of the unlawful

3  activity.

4       The second element of conspiracy to commit money

5  laundering is that the defendant knowingly and intentionally

6  joined the conspiracy for the purpose of furthering the

7  unlawful objective.  I have already instructed you on what it

8  means to act knowingly and intentionally, and those

9  instructions apply here too.

10       As with the conspiracy to commit bank fraud, please

11  bear in mind that conspiracy to commit money laundering is an

12  entirely distinct and separate offense from money laundering

13  itself.  The actual commission of money laundering is not an

14  element of the crime of conspiracy to commit money laundering.

15       If you find that the government has proved beyond a

16  reasonable doubt that Mr. Alisigwe conspired to commit money

17  laundering, then you must find Mr. Alisigwe guilty of Count

18  Four.  On the other hand, if you find that the government has

19  not proved either element of conspiracy to commit money

20  laundering, then you must find Mr. Alisigwe not guilty of Count

21  Four.  Either way, you must record your verdict in response to

22  question 4 on the verdict sheet.

23       In connection with Counts Two, Three, and Four, the

24  government must prove that the defendant knew a particular

25  fact:  As to Count Two, that there was a scheme to defraud; as

A000385

NCE5ali1                    Charge

1    to Count Three, that the means of identification belonged to an

2    actual person; and as to Count Four, that the financial

3    transaction would involve the funds that were the proceeds of

4    some form of unlawful activity.

5          In determining whether the government has proved that

6    the defendant knew any of those facts, you may consider whether

7    the defendant deliberately remained ignorant of what otherwise

8    would have been obvious to him.  We refer to that state of mind

9    as "conscious disregard."

10         If you find that the government proved beyond a

11   reasonable doubt that the defendant deliberately avoided

12   learning the truth, that is, that there was a scheme to

13   defraud, that the means of identification belonged to an actual

14   person, or that the financial transaction would involve

15   proceeds that were proceeds of unlawful activity, then the

16   requirement that the government must have proven knowledge will

17   have been satisfied.  If the evidence shows only that the

18   defendant was negligent or mistaken, that is not enough to

19   prove that he consciously avoided the truth.

20         If you find that the defendant was aware of a high

21   probability that there was a scheme to defraud as to Count Two,

22   that the means of identification belonged to an actual person

23   as to Count Three, or that the financial transaction would

24   involve funds that were proceeds of unlawful activity as to

25   Count Four, and that the defendant acted with deliberate

A000386

NCE5ali1                    Charge

1    disregard of that high probability, you may find the defendant

2    knew that fact.  If, however, you find that the defendant

3    actually believed that the means of identification did not

4    belong to an actual person, or that the financial transaction

5    would not involve funds that were proceeds of unlawful

6    activity, or that there was no scheme to defraud, then you may

7    not find that he knew that fact.

8         The indictment alleges that certain acts occurred on

9    or about various dates.  The government does not need to prove

10   that an act occurred during a specific time period or on a

11   specific date.  I instruct you that it does not matter if a

12   specific event is alleged to have occurred on or about a

13   certain date or in a certain month when the testimony indicates

14   that in fact it occurred on a different date or in a different

15   month.  The law requires only a substantial similarity between

16   the dates and months alleged in the indictment and the dates

17   and months established by the evidence.

18        You are about to begin your deliberations.

19        We will send all of the exhibits into the jury room

20   for your use during the deliberation.  All the paper exhibits

21   will be loaded onto the computer that is available to you in

22   the jury room, and the physical exhibits, the passports and the

23   driver's license, will be sent in as physical exhibits.  If you

24   have any difficulty operating the machine or finding what you

25   want to see, please send me a note and I will send somebody in

A000387

594

NCE5ali1                     Charge

1    to help you.

2              If you want any further explanation of the law or if

3    you want to hear any testimony read back, you may request that.

4    If you ask for any testimony to be reread, please be as

5    specific as possible so that we can identify exactly what you

6    want read and not waste time reading testimony that you do not

7    want to hear.  If there is any doubt about the question or

8    meaning of any instructions that I have given you, you should

9    not hesitate to send me a note asking for clarification or for

10   further explanation.

11             It is very important that you not communicate to

12   anyone outside the jury room about your deliberations or about

13   anything touching on this case.  There is only one exception to

14   this rule.  If it becomes necessary during your deliberations

15   to communicate with me, you should send me a note, in writing,

16   signed by your foreperson, and give it to the marshal who will

17   be available outside the jury room throughout your

18   deliberations.  No member of the jury should ever attempt to

19   communicate with me except by a signed writing, and I will

20   never communicate with a member of the jury on any subject

21   touching on the merits of the case other than in writing or

22   orally here in open court.

23             (Continued on next page)

24

25

A000388

NCEJALI2                    Charge

1          THE COURT:  If you send any notes to the Court, do not

2     disclose anything about your deliberations.  Specifically, do

3     not disclose to anyone — not even to me — how the jury stands,

4     numerically or otherwise, until after you have reached a

5     unanimous verdict or have been discharged.

6          Some of you have taken notes throughout the trial.  I

7     want to emphasize to you that notes are simply an aid to

8     memory.  Your notes may not be given any greater weight or

9     influence in the determination of the case than the

10    recollection of the other jurors.  Any difference between a

11    juror's recollection and another juror's notes should be

12    settled by asking to have the court reporter read back the

13    transcript, because it is the court record that the jury must

14    rely on when making a determination of the facts and rendering

15    a verdict.

16         You will now retire to decide your verdict.  As I've

17    already explained, for the government to prevail, the

18    government must prove each essential element of the charge

19    beyond a reasonable doubt.  If the government carries its

20    burden, you must find the defendant guilty.  Otherwise, you

21    must find the defendant not guilty.

22         Your verdict must be unanimous.  Each juror is

23    entitled to his or her opinion, but you are also required to

24    exchange views with your fellow jurors.  That is the very

25    essence of jury deliberation.  If you have a point of view and,

NCEJALI2                    Charge

1   after discussing it with the other jurors, it appears your own

2   judgment is open to question, then of course you should not

3   hesitate to yield your original point of view if you're

4   convinced that the other view is one that satisfies your

5   judgment and conscience.  Do no give up a point of view that

6   you conscientiously believe simply because you are outnumbered.

7   You should vote with the others only if you are convinced on

8   the evidence, the facts, and the law that it is the correct way

9   to decide the case.  After any breaks or when you arrive in the

10  morning, if your deliberations last more than one day, do not

11  begin to discuss the case until all jurors are present.

12          The first thing you should do when you retire to

13  deliberate is to select one of you to act as your foreperson.

14  Traditionally, Juror No. 1 is the foreperson, but that is only

15  a tradition.  You are free to select any of your members to act

16  as your foreperson, although I urge you not to spend a lot of

17  time on that issue.

18          Once you have reached your verdict, you must record it

19  on the verdict form that I have prepared for you.  The

20  foreperson should fill in the verdict sheet, date it, and sign

21  it.  The foreperson should then give a note to the marshal

22  outside your door stating that you have reached a verdict.  Do

23  not specify what the verdict is in the note.  The foreperson

24  should keep the verdict sheet until I ask for it.  You must all

25  be in agreement with the verdict that is announced in court.

A000390

NCEJALI2                        Charge

1       Please remain seated while I confer with the

2   attorneys.

3           (At sidebar)

4           THE COURT:  Juror got here about 10:30.

5           Any objections?

6           MS. WERNER:  No.

7           THE COURT:  Any objections?

8           MR. KINDER:  No.

9           THE COURT:  Thank you.

10          (In open court; jurors present)

11          THE COURT:  Please swear the marshal.

12          (Marshal sworn)

13          THE COURT:  All right.  Ladies and gentlemen —

14  actually, ladies, I remind you that at the beginning of this

15  case you all took an oath.  Your oath sums up your duty.  You

16  must well and truly try the matters at issue and render a true

17  verdict according to the law and evidence.

18          You may now retire to the jury room and begin your

19  deliberations except Alternate No.  You should take all your

20  stuff with you at this time.

21          (At 10:35 a.m., the jury retired to deliberate)

22          THE COURT:  Thank you for your time and attention.  I

23  am not excusing you from the jury.  Every once in a while

24  something happens to a juror and we have to substitute in an

25  alternate, so my admonition that you not talk about the case

NCEJALI2                          Deliberations

1    continues.  Feel free to give us a call tomorrow to see if we

2    have a verdict yet.  If we need you, we will call you.  Thank

3    you very much.  You are excused, though not off jury duty yet.

4              (Alternate juror excused)

5              THE COURT:  All right.  So you did not make it here on

6    time.

7              JUROR:  Yes.  It was trouble with the trains.  I got

8    lost and then I couldn't make it.

9              THE COURT:  You didn't leave in time, really, because

10   you called Angela at 9:00.  So you're excused.  You're not

11   going to deliberate with the jury.  Did you give Angela your

12   swipe card?

13             JUROR:  I gave the lady, the one with the glasses.

14             THE COURT:  You gave her the swipe card?

15             JUROR:  The other lady, the skinnier one.

16             THE COURT:  You are excused with the thanks of the

17   Court.  You can go back to work.  You're done.

18             JUROR:  Great.  Thank you, everybody.  Okay.

19             (Juror excused)

20             THE COURT:  Make sure Angela knows where you are.

21   They'll go to lunch.  I'm not quite sure what time.  Let's

22   assume 12:30 to 1:30, so you're free during that time.  If it's

23   some other time than that, Angela will tell you.  I assume

24   they'll want food.  You don't need to be called for that, and

25   we'll send that in to them.  Thanks, everybody.

NCEJALI2                          Deliberations

1          (Recess pending verdict)

2          THE COURT:  Just for the record, we have a note, which

3    we'll mark as Court Exhibit 1.  The defense counsel has waived

4    the presence of the client.  It was received on the 14th at

5    about 1:00 and reads, "We would like to review Agent McKeen's

6    transcript."  I've asked the parties to prepare a transcript

7    and I've been given a transcript.

8          Has the government and the defense reviewed it?

9          MR. KINDER:  Yes.

10         MS. WERNER:  Yes.

11         THE COURT:  And all of the sidebars and the like are

12   out?

13         MR. KINDER:  Yes.

14         THE COURT:  It's a weird transcript to read.  Okay.

15         Any objection to me sending them back?

16         MR. KINDER:  None.

17         MS. WERNER:  No.

18         THE COURT:  Thank you all.

19         (Recess pending verdict)

20         THE COURT:  So again, for the record, does the defense

21   waive the defendant's presence?

22         MS. WERNER:  We do.

23         THE COURT:  All right.  We received another note,

24   which we've marked as Court Exhibit 2.  It reads, "We would

25   like the transcript of Agent Tallio for review."  I'm going to

**A000393**

NCEJALI2                    Deliberations

1   give them transcripts.  Have both sides reviewed these and find

2   them adequate?

3               MR. KINDER:  Yes.

4               MS. WERNER:  Yes.

5               THE COURT:  We will send these back.

6               (Recess pending verdict)

7               THE COURT:  Okay.  So we got two notes in rapid

8   succession.  The first one, which is Court Exhibit 3, reads,

9   "If we do not agree on one charge but we agree on the

10  others...what is the next step?"

11              And then the next note which came 22 minutes later at

12  3:20 and I've marked as Court Exhibit 4 reads in all caps, "We

13  have a verdict.  We were able to review the evidence again and

14  have come to a decision."

15              So any objection on me just saying the verdict?

16              MR. KINDER:  No.

17              MS. WERNER:  No.

18              THE COURT:  Okay.  Let's get the jury.

19              Does anybody want to talk to the jury?

20              MS. HOBSON:  We don't know yet.

21              (Jury present)

22              THE COURT:  Ladies and gentlemen, I got your first

23  note, which said, "If we don't agree on one charge but we agree

24  on the others, what's the next step?"  And then before we got

25  to you with that answer, I got your note that said, "We have a

A000394

NCEJALI2                    Verdict

```
 1   verdict.  We were able to review the evidence again and have
 2   come to a decision."
 3          So Madam Foreperson, could you hand the verdict sheet,
 4   please, to Angela.
 5          Madam Foreperson, could you rise, please.  I didn't
 6   tell you the foreperson has to speak.
 7          Count One, on the charge of conspiracy to commit bank
 8   fraud, we the jury find the defendant not guilty or guilty?
 9          THE FOREPERSON:  Guilty.
10          THE COURT:  Count Two, on the charge of bank fraud, we
11   the jury find the defendant not guilty or guilty?
12          THE FOREPERSON:  Guilty.
13          THE COURT:  Count Three, on the charge of aggravated
14   identity theft, we the jury find the defendant not guilty or
15   guilty?
16          THE FOREPERSON:  Not guilty.
17          THE COURT:  Count Four, on the charge of conspiracy to
18   commit money laundering, we the jury find the defendant not
19   guilty or guilty?
20          JUROR:  Guilty.
21          THE COURT:  All right.  Ladies and gentlemen, your
22   foreperson has told me you found the defendant guilty on Counts
23   One, Two, and Four, and not guilty on Count Three.  I'm going
24   to ask you all if that's your verdict.
25          Juror No. 1, is that your verdict?
```

A000395

NCEJALI2                    Verdict

1              JUROR NO. 1: Yes.

2              THE COURT: Juror No. 2, is that your verdict?

3              JUROR NO. 2: Yes.

4              THE COURT: Juror No. 3, is that your verdict?

5              JUROR NO. 3: Yes.

6              THE COURT: Juror No. 4, is that your verdict?

7              JUROR NO. 4: Yes.

8              THE COURT: Juror No. 5, is that your verdict?

9              JUROR NO. 5: Yes.

10             THE COURT: Juror No. 6, is that your verdict?

11             JUROR NO. 6: Yes.

12             THE COURT: Juror No. 7, is that your verdict?

13             JUROR NO. 7: Yes.

14             THE COURT: Juror No. 8, is that your verdict?

15             JUROR NO. 8: Yes.

16             THE COURT: Juror No. 9, is that your verdict?

17             JUROR NO. 9: Yes.

18             THE COURT: Juror No. 10, is that your verdict?

19             JUROR NO. 10: Yes.

20             THE COURT: Juror No. 11, is that your verdict?

21             JUROR NO. 11: Yes.

22             THE COURT: Juror No. 12, is that your verdict?

23             JUROR NO. 12: Yes.

24             THE COURT: Is there any reason I shouldn't excuse the

25     jury with the thanks of the Court?

NCEJALI2                    Verdict

1              MR. KINDER:  No.

2              MS. WERNER:  No.

3              THE COURT:  All right.  Ladies and gentlemen, I'm

4      going to ask you to step back in the jury room.  I'd like to

5      come back and say good night to all the jurors, so I just have

6      a few minutes of things I have to do with the parties, but I'll

7      be back momentarily.

8              (Jury excused)

9              THE COURT:  Okay.  Mr. Alisigwe's sentencing date is

10     April the 8th at 11:00.  Presentencing submissions are due

11     March 25.

12             MS. WERNER:  Your Honor, may we have an extension on

13     our deadline for post-trial briefing?

14             THE COURT:  What would you like?

15             MS. WERNER:  Just a few extra weeks.

16             THE COURT:  Normally the schedule time is two weeks;

17     is that right?  Is it 14 days?

18             MS. WERNER:  I think so.

19             THE COURT:  January 19?  Is that enough time?

20             MS. WERNER:  That would be fine.  Thank you.

21             THE COURT:  Okay.  Any post-conviction motions from

22     the defense are due on the 19th.  Government's response is due

23     February 9, any reply is due February 16.

24             Mr. Alisigwe, I'm going to order that a presentence

25     report be prepared.  You can and you should have your lawyer

NCEJALI2

1    with you when probation comes to interview you.  If you decide

2    to talk to probation, it's important what you tell them is

3    truthful and complete.  The report that probation prepares is

4    very important to me in determining what an appropriate

5    sentence is in your case, so it's important that I have

6    complete and accurate information.

7            Probation is going to prepare a draft report which

8    they'll provide to your attorney.  Your attorney will provide

9    it to you.  Please read the draft report carefully.  If

10   anything in it isn't correct, make sure you tell Ms. Werner so

11   she can tell probation so the report can be corrected before

12   the time of sentence.  At the time of sentence, both you and

13   your attorney will have an opportunity to speak on your behalf.

14           Anything else from either side?

15           MR. KINDER:  Not from the government.

16           MS. WERNER:  No.  Thank you, your Honor.

17           THE COURT:  Does anybody want to talk to the jury?

18           MR. KINDER:  Not us.

19           MS. WERNER:  Yes, we would, your Honor.

20           THE COURT:  Okay.  I'll see if they're interested in

21   talking to you.

22           MS. WERNER:  Thank you.

23           THE COURT:  So don't go away, okay?

24           Thanks, everybody.  Good job done by everybody.

25                          o0o

A000398

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 22 Cr. 425 (VEC) |
| CHINWENDU ALISIGWE,<br>            Defendant. | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Barry D. Leiwant, Esq.
Interim Executive Director
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8700

*Counsel for Chinwendu Alisigwe*

Sylvie J. Levine
Ariel C. Werner
*Of counsel*

To:   Damian Williams, Esq.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007

      Attn:  Meredith Foster, Esq.
             Adam Hobson, Esq.
             William Kinder, Esq.
             Assistant United States Attorneys
             Southern District of New York

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

Barry D. Leiwant
*Interim Executive Director
and Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 25, 2024

**By ECF and Email**

Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

     Re:   **United States v. Chinwendu Alisigwe, 22 Cr. 425 (VEC)**

Dear Judge Caproni:

    We write on behalf of Chinwendu Alisigwe in advance of his April 8, 2024 sentencing. Mr. Alisigwe was convicted at trial of bank fraud, conspiracy to commit bank fraud, and conspiracy to commit money laundering. These offenses are undeniably serious. At trial, the Government presented evidence that Mr. Alisigwe opened bank accounts using names and identification documents mailed to him from Nigeria, evidence that the proceeds of fraud schemes were deposited into those accounts, and evidence that Mr. Alisigwe moved money among those accounts and transferred money out of them. The evidence also showed that Mr. Alisigwe played no role in selecting the victims whose money or identities were stolen and that he did not participate in the fraud schemes that generated the money deposited in the accounts he opened.

    In sentencing Mr. Alisigwe, the Court must consider not only the nature of his conduct, but also the mitigating factors: (1) Mr. Alisigwe is a first-time offender convicted of non-violent offenses who played no role in directly defrauding victims; (2) he is responsible for supporting his elderly mother, his wife, and five children; (3) he has already suffered through nearly 20 months of inhumane jail conditions, far from his family; and (4) on top of his prison sentence, he will face the severe immigration consequences of an aggravated felony conviction.

    After considering all the relevant sentencing factors, the Court should impose a sentence of 24 months' imprisonment. This sentence would be "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

A000400

Honorable Valerie E. Caproni                                    March 25, 2024
United States District Judge                                              Page 2

## I.      Background

Chinwendu Alisigwe was born and raised in Amike, a small village community with dirt roads in the Orlu local government area of Nigeria's Southeastern Imo State. PSR ¶ 45. Although the Nigerian Civil War, also known as the Biafran War, ended 15 years before Mr. Alisigwe's 1985 birth, that conflict—in which more than 1 million people (or, by some estimates, more than 2 million people) died—cast a long shadow over Southeast Nigeria.[1] When the war ended in 1970, "the people of the now-defunct Republic of Biafra, on whose land the war had been fought," had been "vanquished."[2]  According to Nigerian writer Innocent Chizaram Ilo, these Southeasterners were left at the War's end with destroyed homes, the pain of having lost relatives to murder, starvation, and disease, and a legacy of despair: The Biafrans' "descendants [] would have to navigate the world with the weight of their trans-generational trauma."[3]

Mr. Alisigwe grew up in a two-bedroom mud home with his parents, five siblings, and grandparents. *Id.* ¶ 49. With more family members than beds, Mr. Alisigwe and his brothers slept on the living room floor. *Id.* The home had neither electricity nor running water. *Id.* It was the children's job to fetch water by walking 45 minutes from their home over a big hill to the river. *Id.* They carried their pails of water back home over the hill slowly and carefully, struggling not to spill with each step they took.

Mr. Alisigwe's father, Ahunanyaekwere, served in the military. *Id.* ¶ 50. He was gone from home for long stretches of time, sometimes forced to stay away because he was on active duty, and at other times choosing to stay away because he was ashamed of his inconsistent wages and inability to support his family. *Id.* When Ahunanyaekwere was home, he was a vicious disciplinarian. *Id.* ¶ 51. He punished Mr. Alisigwe and his siblings by hitting them with belts and cords, at times causing significant injuries. He stopped only after nearly killing his daughter, Mr. Alisigwe's sister. *Id.*

---

[1] *See* Leon Dash, *10 Years Later Ibos Still Feel Impact of Nigeria's Civil War*, Washington Post (May 26, 1980), https://www.washingtonpost.com/archive/politics/1980/05/27/10-years-later-ibos-still-feel-impact-of-nigerias-civil-war/56b29caa-1a88-4e9a-a2b7-4005c5a95c74/; Chinedu Asadu, *Nigeria's Separatist Protests Are Reminders of Biafran War*, AP (April 1, 2022), https://apnews.com/article/africa-nigeria-a7f1e918e1f647ff92dae7a4dd0459e5; Innocent Chizaram Ilo, *Remembering My Father's Biafra: The Politics of Erasing History*, AlJazeera (May 30, 2020), https://www.aljazeera.com/opinions/2020/5/30/remembering-my-fathers-biafra-the-politics-of-erasing-history-2.

[2] *Id.*

[3] *Id.*

Honorable Valerie E. Caproni                                  March 25, 2024
United States District Judge                                         Page 3

Mr. Alisigwe and his mother Ijeoma shared a close bond, the result of having
confronted many hardships together during Mr. Alisigwe's childhood years. Ijeoma
cared for the children and supported them by selling goods at market when
Ahunanyaekwere had no salary to send home. *Id.* ¶ 50. She made clothes for the
children and learned how to craft shoes for them from melted plastic so that they
would no longer have to walk the 1.5 miles to school barefoot. *Id.* ¶¶ 50, 70. When
Mr. Alisigwe broke his leg at 11 years old, Ijeoma took care of him for two years as
he slowly healed under the watch of a native medicine doctor. *Id.* ¶ 63. When Ijeoma
went to work at the market, she carried Mr. Alisigwe on the back of her bicycle. And
it was Ijeoma who used her savings to fund Mr. Alisigwe's trips from Amike to
Lagos and back for meetings and appointments as he secured a lottery visa to
immigrate to the United States. *Id.* ¶¶ 46, 53.

In 2008, Mr. Alisigwe received his visa and traveled to the United States with
a green card. *Id.* ¶ 53. Not long after, he settled in New York City and began to
build a life. *Id.* Having worked since graduating from high school, Mr. Alisigwe
immediately sought employment after arriving in the United States. *Id.* ¶¶ 77-78.
He earned certifications in security and home health work. *Id.* ¶ 72. He found jobs
in maintenance, construction, food service, security, and retail before becoming a
full-time home health aide. *Id.* ¶¶ 76-77. As a home health aide, Mr. Alisigwe
approached his work with so much care and compassion that one patient who
passed away bequeathed him $400,000, which he used to purchase his home in
Queens. *Id.* ¶ 76. Mr. Alisigwe also tried to be entrepreneurial by incorporating his
own home health aide company and working with a friend to ship used vehicles to
Nigeria. *Id.* ¶ 74.

At 26, with his then-partner, Nsikan, he became a parent to his first child,
███████, *Id.* ¶ 54. Unfortunately—and not for lack of trying—that relationship did
not last, and they separated in 2011. A year later, at the end of 2012, Mr. Alisigwe
ended up reconnecting and falling in love with an old high school classmate, his
now-wife Uju. *Id.* ¶ 55. They married on December 23, 2013. *Id.*; Letter of Uju
Chidimma (attached as Exhibit A). Since then, they have celebrated the births of
four children: ████████ ████████ ████████ and ████████ *Id.*

From 2012 until his 2022 arrest, Mr. Alisigwe traveled back and forth
between the United States and Nigeria with the goal of one day bringing his family
to join him in New York. Ex. A at 2. He has supported his family back in Nigeria
and remained a fixture in their lives through daily phone calls in between his
regular visits. *Id.* His wife Uju writes, "My husband has been my backbone. He is so
supportive of me, our kids, our family, and even of others." *Id.* at 2. She adds, "He
pays the kids['] school fees, buys all our clothes and necessities, and calls us on [the]
phone every day to check on us. He talks to the kids to help them on their school
assessments and monitor all their activities while he's not down here in Nigeria

Honorable Valerie E. Caproni                                    March 25, 2024
United States District Judge                                             Page 4

with us. Before this case, he would always come back to Nigeria to see us. He covers his fatherhood duties even while he's out of the country, because he loves his kids so deeply." *Id.*

## II.     The Advisory Guidelines Range

Probation has calculated an advisory Guidelines range for Mr. Alisigwe of 135 to 168 months. That calculation is incorrect because it relies upon: (1) an unproven $4.5 million intended loss amount, and the use of intended rather than actual loss; (2) an inapplicable enhancement for obstruction of justice under U.S.S.G. § 3C1.1; and (3) an inappropriate decision *not* to apply the two-level reduction for zero-point offenders, under U.S.S.G. § 4C1.1. If Mr. Alisigwe's Guidelines were calculated *without* the obstruction enhancement and *with* the zero-point offender reduction, his overall offense level would be 29 rather than 33, bringing his Guidelines down to 87-108 months. If the Guidelines were calculated based on actual loss rather than intended loss, his overall offense level would be either 23 or 25, bringing his Guidelines down even further to 46-57 months or 57-71 months.

   A.     The Court should not adopt the Government's unsupported $4.5 million intended loss figure.

Mr. Alisigwe's Guidelines range is driven primarily by the loss figure calculated by the Government and provided to Probation. As discussed below, and as numerous courts in this Circuit have concluded, U.S.S.G. § 2B1.1 places outsized emphasis on loss amount as a proxy for the seriousness of a fraud offense.[4] Here, there are two initial problems with the Government's loss calculation, even before reaching the weight that the Court should place on § 2B1.1's loss table.

First, the Government has failed to establish the basis of its $4.5 million loss figure. PSR ¶¶ 18, 26. The Government seems to have reached this number by adding up every deposit into each of the "subject accounts" and then subtracting money that was transferred from one "fraud account to another fraud account" as well as "deposits from reversed fees, interest payments, and purchase refunds." PSR at 26.  It asserts that this figure "constitutes the amount of money deposited into the subject accounts from victims of fraud." *Id.* But the Government has not offered any evidence to substantiate its claim that each of the deposits it includes in its $4.5 million loss figure came from victims of fraud and should be included in that loss amount.[5]

_____

[4] *See infra* Part II.B.i.

[5] The absence of evidence to support the Government's current loss figure, which Probation has adopted, is particularly problematic because the Government's loss number has fluctuated so

Honorable Valerie E. Caproni                            March 25, 2024
United States District Judge                                    Page 5

It is the Government's burden to establish "disputed factual allegations," including loss amount, by a preponderance of the evidence. *United States v. Rigo*, 86 F. Supp. 3d 235, 241 (S.D.N.Y. 2015) (quoting *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003)). "A loss finding must be 'grounded in the evidence.'" *Id.* (quoting *United States v. Coppola,* 671 F.3d 220, 249 (2d Cir. 2012)). While reasonable estimates are permitted, loss amounts "cannot be established on the basis of speculation." *Id.* (citing *United States v. Deutsch,* 987 F.2d 878, 886 (2d Cir. 1993); *United States v. Rutkoske,* 506 F.3d 170, 180 (2d Cir. 2007)). Here, without an accounting of which losses the Government has included in its figure and an explanation of why, the Government's $4.5 million loss amount has no grounding in the evidence.

A further problem with the $4.5 million loss figure is its reliance on intended rather than actual victim loss. Section 2B1.1(b)(1) directs that the base offense level should be increased based on the amount of financial "loss." U.S.S.G. § 2B1.1(b)(1). Commentary to § 2B1.1 states that "loss" should be construed as actual or intended loss, whichever is greater. *Id.* cmt. n.3(A). Courts in the Southern District have typically calculated loss using the intended rather than actual loss amount, in accordance with that commentary.

In 2019, however, the Supreme Court in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), provided new guidance for courts interpreting agency rules and regulations. In 2022, the Third Circuit Court of Appeals applied *Kisor* to find that Application note 3 to U.S.S.G. § 2B1.1 was invalid because it improperly expanded the plain meaning of the term "loss." *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022). Concluding that "in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word 'loss' is the loss the victim actually

---

significantly over the last six months. In September 2023, when the Government extended a written plea offer to Mr. Alisigwe, they calculated the Guidelines using a loss range of $1,500,000 to $3,500,000 (which adds 16, rather than 18, levels). At trial, the Government claimed during its opening statement that "nearly $6 million of stolen victim money" had "filled" the bank accounts opened by Mr. Alisigwe. Tr. 13:24-25, ECF No. 119; *see also* Tr. 15:24-25, ECF No. 119 ("nearly $6 million of victim money flowed into the accounts opened by the defendant). In an effort to substantiate that claim, the Government called a forensic accountant, Jillian Bronson, who testified that the total sum deposited into 36 accounts she examined was "[a]pproximately $5.9 million." Tr. 219:3, ECF No. 121. On cross-examination, Ms. Bronson acknowledged that she had calculated that figure "by adding up all incoming wire transfers, both domestic and international, check deposits, transfers, money order deposits, cash deposits, and ATM deposits." Tr. 295:10-13, ECF No. 121. Her calculation included money transferred from one account to the other, such that she was counting the same sums of money, originally taken from victims, multiple times to reach the figure of nearly $6 million. *Id.* at 300-03. By the time of the Government's summation, the day after Ms. Bronson testified, the Government could not commit to a loss amount. It told the jury that "more than a million dollars in stolen money" had passed through the accounts. Tr. 486:6, ECF No. 123.

Honorable Valerie E. Caproni                                    March 25, 2024
United States District Judge                                             Page 6

suffered," the Court accorded the commentary no weight and remanded the case for resentencing without a 12-level intended loss enhancement. *Id.* at 258. The Second Circuit has not addressed the validity of § 2B1.1's intended-loss commentary following *Kisor*, 139 S. Ct. 2400. But at least two district courts in the Second Circuit have reached the same conclusions as the Third Circuit in *Banks*. In *United States v. Beebe*, 21 Cr. 197 (CBA) (E.D.N.Y. Dec. 20, 2021), Judge Amon agreed that "[n]o ordinary English speaker would use the term loss to describe what a thief has tried but failed to take" and found that "the text of 2B1.1 requires that the guidelines be applied based on actual loss." *United States v. Beebe* Sent'g Tr. 9:23 – 10:2 (attached as Ex. E). In *United States v. Gary*, 20 Cr. 440 (AMD) (E.D.N.Y. Aug. 24, 2023), Judge Donnelly reached the same conclusion, finding that courts applying U.S.S.G. § 2B1.1 must look to actual rather than intended loss under *Kisor*.[6] This Court should do the same.

The Government's intended loss calculation in Mr. Alisigwe's case is even more problematic because it does not reflect Mr. Alisigwe's own intent, as opposed to the intent of overseas fraudsters whose actions Mr. Alisigwe did not control or influence. Application note 3(A)(ii) to U.S.S.G. § 2B1.1(b)(1) defines intended loss as "the pecuniary harm that *the defendant* purposely sought to inflict." The Government has offered no evidence that Mr. Alisigwe knew that $4.5 million was being deposited into the subject accounts after having been stolen from fraud victims. That figure does not reflect his intent.

Using actual rather than intended loss would have a significant impact on Mr. Alisigwe's Guidelines range. Many of the witnesses who testified at trial spoke about fraudulent transactions that were speedily identified as fraudulent and therefore frozen or reversed before any loss was incurred. Indeed, the Government has identified just two victims who suffered actual financial loss, for which they were reimbursed by their employer and financial institution. PSR ¶ 19. It is our understanding that the Government's actual loss calculation is somewhere between $400,000 and $600,000. Calculating the Guidelines using actual rather than intended loss, an actual loss between $250,000 and $550,000 would warrant a 12-level offense level increase from the base offense level. An actual loss between $550,000 and $1,500,000 would warrant a 14-level offense level increase.

There are multiple issues with the Government's $4.5 million intended loss figure. It is speculative rather than substantiated; it does not reflect Mr. Alisigwe's

---

[6] *See also United States v. Patel*, No. 19 Cr. 80181 (RAR), 2023 WL 5453747, at *1-3 (S.D. Fla. Aug. 23, 2023) ("Here, § 2B1.1 is unambiguous. So, the Court cannot consider the commentary and is bound by § 2B1.1's plain text."); United States v. Wheeler, No. 22 Cr. 38 (LWF), 2023 WL 4408939, at *1-3 (E.D.N.C. July 6, 2023) ("In sum, the weight of present authority supports limiting 'loss' to actual loss.").

Honorable Valerie E. Caproni                                          March 25, 2024
United States District Judge                                                Page 7

own intent; and it reflects hypothetical rather than actual loss. The Court should
calculate the Guidelines based on actual loss, a number that the Government
should be able to provide without any problem.

    B.  <u>Mr. Alisigwe did not obstruct justice.</u>

    Probation is wrong to impose a two-level enhancement for obstruction of
justice based on Mr. Alisigwe's testimony at an evidentiary hearing on his potential
duress defense and his recollections in an affidavit drafted by his attorney and
submitted in support of a motion to suppress evidence. *See* PSR ¶¶ 16-17, 21, 32.

    The Court is familiar with Mr. Alisigwe's account of becoming involved in the
conduct at issue, which he testified about during a May 30, 2023 hearing. ECF No.
53. It began with phone calls from strangers in Nigeria who pressured him to open
bank accounts for their own use. *Id.* at 16-21. These strangers threatened to harm
Mr. Alisigwe's family if he did not follow their instructions. *Id.* Mr. Alisigwe
believed it would be futile, at best, or fatal, at worst, to report the fraudsters'
threats to Nigerian law enforcement. As Dr. Allwell Uwazuruike, a senior lecturer
in law at the University of Central Lancashire, would have testified in support of
Mr. Alisigwe's proposed duress defense, the Nigeria Police Force (NPF) is corrupt,
unprofessional, and untrustworthy. *See* Nov. 10, 2023 Expert Disclosure (attached
as Exhibit F). Bribery and extortion are rampant within the NPF, and the police are
known to assist only the paying, well-connected elite. *Id.* at 2. Some police officers
are connected to the criminals they are supposed to be policing, such that reporting
crime to those officers can have deadly consequences for the victim. *Id.* at 3.[7] And as
for reporting the threats in the United States, Mr. Alisigwe believed that if he made
a report and was forced to stop assisting the fraudsters, they would make good on
their threats to his family. ECF No. 53 at 34.

    Mr. Alisigwe's efforts to pursue a duress defense were not an obstruction of
justice. He did so only after being informed by the Court, during a change-of-plea
hearing on February 24, 2023, that the threats he had received from co-conspirators
might constitute a defense to the charges against him, one that he should explore
with his attorney. *See* Tr. 24-26, ECF No. 39. After consulting with his attorney at
that time, Andrew Stoll, Mr. Alisigwe elected to mount a duress defense at trial.
When the Government moved for a pretrial hearing regarding the viability of that
defense, Mr. Stoll joined the Government's request and put Mr. Alisigwe on the
stand to testify about his interactions with the Nigeria-based fraudsters who roped
him into the scheme. *See* May 31, 2023 Duress Hearing Tr., ECF No. 53.

---

[7] *See also* U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: Nigeria,
https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/nigeria/.

A000406

Honorable Valerie E. Caproni                                      March 25, 2024
United States District Judge                                             Page 8

     The Government never proved that Mr. Alisigwe's account was untruthful. And while the Court found that Mr. Alisigwe could not establish a *prima facie* case of duress because he could not show that he had no opportunity to avoid harm to his family other than by participating in the charged crimes, the Court never found that Mr. Alisigwe's account was false. To the contrary, near the end of Mr. Alisigwe's trial, the Court told him that while he could not mount a legal duress defense, he was "welcome" to state the facts he had hoped to share as part of a duress defense at the time of sentence if he was convicted, and "[i]t may well have some bearing on what an appropriate sentence in your case is." Tr. 480:20-24, ECF No. 123. The Court made no finding that Mr. Alisigwe's story was untrue, only that it did not meet the legal requirements for a duress defense.[8]

     Nor did Mr. Alisigwe obstruct justice by submitting a declaration in support of his suppression motion. Mr. Alisigwe's declaration, drafted by Mr. Stoll, provided his best recollection of the events that unfolded on the stressful morning when federal agents burst through the door of his home to arrest him. ECF No. 29. The Government and Probation maintain that Mr. Alisigwe obstructed justice by affirming that four passports seized from his home that day had been in a sealed envelope under his bed rather than stacked on the floor in plain view, as FBI Special Agent William McKeen testified. PSR ¶ 16. The Court's decision to find that Special Agent McKeen testified credibly does not make Mr. Alisigwe's differing recollection untruthful. By that logic, contradictions between the accounts given by Special Agent McKeen and another witness at that hearing, Task Force Officer Justine Killion, and accounts that have no objective corroboration would require a finding that either Special Agent McKeen or Officer Killion had also obstructed justice.[9]

     Notably, when the Government extended a written plea offer to Mr. Alisigwe in September 2023, they did so without any Guidelines enhancement for obstruction of justice, although Mr. Alisigwe had already submitted his written declaration and testified at the evidentiary hearing on his duress defense. The Government's

---

[8] Of course, finding legal insufficiency is a wholly separate finding from the defendant making deliberately false statements. Yet the Probation department conflates them, arguing that because "there was not enough evidence to substantiate the defendant's claim of duress," Mr. Alisigwe "testified falsely." *See* PSR, p. 25, ¶¶ 21, 32. The Court should not make the same error.

[9] For example, Officer Killion testified that when Mr. Alisigwe brought into his bedroom, he was seated on the right side of the bed, just inside the door while Agent McKeen testified that Mr. Alisigwe was seated at the foot of the bed, *see* ECF No. 97 at 3 (including the diagram the two officers drew on during the suppression hearing); Special Agent McKeen testified law enforcement took no photographs or video footage of the search of Mr. Alisigwe's home (not from a cell phone, body-worn camera, or any other device), *see* Hrg. Tr. 31-33.

Honorable Valerie E. Caproni                                    March 25, 2024
United States District Judge                                              Page 9

support for an obstruction of justice enhancement now gives the appearance that
Mr. Alisigwe is being punished for exercising his Sixth Amendment right to a trial
by jury.

      C.  <u>Mr. Alisigwe should benefit from the two-level decrease for zero-point
            offenders.</u>

      Having never been arrested prior to this case, Mr. Alisigwe has no criminal
history points. PSR ¶¶ 39-40. In 2023, the Sentencing Commission adopted § 4C1.1,
which directs that where certain criteria are met, the offense level of a defendant
with zero criminal history points should be decreased by two levels. The
Commission promulgated the new guideline after analyzing "recidivism data,"
which demonstrated "that offenders with zero criminal history points…have
considerably lower recidivism rates than other offenders, including lower recidivism
rates than the offenders in Criminal History Category I with one criminal history
point." See 2023 Amendments (internal citation omitted) at 79.[10]



<u>See</u> U.S. Sent'g Comm'n, The Past Predicts the Future: Criminal History and Recidivism of
Federal Offenders, at 6-7 (March 2017).[11]

---

[10] Available at https://www.ussc.gov/guidelines/amendments/adopted-amendments-
effectivenovember-1-2023.

[11] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2017/20170309_Recidivism-CH.pdf.

Honorable Valerie E. Caproni                                                    March 25, 2024
United States District Judge                                                              Page 10

    The Government asserts that § 4C1.1 does not apply to Mr. Alisigwe because he "personally caused a financial hardship by repeatedly laundering victim money and that money was unretrievable by the banks." PSR at 26. The Guideline provision referenced by the Government, however, § 4C1.1(a)(6), does not disqualify all offenders who cause *any* financial hardship from the two-level decrease. It disqualifies a defendant who "*personally* cause[s] *substantial* financial hardship." § 4C1.1(a)(6) (emphasis added). Mr. Alisigwe should not be disqualified under that provision. Nearly all the intended victims in this case either retrieved their money or never lost it in the first place. Two victims who did lose money were recompensated, one by their employer—an international corporation—and the other by a major financial institution. Thus, the government has not shown by a preponderance of the evidence than anyone suffered a substantial hardship – not an individual victim or a large institution – and certainly not that Mr. Alisigwe was personally responsible for any such hardship.

### III.    Argument: The Court Should Impose a 24-Month Sentence.

    In fashioning an appropriate sentence, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)." *Id.* "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." *Id.* The Court may not presume that the advisory Guidelines range is reasonable and must instead "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). Here, that individualized assessment should result in a sentence of two years' imprisonment.

### A.  <u>The Guidelines overstate Mr. Alisigwe's culpability.</u>

    Under U.S.S.G. § 2B1.1, the loss amount is the most determinative factor, by far, in calculating the advisory Guidelines range. In Probation's calculation of Mr. Alisigwe's Guidelines, loss drives the offense level upward by 18 levels. PSR ¶ 26.[12] Courts in this Circuit have strongly criticized the Guidelines' use of loss as the main measure of the seriousness of economic crimes. There is a "widespread perception that the loss guideline is broken." *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J. concurring). "For the small class of defendants convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges." *Id.* at 380 (internal quotation marks and

---

[12] As noted above, the Guidelines should be calculated with an offense level increase for loss of 12 or 14 rather than 18. *See infra* Part II.A.

Honorable Valerie E. Caproni                                    March 25, 2024
United States District Judge                                         Page 11

alterations omitted); *see also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (condemning the "excessive weight on [the fraud loss] factor" and noting that loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Black*, 16 Cr. 370 (CM), ECF No. 457 (S.D.N.Y. Oct. 24, 2019) (noting the "utterly ridiculous fraud guidelines chart" is "heavily weighted toward increasing the number of enhancement points" as the loss amount increases – "a fact that has been criticized on more than one occasion by this and other courts"); *United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd* 301 F. App'x 93 (2d Cir. 2008) (explaining that relying on Guidelines calculations driven mechanistically by loss amounts can produce an "utter travesty of justice.").

It is now widely recognized that the Guidelines' loss enhancement was developed "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." *Corsey*, 723 F.3d at 380. Because the Commission failed to rely on empirical data or national experience in promulgating and amending § 2B1.1, this Court is free to conclude that the application of this guideline "yields a sentence greater than necessary to achieve § 3553(a)'s purposes." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007); see also *United States v. Gajwani*, 16 Cr. 660 (LAP), ECF No. 50 ("[I]n my view the fraud guidelines at the higher financial levels are much more onerous than what is required.").

In light of the widespread criticism that the Guidelines' treatment of economic crimes has received from courts, practitioners, academics, and experts, an American Bar Association task force (which included among its members Judges Lynch and Rakoff, and former Judge Gleeson) proposed amendments that would focus less on "loss" and more on "culpability."[13] The task force's report drew particular attention to sentences for first-time, non-violent offenders like Mr. Alisigwe and recommended an approach more faithful to the Sentencing Commission's enabling legislation, whereby "[i]f the defendant has zero criminal history points under Chapter 4 and the offense was not 'otherwise serious' within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate."[14] See also *United States v. Leitch*, 11 Cr. 609 (JG), 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28, 2013) (noting that the Commission was "was supposed to ensure 'the general appropriateness' of probationary sentences for first-time offenders unless they

---

[13] Am. Bar Ass'n, Criminal Justice Section, "A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes" (Nov. 10, 2014), available at https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf

[14] *Id.*

Honorable Valerie E. Caproni                                    March 25, 2024
United States District Judge                                           Page 12

commit 'crime[s] of violence or . . . otherwise serious offense[s].' Instead, it
unilaterally declared in 1987 that every theft, tax evasion, antitrust, insider
trading, fraud, and embezzlement case is 'otherwise serious,' and thus no more
eligible for a sentence of probation, even when committed by a first-time offender,
than would a crime of violence").

Judge Garaufis in the Eastern District explained: "The problems with the
loss enhancement have been evident since the inception of the Guidelines. In 2004,
then-District Judge Gerard Lynch generously called the loss enhancement a
'questionable' aspect of the Guidelines…Still, though, the Commission persisted in
sticking to its flawed methodology for tabulating white-collar sentences." *United
States v. Johnson*, 16 Cr. 457 (NGG), ECF No. 233 (Apr. 27, 2018) (citing
*Emmenegger*, 329 F. Supp. 2d at 427). Judge Garaufis continued: "So how did we
progress from an offense level that caps the amount of time in prison at a year and
a half, to one that sets a minimum prison time of approximately five times that
figure? The answer lies in the loss enhancement." He went on: "I…refuse to
mechanistically impose such an illogical sentence." *Id.*

Mr. Alisigwe's case demonstrates the problems with § 2B1.1's loss table,
especially in conspiracy cases. Mr. Alisigwe did not steal money from the victims;
money from the victims was deposited into the bank accounts he opened, and he
sometimes transferred money among those accounts, without him having any idea
where the money came from. He is not nearly as culpable as his un-apprehended co-
conspirators—those who chose exactly how much money they would seek from the
victims they targeted and defrauded. As legal scholars have commented, "the loss
table fails to differentiate offenders who ought to be differentiated. For example, an
amount of loss…does not tell us anything about why the defendant committed the
offense or how much he personally benefited."[15]

For these reasons, we ask that the Court decline to afford great deference to
the Guidelines in this case, even if it adopts the Government's loss figure and
corresponding 18-level enhancement. The Second Circuit has specifically invited
district judges to consider non-Guidelines sentences when utilizing § 2B1.1: "Where
the Commission has assigned a rather low base offense level to a crime and then
increased it significantly by a loss enhancement, that combination of circumstances
entitles a sentencing judge to consider a non-guidelines sentence." *United States v.
Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Indeed, in § 2B1.1, "the Commission
valued fraud…at level six [or seven], which translates in criminal history category I

---

[15] D. Debold & M. Benjamin, "Losing Ground" – In Search of a Remedy for the Overemphasis on
Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft, 160 U.
Pa. L. Rev. PENNumbra 141, 152 (2011); see id. at 153 ("Motive, intent, and personal gain are
all important offense characteristics that do not get accounted for in the guidelines.").

Honorable Valerie E. Caproni                                    March 25, 2024
United States District Judge                                            Page 13

to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *Id.* The Circuit wrote that "[t]his approach" is "unknown to other sentencing systems," and therefore, "its unusualness is a circumstance that a sentencing court is entitled to consider. *Id.* (citing *Kimbrough*, 552 U.S. at 101).

    B. <u>The conditions of confinement that Mr. Alisigwe has endured for 20 months warrant a below-Guidelines sentence.</u>

Mr. Alisigwe has been detained since his July 26, 2022 arrest. When considering just punishment, the Court should consider the onerous conditions of confinement Mr. Alisigwe has endured over the past 20 months at the Essex County Jail and at MDC Brooklyn.

The Essex County Jail, where Mr. Alisigwe spent the first ten months of his pretrial confinement, was so chaotic and poorly managed that in 2021, under pressure from advocates, the county commissioned an independent review of its operations.[16] In 2022, even while Essex's formal review was ongoing, prisoners fought, died, attempted to take their own lives, and started fires within the jail's walls.[17] These incidents created an overall climate of fear and danger for Essex County prisoners and forced them to suffer through perpetual security lockdowns.

On May 25, 2023, Mr. Alisigwe was thrown from the frying pan into the fire, from the Essex County Jail to the MDC. Many courts, including this one, have recognized that conditions at the MDC are "dismal." Tr. 24:22, *United States v. Virga*, 23 Cr. 324 (VEC) (S.D.N.Y. Jan. 5, 2024), ECF No. 39. They have been that

---

[16] Eric Kiefer, *Essex County Promises New Review of Prison As Pressure Mounts*, Patch (Dec. 7, 2021), https://patch.com/new-jersey/newarknj/essex-county-promises-new-review-prison-pressure-mounts; Josh Solomon, *After violence at N.J. jail, oversight committee probes housing and mental health*, NJ.com (Jan. 29, 2022), https://www.nj.com/essex/2022/01/after-violence-at-nj-jail-oversight-committee-probes-housing-and-mental-health.html.

[17] *See* Joe Atmonavage, *4th inmate dies in recent months while in Essex County custody*, NJ.com (May 25, 2022), https://www.nj.com/news/2022/05/4th-inmate-dies-in-recent-months-while-in-essex-county-custody.html; Eric Kiefer, *Violence Continues At Essex County Prison: Inmate Death, Fires, Fights*, Patch (Apr. 20, 2022), https://patch.com/new-jersey/newarknj/violence-continues-essex-county-prison-inmate-death-fires-fights; Josh Solomon and Joe Atmonavage, *N.J. jail inmate died after being hit in the head during fight, his family says*, NJ.com (Mar. 3, 2022), https://www.nj.com/essex/2022/03/nj-jail-inmate-died-after-being-hit-in-the-head-during-fight-his-family-says.html; *see also* The Ambrose Group, LLC, *Essex County Correctional Facility Final Report: Final Assessment and Critical Findings* (Sept. 15, 2022) at 42, https://essexcountynj.org/wp-content/uploads/2022/10/REVISED-ECCF-ASSESSMENT-FINAL-REPORT-10052022-1.pdf.

Honorable Valerie E. Caproni          March 25, 2024
United States District Judge               Page 14

way for years. Even before the Covid pandemic, the MDC was "dirty," "infested with drugs," and plagued by "violence." Tr. 12:25–15:21, 37:15–18, *United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90. The pandemic introduced new levels of chaos that persisted even after Covid receded. Today, MDC prisoners report "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care." *United States v. Chavez*, 22 Cr. 303 (JMF) (S.D.N.Y. Jan. 4, 2024), ECF No. 31 at 1-2. Contraband is widespread and at least four inmates have taken their lives in the last three years. *Id.* at 2.

As Judge Furman has observed, "It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *Id.* at 2-3. To offer just one example, Judge Kaplan observed during the recent sentencing of a defendant who, like Mr. Alisigwe, had been detained pretrial at the Essex County Jail and the MDC:

> The conditions of his detention to date have been horrific both in Essex County and in the MDC. Serving time over the past few years in those institutions has been horrible. It is, in significant measure, the fault of a government which does not provide the facilities or the money to hire competent staff in sufficient numbers to run those facilities in a humane and effective manner. It's a problem we've been dealing with every day for a long time. A sentence of a year in those prisons today, although it's very hard to quantify, is ever so much worse than it would have been five years ago. It's just dreadful.

Tr. 39:16–40:1, *United States v. Tontisabo*, 21 Cr. 701 (LAK) (S.D.N.Y. Jan. 3, 2024), ECF No. 77.

Mr. Alisigwe has tried to use his time at these facilities as productively as possible. At Essex County, he participated in more than a dozen different courses. At the MDC, where few programs have been offered since the pandemic, Mr. Alisigwe has completed the Sentry fitness class and the Resume Writing course. He incurred no disciplinary infractions in either facility, managing to stay clear of the violence raging around him. Nevertheless, the last 20 months, much of it on lockdown—without the freedom to shower, exercise, eat to the point of satiety, or call home—have worn Mr. Alisigwe down. He is tired, stressed, and full of sorrow.

Nor can Mr. Alisigwe be free from worry about conditions at other BOP facilities if he is sentenced to a lengthy term of imprisonment. Although MDC is perhaps in a class by itself, incarceration across *all* BOP facilities has been brutal since the Covid pandemic. Staffing has been severely depleted, facility-wide

Honorable Valerie E. Caproni                              March 25, 2024
United States District Judge                                    Page 15

lockdowns have become routine, and programming has been eviscerated. *See, e.g.*, Glenn Thrush, *Short on Staff, Prisons Enlist Teachers and Case Managers as Guards*, N.Y. Times (May 1, 2023) (describing a "chronically troubled" BOP where 21% percent of open correction officer positions remain unfilled, forcing educational and vocational aides to serve as guards, at the expense of positive programming), *available at* https://shorturl.at/eDGJX. These problems appear to be permanent. DOJ's Office of the Inspector General has highlighted staffing shortages as a major issue for BOP in its annual reports dating back to 2015. *See* DOJ OIG, *Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic* (March 2023), at 44 & n.69–70, available at https://shorturl.at/kpxG9.

As many courts in this Circuit have recognized, harsh conditions of confinement counsel a shorter overall sentence. *See* Tr. 37:8–11, *United States v. Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), ECF No. 29 ("Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced [at MDC] since your arrest in December."); *see also* Tr. 17:17–18:3, *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), ECF No. 250 (describing the "extraordinarily harsh" conditions of near constant lockdowns in BOP jails as "basically like solitary confinement," and noting that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served"); *cf. United States v. Griem*, 2022 WL 17574575, at *1 (2d Cir. Dec. 12, 2022) (affirming denial of sentence reduction where "the District Court explained that it was well aware of the difficult conditions at MDC over the past couple of years and considered this reality in reaching an appropriate sentence"). In formulating its sentence, this Court should account for the deplorable conditions of confinement Mr. Alisigwe has been made to endure.

    C. <u>Given the likely collateral consequences of Mr. Alisigwe's conviction, a 24-month sentence would help reduce unwarranted sentencing disparities.</u>

On top of his prison sentence, Mr. Alisigwe faces additional punishment at the conclusion of this case. Because of his conviction, he will likely be transferred from BOP custody to Immigration and Customs Enforcement (ICE) custody, where he will await his near-certain removal from the United States.

Because all three counts that Mr. Alisigwe was found guilty of at trial were fraud offenses with a loss that exceeded $10,000, they are all aggravated felonies. *See* 8 U.S.C. § 1101(a)(43)(M)(i); *see generally Nijhawan v. Holder*, 557 U.S. 29 (2009). Under the Immigration and Nationality Act (INA), "[a]ny alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States." 8 U.S.C. § 1228(c). Indeed, deportation is "a virtually certain consequence for an alien convicted of an aggravated felony." *United States v. Couto*,

Honorable Valerie E. Caproni                                     March 25, 2024
United States District Judge                                             Page 16

311 F.3d 179, 188 (2d Cir. 2002) (abrogated on other grounds by *Padilla v. Kentucky*, 559 U.S. 356 (2010)). This includes lawful permanent residents like Mr. Alisigwe.

Asylum and cancellation of removal—forms of discretionary relief available to certain noncitizens facing deportation—are unavailable following conviction of an aggravated felony. *Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013) (citing 8 U.S.C. § 1227(a)(2)(A)(iii), §§ 1158(b)(2)(A)(ii), (B)(i); §§ 1229b(a)(3), (b)(1)(C)). Conviction of an aggravated felony results in "a lifetime citizenship bar, a conclusive presumption of deportability, and automatic denial of discretionary relief." *Doe v. United States*, 915 F.3d 905 (2d Cir. 2019); *see also Couto*, 311 F.3d at 189-90 ("[A]n alien convicted of an aggravated felony is automatically subject to removal and no one – not the judge, the INS, nor even the United States Attorney General – has any discretion to stop the deportation."). If Mr. Alisigwe's removal is ordered because of this conviction, his only remedy would be withholding or deferral of removal under the Convention Against Torture (CAT), which would require him to establish that it is more likely than not that he would be tortured if removed to Nigeria. *See* 8 C.F.R. §§ 208.16, 208.17; *Regulations Concerning CAT*, 64 Fed. Reg. 8478, 1999 WL 75823 (Feb. 19, 1999).

This Court, of course, need not make a finding about Mr. Alisigwe's future immigration consequences or the viability of his potential CAT claim. No matter the outcome of that separate proceeding, he will undoubtedly be incarcerated for an additional and significant amount of time while that process is underway. *See* 8 U.S.C. § 1226(c) (mandating detention during removal proceedings for any alien who is deportable by reason of having committed an aggravated felony). A downward variance would therefore help to reduce unwarranted sentencing disparities between Mr. Alisigwe and similarly situated defendants without the added punishment of harsh immigration consequences or additional detention by ICE. *See* 18 U.S.C. § 3553(a)(6).

D.   A 24-month sentence would be sufficiently punitive for Mr. Alisigwe.

Accounting for the conditions of confinement Mr. Alisigwe has endured and the collateral consequences he may face because of his conviction, 24 months' imprisonment is a sufficiently punitive sentence. A two-year prison term is even more impactful because Mr. Alisigwe has never previously been incarcerated. As the Second Circuit Court of Appeals has noted, the experience of jail or prison has a more significant impact on people who have never been incarcerated. *See United States v. Mishoe*, 241 F. 3d 214, 220 (2d Cir. 2001) (observing that prison has a greater significance and is therefore a greater punishment and deterrent, for those who have served little or no prison time in the past).

A000415

Honorable Valerie E. Caproni                                March 25, 2024
United States District Judge                                       Page 17

The twenty months Mr. Alisigwe has spent in custody thus far have also been more harsh than typical because he has been separated all that time from his wife, his children, and his mother. They have never been able to visit him, and he cannot call them nearly as often as prisoners with family in the United States. He has been painfully isolated since his arrest, to the detriment of his mental health. Sitting at the MDC, he thinks about his mother, far away in Orlu, in poor health and without proper care. He pictures his children and his wife, and he feels desperate to return to them.

Mr. Alisigwe's family is just as desperate for his return. His wife Uju, writes that since his arrest, "everything has changed and our life has crumbled." Ex. A at 3. "Our kids are crying every day for their daddy, there is no money to pay for school fees, no money for our upkeep, feedings, no money for my mother in law's medications and hospital bills and treatment, no support from anyone apart from my brothers." *Id.* For Uju, the "pressure is too much," and she "can't stop crying every day." *Id.*

Finally, a 24-month sentence is appropriate given the aberrational nature of this conduct against the backdrop of Mr. Alisigwe's remarkable life. Born into rural poverty, Mr. Alisigwe pursued his education through high school, sought a visa to come to the United States, and worked hard to build a life of purpose and stability when he arrived here. He learned a trade, bought a home, and supported his family.

When Mr. Alisigwe succumbed to pressure to participate in a criminal conspiracy, he stumbled from the noble path he was traveling as a hard-working New Yorker and an aspiring U.S. citizen. In so doing, he betrayed the values he holds dearest. His Minister in Nigeria describes him as "humble, obedient and law abiding," someone who "conducts his life in ethical manners that made him a role model" to other members of the church and community. *See* Letter of Minister Jonathan (attached as Exhibit B). His Minister and his wife both note that Mr. Alisigwe is known for his charitable deeds, such as his support for widows, orphans, and the poor. *Id.*; Ex. A at 1. His longtime friend Gabriel writes that Mr. Alisigwe is "a true gentleman and a man of integrity," a "peaceful, honest and a hardworking person since from his childhood." *See* Letter of Gabriel Nzerem (attached as Exhibit C). Likewise, Joe Rizzo, the elderly patient who left a bequest to Mr. Alisigwe in his will, recognized in him this same spirit of kindness and compassion. PSR ¶ 73. Throughout Mr. Alisigwe's life, and in his community, he has been known not as a thief but as a person of morality and generosity.

Mr. Alisigwe's involvement with fraudsters who stole money from innocent victims stands at odds with the way he has conducted himself at every other point in his life. It is precisely for this reason that he has seemed so tormented at certain points during this case, so eager to explain his shameful deeds. Up until the final moments of his trial, when he publicly wrestled with the choice whether to testify,

A000416

Honorable Valerie E. Caproni                                      March 25, 2024
United States District Judge                                            Page 18

he has been mired in shame. Tr. 480, ECF No. 123. Mr. Alisigwe's shame reflects
his remorse, his deep awareness that what he did was wrong. A lengthy prison term
is not needed to teach him that or any other lesson. He has learned from this
painful experience, and he will never make the same wrongful choices again.

### IV.   Conclusion

For the foregoing reasons, we respectfully urge the Court to impose a
sentence of 24 months' imprisonment.

Respectfully submitted,

Sylvie J. Levine
Ariel C. Werner
Assistant Federal Defenders
Federal Defenders of New York
(212) 417-8770

cc:   AUSAs Meredith Foster, Adam Hobson, and William Kinder

**A000417**

O48sALIs

```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
3  UNITED STATES OF AMERICA,              New York, N.Y.
4             v.                          22 CR 425 (VEC)
5  CHINWENDU ALISIGWE,
6                  Defendant.
7  ------------------------------x
8                                         April 8, 2024
                                          11:15 a.m.
9
10 Before:
11              HON. VALERIE E. CAPRONI,
12                                         District Judge
13                       APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  MEREDITH FOSTER
        ADAM S. HOBSON
17      Assistant United States Attorneys
18 FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant
19 BY:  ARIEL C. WERNER
        SYLVIE LEVINE
20
21
22
23
24
25
```

O48sALIs

1        (Case called)

2            THE DEPUTY CLERK:  Counsel, please state your

3    appearance for the record.

4            MS. FOSTER:  Good morning, your Honor.

5            Meredith Foster and Adam Hobson for the government.

6            THE COURT:  Good morning, Ms. Foster and Mr. Hobson.

7            MS. WERNER:  Good morning, your Honor.

8            Ariel Werner and Sylvie Levine for Mr. Alisigwe,

9    joined by our paralegal.

10            THE COURT:  Good morning, Ms. Werner, Ms. Levine, and

11   Mr. Alisigwe.

12            THE DEFENDANT:  Good morning, your Honor.

13            THE COURT:  OK.  Ms. Werner, have you and your client

14   read the presentence report dated March 6, 2024.

15            MS. WERNER:  We have, your Honor.

16            THE COURT:  Have you discussed it?

17            MS. WERNER:  Yes.

18            THE COURT:  Mr. Alisigwe, did you read the presentence

19   report?

20            THE DEFENDANT:  Yes.

21            THE COURT:  Did you discuss it with your attorney?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Any objections to the report other than

24   the guideline calculation?

25            MS. WERNER:  None other than what we've already

A000419

O48sALIs

1    stated.

2            THE COURT:  OK.  The presentence report will be made

3    part of the record in this matter and placed under seal.  If an

4    appeal is taken, counsel on appeal may have access to the

5    sealed report without further application to this court.

6            I received a sentencing submission from the defense

7    dated March 25, 2024 that included letters from the defendant's

8    wife, a cleric in Nigeria, a friend and one of his tenants.

9            I received a second letter dated April 5 that included

10    a couple of certificates that he was awarded in MDC and a

11    transcript that I, frankly, find inscrutable, but I appreciate

12    it nonetheless.

13            I received letters from the government dated March 25

14    and April 1, 2024, and I received a letter which was attached

15    to the government's submission dated 3/25.  The 3/25 letter

16    included a victim impact statement from one of the victims in

17    this case.

18            Does any other victim wish to be heard, Ms. Foster?

19            MS. FOSTER:  No, your Honor.

20            THE COURT:  All right.  The defendant was convicted at

21    trial of conspiracy to commit bank fraud, bank fraud, and

22    conspiracy to commit money laundering.  The presentence report

23    reflects a guideline level of 33, criminal history category I.

24    I find the correct guidelines calculations is as follows:

25            All of the offenses are grouped, pursuant to 3D1.3(a)

O48sALIs

and I apply the offense level that results in the highest

offense level for the group, and that is bank fraud (a)

pursuant to 2B1.1(a)(1). Because the maximum sentence is 20

years or more, the base offense level is 7.

There is a dispute about loss amount. Does Ms. Werner

want to be heard further on this, on the issue of the loss

amount?

MS. WERNER: I have some responses to points raised in

the government's April 1 letter. But substantially, your

Honor, we will rest on your submission, unless the court would

like to hear our responses to those specific arguments.

THE COURT: I think the Second Circuit law on this is

clear.

MS. WERNER: So we don't totally agree with that.

*Powell*, it doesn't engage with *Kisor* in our opinion,

your Honor. It is a non-precedential summary order where the

Circuit just doesn't take up the question of loss following

*Kisor*. The defendant didn't even raise *Kisor* in his briefs in

this case and affirmatively accepted the general rule that loss

was either actual or intended loss.

Obviously the Second Circuit has said many times that

questions that are lurking in the record rather than actually

being raised should not be considered to have precedential

effect. So we don't agree that the Second Circuit law is clear

following *Kisor*.

O48sALIs

| | |
|---|---|
| 1 | THE COURT:  OK.  Well, whether that case resolves the |
| 2 | issue or not, I agree with the general principle that the |
| 3 | actual loss amount is the correct measure.  You have preserved |
| 4 | your issue.  Maybe you can appeal it on that.  Maybe you can |
| 5 | get clearer law on that. |
| 6 | The evidence at this trial, looking at the bank |
| 7 | records of deposits and excluding transfers between fraudulent |
| 8 | accounts, supports an intended loss amount of 4.5 million.  So |
| 9 | pursuant to 2B1.1(b)(1)(J), that's a plus 18. |
| 10 | That brings us to the issue of whether there was |
| 11 | substantial hardship caused to a victim or 10 or more victims. |
| 12 | Does the defense want to be heard on that? |
| 13 | MS. WERNER:  No, your Honor. |
| 14 | THE COURT:  OK.  I disagree with the substantial |
| 15 | hardship piece of this, but because under the definition of |
| 16 | that provision of the guidelines there seems to require |
| 17 | permanently, the two victims that the government points to got |
| 18 | their money back.  So while the employer and Prudential were |
| 19 | hurt, I don't think there was substantial hardship to the |
| 20 | individual victims, and the dollar amount is not so great as to |
| 21 | cause substantial harm to either the employer or Prudential. |
| 22 | That said, it's really irrelevant because the factor as stated |
| 23 | in the disjunctive, there were clearly 10 or more victims and |
| 24 | therefore the enhancement applies.  So pursuant to 2B1.1(b)(2) |
| 25 | (A)(1), that is a plus two. |

O48sALIs

1        The substantial part of the scheme was committed

2   outside of the United States, so pursuant to 2B1.1(b)(10)(B),

3   that's a plus two.

4        The defendant possessed five or more means of

5   identification produced from another means of identification.

6   Would the defendant like to be heard on that?

7        MS. WERNER:  No, your Honor.

8        THE COURT:  All right.  I find that enhancement

9   applies.  There is no question that he possessed five or more

10  means of identification that were made from other means of

11  identification.  There is no requirement for this enhancement

12  that the defendant had to know that they were real people.  But

13  even if that were somehow the loss of this factor, the court

14  would find by a preponderance of the evidence that the

15  circumstantial evidence supports the conclusion that the

16  defendant knew he was getting wheeled out on the victims.  So

17  pursuant to 2B1.1(b)(11), that's a plus two.

18       That brings us to obstruction.  Would the defendant

19  like to be heard on that?

20       MS. WERNER:  Yes, your Honor.

21       We think that an obstruction enhancement would be

22  completely inappropriate on the facts of this case.  The

23  government says that an obstruction enhancement should apply

24  because of the duress hearing testimony and the suppression

25  declaration.

A000423

O48sALIs

1    Starting with the suppression declaration, that was

2 his recollection of the events.  The agencies had a different

3 one, which the court credited.  That does not mean that

4 Mr. Alisigwe's recollection was false or that he obstructed

5 justice by submitting that declaration.  You know, he had an

6 experience of his home being searched on that very stressful

7 morning that was true to him, and I think that there is simply

8 an sufficient basis to conclude that he in any way was

9 intending to mislead the court or obstruct justice when he

10 submitted that declaration.

11    I also think that there is a problematic chilling

12 effect to be had on individuals litigating their rights under

13 the Constitution when any time they raise a suppression motion

14 and support it with a declaration that documents their

15 experience, they are then deemed with obstruction points.  It's

16 completely reasonable to think that he genuinely believed and

17 recalled these passports being under his bed.

18    THE COURT:  In a sealed envelope.

19    MS. WERNER:  In a sealed envelope.

20    THE COURT:  OK.

21    MS. WERNER:  It's also possible that there were

22 different passports.  I mean, you know --

23    THE COURT:  Maybe there was an envelope full of other

24 passports under his bed.  Could be.

25    MS. WERNER:  He might not have known that those

O48sALIs

1    passports were on the floor, your Honor.

2              THE COURT:  Could be.

3         Why don't you focus on the duress, on that testimony.

4         MS. WERNER:  Turning to the duress testimony,

5    Mr. Alisigwe raised his duress defense after -- the court is

6    familiar with his history -- after appearing for a change of

7    plea hearing, where he was informed that he might have a

8    defense to this case if someone threatened him or his family.

9         He learned that, and after discussing it with his

10   counsel at the time, he decided to raise that defense.  That

11   was his truth, what happened.  You know, we stand by that

12   defense.  We are not here to relitigate the legal sufficiency

13   of that defense, but Mr. Alisigwe testified about his

14   experience.  And it was never his intention to obstruct justice

15   by talking about the threats that he received.  It explained

16   how he came to be involved in this and that was the truth.

17              THE COURT:  OK.

18              (Counsel confer)

19         MS. WERNER:  The government has never disproved or

20   taken on the nature of his testimony.  They have never showed

21   it to be false.

22              THE COURT:  Well, but we are adults and we can assess

23   whether his testimony was preposterous or maybe had some germ

24   of truth to it.  We don't have to take complete leave of common

25   sense just because we're in a courtroom.

O48sALIs

1      MS. WERNER:  Of course not, your Honor, but it's not

2   all or nothing, right.

3      THE COURT:  Correct.  There could be a germ of truth

4   in the testimony.  That doesn't mean that the testimony as a

5   whole did not include pejorative statements.

6      MS. WERNER:  The testimony, while it did not establish

7   to the court's satisfaction that he had no opportunity to avoid

8   the harm or that he could have made a different decision, his

9   testimony about being contacted by these fraudsters, there is

10  no reason to assume that that was untrue.

11     THE COURT:  It was preposterous, though.  The whole

12  story does not hang together as something that happens.  This

13  was total strangers called and he had no idea who they were,

14  never found out who he was.  The other person that he was

15  working with, he had no idea what that person's name is.  They

16  would randomly meet in Flushing Meadow Park and hand off cash

17  between them.  The story was preposterous.

18     MS. WERNER:  We don't agree with that, your Honor.

19     THE COURT:  Well, we can agree to disagree.

20     MS. WERNER:  I think it does not make sense for him to

21  suddenly, on a dime, in the minute of a change of plea hearing,

22  concoct a story.

23     THE COURT:  Well, that wasn't what he concocted at the

24  time.  What he concocted at the time was he was threatened.

25  There could be a germ of truth in that.

A000426

O48sALIs

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | That is, at some point along the line, at some point |
| 2  | he wanted to get out of the deal. He was tired of it. There |
| 3  | could be a point where someone threatened him. I'm not |
| 4  | suggesting that that little element of, to me, to the extent |
| 5  | there was a germ of truth, that was the germ of truth at some |
| 6  | point along the way. |
| 7  | That is not the story he told. The story he told was |
| 8  | far different from that and was, with all due respect, |
| 9  | preposterous. It just didn't hang together as something that |
| 10 | would happen. |
| 11 | (Counsel confer) |
| 12 | MS. WERNER: Your Honor, Ms. Levine and I were not at |
| 13 | the duress hearing. |
| 14 | THE COURT: I understand. |
| 15 | MS. WERNER: But here is what we can say, having |
| 16 | reviewed the transcript, having spoken about it with |
| 17 | Mr. Alisigwe at length. |
| 18 | He has been remarkably consistent on the fact that he |
| 19 | was threatened to participate in this defense, and I understand |
| 20 | that parts of his story may not make sense to the court. That |
| 21 | is Mr. Alisigwe's truth and we do not think that the |
| 22 | obstruction enhancement applies. |
| 23 | THE COURT: OK. Thank you. |
| 24 | Would the government like to be heard on this? |
| 25 | MS. FOSTER: Yes, your Honor. |

A000427

O48sALIs

1           First, I just want to address the suppression

2   declaration.  The defense argues that this was maybe just like

3   mistaken memory.  But as your Honor knows and referenced, the

4   declaration is very specific.  It references the passports

5   being underneath the bed in an envelope.

6           Also, it is contradictory.  He says that he's outside

7   of the front door of the apartment, yet testifies to the agents

8   reaching underneath the bed to get the passports.  So this is

9   not just a declaration that is sort of general and could be

10  written off as a difference in memory.  It's a very specific

11  declaration.

12          I also want to address the idea that, you know, saying

13  that the declaration would require an obstruction enhancement

14  would have a chilling effect.  This isn't a case where we're

15  not just talking about, as your Honor knows, the declaration.

16  We're also talking about a pattern that the defendant has had

17  in this case of obstructing justice.  It's not just the

18  declaration.  It's the extensive testimony that he gave at the

19  duress hearing.

20          And on the duress hearing, you know, the defense

21  implies that we are, you know, mistaking your Honor's ruling on

22  the insufficiency of the evidence for the holding that, you

23  know, there was no duress in this case.  We're not saying that.

24  Instead, we're saying that now that all the evidence has come

25  in at trial, it is even more clear that this rather

A000428

O48sALIs

preposterous account of duress is not true.  The defendant has

been disproved.  There was no duress evidence in the phones,

even though the phones were seized and searched, and he claims

that he communicated by phone with these individuals who

threatened his mother.  There was no evidence of concern for

his mother's safety in his phones.  And to the contrary, the

evidence shows that he was friendly with his coconspirators and

he was taking an active role in making sure that the fraud, the

objects of the fraud were achieved.

The evidence also showed that, you know, this wasn't a

case where he did one or two transactions.  He was doing this

day in and day out, and the benefits of this fraud were clear.

He spent lavishly on himself, in the amount of $100,000 at

least, based on the bank records.  And it was clear from the

evidence at trial that that was his motive to commit these

frauds and that this excuse about the duress was entirely not

only implausible, but made up by the defendant to avoid

responsibility in this case.

THE COURT:  Thank you.

I find that the obstruction enhancement is

appropriate.  Putting aside the suppression hearing, it could

be a failure of recollection.  He could have thought that the

passports were in an envelope.  If that were all this were, I

would probably not grant the motion that there is an

obstruction enhancement.  But there's not.

A000429

O48sALIs

1          Again, just to repeat what I said.  Even if there is a

2     germ of truth that there were some threats against Mr. Alisigwe

3     to get him initially involved or to keep him participating in

4     the crime, the story he told during the duress hearing was

5     absolutely preposterous.  Whatever germ of truth there was in

6     that testimony got lost in just out-of-mouth fiction, and it

7     was told precisely to obstruct these proceedings.

8          So pursuant to 3C1.1, that's a plus two.  That brings

9     us to a zero point offender.  Would the government like to be

10    heard on this?

11         The only reason that he didn't get the minus two on

12    that was because of substantial hardship.

13         (Counsel confer)

14         MS. FOSTER:  We have nothing more to add on that.

15         THE COURT:  I just don't -- I can't agree there was a

16    substantial hardship to permit.  There was a lot of hardship to

17    be clear, but I don't think the sort of hardship that the

18    guidelines anticipate.  So that is a minus two.

19         Let me just say both as to the obstruction enhancement

20    and as to the zero point offender, I would impose the same

21    sentence in this case regardless of whether I make either of

22    those adjustments.

23         That brings me to an adjusted offense level of 31, if

24    I've done the arithmetic correctly.

25         Let me just double-check.  Correct, 31.  As noted, no

A000430

O48sALIs

1    criminal history.  He's in criminal history category I.  Level

2    31, criminal history category I yields a guideline range of

3    108 to 135 months.

4              Are there any guideline arguments I have not

5    addressed, Ms. Foster?

6              MS. FOSTER:  No, your Honor.

7              THE COURT:  Ms. Werner?

8              MS. WERNER:  No, your Honor.

9              THE COURT:  All right.  I don't see a basis for a

10   departure from the guidelines.

11             Are there any factual issues in dispute?

12             MS. FOSTER:  No, your Honor.

13             MS. WERNER:  No, your Honor.

14             THE COURT:  OK.  Would the government like to be heard

15   on sentence?

16             MS. FOSTER:  Yes, your Honor.  Thank you.

17             I don't want to belabor what is in our sentencing

18   submission.  However, I want to directly address a few points

19   that the defense made in its submission.

20             First, the defense appears to argue that the defendant

21   is less culpable and his sentence should be less because he

22   wasn't the person on the computer directly scamming people out

23   of millions of dollars.  However, the defendant was a necessary

24   and fundamental piece of the execution of this fraud, and the

25   individuals behind the computers could not successfully defraud

**A000431**

O48sALIs

1   these victims without the defendant.  The scheme would not have

2   worked if the victims had been asked to send money directly

3   overseas.  They would have been much more likely to suspect

4   something was wrong.  So the people behind the computers needed

5   someone to open bank accounts in stolen identities in the

6   United States.  They also needed someone to quickly withdraw

7   the stolen money as soon as it was deposited into the accounts

8   before the victims and the banks caught on, and they needed

9   someone to open new accounts as soon as prior accounts had been

10  closed down after they were flagged for fraud.

11       The defendant played this necessary role for years.

12  He opened 36 bank accounts, conducted hundreds of transactions,

13  all for the purpose of helping to steal this money from

14  innocent victims.  So the idea that the really distasteful

15  conduct is somewhere else and he's somehow less culpable, I

16  don't think that bears itself out.  And that's especially true

17  when you consider it in Mr. Alisigwe's case, that this conduct

18  continued for such a long period of time and was comprised of

19  so many actions, all with the purpose of furthering this fraud.

20       I also think what makes -- part of what makes these

21  schemes so pervasive and difficult to prosecute and put a stop

22  to is that the knowledge of the criminal actions are

23  compartmentalized.  So the people committing the actual direct

24  fraud, the ones making the misrepresentations, for the most

25  part, are broad, largely untraceable and unfindable, and the

A000432

O48sALIs

1    people, the defendant here, the ones we can trace, they are

2    insulated from some that of knowledge.  I would suggest, your

3    Honor, that that is intentional and that's a part of these

4    schemes and how they continue to defraud these victims.

5          The next point I want to quickly touch on is the

6    defendant's history and characteristics and the nature of the

7    defendant's character.  The defense has understandably pointed

8    to his lack of criminal history and record, and that is

9    something definitely the court can and should consider.  But I

10    also think we have to look at his records since the time of his

11    arrest, not just the conduct itself, which is, of course,

12    serious and troubling.

13          But what happened after that?  The defendant has

14    continually refused to accept responsibility for his actions.

15    Instead of recognizing what he did was wrong, the defendant has

16    falsely portrayed himself as the victim in this event.  He told

17    the court an implausible story about being threatened into this

18    criminal conduct, criminal conduct that he carried on for

19    years.  The story that he has offered has absolutely no

20    evidence in support of it, and yet despite the plainly

21    implausible nature of this story, the defendant has clung to it

22    in order to repeatedly refuse to take responsibility for what

23    he did.

24          In fact at trial, as your Honor likely remembers, he

25    got angry and complained about being treated unfairly when he

A000433

O48sALIs

1  was unable to testify about these threats, despite two prior

2  orders of your Honor precluding him from doing so.  The

3  defendant's actions do not indicate that he recognized that

4  what he did was wrong and has shown that he wants to make

5  things right.  This is deeply troubling.  The government would

6  contend that it's in favor of a substantial sentence of

7  imprisonment.

8          The next thing that I want to touch briefly on is the

9  defense argument the court should basically disregard the

10  guidelines because courts have criticized the guidelines use of

11  loss as the main measure of the seriousness of economic crimes.

12  It is true that courts have in certain cases found the loss

13  amount was not a good proxy for the defendant's culpability,

14  for example, where the actual loss amount was a result of some

15  accident or was driven by a broader conspiracy in which the

16  defendant had a very small role.

17          However, this is not the case here.  Here, the loss

18  amount is actually a very good proxy for the defendant's

19  culpability.  The defendant was responsible for laundering the

20  entire 4.5 million of stolen funds.  He didn't just touch a

21  portion of these funds.  Instead, he touched all 4.5 million of

22  them.  He also participated in the scheme over the course of

23  years and through hundreds of intentional decisions.  He opened

24  36 accounts, accounts that received stolen funds from upwards

25  of 40 victims, and so the significant loss amount here actually

A000434

18

O48sALIs

reflects the longstanding and far-reaching nature of the
defendant's criminal conduct in this case.

For similar reasons, the defendant's conduct is also
not aberrational. As the defense argues, conduct that one
engages in repeatedly over several years is not aberrational.
Instead, the defendant has engaged in a long pattern of
criminal conduct for a significant portion of his life which he
just happened to avoid criminal prosecution for prior to this
case.

The last thing I wanted to just touch on is the notion
of deterrence. As the government has noted in its sentencing
submission, this is a case where general deterrence is
particularly necessary. These frauds are extremely difficult
to prosecute. The international nature of these cases also
means that large numbers of people who participate in them will
never face any consequences for their actions.

So the government's recommendation for a sentence in
this case is because it believes that such a sentence would
help to communicate the types of very serious consequences that
will result if someone is deciding whether to participate in
furthering this type of a scheme.

So, for all these reasons, we believe that a
substantial incarceratory sentence is important to reach the
goals of sentencing and so we've tried, in crafting that, to
recommend a sentence of 108 months, which we believe here is

**A000435**

O48sALIs

```
1    not greater than necessary to serve those purposes.
2                 THE COURT:  Thank you.
3                 Ms. Werner.
4                 MS. WERNER:  Thank you, your Honor.
5                 Your Honor, up to this point, Mr. Alisigwe has already
6    been severely punished.  The court is familiar, of course, with
7    the legal and procedural history of this case.  The court is
8    less familiar with what has been going on for Mr. Alisigwe, the
9    more private part of it.  The fact that he has been suffering
10   for nearly two years.  He has spent nearly two years in
11   conditions that are operating under, frankly, hellish and
12   inhumane conditions.  Even it's gotten worse since the filing
13   of our submission two weeks ago.  There are now reports of
14   maggots in the food at the MDC.
15                THE COURT:  I have been well engaged with that issue.
16   I do not believe there were maggots in the food.
17                MS. WERNER:  Well, the facility --
18                THE COURT:  May have been bugs.  May have been.
19                MS. WERNER:  I don't want to get bogged down whether
20   there were weevils at the MDC or maggots.  There are bugs in
21   the food that people are finding.
22                THE COURT:  OK.
23                MS. WERNER:  And that's appalling in our view.
24                THE COURT:  I don't disagree.
25                MS. WERNER:  The lockdowns situation has not improved.
```

A000436

O48sALIs

1    It has only gotten worse.  The situation at the MDC is abysmal.

2            For Mr. Alisigwe, it has been in many ways worse than

3    it has been for other prisoners, because during the entire

4    period that he has been incarcerated, he has been unable to see

5    his wife, his mother, and his children.  He has been completely

6    cut off from them.  And what that does to any person's psyche,

7    let alone the emotional well-being of a person who cares so

8    much about their family, it's been devastating to watch the

9    transformation that he has gone through over the last two

10   years.  He has spent this time reflecting, and the court will

11   hear from him in a moment.  He is very reflective about his

12   role in this and his own behavior, and that suffering has had

13   an impact on him.

14           Turning to his role in this offense.  We're not here

15   to revisit the duress question, but this was a sprawling,

16   sophisticated operation.  I think the parties agree there are

17   fraudsters who are sitting far away beyond their reach, who are

18   in many ways pulling the strings of this operation.  They are

19   designing it, they are identifying and targeting victims, and

20   then they are locating people who they are able to use as their

21   pawns.

22           This is not to say that Mr. Alisigwe's role was not

23   intentional or willful.  We are not here to relitigate that.

24   But he is, in a sense, the pawn being used by these people

25   overseas who are profiting substantially from this scheme.  He

A000437

O48sALIs

understands now what a huge mistake it was to participate, what a mistake it was, that it was also wrong.  He's ashamed of it.

But his role matters.  I disagree with the government that there is no distinction to be drawn between the culpability of someone who plays the role that Mr. Alisigwe played, which is opening bank accounts that money is coming into, and moving money that he played no role in stealing from victims.  It's an important role in this scheme no doubt, but there is a difference.  There is a major difference between a person who looks up wheelchairs for kids and makes a decision to try to steal nearly $50,000 from a charity that serves disabled children and a person who opens up a bank account and never hears the name Wheelchairs For Kids until there is a victim impact letter in his case claiming that he targeted them when he never did.  His role is different.  He has more than paid for that role, and a sentence of two years is enough to punish Mr. Alisigwe for the role, the very specific role that he played in this offense.

In terms of specific deterrence, as I noted, he has been punished harshly and his punishment will continue.  As we noted in our submission, these offenses will be defined under the immigration law as aggravated felonies.  We don't know what will happen when Mr. Alisigwe goes to immigration court.  But as he litigates those claims, his detention will be mandatory. So he will serve additional time in ICE detention after the end

A000438

O48sALIs

1 of his prison sentence, and there is a very strong possibility,

2 the case law I know the court is familiar with says that it's

3 all but certain he will be deported.

4   And his identity as an American, the life he has

5 built here, is incredibly important to him.  Before he became

6 involved in this scheme, he was building and living the

7 American dream.  He had grown up in poverty in rural Nigeria in

8 a place where he trecked miles to get pails of water to bring

9 home to his mud house and slept on the floor.  And he applied

10 for this lottery visa and remarkably was able to come to the

11 United States.

12   When he came here, he did not squander that

13 opportunity.  He immediately found employment.  He was such a

14 trusted employee of the patient for whom he was a home health

15 aide, that that person left him a sizeable behest in his will

16 that Mr. Alisigwe did not put away, but rather used for the

17 down payment on a home, a home that he eventually hoped would

18 be filled with the laughter of his children and his wife when

19 he brought them over.

20   Because of his involvement with this scheme, I don't

21 want to say that that vision is gone, because there may be a

22 fight ahead.  And I hope he wins it.  I don't want to comment

23 on the success of that claim, but it is very much in jeopardy.

24 That dream is very much in jeopardy as a result of his

25 involvement, and that is a tremendous punishment.

A000439

23

O48sALIs

1        In terms of general deterrence, your Honor, no one
2   could look at what has happened to Mr. Alisigwe and come away
3   with the conclusion that he is getting a slap on the wrist.
4   After his arrest, despite the fact that this was a financial
5   case, he was detained, he was never granted bail, and he sat in
6   pretrial detention for a very long time under very harsh
7   conditions.  He will face these serious immigration
8   consequences.  Nothing about this experience, from his pretrial
9   detention to his prison time to his loss at trial to whatever
10  happens in immigration court, could ever possibly be construed
11  as lenient.

12        And while I recognize that the government feels the
13  people who are playing these far-away roles in the fraud, the
14  people who are more culpable that Mr. Alisigwe, they may be
15  hard to reach.  But no one, neither they nor the people who are
16  targeted as their pawns in the United States could look at
17  Mr. Alisigwe and feel there is no risk in participating in the
18  way that he did.

19        In terms of retribution, his involvement does not
20  merit more than a two-year prison sentence.  The government is
21  arguing for a ten-year sentence which, when you look at other
22  sentences coming out of this courthouse -- I mean, Sam
23  Bankman-Fried getting 25 years for a scheme involving billions.
24  The idea that a person who played the role Mr. Alisigwe played,
25  the idea that he should serve a decade in prison shocks my

A000440

O48sALIs

1    conscience, at least.  That would be an incredibly

2    disproportionate sentence to the conduct that he committed.

3         We stand by our arguments in our sentencing submission

4    about loss as a very poor proxy for culpability generally, and

5    as a poor proxy for Mr. Alisigwe's culpability.  He was not

6    responsible for the amount of money that these far-away

7    fraudsters sought from victims.  The government has not proved

8    in any way that he is responsible for every transaction that

9    happened in these accounts.  They showed some subset of videos

10   and photographs showing him committing transactions in the

11   accounts, but they cannot establish that he is responsible for

12   all of the movements and all of the money coming into those

13   accounts.

14        And so that $4.5 million figure, besides being

15   untethered from the reality of loss in this case, it is not an

16   actual reflection of what he intended to do and of the harm

17   that he did.

18        THE COURT:  I don't want to change your flow, but it

19   has to be either him directly or indirectly.  He opened the

20   accounts.  He had control of debit cards.  He had control of

21   the accounts.

22        The numbers, you know, the account numbers, any

23   passwords, all of that was him.  Whether he was the one that

24   sat at a computer and moved the money to the next bank account,

25   he either did it directly or did it indirectly by giving that

A000441

1     information to someone else for them to do it.

2           MS. WERNER:  Let's assume that he gave the information

3     to someone else.  I don't think that that person's decision-

4     making, with regard to what they did in those accounts, any

5     transfers that they did, any transactions that they did, that

6     is not a reflection of his intent and it should not be a

7     reflection of his culpability either.

8           I understand how conspiracy works.  I'm not saying

9     that he bears no responsibility.  But if those people did

10    transactions leading up to, you know, $4.5 million, that does

11    not reflect what he intended to do.

12          Finally, your Honor, and I think most importantly,

13    Mr. Alisigwe is not that person.  This case, in these actions,

14    he is not that person.  He is so much more than that.  The

15    court has read the letter from his wife, from his pastor, from

16    his friend.  He is a person who, in his community, is known for

17    charity, who is known for caring not only about his kids, his

18    mother, but caring for widows, caring for orphans, for

19    supporting people whenever he can.  Is a person who worked hard

20    to get to the place where he was when he took an extremely

21    wrongful detour and became involved in this offense.

22          As I said, he is ashamed of the fact that he betrayed

23    the values that he holds dear as a religious person, as a hard-

24    working person, a person with a very strong sense of what is

25    right and what is wrong, and these actions that he took part

A000442

O48sALIs

```
1    in, they do not reflect the truth of who Mr. Alisigwe is.  He

2    has a life to live beyond this.  He will return to being a

3    father, to being a husband.  It's very important to him that he

4    get back to care for his mother, whose health has been failing

5    as this case has been progressing.  And we feel very much that

6    he has suffered enough, that he has been punished enough.

7              THE COURT:  Thank you, Ms. Werner.

8              Mr. Alisigwe, would you like to be heard?

9              THE DEFENDANT:  Yes.

10             THE COURT:  If you're going to read something,

11   Mr. Alisigwe, I'm going to encourage you to read it slowly.

12   The court reporter has to get it all down.  It's important that

13   she gets everything you say.

14             THE DEFENDANT:  This is my letter to the judge.

15             Your Honor, Honorable Judge Valerie Caproni, United

16   States District Judge.  Good morning, your Honor.

17             I'm writing this letter to you with so much panic in

18   my heart.  Thank you so much for taking out your time to read

19   this, my letter.  My name is Chinwendu Aligiswe.  I am from

20   Amaike in Orlu, Imo State, Nigeria.  It's a very small village.

21   I am from a family, a family of two brothers and three sisters,

22   my mother, my father, my grandmothers, and we all live in a

23   two-bedroom mud house.  I am the last child of my parents.

24             My parents suffer so much.  My parents suffer so much

25   trying to give us a good education in my village, to feed us,
```

O48sALIs

1    and to clothe us.  Living in a village of no water, no

2    electricity, and no good roads, my mother was very -- was a

3    very hard-working, loving, hard-working, loving, caring and

4    compassionate.  When my father stopped working and my mother

5    was the only -- was the only one taking care of the whole

6    family, she worked six days a week.  And on Sunday, when we all

7    go to church, once we come back from church, she would go back

8    to the market to sell her goods so that we can eat at home and

9    be able -- and be able to go to school, because she is the only

10   one paying for our school fees at school.

11           My mother was everything to me.  She suffered so much

12   for us.  For especially me.  When I broke my leg, she was

13   the -- she was the one carrying me around for treatment and to

14   the market on her bicycle for my way and back.  I am in America

15   today.  It's her.  My mother made it possible for me to come to

16   America.

17           My mother had to borrow money from people.  She sold

18   some of her things, and she also borrowed -- she also borrowed

19   a small piece of land to make sure I came to America.  Me

20   winning the American visa lottery was the best thing that ever

21   happened to my family, and me coming to America has been a big

22   blessing in my life and to my family.

23           I have been praying so much for God to help me bring

24   my mother and my family to America to live with me here so she

25   can have a very good medical care here in America.  My father

A000444

O48sALIs

was never around.  Maybe once a week or twice, if we are lucky.

Even when I feel -- even when I fell and broke my shoulder, it

was all my mother who took care of me.  It was all my mother

that took care of me for months.  She would carry me on her

back for hours.  My brother was killed and my father was killed

also in the village.  My second sister died, and my family

members said she was killed also by poison.

Since I came to America, I have been working two or

three jobs to help my family and to support some poor widows

and their children, and also support the disabled people and

motherless and fatherless children place, because I know how

hard and painful life is out there.  I am not a bad person.  It

was never my American plan or intentions to get involved in

this horrible (get) in my life.

I was not trained by my parents to be involved in any

criminal activity.  I am from a well-known, God-fearing family,

and truthful Christian home in my village and in my church.  I

regret my actions, how I handled the whole situation, the whole

threats that was coming to my family.  My mother's life was so

much in danger.  A letter was extended to my wife and kid.  It

hurts me so much that I got involved in this shameful act and I

am in prison today because of it.

I haven't seen my kids, wife, or my lovely mother.  I

promised my family that they were coming to America in 2006,

once they got their visas to come over here.  My heart bleeds

A000445

O48sALIs

1    so much, so much pain that I cry every day praying to God,

2    praying to God for mercy, for him to have mercy on me.

3          I'm so, so sorry, your Honor.  Have mercy on me.  Have

4    mercy upon me, and please give me a second chance in life

5    again.  Please.  All I ever wished for was for my family to

6    move here and live over here with me and be safe from -- be

7    saved from hands, poisoned or killed.

8          Please, your Honor, have mercy on me.  I am very sorry

9    for my actions.  I wish I can turn back the hands of time now.

10    I would have done -- I would have done it right now.  Please,

11    ma'am.  I am deeply sorry for my actions.  Please have mercy on

12    me, ma'am.  Please, ma'am, have mercy upon me.

13          THE COURT:  Thank you, Mr. Alisigwe.

14          Mr. Alisigwe, I'm required by federal law to consider

15    the nature and circumstances of your offense and the history

16    and characteristics of you.

17          You're 38 years old.  You have five children.  You won

18    a visa lottery and received a green card.  In all likelihood,

19    this conviction will result in your deportation from the United

20    States.  That's sad for you, giving up what really was the

21    lottery.  I mean, you won the lottery.

22          On the other hand, because all of your family is in

23    Nigeria, virtually all of your family is in Nigeria, that does

24    not present the same sort of negative collateral consequences

25    that it does for many, many, many, many noncitizen defendants

A000446

O48sALIs

1    that are deported and all of their family is still in the

2    United States.

3            The defendant was raised in Nigeria and completed high

4    school.  He's married and has four children in Nigeria with his

5    current wife.  His mother is still alive, and he's obviously

6    quite connected to his mother, and she is not in great health.

7    Mr. Alisigwe appears to be estranged from his surviving

8    siblings.

9            While in the United States and before his involvement

10   in this crime, he worked as a home health aide.  He reported

11   that he had a long-time client who so appreciated his work that

12   he named the defendant in his will.  The defendant used those

13   proceeds to buy a house that he still owns in Queens.

14   Inextricably, despite inheriting between 400,000 and

15   $700,000 -- the number varied between the probation report and

16   pretrial services report -- he took out a mortgage on the

17   house.  It's not clear where the cash that he inherited went.

18   He continues to own the house, and it generates monthly income

19   even with the mortgage.

20           His wife thinks he's great and reports that his

21   children miss regular contact with him.  The cleric in Nigeria

22   reports as the chairman of the church's parochial committee.

23   The defendant reports that he's is engaged in charitable giving

24   in Nigeria.

25           The defendant has participated in some programming at

O48sALIs

the MDC and has a clear disciplinary record. Taking all that
into account, federal guidelines requires me to impose a
sentence reasonable but no greater than necessary to accomplish
the goals of sentencing. I have considered all the required
sentencing factors as well as the guidelines.

In terms of what is most important, we start with the
seriousness of the offense. This is undoubtedly a serious
offense. You only need to pick a jury in this city to learn
how many people have been victimized by identity theft. Even
if the victim does not actually lose money in the scheme, the
crime itself causes huge headaches. And the victims who don't
lose money, it's not uncommon that the reason they don't lose
money is because the bank is making up the money. When the
bank makes up the money that, in turn, increases the costs of
goods and services for everybody, because everybody ends up
paying more because the bank is having to compensate customers
because their money was stolen by people like Mr. Alisigwe and
his coconspirators.

So, furthermore, this was not a one time foray into
this crime for the defendant. As the prosecutor pointed out,
Mr. Alisigwe, you participated in this crime for years. You
were not a passive participant. You had to keep up with the
timing of deposits so that money could strategically be moved
as soon as possible to protect it from seizure. You went into
the bank with other people's passports. You have got to have

A000448

O48sALIs

ice in your veins to be able to sit in front of a bank officer

and say, Oh, yes, this is me.  I need to open a bank account.

And you did all that despite having a healthcare business and

other ways of legitimately earning money in this country.

I've considered the need to promote respect for the

law.  Society expects that people who engage in these sorts of

well-planned out fraud schemes receive appropriate sentences.

I agree with the defense, you're not the mastermind of all

this.  But these schemes depend on everybody, the people who

are the masterminds and the people who are receiving false

passports and walking into banks and opening bank accounts.

I've considered the need to provide just punishment

while avoiding unwarranted disparities.  Mr. Alisigwe, this

factor says that similar people should get similar sentences.

The problem with that is no two people are exactly the same,

and it's hard to draw sort of direct lines between two people

who are engaged even in the same crime.

Your attorney has argued to me about the fraud table

and how it skews sentences in fraud cases.  I tend to agree

with that point, and certainly at the upper ends of the fraud

table that has a particularly adverse effect on skewing

sentences upward.  In this case, however, the guidelines

statistics that the Commission has provided us show that the

vast majority of defendants with this crime of conviction at

level 33, which is higher than I've calculated your guideline

O48sALIs

1    to be, receive a term of imprisonment, they all receive a term

2    of imprisonment, virtually all, and the average sentence is

3    93 months.  The median was 90.  That tells me that most judges

4    countrywide tend to agree that the guideline sentence is

5    somewhat skewed high, perhaps warranting a downward variance.

6           I've considered the need to defer criminal conduct.

7    There are two aspects of deterrence that judges are supposed to

8    consider.

9           General deterrence, how do we deter people generally

10   from committing crimes.  It would be in your case, whenever the

11   first person suggested this to you, you would have said,

12   absolutely not.  I'm having nothing to do with this.  You and

13   everyone else would do that.  Specific deterrence is how do we

14   deter you from committing another crime.

15          In terms of general deterrence, look, I think it's

16   important that generally the word is out that these sorts of

17   schemes are treated harshly by the government.  But I'm not

18   sure many people are going to know what Mr. Alisigwe's sentence

19   is.

20          In terms of specific deterrence, I think it's

21   important.  Mr. Alisigwe is now saying all the right things.

22   He says he's terribly sorry.  He wants the court to show mercy

23   on him.  His mother is wonderful.  But you participated in this

24   crime for years.  You opened, what do they say, 40-something

25   bank accounts.  That means you walked into lots of different

A000450

O48sALIs

1  banks, sat down with --

2         You're shaking your head.  That's what you did.

3  That's what you did.  You were stopped at JFK twice and

4  questioned, and you gave up not an ounce of this.  So whether

5  here or in Nigeria, you need to learn to be the person that you

6  said your mother taught you to be, which is an entirely honest

7  person who is not engaged in this sort of criminal scheme.

8         I've considered the need to protect the public from

9  the defendant, Mr. Alisigwe.  There was absolutely no violence

10  that I'm aware of.  Protecting people from fraud is important.

11  While it is true that the defendant should be deported at the

12  end of his sentence, it's not guaranteed.  Based on the defense

13  submission, it seems to me like the defendant plans to fight

14  being deported.  He has every right to do that.  Assuming that

15  he ends up back in the United States, it is important that he

16  understand that fraud in this country is treated harshly.

17         Lastly, I've considered the need to provide the

18  defendant with needed educational or vocational training,

19  medical care, or other correctional treatment.  You need to

20  have a job.  Whether it's here or in Nigeria, you need to be

21  able to get a job.  As a felon, if you end up back in the

22  United States, whether you can be in home healthcare sort of

23  depends on how the authorities view a fraud conviction.  But

24  whether you're here or there, you need a job.  I think

25  somewhere in the presentence report it indicates that you knew

O48sALIs

1  how to lay bricks, that you were a mason for some period of

2  time.  That's a good job.  That's something that you might want

3  to work on.

4          Based on my consideration of the sentencing factors, I

5  find that the guideline sentence is longer than necessary to

6  achieve the goals of sentencing and, therefore, I am varying

7  downward from the guideline range.  That said, I think the

8  defendant's recommendation of a sentence of two years is

9  entirely inadequate to satisfy the goals of sentencing.

10          On Counts One, Two, and Four, I sentence you to the

11  custody of the Attorney General for a period of five years on

12  each concurrent, to be followed by a period of supervised

13  release of five years on Counts One and Two, and three years on

14  Count Four concurrent.

15          The mandatory conditions of supervised release -- all

16  of this is irrelevant if you're not released into the United

17  States -- but if you are released into the United States either

18  because they parole you out of ICE custody or because you

19  actually get relief from deportation, all of these conditions

20  will apply.

21          You must not commit another crime;

22          You cannot illegally possess a controlled substance;

23          You cannot possess a firearm or other destructive

24  device;

25          The defendant will not be subject to mandatory drug

A000452

O48sALIs

1    testing because there is a low risk of drug abuse;

2              The defendant must cooperate in the collect of DNA.

3              In addition to the standard conditions of supervision,

4    I'm imposing the following special conditions:

5              The defendant must provide the probation office with

6    access to any requested financial information;

7              The defendant must not incur new credit charges or

8    open additional lines of credit without approval of the

9    probation office unless he is in compliance with the

10   installment payment schedule;

11             The defendant must submit his person, residence,

12   office, vehicle, papers, computer, other electronic

13   communication data storage devices, cloud storage or media, or

14   effects to search if the probation has a reasonable suspicion

15   that contraband or evidence of a violation of conditions of

16   release may be found there.  If needed, the probation office

17   can conduct the search with the assistance of law enforcement.

18   Any search must be conducted at a reasonable time in and in a

19   reasonable manner.  Failure to submit to a search may be

20   grounds for revocation.  The defendant must inform any

21   residents that the premises may be subject to search pursuant

22   to this condition.

23             The defendant must participate in an outpatient mental

24   health treatment program approved by the probation office.  The

25   defendant must continue to take any prescribed medication,

O48sALIs

unless otherwise instructed by the mental health care provider.
The defendant must contribute to the cost of services based on
his ability to pay or the availability of third-party payments.
I'm authorizing the release of available psychological or
psychiatric evaluations and reports, including the presentence
report, to the healthcare provider.

The defendant must report to the nearest probation
office within 72 hours of release, and he'll be supervised by
the district of residence.

Are there any objections to any of the special
conditions?

MS. FOSTER:  Not from the government.

MS. WERNER:  No, your Honor.

THE COURT:  All right.  In terms of a fine, I disagree
that he has no ability to pay.  He's got equity in a house.
The restitution and forfeiture will wipe out any available
funds that he has.

The defendant is ordered to forfeit $4,463,475.80 to
the government.  The defendant is required to pay restitution
in the amount of $499,949.88.

There is a mistake in the restitution order.  You've
got an individual victim rather than Prudential as one of the
payees.  If you can submit a new restitution order, please.

MS. FOSTER:  Yes, your Honor.

THE COURT:  I must impose a $300 special assessment.

**A000454**

O48sALIs

The installment payment is, assuming the defendant is released
into the country, he has to comply with the Inmate Financial
Responsibility Program while in prison.  Thereafter he must pay
10 percent of gross income towards his financial obligations.

Are there any requests for designation?

MS. WERNER:  One moment, your Honor.

THE COURT:  Sure.

MS. WERNER:  Your Honor, we would request a
recommendation of a facility in the northeast in the New York
area.

THE COURT:  OK.  I'm happy to make that request.

Can you give me, kind of, why you want the northeast?

Is it to facility attorney visits, or does he have
friends that would visit him?

MS. WERNER:  Potential visits from friends.

THE COURT:  OK.  I'll make that request.

Mr. Alisigwe, I'll request that you be kept somewhere
near the New York area.  All I can do is request.  At the end
of the day it's up to the Bureau of Prisons where they are
going to put you.  I'll ask that they put you nearby to
facilitate visits.

Mr. Alisigwe, you have the right to appeal your
conviction and sentence.  If you're unable to pay the cost of
an appeal, you may apply for appeal *in forma pauperis*.  The
notice of appeal must be filed within 14 days of the judgment

A000455

O48sALIs

1  of conviction.

2           Anything further from the government?

3           MS. FOSTER:  No, your Honor.

4           THE COURT:  Is there an underlying indictment in this

5  case?

6           MS. FOSTER:  To the extent there is, we would ask that

7  that any open counts be dismissed.

8           THE COURT:  The underlying indictment, I think this is

9  an S1.  There must be another one.

10           MS. FOSTER:  Yes, there is.

11           THE COURT:  S1.

12           The original indictment is dismissed.

13           MS. FOSTER:  The only other thing I would note is that

14  we handed your deputy a proposed order of forfeiture.

15           THE COURT:  He signed the order of forfeiture.

16           MS. FOSTER:  We will submit and confer with counsel --

17           THE COURT:  A revised restitution order.

18           MS. FOSTER:  Yes.

19           THE COURT:  Yes.  Thank you.

20           Anything further from the defense?

21           MS. WERNER:  No, your Honor.

22           THE COURT:  Thanks, everybody.

23           (Adjourned)

24

25

 **Agbogidi**

Thanks bro 7:21 PM ✓✓

MAY 11, 2018

Anything for Sadia mughal?? 2:52 PM ✓✓

 **NBC News on Twitter**
""And no, I do not yield one second to you! Not one second!"Heated exc…
twitter.com

Check out @NBCNews's Tweet:
https://twitter.com/NBCNews/status/994936413299920897?s=08 6:21 PM

Waw 7:14 PM ✓✓

MAY 19, 2018

📞 Missed voice call at 6:17 PM

How far igba? 6:20 PM ✓✓

I dey for call 6:21 PM ✓✓

But we can chat 6:21 PM ✓✓

Keije 6:21 PM ✓✓

Udo 6:33 PM

Good evening 6:33 PM

GOVERNMENT
EXHIBIT
301
22 Cr. 425 (VEC)

A000457



Old Items

daniel johnson, ████0028 dob 04/17/1982.

Feb 7 4:18 PM

ennis clark, ████2994 dob 01/05/1980

Feb 7 4:21 PM

joseph haley, ████5693 dob 06/07/1982

Feb 7 4:26 PM

sadia mughal, ████1658 dob 01/07/1975

Feb 7 4:30 PM

Ok... A big thanks

Feb 7 4:33 PM

Chukwubueze

Mar 21 5:10 PM

Enter message                    Send

GOVERNMENT
EXHIBIT
302
22 Cr. 425 (VEC)

A000458

BUSINESS name.

L I INDUSTRIAL COMPANY
LIMITED.
BUSINESS Address. 995 EAST
78TH STREET BROOKLYN, NY
11236.

ACCOUNT #.
████████4201.

ROUTING#
021000089.

SWIFTCODE.
CITIUS33.

CITIBANK, N.A.
185 MADISON AVENUE NEW
YORK, NY 10016.          9:16 A

A000459

GOVERNMENT
EXHIBIT
303
22 Cr. 425 (VEC)



GOVERNMENT
EXHIBIT
304
22 Cr. 425 (VEC)

A000460



Auction ACCESS

**C ALISIGWE**

*Cardholder Since 2017*

**101306776**

GOVERNMENT EXHIBIT 305
22 Cr. 425 (VEC)

A000461



## UNITED STATES OF AMERICA · PERMANENT RESIDENT

ALISIGWE CHINWENDU C 21 NOV 198

**Surname**
**ALISIGWE**

**Given Name**
**CHINWENDU C**

**USCIS#**     **Category**
**059-482-575**    **DV1**

**Country of Birth**
**Nigeria**

**Date of Birth**    **Sex**
**21 NOV 1985**    **M**

**Card Expires:**    **05/02/24**

**Resident Since:**    **06/19/08**



# NEW YORK STATE

### DRIVER LICENSE

USA

**ID 413 011 169**    **Class E**

**ALISIGWE
CHINWENDU C**

96 RUBY ST # 1
ELMONT, NY 11003



**Sex** M   **Height** 6'-01"   **Eyes** BRO

**DOB** 11/21/1985

**Expires** 11/21/2021

E NONE

R NONE

**Issued** 05/16/2017



CHINWENDU A

EXCELSIOR

NOV 85

**GOVERNMENT
EXHIBIT
306**

22 Cr. 425 (VEC)

A000462



Customer Service/Servicio 800.421.2110    Collect outside the U.S. and Canada 302.738.3775

869

▲ AUTHORIZED SIGNATURE    Security Code

**CHINWENDU C ALISIGWE**
**5524 3385 9149 2632**
**Valid Thru: 04/23   Cardholder Since: 17**

DEBIT CARD

Bank of America



 National Trust *for* Historic Preservation
*Save the past. Enrich the future*

4117 7339 7794 6681

4117    GOOD THRU LAST DAY OF ▶ 11/20    DEBIT

CHINWENDU C ALISIGWE    VISA

Bank of America

BUSINESS DEBIT CARD

4135 7445 0768 1909

GOOD THRU LAST DAY OF ▶ 04/21
CELE PRIVATE CARE
CHINWENDU C ALISIGWE    VISA

Global     Fidelity



6500 0412 1003 9851

Valid Thru
01/22

CHINWEKOS GOLDEN    Verve

A000463

GOVERNMENT
EXHIBIT
307
22 Cr. 425 (VEC)

# FEDERAL REPUBLIC OF NIGERIA



PASSPORT
PASSEPORT



Type / *Type*
P

Country Code / *Code du pays*
NGA

Passport No. / *Passeport Nº*
A50451209

Surname / *Nom*
ALISIGWE

Given Names / *Prénoms*
CELESTINE CHINWENDU

Nationality / *Nationalité*
NIGERIAN

Date of Birth / *Date de naissance*
21 NOV / NOV 85

Personal No. / *Nº personnel*

Sex / *Sexe*   Place of Birth / *Lieu de naissance*
M

Authority / *Autorité*

Date of Issue / *Date de délivrance*
15 DEC / DÉC 17

Date of Expiry / *Date d'expiration*
14 DEC / DÉC 22

P<NGAALISIGWE<<CELESTINE<CHINWENDU<<<<<<<<<
A504512092NGA8511216M2212142<<<<<<<<<<<<<04

A000464

GOVERNMENT
EXHIBIT
308
22 Cr. 425 (VEC)



citi<sup>®</sup> CITIBANK, N.A.
FRAUD PREVENTION
PO BOX 769027-9027
SAN ANTONIO TX 78245-996

08/07/2017

DAVID HUDGINS
995 E 78TH ST
BROOKLYN NY  11236-3827

GOVERNMENT
EXHIBIT
309
22 Cr. 425 (VEC)

A000465

AO 245B (Rev. 09/19)　Judgment in a Criminal Case　(form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Chinwendu Alisigwe | Case Number: S1 22CR00425- 001 (VEC) |
| | USM Number: 12785-510 |
| | Ariel C. Werner |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)　1,2,4
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC§1349, §1344 | Conspiracy to Commit Bank Fraud | 1/31/2023 | 1 |
| 18 U.S.C. §1344 | Bank Fraud | 1/31/2023 | 2 |
| 18 U.S.C. §1956(h), 18 U.S.C. §1956(a)(1)(B)(i) | Conspiracy to Commit Money Laundering | 1/31/2023 | 4 |

The defendant is sentenced as provided in pages 2 through ____7____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)　open and underlying　☐ is　☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

4/8/2024
Date of Imposition of Judgment

Signature of Judge

Hon. Valerie Caproni, U.S.D.J.
Name and Title of Judge

4. 8. 24
Date

A000466

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT: Chinwendu Alisigwe
CASE NUMBER: S1 22CR00425- 001 (VEC)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Five (5) years on Counts 1, 2, and 4 to be served concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

The Court recommends the defendant be designated in a facility close to New York City Metropolitan Area to facilitate visits.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A000467

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT:  Chinwendu Alisigwe
CASE NUMBER:  S1 22CR00425- 001 (VEC)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Five (5) years on Counts 1 and 2, Three(3) years on Count 4 to be served concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

A000468

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
              Sheet 3A — Supervised Release

Judgment—Page ____4____ of ____7____

DEFENDANT: Chinwendu Alisigwe
CASE NUMBER: S1 22CR00425- 001 (VEC)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

**A000469**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page   5   of   7

DEFENDANT: Chinwendu Alisigwe
CASE NUMBER: S1 22CR00425- 001 (VEC)

# SPECIAL CONDITIONS OF SUPERVISION

Defendant must provide the Probation Officer with access to any requested financial info.

Defendant must not incur new credit charges or open additional lines of credit without the approval of Probation Officer unless he is in compliance with the installment payment schedule.

Defendant shall submit his person, residence, office, vehicle, papers, computer, other electronic communications, data storage devices, cloud storage or media, and effects to a search if the Probation Officer has reasonable suspicion that contraband or evidence of a violation of the conditions of release may be found there. If needed, the Probation Officer can conduct the search with the assistance of law enforcement. Any search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant must inform any other residents that the premises may be subject to search pursuant to this condition.

Defendant must participate in an outpatient mental health treatment program approved by the Probation Officer. The defendant must continue to take any prescribed medications unless otherwise instructed by the mental health care provider. Defendant must contribute to the cost of services based on his ability to pay or the availability of third party payments. The Court authorizes the release of available psychological or psychiatric evaluations and reports, including the Presentence Report, to the health care provider.

The defendant must report to the nearest Probation Office within 72 hours of release.

Defendant shall be supervised by the district of residence.

**A000470**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 5 — Criminal Monetary Penalties

Judgment — Page    6    of    7

DEFENDANT: Chinwendu Alisigwe
CASE NUMBER: S1 22CR00425- 001 (VEC)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 300.00 | $ 499,949.88 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| See Order of Restitution | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $          0.00 | $          0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☑ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**A000471**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT: Chinwendu Alisigwe
CASE NUMBER: S1 22CR00425- 001 (VEC)

Judgment — Page ___7___ of ___7___

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___300.00___    due immediately, balance due

       ☐  not later than _____ , or
       ☑  in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

       Defendant must pay at least 10% of his monthly gross income towards his financial obligations after release. While
in custody he must make payments in accordance with BOP's Inmate Financial Responsibility Program.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
$4,463,475.80

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

A000472



Criminal Notice of Appeal - Form A

**RECEIVED**

APR 11 2024

S.D.N.Y. - APPEALS

# NOTICE OF APPEAL

**United States District Court**

Southern _____ District of New York

# ORIGINAL

Caption:

United States of America

v.

Chinwendu Alisigwe

Docket No.: S1 22 Cr. 425

Judge Valerie E. Caproni
(District Court Judge)

Notice is hereby given that the defendant Chinwendu Alisigwe appeals to the United States Court of Appeals for the Second Circuit from the judgment [ ✔ other [ _____
(specify)

entered in this action on April 8, 2024
(date)

This appeal concerns: Conviction only [___] Sentence only [___] Conviction & Sentence [ ✔ Other [___

Defendant found guilty by plea [ ] | trial | ✔ | N/A |

Offense occurred after November 1, 1987? Yes | ✔ | No [ N/A [

Date of sentence: April 8, 2024 _____ N/A [___]

Bail/Jail Disposition: Committed [ ✔ Not committed | N/A |

Appellant is represented by counsel? Yes ✔ | No | If yes, provide the following information:

Defendant's Counsel: Barry D. Leiwant, Esq.

Counsel's Address: Federal Defenders of New York

52 Duane Street, 10th Floor, NY, NY 10007

Counsel's Phone: (212) 417-8763

Assistant U.S. Attorney: Meredith Foster, Esq.

AUSA's Address: 26 Federal Plaza

New York, NY 10278

AUSA's Phone: (212) 637-2310

**ARIEL WERNER, ESQ.**
Signature

**A000473**

---

## CERTIFICATE OF SERVICE

I certify that a copy of this Appendix has been served by ACMS on the United States Attorney/S.D.N.Y.; Attention: **MEREDITH C. FOSTER, ESQ.,** Assistant United States Attorney, 26 Federal Plaza, New York, NY 10278.

Dated:      New York, New York
            August 14, 2024


_Colleen P. Cassidy_
**COLLEEN P. CASSIDY**
Assistant Federal Defender