# 24-960-cr

To be argued by:
**COLLEEN P. CASSIDY**

───────────────────────────────────
───────────────────────────────────

United States Court of Appeals
For the Second Circuit
─────────────────
Docket No. 24-960-cr
─────────────────────────

UNITED STATES OF AMERICA,

Appellee,

-against-

CHINWENDU ALISIGWE, a/k/a SEALED DEFENDANT 1,

Defendant-Appellant.

─────────────────────────────
APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────

**BRIEF FOR DEFENDANT-APPELLANT CHINWENDU ALISIGWE**
───────────────────────────────────

Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

*Attorney for Defendant-Appellant*
**CHINWENDU ALISIGWE**

**COLLEEN P. CASSIDY**,
 *Of Counsel*

───────────────────────────────────
───────────────────────────────────

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

STATEMENT OF THE ISSUES .......................................................... 4

STATEMENT OF THE CASE .............................................................. 6

The Warrantless Searches of Alisigwe's Cellphone at JFK Airport ................. 6

The District Court Denies Alisigwe's Motion to Suppress .............................. 7

Alisigwe Is Charged With Bank Fraud, Money Laundering And
Aggravated Identity Theft ........................................................................ 9

Trial Evidence ........................................................................................ 10

    The frauds and attempted frauds ............................................................ 10

    The bank accounts opened under false names ......................................... 12

    Evidence from the cellphone and mail searches ...................................... 18

The Verdict ............................................................................................. 20

Sentencing .............................................................................................. 20

    A.  The Disputed Loss Amount ............................................................. 20

B.  The Obstruction Enhancement for Perjury at the Duress Hearing ...................................................................22

    Alisigwe's duress testimony ........................................23

    The court's perjury finding ...........................................27

    The Ultimate Sentence ..................................................29

ARGUMENT.........................................................................30

POINT I.................................................................................30

Alisigwe's Fourth Amendment Rights Were Violated By The Trial Court's Admission Of Evidence Resulting From Two Warrantless Searches Of His Cellphone At The Airport ......................................30

A.  The Standard of Review ...................................................31

B.  The search of a cellphone requires a warrant, even in circumstances where a warrantless search is generally allowed ...............................................................................32

C.  The Border Search Exception To The Warrant Requirement.........35

D.  The trial court erred in holding that no warrant is required to search a cell phone at the border ......................................41

E.  The district court's good-faith ruling was wrong...........................46

F.  Alisigwe's conviction should be vacated and a hearing held to determine how much of the government's evidence must be excluded as fruits of the illegal cellphone searches.........................49

ii

POINT II ..................................................................................51

The Plain Meaning Of Loss Under Guideline 2B1.1 Is Actual Loss
And The Commentary Explaining That "Loss Is The Greater Of
Actual Loss Or Intended Loss" Is Invalid Under Kisor v. Wilkie,
139 S.Ct. 2400, 2415 (2019) ...................................................51

    A.  Standard of Review ...............................................52

    B.  The "intended loss" commentary of Guideline 2B1.1 is
       invalid after *Kisor* ...............................................53

POINT III .................................................................................58

The District Court Erroneously Increased Alisgiwe's Guideline Offense
Level For Obstruction Of Justice Based On A Perjury Finding That Was
Unsupported By Specific Findings of Wilful, Material Falsehood And
Was Undermined By The Court's Own Acknowledgement That His
Basic Claim That He Was Threatened Was Probably True ...........58

    A.  Standard of Review ...............................................59

    B.  The District Court's Findings Were Insufficient To Support
       the Obstruction of Justice Enhancement ...........................59

CONCLUSION .........................................................................63

# TABLE OF AUTHORITIES

*Cases*

*Alasaad v. Mayorkas*,
　988 F.3d 8 (1st Cir. 2021) ........................................................ 42, 43, 47

*Arizona v. Gant*,
　556 U.S. 332 (2009) .......................................................................32

*Auer v. Robbins*,
　519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997) ......................................54

*Chimel v. California*,
　395 U.S. 752 (1969) .......................................................................33

*Davis v. United States*,
　564 U.S. 229 (2011) ................................................................... 47, 48

*Kisor v. Wilkie*,
　139 S.Ct. 2400 (2019) ............................................................ 51, 52, 54, 56

*Maryland v. King*,
　569 U.S. 435 (2013) .......................................................................33

*Riley v. California*,
　573 U.S. 373 (2014) ................................................................. *passim*

*S.E.C. v. Dorozhko*,
　574 F.3d 42 (2d Cir. 2009) .................................................................47

*Stinson v. United States*,
　508 U.S. 36 (1993) ........................................................................54

iv

*United States v. Agudelo,*
    414 F.3d 345 (2d Cir. 2005) ..................................................................60

*United States v. Aguiar,*
    737 F.3d 251 (2d Cir. 2013) ..................................................................47

*United States v. Aigbekaen,*
    943 F.3d 713 (4th Cir. 2019) ......................................... 35, 40, 41, 46

*United States v. Algahaim,*
    842 F.3d 796 (2d Cir. 2016) ..................................................................53

*United States v. Alicea,*
    837 F.2d 103 (2d Cir. 1988) ..................................................................23

*United States v. Arguedas,*
    86 F.3d 1054 (11th Cir. 1996) ..............................................................60

*United States v. Asbury,*
    586 F.2d 973 (2d Cir. 1978) ..................................................................35

*United States v. Bakhtiari,*
    913 F.2d 1053 (2d Cir. 1990) ................................................................23

*United States v. Banks,*
    55 F.4th 246, 257 (3d Cir. 2022) ........................................ 52, 54, 55, 56

*United States v. Beebe,*
    21 Cr. 197 (CBA (E.D.N.Y. Dec. 20, 2021) ......................................56

*United States v. Ben-Shimon,*
    249 F.3d 98 (2d Cir. 2001) ........................................................... 59, 60

v

*United States v. Cano,*
    934 F.3d 1002 (2019) ........................................................ 34, 40, 43, 46

*United States v. Coppola,*
    671 F.3d 220 (2d Cir. 2012) ................................................................57

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013) ................................................................53

*United States v. Dunnigan,*
    507 U.S. 87 (1993)................................................................................60

*United States v. Emmenegger,*
    329 F.Supp.2d 416 (S.D.N.Y. 2004)....................................................53

*United States v. Eng,*
    971 F.2d 854 (2d Cir. 1992) ................................................................50

*United States v. Feldman,*
    647 F.3d 450 (2d Cir. 2011) ................................................................62

*United States v. Flores-Montano,*
    541 U.S. 149 (2004)...................................................................... 35, 44

*United States v. Fox,*
    __ F.Supp.3d __, 2024 WL 3520767
    (E.D.N.Y. July 24, 2024) ......................................... 34, 39, 45, 46, 48

*United States v. Gary,*
    20 Cr. 440 (AMD) (E.D.N.Y. Aug. 24, 2023)....................................56

*United States v. Gomez,*
    877 F.3d 76 (2d Cir. 2017) ..................................................................31

vi

*United States v. Kirschenblatt,*
    16 F.2d 202 (2d Cir. 1926) ..............................................................33

*United States v. Kolsuz,*
    890 F.3d 133 (4th Cir. 2018) ..........................................................41

*United States v. Levy,*
    803 F.3d 120 (2d Cir. 2015) ..................................................... 41, 44

*United States v. McKinney,*
    22 Cr. 20249 (JEL), 2022 WL 17547467 (E.D. Mich. Dec. 9, 2022) ...............56

*United States v. Montoya de Hernandez,*
    473 U.S. 531 (1985) ................................................................ 35, 36

*United States v. Nasir,*
    17 F.4th 459 (3rd Cir. 2021) ..........................................................55

*United States v. Patel,*
    No. 19 Cr. 80181 (RAR), 2023 WL 5453747 at *1-3, 2023 WL 5453747
    (S.D. Fla. Aug. 23 2023) ..............................................................56

*United States v. Ramsey,*
    431 U.S. 606 (1977) ..................................................................35

*United States v. Ricciardi,*
    989 F.3d 476 (6th Cir. 2021) ..........................................................55

*United States v. Robinson,*
    414 U.S. 218 (1973) ..................................................................32

*United States v. Rosario,*
    988 F.3d 630 (2d Cir. 2021) ..................................................... 59, 60

*United States v. Smith*,
  673 F. Supp.3d 381 (S.D.N.Y. 2023)............................... 34, 37, 38, 46

*United States v. Sultanov*,
  __F.Supp. 3d __ , 2024 WL 3520443 (E.D.N.Y. July 24, 2024).... 34, 38, 39, 46

*United States v. Taylor*,
  961 68, 74 (2d Cir. 2020)..................................................52

*United States v. Thompson*,
  808 F.3d 190 (2d Cir. 2015) ..............................................59

*United States v. Wallace*,
  937 F.3d 130 (2d Cir. 2019) ..............................................31

*United States v. Wheeler*,
  No. 22 Cr. 38 (LWF), 2023 WL 4408939 ( E.D.N.C. July 6, 2023) ................56

*Weeks v. United States*,
  232 U.S. 383 (1914)........................................................32

**Statutes**

18 U.S.C. 1621...............................................................59

**United States Sentencing Guidelines**

U.S.S.G. § 2B1.1 .......................................................... *passim*

U.S.S.G. § 2B1.1(b)(1) ....................................................... 51

U.S.S.G. § 2B1.1(b)(1) Commentary n.3 .......................................52

viii

United States Court of Appeals
For the Second Circuit
_____

Docket No. 24-960-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

CHINWENDU ALISIGWE, a/k/a SEALED DEFENDANT 1,

Defendant-Appellant.
_____

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

**BRIEF FOR DEFENDANT-APPELLANT CHINWENDU ALISIGWE**
_____

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On February 7, 2019, Alisigwe arrived at JFK Airport with a valid

passport. A government fraud investigator, not part of the border patrol,

searched his cellphone without obtaining a warrant. The agent was looking

for evidence of fraud and identity theft, and photographed evidence from

the cellphone that was ultimately used to charge and convict Alisigwe of

bank fraud, bank fraud conspiracy and money laundering at trial.  On March 1, 2021, the same government agent went to JFK airport to meet Alisigwe when he arrived and again he searched his cellphone and photographed evidence that he found. The evidence taken from Alisigwe's cellphone in both searches was introduced at his trial for bank fraud, money laundering and aggravated identity theft. The searches also led to other evidence introduced at trial, including bank account information and evidence obtained from intercepted mail.

The district court should have suppressed the fruits of these searches. The cellphone searches went far beyond a "routine" border stop and, given the extraordinary invasion of privacy involved in a cellphone search, required a warrant. *Riley v. California*, 573 U.S. 373 (2014). The searches were conducted not by border agents for the purpose of protecting the border, but by a government agent investigating ordinary fraud and identity theft and using a purported "border search" to evade the warrant requirement. Therefore, the cellphone evidence and the evidence resulting

from it should have been suppressed and its admission violated Alisigwe's Fourth Amendment rights.

In sentencing Alisigwe, the court incorrectly calculated the Guideline range based on the "intended loss" amount of $4.5 million, which was the total amount deposited in the accounts opened, even though most of that money was frozen and never lost. The actual loss amount was much lower, $499,949. On this issue of first impression in this Circuit, this Court should apply the Supreme Court's holding in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), as the Third Circuit did in *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022), to hold that the Guideline loss calculation for fraud is limited to actual loss. The fraud loss guideline, U.S.S.G. § 2B1.1, creates escalating offense level enhancements based on "loss," not intended loss. "Intended loss" appears only in the commentary to the fraud loss Guideline and expands considerably on the plain meaning of the word "loss." *Banks*, 55 F.4th at 257.

Finally, the district court assessed Alisigwe two offense levels for obstruction of justice on the theory that he lied in the pretrial hearing on

his duress defense without findings sufficient to support perjury. The court

denied the duress defense on legal grounds. The court acknowledged

multiple times that Alisigwe probably was threatened and there was a

"germ of truth" in his testimony, but opined that some details were

"preposterous" without explaining why or identifying any statements that

were so unlikely as to constitute perjury on their face. The court also failed

to make the required findings of materiality and willfulness for a perjury

determination.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231, and entered

judgment on April 4, 2024. A.466. Alisigwe filed timely notices of appeal.

A.473. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. §

3742.

## STATEMENT OF THE ISSUES

I.      After *Riley v. California*, 573 U.S. 373 (2014), does a cellphone search

        for evidence of fraud at the border require a warrant, and did the

        district court err in 1) refusing to apply *Riley* to a cellphone search at

the airport; 2) holding that reasonable suspicion of any crime justifies a warrantless search of a cellphone at the border; and 3) concluding that any Fourth Amendment violation was in good faith where the "border search" in question was conducted not by border agents but by ordinary government fraud investigators who went to the airport to search Alisigwe's cellphone under the border search exception?

II. Does the Supreme Court's ruling in *Kisor v. Wilkie*, 139 S.Ct. 2400, 2414-15 (2019), affording no deference to an agency's interpretation of its own rule unless that rule is "genuinely ambiguous," render the "intended loss" commentary to Guideline 2B1.1 invalid, as the Third Circuit has held in *United States v. Banks*, 55 F. 4th 246, 256-58 (3d Cir. 2022)?

III. Was the district court's obstruction of justice Guideline enhancement, based on perjury, unsupported by specific findings of fact where it acknowledged that the core of Alisigwe's duress testimony – that he was threatened into committing the crime – was probably true but opined that the story did not "hang together," and specifically

pointed only to facts that were neither contradicted nor facially implausible?

## STATEMENT OF THE CASE

**The Warrantless Searches of Alisigwe's Cellphone at JFK Airport**

On February 7, 2019, when Alisigwe flew home from a visit to his family in Nigeria, border agents stopped him at JFK Airport and placed him in secondary inspection at the behest of Agent Tallio of DHS's Document and Benefit Fraud Task Force. A.260. Tallio was at the airport to interview and search Alisigwe "looking for evidence of fraudulent transactions" and his use of "multiple identities." A.229, 260-61. The UK had informed DHS that it had seized a fraudulent South African passport bearing Alisigwe's photograph. A.189, 229. Although Alisigwe used his own valid passport to enter, Tallio questioned him about the South African passport. Alisigwe acknowledged that the photo "looked like him," but denied knowing where or when the photo was taken. A.237. Tallio ordered him to unlock his cellphone, which he did. A.189-90. He then searched

through the cellphone and took photographs of evidence he wanted. A.250-57.

On March 1, 2021, when Alisigwe arrived at JFK again with his valid passport, Tallio was there again in a separate room where Alisigwe could not see him. A.273-74. Tallio instructed border agents to take Alisigwe's cellphone and bring it to him, where he again searched for evidence and took photographs of what he found. A.229-30, 258-59, 273-74.

Starting on July 30, 2020, and continuing until after his arrest on July 26, 2022, the border patrol intercepted mail at the U.S. border and recovered multiple false passports bearing Alisigwe's photograph and the names of other persons being sent to him. A.231.

**The District Court Denies Alisigwe's Motion to Suppress**

Alisigwe moved to suppress the fruits of both the cellphone searches and the mail seizures, but the district court denied the motion on the ground that these were valid border searches. A.234-40.  It held that the Supreme Court's holding in *Riley* that a cellphone search is an

extraordinary invasion of privacy requiring a warrant, even where a warrant exception applies, does not apply to border searches. A.234-36. Although the district court ruled that the cellphone searches here were not "routine" border searches, it held that a warrantless cellphone search at the border is justified by reasonable suspicion that the defendant is involved in any crime, whether or not it is related to protecting the border. A.236-38. The court further held that, in any event, the "good faith" exception applied to the agent's actions because the border patrol's manual allowed searches of cellphones at the border. A.239-40. Citing one case from the First Circuit, the district court concluded that the good faith exception would apply under "the state of the law in 2019 and 2021." *Id*.

Photographs of evidence taken from both cellphone searches and the mail searches were introduced at trial. A.247-65, 275-81; GX 301-309, 601-622. In addition to the direct use of the evidence taken from the cellphone searches, these searches were so early in the investigation that they led the government to other evidence that was introduced at trial. For example, the first cellphone search revealed bank account information, such as names

and account numbers, that ultimately were found to be accounts Alisigwe had opened under false names. A.250-57, 458-60, GX 302-04, 309. The second cellphone search revealed a conversation about one of the bank account names. A.457, GX 301. Because the court denied the suppression motion without a hearing and held the searches lawful, A.232-40, there was no opportunity to establish just how much of the evidence at trial was the fruit of these two searches.

**Alisigwe Is Charged With Bank Fraud, Money Laundering And Aggravated Identity Theft.**

An indictment filed on August 4, 2022 charged Alisigwe with bank fraud and aggravated identity theft, and a superceding indictment filed on August 17, 2023, charged him with conspiracy to commit bank fraud, substantive bank fraud, aggravated identity theft, and conspiracy to commit money laundering. A.7, 15, 27-29.

**Trial Evidence**

Several witnesses testified about fraudulent transfers of money or stock undertaken by someone impersonating either the witness, a co-worker, or client. T.26-135. The funds were deposited into accounts opened under various false names. T.137-203. Most of the frauds were thwarted immediately and the funds were recovered. T.26-135, 303-07. It was undisputed that Alisigwe was not involved in the actual frauds but he opened the bank accounts under false names, using false passports that were sent to him. T.137-202. To prove his knowledge of the larger scheme and his fraudulent intent to commit bank fraud, wire fraud, and launder money, the government used the information seized from his cellphones and his intercepted mail. T. 377-78, A. 249-59, 276-80, 289, 293, 310-11, 315, 340, 343-46; GX 301-04, 309, 601-21.

**The frauds and attempted frauds**

None of the witnesses who testified to frauds and attempted frauds had ever met or interacted with Alisigwe. T.40, 62, 78, 114.

Madeline Robinson testified that someone impersonating her caused a $48,000 cashier's check to be sent from her nonprofit charity, Wheelchairs 4 Kids, to an account of Henry Nellen in Brooklyn. T.26-37. The police found that her email had been hacked, and her charity recovered the money and closed the accounts. T.34-37.

Similarly, someone impersonating Warren Roberts, a South African executive of RPM International, Inc., had caused unauthorized transfers of his restricted equity compensation into common stock, where it was sold. T.40-59. RPM compensated Roberts with new restricted stock worth substantially the same amount as his loss. T.51.

Suzanna Lee worked for an investment firm and her office email was hacked to authorize a wire transfer of $684,000 from her account JPMorgan Chase Bank. T.64-65. Lee cancelled or froze all her accounts. T.75. JPMorgan recovered the funds and returned them to her. T.76.

Luther Bell worked in the treasury department of Prince George's County, Maryland. The email of a colleague was hacked and used to direct him to send a wire transfer of $1,052,000 to an usual recipient of wire

11

transfers from his department. T.94-95. The hacker directed him to send it to a different account number at "JPMorgan Chase Cincinnati Machines," which it described a subsidiary of JPMorgan chase. T.99-100. Again, the fraud was detected and Prince Georges County got the full amount of the wire transfer back the next day. T.102-10.

Jeffrey Dolcimascolo, a fraud investigator for Prudential Life Insurance, testified that in 2018 someone impersonating Heinz Wilhelm, a client, requested a full cash out of his $110,000 annuity and directed the funds to be transferred to account ending in 5572 at JPMorgan Chase. T.115-22. Prudential reimbursed Wilhelm for the stolen funds. T.135.

**The bank accounts opened under false names**

Bank records were introduced from several banks pertaining to accounts opened under false names with false identity documents T.137-40. These included JP Morgan accounts under the names Wilhelm Heinz, Sadia Mughal, Ronald Henry Nellen, Gwen Moro Kibbe, International Mercantile Co PTE, Joseph Haley, Cincinnati Machines, Ramon Garcia Pastor, John Louis Foulk, and Bruce Frank Powers; a Sterling National Bank account

under the name PT Ggindonesia Yaya Garments; Santander Bank accounts under the names Daniel Johnson, Horay Textile Limited, PT Ggrindonnesia Garments, Buana Samudra Lestari Inc., Ambar Passion, Sadia Mughal, and Dennis Clark; Citibank accounts under the names Li Industrial Company Limited, CV Yudhistira Inc., and Husky Injection Molding Systems; a TD Bank account for Dennis Eckstein; an HBSC account under the name Horay Textile Limited, and a Bank of America account in the name Warren Roberts. T.139-40. Records of a Bank of America account in Alisigwe's name were also introduced. T.140.

Robert Novakowski, vice president investigator at JPMorgan Chase Bank worked in global security on a team that investigates account takeovers, frauds, business email compromise scams, and customer impersonation. T.141-43. He testified that to open an account a customer must produce a government photo identification plus secondary identification such as a credit card or utility bill, and sign a signature card. T.146-47.

13

After a referral from Prudential, Novakowski investigated the account of Wilhelm Heinz. T.149. He found that the Heinz account was opened with a South African passport and a utility bill in that name bearing the address 995 East 78th Street, Brooklyn NY. T.151. He learned that the account had been opened at a branch in Richmond Hill and he reviewed all the transactions. T.151-64. He found that the $111,836 payment from Prudential had been deposited and that ATM and branch withdrawals had also been made in Richmond Hill. T.153-64. A wire transfer of $75,000 from the account to Horay Textile Limited was made at the Richmond Hill branch. T.170-71.  Novakowski reviewed the video surveillance from the branch and ATM transactions. T.164-72. Video and stills from the video were introduced at trial. T.166-75. It was the same individual, who appeared to be Alisigwe, making all the transactions. T.150, 175.

Novakowski's investigation led him to uncover at least six additional accounts that had been opened by the same person, who appeared to be Alisigwe. T.176. The account of Sadia Mughal had been opened with a

14

South African passport and an employer ID from PT GGindonesia Yaya

Garments, and listed the same address in Brooklyn, again using a utility

bill. T.176-78. That account was opened at a branch in Manhattan and video

surveillance showed the person who opened it and also showed him

conducting transactions there in that account. T.180-84. He deposited at the

ATM a bank check from Sadia Mughal 's account at Sterling National Bank,

payable to Sadia Mughal, in the amount of $64,134. T.182. He withdrew

$3000 from the ATM. He sent a wire transfer of 48,000 from the branch to

Liang Lanying at Hong Kong Banking Corporation. T.184. Video

surveillance images of these transactions were introduced at trial. T. 180-96.

The account of Ramon Garcia Pastor was opened with a South African

passport using the same Brooklyn address. T.202-03.

Similar evidence showed the same person opening the account of

Ronald Henry Nellen with a Namibian passport, using an address in

Syosset New York, and opening the account of Gwen Maro Kibbe using the

same Syosset address. T.197-98. The same person opened business accounts

for International Mercantile, using the name Joseph Haley, T.198-201, and

15

for Dennis Clark d/b/a Cincinatti Machines using the 78th Street address in Brooklyn. T.201-02.

Jillian Bronson, an FBI forensic accountant, had reviewed the bank records of 36 accounts and the surveillance footage. T.211-14. She had prepared a chart showing 36 accounts, and indicating that the total amount of deposits and withdrawals from all those accounts over a 5-year period was approximately $5.9 million. T.216-19, 235. However, those totals double-and triple-counted sums that were transferred from one account to another. T.295-97. Each debit and each deposit was counted, even where that same amount was already counted. The totals also included all of the funds that were immediately returned, which was most of them. T.303-07. Bronson had to acknowledge that the $6 million figure was not the amount stolen. T.308-11.

Bronson testified that several accounts had shared the same addresses and phone numbers. T.222-26. About $2.7 million was deposited in the accounts by wire transfer. 227. Approximately $653,000 was withdrawn in cash and about $96,000 was spent on retail purchases from

all the accounts. T.229-30. The rest was either transferred to other accounts or returned to the place where it came from. T.229.

Most deposits from the frauds at issue, -- the $1 million from Prince George's county to the Dennis Clark account, the $682,935 from Suzanna Lee's account, the $48,000 from Wheels4Kids, -- were returned to their owners. T. 253-55, 264, 303-07. Of those transfers that were not recovered, the records showed: 1) that a total of $335,706 was transferred from RPM to the Warren Roberts Bank of America account between May and July 2020, and that $368,235 was transferred out to recipients in China and the UK. T. 270-272. Of the $111,000 sent from Prudential to the Wilheim Heinz account, three ATM withdrawals for $3000 each were made within a few days, and $75,000 was wired out to the Horay Textile account, then $65,000 was wired from that account to the Sadia Mughal account at Sterling Bank, and then $64,000 was wired from that account to the JPMorgan account in the name of Sadia Mughal. T.258-60.

Two people whose names were on the accounts, Henry Nellen and Sadia Mughal, were real individuals who testified at trial that they never

17

opened these accounts and did not know about them. T.22-24, 371-76. They had never lived in Nambia, South Africa, or at the addresses listed on the accounts. T.23, 374. Neither had lost any money because of the false accounts. T.25, 376.

### Evidence from the cellphone and mail searches

From 2018 to 2021, Agent Kyle Tallio was working for the Homeland Security Document and Benefit Task Force, investigating cases involving document fraud, immigration fraud, and public benefits fraud. A.249-50. He was at JFK Airport on February 7, 2019, when Alisigwe arrived, and he instructed border agents to take Alisigwe to secondary inspection. Tallio took Alisigwe's cellphone to search for evidence of fraudulent financial transactions and stolen identification. A.250, 260-61. He took photographs of several messages, which were introduced at trial. A.247, 250-51. These included the names, social security numbers, and dates of birth for some of the accounts – Dennis Clark, Joseph Haley, Sadia Mughal –, bank account information for Li Industrial Company, and the Brooklyn address associated with many accounts. A.250-57, 458-60, GX 302-304. He also took

18

a photograph of a letter on Alisigwe's phone addressed to David Hudgins at the 995 East 78th Street, Brooklyn, address from Citibank fraud prevention. A.256, 465, GX 309.

Two years later, on March 1, 2021, Agent Tallio was again at JFK Airport when Alisigwe returned from a trip to Nigeria, and he searched Alisigwe's cell phone for more evidence. A.258. He photographed a What's App conversation between Alisigwe and a man named Agbogidi, in which Alisigwe asked, "Anything for Sadia Mughal?" A.259, 457, GX 301.

The government also introduced evidence from international mailings intercepted between July 30, 2020 and January 2023. A.276-81, GX 601-621. These included several counterfeit passports and driver's licenses mailed to various addresses in Jamaica, NY, and Rosedale, NY, and to Robert Warren at 995 East 78th Street, Brooklyn. They all bore photographs of Alisigwe. The false South African passport that had been seized by the UK was also admitted. A.280, GX 622.

The government also introduced four false passports and four false driver's licenses bearing photographs of Alisigwe that it found in his

Queens home when he was arrested there on July 26, 2022. T.414-16, 438, 442. They also seized his cellphone. T.443.

The government stipulated that they had no evidence that Alisigwe had resided at 995 East 78th Street, 53 Dorcas Avenue or 32 Devine Avenue in Syosset, or in Randolph Massachusetts, or in Rosedale, New York. T.461-62. In August 2020, Agent Tallio conducted a controlled delivery of seized mail to the 995 East 78th Street address and another person opened the door. T.461.

**The Verdict**

Alisigwe was convicted of conspiracy to commit and substantive bank fraud, and money laundering. He was acquitted of aggravated identity theft. A. 395.

**Sentencing**

**A.    The Disputed Loss Amount**

Alisigwe appeared for sentencing before Judge Caproni on April 8, 2024.  The parties disputed the applicable loss amount. The presentence

20

report had applied "intended loss" based on the Guideline § 2B1.1 commentary, note 3, which says to apply the greater of actual or intended loss. PSR ¶ 26. The probation department calculated intended loss to be $4.5 million, the total amount deposited into false accounts, even though only a fraction of that was actual loss. *Id*. Most of the deposits were flagged immediately and the deposits were frozen and the transactions reversed before any loss occurred. A.405. The government advocated for the $4.5 million figure, which resulted in an increase of 18 levels from the base offense level of 7. A.421-22, PSR ¶ 26. Defense counsel argued that actual loss should apply, which was the much lower $499,949, the amount assessed for restitution. A.403-05, 462. That figure would result in a 12-level, rather than 18-level increase. U.S.S.G. § 2B1.1(b)(1).

The defense contended that the commentary in note 3 was invalid because it improperly expanded the plain meaning of loss, which was actual loss. A.404-05. Counsel relied on the Supreme Court's decision in *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), restricting reliance on agency interpretation of its rules and the Third Circuit's decision in *United States v.*

21

*Banks*, 55 F.4ᵗʰ 246, 257 (3d Cir. 2019), applying *Kisor* to invalidate the

Sentencing Commission's commentary expanding loss to include intended

loss. *Id*. Judge Caproni rejected that argument, stating "Maybe you can

appeal on that. Maybe you can get clearer law on that." [1]  A.422. It ruled

that the evidence "supports an intended loss amount of 4.5 million. So

pursuant to § 2B1.1(b)(1)(J), that's a plus 18." *Id*.

## B.     The Obstruction Enhancement for Perjury at the Duress Hearing

Over objection, the court assessed two levels under U.S.S.G. § 3C1.1

for obstruction of justice on the ground that the court found Alisigwe's

testimony at a pretrial duress hearing to be mostly false. A.425-27, 429-30. [2]

During an attempt to plead guilty to a single count of aggravated identity

theft, Alisigwe had acknowledged in response the district court's question

---

[1] Although the judge stated "I agree with the general principle that the actual loss amount is the correct measure" (A.422), she clearly meant intended loss, which she applied.

[2] On top of that, the court assessed two levels each under U.S.S.G. § 2B1.1(b)(2)(A)(1) because there were more than 10 victims, under U.S.S.G. § 2B1.1(b)(10)(B) because part of  scheme was committed outside the United States, and under USSG § 2B1.1(b)(11) because Alisigwe possessed more than five means of identification that were made from other pieces of identification, for six more levels. A.423.

that he had been threatened into committing the offense. A.52-77. The court instructed him to speak to his lawyer about a duress defense and thereafter a duress defense was proffered. A.76-77, 82-92. After Alisigwe testified at a hearing to his defense, the district court precluded the duress defense on the legal ground that his testimony failed to establish that he had no reasonable opportunity to escape the harm. A.182-85. The court relied on *United States v. Bakhtiari*, 913 F.2d 1053, 1057-58 (2d Cir. 1990) and *United States v. Alicea*, 837 F.2d 103, 105-07 (2d Cir. 1988) to rule that his failure to report the threats to either Nigerian or U.S. authorities was fatal to the defense, regardless of how futile he thought that would be. *Id*.

### Alisigwe's duress testimony

Alisigwe testified that he was born in Nigeria and had legally immigrated to the United States in 2008, but his family, including his parents, wife, and children, lived in Nigeria. A.95-96, 104, 107, 109, 111-12, 133.

In 2015, Alisigwe received a call from a Nigerian whom he did not know, but who knew his name and said he wanted to do business. A.109-

10. Alisigwe thought it was car business, the business Alisigwe was in. A.110. The man called back a week later and said he wanted Alisigwe to open an account for him. When Alisigwe asked what the account was for, the man said he would explain it later, but he did not call back for another six months. A.110-11. When he did call, he asked Alisigwe to open accounts for him and told him that he would be receiving calls from unknown callers as "call-1." A.111. Alisigwe resisted and asked what this was about and where the stranger was from. The man said only that he was "from the same place where you are from." A.111.

After Alisigwe's father died, the stranger texted him a picture of Alisigwe's mother in Nigeria and said, "I know your mom. I know your father. Your father just died, so we know you and we want you to work with us." A.112. A week later the man sent him another photo of his mother and said he knew everything about Alisigwe's family and if Alisigwe just did what he said, "nobody will get hurt." He said, "We know your father is dead. If your mom die, I don't think you will be able to come

24

back home. And after your mom, we will come after your family. We know everybody in your family." A.113.

After that, Alisigwe followed the instructions he received to open bank accounts and buy new phones with new sim cards. A.114. He received names in the mail, sent passport photos of himself to Nigeria, and received passports with his photo and other names and information with which to open accounts. A.116-17.

Alisigwe did not report these threats to the Nigerian police. A.116. He testified that the police in Nigeria are corrupt and he could not trust them. A.98-101. The police were so mixed up with the criminals in Nigeria that it was hard to tell who were really police. A.101-03. He said that if he reported it the police would either do nothing or let the criminals know that he reported and they would kill his mom. A.116-17. He was likewise afraid to report it to United States authorities because he would have to stop helping the Nigerian criminals and then they would kill his mother. A.118-19.

Once when he was in Nigeria visiting his family, men approached him and threatened him again. A.117. They subsequently sent him photos of his mother in the scooter she rode to the market. A.118. He continued to do their bidding and, whenever he ignored the calls for a while, they would again threaten his family. A.119. He never found out who they were. A.119-20. The callers were identified as "call-1" or, on What's App as "Odompka," a nickname. A. 130. Whenever he bought a new phone and sim card, he called the same What's App number to send his new phone number. A.136.

The Nigerian criminals also had a handler working here, whom Alisigwe was directed to meet from time to time to deliver cash from the accounts. A.136-39. He was also African, but spoke fluent English. A.136. He did not identify himself either. A.137. The Nigerians would call Alisigwe and tell him to withdraw money from a particular account and meet the man with the cash. A.137-41. Then the man would call and say where to meet, usually in a park in Queens. A.137-139. The local man used different local phone numbers. A.140.

26

After Alisigwe was questioned and his cellphone was searched at the airport, he did not answer their calls for three weeks. A.125. They went to his mother's house, took a photo of her there, and sent it to him. A.125. He resumed working for them because of fear for his mother. A.126.

### The court's perjury finding

The PSR recommended the enhancement based on its claim that Alisigwe "testified falsely in his duress hearing." PSR ¶ 32. [3]  Defense counsel argued that Alisigwe's testimony had never been contradicted or shown to be false. A.425.  The district court acknowledged multiple times that it may have been true that he was threatened, while expressing a general belief that some details did not "hang together":

"There could be a germ of truth in his testimony. That doesn't mean that the testimony as a whole did not contain pejorative [sic] statements." A.426.

---

[3] The PSR also asserted that Alisigwe "submitted a materially false declaration in support of his motion to suppress" the passports found in his house. PSR ¶ 32. The court agreed with defense counsel that the differences between his account of where the passports were and the agent's account of where he found them (which the court credited) could have been just a difference in recollection and not a lie. A.424. It denied the obstruction enhancement on that ground. A.429.

27

"There could be a point where someone threatened him. I'm not suggesting that that little element of, to me, to the extent there was a germ of truth in it, that was the germ of truth at some point along the way." A.427.

"That is not the story he told. The story he told was far different from that and was, with all due respect, preposterous. It just didn't hang together as something that would happen." A.427.

The only specific statements the court pointed to as "preposterous" were Alisigwe's testimony that "total strangers called and he had no idea who they were, never found out who he was. The other person that he was working with, he had no idea what that person's name is. They would randomly meet in Flushing Meadow Park and hand off cash between them." The story was preposterous. A.426. The court did not explain why it was preposterous that criminals threatening someone's family in Nigeria to help them deposit their fraud proceeds would not reveal their names. Nevertheless, it concluded:

> "Even if there is a germ of truth that there were some threats against Mr. Alisigwe to get him initially involved or to keep him participating in the crime, the story he told during the duress hearing was absolutely preposterous. Whatever germ of truth there was in that testimony got lost

> in just out-of-mouth fiction, and it was precisely to obstruct
> these proceedings"

A.430. The court applied the obstruction enhancement and then granted

Alisigwe the two-level reduction pursuant to U.S.S.G. § 4C1.1 because

Alisigwe had zero criminal history points. *Id.* It stated that its sentence

would be the same with or without its rulings on the obstruction

enhancement and the zero point offender deduction. A.430.

### The Ultimate Sentence

The court arrived at a total offense level of 31 and a Guidelines range

of 108 to 135. A.430-31. Had the court applied actual loss instead of

intended loss, the total offense level would have been 25 and the

Guidelines range would have been 57-71 months. U.S.S.G. § 5A. Had it

additionally not applied the two-level obstruction enhancement, the

Guidelines range would have been 46-57 months. *Id.*

The government requested a sentence of 108 months, the bottom of

the court's calculated range. A.435. The defense requested a sentence of 24

months, based on Alisigwe's 20 months of confinement at the MDC and

Essex County jail under well-documented horrendous conditions; his long

isolation from his close family in Nigeria, whom he previously visited

frequently and called daily; his almost certain deportation and further

confinement while contesting and awaiting deportation; and the loss

guideline's overstatement of Alisigwe's culpability, given his perfunctory

role in the offense. A.409-17, 436-41.

The court agreed that the fraud Guidelines were "somewhat skewed

high" and that a variance was warranted. A.450. From the 108-month

benchmark, the court varied to a five-year prison sentence. A.452.

**ARGUMENT**

**POINT I**

**Alisigwe's Fourth Amendment Rights Were Violated
By The Trial Court's Admission Of Evidence Resulting
From Two Warrantless Searches Of His Cellphone At
The Airport**

On two occasions when Alisigwe arrived at JFK Airport with a valid

passport, a government fraud investigator searched through his cellphone,

searching for evidence of financial fraud and identity theft, and

photographed evidence that he found. The agent had no warrant but relied on the border search exception, even though he was not a border patrol agent and was investigating fraud, not contraband or border crimes. The district court's refusal to suppress the evidence resulting from those searches, and the admission of this evidence at trial, was error. Although the district court recognized that these were not "routine border searches," it upheld them as justified by reasonable suspicion, ruling that no warrant was needed at the border. The district court refused to apply the Supreme Court's holding in *Riley v. California,* 573 U.S. 373 (2014), that a warrant is required to search a cellphone, holding that it does not apply at the border and that reasonable suspicion that Alisigwe was involved in any criminal activity was sufficient to search his cellphones. This Court should reverse.

### A.    The Standard of Review

"On appeal from a denial of a suppression motion, [this Court] review[s] a district court's . . . resolution of questions of law and mixed questions of law and fact *de novo.*" *United States v. Wallace*, 937 F.3d 130, 137 (2d Cir. 2019), quoting *United States v. Gomez*, 877 F.3d 76, 85 (2d Cir. 2017).

31

**B.** **The search of a cellphone requires a warrant, even in circumstances where a warrantless search is generally allowed.**

In *Riley*, 573 U.S. 373, the Supreme Court held that the authorities may not search a suspect's cellphone without a warrant as part of a search incident to the suspect's arrest. A search incident to an arrest, like a border search, is an exception to the Fourth Amendment rule against searches without a warrant. *Id.* at 382; *Weeks v. United States*, 232 U.S. 383 (1914). Many things may be searched incident to an arrest: the suspect's person, pockets, purse, wallet, automobile, etc., …., *Riley*, 573 U.S. at 382-85, citing *Arizona v. Gant*, 556 U.S. 332, 350 (2009); *United States v. Robinson*, 414 U.S. 218, 236 (1973) -- but not, the Supreme Court held, his cellphone. *Riley*, 573 U.S. at 386. Cellphones, the Court explained, are different.

The search-incident-to arrest exception to the warrant requirement is based on government interests in a volatile arrest situation and "on an arrestee's reduced privacy interests." *Id*. at 392. However, an arrestee's privacy interests are not reduced to zero and "when 'privacy-related concerns are weighty enough' a "search may require a warrant,

32

notwithstanding the diminished expectations of privacy of the arrestee.'"

*Id.,* quoting *Maryland v. King*, 569 U.S. 435, 463 (2013). Reasoning that

cellphones "differ in both a quantitative and qualitative sense from other

objects" found on a person, the Court analogized to the search of an

arrestee's house – which requires a warrant, even after the defendant is

arrested in his house. *Id*. at 392-93, 396, *Chimel v. California*, 395 U.S. 752, 763

(1969). The modern cellphone carried by most adults is "a digital record of

nearly every aspect of their lives – from the mundane to the intimate."

*Riley*, 573 U.S. at 395. A search of such records is "quite different" from a

search of a personal item like a wallet or purse. *Id.*, at 396.  It is instead

similar to searching a man's house:

> In 1926, Learned Hand observed (in an opinion
> later quoted in *Chimel*) that it is "a totally different
> thing to search a man's pockets and use against him
> what they contain, from ransacking his house for
> everything which may incriminate him." *United
> States v. Kirschenblatt*, 16 F.2d 202, 203 (C.A.2). If his
> pockets contain a cell phone, however, that is no
> longer true. Indeed, a cell phone search would
> typically expose to the government far *more* than the
> most exhaustive search of a house: A phone not only
> contains in digital form many sensitive records

33

> previously found in the home; it also contains a broad
> array of private information never found in a home in any
> form – unless the phone is.

*Id.* at 396-97. The extraordinary invasion of privacy of a cellphone search is
not justified by the government's interest in preserving evidence; therefore,
a cellphone search does not fall within the warrant exception for a search
incident to arrest. It requires a warrant. *Id.* at 403.

The reasoning of *Riley* is directly applicable to the routine-border-
search exception to the warrant requirement. This Court has not yet
applied *Riley* to a border search, but other Circuits and district courts in
this Circuit have applied *Riley* to hold that the border search exception to
the warrant requirement does not apply to a cellphone search, *United States
v. Sultanov*, __F.Supp. 3d __ , 2024 WL 3520443, * 22 (E.D.N.Y. July 24, 2024)
(NRM); *United States v. Fox*,__ F.Supp.3d __ , 2024 WL 3520767 , * 9
(E.D.N.Y. July 24, 2024) (NGG); *United States v. Smith*, 673 F. Supp.3d 381,
387 (S.D.N.Y. 2023)(JSR), at least not a search for evidence of crime
unrelated to contraband or other border offenses.  *United States v. Cano*, 934

F.3d 1002, 1018 (2019); *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019). This Court should do the same.

## C.     The Border Search Exception To The Warrant Requirement

An exception has been carved from the Fourth Amendment warrant requirement for routine border searches, based on the government's right to control "who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977). This permits the "routine" search of a traveler and his effects to intercept contraband and prevent smuggling and illegal entry. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (government's "inherent authority to protect… its territorial integrity" includes a strong "interest in preventing the entry of unwanted persons and effects.") For more invasive searches, such as strip searches or holding someone suspected of swallowing contraband until it can be passed, courts have required reasonable suspicion to believe the traveler is carrying contraband. *Montoya*, 473 U.S. at 531; *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978). The Fourth Amendment requires, even at the border, that "the

permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Montoya*, 473 U.S. at 537. Thus, the government's interest in securing the border and intercepting contraband must be balanced against the nature of the intrusion into the traveler's privacy.

In the case of a cellphone search after *Riley*, that balance is clear: a warrant is required. The extraordinary intrusion of searching a person's cellphone– which "differs in both a quantitative and qualitative sense from other objects," *Riley*, 573 U.S. at 393, – is not justified by the government's interest in securing its borders.  A cellphone search for evidence of a fraud crime does not further the government's core interest at the border in preventing contraband or illegal persons from entering the country. In this case, the government agent – a fraud investigator, not the border patrol -- was simply gathering evidence for a criminal fraud investigation, not pursuing suspicion of contraband.  The government's desire to gather evidence for a fraud case does not outweigh the extraordinary invasion of

privacy that a cellphone search entails. This Court should follow *Riley* to hold that a cellphone search does not fall within the border search exception to the warrant requirement for the same reasons that it does not fall within the exception for a search incident to arrest: it is too invasive for the purpose of the exception.

Judge Rakoff did just that in *Smith*, 673 F.Supp.3d 387, 393-395. Acknowledging that border agents have latitude to search a person's body and effects without a warrant, Judge Rakoff reasoned that *Riley* had "made clear that searching the data contained on a person's cellphone is not like searching his body or pockets." *Id*. at 387. Rather, a cellphone contains "reams of information" about "its owner's past movements, communications, and transactions," the "vast majority" of which will "likely have no connection to the traveler's reasons for crossing the border on a given day." *Id*. Moreover, unlike seizing contraband at the border, seizing information from a traveler's cellphone does not actually prevent anything unwanted from entering the country. *Id*.

37

Applying *Riley*'s Fourth Amendment weighing of "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests," 573 U.S. at 385, to border searches of cellphones, Judge Rakoff concluded there was no basis for an exception to the warrant requirement. *Smith*, 673 F.Supp.3d at 393-95. The court examined the government interests at stake, generally the "integrity of the border," and specifically intercepting contraband, apprehending those who pose a threat or are entering illegally, and inspecting goods for taxation. *Id*. at 394. The court reasoned that "[n]one of the rationales" supporting the exception "justifies applying it to searches of digital information contained on a traveler's cell phone, and the magnitude of the privacy invasion caused by such searches dwarfs that historically posed by border searches and would allow the government to extend its border search authority well beyond the border itself." *Id*.

Two district courts in the Eastern District of New York have recently come to the same conclusion. In *Sultanov*, 2024 WL 3520443 at *15-22, Judge

38

Morrison applied *Riley* to evaluate a cellphone search's invasion of privacy against the government's "interest in protecting the integrity of the border by preventing 'illegal articles' and inadmissible foreign citizens from entering the country." As in *Smith*, the court held that a cellphone search and seizure of data did not prevent the data from entering the country and did not sufficiently serve the purpose of the exception to justify "the extraordinary intrusion into a person's privacy posed by a cellphone search." *Id.* In *Fox*, where –as in this case -- the cellphone search was not conducted by border agents but by a Homeland Security agent investigating benefits fraud, Judge Garaufis held that the purpose of the border search exception could not justify the extraordinary intrusion of a cellphone search, particularly where the purpose of the search was not to protect the border but to obtain evidence of non-contraband crimes. 2024 WL 3520767 at *10-12.

Other Circuits have applied this same rationale to conclude that warrantless border searches of cellphones are limited to suspicion of crimes related to protecting the border, like smuggling, and do not extend to

39

ferreting out general crime. In *Cano*, 934 F.3d at 1018, the Ninth Circuit applied *Riley*'s analysis to the purpose of the border search exception – to protect the border from contraband – and held that warrantless cellphone searches at the border can be justified only for the purpose of searching for contraband. Therefore, where contraband is suspected, as it was in *Cano*, border inspectors may open the phone and look for contraband, but they may not search for evidence of crimes, nor photograph or record information from the cellphone. *Id*. at 2018-19. This kind of "forensic" search for evidence goes far beyond the scope of a border search, which does not "include the power to search for *evidence* of contraband that is *not* present at the border." *Id.* at 1018.

Similarly, the Fourth Circuit applied *Riley* to hold that "an intrusive and nonroutine search under the border search exception" – like a cellphone search – can only be justified by reasonable suspicion "of an offense that bears some nexus to the border search exception's purpose" and not by the government's "generalized interest in law enforcement and combatting crime." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir.

40

2019). "A warrant exception will not excuse a warrantless search where applying the exception 'would untether the rule from the justifications underlying [it].'" *Id*. at 720, *quoting Riley*, 573 U.S. at 386. *See also United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018) ("At some point…even a search initiated at the border could become so attenuated from the rationale for the border search exception that it no longer would fall under that exception.")

### D.   The trial court erred in holding that no warrant is required to search a cell phone at the border.

Judge Caproni rejected the application of *Riley* to the border search warrant exception. The court relied instead on *United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015), which upheld a warrantless search of a spiral notebook at the border based on reasonable suspicion that it would contain evidence of securities fraud. But *Riley* expressly distinguished a cell phone from things like notebooks. 573 U.S. at 392-93 (distinguishing items like a wallet, address book, or purse). *Riley* compared the government's claim that a cell phone was similar to such items to "saying a ride on horseback is

41

materially indistinguishable from a flight to the moon." *Id*. at 393. "Cell phones," the Supreme Court has explained, "differ in both a quantitative and qualitative sense from other objects that might be kept on an arrestee's person," and a warrant is required for such an invasion of privacy. *Id.* at 393. *Levy* has no bearing on the applicability of *Riley* to a border search.

The district court also cited the First Circuit's opinion in *Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1ˢᵗ Cir. 2021) for the proposition that *Riley* did not impose "a categorical warrant requirement on all cellphone searches, including those conducted at the border." That is true but that is not the end of the *Riley* analysis, which requires a weighing of the defendant's privacy interest – enormous in the case of a cellphone, a digital record of a person's entire life – against the government's interest at the border. The First Circuit in *Alasaad* did not engage this analysis. Instead, it distinguished *Riley* on the ground that it did not address border searches and opined without reasoning that "warrantless electronic device searches are essential to . . . the purpose of ensuring that the executive branch can adequately protect the border." *Id*. *Alasaad* did not grapple with the

42

specific government interest in preventing contraband or inadmissible persons from entering -- which justifies the border search exception -- and whether that requires the exceptional invasion of privacy that a cell phone search entails. It rejected the argument that a warrantless border search must at least be limited to reasonable suspicion of contraband, while acknowledging the Ninth Circuit's holding to that effect in *United States v. Cano*, 934 F.3d at 1018. *Alasaad*, 988 F.3d at 20.

The district court's analysis was incorrect, especially in a case like this, where border agents were not investigating border crime. Indeed, border agents did not even conduct the search. Rather, border agents stopped Alisigwe at the direction of government fraud investigator Tallio, who himself conducted the cellphone searches. Tallio acknowledged that he was searching for evidence of financial fraud and identity theft, not evidence of contraband or illegal re-entry. Ordinary government agents like Tallio, investigating fraud, would need a warrant to search Alisigwe's cellphone for evidence of bank fraud. Instead, he used Alisigwe's travel to set up a "border search."

43

This is another distinction between the cellphone search here and the notebook search in *Levy* – beyond the major difference in the invasiveness of the search identified by *Riley*. *Levy* upheld a border search of a notebook *by border agents*, based on reasonable suspicion that it contained evidence of criminal charges that Levy was returning home to face. This Court held that, in that context, the border search was not unlawful just because border agents had been tipped off by a DEA task force. *Levy*, 803 F.3d at 123. *Levy* recognized that the border patrol is supposed to focus on "contraband, dutiable merchandise, immigration fraud, and terrorism," *citing United States v. Flores-Montano*, 541 U.S. at 153, but held that they are not expected to "to ignore tangible evidence of a federal crime." *Id*. at 124. Since the border patrol had the authority to look at Levy's papers, including his notebook, this Court held that it could photograph pages of the notebook that contained evidence of crime. *Id*.

That is not what happened here. Alisgwe's cellphone was searched not by border agents, but by government agent Tallio investigating Alisigwe for fraud and identity theft. Tallio was at the airport not as a

44

border agent protecting the border, but as a fraud and benefits investigator to conduct a warrantless search for evidence of fraud on Alisigwe's cellphone. He used the border agents to stop Alisigwe at the airport and take him to secondary inspection so that he could search his cellphone for evidence of crime that he was investigating. A district court in this Circuit recently held on similar facts that *Levy* is limited to a standard border search of someone facing criminal charges and "does not [] provide blanket permission for law enforcement officers to direct CBP to seize smartphones pursuant to an early-stage investigation of domestic crime." *Fox*, 2024 WL 3520767 at *11.  Given *Riley*'s "heightened privacy interest in cellphones even when a traditional exception otherwise applies," *Fox* reasoned that the investigating agent "was not permitted to shirk the warrant requirement that would otherwise apply to searches of cellphones for evidence of a domestic crime by directing the seizure of the phone at the airport." *Id*. at 10.

Judge Caproni's view that the border search exception allows any search – even the highly invasive search of all personal data on a cellphone

– based on reasonable suspicion of any crime, no matter how untethered to protecting the border, cannot be correct. Such a rule would invite government agents investigating any crime to simply go to the airport any time a target entered the United States and instruct the border agents to search his cellphone – or as happened here, take his cellphone and give it to the investigating agent to search.

The *Riley* decision requiring a warrant for a cellphone search even where the warrant exception for an arrest applies is directly analogous to searches at the border. *Sultanov*, 2024 WL 3520443 at * 22*; Fox*, 2024 WL 3520767 at * 9; *Smith*, 673 F. Supp 3d at 387. At a minimum, as the Ninth and Fourth Circuits have held, even if reasonable suspicion could support a warrantless cellphone search for contraband, it does not support a search for evidence of any crime. *Cano*, 934 F.3d at 1018; *Aigbekaen*, 943 F.3d at 721.

## E.    The district court's good-faith ruling was wrong.

The district court was also wrong in concluding that, even if a warrant was required for such an invasive search, the officers acted in good faith because the customs and border patrol manual said that they could

46

search a cellphone at the border. The good-faith exception to the exclusionary rule requires "objectively reasonable reliance on binding appellate precedent" in undertaking a warrantless search. *Davis v. United States*, 564 U.S. 229, 232 (2011). The self-serving manual of a law enforcement agency is not legal precedent at all, let alone binding appellate precedent. The district court also referred to the "state of the law" in 2019-21 as expressed by the 2021 First Circuit decision in *Alasaad*, but that is not binding appellate precedent either. Binding appellate precedent means the precedent of the Supreme Court and the Second Circuit. *United States v. Aguiar*, 737 F.3d 251, 261 (2d Cir. 2013); *S.E.C. v. Dorozhko*, 574 F.3d 42, 45 (2d Cir. 2009). There is no binding appellate precedent authorizing a warrantless cellphone search at the border, much less by agents who are not border agents at all but who have gone to the border for the purpose of searching for evidence of ordinary fraud crimes.

Even were the Court to look, contrary to its precedent, to other Circuits, it would find no solid precedent to support the searches here. Only the First Circuit in *Alasaad* permits warrantless cellphone searches at

the border for evidence of any crime; the Fourth and Ninth Circuits require that the purpose of the search be tethered to protection of the border. *See Supra*, at 41-42. Moreover, *Alasaad* post-dated the 2019 cellphone search here by two years, while *Cano* and *Aigbekaen* were 2019 decisions. So there was actually more out-of-Circuit precedent holding *Riley* applicable to a border search.

Looking at the specific facts here, it is plain that Agent Tallio did not act "with an objectively reasonable good faith belief that [his] conduct [was] lawful." *Davis*, 564 U.S. at 238. Tallio's actions of going out to JFK when Alisigwe returned from visits to his family to conduct a "border search" was ruse – a "deliberate, tactical choice to evade the warrant requirement that would otherwise apply to a search the contents of [Alisigwe's] cellphone." *Fox*, 2024 WL 3520767 at *20.  Nor can the border patrol manual provide good-faith justification for his search: he was not a member of the border patrol and this was not a real border search. There is no government manual or binding precedent advising all government agents that no matter what crimes they are investigating, if the target takes

48

a foreign trip, they can go to the border and search his cellphone for

evidence of those crimes. Indeed, this just exactly the kind of conduct that

calls for the deterrent effect of the exclusionary rule. *Id*. (conduct of

government agent investigating fraud who went to the airport for the

purpose of searching target's cellphone under the border search exception

was not in good faith and necessitated deterrence).

**F.    Alisigwe's conviction should be vacated and a hearing held to determine how much of the government's evidence must be excluded as fruits of the illegal cellphone searches.**

The screenshots taken during the cellphone searches were important

evidence at trial. This can be seen by the government's repeated references

to them as evidence of Alisigwe's intent and knowledge of the fraud

scheme throughout its summations. In its main summation, the

government referred to the text messages and photos taken from those

searches at five separate points and in its rebuttal at two separate points.

A.289, 293, 294, 310-11, 315, 340, 344. This was an integral part of the

government's case.

Further, because the court ruled that there was no Fourth

Amendment violation, it was never determined what other evidence was

the fruit of these searches. The first search was conducted very early in the

investigation, based only on a tip from the U.K. government that it had

seized a false passport bearing Alisigwe's photograph. That first cellphone

search uncovered names of fraudulent account holders as well as a letter

from the Citibank fraud detection unit about one of the accounts – evidence

that certainly led the government agents to uncover the bank fraud scheme.

Thus, the court's denial of the suppression motion undoubtedly

allowed admission of further fruits of the searches, even beyond that found

immediately. The exclusionary rule prohibits the admission of "derivative

evidence acquired as an indirect product or result of the unlawful search"

unless the government can "establish by a preponderance of the evidence

that the information ultimately or inevitably would have been discovered

by lawful means." *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992)

(vacating conviction and remanding for "particularized findings" as to

which pieces of evidence would inevitably have been discovered without

50

the illegal search). Alisigwe's conviction should be vacated and a hearing

held to determine the extent of the fruits of the cellphone searches.

## POINT II

**The Plain Meaning Of Loss Under Guideline 2B1.1
Is Actual Loss And The Commentary Explaining That
"Loss Is The Greater Of Actual Loss Or Intended Loss" Is
Invalid Under Kisor v. Wilkie, 139 S.Ct. 2400, 2415 (2019)**

Alisigwe's sentence was based on a Guideline range elevated by six

levels – an increase of 51 months – by charging him for intended loss rather

than the actual loss caused by his crimes. The actual loss incurred was

$499,949, but he was held liable for $4.5 million, the overwhelming bulk of

which was never lost by anyone because the banks reversed the

transactions. The fraud Guideline itself, U.S.S.G. § 2B1.1(b)(1), increases the

offense level only for loss, and does not mention intended loss. Setting

forth an escalating table of loss thresholds and offense level increases, it

says: "If the loss exceeded $6500, increase the offense level as follows." *Id.*

According to that table, Alisigwe's offense level should have been

increased by 12, for a loss amount greater than $250,000 but less than

51

$550,000. Instead, it was increased by 18 levels, for an intended loss of more than 3.5 million but less than 9.5 million. The district court applied the commentary to the Guideline in application note 3, which says that "loss is the greater amount of actual loss or intended loss."

However, this commentary is no longer valid. In *Kisor v. Wilkie*, __U.S. __, 139 S.Ct. 2400, 2414-15 (2019), the Supreme Court restricted judicial deference to an agency's interpretive rules –- such as the guideline commentary –- to those that interpret "genuinely ambiguous" legislative rules. The Third Circuit logically applied *Kisor* in *United States v. Banks*, 55 F.4th 246, 256-58 (3d Cir. 2022), to hold invalid the commentary expanding loss to include intended loss. This Court should follow *Banks* and *Kisor* and hold that loss under Guideline § 2B1.1 is limited to actual loss.

## A.    Standard of Review

This Court reviews *de novo* the interpretation of the Guidelines. *United States v. Taylor*, 961 68, 74 (2d Cir. 2020).

B.   **The "intended loss" commentary of Guideline 2B1.1 is invalid after *Kisor*.**

For decades, courts have been applying the commentary to Guideline § 2B1.1 explaining that "loss is the greater of actual loss and intended loss." This resulting disconnection of the guideline's loss numbers from the actual harm caused has engendered a chorus of lament about the loss table's overstatement of culpability in fraud cases. *See, e.g., United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (Newman J., concurring) (courts should consider the "unusualness" of the Commission's choice to make loss amount the "principal determinant of the adjusted offense level" in deciding whether to vary); *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J. concurring) (large guideline loss calculations make the guideline "divorced both from the objectives of Section 3553(a) and, frankly, from common sense"); *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (condemning "excessive weight" on the loss factor, which is a "relatively weak indicator of the moral seriousness of the offense and the need for deterrence").

The Supreme Court's decision in *Kisor*, as applied to the intended loss commentary by *Banks*, brings a much-needed corrective to the Sentencing Commission's use of "commentary" to expand the Guidelines in ways that ratchet up sentences. *Kisor* held that an agency's interpretation of its legislative rule is entitled to no deference unless it interprets a rule that is "truly ambiguous." 139 S.Ct. at 2414. Previously, the Court had accorded deference to an agency's interpretation of its rule unless it was "plainly erroneous or inconsistent with the regulation. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S. Ct. 905, 911, 137 L. Ed. 2d 79 (1997). Under the *Auer* doctrine, the Sentencing Commission's commentary to a guideline —- "as an agency's interpretation of its own legislative rule" —- was valid unless it was plainly erroneous or conflicted with the Guideline. *Stinson v. United States,* 508 U.S. 36, 44-45 (1993).

After *Kisor,* this is no longer the case. *Auer* deference requires a genuine ambiguity in legislative rule – here, Guideline § 2B1.1's escalating enhancements based on "loss." If loss is an unambiguous term, the

54

Commission's commentary that loss includes intended loss is entitled to no deference.

This is what the Third Circuit has held. First, the Third Circuit held that *Kisor* applies to the Sentencing Commission's interpretative commentary, just as the Supreme Court had held in *Stinson* that *Auer* applied to that commentary. *United States v. Nasir*, 17 F.4th 459, 470-71 (3rd Cir. 2021) *(en banc)*; *accord United States v. Ricciardi*, 989 F.3d 476, 479–80 (6th Cir. 2021) (applying *Kisor* to reject a different commentary to § 2B1.1). Then in *Banks*, 55 F.4th 246, the Third Circuit held that under *Kisor*, the commentary's expansion of loss to include intended loss is invalid. Consulting the plain or ordinary meaning of the term "loss," *Banks* found unanimity in the definitions of loss to refer to actual loss – e.g., "a decrease in the amount," "the amount of something lost," "financial detriment … or damage" "harm or suffering caused by losing or being lost" and 'the damage, trouble, disadvantage, [or] deprivation . . . caused by losing something," "the diminution of one's possessions or advantages." *Id.* at 257-58. "None of these definitions suggest[ed] an ordinary understanding

that "loss" means "intended loss." *Id*. at 258. *Banks* concluded that "the ordinary meaning of the word 'loss' is the loss the victim actually suffered." *Id.* Therefore, the Court held that the commentary including intended loss was entitled to "no weight" and the plain meaning of loss – actual loss -- applied. *Id.*

This Court should follow *Banks.* Several district courts have applied *Kisor* to invalidate the "intended loss" commentary, *e.g., United States v. Patel*, No. 19 Cr. 80181 (RAR), 2023 WL 5453747 at *1-3 (S.D. Fla. Aug. 23 2023); *United States v. Wheeler*, No. 22 Cr. 38 (LWF), 2023 WL 4408939 at *1-3 ( E.D.N.C. July 6, 2023), *United States v. McKinney*, 22 Cr. 20249 (JEL), 2022 WL 17547467 (E.D. Mich. Dec. 9, 2022), including courts in this Circuit. *E.g., United States v. Beebe*, 21 Cr. 197 (CBA (E.D.N.Y. Dec. 20, 2021), Dkt. No. 129,  9-10 ("no ordinary English speaker would use the term loss to describe what a thief has tried but failed to take"); *United States v. Gary*, 20 Cr. 440 (AMD) (E.D.N.Y. Aug. 24, 2023). It is virtually mandated by *Kisor* and the plain meaning of the word "loss." The district court erred in applying the commentary's "intended loss."

This error meant a six-level increase in Alisigwe's offense level, which translated to a Guidelines range that was 51 months higher at its bottom – 108 months rather than 57 months. Judge Caproni concluded that Alisigwe merited a variance from the Guidelines range, but varied from the wrong benchmark of 108 months. This led her to a sentence of 60 months, higher than the bottom of the Guidelines range if actual loss were used. The court's error in holding Alisigwe liable for intended loss, and rejecting *Kisor's* change in the law, clearly affected Alisigwe's sentence. *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("A mistaken Guidelines calculation is a procedural error that can render even a non-Guidelines sentence unreasonable.") Therefore, his sentence should be vacated and the case remanded for resentencing.

## POINT III

**The District Court Erroneously Increased Alisigwe's Guideline Offense Level For Obstruction of Justice Based On A Perjury Finding That Was Unsupported By Specific Findings Of Wilful, Material Falsehood And Was Undermined By The Court's Own Acknowledgment That His Basic Claim That He Was Threatened Was Probably True.**

The district court's application of the two-level Guideline enhancement for obstruction of justice was based on its conclusion that Alisigwe testified falsely in his duress hearing, even though his testimony was never contradicted or shown to be false. The district court itself acknowledged several times that Alisigwe may well have been threatened to commit the crime at some point and that there was a "germ of truth" to his story. So why did the court hold him liable for perjury? In its view, his story did not "hang together," and parts of it sounded "preposterous." Specifically, the only things the court identified as "preposterous" were that Alisigwe never knew the name of the person who threatened him in Nigeria, nor the name of his handler in New York, who met him in the park to exchange money and passports. The court never explained why it found this incredible, and criminals declining to share identifying information with a stooge is not

58

inherently incredible. Nor did the court make any findings that these purported falsehoods were material and wilful. Judge Caproni's views without proper findings were insufficient as a matter of law to justify the obstruction enhancement.

### A.     Standard of Review

This Court considers *de novo* whether the district court's factual findings are sufficient support an obstruction of justice enhancement. *United States v. Rosario*, 988 F.3d 630, 632 (2d Cir. 2021); *United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001).

### B.     The District Court's Findings Were Insufficient To Support the Obstruction of Justice Enhancement.

"If an obstruction of justice enhancement is based on perjurious testimony, courts must apply the federal perjury statute, 18 U.S.C. § 1621," which is violated only if the defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015), *quoting United States v.*

*Dunnigan,* 507 U.S. 87, 94 (1993). Moreover, if a defendant objects to the enhancement, "a district court must review the evidence and make independent findings necessary to establish" those elements. *Dunnigan*, 507 U.S. at 95. "[T]he sentencing court must find by a preponderance of the evidence 'that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.'" *United States v. Agudelo*, 414 F.3d 345, 349 (2dCir. 2005). Moreover, the district court must "identify the 'statements on which the perjury finding was grounded,'" and make specific findings that they are false and material. *United States v. Rosario*, 988 F.3d 630, 634 (2d Cir. 2021); *quoting United States v. Ben-Shimon*, 249 F.3d 98, 104 (2d Cir. 2001); *accord, United States v. Arguedas*, 86 F.3d 1054, 1059 (11th Cir. 1996).

Here, the court failed to make specific findings as to what, precisely, was false in Alisigwe's story and whether the falsehoods were material and willful. The court actually stated repeatedly that Alisigwe may have been threatened and that his story had a "germ of truth" but that it thought the whole story "did not hang together." Oddly, the only specific statements

the court identified as false – even "preposterous"—was Alisigwe's testimony that "total strangers called and he had no idea who they were, never found out who he was. The other person that he was working with, he had no idea what that person's name is. They would randomly meet in Flushing Meadow Park and hand off cash between them." A. 426.

The court gave no reason why this was particularly unlikely, let alone preposterous. If fraudsters in Nigeria were threatening Alisigwe's family to coerce him to run the bank accounts, it would make sense that they would not identify themselves or their local handler by name and that any meetings would occur in neutral places like a public park. Using their real names or meeting Alisigwe at his home, for example, would make it much easier for Alisigwe to report them. There is no reasoned basis for the court's determination -- having agreed that the core part of his testimony could be true—that this ordinary covering of tracks was so unlikely as to constitute perjury.

Nor did the court make a specific finding that these facts were material. The testimony most material to Alisigwe's duress defense was

61

that Nigerian fraudsters threatened to harm his mother in Nigerian if he did not help them with the bank accounts. The court did not identify this claim as false and indeed acknowledged that it may have been true. Whether Alisigwe knew the names of the people threatening him and where he met his handler were more marginal to his defense. Likewise, the court did not make a finding that he willfully lied.

Without reasoned findings of willful falsehood about specific material facts, the court's perjury conclusion is unsupported, and the sentence should be vacated on this basis as well. Although the court stated that it would impose the same sentence regardless of its rulings on two enhancements, including this one, this Court has stated: "Nor do we believe that criminal sentences may or should be exempted from procedural review with the use of a simple incantation" stating that the court "would impose the same sentence regardless of any errors calculating the applicable Guidelines range." *United States v. Feldman*, 647 F.3d 450, 460 (2d Cir. 2011). Here the court's blanket statement that it would impose the

62

same sentence if either of her enhancement rulings were incorrect likewise should not preclude review.

## CONCLUSION

For the reasons stated in Point I, Alisigwe's conviction should be vacated and the fruits of the cellphone searches suppressed. Alternatively, for the reasons stated in Points II and III, his sentence should be vacated and the case remanded for resentencing.

Dated:     New York, New York
            August 14, 2024

                    Respectfully submitted,

                    FEDERAL DEFENDERS OF
                    NEW YORK, INC.
                     APPEALS BUREAU

                    By: *Colleen P. Cassidy*
                    **COLLEEN P. CASSIDY**
                    Attorney for Defendant-Appellant
                     **CHINWENDU ALISIGWE**
                    52 Duane Street – 10th Floor
                    New York, New York 10007
                    Tel.: (212) 417-8742

## CERTIFICATE OF SERVICE

I certify that a copy of this Brief has been served by ACMS on the United States Attorney/S.D.N.Y.; **Attention: MEREDITH C. FOSTER, ESQ.,** Assistant United States Attorney, 26 Federal Plaza, New York, NY 10278.

Dated:      New York, New York
            August 14, 2024

*Colleen P. Cassidy*
**COLLEEN P. CASSIDY**
Assistant Federal Defender

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 11,392 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Microsoft Word** with **14 characters per inch in Palatino Linotype** type style.

Dated:     New York, New York
           August 14, 2024

_Colleen P. Cassidy_
**COLLEEN P. CASSIDY**
Assistant Federal Defender

65