# 24-960

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

United States of America,

*Appellee*,

v.

Chinwendu Alisigwe,

*Defendant–Appellant.*

On appeal from the United States District Court for the
Southern District of New York — No. 22 Cr. 425 (Caproni, V.)

## BRIEF OF AMICI CURIAE THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AND REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF DEFENDANT

Bruce D. Brown
Gabriel Rottman
Grayson Clary
Reporters Committee for Freedom of the Press
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300

Stephanie Krent
Scott B. Wilkens
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
stephanie.krent@knightcolumbia.org

## Corporate Disclosure Statement

The Knight First Amendment Institute at Columbia University has no parent corporation and, no publicly held corporation owns 10 percent or more of its stock. The Knight Institute is a non-profit, non-partisan organization governed by a nine-member board of directors, five of whom are associated with Columbia University.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

*/s/* Stephanie Krent
Stephanie Krent

## Table of Contents

Corporate Disclosure Statement ................................................................... i

Table of Authorities ............................................................................... 1

Interest of Amici Curiae.......................................................................... 5

Introduction........................................................................................ 5

Argument ........................................................................................... 8

    I.    Government searches of electronic devices burden First and Fourth
        Amendment freedoms. ................................................................ 8

        A.    Government searches of electronic devices at the border
              burden the freedom of the press. ......................................... 9

        B.    Government searches of electronic devices at the border
              intrude on travelers' right to privacy and the freedoms of
              speech and association. ................................................... 12

    II.    The government's warrantless searches of Mr. Alisigwe's cell
        phones were unconstitutional. ..................................................... 15

        A.    Warrantless searches of electronic devices at the border
              violate the First Amendment. ........................................... 18

            1.    Searches of electronic devices at the border trigger
                    First Amendment scrutiny.................................... 18

            2.    Warrantless device searches do not survive any form
                    of heightened scrutiny......................................... 19

        B.    Warrantless searches of electronic devices at the border
              violate the Fourth Amendment....................................... 23

            1.    Searches of electronic devices at the border are
                    profound intrusions upon personal privacy......................... 25

2.    Granting border agents broad discretion to search
      electronic devices does not serve the government
      interest underlying the border-search exception. ................ 27

3.    The balance of interests requires a warrant when the
      government searches electronic devices at the border. ....... 31

Conclusion ....................................................................................... 34

Certificate of Compliance .............................................................. 35

# Table of Authorities

## Cases

*Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021) .................................. 18, 22, 30, 32

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) .................................... 20

*Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971) ......................................................... 20

*Carpenter v. United States*, 585 U.S. 296 (2018) ............................................. 24, 32

*Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) ..................................... 10

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) .................... 22

*Collins v. Virginia*, 584 U.S. 586 (2018) ................................................................. 28

*Florida v. Royer*, 460 U.S. 491 (1983) .................................................................... 28

*Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29 (2d Cir. 1999) ............................. 10

*Guan v. Mayorkas*, 530 F. Supp. 3d 237 (E.D.N.Y. 2021) ..................................... 11

*In re Application of Shervin Pishevar for an Order to Take Discovery*
*for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782*, 439
F. Supp. 3d 290 (S.D.N.Y. 2020) ....................................................................... 10

*Marcus v. Search Warrants*, 367 U.S. 717 (1961) .................................................. 24

*Maryland v. Macon*, 472 U.S. 463 (1985) ............................................................... 23

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .................................... 20

*NAACP v. Button*, 371 U.S. 415 (1963) .................................................................... 8

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ................................................................... 18

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ............... 22

*Riley v. California*, 573 U.S. 373 (2014) ........................................................ passim

*Stanford v. Texas*, 379 U.S 476 (1965) ............................................................ 24, 34

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ................................................ 18

*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019) ................................ 30

*United States v. Alisigwe*, No. 1:22-cr-425 (VEC), 2023 WL 8275923
   (S.D.N.Y. Nov. 30, 2023) ................................................................................ 27

*United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008) ..................................... 23

*United States v. Camou*, 773 F.3d 932 (9th Cir. 2014) ....................................... 32

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) ............................... 28, 30, 32

*United States v. Castillo*, 70 F.4th 894 (5th Cir. 2023) ...................................... 32

*United States v. Flores-Montano*, 541 U.S. 149 (2004) ................................ 28, 30

*United States v. Fox*, No. 1:23-cr-227 (NGG), 2024 WL 3520767
   (E.D.N.Y. July 24, 2024) ................................................................................ 31

*United States v. Gavino*, No. 1:22-cr-136 (RPK), 2024 WL 85072
   (E.D.N.Y. Jan. 7, 2024) .................................................................................. 27

*United States v. Jones*, 565 U.S. 400 (2012) ............................................... 14, 21

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) ...................................... 32

*United States v. LaRouche Campaign*, 841 F.2d 1176 (1st Cir. 1988) .................. 10

*United States v. Levy*, 803 F.3d 120 (2d Cir. 2015) ........................................... 30

*United States v. Mendez*, 103 F.4th 1303 (7th Cir. 2024) .......................... passim

*United States v. Molina-Isidoro*, 884 F.3d 287 (5th Cir. 2018) .......................... 28

*United States v. Ramsey*, 431 U.S. 606 (1977) ........................................ 18, 19, 28

*United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023) ................... 25, 29, 31

*United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) ......................................... 32

*United States v. Sultanov*, No. 1:22-cr-149 (NRM), 2024 WL 3520443 (E.D.N.Y. July 24, 2024) ........................................................................ passim

*United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) ........................... 29, 30, 32

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297 (1972) ......................................................................................... 14, 21

*United States v. Xiang*, 67 F.4th 895 (8th Cir. 2023) ................................. 30, 31, 32

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................ 20

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) ................................................. 20

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ................................... 7, 17, 23, 32

## Other Authorities

Alexandra Ellerbeck, *Security Risk for Sources as U.S. Border Agents Stop and Search Journalists*, Comm. to Protect Journalists (Dec. 9, 2016), https://perma.cc/VJ9L-HUG5 ................................................. 10

*AP Chief Points to Chilling Effect After Justice Investigation*, Reps. Comm. for Freedom of the Press (June 19, 2013), https://perma.cc/U7Z8-FPEK ............................................................. 11

*Border Searches of Electronics at Ports of Entry, FY 2023 Statistics*, U.S. Customs & Border Prot., https://perma.cc/NE59-CVYP ........................... 8

Brooke Crothers, *How Many Devices Can a Smartphone, Tablet Replace?*, CNET (July 10, 2011), https://perma.cc/Z8KE-5Y8U ..................... 9

CBP Directive No. 3340-049A, Border Search of Electronic Devices (Jan. 4, 2018), https://perma.cc/3QKY-MPGR ..................................... 8

*CBP Electronic Media Report (7/26/2017)*, Knight First Amendment Inst. at Columbia Univ., https://perma.cc/X5QF-V5CU ................................. 14

*CBP Electronic Media Report (9/03/2017)*, Knight First Amendment Inst. at Columbia Univ., https://perma.cc/KVJ9-7PXR ................................. 14

*CRCL Complaint Closure (07/11/2017)*, Knight First Amendment
  Inst. at Columbia Univ., https://perma.cc/2GDA-F7G6 .................................... 13

*CRCL Complaint Intake Form (5/27/2018)*, Knight First Amendment
  Inst. at Columbia Univ., https://perma.cc/W7K3-2JQH .................................... 13

ICE Directive No. 7-6.1, Border Searches of Electronic Devices (Aug.
  18, 2009), https://perma.cc/9455-Z2AX ............................................................ 8

*Introduction to the Reporter's Privilege Compendium*, Reps. Comm.
  for Freedom of the Press, https://perma.cc/LQ7X-AAJA ................................ 10

Joseph Cox, *WSJ Reporter: Homeland Security Tried to Take My
  Phones at the Border*, Motherboard (July 21, 2016),
  https://perma.cc/BMN9-96LW ......................................................................... 12

Michael J. de la Merced, *A World of Deal Making, Gleaned with an
  iPhone X*, N.Y. Times (Dec. 27, 2017), https://perma.cc/5N4W-
  2LN8 ................................................................................................................... 9

Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the
  Border Face Coordinated Harassment from U.S. and Mexican
  Authorities*, The Intercept (Feb. 8, 2019), https://perma.cc/SR2Y-
  Y8KR .................................................................................................................. 11

Tom Jones, Mari Payton & Bill Feather, *Source: Leaked Documents
  Show the U.S. Government Tracking Journalists and Immigration
  Advocates Through a Secret Database*, NBC 7 (Jan. 10, 2020),
  https://perma.cc/6VPX-B67U ........................................................................... 11

*With Liberty to Monitor All: How Large-Scale US Surveillance Is
  Harming Journalism, Law, and American Democracy*, Human
  Rights Watch (2014), https://perma.cc/KUH6-4MVF ...................................... 11

## Interest of Amici Curiae

Amici curiae are the Knight First Amendment Institute at Columbia University and the Reporters Committee for Freedom of the Press. As organizations that advocate for the First Amendment rights of the press and public, amici have a strong interest in ensuring that searches of electronic devices at the border honor constitutional limits. Amici have filed amicus briefs in similar cases. *See* ECF No. 22.[1]

## Introduction

Personal electronic devices have become extensions of the human mind. Cell phones and laptops store enormous volumes of individuals' private information and expressive materials: journalists' work product; travelers' private thoughts and personal and professional associations; and digital records of travelers' whereabouts and communications. The question before this Court is whether the Constitution permits the government to search through this treasure trove of information without a warrant any time a person crosses one of the nation's borders. Amici respectfully submit that the answer to that question is no. Because of the scale and sensitivity of

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. The Court granted amici's motion for leave to file this brief. *See* ECF No. 24.

the information stored on these devices, unregulated searches of them pose a grave threat to privacy as well as to the freedoms of speech, association, and the press.

In the absence of a warrant, searches of electronic devices at the border are unconstitutional, and the district court was wrong to conclude otherwise. These searches burden the expressive and privacy rights of all travelers, with particularly serious implications for the newsgathering rights of journalists. Journalists are especially vulnerable to the chilling effects of electronic device searches, both because sources may refuse to speak with reporters for fear that their identities and anything they say may end up in the government's hands, and because reporters may fear reprisal at the border if their reporting is perceived to be critical of the government. Documents obtained by amicus Knight Institute through a Freedom of Information Act (FOIA) lawsuit show that this threat is real: border agents have routinely used their authority to examine sensitive expressive and associational content stored on travelers' devices, including in ways that were discriminatory, arbitrary, and demeaning.

Warrantless searches of electronic devices chill travelers' ability to express themselves, join political or religious groups, or read and receive information from others. They therefore trigger the protections of the First Amendment, which stands as an independent bulwark against unregulated searches that implicate expressive and associational rights. Warrantless border searches of electronic devices cannot

survive any form of heightened scrutiny, because they are not narrowly tailored to serve a substantial government interest and do not leave open alternative channels of communication for travelers or journalists.

These searches also violate the Fourth Amendment. The Supreme Court has emphasized that the Fourth Amendment must be applied with "scrupulous exactitude" when searches implicate expressive rights. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S 476, 485 (1965)). Given the profound expressive and privacy interests at stake and the weak link between the government's investigative interest and the original justification for the border-search exception, the Fourth Amendment requires a warrant before the government can search electronic devices at the border, unless, in a specific case, another exception to the warrant requirement applies. Imposing a warrant requirement would protect travelers' constitutional interests without compromising the government's ability to search travelers' devices where there is good reason for it to do so.[2]

---

[2] Amici take no position on the applicability of the "good faith" exception or other issues raised by the parties in this appeal.

## Argument

### I.   Government searches of electronic devices burden First and Fourth Amendment freedoms.

Policies promulgated by U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) permit border agents to search journalists' and other travelers' electronic devices without a warrant, and often without any suspicion at all.[3] ICE and CBP conduct these searches frequently— in fiscal year 2023, for example, CBP conducted over 41,000 of them.[4] And while it would be clear even absent specific evidence that these invasive searches implicate expressive and highly sensitive information protected by the First and Fourth Amendments and constrict the "breathing space" that First Amendment freedoms need "to survive," *NAACP v. Button*, 371 U.S. 415, 433 (1963), their implications

---

[3] ICE's policy authorizes suspicionless searches of electronic devices at the border regardless of the search method used. ICE Directive No. 7-6.1, Border Searches of Electronic Devices (Aug. 18, 2009), https://perma.cc/9455-Z2AX. Although ICE issued an internal directive in May 2018 temporarily requiring reasonable suspicion to conduct "advanced" searches—those using "external equipment" to "review, copy and/or analyze [a device's] contents," ICE has never formally revised its policy. *See* Mot. for Summ. J., Ex. 20, *Alasaad v. Mayorkas*, No. 1:17-cv-11730 (DJC) (D. Mass. 2017, ECF No. 91-19, https://perma.cc/KL6B-7QDW. CBP's policy authorizes suspicionless searches unless they are "advanced," in which case "reasonable suspicion" or a "national security concern" is required. CBP Directive No. 3340-049A, Border Search of Electronic Devices (Jan. 4, 2018), https://perma.cc/3QKY-MPGR.

[4] *See Border Searches of Electronics at Ports of Entry, FY 2023 Statistics*, U.S. Customs & Border Prot., https://perma.cc/NE59-CVYP.

8

for privacy, association, and expression are well-documented through news reporting, transparency litigation, and journalists' and travelers' personal accounts.

## A. Government searches of electronic devices at the border burden the freedom of the press.

Electronic devices are critical tools for the modern-day press. For journalists on assignment, they serve as notebooks, "cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley v. California*, 573 U.S. 373, 393 (2014).[5] Unfettered government access to journalists' devices chills the willingness of sources to share information with journalists, and thereby impedes journalists' ability to gather the news and inform the public. Also, in the absence of a warrant requirement, border agents can use device searches in attempts to suppress press coverage that government officials perceive as unfavorable.

First, warrantless electronic device searches deter potential sources from speaking to the press, damming the free flow of information to the public. As courts have recognized, "a journalist's ability to foster and maintain confidential relationships with sources is essential to effective reporting." *In re Application of*

---

[5] *See also* Brooke Crothers, *How Many Devices Can a Smartphone, Tablet Replace?*, CNET (July 10, 2011), https://perma.cc/Z8KE-5Y8U; Michael J. de la Merced, *A World of Deal Making, Gleaned with an iPhone X*, N.Y. Times (Dec. 27, 2017), https://perma.cc/5N4W-2LN8.

*Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 306 (S.D.N.Y. 2020); *see also Chevron Corp. v. Berlinger*, 629 F.3d 297, 306–07 (2d Cir. 2011). Many sources are willing to speak to reporters only with that assurance of confidentiality because they reasonably fear retribution if their identities are revealed, including criminal prosecution, loss of employment, and even risk to their lives.[6]

But reporters who travel internationally cannot credibly offer sources confidentiality if the mere act of crossing the border exposes their electronic devices to search and the identities of their contacts to disclosure.[7] When border agents can mine any journalist's work product at will, the press runs "the disadvantage of . . . appearing to be an investigative arm of the judicial system or a research tool of government" rather than an independent check on it. *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (cleaned up); *see also Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 35 (2d Cir. 1999). Reporters have often described this dynamic in past controversies involving government investigations of

---

[6] *See Introduction to the Reporter's Privilege Compendium*, Reps. Comm. for Freedom of the Press, https://perma.cc/LQ7X-AAJA.

[7] *See, e.g.,* Alexandra Ellerbeck, *Security Risk for Sources as U.S. Border Agents Stop and Search Journalists*, Comm. to Protect Journalists (Dec. 9, 2016), https://perma.cc/VJ9L-HUG5.

the news media.[8] The warrantless search authority the government defends here poses the same risk to the free flow of information to the public.

Second, journalists crossing the border run the risk of being singled out for electronic device searches, possibly in retaliation for reporting perceived as critical of the government. In recent years, a flurry of news reports have documented a clear pattern of harassment at the border of journalists covering migration issues, including searches and seizures of their electronic devices.[9] It was later learned that these screenings were facilitated by a secret database CBP maintained to monitor reporters covering issues related to migrants crossing the U.S.–Mexico border.[10] A federal court in this Circuit concluded, in a suit filed by five photojournalists whose names appeared in the database, that the allegations stated a violation of the reporters' First Amendment rights. *Guan v. Mayorkas*, 530 F. Supp. 3d 237 (E.D.N.Y. 2021). And in July 2016, U.S. border agents attempted to search two cell

---

[8] *See, e.g.*, *AP Chief Points to Chilling Effect After Justice Investigation*, Reps. Comm. for Freedom of the Press (June 19, 2013), https://perma.cc/U7Z8-FPEK; *see also With Liberty to Monitor All: How Large-Scale US Surveillance Is Harming Journalism, Law, and American Democracy* at 3–4, Human Rights Watch (2014), https://perma.cc/KUH6-4MVF.

[9] *See, e.g.*, Ryan Devereaux, *Journalists, Lawyers, and Activists Working on the Border Face Coordinated Harassment from U.S. and Mexican Authorities*, The Intercept (Feb. 8, 2019), https://perma.cc/SR2Y-Y8KR.

[10] *See* Tom Jones, Mari Payton & Bill Feather, *Source: Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, NBC 7 (Jan. 10, 2020), https://perma.cc/6VPX-B67U.

phones belonging to a *Wall Street Journal* reporter whose recent work had reportedly "deeply irked the US government," and whose previous reporting had sparked a congressional investigation into corruption in the military.[11] So long as the government has the authority to conduct warrantless device searches at the border, the risk of this sort of abuse remains.

### B. Government searches of electronic devices at the border intrude on travelers' right to privacy and the freedoms of speech and association.

Warrantless device searches at the border have implications not just for journalists but for ordinary travelers as well. These searches chill travelers' First Amendment-protected activities and intrude on their Fourth Amendment privacy rights. Through FOIA litigation, *see Knight First Amendment Inst. at Columbia Univ. v. DHS*, No. 1:17-cv-00548 (TSC) (D.D.C. 2017), amicus Knight Institute has obtained thousands of records documenting device searches conducted by CBP and ICE. The records are a reminder of the private and often intimate nature of the information stored on travelers' cell phones and laptops, and they underscore the risk that, in the absence of a warrant requirement, border agents will use their authority in arbitrary and discriminatory ways.

---

[11] Joseph Cox, *WSJ Reporter: Homeland Security Tried to Take My Phones at the Border*, Motherboard (July 21, 2016), https://perma.cc/BMN9-96LW.

In many instances, border agents conducting electronic device searches appeared to use the information they were rifling through to ask intrusive questions about travelers' religious beliefs and political affiliations. For example, in one incident, border agents ordered a traveler to hand over his devices as well as his cell phone and computer passwords. When he asked whether the officers needed a warrant, one officer replied, "This is the border. We don't need anything." The officers then searched through text messages, contacts, and photos, asking extensive questions about what they found, including questions about his political views, any political organizations he belonged to, and whether he hated America or was part of "Antifa."[12] Another traveler recalled that after officers confiscated her phone and demanded her password, they reviewed videos on her phone, checked her Facebook page, and interrogated her for forty-five minutes about the mosque she attended, whether she knew any victims of the Quebec mosque attack that had taken place the week before, and her opinion of President Trump's policies.[13]

Search reports completed by CBP and ICE officers show that they not only reviewed the contents of travelers' devices during border encounters, but also kept records of travelers' social media accounts. During one search, CBP officers

---

[12] *CRCL Complaint Intake Form (5/27/2018)*, Knight First Amendment Inst. at Columbia Univ., https://perma.cc/W7K3-2JQH.

[13] *CRCL Complaint Closure (07/11/2017)*, Knight First Amendment Inst. at Columbia Univ., https://perma.cc/2GDA-F7G6.

recorded a traveler's usernames on Instagram, Facebook, WhatsApp, Viber, Snapchat, YouTube, and Tango. The officers also made note of the traveler's answers to account security questions and his phone passcode.[14] Other reports document travelers' email addresses.[15]

In each of these incidents, CBP and ICE policies did not require agents to have any particular reason to search the devices. Yet the searches imposed profound burdens on speech and association. As in the context of government surveillance more generally, when individuals fear that their speech will be scrutinized, they will be less inclined to speak. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring) ("Awareness that the government may be watching chills associational and expressive freedoms."); *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 320 (1972) ("Official surveillance, whether its purpose be criminal investigation or ongoing intelligence gathering, risks infringement of constitutionally protected privacy of speech."). When travelers know they can be subjected to warrantless searches touching on political, social, religious, or other expressive activity—activity that the First and Fourth Amendments were designed to protect from unreasonable government scrutiny—

---

[14] *CBP Electronic Media Report (7/26/2017)*, Knight First Amendment Inst. at Columbia Univ., https://perma.cc/X5QF-V5CU.

[15] *E.g.*, *id.*; *CBP Electronic Media Report (9/03/2017)*, Knight First Amendment Inst. at Columbia Univ., https://perma.cc/KVJ9-7PXR.

they are less likely to engage in that activity. Travelers will be fearful of exchanging messages about politics or religion, storing videos from their houses of worship, or documenting their election-related activities. They will be less inclined to engage in constitutionally protected activity within the United States because of the knowledge that their activities may be exposed when they cross the border.

## II.   The government's warrantless searches of Mr. Alisigwe's cell phones were unconstitutional.

This Court should hold that the government's warrantless searches of Mr. Alisigwe's cell phones violated the First and Fourth Amendments. Cell phones, tablets, and laptop computers differ fundamentally from other objects in the scale and nature of expressive and private information they typically contain, and, as a result, the burdens that device searches impose on expressive freedoms and individual privacy make these searches unlike those that historically fell within the Fourth Amendment's border-search exception.

In *Riley v. California*, the Supreme Court was faced with a question directly relevant here: whether warrantless searches of arrestees' cell phones are permissible under the search-incident-to-arrest exception to the warrant requirement. 573 U.S. at 385. To answer this question, the Court applied the balancing framework it generally uses to "determine whether to exempt a given type of search from the warrant requirement"—"assessing, on the one hand, the degree to which [the type of search] intrudes upon an individual's privacy and, on the other, the degree to

which it is needed for the promotion of legitimate governmental interests." *Id.* (cleaned up). When *Riley* was decided, the search-incident-to-arrest exception permitted warrantless searches of personal items carried by the individual, such as a "cigarette pack, a wallet, or a purse," because the government interests underlying the exception—officer safety and evidence preservation—outweighed the "arrestee's reduced privacy interests upon being taken into police custody." *Id.* at 386, 391, 393.

The Court concluded that this balancing yields a very different result when it comes to searching cell phones. These searches constitute a profound invasion of an individual's privacy given the "vast quantities of personal information" that cell phones can contain, including "every piece of mail [owners] have received for the past several months, every picture they have taken, [and] every book or article they have read," as well as "picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." *Id.* at 386, 393–94. And on the other side of the balance, the Court concluded that these searches did not serve the government's interests in officer safety or evidence preservation, because cell phone data "cannot itself be used as a weapon" and can be preserved simply by turning off the phone. *Id.* at 386–87. The government had argued that a cell phone was "materially indistinguishable" from personal items like a wallet or a purse, but the

Court rejected this logic, comparing it to "saying [that] a ride on horseback is materially indistinguishable from a flight to the moon." *Id.* at 392–93.

The profound differences between electronic devices and other personal effects likewise have important implications for this appeal. Electronic device searches necessarily sweep up a great deal of expressive and sensitive information, most—if not all—of which will be wholly unrelated to any legitimate government interest. Because of this, warrantless electronic device searches at the border are not narrowly tailored to a substantial government interest; they therefore fail any form of heightened scrutiny under the First Amendment. These searches are also unreasonable under the Fourth Amendment, because, as in *Riley*, the balance of interests that justified the border-search exception in the analog context is significantly altered in the context of incredibly intrusive digital searches. When the Fourth Amendment is applied with the "scrupulous exactitude" required when searches involve expressive material, *Zurcher*, 436 U.S. at 564, it is clear that the profound privacy interests at stake outweigh the very narrow government interest in unregulated electronic device searches at the border.

17

**A.    Warrantless searches of electronic devices at the border violate the First Amendment.**

**1.    Searches of electronic devices at the border trigger First Amendment scrutiny.**

The First Amendment stands as an independent source of protection, separate and apart from the Fourth Amendment, against the search and seizure of devices at the border. *See Tabbaa v. Chertoff*, 509 F.3d 89, 101–07 (2d Cir. 2007) (independently evaluating whether the border searches at issue violated the First Amendment after concluding they did not violate the Fourth Amendment); *Alasaad v. Mayorkas*, 988 F.3d 8, 22 (1st Cir. 2021) ("The First Amendment provides protections—independent of the Fourth Amendment—against the compelled disclosure of expressive information."); *Nieves v. Bartlett*, 587 U.S. 391, 414 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("[T]he *First* Amendment operates independently of the Fourth and provides different protections." (emphasis in original)).

The distinction between First and Fourth Amendment protections has been clear since the Supreme Court first articulated the border-search exception to the Fourth Amendment's warrant requirement in *United States v. Ramsey*, 431 U.S. 606 (1977). *Ramsey* involved a search of incoming international mail suspected to contain heroin. *Id.* at 609–10. After holding the search permissible under the Fourth Amendment, the Court separately considered the possibility that the search would

18

chill free speech. The Court concluded that any chill would be "minimal" because the "[a]pplicable postal regulations flatly prohibit[ed], under all circumstances, the reading of correspondence absent a search warrant." *Id.* at 623–24. In other words, the Court made clear that the inspection of expressive content at the border raises independent First Amendment concerns.

In this case, too, the First Amendment provides independent protection because searches of electronic devices necessarily implicate—indeed, they target—expressive activity. Nearly all information exposed to border agents while searching travelers' cell phones is expressive or associative. As the Supreme Court noted in *Riley*, cell phones are "minicomputers" that are much more than just phones; they "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." 573 U.S. at 393. They have an "immense storage capacity" that allows them to hold "millions of pages of text, thousands of pictures, or hundreds of videos." *Id*. at 393–94. In short, "[a]fter *Riley*, it is undeniable that the contents of a traveler's cell phone implicate core First Amendment activities." *United States v. Sultanov*, No. 1:22-cr-149 (NRM), 2024 WL 3520443, at *25 (E.D.N.Y. July 24, 2024).

### 2. Warrantless device searches do not survive any form of heightened scrutiny.

Under any form of heightened scrutiny, warrantless searches of electronic devices at the border are unconstitutional. The Supreme Court has long applied

exacting scrutiny to the forced disclosure of personal beliefs and private associations. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021); *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6–7 (1971). Anonymous writings, too, enjoy strong First Amendment protection. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347–48 (1995).[16]

Even under intermediate scrutiny, the government must show that its searches are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels of communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Bonta*, 594 U.S. at 608–09 (explaining that narrow tailoring is "crucial where First Amendment activity is chilled," including  where policies burden the freedom of association, "because First Amendment freedoms need breathing space to survive"). It cannot do so here.

First, whatever weight this Court gives the government's asserted interests, *see infra* Part II.B.2, warrantless searches of electronic devices at the border fail to satisfy the "narrow tailoring" requirement. In *Riley*, the Supreme Court rejected the government's contention that searches of cell phones incident to arrest were constitutional if officers had reasonable suspicion that they would uncover

---

[16] First Amendment concerns with unmasking anonymous speakers are especially acute when those speakers are reporters' confidential sources, because their exposure threatens the ability of reporters to gather and report the news. *See Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981).

"information relevant to the crime, the arrestee's identity, or officer safety." 573 U.S. at 399. The Court explained that the reasonable suspicion standard was not protective enough because devices searches "sweep in a great deal of information, and officers would not always be able to discern in advance what information would be found where." *Id.* Here, too, even if border agents searched devices only when they had a reasonable suspicion that the devices contained so-called digital contraband, the searches "would sweep in a great deal of information" unrelated to that interest. *Id.*

In addition, the harm from the government's warrantless device searches extends far beyond those travelers whose devices are searched. The knowledge that the content of their devices may be searched without a warrant has a chilling effect on the expressive activities of all travelers, who may refrain from using their devices for expressive and associational purposes for fear that their communications will be exposed. *See Sultanov*, 2024 WL 3520443, at *25 (noting "the substantial risk that allowing warrantless searches of incoming travelers' electronic devices will unduly burden, chill, or otherwise infringe upon their First Amendment activities"); *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring); *U.S. Dist. Ct. for E. Dist. of Mich.*, 407 U.S. at 320. This chilling effect is exacerbated by the nearly unfettered authority that CBP's and ICE's policies give border agents to decide whose devices to search and for what reason. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750,

21

757 (1988) (referring to the "time-tested knowledge that in the area of free expression . . . placing unbridled discretion in the hands of a government official or agency . . . may result in censorship"). Warrantless electronic device searches thus threaten to chill the speech of everyone who crosses a U.S. border.

Second, these searches fail to "leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). In the modern world, there is no realistic alternative to the communication channels that electronic devices provide, whether a potential alternative is evaluated in terms of speed, scope, breadth of audience, or ability to communicate with otherwise remote persons. *See Riley*, 573 U.S. at 393. The government's claim that it may manually search the contents of literally every device crossing the border without ever obtaining a warrant leaves no realistic alternative for travelers or journalists hoping to safeguard the confidentiality of their communications. These searches are therefore entirely inconsistent with the requirements of the First Amendment.

While the First Circuit rejected a facial First Amendment challenge to the government's electronic device border search policies in *Alasaad v. Mayorkas*, its analysis was flawed. There, the court held that the government's policies had "a plainly legitimate sweep" and "serve[d] the government's paramount interests in protecting the border." *Alasaad*, 988 F.3d at 22. But the court relied on pre-*Riley*

border search cases that employed reasoning rejected in *Riley*, failed to apply narrow tailoring, and ignored the fact that a warrant requirement would protect travelers' expressive interests without compromising the government's ability to search the devices when there is reason to do so.[17]

### B. Warrantless searches of electronic devices at the border violate the Fourth Amendment.

The First Amendment, in addition to providing an independent basis for evaluating the constitutionality of the searches at issue, "imposes special constraints on searches for and seizures of presumptively protected material [] and requires that the Fourth Amendment be applied with 'scrupulous exactitude' in such circumstances." *Maryland v. Macon*, 472 U.S. 463, 468 (1985) (quoting *Stanford*, 379 U.S. at 485); *see also Zurcher*, 436 U.S. at 564. That is the case here, where permitting border agents to intrude on First Amendment interests without judicial oversight would have grave consequences for the freedoms of speech, association, and the press. *See Sultanov*, 2024 WL 3520443, at *25–26.

Since the Founding, the Fourth Amendment's protections have been understood as safeguards for free expression and the free press in particular. The

---

[17] In *United States v. Arnold*, the pre-*Riley* case *Alasaad* relied on most heavily, the Ninth Circuit reasoned that the search of a laptop is "logically [no] different from" the search of luggage and cannot be compared to the search of a home. 533 F.3d 1003, 1009–10 (9th Cir. 2008). In *Riley*, however, the Supreme Court flatly rejected the same arguments. 573 U.S. at 393, 396–97.

prohibition on unreasonable searches was widely understood as a response to abusive English practices targeting dissident publishers. *See Stanford*, 379 U.S. at 482; *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961) (explaining that the Fourth Amendment was written "against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression").

More recent cases, too, highlight the Court's special concern for searches that burden expressive activities. In *Carpenter v. United States*, the Court rejected the extension of the third-party doctrine to cell-site location records because of "the seismic shifts in digital technology" that made possible "the exhaustive chronicle of location information casually collected by wireless carriers today," which could "provide[] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." 585 U.S. 296, 311, 313–14 (2018) (cleaned up). And as noted above, the Court held in *Riley* that the search-incident-to-arrest exception did not extend to searches of cell phones, explaining that the quantitative and qualitative differences between electronic devices and other objects that might hold expressive content necessitate rethinking the application of analog-era constitutional doctrines in new technological circumstances. 573 U.S. at 393.

The rules governing searches of electronic devices at the border must therefore be fashioned with the care the Supreme Court has required where the government's discretion could, if left unregulated, be abused to tread on First Amendment interests. As the discussion below illustrates, careful application of the Fourth Amendment's balancing test in light of the expressive and privacy interests at stake "yields the same result as in *Riley*." *United States v. Smith*, 673 F. Supp. 3d 381, 394 (S.D.N.Y. 2023). Unless an independent exception applies, the government must "get a warrant." *Riley*, 573 U.S. at 403.

### 1.    Searches of electronic devices at the border are profound intrusions upon personal privacy.

Searches of electronic devices at the border constitute an extraordinary intrusion into the privacy of journalists and other travelers. To be sure, travelers crossing our international borders generally have diminished privacy interests in their physical effects—in the items they carry in their baggage, purses, or pockets. But as discussed above, electronic devices are fundamentally different from any other personal item that individuals may carry with them at the border.

Quantitatively, the storage capacity of electronic devices allows users to "collect[] in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record." *Riley*, 573 U.S. at 394. As the Supreme Court has recognized, even the amount of "just one type of information" can "convey far more than

25

previously possible," such that "[t]he sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions." *Id.* Qualitatively, electronic devices have led to the collection of many new types of data, such as search and browsing history, location data, and the "detailed information about all aspects of a person's life" captured by the countless apps people can download, which no wallet or luggage search could previously have reached. *Id.* at 396.

In effect, given the pervasiveness of these devices, most Americans "keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* at 395; *see also Sultanov*, 2024 WL 3520443, at *19 ("[R]eviewing the information in a person's cell phone is the best approximation government officials have for mindreading."). The expressive and privacy interests at stake in device searches dwarf those implicated by a typical border search for physical contraband.

The government's argument before the district court that manual searches of electronic devices at the border are "routine" and require no suspicion is not at all persuasive. *See* Gov't Br. 10, *United States v. Alisigwe*, No. 1:22-cr-425 (VEC) (S.D.N.Y. 2023), ECF No. 57. The searches in *Riley* were also manual and no more intrusive than the searches at issue here, and yet, as the Supreme Court made clear, they could not permissibly be conducted without judicial supervision. A court in this

Circuit recently explained, based on record evidence from CBP, that "[a] manual search could be conducted by any number of officers, for any amount of time, and include a review of any type of content on the phone, including content that is password protected or encrypted." *Sultanov*, 2024 WL 3520443, at *20. For this reason, several courts in this Circuit—including the district court in this case—have concluded that even manual searches of electronic devices at the border are the type of invasive, non-routine searches that require a warrant or reasonable suspicion. *See id.* (requiring a warrant); *United States v. Gavino*, No. 1:22-cr-136 (RPK), 2024 WL 85072, at *4 (E.D.N.Y. Jan. 7, 2024) (requiring reasonable suspicion); *United States v. Alisigwe*, No. 1:22-cr-425 (VEC), 2023 WL 8275923, at *5 (S.D.N.Y. Nov. 30, 2023) (same).[18]

### 2.    Granting border agents broad discretion to search electronic devices does not serve the government interest underlying the border-search exception.

Like other narrow, carefully delineated exceptions to the warrant requirement, the border-search exception "must be limited in scope to that which is justified by

---

[18] The Seventh Circuit's recent effort to downplay the intrusiveness of manual searches in *United States v. Mendez* is unpersuasive. Although the court noted that manual searches do not include "download[ing] and perus[ing] the phone's entire contents," 103 F.4th 1303, 1310 (7th Cir. 2024), this was also true in *Riley*, and even without that capability, "[t]he only practical limitation on a manual search is a CBP officer's interest and zeal, and its potential scope is, in a word, breathtaking." *Sultanov*, 2024 WL 3520443, at *21.

the particular purposes served by the exception." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Riley*, 573 U.S. at 386 (an exception to the warrant requirement cannot be extended if doing so would "untether the rule from the justifications underlying [it]"); *Collins v. Virginia*, 584 U.S. 586, 595 (2018) (same). Here, the purpose of the border-search exception is "preventing the entry of unwanted persons and effects" into the country. *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004); *see also Ramsey*, 431 U.S. at 616–19 (recognizing the "right of the sovereign to protect itself" by ensuring that the people and property crossing into this country are authorized to do so); *see also United States v. Molina-Isidoro*, 884 F.3d 287, 295 (5th Cir. 2018) (Costa, J., specially concurring) ("the strongest historic rationale for the border-search exception" is the "detection of . . . contraband").

Though undoubtedly important, this interest is a narrow one. The Supreme Court has long distinguished "between seizing goods at the border because their importation is prohibited and seizing goods at the border because they may be useful in prosecuting crimes." *United States v. Cano*, 934 F.3d 1002, 1018 (9th Cir. 2019) (citing *Boyd v. United States*, 116 U.S. 616, 622–23 (1886)); *see also Molina-Isidoro*, 884 F.3d at 296 (Costa, J., specially concurring). Only the former falls within the border-search exception.

This interest in preventing the entry of contraband is not served by vesting border agents with the authority to conduct warrantless searches of every traveler's

electronic devices. Although luggage can be used to conceal physical contraband, including drugs, firearms, and other types of illicit items, electronic devices cannot. And while they may contain "digital contraband in the form of child pornography," *United States v. Mendez*, 103 F.4th 1303, 1309 (7th Cir. 2024), there is no reason to believe that this is a "prevalent" problem *at the border*. *See Riley*, 573 U.S. at 389–90. Even if it were, it is unlikely that "the ability to conduct a warrantless search would make much of a difference" in preventing digital contraband from entering the country, *id.* at 390, because the data stored on a traveler's electronic device "can and very likely does exist not just on the phone device itself, but also on faraway computer servers potentially located within the country." *Smith*, 673 F. Supp. 3d at 394; *see also Sultanov*, 2024 WL 3520443, at *18 ("The very notion of geographic boundaries has little meaning in the context of electronic data.").[19] Because searching electronic devices at the border is at best only minimally related to the interest in preventing contraband from entering the United States, extending the border-search exception to electronic device searches would "untether the rule from the justifications underlying [it]." *Riley*, 573 U.S. at 386.

---

[19] Thus, it is simply incorrect to say that "digital child pornography poses the same exact risk of unlawful entry at the border as its physical counterpart." *United States v. Touset*, 890 F.3d 1227, 1235 (11th Cir. 2018) (cleaned up); *Mendez*, 103 F.4th at 1309 (following *Touset*).

Many courts that have upheld warrantless device searches at the border have limited the scope of such searches for this reason. For example, in *United States v. Cano*, the Ninth Circuit held that the border-search exception is "limited in scope to searches for contraband" and does not permit warrantless searches for evidence of crimes, including "past or future border-related crimes." 934 F.3d at 1020. Other courts have treated the exception more broadly but have agreed that forensic searches must "bear[] some nexus" to the purposes underlying it. *See United States v. Aigbekaen*, 943 F.3d 713, 720–21, 724 (4th Cir. 2019); *Alasaad*, 988 F.3d at 20. The crucial point is that each court recognizes the border-search exception has a limited purpose—to allow the government to prevent the entry of "unwanted persons and effects." *Flores-Montano*, 541 U.S. at 152–53.[20]

This Court's decision in *United States v. Levy* does not require that the border-search exception be given a broader scope. In *Levy*, the Court upheld the warrantless search of the defendant's spiral notebook when he arrived in the United States "to face criminal charges" for securities fraud. 803 F.3d 120, 121 (2d Cir. 2015). Although two circuits have interpreted *Levy* as standing for the proposition that the

---

[20] Other courts that have not expressly limited warrantless searches of electronic devices to the purposes underlying the border-search exception have nonetheless only upheld searches for digital contraband or evidence of a border-related crime. *See, e.g., Mendez*, 103 F.4th at 1309 (child pornography); *Touset*, 890 F.3d at 1231, 1238 (same); *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023) (evidence of economic espionage).

border-search exception is unlimited in scope and applies to searches for general law enforcement purposes, that is incorrect. *See Mendez*, 103 F.4th at 1309 n.4; *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023). As a court in this Circuit recently observed, "*Levy* does not . . . provide blanket permission for . . . CBP to seize smartphones pursuant to an early-stage investigation of domestic crime." *United States v. Fox*, No. 1:23-cr-227 (NGG), 2024 WL 3520767, at *11 (E.D.N.Y. July 24, 2024). Notably, *Levy* did not address warrantless searches of electronic devices, which, for all the reasons stated above, are different in kind from warrantless searches of physical items like a notebook.

### 3.     The balance of interests requires a warrant when the government searches electronic devices at the border.

The balance of interests here is straightforward: Warrantless searches of electronic devices at the border constitute an unprecedented intrusion upon the privacy and expressive rights of journalists and other travelers and do not meaningfully serve the interests that justify the border-search exception in the first place. That some travelers' devices might contain digital contraband cannot justify granting the government unfettered authority to search the devices of every traveler entering or exiting the country. As a result, unless another exception applies, the government must obtain a warrant before searching an electronic device at the border. *See Smith,* 673 F. Supp. 3d at 396; *Sultanov*, 2024 WL 3520443, at *22. Requiring a warrant is reasonable, in short, because "[w]ith all they contain and all

they may reveal, [electronic devices] hold for many Americans the privacies of life." *Riley*, 573 U.S. at 403 (cleaned up).

Requiring a warrant for both manual and forensic searches of electronic devices would be the most protective rule any circuit court has adopted so far, but it is the right one. A lower standard simply cannot be squared with the Supreme Court's application of the search-incident-to-arrest exception in *Riley* or the third-party doctrine in *Carpenter*. Circuit courts that have concluded otherwise emphasize "the fact that the searches are taking place at the border," *Mendez*, 103 F.4th at 1310 (quoting *Alasaad*, 988 F.3d at 18), while effectively ignoring the "seismic shifts in digital technology" that make searches of electronic devices distinctly threatening to the expressive and privacy interests at stake. *Carpenter*, 585 U.S. at 313.[21] Tellingly, none of these decisions even mentions the duty to apply the warrant requirement with "scrupulous exactitude" in cases involving searches of expressive and associational materials. *Zurcher*, 436 U.S. at 564.[22] "Where the government seeks

---

[21] Notably, this Court and the Ninth Circuit have applied *Riley* beyond the search-incident-to-arrest context to require a warrant before searching "cell phones seized under other exceptions to the . . . warrant requirement." *United States v. Smith*, 967 F.3d 198, 208 (2d Cir. 2020) (citing *United States v. Kirk Tang Yuk*, 885 F.3d 57, 79 & n.11 (2d Cir. 2018) ("plain view" exception); *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014) (automobile exception)).

[22] *See Mendez*, 103 F.4th at 1307–10; *United States v. Castillo*, 70 F.4th 894, 897–98 (5th Cir. 2023); *Alasaad*, 988 F.3d at 16–18; *United States v. Kolsuz*, 890 F.3d 133, 143–44 (4th Cir. 2018); *Xiang*, 67 F.4th at 899–900; *Cano*, 934 F.3d at 1016, 1020; *Touset*, 890 F.3d at 1233–34.

32

access to private devices that hold such a vast array of expressive content, only the standard conceived by the Founders and codified in the Fourth Amendment— probable cause and the approval of a neutral magistrate—can bear the weight of that obligation." *Sultanov*, 2024 WL 3520443, at *26.

Crucially, requiring border agents to obtain a warrant before searching electronic devices will not impair their ability to search devices when justified. Border agents will still be able to search electronic devices at the border as long as they can show a neutral arbiter that they have a good enough reason for doing so. *See Riley*, 573 U.S. at 401 ("Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest."). And recent advances in both technology and practice have made obtaining a warrant more efficient. *Id.*; *see also Sultanov*, 2024 WL 3520443, at *24. Of course, "notwithstanding the presumptive application of the Fourth Amendment's warrant requirement" to searches of electronic devices at the border, other exceptions to the warrant requirement, such as the exigent-circumstances exception, may apply in particular cases. *Sultanov*, 2024 WL 3520443, at *20 n.9 (quoting *Riley*, 573 U.S. at 401–02).

The Fourth Amendment balance tilts sharply in favor of protecting the expressive and privacy rights of travelers, as well as the newsgathering activities of

journalists. A warrant is generally necessary before agents conduct an electronic device search, even if that search occurs at one of the nation's borders. "No less a standard could be faithful to First Amendment freedoms." *Stanford*, 379 U.S. at 485.

## Conclusion

For the foregoing reasons, the Court should hold that the government's searches of Mr. Alisigwe's cell phones violated the Constitution.

September 11, 2024                          Respectfully submitted,

Bruce D. Brown                              /s/ Stephanie Krent
Gabriel Rottman                             _____
Grayson Clary                               Stephanie Krent
Reporters Committee for Freedom of          Scott B. Wilkens
   the Press                  Alex Abdo
1156 15th St. NW, Suite 1020                Jameel Jaffer
Washington, D.C. 20005                      Knight First Amendment Institute at
(202) 795-9300                                 Columbia University
                                            475 Riverside Drive, Suite 302
                                            New York, NY 10115
                                            (646) 745-8500
                                            stephanie.krent@knightcolumbia.org

                                            *Counsel for Amici Curiae*

**Certificate of Compliance**

This brief complies with the type-volume limit of the Court of Appeals for the Second Circuit Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,934 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: September 11, 2024                    */s/* Stephanie Krent
                                             Stephanie Krent