# 24-960

*To Be Argued By*:
MEREDITH C. FOSTER

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 24-960

➤━◆◆◆━➤

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

CHINWENDU ALISIGWE, also known as Sealed Defendant 1,

*Defendant-Appellant.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

MEREDITH C. FOSTER,
WILLIAM C. KINDER,
JAMES LIGTENBERG,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Government's Case . . . . . . . . . . . . . . . . 2

    B. The Defense Case and Verdict . . . . . . . . . . . 5

    C. The Sentencing . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT:

POINT I—The District Court Properly Denied
    Alisigwe's Motion to Suppress Evidence Obtained
    from Border Searches of his Cellphones . . . . . . 7

    A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 8

    B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 11

        1. The Border Search Exception . . . . . . . 11

        2. The Good Faith Exception . . . . . . . . . . 16

    C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1. The Border Searches of Alisigwe's Phones
           Did Not Violate the Fourth
           Amendment . . . . . . . . . . . . . . . . . . . . . 17

           a. A Warrant Was Not Required to
              Search Alisigwe's Phones . . . . . . . 17

ii

PAGE

       b.   Reasonable Suspicion Was Not
           Required to Search Alisigwe's
           Phones . . . . . . . . . . . . . . . . . . . . . . 23

       c.   Reasonable Suspicion Supported
           the Searches of Alisigwe's
           Phones . . . . . . . . . . . . . . . . . . . . . . 25

     2.   The Good-Faith Exception
        Applies . . . . . . . . . . . . . . . . . . . . . . . . . 30

POINT II—The District Court Correctly Calculated
the Guidelines Using the Intended Loss
Amount. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

   A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 33

   B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . 33

   C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 34

POINT III—The District Court Properly Applied the
Obstruction Enhancement . . . . . . . . . . . . . . . . . 36

   A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 37

     1.   Evidentiary Hearing Regarding Duress
        Defense . . . . . . . . . . . . . . . . . . . . . . . . 37

     2.   Sentencing . . . . . . . . . . . . . . . . . . . . . . 39

   B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . 41

   C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 43

iii

PAGE

1. There Was No Error in the District Court's Application of the Obstruction Enhancement . . . . . . . . . . . . . . . . . . . .  43

2. Any Purported Error Was Harmless . . . . . . . . . . . . . . . . . . . . . . .  46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

## TABLE OF AUTHORITIES

*Cases*:

*Alasaad v. Mayorkas*,
    988 F.3d 8 (1st Cir. 2021) . . . . . . . . . . . . . . *passim*

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 30

*Cady v. Dombrowski*,
    413 U.S. 433 (1973) . . . . . . . . . . . . . . . . . . . . . . . 11

*Davis v. United States*,
    564 U.S. 229 (2011) . . . . . . . . . . . . . . . . . . . . . . . 33

*Herring v. United States*,
    555 U.S. 135 (2009) . . . . . . . . . . . . . . . . . . . . . . . 17

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) . . . . . . . . . . . . . . . . . . . . 34, 36

*Navarette v. California*,
    572 U.S. 393 (2014) . . . . . . . . . . . . . . . . . . . . . . . 13

iv

PAGE

*Riley v. California*,
573 U.S. 373 (2014) . . . . . . . . . . . . . . . . . . . *passim*

*Stinson v. United States*,
508 U.S. 36 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Abreu*,
514 F. App'x 13 (2d Cir. 2013) . . . . . . . . . . . . . . 46

*United States v. Aigbekaen*,
943 F.3d 713 (4th Cir. 2019) . . . . . . . . . . . . 26, 32

*United States v. Asbury*,
586 F.2d 973 (2d Cir. 1978) . . . . . . . . . . 13, 23, 31

*United States v. Ayers*,
416 F.3d 131 (2d Cir. 2005) . . . . . . . . . . . . . . . . 42

*United States v. Beverly*,
5 F.3d 633 (2d Cir. 1993) . . . . . . . . . . . . . . . 44, 45

*United States v. Bliss*,
430 F.3d 640 (2d Cir. 2005) . . . . . . . . . . . . . . . . 42

*United States v. Boler*,
115 F.4th 316 (4th Cir. 2024) . . . . . . . . . . . . . . . 34

*United States v. Cano*,
934 F.3d 1002 (9th Cir. 2019) . . . . . 14, 16, 17, 24

*United States v. Castillo*,
70 F.4th 894 (5th Cir. 2023) . . . . . . . . . . 14, 17, 24

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008) (en banc) . . . . . . . . 42

*United States v. Chalarca*,
95 F.3d 239 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 45

v

PAGE

*United States v. Cramer,*
    777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . 43, 47

*United States v. Delarosa,*
    675 F. App'x 91 (2d Cir. 2017) . . . . . . . . . . . . . . 47

*United States v. Dundon,*
    349 F. App'x 588 (2d Cir. 2009) . . . . . . . . . . 42, 45

*United States v. Dunnigan,*
    507 U.S. 87 (1993). . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Feldman,*
    647 F.3d 450 (2d Cir. 2011) . . . . . . . . . . . . . 47, 48

*United States v. Flores-Montano,*
    541 U.S. 149 (2004). . . . . . . . . . . . . . . . . . . *passim*

*United States v. Fox,*
    No. 23 Cr. 227 (NGG), 2024 WL 3520767
    (E.D.N.Y. July 24, 2024). . . . . . . . . . . . . . . . 19, 29

*United States v. Gavino,*
    No. 22 Cr. 136 (RPK), 2024 WL 85072 (E.D.N.Y.
    Jan. 7, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Gershman,*
    31 F.4th 80 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 43

*United States v. Hayes,*
    209 F. App'x 548 (7th Cir. 2006) . . . . . . . . . . . . 28

*United States v. Hendrickson,*
    26 F. 3d 321 (2d Cir. 1994). . . . . . . . . . . . . . . . . 45

*United States v. Irving,*
    452 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . *passim*

vi

PAGE

*United States v. Jackson*,
    618 F. App'x 472 (11th Cir. 2015) . . . . . . . . . . . . 28

*United States v. Jass*,
    569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . 43, 47

*United States v. Kolsuz*,
    890 F.3d 133 (4th Cir. 2018) . . . . . . . . . 15, 17, 31

*United States v. Komar*,
    529 F. App'x 28 (2d Cir. 2013) . . . . . . . . . . . . . . 47

*United States v. Leon*,
    468 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . . 16, 17

*United States v. Levy*,
    803 F.3d 120 (2d Cir. 2015) . . . . . . . . . . . . . *passim*

*United States v. Lincecum*,
    220 F.3d 77 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 46

*United States v. Livoti*,
    196 F.3d 322 (2d Cir. 1999) . . . . . . . . . . . . . . . . 42

*United States v. Mendez*,
    103 F.4th 1303 (7th Cir. 2024). . . . . . . . . . . *passim*

*United States v. Molina-Isidoro*,
    884 F.3d 287 (5th Cir. 2018) . . . . . . . . . . . . 15, 31

*United States v. Montoya de Hernandez*,
    473 U.S. 531 (1985). . . . . . . . . . . . . . . . 12, 18, 23

*United States v. Muench*,
    694 F.2d 28 (2d Cir. 1982) . . . . . . . . . . . . . . 18, 28

*United States v. Nkongho*,
    107 F.4th 373 (4th Cir. 2024). . . . . . . . . . . . . . . 22

vii

PAGE

*United States v. Ogberaha*,
    771 F.2d 655 (2d Cir. 1985) . . . . . . . . . . . . . . . . . 23

*United States v. Pereira-Gomez*,
    903 F.3d 155 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 35

*United States v. Potes-Castillo*,
    638 F.3d 106 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 34

*United States v. Rainford*,
    110 F.4th 455 (2d Cir. 2024) . . . . . . . . .   33, 35, 36

*United States v. Ramsey*,
    431 U.S. 606 (1977). . . . . . . . . . . . . .   11, 12, 13, 15

*United States v. Raymonda*,
    780 F.3d 105 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 16

*United States v. Rosa*,
    626 F.3d 56 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . 16

*United States v. Sanchez*,
    679 Fed. App'x 81 (2d Cir. 2017) . . . . . . . . . . . . . 47

*United States v. Shonubi*,
    998 F.2d 84 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 42

*United States v. Shuster*,
    331 F.3d 294 (2d Cir. 2003) . . . . . . . . . . . . . 43, 47

*United States v. Smith*,
    673 F. Supp. 3d 381 (S.D.N.Y. 2023). . . . . . *passim*

*United States v. Smith*,
    No. 22-3104, 2024 WL 4404046 (2d Cir. Oct. 4,
    2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

viii

PAGE

*United States v. Sultanov,*
No. 22 Cr. 149 (NRM), 2024 WL 3520443
(E.D.N.Y. July 24, 2024). . . . . . . . . .   19, 21, 24, 32

*United States v. Tineo,*
No. 23 Cr. 223 (DLI), 2024 WL 2862289 (E.D.N.Y.
June 6, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Touset,*
890 F.3d 1227 (11th Cir. 2018) . . . . . . .   14, 24, 31

*United States v. Vergara,*
884 F.3d 1309 (11th Cir. 2018) . . . . . . .   16, 17, 31

*United States v. Wanjiku,*
919 F.3d 472 (7th Cir. 2019) . . . . . . . . . . . . . . . . 32

*United States v. Xiang,*
67 F.4th 895 (8th Cir. 2023). . . . . . . . . . . . . 15, 17

*United States v. Zagari,*
111 F.3d 307 (2d Cir. 1997) . . . . . . . . . . . . . . . . 41

*United States v. Zheng,*
113 F.4th 280 (2d Cir. 2024) . . . . . . . . . . . . . . . 36

*United States v. Zodhiates,*
901 F.3d 137 (2d Cir. 2018) . . . . . . . . . . . . . 17, 32

*Whren v. United States,*
517 U.S. 806 (1996). . . . . . . . . . . . . . . . . . . . . . . . 13

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1028A. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ix

PAGE

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1956(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

89 Fed. Reg. 36,853 (May 3, 2024) . . . . . . . . . . . . . 34

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-960

———————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

CHINWENDU ALISIGWE, also known as
Sealed Defendant 1,

*Defendant-Appellant.*

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————————

## Preliminary Statement

Chinwendu Alisigwe appeals from a judgment of conviction entered on April 8, 2024, in the United States District Court for the Southern District of New York, following a jury trial before the Honorable Valerie E. Caproni, United States District Judge.

Superseding Indictment S1 22 Cr. 425 (VEC) (the "Indictment") was filed on August 17, 2023, in four counts. Count One charged Alisigwe with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. Count Two charged Alisigwe with bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. Count Three charged

2

Alisigwe with aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2. Count Four charged Alisigwe with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

Trial commenced on December 11, 2023, and ended on December 14, 2023, when Alisigwe was convicted on Counts One, Two, and Four, and acquitted on Count Three.

On April 8, 2024, Judge Caproni sentenced Alisigwe principally to five years' imprisonment, to be followed by five years' supervised release.

Alisigwe is serving his sentence.

## Statement of Facts

### A.  The Government's Case

The Government's proof at trial, the sufficiency of which is not challenged on appeal, established that Alisigwe participated in a wide-ranging bank fraud and money laundering conspiracy. Specifically, from 2017 through 2020, Alisigwe used fake identifications —including fraudulent passports and other identification documents—to open thirty-six bank accounts at various financial institutions (the "Alisigwe Accounts"). (PSR ¶ 10; Tr. 216-19).[1] The Alisigwe

---

[1]  "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Alisigwe's sentencing; "Tr." refers to the trial transcript; "GX" refers to a Government exhibit at trial; "Br." refers to Alisigwe's brief on appeal;

3

Accounts were opened in the names and social security numbers of real people who did not know that their identities were being used. (PSR ¶ 10; Tr. 219-20, 371-73). After Alisigwe opened these accounts, millions of dollars from a variety of fraud schemes, including business email compromise schemes, were deposited into the accounts. (PSR ¶ 11).

For example, in approximately July 2018, a co-conspirator of Alisigwe impersonated the executive of a children's charity (Wheelchairs 4 Kids) via email, causing the charity's bank to send a $48,000 check to one of the Alisigwe Accounts. (PSR ¶ 11; Tr. 25-37, 276). As another example, in April 2019, a co-conspirator impersonated a victim over email and instructed the victim's bank to send a wire of more than $680,000 to another one of the Alisigwe Accounts. (PSR ¶ 11; Tr. 63-76, 254).

Surveillance footage from the banks showed Alisigwe controlling the Alisigwe Accounts, including by opening them, depositing checks into them, withdrawing money from them, and making wire transactions using them. (PSR ¶ 12; Tr. 214, 245-50). After the fraud proceeds were deposited into the Alisigwe

---

"A." refers to the appendix filed with that brief; "Amici Br." refers to the brief of *Amici Curiae* The Knight First Amendment Institute at Columbia University and Reporters Committee for Freedom of the Press; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

4

Accounts, Alisigwe engaged in a series of transactions designed to disguise the nature of the fraud proceeds. (PSR ¶ 12). Specifically, he transferred large sums of victim money from account to account that he had opened in other people's names. (PSR ¶ 12; Tr. 242-45). He also withdrew over $600,000 in fraud proceeds in cash. (PSR ¶ 12; Tr. 229). After disguising the nature of the fraud proceeds, Alisigwe wired portions of the stolen funds to bank accounts in foreign countries, including China and the United Kingdom. (PSR ¶ 12; Tr. 233). Alisigwe also took a cut of the stolen funds for himself and spent approximately $100,000 of victim money on purchases at stores like Zara, Nordstrom, Macy's, and Best Buy. (PSR ¶ 12; Tr. 230-32, 288).

When Alisigwe was arrested, a law enforcement officer found (in plain view) four passports bearing Alisigwe's photograph and other people's names, along with four corresponding driver's licenses. (PSR ¶ 14; Tr. 415). In addition, over the course of the investigation, over twenty passports and other identification documents bearing Alisigwe's photograph and other people's names were seized from international mail. (PSR ¶ 14; A. 276-80). Several of these packages were sent from Lagos, Nigeria. (PSR ¶ 14; A. 276-80).

Contents from Alisigwe's phone showed that Alisigwe was an active participant in the fraud scheme. (PSR ¶ 12; Tr. 424-32; GX 301-09). For example, Alisigwe sent several text messages to an individual saved in his phone as "Agbogidi" to inquire if any mail related to the Alisigwe Accounts had arrived at Agbogidi's residence. (PSR ¶ 12; Tr. 424-30). In one text message, Alisigwe referenced the name of a victim

5

whose identity was used to open one of the Alisigwe Accounts ("Victim-1") and asked Agbogidi if there was "Anything for [Victim-1]??" (Tr. 226, 427; A. 258-59). Text messages also showed that Agbogidi lived at a specific address in Brooklyn—the same address that was listed as the home address on approximately 23 of the 36 Alisigwe Accounts. (Tr. 225-26, 429). In addition, the photo gallery of Alisigwe's phone contained numerous images of messages containing names, birthdates, social security numbers, and addresses matching those used to open the Alisigwe Accounts. (A. 248-59).

## B. The Defense Case and Verdict

Alisigwe did not present a defense case. (*See* Tr. 482-83). On December 14, 2023, the jury returned a verdict finding Alisigwe guilty of Counts One, Two, and Four, and not guilty of Count Three. (Tr. 601).

## C. The Sentencing

In advance of Alisigwe's sentencing, the Probation Office prepared the Presentence Report. The Presentence Report concluded that Alisigwe's total offense level under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") was 33, based on a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1); an 18-level increase under U.S.S.G. § 2B1.1(b)(1)(J) because the offense involved intended loss of at least $3.5 million; a 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A) because the offense involved at least 10 victims; a 2-level increase under U.S.S.G. § 2B1.1(b)(10)(B) because a substantial part of the fraudulent scheme was committed outside the United

6

States and otherwise involved sophisticated means; a 2-level increase under U.S.S.G. § 2B1.1(b)(11)(ii) because Alisigwe possessed names and social security numbers of others; and a 2-level increase under U.S.S.G. § 3C1.1 because Alisigwe (i) testified falsely at a pretrial duress hearing and (ii) submitted a materially false declaration in support of a pretrial motion to suppress passports seized at the time of his arrest. (PSR ¶¶ 25-36). The Presentence Report's loss calculation relied on the intended loss amount of $4.5 million. (PSR ¶ 18).

Based on the total offense level of 33 and Alisigwe's Criminal History Category of I, the Presentence Report calculated a Guidelines range of 135 to 168 months' imprisonment. (PSR at 28). Alisigwe's counsel objected to the Presentence Report's Guidelines calculation, including, as relevant here, to the use of intended (as opposed to actual) loss and to the application of the obstruction-of-justice enhancement. (PSR at 25).

Alisigwe was sentenced on April 8, 2024. Judge Caproni began the sentencing hearing by addressing Alisigwe's objections to the Guidelines calculation in the Presentence Report. (A. 421). First, Judge Caproni applied the intended loss amount under U.S.S.G. § 2B1.1(b)(1), concluding that "the Second Circuit law" permitting the use of intended loss "is clear." (A. 421-22). Second, Judge Caproni found that, even putting aside the declaration submitted in connection with the suppression hearing, the obstruction enhancement applied based on Alisigwe's testimony at his duress hearing. (A. 429-30). Judge Caproni clarified, however,

7

that she would "impose the same sentence in this case" regardless of whether she applied the obstruction enhancement. (A. 430).

After determining the applicable Guidelines range and giving all parties a chance to address the court, Judge Caproni sentenced Alisigwe to a below-Guidelines sentence of five years' imprisonment. (A. 452).

## ARGUMENT

### POINT I

### The District Court Properly Denied Alisigwe's Motion to Suppress Evidence Obtained from Border Searches of his Cellphones

Alisigwe argues that Judge Caproni erred in denying his motion to suppress evidence obtained from border searches of his cellphones. (Br. 30-51). This argument is meritless. As every circuit to have considered the question has concluded, a warrant is not required to search a cellphone at the border. Moreover, as numerous Courts of Appeals have held, the type of manual cellphone search conducted here is a "routine" border search that does not require reasonable suspicion. And even if this Court were to depart from the prevailing consensus and conclude that a manual cellphone search is a "non-routine" border search, law enforcement had reasonable suspicion to justify the searches of Alisigwe's phones. In any event, even if the Court were to conclude that the manual reviews of Alisigwe's cellphones were unlawful, the Court should affirm under the good-faith exception to the exclusionary rule.

8

### A. Relevant Facts

In late 2018, the Department of Homeland Security ("DHS") received information from the United Kingdom Border Force that Alisigwe was using a false identity. (A. 47). Specifically, the U.K. Border Force had intercepted and seized a fraudulent South African passport with a U.S. nonimmigrant visa in the name of Wilhelm Heintz. (A. 47). Facial recognition software indicated that the photograph on the passport was of Alisigwe, not of Wilhelm Heintz. (A. 47). Alisigwe, a legal permanent resident of the United States, had previously filed a naturalization application seeking U.S. citizenship with U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS. (A. 47). As a result, the New York Document and Benefit Fraud Task Force of Homeland Security Investigations ("HSI")—which is also a component of DHS—opened a criminal investigation in conjunction with USCIS, the HSI Attaché in London, and the Department of Justice. (A. 47).

On February 7, 2019, Alisigwe landed at John F. Kennedy International Airport ("JFK Airport") after traveling from Lagos, Nigeria, through London. (A. 48). In connection with the investigation of Alisigwe's use of a false identity, officers from HSI and U.S. Customs and Border Protection ("CBP") (yet another DHS component) stopped and interviewed Alisigwe upon his arrival at JFK Airport. (A. 48). The HSI agents asked Alisigwe about his travel to Nigeria, his family, his employment in the United States, and the property he owned in the United States. (A. 48). The agents also asked Alisigwe if he ever used

9

passports from other countries or in other names, which Alisigwe denied. (A. 48). The agents showed Alisigwe the photograph from the Heintz passport, which Alisigwe acknowledged looked like him. (A. 48).

During the interview, HSI Special Agent Kyle Tallio reviewed and photographed Alisigwe's personal effects, including Alisigwe's cellphone. Special Agent Tallio took photographs of, among other things, Alisigwe's identification card and images contained in the photo gallery of Alisigwe's cellphone. (A. 249-58). Alisigwe's photo gallery included images of other people's names, birthdates, and social security numbers, as well as bank account information and addresses. (A. 249-58). Special Agent Tallio did not obtain a full extraction of Alisigwe's cellphone; rather, he manually reviewed the phone by simply scrolling through it and taking pictures of it. (A. 264). The interview of Alisigwe lasted less than an hour. (A. 47). Many of the personal identifiers observed by Special Agent Tallio in Alisigwe's photo gallery matched information used by Alisigwe to open the Alisigwe Accounts. (A. 249-58, 310).

Similarly, on March 1, 2021, Alisigwe arrived at JFK Airport after traveling internationally and was stopped by CBP and HSI agents in connection with their ongoing investigation. (A. 247, 273-75). The agents, including Special Agent Tallio, interviewed Alisigwe about the purpose of his travel and reviewed his personal effects, including his cellphone. (A. 50-51). Special Agent Tallio again manually reviewed Alisigwe's cellphone by scrolling through it and taking photographs, rather than obtaining a full extraction of

10

the phone. (A. 273-75). At this time, Special Agent Tallio took a photograph of a WhatsApp message in which Alisigwe asked a co-conspirator whether there was "[a]nything for" Victim-1, one of the people whose identities Alisigwe had used to open the Alisigwe Accounts. (A. 259).

On January 6, 2023, Alisigwe moved to suppress his statements and the photographs of his cellphone obtained by law enforcement during the border interviews on February 7, 2019 and March 1, 2021. (A. 32-51). The Government filed its response on August 4, 2023, opposing Alisigwe's motion to suppress the cellphone evidence but indicating that it did not intend to offer at trial the challenged statements. (Dkt. 57 at 6). Alisigwe filed a reply on October 13, 2023. (A. 197).

On November 30, 2023, Judge Caproni issued an opinion and order denying Alisigwe's motion to suppress the cellphone evidence obtained during the border interviews. (A. 228-46).[2] Judge Caproni concluded that although the manual search of Alisigwe's phone was "nonroutine," the law enforcement agents who searched the phone had reasonable suspicion to do so. (A. 234-38). Judge Caproni rejected Alisigwe's argument that the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014) requires a warrant to conduct a border search of a cellphone, observing that

_____

[2] Given the Government's representation that it did not intend to introduce at trial statements obtained during the border interviews, Judge Caproni denied as moot Alisigwe's motion to suppress those statements. (A. 228 n.1).

11

*Riley* did not impose a categorical warrant requirement on all cellphone searches, and "did not upend long-settled precedent" regarding the Government's authority to conduct warrantless searches at the border. (A. 235-36). Judge Caproni further held that even if that conclusion were incorrect, the good-faith exception to the exclusionary rule would apply, because neither the Supreme Court nor the Second Circuit had addressed the lawfulness of warrantless cellphone searches at the border, and those circuits that had addressed the question had rejected the position that a warrant is required. (A. 238-40).

## B.   Applicable Law

In evaluating the denial of a motion to suppress evidence, this Court reviews a district court's factual findings for clear error and its conclusions of law *de novo*. *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015).

### 1.   The Border Search Exception

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are *per se* unreasonable unless an exception applies. *See Cady v. Dombrowski*, 413 U.S. 433, 439 (1973). One such exception is a border search, which, "from before the adoption of the Fourth Amendment, ha[s] been considered 'reasonable' by the single fact that the person or item in question had entered our country from outside." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). An airport is the functional equivalent of a

12

border and thus a search in an airport falls within the scope of the border search authority. *See United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006).

The border search exception is a "longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained" for a search. *Ramsey*, 431 U.S. at 621. The Government's authority to search persons and effects at the border is rooted in "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *Id.* at 616; *see also id.* at 619 ("Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry."). This principle reflects that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). In addition, "[t]he expectation of privacy [is] less at the border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985). Consequently, the "Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border." *Id.* at 540.

Under the border search exception, routine searches of an incoming traveler's person and belongings are "not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538. Indeed, border searches ordinarily "are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano*, 541

13

U.S. at 152–53 (citing *Ramsey*, 431 U.S. at 616); *see also Levy*, 803 F.3d at 122 ("When the evidence at issue derives from a border search, we recognize the Federal Government's broad plenary powers to conduct so-called 'routine' searches at the border even without 'reasonable suspicion that the prospective entrant has committed a crime.'"). "Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." *Irving*, 452 F.3d at 123.

This Court has further explained that, even for non-routine border searches, no warrant is required. Rather, a non-routine border search is valid "if it is supported by reasonable suspicion." *Irving*, 452 F.3d at 124; *see also United States v. Asbury*, 586 F.2d 973, 977 (2d Cir. 1978) (affirming validity of warrantless border strip search). The reasonable suspicion standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence"; indeed, it requires only "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Levy*, 803 F.3d at 123 (citing *Navarette v. California*, 572 U.S. 393, 396-97 (2014)). Reasonable suspicion is measured in light of the "totality of the circumstances—the whole picture," *Navarette*, 572 U.S. at 397, and the "actual motivations of the individual officers involved . . . play no role in [the] Fourth Amendment analysis," *Whren v. United States*, 517 U.S. 806, 813 (1996).

This Court has further held that when conducting border searches, law enforcement agents are "neither

14

expected nor required to ignore tangible or documentary evidence of a federal crime," and have "the authority to search and review a traveler's documents and other items at the border when they reasonably suspect the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." *Levy*, 803 F.3d at 120 (holding that border search of notebook was permissible where CBP had reasonable suspicion that traveler "was engaged in a financial crime"); *see also Irving*, 452 F.3d at 123 (the validity of a border search "does not depend on whether it is prompted by a criminal investigative motive").

This Court has not yet addressed whether a manual search of a cellphone—such as the one at issue here—constitutes a routine or non-routine border search. But the "consensus" among the Courts of Appeals is that "brief, manual searches of a traveler's electronic device" are routine border searches requiring no individualized suspicion at all. *United States v. Mendez*, 103 F.4th 1303, 1307 (7th Cir. 2024); *see also United States v. Castillo*, 70 F.4th 894, 897–98 (5th Cir. 2023) (holding that for "manual cell phone searches at the border," the circuits "have uniformly held" that no warrant or reasonable suspicion is required); *Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2021) ("[B]asic border searches [of electronic devices] are routine searches and need not be supported by reasonable suspicion."); *United States v. Cano*, 934 F.3d 1002, 1016, 1018 (9th Cir. 2019) ("[M]anual searches of cell phones at the border are reasonable without individualized suspicion."); *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018) (holding that even a *forensic*

15

search of an electronic device at the border requires no individualized suspicion).

Routine or otherwise, searches at the border "never" require a warrant or probable cause. *Ramsey*, 431 U.S. at 619 ("There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause."). "At most, border searches require reasonable suspicion." *Mendez*, 103 F.4th at 1307. Indeed, every circuit to have addressed the question has concluded that, notwithstanding the Supreme Court's decision in *Riley*, which held that a warrant is required to search a cellphone incident to a domestic arrest, *see* 573 U.S. at 385-403, a warrant is *not* required for the search of a cellphone at the border. *See Alasaad*, 988 F.3d at 16-17 (1st Cir. 2021) ("*Riley* does not command a warrant requirement for border searches of electronic devices, nor does the logic behind *Riley* compel us to impose one"); *United States v. Kolsuz*, 890 F.3d 133, 142 (4th Cir. 2018) (rejecting argument that *Riley* required warrant based on probable cause for border search of cellphone); *United States v. Molina-Isidoro*, 884 F.3d 287, 291 (5th Cir. 2018) ("For border searches both routine and not, no case has required a warrant. . . . [I]t is telling that no post-*Riley* decision issued either before or after this search has required a warrant for a border search of an electronic device."); *Mendez*, 103 F.4th at 1309 (7th Cir. 2024) ("No circuit court has read *Riley* to require more than reasonable suspicion to support even the most intrusive electronics search at the border."); *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023) ("[In *Alasaad*,] [t]he First Circuit carefully explained why Xiang's broad argument 'rests

16

on a misapprehension of the applicability' of *Riley*. . . . We agree."); *Cano*, 934 F.3d at 1015 (9th Cir. 2019) ("[P]ost-*Riley*, no court has required more than reasonable suspicion to justify even an intrusive border search," and "[e]very circuit that has faced this question has agreed that *Riley* does not mandate a warrant requirement for border searches of electronic devices, whether basic or advanced."); *United States v. Vergara*, 884 F.3d 1309, 1312-13 (11th Cir. 2018) ("Border searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule.").

### 2. The Good Faith Exception

Even where evidence is obtained in violation of Fourth Amendment rights, "[a] violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010); *see also United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."). The exclusionary rule's "corrective value justifies its cost when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Raymonda*, 780 F.3d 105, 117-18 (2d Cir. 2015).

With those remedial purposes in mind, the good-faith exception to the exclusionary rule asks "whether a reasonably well-trained officer would have known

17

that the search was illegal in light of all of the circumstances." *Herring v. United States*, 555 U.S. 135, 145 (2009). "[W]hen the Government acts with an objectively reasonable good-faith belief that their conduct is lawful, the exclusionary rule does not apply." *United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018); *see Leon*, 468 U.S. at 922 n.23 (explaining that the good-faith exception is an objective test requiring reviewing courts to evaluate "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal . . . .").

## C. Discussion

### 1. The Border Searches of Alisigwe's Phones Did Not Violate the Fourth Amendment

#### a. A Warrant Was Not Required to Search Alisigwe's Phones

Alisigwe asserts that following the Supreme Court's decision in *Riley*, the border search exception no longer justifies a warrantless search of a cellphone at the border. (Br. 32-46). Every circuit to have considered the question has disagreed. *See, e.g.*, *Alasaad*, 988 F.3d at 16-17 (1st Cir. 2021); *Kolsuz*, 890 F.3d at 142 (4th Cir. 2018); *Castillo*, 70 F.4th at 897–98 (5th Cir. 2023); *Mendez*, 103 F.4th at 1309 (7th Cir. 2024); *Xiang*, 67 F.4th at 900 (8th Cir. 2023); *Cano*, 934 F.3d at 1015 (9th Cir. 2019); *Vergara*, 884 F.3d at 1312-13 (11th Cir. 2018).

The Courts of Appeals' uniform rejection of Alisigwe's position is well-founded. Neither *Riley* nor its logic compel the conclusion that a warrant is

18

required for searches of electronic devices at the border. *Riley* addressed a warrantless search of a cellphone under a different exception to the warrant requirement: a search incident to arrest. *See Riley*, 573 U.S. at 385-403. It reasoned that an individual's privacy interest in their cellphone is heightened in light of the vast quantity of data that may be stored on such devices, and that the Government's interest in searching an arrestee's cellphone following an arrest is limited, as such searches do not meaningfully advance the purposes of the search-incident-to-arrest exception: protecting officers and preventing the destruction of evidence. *Id.*

But the purposes of a border search, and the attending governmental and privacy interests at the border, are different than those implicated during a domestic arrest. The border search exception to the Fourth Amendment's warrant requirement is grounded in the Government's "inherent authority to protect, and . . . paramount interest in protecting, its territorial integrity." *Flores-Montano*, 541 U.S. at 153; *see also United States v. Muench*, 694 F.2d 28, 33 (2d Cir. 1982) ("The right of the United States to conduct border searches is based on its sovereign authority to protect its territorial integrity."). And an individual's privacy expectation is "less at the border than in the interior." *Montoya de Hernandez*, 473 U.S. at 539-40. Thus, at the border, the "Fourth Amendment balance between the interests of the Government and the privacy right of the individual" is flipped from what it is during a search incident to arrest—it is "struck much more favorably to the Government." *Id.*

19

As the Seventh Circuit observed in *Mendez*, "[w]hat is unreasonable after arrest may be perfectly reasonable at customs." *Mendez*, 103 F.4th at 1308. Indeed, *Riley* itself limited its holding to the searches incident to arrest, acknowledging that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Riley*, 573 U.S. at 401-02. Border searches, with the Government's "paramount interest in protecting[] its territorial integrity," are just such an exception. *Flores-Montano*, 541 U.S. at 153; *see also Alasaad*, 988 F.3d at 17 ("[G]iven the volume of travelers passing through our nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border."). Thus, *Riley* did not upend the longstanding, well-settled precedent that a warrant is not required to conduct a border search, even of a cellphone.

In support of his argument that a warrant was required to search his phones, Alisigwe points to three district court cases—*United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023); *United States v. Sultanov*, No. 22 Cr. 149 (NRM), 2024 WL 3520443 (E.D.N.Y. July 24, 2024); and *United States v. Fox*, No. 23 Cr. 227 (NGG), 2024 WL 3520767 (E.D.N.Y. July 24, 2024). (*See* Br. 37-39). These non-binding cases are distinguishable and inconsistent with the clear weight of authority.

*Fox*, for example, is entirely inapposite because it was expressly limited to its unique facts. *See* 2024 WL 350767, at *9-12. In *Fox*, in contrast to here, the law enforcement agent "became interested in seizing the

20

phone in the month prior to [the defendant's] trip while she was located in the United States; the search was conducted over one thousand miles from where [the defendant] entered the country; the phone was not searched until days later"; "the interest in the phone derived from a domestic crime without a transnational connection and which was unrelated to CBP's enforcement of border laws"; "there [was] no indication that [the defendant] engaged in illegal activities abroad or during her travels"; and "there [was] no indication the search was prompted by an interest in excluding unwanted persons from the country." *Id.* at *9. Under those specific facts, Judge Nicholas G. Garaufis concluded that the search at issue fell outside the border-search exception. *Id.* at *12. Judge Garaufis made clear, however, that he was not "attempt[ing] to establish a framework for when manual searches of cell phones seized at the border are reasonable, as other courts have done." *Id.* "In a case with different facts," Judge Garaufis explained, he may find a warrantless border search to be reasonable. *Id.*

In *Smith*, border agents stopped the defendant at Newark Airport as he attempted to travel from Newark to Jamaica, seized his phone, and made and then reviewed a forensic copy of data stored on his phone. *See Smith*, 673 F. Supp. 3d at 387-88. The border search was conducted in connection with law enforcement's investigation into the defendant's role in a purely domestic crime: conspiring to control the New York-area emergency mitigation services industry. *Id.* at 387. The defendant moved to suppress the results of the border search on Fourth Amendment grounds. *Id.* at 389. Judge Jed S. Rakoff denied the motion based

21

on the good-faith exception, but concluded that, in light of *Riley*, "the Government may not copy and search an American citizen's cell phone at the border without a warrant absent exigent circumstances." *Id.* at 394. In balancing the Fourth Amendment interests at stake, Judge Rakoff dismissed the Government's interest in searching digital data at the border as "relatively weak," because digital contraband or other data can be transmitted into the country without being contained on a physical device brought across the border. *Id.* at 395. Citing *Riley*, Judge Rakoff further observed that a "cell phone likely contains huge quantities of highly sensitive information," and concluded that the privacy interests in a traveler's cellphone were "much stronger than [the] privacy interests in [their] baggage." *Id.* at 395-96. Judge Rakoff acknowledged that his "preferred rule"—that warrants are required for phone searches at the border—was contrary to the conclusions reached by every Court of Appeals that had considered the issue. *Id.* at 398 (noting that his position is "more protective than the approach of any circuit court to consider the question"); *id.* at 396 (recognizing that "of the five federal courts of appeals to consider the question, none has gone quite this far").

*Sultanov* relied heavily on the reasoning in *Smith*. *See* 2024 WL 3520443, at *16, 18, 22, 23, 28. In *Sultanov*, Judge Nina R. Morrison reasoned that "searching cell phone data does little to promote the specific governmental interests that the border search exception was designed to protect," and "represent[s] an extraordinary invasion of a traveler's privacy." *Id.* at *19. Accordingly, Judge Morrison held, "a search of a cell phone at the border generally requires probable cause

22

and a warrant to be reasonable under the Fourth
Amendment." *Id.* at *22. Judge Morrison admitted
that none of the circuit courts to address this issue had
"go[ne] this far." *Id.* at *23.

Consistent with this admission, the district court
decisions cited by Alisigwe are contrary to the weight
of authority. In contrast to the cases decided by the
Courts of Appeals, these district court decisions im-
properly balance the Fourth Amendment interests at
stake at the border. The narrow view of the border
search exception expressed in these decisions "fails to
appreciate the full range of justifications for the border
search exception." *Alasaad*, 988 F.3d at 21. Indeed, the
Government's interest in searching cellphones at the
border is exceptional, not weak. As the Fourth Circuit
observed in *United States v. Nkongho*, 107 F.4th 373
(4th Cir. 2024)—a case involving, as here, a border
search of a cellphone in connection with an interna-
tional fraud scheme—cellphone searches at the border
are "critical for preventing cross-border crime and the
importation of contraband," including "evidence of on-
going transnational criminal activity . . . such as com-
munications between conspirators." *Id.* at 381; *see also
Alasaad*, 988 F.3d at 19 ("[T]he government's interest
in preventing crime at international borders 'is at its
zenith,' . . . and it follows that a search for evidence of
either contraband or a cross-border crime furthers the
purposes of the border search exception to the warrant
requirement.").

The *Smith* court was also wrong to conclude that
"the magnitude of the privacy invasion caused by" bor-
der searches of cellphones "dwarfs that historically

23

posed by border searches." *Smith*, 673 F. Supp. 3d at 394. This Court has already affirmed warrantless border searches in highly intrusive contexts, such as strip searches and body-cavity searches. *See Irving*, 452 F.3d at 123-24 ("[M]ore invasive searches, like strip searches, require reasonable suspicion."); *United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir. 1985) (requiring reasonable suspicion for body cavity search); *Asbury*, 586 F.2d at 976 (requiring reasonable suspicion for strip search); *see also Montoya de Hernandez*, 473 U.S. at 541-42 (requiring reasonable suspicion for detention of traveler overnight for purpose of monitored bowel movement).[3] A faithful application of Supreme Court and Second Circuit precedent regarding border searches thus compels the conclusion that, notwithstanding a traveler's significant privacy interest in their cellphones, warrantless searches of cellphones at the border are permitted to advance the Government's paramount interest in protecting its territorial integrity.

### b.  Reasonable Suspicion Was Not Required to Search Alisigwe's Phones

The balancing of Fourth Amendment interests at the border further supports the conclusion, reached by

---

[3]  As discussed below, reasonable suspicion was not required to conduct a manual search of Alisigwe's phones. But even if this Court concludes that it was, law enforcement had reasonable suspicion to support the search.

24

numerous Courts of Appeals, that the type of manual cellphone search conducted here is a "routine" border search that does not require individualized suspicion. *See Alasaad*, 988 F.3d at 17 (1st Cir. 2021); *Castillo*, 70 F.4th at 897–98 (5th Cir. 2023); *Mendez*, 103 F.4th at 1307 (7th Cir. 2024); *Cano*, 934 F.3d at 1016 (9th Cir. 2019); *Touset*, 890 F.3d at 1233 (11th Cir. 2018); *see also Sultanov*, 2024 WL 3520443, at *21 ("[N]one of the Courts of Appeals to consider this . . . area of law has held that a manual search of a cell phone at the border is a nonroutine search."). The privacy interest of an international traveler is "tempered by the fact that the searches are taking place at the border." *Alasaad*, 988 F.3d at 18. And manual electronic searches are "brief procedure[s]" of limited intrusiveness. *Flores-Montano*, 541 U.S. at 155. During a manual search, as opposed to a full forensic examination, a law enforcement agent "cannot download and peruse the phone's entire contents"; instead, "they must physically scroll through the device, making it less likely for an agent to tap into the revealing nooks and crannies of the phone's metadata, encrypted files, or deleted contents." *Mendez*, 103 F.4th at 1310; *see also Alasaad*, 988 F.3d at 18 ("Basic border searches also require an officer to manually traverse the contents of the traveler's electronic device, limiting in practice the quantity of information available during a basic search.").

That is precisely what happened here. Law enforcement did not obtain a full extraction of Alisigwe's phone. Rather, on both occasions that Alisigwe was stopped at the border, Special Agent Tallio manually reviewed Alisigwe's cellphone by scrolling through it

25

for a brief period of time, recording the phone's contents only by taking pictures with his own phone. (A. 264; 273-75). Given its limited intrusiveness and travelers' reduced privacy interests at the border, this Court should conclude, as have the First, Fifth, Seventh, Ninth, and Eleventh Circuits, that a manual cellphone search is a routine border search that need not be supported by reasonable suspicion.

### c. Reasonable Suspicion Supported the Searches of Alisigwe's Phones

Even if the Court were to depart from the prevailing consensus among the Courts of Appeals and conclude that a manual cellphone search is a non-routine border search, law enforcement had reasonable suspicion to justify the searches of Alisigwe's phones.

The reasonable suspicion standard requires only "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Levy*, 803 F.3d at 123. At the time Alisigwe was stopped at JFK Airport on February 7, 2019, HSI had opened an investigation into his use of a false identity based on a referral from the U.K. Border Force, which had intercepted a fraudulent passport bearing Alisigwe's photograph. (A. 47). During the February 7, 2019 interview, Alisigwe acknowledged that the photograph from the fraudulent Heintz passport looked like him, yet denied using other passports or names. (A. 48). By the time of the March 1, 2021 border stop, HSI's investigation remained ongoing and was further bolstered by, among other things, the evidence of the personal identifying information found in Alisigwe's phone during the 2019

26

border stop (A. 50-51) and the seizure of multiple additional fraudulent passports and driver's licenses bearing Alisigwe's photograph but the names of other people (A. 279-80). As Judge Caproni correctly noted, the information possessed by the Government thus satisfied the "relatively modest" burden of reasonable suspicion. (A. 238).

Alisigwe does not contend otherwise. Instead, he relies on cases from the Ninth and Fourth Circuits for the proposition that the border search authority is limited to searches for contraband or evidence of border-related crimes, and argues that the searches of his phones fell outside that scope. (Br. 39-40). In *Cano*, the Ninth Circuit held that the border search exception authorizes warrantless searches of cellphones only to determine if the phone contains contraband. *See* 34 F.3d at 1018. In *United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019), the Fourth Circuit held that for a non-routine border search, the Government must have individualized suspicion of an offense bearing "some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Id.* at 721. But neither holding is the law in this Circuit. In *Levy*, this Court held that agents conducting a border search "have the authority to search and review a traveler's documents and other items at the border when they reasonably believe that a traveler is engaged in criminal activity, *even if the crime falls outside the primary scope of their official duties*." 803 F.3d at 124 (emphasis added). Thus, notwithstanding the fact that border agents focus "primarily on contraband, dutiable merchandise,

27

immigration fraud, and terrorism," they are "neither expected nor required to ignore tangible or documentary evidence of a federal crime." *Id.*

Moreover, searches of cellphones at the border not only further the Government's interest in preventing entry of contraband, but also support the other border-related purposes of the border search exception, including national security concerns, unlawful immigration, and transnational crime. *Cano*'s contrary conclusion is at odds with this Court's controlling precedent in *Levy*, which rejects the proposition that border searches are limited to detecting contraband. *Levy*, 803 F.3d at 124; *see also United States v. Gavino*, No. 22 Cr. 136 (RPK), 2024 WL 85072, at *6 (E.D.N.Y. Jan. 7, 2024) (finding *Cano* unpersuasive in light of controlling precedent in *Levy*); *United States v. Tineo*, No. 23 Cr. 223 (DLI), 2024 WL 2862289, at *6 (E.D.N.Y. June 6, 2024) ("The *Cano* court apparently did not consider the urgency of curtailing ongoing crimes, such as, for example, international narcotics importation and distribution conspiracies with coconspirators within the United States[.]").

In any event, Alisigwe is wrong to suggest that the investigation into him lacked a nexus to the purposes of the border search exception. Alisigwe repeatedly refers to Special Agent Tallio as a generic "fraud investigator" who was not investigating crimes related to the border. (Br. 1, 5, 30, 31, 36, 43). This characterization ignores that Special Agent Tallio is an agent of HSI—a component of DHS specifically focused on investigating "transnational crime and violations of the customs and immigration laws of the United States."

28

Homeland Security Investigations, "What We Investigate," available at *https://www.dhs.gov/hsi/investigate* (last accessed November 13, 2024). Indeed, as Special Agent Tallio testified, as a member of HSI's New York Document and Benefits Fraud Task Force, he is specifically responsible for investigating, among other crimes, "immigration fraud." (A. 249). Alisigwe's characterization further ignores that HSI's investigation was specifically focused on the use of a fraudulent passport by Alisigwe, who at the time was a legal permanent resident with a pending citizenship application. (A. 47). Law enforcement's investigation into Alisigwe and the border searches of his phone were therefore directly tied to the core rationale of the border search exception—the Government's paramount interest in protecting its territorial integrity. *See Flores-Montano*, 541 U.S. at 153; *Muench*, 694 F.2d at 33.[4]

For similar reasons, Alisigwe's reliance on the district court's reasoning in *Fox* is misplaced. The *Fox* court held that a purported border search of a traveler's cellphone was not, in fact, a border search, where

---

[4]    Likewise, even accepting *Cano*'s conclusion that the border search exception is limited to evidence of contraband, the searches of Alisigwe's phones did, in fact, yield contraband. Alisigwe's phones contained the names, birthdates, social security numbers, and addresses of innocent victims. *See, e.g.*, *United States v. Jackson*, 618 F. App'x 472, 478 (11th Cir. 2015) (describing personal identifying information of others as "contraband"); *United States v. Hayes*, 209 F. App'x 548, 551 (7th Cir. 2006) (same).

29

the search was conducted days after and over a thousand miles away from where it was seized at the Miami airport, and law enforcement's investigation related to a "domestic crime without a transnational connection." 2024 WL 3520767 at *9. Not so here. There is no dispute that during each of the border searches, Special Agent Tallio conducted a brief manual search of Alisigwe's phones at JFK Airport immediately after Alisigwe's arrival in the country. (A. 47-48, 50-51). And unlike in *Fox*, the investigation into Alisigwe did not relate to a purely domestic crime. Again, the investigation was initially opened after the U.K. Border Force intercepted a fraudulent passport bearing Alisigwe's photograph. (A. 47). And the investigation ultimately revealed that Alisigwe played a critical role in a wide-ranging international fraud and money-laundering scheme, in which he used fraudulent passports and identity documents (over twenty of which were seized from international mail) to open U.S. bank accounts in the names of other people and then wire fraud proceeds to co-conspirators abroad. (PSR ¶¶ 12, 14; A. 276-80; Tr. 233). The transnational nexus that *Fox* lacked is plainly present here. Indeed, Judge Garaufis's decision in *Fox* specifically distinguished the facts in *Fox* from those here, observing that "in *Alisigwe*, the defendant was searched because he was suspected of using fraudulent passports—relating to the Government's interest in border integrity and knowing who is entering the country." *Fox*, 2024 WL 3520767, at *8.

Because law enforcement had reasonable suspicion that evidence of an offense threatening U.S. territorial integrity would be found on Alisigwe's phones, the

30

border searches of those phones fell well within the scope of the border search authority and did not violate the Fourth Amendment.[5]

## 2. The Good-Faith Exception Applies

Even if the Court were to conclude that the manual reviews of Alisigwe's cellphones were unlawful, the Court should apply the good-faith exception to the exclusionary rule.

Neither the Supreme Court nor this Court has ever held that warrantless border searches of cellphones

———————

[5] The brief of *amici curiae* raises the additional constitutional argument that the border searches of Alisigwe's phones violated the First Amendment. (Amici Br. 18-23). This argument is not properly before the Court, as it was not raised by Alisigwe. *See Bano v. Union Carbide Corp.*, 273 F.3d 120, 128 n.5 (2d Cir. 2001) (*amici* cannot raise issues on appeal not presented by the parties); 16AA Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3975.1 (5th ed. Jun. 2024 Update) ("In ordinary circumstances, an amicus will not be permitted to raise issues not argued by the parties."). Even if this argument were before the Court, it lacks merit. *See, e.g.*, *Alasaad*, 988 F.3d at 22 (holding that content-neutral border searches, which "have a plainly legitimate sweep and serve the government's paramount interests in protecting the border," do not violate the First Amendment, and observing that the presence of expressive material on electronic devices does not trigger a warrant requirement).

31

are unconstitutional. Indeed, this Court's decisions up-holding the Government's "broad plenary powers" to conduct warrantless border searches strongly indicate that border searches of cellphones are permissible. *See, e.g.*, *Levy*, 803 F.3d at 124 (warrantless search of traveler's notebook permissible); *Irving*, 452 F.3d at 123-24 (warrantless search of computer diskette per-missible); *Asbury*, 586 F.2d at 977 (warrantless border strip search of traveler permissible).

Moreover, at the time of the searches, multiple cir-cuits had already held that a warrant is not required for searches of cellphones at the border. *See, e.g.*, *Kolsuz*, 890 F.3d at 142 (4th Cir. 2018) (rejecting argu-ment that *Riley* required warrant based on probable cause for border search of cellphone); *Vergara*, 884 F.3d at 1312-13 (11th Cir. 2018) ("Border searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule."); *Touset*, 890 F.3d at 1233 (11th Cir. 2018) (holding that even a forensic search of an elec-tronic device at the border requires no individualized suspicion); *cf. Molina-Isidoro*, 884 F.3d at 292 (observ-ing that "it is telling that no post-*Riley* decision issued either before or after this search has required a war-rant for a border search of an electronic device"). Con-sistent with the circuit cases upholding warrantless searches of cellphones at the border, CBP guidance in place at the time indicated that forensic searches of

32

electronic devices could be conducted without a warrant based on reasonable suspicion.[6]

The HSI agents conducting the warrantless border searches of Alisigwe's cellphones therefore had "an objectively reasonable good-faith belief that their conduct was lawful," especially in light of their reasonable suspicion that Alisigwe was engaged in transnational criminal activity involving the use of fraudulent passports. Under these circumstances, the exclusionary rule does not apply. *Zodhiates*, 901 F.3d at 143; *see also Aigbekaen*, 943 F.3d at 725 (finding warrantless border search of cellphone unlawful but applying good-faith exception because the HSI agents who conducted the search "reasonably relied on an established and uniform body of precedent allowing warrantless border searches of digital devices"); *see also United States v. Wanjiku*, 919 F.3d 472, 479 (7th Cir. 2019) ("[A]gents acted in good faith when they searched the devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border."); *Smith*, 2023 WL 3358357, at *13 (applying good-faith exception to warrantless cellphone search at the border); *Sultanov*, 2024 WL 3520443, at *26-28 (same).

---

[6] *See* CBP Directive Regarding Border Searches of Electronic Devices, *available at https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Search-of-Electronic-Media.pdf.* (last accessed Nov. 13, 2024).

33

Accordingly, even if the Court were to conclude that the border searches of Alisigwe's phones were unlawful, it should affirm under the good-faith exception. Because the agents conducted the searches based on an objectively reasonable good-faith belief that their conduct was lawful, "the harsh sanction of exclusion should not be applied." *Davis v. United States*, 564 U.S. 229, 241 (2011).

## POINT II

### The District Court Correctly Calculated the Guidelines Using the Intended Loss Amount

Alisigwe next argues that Judge Caproni erred by calculating his Guidelines range based on the intended loss amount, rather than the actual loss amount. (Br. 51-57). This argument is directly foreclosed by this Court's decision in *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024).

### A. Relevant Facts

At sentencing, Alisigwe argued that the applicable loss amount under the Guidelines should be calculated based on actual loss, which he claimed was between $400,000 and $600,000. (A. 405, 421-22). Judge Caproni disagreed and applied the intended loss amount of $4.5 million, triggering an 18-level increase in the offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J). (A. 422).

### B. Applicable Law

Section 2B1.1 of the Guidelines provides that a defendant's offense level is based in part on the amount

34

of "loss" involved in the offense. U.S.S.G. § 2B1.1(b)(1). In the commentary to the November 1, 2023 Guidelines Manual, Application Note 3(A) defined loss as "the greater of actual or intended loss." U.S.S.G. § 2B1.1 app. n.3(A) (2023). Application Note 3(A) further explained that "intended loss" means "the pecuniary harm that the defendant purposely sought to inflict," and "includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 app. n.3(A)(ii) (2023).[7]

This Court reviews the "sentencing court's interpretation of the Sentencing Guidelines *de novo*, but review[s] its related findings of fact only for clear error." *United States v. Potes-Castillo*, 638 F.3d 106, 108 (2d Cir. 2011).

## C.  Discussion

Alisigwe argues that Judge Caproni inappropriately calculated his Guidelines based on the intended (rather than actual) loss amount. (Br. 51-57). According to Alisigwe, the Supreme Court's ruling in *Kisor v. Wilkie*, 588 U.S. 558 (2019)—which "restricted judicial deference to an agency's interpretive rules . . . to those

---

[7]  The United States Sentencing Commission subsequently amended Section 2B1.1 by incorporating the intended loss commentary into the Guidelines' text. *See* 89 Fed. Reg. 36,853, 36,855-36,857 (May 3, 2024); *United States v. Boler*, 115 F.4th 316, 327 n.6 (4th Cir. 2024). That amendment took effect on November 1, 2024. *See* U.S.S.G. §§ 2B1.1(b)(1)(A), 2B1.1(b)(1)(C) (2024).

35

that interpret 'genuinely ambiguous' legislative rules"
—rendered Application Note 3(A) invalid. (Br. 52).[8]

This argument is flatly contradicted by this Court's
decision in *Rainford*. In *Rainford*, the Court held that
Application Note 3(A)'s definition of loss (as including
intended loss) controlled under *Stinson v. United
States*, 508 U.S. 36 (1993), in which the Supreme Court
held that "commentary in the Guidelines Manual that
interprets or explains a guideline is authoritative un-
less it violates the Constitution or a federal statute, or
is inconsistent with, or a plainly erroneous reading of,
that guideline." *Rainford*, 110 F.4th at 475 (citing
*Stinson*, 508 U.S. at 38). Because Application Note
3(A)'s definition of loss is "neither inconsistent with
nor a plainly erroneous reading of the guideline," this
Court held that it was authoritative. *Id.*

In reaching this holding, the Court explicitly re-
jected Alisigwe's argument on appeal: that *Kisor* inva-
lided Application Note 3(A). *See Rainford*, 110 F.4th at
475 n.5. Following *Kisor*, the Court explained, "circuit
courts have disagreed as to whether the application
note defining 'loss' to include the intended loss should
continue to receive deference." *Id.* This Court, how-
ever, held that it would "adhere to *Stinson* and defer
to the application note for two reasons." *Id.* First, the

---

[8]    Because Alisigwe was sentenced on April 8,
2024, the November 1, 2023 Guidelines Manual ap-
plied. *See United States v. Pereira-Gomez*, 903 F.3d
155, 160 n.6 (2d Cir. 2018) ("A sentencing court typi-
cally applies the Guidelines Manual in place at the
time of sentencing . . . .").

36

Court noted, "the Supreme Court has not overruled *Stinson*," which directly controls. *Id.* Second, the Court continued, "the guidelines commentary would meet the *Kisor* standard in any event." *Id.* Specifically, the Court concluded that "[b]ecause the Sentencing Commission adopts the commentary alongside the guidelines, the commentary necessarily reflects the Commission's 'authoritative, expertise-based, fair, or considered judgment.'" *Id.* (citing *Kisor*, 588 U.S. at 573). "Indeed," the Court explained, "the guidelines and the commentary operate together as a reticulated whole and accordingly the two are to be read together." *Id.*

*Rainford* is controlling and directly forecloses Alisigwe's intended loss argument. *See id.*; *see also, e.g.*, *United States v. Zheng*, 113 F.4th 280, 299-300 (2d Cir. 2024) (applying *Rainford* to reject argument that district court improperly calculated Guidelines based on intended loss); *United States v. Smith*, No. 22-3104, 2024 WL 4404046, at *3 (2d Cir. Oct. 4, 2024) (same). Yet even though *Rainford* was issued before Alisigwe filed his brief, Alisigwe does not address it in any way, much less offer any basis for distinguishing it. Consistent with this Court's holding in *Rainford*, it should reject Alisigwe's challenge to Judge Caproni's calculation of the Guidelines using the intended loss amount.

## POINT III

### The District Court Properly Applied the Obstruction Enhancement

Finally, Alisigwe contends that Judge Caproni erred by applying the obstruction-of-justice enhancement to increase his Guidelines range. (Br. 58-63).

37

This argument lacks merit. Judge Caproni correctly determined that the obstruction enhancement was warranted based on Alisigwe's deliberate lies under oath. And even assuming that Judge Caproni erred, any error was harmless because—as she made clear—she would have imposed the same sentence regardless of whether the enhancement applied.

## A.  Relevant Facts

### 1.  Evidentiary Hearing Regarding Duress Defense

Alisigwe first raised a potential duress defense at a change of plea hearing on May 31, 2023. (A. 75-76). During the change of plea hearing, Judge Caproni asked Alisigwe whether any co-conspirators had threatened him in any way to make him participate, and Alisigwe responded in the affirmative. (A. 75-76). Alisigwe then stated that those co-conspirators had threatened his mother's life. (A. 76). After Alisigwe noted that he had not discussed a potential duress defense with his attorney, Judge Caproni adjourned the hearing to allow that discussion to occur. (A. 76).

Alisigwe subsequently indicated that he wished to present a duress defense at trial, and Judge Caproni held an evidentiary hearing on this issue. At the hearing, Alisigwe testified that around 2015, he received a call from "a total stranger" who said that he had a "business" and wanted Alisigwe to help him with it. (A. 109). When Alisigwe asked the stranger whether it was a "car business," the man said that it was a "different business," that Alisigwe "shouldn't worry," and that he would call Alisigwe back. (A. 109). Alisigwe

testified that about six months later, the stranger called him again and asked him to "open accounts." (A. 111). Alisigwe refused and asked the stranger for his name, and the stranger responded: "I'm from the same place where you are from." (A. 111).

Alisigwe testified that, after this occurred, the stranger continued to ask Alisigwe to open accounts for him and sent Alisigwe pictures of Alisigwe's mother by text message. (A. 113). At one point, Alisigwe claimed, the stranger told him: "[Just] listen to me, and do as I say, and nobody will get hurt. . . . [A]fter your mom, we will come after your family." (A. 113). When Alisigwe asked what the stranger wanted from him, the stranger purportedly said: "just open the account, then I will tell you what to do." (A. 113). Alisigwe later received a passport in another person's name by mail and was told to use it to open an account. (A. 115-16).

According to Alisigwe, he continued for years to open accounts for these individuals using fake passports and identification documents because each time he told them he was done, they "would start threatening [him] with [his] mother." (A. 119). He also testified that while he engaged in these activities at their behest for a number of years, he never learned their names. (A. 119-20, 129).

Alisigwe claimed that he communicated with the strangers by phone, but that he could not remember their phone numbers because they kept telling him to throw away his old phone and get a new one. (A. 129-31). He stated that he provided the phone numbers of his new phones to a man that he met in person in the

39

United States, who collected the money from him. (A. 136). Alisigwe said that he did not know this man's name but that the man would "call [Alisigwe] on the phone and say 'hey, I'm coming.'" (A. 136-37). Alisigwe later claimed, however, that it was the people in Nigeria who would call him and tell him when someone was coming to collect the money. (A. 137). Alisigwe testified that the same man would come each time and that their meetings would usually occur at a park in Queens. (A. 137). He explained that, during the first meeting, he knew who to give the money to because the man said, "I'm from your friends." (A. 138). The first time that Alisigwe gave this man money, he stated, he handed the man $17,000 in cash. (A. 138).

Alisigwe further testified that he never contacted police about the threats because he believed that the Nigerian police would not do anything about it and that, if he went to U.S. authorities, the strangers would kill his mother. (A. 116-19).

After the hearing, Judge Caproni issued a written opinion holding that Alisigwe had failed to make a *prima facie* showing of duress and that he was therefore precluded from raising a duress defense at trial. (A. 177-85). Specifically, Judge Caproni concluded that Alisigwe had "not proffered adequate evidence that he lacked a reasonable opportunity to escape harm to his family other than by engaging in illegal activity." (A. 183).

## 2. Sentencing

In its sentencing submission, the Government argued that a two-point obstruction enhancement

40

applied based on Alisigwe's plainly implausible testimony at the duress hearing, as well as Alisigwe's submission of a false declaration in support of a pretrial motion to suppress passports seized at the time of his arrest. (Dkt. 130 at 3-4). Alisigwe argued that any such enhancement would be improper. (A. 406-08, 423-26).

At sentencing, Judge Caproni concluded that, even putting aside the suppression affidavit, the obstruction enhancement applied based on Alisigwe's testimony at the duress hearing. (A. 429). In reaching this conclusion, Judge Caproni described Alisigwe's testimony as "preposterous," noting that "the whole story does not hang together as something that happens." (A. 416). Judge Caproni continued: "[That] total strangers called and he had no idea who they were, never found out who he was. The other person that he was working with, he had no idea what that person's name is. They would randomly meet in Flushing Meadow Park and hand off cash between them. The story was preposterous." (A. 426).

Judge Caproni made clear that while there may have been "some germ of truth" to the claim that "at some point along the way" "someone threatened him," "[t]hat is not the story he told." (A. 427). Instead, she explained, "the story he told was far different from that and was, with all due respect, preposterous." (A. 427). Judge Caproni then reiterated the point, noting, "Whatever germ of truth there was in that testimony got lost in just out-of-mouth fiction, and it was told precisely to obstruct these proceedings." (A. 429-30).

41

After concluding that the obstruction enhancement applied, Judge Caproni made clear that the resolution of this issue had no impact on Alisigwe's sentence. (A. 430). Judge Caproni explicitly stated that she "would impose the same sentence in this case regardless of whether" the obstruction enhancement applied. (A. 430).

## B. Applicable Law

Under Section 3C1.1 of the Guidelines, two levels are added to the offense level:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct . . . .

U.S.S.G. § 3C1.1. The enhancement can be applied to perjured testimony, as long as the district court finds that "the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). Once a court determines that a defendant has committed perjury at trial or at a hearing, "an enhancement of sentence is *required* by the Sentencing Guidelines." *United States v. Dunnigan*, 507 U.S. 87, 98 (1993) (emphasis added).

42

When a sentencing court imposes an obstruction enhancement, separate findings of fact are not required, as long as the sentencing court makes "a general finding of obstruction that tracks those factual predicates necessary to support a finding of perjury." *United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993). A court, however, is not required to render its obstruction of justice findings using any particular language or "magic words." *United States v. Dundon*, 349 F. App'x 588, 590 (2d Cir. 2009) ("Although the District Court did not use the words 'willfull,' 'willfully,' or 'willfullness' at the sentencing hearing, we do not read our precedent to require the use of magic words at sentencing."); *see United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (en banc) ("Sentencing is a responsibility heavy enough without our adding formulaic or ritualized burdens.").

On appeal, "[o]bstruction of justice enhancements are subject to a mixed standard of review." *United States v. Ayers*, 416 F.3d 131, 133 (2d Cir. 2005) (per curiam). A district court's findings of fact—including its credibility determinations and determinations of the defendant's intent—are reviewed for clear error. *Id.*; *see United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999). "However, [a] ruling that the established facts constitute obstruction or attempted obstruction under the Guidelines . . . is a matter of legal interpretation and is to be reviewed *de novo*, giving due deference to the district court's application of the guidelines to the facts." *United States v. Bliss*, 430 F.3d 640, 646 (2d Cir. 2005).

43

Even where this Court identifies a procedural error in a sentence, including an error in calculating the applicable Guidelines, if "the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) (citing *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009)); *see United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003) ("[G]uideline disputes that would not have affected the ultimate sentence need not be adjudicated on appeal.").

## C.   Discussion

### 1.   There Was No Error in the District Court's Application of the Obstruction Enhancement

Judge Caproni correctly applied the obstruction enhancement based on Alisigwe's deliberate, material lies under oath. Alisigwe's perjury related to one of the key issues at the duress hearing: whether he participated in the activities charged in the Indictment due to threats. As Judge Caproni concluded, Alisigwe's testimony that strangers threatened him and forced him to participate in illegal activities for years was "preposterous." (A. 416). While these lies were ultimately unsuccessful in convincing Judge Caproni that Alisigwe had a valid duress defense, they went to the heart of the duress hearing and were plainly material. *See United States v. Gershman*, 31 F.4th 80, 103-04 (2d Cir. 2022) (noting that the "threshold for materiality is

44

conspicuously low" and that the defendant's conduct need only have the "*potential*" to impede the proceedings); *see also* U.S.S.G. § 3C1.1, app. n.6 (defining " '[m]aterial' evidence, fact, statement, or information" as "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination"). As Judge Caproni found, Alisigwe's perjury was also willful: he intentionally told a story full of lies to try to get away with his crimes by claiming he had committed them under duress. (A. 429-30). Judge Caproni's findings—made based on her firsthand observations of Alisigwe's testimony—are entitled to "special deference," *United States v. Beverly*, 5 F.3d 633, 642 (2d Cir. 1993), and amply support the application of the obstruction-of-justice enhancement.

Alisigwe wrongly claims that Judge Caproni made no "specific findings as to what, precisely, was false in [his] story." (Br. 60). In fact, however, Judge Caproni specifically concluded that "the whole story" Alisigwe told at the duress hearing was "preposterous." (A. 416). Judge Caproni also gave examples of the type of testimony she found preposterous at the hearing, including "[that] total strangers called and he had no idea who they were," that he did not know the name of "the other person that he was working with," and that he and this other person "would randomly meet in Flushing Meadow Park and hand off cash between them." (A. 426).

Alisigwe also disputes Judge Caproni's credibility findings, claiming that his testimony was not "inherently incredible." (Br. 59; *see* Br. 58-59, 61). But

45

Alisigwe offers no sound reason for this Court to sec-
ond-guess Judge Caproni's findings. "Where there are
two permissible views of the evidence, the factfinder's
choice between them cannot be clearly erroneous."
*United States v. Chalarca*, 95 F.3d 239, 244 (2d Cir.
1996). In particular, because "assessing the credibility
of witnesses is distinctly the province of the district
court," this Court should defer to a district court's fac-
tual findings based on the testimony of witnesses. *Bev-
erly*, 5 F.3d at 642; *accord United States v. Hendrick-
son*, 26 F. 3d 321, 339 (2d Cir. 1994). Accordingly,
while Alisigwe may disagree with Judge Caproni's
view that he was lying about his interactions with pur-
ported strangers for years, her credibility determina-
tion was not clearly erroneous.

Moreover, contrary to Alisigwe's claims (Br. 61-62),
Judge Caproni did not fail to make specific findings
that Alisigwe's perjury was willful and material.
Judge Caproni found that Alisigwe's testimony at the
duress hearing was "out-of-mouth fiction . . . told pre-
cisely to obstruct these proceedings." (A. 430; *see also*
A. 426-27). She contrasted this testimony with
Alisigwe's false suppression affidavit, which she found
could have resulted from "a failure of recollection."
(A. 429). By concluding that Alisigwe lied in the duress
hearing for the purpose of obstructing the proceedings
—and not due to any "failure of recollection"—Judge
Caproni necessarily found that the false testimony
was willful and not the result of "confusion, mistake,
or faulty memory." U.S.S.G. § 3C1.1, app. n.2. That
willfulness finding was sufficient. *See Dundon*, 349 F.
App'x at 590 (affirming the application of the obstruc-
tion enhancement and explaining: "[a]lthough the

46

District Court did not use the words 'willfull,' 'willfully,' or 'willfullness' at the sentencing hearing, we do not read our precedent to require the use of magic words at sentencing"); *see also United States v. Abreu*, 514 F. App'x 13, 16 (2d Cir. 2013) (holding that district court found willfulness for purposes of obstruction enhancement "despite not using the specific word").

Likewise, while Judge Caproni did not use the specific word "material," she found that Alisigwe's testimony presented an account of the facts that was intended to "obstruct these proceedings" by falsely proffering that he had acted under duress. (A. 430; *see also* Br. 426-27). That materiality finding was sufficient, particularly because the whole point of Alisigwe testifying at the hearing was to present a story that, if believed, would have "tend[ed] to influence or affect" whether he could present a duress defense. U.S.S.G. § 3C1.1, app. n.6; *see United States v. Lincecum*, 220 F.3d 77, 81 (2d Cir. 2000) (concluding that district court's materiality finding was sufficient because the court, while "not using the specific word 'material,'" had noted that the affidavit in question presented an account of the facts that, if true, would have led to the suppression of evidence).

## 2. Any Purported Error Was Harmless

Even assuming that Judge Caproni erred in applying the obstruction enhancement (and she did not), any error was harmless. After applying the enhancement, Judge Caproni expressly stated that she would "impose the same sentence in this case regardless" of whether the enhancement applied. (A. 430). Because

47

the obstruction enhancement did not affect the ultimate sentence that Alisigwe received, any error in applying that enhancement was harmless. *See Cramer*, 777 F.3d at 601; *Shuster*, 331 F.3d at 296; *see also Jass*, 569 F.3d at 68 (finding Guidelines error to be harmless where "district court unequivocally stated that it would impose the same 65-year sentence" in any event); *United States v. Sanchez*, 679 Fed. App'x 81, 84 (2d Cir. 2017) ("Even assuming Sanchez is correct, the record reflects that the same sentence would have been imposed anyway, such that the alleged error may be deemed harmless."); *United States v. Delarosa*, 675 F. App'x 91, 93 (2d Cir. 2017) ("At all times . . . the District Court made plain that the Guidelines range would not affect Delarosa's sentence. . . . Even assuming that the District Court committed procedural error in its Guidelines calculation, it is clear from the record that the Guidelines calculation did not affect the District Court's ultimate imposition of sentence. Accordingly, any error was harmless . . . ."); *United States v. Komar*, 529 F. App'x 28, 29-30 (2d Cir. 2013) ("Even if we were to conclude otherwise, however, Komar would not be entitled to resentencing based on such Guidelines error because the district court made clear that it would have imposed the same sentence even if the applicable Guidelines range had been different.").

Contrary to Alisigwe's argument (Br. 62-63), this Court's decision in *United States v. Feldman*, 647 F.3d 450 (2d Cir. 2011) does not suggest otherwise. In *Feldman*, this Court concluded that it was "ambiguous whether the claimed error affected the district court's sentence." *Id.* at 459. Because "the sentencing transcript [left] doubt that the District Court would have

48

imposed the same sentence absent" the challenged enhancements, this Court could not conclude that application of the enhancement was harmless. *Id.* at 460. Here, by contrast, Judge Caproni made an "explicit and unambiguous declaration" that the obstruction enhancement "did not affect the ultimate sentence." *Id.* at 459. *Feldman* is thus inapposite here.

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:    New York, New York
          November 13, 2024

               Respectfully submitted,

               DAMIAN WILLIAMS,
               *United States Attorney for the*
               *Southern District of New York,*
               *Attorney for the United States*
               *of America.*

MEREDITH C. FOSTER,
WILLIAM C. KINDER,
JAMES LIGTENBERG,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 11,514 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: JAMES LIGTENBERG,
*Assistant United States Attorney*