24-960
*United States v. Alisigwe*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2024
No. 24-960

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**CHINWENDU ALISIGWE**,
*Defendant-Appellant*.*

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MARCH 28, 2025
DECIDED: SEPTEMBER 17, 2026

Before: MENASHI and LEE, *Circuit Judges*, and GONZALEZ, *Judge*.†

A jury found Chinwendu Alisigwe guilty of fraud offenses based on his use of fraudulent identification documents to open bank

* The Clerk of Court is directed to amend the caption as set forth above.

† Judge Hector Gonzalez of the United States District Court for the Eastern District of New York, sitting by designation.

accounts using the names and social security numbers of real people. Alisigwe argues that the district court erred by denying his motion to suppress evidence obtained from two searches of his cellphone at John F. Kennedy International Airport. He argues that the searches violated the Fourth Amendment because the government did not obtain a warrant. We disagree. No suspicion is required before the government searches a traveler's cellphone at the border. Nor does the First Amendment impose an independent warrant requirement for searches of cellphones at the border. We also reject Alisigwe's additional arguments that the district court erred by imposing two enhancements under the Sentencing Guidelines: (1) an eighteen-point enhancement under § 2B1.1(b)(1)(J) because the offense involved an intended loss of at least $3,500,000, and (2) a two-point enhancement under § 3C1.1 for obstruction of justice. We affirm the judgment of the district court.

Judge Lee concurs in the judgment in a separate opinion.

---

COLLEEN P. CASSIDY, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

JAMES LIGTENBERG, Assistant United States Attorney (Meredith C. Foster, William C. Kinder, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Plaintiff-Appellee*.

SCOTT B. WILKENS, Knight First Amendment Institute at Columbia University (Stephanie Krent, Alex Abdo, Jameel Jaffer, Knight First Amendment Institute at Columbia University; Bruce D. Brown, Gabriel Rottman, Grayson Clary, Reporters Committee for Freedom of the Press, *on the brief*), *for* Amici Curiae Knight First

Amendment Institute at Columbia University and Reporters Committee for Freedom of the Press.

MENASHI, *Circuit Judge*:

Chinwendu Alisigwe, a lawful permanent resident, appeals from a judgment of conviction following trial for conspiracy to commit bank fraud, bank fraud, and conspiracy to commit money laundering.

International law enforcement agencies suspected that Alisigwe used fraudulent passports and identification documents to open bank accounts in the names of real people. In 2019, officers from the New York Document and Benefit Fraud Task Force of Homeland Security Investigations ("HSI") and Customs and Border Protection ("CBP") stopped Alisigwe at John F. Kennedy International Airport ("JFK"). During an interview, an officer scrolled through Alisigwe's cellphone and photographed its contents. The officers found images of other people's names, birthdates, and social security numbers. Two years later, officers again stopped Alisigwe at JFK. An officer scrolled through Alisigwe's cellphone and photographed a WhatsApp message in which Alisigwe asked a co-conspirator whether he had received "[a]nything for" an individual whose identity Alisigwe had stolen. App'x 259.

The district court denied Alisigwe's motion to suppress the evidence obtained from his cellphone. In doing so, it concluded that "cellphone searches cannot be conducted without reasonable suspicion of criminal activity because they are not routine border searches." *United States v. Alisigwe*, No. 22-CR-425, 2023 WL 8275923, at *5 (S.D.N.Y. Nov. 30, 2023). But it decided that "[o]n both occasions that law enforcement agents searched a cellphone belonging to

Alisigwe, they had reasonable suspicion to do so." *Id.* at *6. There was such suspicion, according to the district court, because the Department of Homeland Security ("DHS") had "launched an investigation regarding Alisigwe's use of multiple identities," the "United Kingdom's border force had seized a fraudulent South African passport bearing Alisigwe's photograph, and DHS's Document and Benefit Fraud Task Force was planning to pursue criminal or administrative charges against Alisigwe." *Id.* (internal quotation marks omitted). The district court noted that other district courts in this circuit have held that a warrant is required to search a suspect's cellphone at the border. *Id*. The district court concluded that even if a warrant were required, the good-faith exception to the exclusionary rule would apply because "neither the Supreme Court nor the Second Circuit has addressed the lawfulness of warrantless searches of cellphones at the border." *Id.* at *7.

We do so now. First, we conclude that the district court properly denied Alisigwe's motion to suppress evidence obtained at the border. Contrary to the district court's reasoning, however, reasonable suspicion was not required. The "longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). "The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Id.* at 620. Because "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and

examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border," *Ramsey*, 431 U.S. at 616.

Under our precedents, no suspicion is required before the government searches a traveler's property at the border. *See United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006). Searches of property "are made reasonable by that person's decision to enter this country." *Id.* To be sure, nonroutine searches, which are "more invasive searches, like strip searches, require reasonable suspicion." *Id.* But we have held that "the label 'non-routine' should generally be reserved for intrusive border searches of *the person* (such as body-cavity searches or strip searches), not belongings." *United States v. Levy*, 803 F.3d 120, 123 n.3 (2d Cir. 2015) (emphasis added). Because a cellphone is property, our precedents establish that the government does not need to have reasonable suspicion before searching a traveler's cellphone at the border.

We reject Alisigwe's invitation to extend *Riley v. California*, 573 U.S. 373 (2014), to conclude that a "search of a cellphone requires a warrant, even in circumstances where a warrantless search is generally allowed." Appellant's Br. 32. *Riley* involved the exception to the warrant requirement for a search incident to an arrest. That exception aims to avoid "the two risks" of "harm to officers and destruction of evidence." *Riley*, 573 U.S. at 386. In *Riley*, the Court explained that because "[t]here are no comparable risks when the search is of digital data," the rationale for the search-incident-to-arrest exception does not have "much force with respect to digital content on cell phones." *Id.* That holding does not implicate the border-search exception, which relies on a different rationale.

Alisigwe asks us to limit the border-search exception to exclude searches "for evidence of crime unrelated to contraband or other border offenses." Appellant's Br. 34. But we have previously held that "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *Irving*, 452 F.3d at 123. Our precedent holding that the government may perform pretextual searches at the border without a warrant means that the government is not limited to searching for contraband or evidence of border offenses. That is because the government's interest at the border is not limited to detecting physical contraband. Rather, the government has "broad authority to control who and what enters the country." *Tabbaa v. Chertoff*, 509 F.3d 89, 102 n.5 (2d Cir. 2007). Searching for evidence of criminality among those entering the country is an exercise of that authority.

Second, we conclude that the First Amendment does not impose a separate limitation on the government's authority to search cellphones at the border. Special protection against cellphone searches at the border would be both over- and underinclusive of speech: The government would be limited in its authority to search for evidence of non-expressive conduct on cellphones but could freely search for expressive conduct in any other type of property, such as notebooks, diaries, and films. And that novel form of First Amendment protection would conflict with the purpose of the border-search exception because it would prevent the government from thwarting the entry of persons with ties to terrorism.

Third, we reject Alisigwe's arguments that the district court erred by imposing two enhancements under the Sentencing Guidelines: (1) an eighteen-point enhancement under § 2B1.1(b)(1)(J) because the offense involved an intended loss of at least $3,500,000, and (2) a two-point enhancement under § 3C1.1 for obstruction of

justice. As Alisigwe concedes in his reply brief, we have held that the loss under § 2B1.1 is the greater of the actual or intended loss. The district court correctly relied on the intended loss to calculate Alisigwe's sentence. And the district court did not clearly err by finding that Alisigwe willfully and materially obstructed court proceedings by concocting a story during his duress hearing. That finding justified the obstruction enhancement under § 3C1.1. We affirm the judgment of the district court.

**BACKGROUND**

Between 2017 and 2020, Alisigwe opened thirty-six bank accounts using fraudulent passports and driver's licenses. He deposited millions of dollars from other fraudulent schemes into the bank accounts and transferred money among the accounts to disguise the nature of the proceeds. He also wired portions of the stolen funds to accounts in China and the United Kingdom and kept some of the funds for himself.

In 2018, the United Kingdom Border Task Force informed DHS that it had seized a fraudulent South African passport with an American nonimmigrant visa in the name of Wilhelm Heintz. *See* App'x 47. Facial recognition software indicated that the photograph on the passport was of Alisigwe, who had previously filed a naturalization application with U.S. Citizenship and Immigration Services ("USCIS"). As a result, HSI opened a criminal investigation in coordination with USCIS, the HSI Attaché in London, and the U.S. Department of Justice.

Alisigwe returned to the United States from a trip to Nigeria in February 2019. He went through the regular customs inspection at JFK before agents from HSI instructed CBP to put him in a secondary inspection area. HSI officers stopped him because they were "looking

for evidence of fraudulent financial transactions … and stolen identification information … [o]r documents." *Id.* at 260-61. When an officer showed Alisigwe the Heintz passport, Alisigwe said "[t]hat looks like me" but denied knowing when or where the photograph was taken. *Id.* at 48.

An officer instructed Alisigwe to unlock his cellphone, which Alisigwe did. The officer then scrolled through Alisigwe's cellphone and used his own cellphone to photograph images contained in Alisigwe's photo gallery.[1] The photo gallery contained images of other people's names, birthdates, and social security numbers as well as bank account information and addresses. *See* App'x 457-61. The information in the photo gallery matched the information Alisigwe used to open various bank accounts. After the search, Alisigwe was released into the country.

Over two years later, HSI and CBP officers stopped Alisigwe again at JFK as he returned from an international trip. *See id.* at 273. The officers interviewed Alisigwe about the purpose of his travel and again manually reviewed his cellphone by scrolling through it and taking photographs. *See id.* at 50-51. The officers photographed a WhatsApp message in which Alisigwe asked an individual whether he had received "[a]nything for" one of the people whose identities Alisigwe had stolen. *Id.* at 259; *see id.* at 457. Alisigwe was again released into the country.

Alisigwe was subsequently arrested. The government charged him with conspiracy to commit bank fraud, bank fraud, aggravated identity theft, and conspiracy to commit money laundering. At a

[1] The officer did not perform a cell phone extraction, which would have involved connecting Alisigwe's phone to a computer and downloading information not accessible by scrolling through the phone. *See* App'x 264.

change-of-plea hearing, Alisigwe said that he had been coerced to commit the crimes because of threats to his mother's life. *See id.* at 75-76. The district court declined to accept his guilty plea and, with his consent, held a hearing to determine whether he could make a *prima facie* showing of duress.

At the duress hearing, Alisigwe testified that in 2015 he received a call from "a total stranger" who requested his help with a "business." *Id.* at 109. As Alisigwe recounted it, the stranger said that Alisigwe "shouldn't worry" and that he would call Alisigwe back. *Id.* The same person called him "about a week later" and said "I want you to give me an account so I will send money into the account." *Id.* at 110. Six months later, the man called him and said "I want you to open accounts." *Id.* at 111. At some point in the future, "[t]he same person who had been calling" sent Alisigwe "a picture of [his] mom." *Id.* at 112. When Alisigwe refused to open the requested accounts, the man told Alisigwe "listen, we know everything about you and your family. So just listen to me, and do as I say, and nobody will get hurt. Nothing will happen to you to your mom. We know your father is dead. If your mom die, I don't think you will be able to come back home. And after your mom, we will come after your family. We know everybody in your family." *Id.* at 113.

The man purportedly sent Alisigwe a package from Nigeria containing a list of names, a phone, and a phone number to call. *See id.* at 114-15. When Alisigwe called the number, a different man answered. This man told Alisigwe "to take a passport picture" and send it to Nigeria. *See id.* at 115. This man subsequently sent Alisigwe a passport in another person's name by mail and told him to use it to open a bank account.

Alisigwe testified that he opened accounts for the unknown men using fake passports and identification documents because whenever Alisigwe said that he wanted to stop, the men "would start threatening [him] with [his] mom." *Id.* at 119. He never learned the names of the men who called him. Alisigwe claimed that he communicated with the strangers by phone, but he did not know their phone numbers because they repeatedly told him to discard and replace his old phone. *See id.* at 129-31.

Alisigwe testified that he withdrew cash from the accounts using fraudulent identification documents and delivered the cash to a man that he met at a park in Queens. *See id.* at 137-38. He said that he knew the person to whom he should give the money at the first meeting because the man approached him and said "I'm from your friends." *Id.* at 138. He did not know the man's name, but the man would "call [Alisigwe] on the phone and say 'hey, I'm coming.'" *Id.* at 137. Alisigwe later claimed that the original unknown callers from Nigeria would call and tell him when someone was coming to collect the money. *See id.* Alisigwe testified that he never contacted police about the threats because he believed that the Nigerian police would not do anything about it and that the strangers would kill his mother if he contacted U.S. authorities. *See id.* at 116-19.

The district court held that Alisigwe did not make a *prima facie* showing of duress because he failed to show that "he lacked a reasonable opportunity to escape harm to his family other than by engaging in illegal activity." *Id.* at 183. The district court said that it was "fatal to his duress defense" that "[a]t no point during this extended period of illegal conduct … did Mr. Alisigwe report the threats against his family to any law enforcement officers." *Id.* The district court explained that "[a]ny issues with Nigerian police did not

prevent Mr. Alisigwe from reporting the threats against his family to law enforcement in the United States." *Id.* at 184. Moreover, it did not help Alisigwe's defense of duress that "contacting U.S. authorities was also out of the question because doing so would have prevented him from cooperating with the men who were threatening him" because "Alisigwe's subjective fears about the consequences of contacting U.S. law enforcement are insufficient to excuse compliance with this element of a duress defense." *Id.* at 185.

Following a three-day trial, Alisigwe was convicted of all counts but aggravated identity theft. In calculating Alisigwe's sentence, the district court imposed two relevant enhancements under the Sentencing Guidelines: (1) an eighteen-point increase under § 2B1.1(b)(1)(J) because the offense involved an intended loss of at least $3,500,000, and (2) a two-point enhancement under § 3C1.1 for obstruction of justice based on Alisigwe's testimony at the duress hearing. The applicable guidelines sentencing range was 135 to 168 months of imprisonment. The district court varied downward and sentenced Alisigwe to five years of imprisonment. *See* Special App'x 31.

## DISCUSSION

"In evaluating the denial of a motion to suppress evidence, we review the district court's factual findings for clear error and its conclusions of law *de novo*." *Levy*, 803 F.3d at 122. "We review a district court's application of the guidelines *de novo*, but factual determinations are reviewed for clear error." *United States v. Rainford*, 110 F.4th 455, 475 (2d Cir. 2024).

We resolve three issues in this appeal. First, the district court did not err by denying Alisigwe's motion to suppress the evidence obtained from the two cellphone searches at the border. *Riley* did not

disturb our precedent holding that a search of a traveler's property at the border is a routine search that requires no suspicion. The government has as strong an interest in digital contraband as in other property. Because the border-search exception serves the purpose of preventing the entry of unwanted persons or things into the country—not only specific types of contraband—it is not limited to cases in which the government is investigating border crimes.

Second, the First Amendment does not separately require the government to obtain a warrant before searching a cellphone at the border. A special warrant requirement for cellphones designed to protect speech would be overinclusive because it would restrict searches of cellphones for evidence of non-expressive conduct, and it would be underinclusive because it would impose no limits on searches of other property that typically contain expressive content, such as notebooks and diaries. Such a novel requirement would conflict with the purpose of the border-search exception because the government may deny entry to the country based on expressive conduct, such as support for terrorist groups. Our precedent forecloses the conclusion that the First Amendment establishes its own independent warrant requirement for border searches.

Third, the district court did not err in its application of the guidelines. We have held that § 2B1.1 permissibly defines the loss as the greater of the actual or intended loss. The district court correctly relied on the intended loss to calculate Alisigwe's sentence. The district court also did not clearly err by finding that Alisigwe concocted a story at his duress hearing or by concluding that doing so amounted to a willful and material obstruction of the proceedings under § 3C1.1.

**I**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley*, 573 U.S. at 382. "One of those exceptions is a search at our nation's borders." *Irving*, 452 F.3d at 123.

**A**

"Border searches … from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *Ramsey*, 431 U.S. at 619. "An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception." *Irving*, 452 F.3d at 123 (citing *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986)).

"The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Ramsey*, 431 U.S. at 620. "The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Flores-Montano*, 541 U.S. at 152. The government has an interest in preventing the entry not only of known criminals but also of those "who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives." *United States v. Montoya de Hernandez*, 473 U.S. 531, 544 (1985). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting,

its territorial integrity." *Flores-Montano*, 541 U.S. at 153.[2] Because of that interest and authority, it "require[s] no extended demonstration" to establish that "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616.

Just as the government's interest in conducting a search is stronger at the border, the corresponding privacy interest of the traveler is weaker. "[A] port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search." *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971). As a result, "not only is the expectation of privacy less at the border than in the interior," but "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Montoya de Hernandez*, 473 U.S. at 539-40.

In light of these long-established principles, there is a "wealth of authority establishing the border search as 'reasonable' within the Fourth Amendment even though there be neither probable cause nor a warrant." *Ramsey*, 431 U.S. at 622. The Supreme Court approved the detention of a "suspected alimentary canal smuggler" until she either

---

[2] "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez*, 473 U.S. at 537.

excreted the contraband or submitted to an x-ray or rectal examination—even though the government had only reasonable suspicion. *Montoya de Hernandez*, 473 U.S. at 541.[3] The Court concluded that the search at least began as "a routine border search" and that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *Montoya de Hernandez*, 473 U.S. at 540-41. The Court offered "no view on what level of suspicion, if any, is required for *nonroutine* border searches such as strip, body cavity, or involuntary x-ray searches." *Id.* at 541 n.4 (emphasis added).

That was not the only time the Supreme Court indicated that "nonroutine" searches involve an intrusion on intimate bodily privacy. In a case involving the "removal, disassembly, and reassembly of the fuel tank" in a vehicle attempting to cross the

[3] The suspected smuggler "had made at least eight recent trips" from Bogota to the United States, revealed to customs inspectors that "she spoke no English and had no family or friends in the United States," "possessed $5,000 in cash, mostly $50 bills, but had no billfold," represented that "she had come to the United States to purchase goods for her husband's store in Bogota" but "indicated to the inspectors that she had no appointments with merchandise vendors," "had no hotel reservations," "could not recall how her airline ticket was purchased," and "had no shoes other than the high-heeled pair she was wearing." *Montoya de Hernandez*, 473 U.S. at 533-34. Based on this information, the customs inspectors developed the reasonable suspicion to "conduct a patdown and strip search," during which the inspector "felt respondent's abdomen area and noticed a firm fullness, as if respondent were wearing a girdle," and "noticed that respondent was wearing two pairs of elastic underpants with a paper towel lining the crotch." *Id.* at 534.

border, the Court explained that "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles." *Flores-Montano*, 541 U.S. at 154, 152. When the government searches property such as a vehicle, "[c]omplex balancing tests to determine what is a 'routine' vehicle search, as opposed to a more 'intrusive' search of a person, have no place." *Id.* at 152.

Based on these precedents, we have said that "the level of intrusion into a person's privacy is what determines whether a border search is routine." *Irving*, 452 F.3d at 123. "Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, *unlike strip searches*, do not substantially infringe on a traveler's privacy rights." *Id.* (emphasis added). Indeed, "we have long ruled that searches of a person's luggage or personal belongings are routine searches." *Id.* at 123-24. Moreover, "pat-down searches have repeatedly been found to be routine, even when they were followed by the lifting of an applicant's shirt or the forced removal of shoes." *Tabbaa*, 509 F.3d at 99. The "potential indignity" of such a pat-down search "fail[s] to compare with the much greater level of intrusion associated with a body cavity or full strip search." *Id.* (quoting *United States v. Charleus*, 871 F.2d 265, 268 (2d Cir. 1989)).

The upshot of the case law is that "the label 'non-routine' should generally be reserved for intrusive border searches of the person (such as body-cavity searches or strip searches), not belongings." *Levy*, 803 F.3d at 123 n.3. Only "more invasive searches,

like strip searches," are nonroutine and "require reasonable suspicion." *Irving*, 452 F.3d at 123.[4]

**B**

Alisigwe argues that *Riley* requires us to reconsider the distinction we have previously drawn between routine and nonroutine border searches. He insists that the "extraordinary intrusion of searching a person's cellphone" cannot be "justified by the government's interest in securing its borders." Appellant's Br. 36.

*Riley* did not address the border-search exception. That case arose in the context of a search incident to arrest. *See* 573 U.S. at 373. The exception to the warrant requirement for a search incident to arrest allows an officer to search the area immediately around an arrestee to prevent "harm to officers and destruction of evidence." *Id.* at 386. The Supreme Court considered whether the exception allowed

---

[4] In *Irving*, the government not only conducted a routine search of luggage but also "found *and retained* two computer diskettes and a disposable camera," and after seizing that property the government analyzed the diskettes and developed the film. Brief for the United States at 43, *United States v. Irving*, No. 04-971 (2d Cir. Sept. 10, 2004), 2004 WL 5261434 (emphasis added). Our court said the seizure and off-site analysis of those items "were supported by reasonable suspicion," so "we need not determine whether they were routine or non-routine." *Irving*, 452 F.3d at 124. This case involves a manual search at the border rather than a seizure or a forensic analysis. *See infra* note 9. The reasonable suspicion required for nonroutine searches, we have explained, "requires only 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Levy*, 803 F.3d at 123 (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). "[T]he level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

officers to conduct a warrantless search of Riley's cellphone when arresting him. The Court concluded that it did not. The Court explained that neither of the "rationales" for the search-incident-to-arrest exception "has much force with respect to digital content on cell phones." *Id.* With respect to the government interest, the exception serves to minimize the "two risks" of "harm to officers and destruction of evidence." *Id.* While those risks "are present in all custodial arrests," there "are no comparable risks when the search is of digital data." *Id.* The "[d]igital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape," and "once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone." *Id.* at 387-88.

With respect to the privacy interest of the arrestee, the search-incident-to-arrest exception relies on the notion that "any privacy interests retained by an individual after arrest [are] significantly diminished by the fact of the arrest itself." *Id.* at 386. But because cellphones contain "vast quantities of personal information," the "search of the information on a cell phone bears little resemblance to the type of brief physical search" that the search-incident-to-arrest exception generally allows. *Id.* The Court observed that cellphones "implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse"—those items typically found when "inspecting the contents of an arrestee's pockets"—because cellphones "differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Id.* at 393. "[T]he possible intrusion on privacy is not physically limited in the same way" given "the gulf between physical practicability and digital [storage] capacity." *Id.* at 394. The data on a

cellphone "could reveal an individual's private interests or concerns" or "where a person has been." *Id.* at 395-96.

The Supreme Court carefully limited its decision to the search-incident-to-arrest exception and expressly noted that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 401-02.[5]

Applying the logic of *Riley* to the border-search exception leads to the conclusion that the search of a cellphone at the border is a routine search. First, we consider "the government interest." *Riley*, 573 U.S. at 386. Unlike the two specific risks that the search-incident-to-arrest exception aims to avoid, the border-search exception furthers the government's much broader "interest in preventing the entry of unwanted persons and effects." *Flores-Montano*, 541 U.S. at 152. That interest is implicated with equal force "when the search is of digital data." *Riley*, 573 U.S. at 386. The digital data may itself be the material that the government seeks to exclude from the country. In other words, "cell phones *can* contain the contraband the border search doctrine means to intercept" such as "digital contraband in the

---

[5] The Supreme Court has also considered whether an individual has a reasonable expectation of privacy in cell-site location information and location history. *See Carpenter v. United States*, 585 U.S. 296, 313 (2018); *Chatrie v. United States*, 146 S. Ct. 2193, 2199 (2026). The Court decided that the "rationale underlying the third-party doctrine," according to which there is a diminished expectation of privacy in information voluntarily conveyed to another, does not apply when the government collects such location information from a service provider. *Carpenter*, 585 U.S. at 315. The Court has not articulated a general Fourth Amendment rule specific to cellphones, but it has "noted [that] when considering new innovations … the Court must tread carefully in such cases, to ensure that we do not 'embarrass the future.'" *Id.* at 316 (quoting *Nw. Airlines v. Minnesota*, 322 U.S. 292, 300 (1944)).

form of child pornography." *United States v. Mendez*, 103 F.4th 1303, 1309 (7th Cir. 2024). "The government's interest in detecting child pornography at the border is just as strong as its interest in intercepting firearms, narcotics, or any other prohibited item." *Id.*; *see also United States v. Touset*, 890 F.3d 1227, 1235 (11th Cir. 2018) ("'[D]igital' child pornography poses the same exact 'risk' of unlawful entry at the border as its physical counterpart.").

In this case, Alisigwe sought to bring into the country lists of stolen personally identifiable information. That is contraband whether in digital or physical form. *See United States v. Jackson*, 618 F. App'x 472, 476-78 (11th Cir. 2015) (describing "a notebook containing names, social security numbers, and birthdates" as "contraband"). The government's interest in detecting such information does not change based on the format in which it is recorded.

And the fact that a cellphone contains "personal information" about the owner makes it *more* rather than less relevant to the rationale for the border-search exception. *Riley*, 573 U.S. at 386. The government has an "interest in preventing the entry of unwanted persons" and identifying those persons may depend on personal information. *Flores-Montano*, 541 U.S. at 152. It is "'without doubt' that the power to exclude aliens 'can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders.'" *Ramsey*, 431 U.S. at 619 (quoting *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973)). "Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in." *Carroll v. United States*, 267 U.S. 132, 154 (1925). Whether a person is entitled to enter often depends on personal information. The government must deny admission to an

alien determined "to have a communicable disease," 8 U.S.C. § 1182(a)(1)(A)(i), "to have a physical or mental disorder and behavior associated with the disorder that may pose … a threat," *id.* § 1182(a)(1)(A)(iii)(I), "to be a drug abuser or addict," *id.* § 1182(a)(1)(A)(iv), to have committed acts amounting to "a crime involving moral turpitude" or a controlled substance offense, *id.* § 1182(a)(2)(A)(i), to be coming to the United States "to engage in prostitution" or "any other unlawful commercialized vice," *id.* § 1182(a)(2)(D), to have the intent even "incidentally" to engage in espionage, the evasion of export controls, or "any other unlawful activity," *id.* § 1182(a)(3)(A), to be one who "endorses or espouses terrorist activity," *id.* § 1182(a)(3)(B)(i)(VII), to have "been a member of or affiliated with the Communist or any other totalitarian party," *id.* § 1182(a)(3)(D)(i), or to be "likely at any time to become a public charge," *id.* § 1182(a)(4)(A), among other criteria.

In this case, the officer from HSI's New York Document and Benefit Fraud Task Force who searched Alisigwe was charged with investigating "immigration fraud." App'x 249. Because Alisigwe was a legal permanent resident with a pending application for citizenship, *see id*. at 47, 122, the investigation into his criminal activity also determined whether he was entitled to enter the country. As Alisigwe concedes, *see id.* at 414, the three crimes of which he was ultimately convicted are "aggravated felon[ies]," 8 U.S.C. § 1101(a)(43)(M)(i), that make him "deportable," *id.* § 1227(a)(2)(A)(iii), on an expedited basis, *see id.* § 1228(c), as well as inadmissible, *see id.* § 1227(a)(1)(A).

Second, as in *Riley* we consider the "privacy interests" of the person to be searched. *Riley*, 573 U.S. at 386. The search-incident-to-arrest exception historically has authorized the "brief physical search" of "a patdown of [the arrestee's] clothing and an inspection of [items] found in his pocket." *Id.* at 386, 392. The border-search

exception, by contrast, authorizes much more extensive searches. The authority of the government to "inspect luggage" is "not questioned." *Thirty-Seven Photographs*, 402 U.S. at 376. "Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." *Irving*, 452 F.3d at 123. The government also may conduct suspicionless "border searches of vehicles." *Flores-Montano*, 541 U.S. at 152. The government may ask the traveler to exit his vehicle and may not only search the vehicle's contents but also "remove, disassemble, and reassemble a vehicle's fuel tank." *Id.* at 155. There is no expectation of privacy in any aspect of a vehicle at the border because "balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles." *Id.* at 152.

In order to conduct such an extensive but routine search, we have explained that the government may detain the travelers, even if "U.S. citizens," for several hours because a traveler has no expectation of privacy in being free of such a detention at the border:

> [C]ommon sense and ordinary human experience suggest that it may take up to six hours for CBP to complete the various steps at issue here, including vehicle searches, questioning, and identity verification, all of which we have already found to be routine. The additional four hours, while certainly inconvenient, thus cannot be considered an unexpected level of intrusion into a person's privacy that by itself would render the searches non-routine. Accordingly, the searches and detention of plaintiffs were routine in the border context and thus did not violate the Fourth Amendment.

*Tabbaa*, 509 F.3d at 100-01 (internal quotation marks, citation, and footnote omitted).

And the government may review any material containing personal information that it finds in the traveler's luggage or in his vehicle. In *Levy*, we explained that "the officers inspected Levy's luggage, focusing on a spiral-bound notebook that contained eighteen pages of Levy's handwritten notes on various subjects, including travel information, business contacts, bank and trading account data, and limited details of Levy's personal affairs." *Levy*, 803 F.3d at 121. We had "no doubt" that such an inspection was "routine." *Id.* at 122. Even the photocopying of the entire notebook, we suggested, could not "be so 'intrusive' that it becomes a 'non-routine' search requiring reasonable suspicion" because "the label 'non-routine' should generally be reserved for intrusive border searches of the person (such as body-cavity searches or strip searches), not belongings." *Id.* at 123 n.3.

The fact that "a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record" might distinguish it from the physical material that can be "tucked into a wallet." *Riley*, 573 U.S. at 394. But a similar combination of information could be discovered through a search of everything contained in a traveler's luggage and vehicle. The arrestee has "reduced privacy interests" in "an item found on an arrestee's person." *Id.* at 391-92. But the traveler at the border has no expectation of privacy in anything he brings into the country. "[T]he United States 'is entitled to require that whoever seeks entry must establish the right to enter and to bring into the country *whatever* he may carry.'" *United States v. Muench*, 694 F.2d 28, 33 (2d Cir. 1982) (emphasis added) (quoting *Torres v. Puerto Rico*, 442 U.S. 465, 473 (1979)). Searches of "persons and property crossing into this country[] are

reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616.

The Supreme Court has never required that the government have reasonable suspicion to search any type of property at the border. To the contrary, the Court has said that "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched"—do not apply even to the most extensive searches of property such as a vehicle inspection. *Flores-Montano*, 541 U.S. at 152.

The Supreme Court has said that a warrant is not required even for the highly intrusive search or seizure of a person. A warrant was not required for the government to detain a suspected alimentary canal smuggler until she excreted the contraband or submitted to an x-ray or rectal examination. *See Montoya de Hernandez*, 473 U.S. at 541. We have required the government to have only reasonable suspicion before performing strip searches and body cavity searches at the border. *See United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir. 1985); *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978).[6] Those cases involved (1) a "body cavity search that revealed a heroin-filled condom concealed in [the traveler's] vagina," *Ogberaha*, 771 F.2d at 657, (2) "a strip search" to investigate "a bulge" in a man's "underwear" that turned out to be "two packets of money," and (3) a

[6] Even then, we have not required reasonable suspicion for strip searches that were "unaccompanied by exposure of intimate bodily parts." *United States v. Sanders*, 663 F.2d 1, 3 (2d Cir. 1981) (holding that no reasonable suspicion is required before "the removal of an artificial leg" even though "the exposure of the stump to which the prosthetic device is attached, accompanied by a temporary lack of mobility, constitutes an embarrassment").

"strip search" to identify items concealed in a woman's "girdle" and "concealed in her brassiere," *Asbury*, 586 F.2d at 977.

Alisigwe's argument for a warrant requirement would require us to conclude that scrolling through a cellphone is a more invasive search than reaching into and around a person's genitals.[7] But *Riley* does not require that counterintuitive result. The holding of *Riley* does not apply to the border-search exception, and the logic of *Riley* does not suggest that the search of a cellphone should be treated differently than other searches of property at the border. In fact, every circuit to consider whether *Riley* requires the government to obtain a warrant before searching a traveler's cellphone at the border has concluded that it does not, and no circuit has required *any* level of suspicion before the government may conduct the sort of manual search of a cellphone that occurred here.[8]

---

[7] *Cf.* Oral Argument Audio Recording at 6:01 (Alisigwe's counsel suggesting that a cellphone search is "very, very intrusive in a different way").

[8] *See Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2021) ("*Riley* does not command a warrant requirement for border searches of electronic devices nor does the logic behind *Riley* compel us to impose one."); *United States v. Kolsuz*, 890 F.3d 133, 147 (4th Cir. 2018) ("Even as *Riley* has become familiar law, there are no cases requiring more than reasonable suspicion for forensic cell phone searches at the border."); *United States v. Belmonte Cardozo*, 181 F.4th 461, 471 (4th Cir. 2026) ("[M]anual cell phone searches are routine border searches that do not require individualized suspicion."); *United States v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018) ("[I]t is telling that no post-*Riley* decision issued either before or after this search has required a warrant for a border search of an electronic device."); *Mendez*, 103 F.4th at 1309 ("No circuit court has read *Riley* to require more than reasonable suspicion to support even the most intrusive electronics search at the border."); *United States v. Eta*, 180 F.4th 936, 943 (7th Cir. 2026) ("[E]very court of appeals to address manual searches of electronic devices

We agree with those circuits that *Riley* does not alter the precedents that define the scope of the border-search exception. Those precedents lead to the conclusion that the search of a traveler's property at the border—including a cellphone—is a routine search that the government may conduct without suspicion.[9]

---

post-*Riley* agrees that they are routine and thus do not require individualized suspicion."); *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023) ("*Riley* involved a different Fourth Amendment exception, searches incident to arrest. No Circuit has held that the government must obtain a warrant to conduct a routine border search of electronic devices."); *United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) ("[M]anual searches of cell phones at the border are reasonable without individualized suspicion."); *United States v. Vergara*, 884 F.3d 1309, 1312-13 (11th Cir. 2018) ("Border searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule."); *United States v. Pulido*, 133 F.4th 1256, 1275 (11th Cir. 2025) ("[F]orensic searches of electronic devices don't require any level of suspicion.").

[9] Because this case involves only a manual review of the contents of the cellphone, we need not decide whether the use of "sophisticated forensic search methods," such as "the off-site forensic analysis of the phone's data," might qualify as a nonroutine search requiring reasonable suspicion. *Kolsuz*, 890 F.3d at 146 n.5, 140. In general, "balancing tests to determine what is a 'routine'" search of property, "as opposed to a more 'intrusive' search of a person, have no place in border searches" of property. *Flores-Montano*, 541 U.S. at 152. But some courts have relied on "a commonsense differentiation between a manual review of files on an electronic device and application of computer software to analyze a hard drive." *Kolsuz*, 890 F.3d at 146 (quoting *United States v. Cotterman*, 709 F.3d 952, 967 (9th Cir. 2013)); *but see id.* at 149 (Wilkinson, J., concurring in the judgment) ("Rather than deciding the case on solid and suitably limited grounds, the majority goes on to prescribe a constitutional standard whose rationale would label a great many cell phone searches undertaken at the border as 'nonroutine' and forbidden absent prior individualized suspicion."); *United States v. Aigbekaen*, 943 F.3d 713, 731 (4th Cir. 2019) (Richardson, J., concurring in the judgment) ("[W]e are not free to rewrite the Supreme Court's case law

**C**

Even though no circuit court has adopted a warrant requirement for the search of a cellphone at the border, Alisigwe notes that decisions of district courts within our circuit have done so. *See United States v. Smith*, 673 F. Supp. 3d 381, 393 (S.D.N.Y. 2023); *United States v. Sultanov*, 742 F. Supp. 3d 258, 284 (E.D.N.Y. 2024); *United States v. Fox*, No. 23-CR-227, 2024 WL 3520767, at *6 (E.D.N.Y. July 24, 2024); *United States v. Djibo*, 151 F. Supp. 3d 297, 309 (E.D.N.Y. 2015). Those decisions are wrong.

In *Smith*, the defendant was under investigation for conspiracy to control the industry for emergency mitigation services in the New York area. Officers at Newark Liberty International Airport took Smith's cellphone as he was returning from Jamaica. "They reviewed the phone manually and created and saved an electronic copy of it as it existed as of that date and time." 673 F. Supp. 3d at 386-87. The officers examined the digital copy and discovered communications about gang activity, a "remuneration arrangement and the 'rules' about responding to fires," and "submitting fraudulent insurance claims." *Id.* at 388.

---

based on our own ideas. And that law is sweeping in its deference to the authority of the government to conduct searches at the border."). The question may often lack practical significance because a suspicionless manual search might establish reasonable suspicion for a forensic search. *Cf. Irving*, 452 F.3d at 124; *United States v. Castillo*, 70 F.4th 894, 898 (5th Cir. 2023) ("[T]he manual cell phone search here produced evidence of child pornography. So if that search was valid, then it's hard to see how that would not justify the subsequent forensic searches for additional evidence."). Without particular circumstances in a case before us, we do not address the question "in a vacuum." *Kolsuz*, 890 F.3d at 153 (Wilkinson, J., concurring in the judgment).

The district court decided that such a warrantless search violated the Fourth Amendment because the government's "interest in searching the digital data 'contained' on a particular physical device located at the border is relatively weak." *Id.* at 395. The district court acknowledged that the government has an interest in "preventing unwanted persons or things from entering the country," but it decided that searching Smith—who sought to enter the country carrying evidence of criminal activity—did not further that interest. *Id.* at 399. The district court explained that "data stored on a cell phone … can and very likely does exist not just on the phone device itself, but also on faraway computer servers potentially located within the country," so "[s]topping the cell phone from entering the country would not, in other words, mean stopping the data contained on it from entering the country." *Id.* at 394.

In reaching that conclusion, the district court relied on academic commentators who have argued that "[d]ata's mobility—in particular its speed and unpredictability—challenges our understanding of both what it means to transit from place to place and what it means to 'store' our property"[10] and that "the nature of digital files is they … can be zipped around the world in an instant without any physicality."[11] According to these commentators, "[t]he properties of digital data weaken the contraband detection rationale for border searches" because "[a] person who wants to bring digital

---

[10] Jennifer Daskal, *The Un-Territoriality of Data*, 125 Yale L.J. 326, 366 (2015).

[11] Stanford Law School, Searching Computers at the Border: Professor Orin Kerr, at 18:54 (YouTube, Mar. 3, 2022), https://perma.cc/GBB6-LSBK.

contraband into the United States can circumvent the CBP entirely by sending it over the Internet."[12]

As we have explained, the government may conduct suspicionless border searches "pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *Ramsey*, 431 U.S. at 616. The examination is not limited to the detection of contraband or other particular items. We have long held that "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *Irving*, 452 F.3d at 123. In fact, whether the motivation for a customs officer to search a traveler "arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search" because the customs officer is not "prevented by the Fourth Amendment from conducting such a search merely because it furthers another federal agency's criminal investigation." *Levy*, 803 F.3d at 123-24. Even if "the ease of avoiding physical searches underscores that the searches are designed to identify wrongful actors, not to find contraband," Kerr, *supra* note 12, at 124-25, that would not undermine the justification for a border search because the border-search exception furthers the governmental interest in preventing wrongful actors from entering the country.

Nor is it persuasive that searches at the border would no longer be justified if criminals could evade such searches by transmitting information over the internet. The government "is not precluded from barring some avenues of illegal importation because avenues exist that are more difficult to regulate." *United States v. 12 200-Foot Reels of*

[12] Orin Kerr, The Digital Fourth Amendment: Privacy and Policing in Our Online World 124 (2025).

*Super 8mm. Film*, 413 U.S. 123, 129 (1973). And the possibility of evading the detection of illegal material entering the country would make it more important for the government to identify the wrongful *actors* who seek to enter. "To give criminal enterprises the advantage of technological advancements and at the same time impair access of law enforcement to those same developments risks recalibrating the Fourth Amendment balance in a manner that does not comport with reasonableness." *Kolsuz*, 890 F.3d at 152 (Wilkinson, J., concurring in the judgment).

**D**

Alisigwe argues that the scope of a border search must be limited to "investigating border crime." Appellant's Br. 43. Our court has already rejected that argument. We have held that a border search may be pretextual. *See Irving*, 452 F.3d at 123 ("[P]retext should not determine the validity of a border search."). We explained that "in the case of searches at airports, it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion, but require reasonable suspicion for searches of passengers that are suspected of criminal activity." *Id.* (citation omitted).[13] As a result, "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." *Irving*, 452 F.3d at 123. That a customs officer's search was "prompted by another federal agency is irrelevant to the validity of a border search" because the customs officer is not "prevented by the Fourth Amendment from conducting such a search merely because it furthers another federal

[13] *See also United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983) ("We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers.") (quoting *United States v. Arra*, 630 F.2d 836, 846 (1st Cir. 1980)).

agency's criminal investigation." *Levy*, 803 F.3d at 123-24; *see also Muhammad v. Ahern*, 350 F. App'x 529, 531 (2d Cir. 2009) ("[T]he appropriate issue for a Fourth Amendment challenge to a border stop is not the motive behind the stop, but the intrusiveness of the search.").

We have rejected the argument that "border searches conducted by the CBP, even at the prompting of another federal agency, should at least be confined to crimes that a statute or regulation specifically authorizes CBP to investigate." *Levy*, 803 F.3d at 124. We held instead that customs and border officers "have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties." *Id.*; *see also United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) ("[W]here customs officers are authorized to search for material subject to duty or otherwise introduced illegally into the United States and they discover the instrumentalities or evidence of crimes, they may seize the same.") (quoting *United States v. Schoor*, 597 F.2d 1303, 1306 (9th Cir. 1979)); *United States v. Alfonso*, 759 F.2d 728, 735 (9th Cir. 1985) ("It is sufficient that the search be executed under the authority and direction of those agencies having jurisdiction in safeguarding the borders.").[14]

To determine whether a search is "commensurate with its purpose," *Arizona v. Gant*, 556 U.S. 332, 339 (2009), we "balanc[e] the

---

[14] *Cf. United States v. Seljan*, 547 F.3d 993, 1004 (9th Cir. 2008) ("Seljan has not cited authority under the Fourth Amendment that required the agents to disregard evidence of other unlawful activity, even if the unlawfulness had nothing to do with transporting unreported monetary instruments.").

legitimate governmental interests against the offensiveness of the intrusion," *Ogberaha*, 771 F.2d at 657. The interest that the border-search exception serves is not limited to the detection of smuggling. "At the border, customs officials have more than merely an investigative law enforcement role. They are also charged, along with immigration officials, with protecting this Nation from entrants who may bring *anything harmful* into this country, whether that be communicable diseases, narcotics, or explosives." *Montoya de Hernandez*, 473 U.S. at 544 (emphasis added). The government must also prevent "the entry of unwanted persons." *Flores-Montano*, 541 U.S. at 152; *see Almeida-Sanchez*, 413 U.S. at 272.

**II**

Even if the Fourth Amendment does not prohibit the suspicionless search of a cellphone, the amici argue that we should hold that the First Amendment imposes its own warrant requirement for cellphone searches because "[e]lectronic device searches necessarily sweep up a great deal of expressive and sensitive information" and "necessarily implicate—indeed, they target—expressive activity."[15] We decline to do so.

As a general matter, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). Because "[c]hallenges to the reasonableness of a

---

15 Brief of Amici Curiae the Knight First Amendment Institute at Columbia University and Reporters Committee for Freedom of the Press 17-19. We granted leave for Alisigwe to cede time at oral argument to the amici to present this argument. *See* Order, *United States v. Alisigwe*, No. 24-960 (2d Cir. Mar. 12, 2025), ECF No. 59.

search by government agents clearly fall under the Fourth Amendment," which "provides an explicit textual source" for the warrant requirement, it would be surprising to discover that the First Amendment imposes its own separate warrant requirement as an implication of the freedom of speech. *Conn v. Gabbert*, 526 U.S. 286, 293 (1999). In fact, the Supreme Court has "eschew[ed] any suggestion that the standard of probable cause in the First Amendment area is different than in other contexts," and accordingly it has held that "an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." *New York v. P.J. Video, Inc.*, 475 U.S. 868, 875 (1986).[16] The general rule is that the First Amendment does not alter the standards that the Fourth Amendment prescribes based on the material to be searched.

Unsurprisingly, then, we conclude that the First Amendment does not require the government to obtain a warrant before searching a cellphone. Such a requirement would be both overinclusive and underinclusive with respect to protected speech. It would provide heightened protection to evidence of non-expressive conduct stored on a cellphone but no protection to more clearly expressive physical materials such as notebooks, diaries, pamphlets, and films. And it

---

[16] *See United States v. Syphers*, 426 F.3d 461, 465 n.1 (1st Cir. 2005) ("The assessment of probable cause is no different where First Amendment concerns may be at issue."); *United States v. Weber*, 923 F.2d 1338, 1343 n.6 (9th Cir. 1990) (rejecting "the proposition that a stricter probable cause standard should apply when first amendment values are implicated"); *White Fabricating Co. v. United States*, 903 F.2d 404, 411 (6th Cir. 1990) ("We recognize also that there is no 'higher' standard for probable cause for issuance of a warrant required in First Amendment cases such as this one.").

would conflict with the rationale for the border-search exception because the government may exclude persons from the country based on speech such as support for terrorism or terrorist organizations. We have previously held that subjecting travelers to border searches based on expressive conduct did not violate the First Amendment because the "[i]nterception and detection at international border crossings is likely the most effective way to protect the United States from terrorists and instruments of terrorism." *Tabbaa*, 509 F.3d at 103. That precedent forecloses the amici's proposal.

**A**

The amici argue that "[n]early all information exposed to border agents while searching travelers' cell phones is expressive or associative" because cellphones contain "journalists' work product; travelers' private thoughts and personal and professional associations; and digital records of travelers' whereabouts and communications."[17] But cellphones also contain information that does not receive protection under the First Amendment—such as criminal communications, bank statements, and location tracking information—that may be related to the government's interest in protecting the integrity of the border. And cellphones may contain information that—in some circumstances—would receive the protection of the First Amendment, such as terrorist propaganda, but that is nevertheless a legitimate subject of government interest when policing the border. The amici do not deny that the government has a border-related interest in searching this sort of material. And the novel warrant requirement that the amici propose would allow the government to conduct suspicionless searches of propaganda stored on CDs or written in pamphlets, of communications or bank

[17] Brief of Amici Curiae, *supra* note 15, at 19, 5.

statements on printed pages, and of travel history reflected in tickets and receipts that might be found in the traveler's luggage.

At the same time, the proposed requirement would provide no protection for more straightforwardly expressive material that the government might find in physical form. Thus, the government would be allowed to conduct a suspicionless search of a journalist's actual notebook but would need to obtain a warrant before scrolling through the "Notes" application on the same journalist's cellphone. Diaries, photographs, leaflets, newsletters, and artwork would receive no protection.

The First Amendment extends the same protection to expression regardless of the medium in which it occurs. "[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). And to comport with the First Amendment, a law must pursue legitimate ends "by means that are neither seriously underinclusive nor seriously overinclusive." *Id.* at 805. The First Amendment itself would not protect speech in as seriously overinclusive and underinclusive a manner as the amici propose.

**B**

The proposed warrant requirement based on the First Amendment would also conflict with the purpose of the border-search exception because the government has an interest in excluding persons from the country based on expressive conduct. An alien is inadmissible to the United States, for example, if he "endorses or

espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization," 8 U.S.C. § 1182(a)(3)(B)(i)(VII), or is "affiliated with the Communist or any other totalitarian party," *id.* § 1182(a)(3)(D)(i).

We have previously held that the government may permissibly burden protected expression by engaging in suspicionless searches at the border. In *Tabbaa*, the government detained and searched travelers returning from certain Islamic conferences in Canada. "Attendance at one of the Islamic conferences at issue was the sole factor that triggered the enhanced processing." 509 F.3d at 94. The travelers, who were American citizens, were not only searched extensively but also questioned about their expressive activities. "[T]hey were required to answer intrusive questions about their activities at the conference, the content of the lectures they attended, and their reasons for attending." *Id.* at 98. "[T]he searches were routine under the Fourth Amendment," *id.* at 102 n.4, were conducted without reasonable suspicion,[18] and involved about a six-hour detention "including vehicle searches, questioning, and identity verification," 509 F.3d at 100.[19]

We recognized that the searches burdened the travelers' "associational rights" to a "sufficiently 'significant'" degree "to

---

18 *See Tabbaa*, 509 F.3d at 94 ("[A]t no time did CBP have reasonable suspicion that any particular plaintiff had committed a crime or was associated with terrorists.").

19 The travelers "were directed to fill out several forms, and then were questioned about, *inter alia*, their past travels, their relationship to other vehicle occupants, what occurred at the [Islamic] Conference, and why they had attended the conference"; "were frisked, fingerprinted, and photographed, and their cars were searched"; and "officers forcibly kicked their feet open and almost knocked them on the ground in order to effectuate the pat-downs." *Tabbaa*, 509 F.3d at 94-95.

implicate the protections of the First Amendment." 509 F.3d at 102. But we held that "the government's interest in protecting the nation from terrorism constitutes a compelling state interest unrelated to the suppression of ideas, and that the [search policy] was instituted to serve this compelling state interest." *Id.* at 103. And "this interest could [not] have been 'achieved through means significantly less restrictive of [the travelers'] associational freedoms,'" *id.* (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)), because "interception and detection at international border crossings is likely the most effective way to protect the United States from terrorists and instruments of terrorism," *id.* (quoting *Tabbaa v. Chertoff*, No. 05-CV-582, 2005 WL 3531828, at *15 (W.D.N.Y. Dec. 22, 2005)).

Under our precedent, the First Amendment does not prevent the government from conducting extensive suspicionless searches at the border based on the expressive activities of American citizens. So it would not make sense to conclude that the First Amendment prevented the government from scrolling through Alisigwe's cellphone when he appeared at the border. Even if "[e]lectronic device searches necessarily sweep up a great deal of expressive and sensitive information,"[20] we have already held that routine border searches conducted without suspicion "are not *per se* unconstitutional simply because innocent U.S. citizens"—let alone criminal aliens such as Alisigwe—"were subject to enhanced processing techniques and thus experienced an indirect burden on their right[s]" under the First Amendment. *Tabbaa*, 509 F.3d at 104.

We join every other circuit to have considered the question in holding that "the border search doctrine is not subject to a First Amendment exception." *United States v. Ickes*, 393 F.3d 501, 507 (4th

---

[20] Brief of Amici Curiae, *supra* note 15, at 17.

Cir. 2005); *see also United States v. Arnold*, 533 F.3d 1003, 1006 (9th Cir. 2008) (declining to "promulgate a reasonable suspicion requirement for border searches where the risk is high that expressive material will be exposed"); *Alasaad*, 988 F.3d at 23 (declining to hold that "the presence of expressive material on electronic devices 'trigger[s] a warrant requirement'").

**III**

Alisigwe argues that the district court erred when calculating his guideline range pursuant to the Sentencing Guidelines. In his view, the district court erred by (1) calculating his offense level using the intended rather than actual loss, and (2) applying the obstruction enhancement based on his testimony at the duress hearing. "We review the sentencing court's interpretation of the Sentencing Guidelines *de novo*, but [we] review its related findings of fact only for clear error." *United States v. Potes-Castillo*, 638 F.3d 106, 108 (2d Cir. 2011).

**A**

The Sentencing Guidelines provide that the offense level of a defendant will be based in part on the amount of the "loss" associated with the offense. U.S.S.G. § 2B1.1. If the loss is between $3,500,000 and $9,500,000, the defendant will receive an eighteen-point enhancement. *See id*. § 2B1.1(b)(1)(J). At the time of Alisigwe's sentencing, the application notes to the guideline explained that the loss is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 comment. (n.3(A)(ii)) (2023).[21] The "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict" and "includes

[21] This definition now appears in the guideline itself. *See* U.S.S.G. § 2B1.1 amend. 827 (2024).

intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 comment. (n.3(A)(ii)) (2023). At sentencing, Alisigwe argued that the district court should calculate the amount of the loss based only on the actual loss, which he said was between $400,000 and $600,000. *See* App'x 405, 421-22. The district court instead relied on the intended loss of $4,500,000, which led to the eighteen-point enhancement.

Alisigwe argued that because the Supreme Court has "restricted judicial deference to an agency's interpretive rules … to those that interpret 'genuinely ambiguous' legislative rules," courts should adopt the same approach with respect to the Sentencing Guidelines and ignore the application notes if the guideline is not genuinely ambiguous. Appellant's Br. 52 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019)).

After he filed his initial brief, however, our court decided that we continue to follow the principle "that 'commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.'" *Rainford*, 110 F.4th at 475 (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993)). We explained that "the Supreme Court has not overruled *Stinson*" and that "[b]ecause the Sentencing Commission adopts the commentary alongside the guidelines, the commentary necessarily reflects the Commission's 'authoritative, expertise-based, fair, or considered judgment.'" *Id.* at 475 n.5 (citation omitted) (quoting *Kisor*, 588 U.S. at 573). In light of that principle, we specifically held that "the application note defining loss is neither inconsistent with nor a plainly erroneous reading of the guideline" and that "the guideline does not contradict the understanding

expressed in the commentary that 'loss' encompasses intended loss." *Id.* at 475.[22]

In his reply brief, Alisigwe concedes that we have "upheld the validity of the intended loss commentary to the loss guideline after *Kisor v. Wilkie* and that the claim is foreclosed in this Court." Reply Br. 22 (citation omitted). We agree.[23]

**B**

Alisigwe additionally argues that the district court erred by applying an enhancement based on his testimony at the duress hearing. Under the Sentencing Guidelines, a defendant will receive a two-level enhancement "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of

---

[22] We have since reaffirmed that holding. *See United States v. Zheng*, 113 F.4th 280, 300 (2d Cir. 2024) ("[I]t was proper for the district court to defer to the Guidelines commentary interpreting 'loss' in § 2B1.1(b)(1)."). "And we have rejected [Alisigwe's argument] a third time" and "still a fourth time." *United States v. Kukoyi*, 126 F.4th 806, 815 (2d Cir. 2025) (Menashi, J., concurring in part and concurring in the judgment) (citing *United States v. Pasternak*, No. 23-6316, 2024 WL 4763986, at *4 (2d Cir. Nov. 13, 2024); *United States v. Rech*, No. 23-6477, 2024 WL 5165454, at *1 (2d Cir. Dec. 19, 2024)).

[23] Even if we were to apply the *Kisor* framework, we would agree with those circuits that have held that the Sentencing Commission permissibly interpreted "loss" in the application notes. *See United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023) ("Applying *Kisor*'s framework, we defer to the Sentencing Commission's interpretation of 'loss.'"); *United States v. Boler*, 115 F.4th 316, 328-29 (4th Cir. 2024) ("[B]ecause a genuine ambiguity exists as to the meaning of 'loss' in Guidelines § 2B1.1 and the character of the commentary supports that it is deserving of deference, we affirm the district court's application of the commentary and its reliance on [the defendant's] full intended loss amount to calculate her Guidelines sentencing range pursuant to section 2B1.1.").

justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1.

"In reviewing the application of an obstruction enhancement, we apply a 'mixed standard of review.' Findings of fact are reviewed for clear error, and legal conclusions such as 'a ruling that the established facts constituted obstruction or attempted obstruction under the Guidelines' are reviewed *de novo*." *United States v. Strange*, 65 F.4th 86, 88-89 (2d Cir. 2023) (emphasis added) (citation and alteration omitted) (quoting *United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003)).

"[I]n order to base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). "[A] general finding of obstruction that tracks those factual predicates necessary to support a finding of perjury will suffice." *United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993).

The district court did not clearly err by finding that Alisigwe committed perjury. Alisigwe's testimony that threatening strangers forced him to commit crimes was "preposterous." App'x 426. The district court explained that "[e]ven if there is a germ of truth that there were some threats against Mr. Alisigwe to get him initially involved or to keep him participating in the crime, the story he told during the duress hearing was absolutely preposterous. Whatever germ of truth there was in that testimony got lost in just out-of-mouth fiction, and it was told precisely to obstruct these proceedings." *Id.* at

430. As the Probation Office explained, "The only evidence of these threats is Alisigwe's own testimony, and all other evidence shows that the claim was false." PSR ¶ 17. The communications on Alisigwe's cellphones showed that he "was friendly with his co-conspirators, having daily personal conversations, talking about women, and attending parties," and that he "had a relationship of trust and confidence with the other conspirators." *Id.* He had "multiple encounters with federal law enforcement authorities" during the scheme but "never sought help or assistance; instead, he lied to investigators to try to prevent them from learning about the scheme." *Id.* And "[d]espite making hundreds of thousands of dollars from the scheme," Alisigwe never "spent any of that money to help his mother escape the alleged threats." *Id.*

Alisigwe claims that "the court failed to make specific findings as to what, precisely, was false in Alisigwe's story and whether the falsehoods were material and willful." Appellant's Br. 60. But the district court explained that it found "the whole story" to be false: that "total strangers called and he had no idea who they were," that he did not know the name of "[t]he other person that he was working with," and that he and the other person "would randomly meet in Flushing Meadow Park and hand off cash between them." App'x 426.

The district court concluded that the false testimony was both willful and material. The district court described the testimony as "out-of-mouth fiction … told precisely to obstruct these proceedings." *Id.* at 430. That means it was willful. "Although the District Court did not use the words 'willful,' 'willfully,' or 'willfulness' at the sentencing hearing, we do not read our precedent to require the use of magic words at sentencing." *United States v. Dundon*, 349 F. App'x 588, 590 (2d Cir. 2009). The purpose of the "proceedings" that the testimony aimed to "obstruct" was for

Alisigwe to offer testimony that would "tend to influence or affect" his ability to establish a defense of duress. U.S.S.G. § 3C1.1 comment. (n.6). That means the false testimony was material. Because the district court did not clearly err in finding that Alisigwe committed perjury, it properly applied the two-level obstruction enhancement.

## CONCLUSION

Routine searches at the border are reasonable simply because those searches occur at the border. Because the search of Alisigwe's cellphone was a routine search, the government was entitled to conduct the search without suspicion. Neither the Fourth Amendment nor the First Amendment creates a special exemption from the border-search exception for cellphones. Accordingly, the motion to suppress was properly denied. The district court also did not err in its guidelines calculation. We affirm the judgment of the district court.