EUNICE C. LEE, *Circuit Judge*, concurring in the judgment:

The border-search rationale as an exception to the Fourth Amendment prohibition against warrantless searches and seizures was aimed primarily at the right of the federal government to search the person and personal effects of those entering the country, for the purpose of controlling the admission of contraband and persons not lawfully permitted admission. At the time of its creation, no item remotely comparable to the modern cellphone existed or was contemplated as a target of search. Today, despite a cellphone's dissimilarity to the types of property for which the exception was created, the majority holds that law enforcement may search through the data on any international traveler's cellphone—perhaps the single most comprehensive, sensitive and closely-guarded repository of a person's private information and data—with *no* suspicion and for any reason (including political or discriminatory ones), without implicating constitutional rights. While I agree that neither a warrant nor probable cause is necessary to search a cellphone at an international airport, which is the only basis on which Alisigwe seeks suppression of the evidence seized as a result of the cellphone searches in this case,[1] I disagree with the majority's additional and broad conclusion that such

[1] The district court concluded that the search of Alisigwe's cellphone required reasonable suspicion, rather than probable cause, and that the reasonable suspicion

searches are "routine," requiring neither reasonable suspicion, nor any other kind of individualized suspicion. Accordingly, I concur only in the court's judgment.

A standard that permits a search of every international traveler's cellphone without suspicion means that any person who goes on vacation or a business trip anywhere outside the country can be subject, upon their return home, to review of their medical records, financial information, personal messages, internet search and viewing habits, location tracking, and any other private information that may be contained on their cellphone through stored data, apps, or cloud connection. Under the majority's view, law enforcement at an international airport, whether it is TSA, Customs and Border Protection, or ICE, has unlimited power to review the data on any traveler's cellphone. This unrestricted authority to search is not a carefully-crafted exception to the Fourth Amendment to address an immigration or contraband-related interest in controlling who or what comes into the country; it eliminates Fourth Amendment protections in this context.

---

standard was satisfied. On appeal, Alisigwe does not challenge the finding of reasonable suspicion, but instead argues only that the search required a warrant and probable cause. Thus, consideration of whether reasonable suspicion or some other individualized suspicion was necessary did not have to be ruled upon in this case. "As a general rule courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach." *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976).

Though many courts have held to the contrary, I do not think we should so readily interpret the Fourth Amendment to accept the further (and seemingly inexorable) diminishment of our privacy by way of suspicionless cellphone searches at the border.

I.

Routine searches at the border of items like luggage and clothing require neither a warrant nor probable cause. *United States v. Ramsey*, 431 U.S. 606, 619 (1977). The government has the right "to conduct so-called 'routine' searches at the border even without 'reasonable suspicion that the prospective entrant has committed a crime.'" *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015) (quoting *Tabbaa v. Chertoff*, 509 F.3d 89, 97–98 (2d Cir. 2007)). But a more "invasive," non-routine search at the border requires reasonable suspicion. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006); *see also Tabbaa*, 509 F.3d at 98. Thus, the critical question for determining whether reasonable suspicion, or any level of suspicion, is required for law enforcement to search an individual's cellphone at an international airport is whether such a search should be deemed "routine."

In answering this question, it is "the level of intrusion into a person's privacy [that] determines whether a border search is routine." *Irving*, 452 F.3d at 124. *Irving*

offers examples of routine searches, listing searches of items—outer clothing, luggage, a purse, wallet, pockets, or shoes—that "do not substantially infringe on a traveler's privacy rights." *Id.* at 123. Searching a piece of luggage is easily labeled routine; searching what is effectively a portable computer with voluminous amounts of personal data is not. The exponentially greater storage capability of modern cellphones, and the troves of private and intimate information they may contain, makes a comparison of them to a suitcase untenable. Simply labeling a cellphone as "property," to dispense with any requirement of suspicion for its search, denies a fundamental reality of the modern cellphone—it is not a suitcase.

The extraordinary uniqueness of a cellphone as an object of search was well understood and emphasized by the Supreme Court in *Riley v. California*, 573 U.S. 373 (2014), in which the Court was called upon to consider whether the contents of a cellphone could be searched incident to a lawful arrest without a warrant. The relevance of *Riley* is not in any application of its legal holding, but rather in the Court's recognition that a cellphone should not be treated like the average item that could be carried on someone's person. The Court concluded that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 393. The Court rejected

the attempt to compare a search of a cellphone to a search of these items because claiming such searches to be "materially indistinguishable," is "like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Id.*

The Court recognized in *Riley* that the dramatically greater storage capacity[2] and the qualitatively distinct nature of the data that can be accessed through cellphones, including highly private information about an individual's personal thoughts and behaviors, make them distinct from other items found on someone's person or in their possession, and the Court treated this distinction as meaningful. *See id.* at 393-94. Moreover, the fact that people's cellphones are generally continually on their person or in their presence further distinguishes them from a suitcase or a vehicle or other types of property in which information could be contained and for which a search might be deemed routine. "While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time." *Carpenter v. United States*, 585 U.S. 296, 311 (2018) (observing that cell-

[2] *Riley* highlighted that, in 2014, the then-current top-selling smartphone had a standard storage capacity of 16 gigabytes, expandable up to 64 gigabytes. 573 U.S. at 394. Today, the top-selling smartphones have standard storage capacities starting at 256 gigabytes, expandable up to 2,000 gigabytes (2 terabytes). *See, e.g.*, Brenda Stolyar, *The Best Smartphones*, The New York Times (Apr. 3, 2026), available at https://www.nytimes.com/wirecutter/reviews/best-smartphones [https://perma.cc/5L6V-ESDE].

site information obtained from a person's cellphone presents greater privacy concerns than the GPS monitoring of a car). Indeed, "a cell phone—almost a 'feature of human anatomy,'—tracks nearly exactly the movements of its owner." *Id.* at 311 (citation modified) (quoting *Riley*, 573 U.S. at 385); s*ee also Chatrie v. United States*, 146 S. Ct. 2193, 2209-10 (2026) (finding that cellphone users have a reasonable expectation of privacy in their location data because even short-term location information "reveals private matters" deserving of protection from government intrusion).

These fundamental truths about the unparalleled ability of a cellphone search to invade an individual's privacy should be considered when determining whether the searches of these devices at an airport are "routine."

Our prior caselaw analyzing the border-search exception and applying it to conclude that reasonable suspicion is not required for "routine" searches of suitcases, notebooks, and the like does not provide meaningful guidance on the question of whether the search of a cellphone is routine. Indeed, when this court decided *Irving* in 2006, the first iPhone had not yet been released, and a year later in 2007, only about 4% of American adults even owned a smartphone. Adrian F. Ward et al., *Brain Drain: The Mere Presence of One's Own Smartphone Reduces*

*Available Cognitive Capacity*, 2 J. ASS'N FOR CONSUMER RSCH. 140, n.1 (2017); *see also Mobile Fact Sheet*, PEW RSCH. CTR. (Nov. 20, 2025), available at https://www.pewresearch.org/internet/fact-sheet/mobile [https://perma.cc/57DC-8JDS] (indicating that in 2025, 91% of American adults owned a smartphone). Thus, it is not surprising that *Irving's* analysis focusing on traditional, tangible property does not easily translate to an item like a cellphone and its data, which are dramatically different from the luggage and its contents that were at issue there. 452 F.3d at 124.

But to the extent that *Irving* sheds light on the question of searches of electronic storage items, such as cellphones, it recognized that such searches might not be routine. *See id.* Despite giving the specific example of only a strip search as one that is clearly non-routine, the court recognized—years before the widespread use of smartphones—that searches of data storage devices might not be routine. *Id.* at 123. Although the court concluded without difficulty that the search of the defendant's luggage was routine and thus did not require reasonable suspicion, it was less willing to so label the secondary search of the camera film and 3.5-inch computer disks found within Irving's luggage. *Id.* at 123-24. Instead, after explaining how a non-routine search is "valid under the Fourth Amendment . . . if

it is supported by reasonable suspicion," *id.* at 124, the court painstakingly described the evidence to justify the search of those data storage items, ultimately concluding that because the searches of those items "were supported by reasonable suspicion, we need not determine whether they were routine or non-routine." *Id.*

Moreover, by acknowledging the possibility that a search of an electronic data storage device such as a computer disk might be non-routine, *Irving* also implicitly rejected the notion that it is *only* strip searches that are non-routine. *See id.* While it is true that strip or body-cavity searches are the clearest examples of a non-routine search, we have avoided holding that they are the only category of searches that are so invasive as to be non-routine. *See Levy*, 803 F.3d at 123 n.3 (noting that "[l]ike the Supreme Court, we have suggested that the label 'non-routine' *should generally* be reserved for intrusive border searches of the person" but declining to decide whether searching and copying a notebook found within the defendant's luggage was non-routine) (citation omitted) (emphasis added).

Indeed, although strip and body-cavity searches may be the most intrusive and personally odious forms of search, they are not the only invasions of privacy worthy of protection. The personal data stored on a cellphone allows for the

reconstruction of "[t]he sum of an individual's private life." *Riley*, 573 U.S. at 394. The expansive probing into a person's private thoughts and confidential information that can result from a cellphone search, including medical and financial records, internet browsing history, location tracking, personal messages, photos, and memos, is something that most people, in fact, would find to be an extreme invasion of their privacy. *See United States v. Smith*, 967 F.3d 198, 207 (2d Cir. 2020) (noting that the "'search and seizure of digital media is, in some ways, distinct from what has come before' the advent of personal electronic storage and communication devices" in part because of the "vast quantities of irrelevant private material" they contain) (quoting *United States v. Ganias*, 824 F.3d 199, 218 (2d Cir. 2016) (*en banc*)).

Intrusiveness can occur not just from the nature of the search itself but from the breadth of what is recovered from the search. The line between what is routine and what is non-routine may not always be clear, and "[t]here is, of course, a good deal of distance between strip and body cavity searches near one end of the spectrum and a search of pockets or outer clothing near the other." *Tabbaa*, 509 F.3d at 98. But while a cellphone search may not be as physically intrusive as a strip search, it is much closer on the spectrum to a strip search than it is to the search of

luggage because of the amount of information it reveals. An unrestricted and suspicionless search of a cellphone is intrusive enough to warrant greater protection than the majority gives it today—which is none.

II.

When determining the scope of an exception to the warrant requirement, the Supreme Court looks to the nature of the justification underlying the exception to set its boundaries. *See Riley*, 573 U.S. at 385-91; *accord, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 351 (2009). Because the border-search exception is premised on the traditional grounds of controlling immigration and the bringing of contraband items into the country, it does not comfortably fit as a justification for broad, suspicionless searches of cellphones and their data.

The Supreme Court has explained that "[a]bsent more precise guidance from the founding era,"—plainly absent here given what would have been the unfathomable nature of a cellphone—we determine whether a certain type of search is exempt from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Riley*, 573 U.S. at 385 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300

(1999)). With regard to the border-search exception, it "is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Ramsey*, 431 U.S. at 620. In light of the government's heightened interest in territorial integrity at the international border, and the concomitant lessened expectation of privacy at the border, *see United States v. Flores-Montano*, 541 U.S. 149, 152–154 (2004), courts have readily—and I believe correctly—concluded that neither a warrant nor probable cause is required to search a cellphone at the border. However, non-routine searches may require reasonable suspicion and, as discussed above, not only are cellphone searches not routine, but they also do not implicate the type of sovereign interests that prompted the border-search exception.

The governmental interests at which the border-search exception is aimed—the who and what may enter—are those pertaining to the admissibility and entry of noncitizens and the carrying of dangerous or illegal items into the country. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 544 (1985) (noting that customs and immigration officials are tasked "with protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives"); *Ramsey*, 431 U.S. at 618 ("Travellers may be so

stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in."). While these are not the only legitimate governmental interests, they are the ones animating the border-search exception. Permitting suspicionless searches of cellphones, a substantial intrusion into one's privacy, does not align well with the exception's purposes.

A cellphone, and more specifically its data, is not like other property in that it cannot carry contraband of the traditional kind at which the border-search exception is targeted. *See Montoya*, 473 U.S. at 537 (noting that "Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country"). Digital data stored on a cellphone is not "carried" across a border in any real sense. Unlike tangible property, digital data has no fixed or necessarily identifiable physical location.[3] The government's border-search interest in

[3] Through "cloud" computing, a single body of data may be distributed across servers in multiple jurisdictions, accessible in any number of locations simultaneously, and transmitted between them even without the user's knowledge or control. Digital data is thus intangible, ubiquitous, and capable of movement in unpredictable ways all around

preventing contraband from *entering or exiting* the country is inherently tied to the contraband's physicality—a quality digital data lacks. *See* Orin Kerr, *The Digital Fourth Amendment: Privacy and Policing in Our Online World* at 123 (2025). This intangibility makes it hard to see how policing the "entry" of digital data at a border checkpoint advances the governmental interests underlying the border-search exception: preventing the *entry* of contraband and unauthorized persons.

To the extent that there is a potential for digital devices to include so-called digital contraband, that risk also does not justify the suspicionless search authority that the majority's opinion endorses. Notwithstanding that digital contraband is largely untethered to its physical location, the example generally offered of digital contraband that can be "found" at the border within a cellphone's data is child sexual abuse materials. It is true that, theoretically, such material could be discovered on any cellphone of any person, but that possibility should not provide a justification for searching every cellphone at the border. *See, e.g.*, *United States v. Cotterman*, 709 F.3d 952, 966 (9th Cir. 2013) (describing the important safety concerns regarding the government's authority to protect the nation from

---

the world in any instant. *See* Orin Kerr, *The Digital Fourth Amendment: Privacy and Policing in Our Online World* at 122–125 (2025); *see also* Jennifer Daskal, *The Un-Territoriality of Data*, 125 Yale L.J. 326, 366 (2015).

contraband at the border but also noting that "legitimate concerns about child pornography do not justify unfettered crime-fighting searches or an unregulated assault on citizens' private information"). In fact, the same universal possibility of discovery exists with regard to the tangible contraband that is the subject of every strip or body-cavity search; it could be found on any person. However, that does not make a strip search routine and obviate the need for reasonable suspicion. Again, the question is the intrusiveness of the search in determining whether it requires reasonable suspicion. *See Irving*, 452 F.3d at 123–24.

Insofar as searches of cellphone data could help the government identify criminal actors who seek to enter the country, that general goal of identifying and prosecuting wrongdoers also has little connection to the underpinnings of the border-search rationale. While it is true that "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive," *id.* at 123, allowing a suspicionless search of a cellphone, given the disconnect with the exception's rationale, does not seem warranted. "Because searching [digital data] advances a criminal law enforcement interest, not a border concern, it should be treated under traditional Fourth Amendment rules." Kerr, *The Digital Fourth Amendment* at 123.

When considering the governmental interest in controlling the admission of noncitizens, the strength of the interest and the efficacy of allowing suspicionless searches of the data on any person's cellphone as a means of preventing unlawful entry, when weighed against the privacy intrusion, is unclear. First, independent of the Fourth Amendment, there is a complex panoply of immigration law that addresses issues of entry and admissibility, including which rights may or may not apply to noncitizens of varying statuses and ties to the United States. *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) (noting the "ascending scale of rights" a noncitizen may be afforded "as he increases his identity with our society"); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (noting that a noncitizen's "constitutional status" rises as his "ties" to the country increase). As we have cautioned before, this "infinitely complex area . . . requir[es] us to approach the subject carefully, one step at a time." *Kuhali v. Reno*, 266 F.3d 93, 98 (2d Cir. 2001).

Second and relatedly, although the government may have good reason to probe the admissibility of a particular visa holder, that interest does not extend to a clear holder of a U.S. passport. Thus, there is no all-inclusive immigration enforcement interest justifying suspicionless searches at the border, regardless of the status of the travelers and the circumstances of their entrance. The government

has no legitimate interest, for instance, in denying admission to its own citizens or nationals. *See, e.g.*, *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001) (describing citizenship as including "the full protection of the United States, [and] the absolute right to enter its borders").

Finally, the fact that the modern cellphone permits a greater and more intense level of scrutiny of people's private information than was possible previously is not an inherent reason to allow such searches, in the name of policing noncitizens, given the need "to ensure that the 'progress of science' does not erode Fourth Amendment protections." *Chatrie*, 146 S. Ct. at 2217 (quoting *Carpenter*, 585 U.S. at 320 (citation modified)). These complex factors warrant a more thorough and case-by-case consideration before concluding that prevention of unlawful entry justifies the elimination of a suspicion requirement to search anyone's cellphone at the border.

III.

Neither the Supreme Court nor our court has spoken directly to the consideration of digital data in the context of the border-search exception, but given the significant privacy interests at stake, there is reason to tread with caution in dispensing with the requirement of *any* suspicion prior to a search. *See Irving*,

452 F.3d at 124 (hesitating to label the search of a computer disk recovered from a traveler at the border as routine). And one such reason can be found in the prevalence of statutes designed to protect data privacy.

Indeed, Congress has repeatedly determined that certain categories of information commonly found on cellphones are sufficiently sensitive to warrant statutory restrictions on government access—restrictions that operate independently of the constitutional safeguards imposed by the Fourth Amendment. For example, the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710 (1988), prevents the disclosure of information identifying a person as having requested or obtained particular video materials or services. These same viewing habits, and far more, can be discovered by accessing a person's cellphone, invoking privacy issues comparable to those targeted by the VPPA.

As another example, Congress expressed similar concerns when it enacted the Electronic Communications Act of 1986, which was intended to protect the privacy of people's electronic communications more generally. *See* S. Rep. No. 99-541, at 2 (1986), *reprinted in* U.S.C.C.A.N. 3555, 3556 (indicating Congress's concern that existing constitutional privacy doctrines have not kept pace with rapid technological changes). Congress concluded that additional statutory safeguards

were necessary to protect "the security and privacy of business and personal communications." *Id.*; *see also id*. S. Rep. No. 99-541, at 8-11 (1986), *reprinted in* U.S.C.C.A.N. 3555, 3562-65 (surveying the diverse types of new telecommunications and computer technologies covered by the Act, including communications sent via cellphones, email, and social networks). And it offered a prescient warning: that "the law must advance with the technology to ensure the continued vitality of the [F]ourth [A]mendment" because "[p]rivacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances." *Id*. at 5. It is difficult to reconcile these legislative judgments with the proposition that the same kinds of digital communications, as well as other types of statutorily-protected and sensitive information, such as medical and financial records, when found in large volumes on a cellphone at the border, become no more than the digital equivalent of papers in a suitcase. Indeed, under no circumstances could a suitcase search reveal the sum of a person's digital viewing habits, electronic communications, personal health history, and finances.

These examples are offered not only to highlight the importance of digital privacy concerns, but also to demonstrate why we should be hesitant to assume the government's interests at the border automatically supersede these protected

privacy interests. Congress's considered judgment reinforces the Supreme Court's instruction to "tread carefully" when considering technological advancements. *Carpenter*, 585 U.S. at 316. The Court "[w]hen confronting new concerns wrought by digital technology . . . has been careful not to uncritically extend existing precedents." *Id.* at 318. Accordingly, we should be wary of converting the border-search exception—developed in an era of trunks, suitcases, and other physical containers—into a categorical rule that renders every search of every cellphone at the border "routine," regardless of the nature of the information examined, or the intrusiveness of the search method.

IV.

Lastly, the majority takes an expansive view of the scope of what is before us with respect to its analysis of the First Amendment. Although resolution of this appeal does not require us to reach the First Amendment theory advanced solely by the amici, the Knight First Amendment Institute at Columbia University and Reporters Committee for Freedom of the Press, the majority takes on this argument and concludes that the First Amendment does not provide an independent basis to challenge a search pursuant to the border-search doctrine. Because I do not

believe that this issue is properly before us, I do not think that we should address it.

Alisigwe did not raise a First Amendment challenge on appeal to the border searches of his cellphones. Nor did the parties raise below or the district court decide a First Amendment claim. The First Amendment theory entered this appeal through the amici, whose brief raised various constitutional concerns about speech, association, press freedoms, and source confidentiality. While amici raise important First Amendment interests that warrant careful consideration in an appropriate case, they are not the basis of any claim Alisigwe presented as an independent ground for reversal.

That matters. Courts ordinarily decide issues presented by the parties, not broader constitutional theories introduced by amici. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001) ("Although an amicus brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues into an appeal, at least in cases where the parties are competently represented by counsel."); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 127 n.5 (2d Cir. 2001) (same); *see also* 16AA Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3975.1 (5th ed. 2026) ("In

ordinary circumstances, an amicus will not be permitted to raise issues not argued by the parties."). *See generally United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation . . . . [I]n both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).

That restraint is especially appropriate here because the majority reaches and decides an unpresented constitutional theory, even though the appeal can be fully resolved on Fourth Amendment grounds. *See Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 184 (1999) ("It is . . . an established part of our constitutional jurisprudence that we do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground."). Nonetheless, the majority broadly opines on the First Amendment issues raised by the amici. Because the Fourth Amendment analysis is sufficient to affirm, I would leave that constitutional theory for a case that properly presents it.

* * *

"The Fourth Amendment must, as ever, protect against unjustified governmental intrusion on the privacy of the individual." *Chatrie*, 146 S. Ct. at 2193. Allowing suspicionless searches of cellphones at the border undermines the essential privacy principles the Fourth Amendment was intended to protect, and we should hesitate in creating rules that further weaken this cherished constitutional protection.